Michael D. Kimerer, #002492
Lori L. Voepel, #015342
Kimerer & Derrick, P.C.
221 East Indianola Avenue
Phoenix, Arizona 85012
Telephone: 602/279-5900
Facsimile: 602/264-5566
Attorneys for Petitioner

FILED _____ LODGED _____
RECEIVED _____ COPY _____

2002 JUN 11   PM 6: 46

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

07-99001

| | | |
|---|---|---|
| DEBRA JEAN MILKE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. CV-98-0060-PHX-RCB |
| v. | ) | |
| | ) | |
| TERRY STEWART, et al., | ) | |
| | ) | |
| Respondent. | ) | |
| ——————————————— | ) | |

### PETITIONER'S BRIEF ON THE MERITS
### TO PETITION FOR WRIT OF HABEAS CORPUS
### PURSUANT TO 28 U.S.C. § 2254



## TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Arguments on the Merits

I.   The Overreaching Tactics of Phoenix Police Detective
     Armando Saldate denied Petitioner's Rights Against
     Self-Incrimination, Due Process, a Fair Trial, and a Just
     Sentencing Determination in Violation of the Fifth, Sixth,
     Eighth and Fourteen Amendments to the United States
     Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     A.   The Interrogation Methods Employed By Police
          Armando Saldate Rendered the Results of His
          Interrogation of Debra Milke Unreliable and Violated
          Debra Milke's Right to Due Process . . . . . . . . . . . . . . . . . . 21

     B.   Detective Saldate's Prior History Illustrates a Pattern
          of Unprofessional Conduct and Overreaching Tactics,
          which Violate the United States Constitution and
          Produce Unreliable Results . . . . . . . . . . . . . . . . . . . . . . 32

          1.   Detective Saldate has an Affinity for Questioning
               Injured and Mentally Impaired Suspects . . . . . . . . . . . . . 33

          2.   Detective Saldate has Demonstrated his Utter
               Disregard for *Miranda v. Arizona* . . . . . . . . . . . . . . . . 36

          3.   Detective Saldate has a History of Lying to the Grand
               Jury in Order to Secure Indictments . . . . . . . . . . . . . . . 40

          4.   Detective Saldate has a History of Corrupting and
               Misusing the Outcomes of Line-Up Identifications . . . . . . . . 41

          5.   Detective Saldate has Previously Been Accused of
               Fabricating Confessions . . . . . . . . . . . . . . . . . . . . . 41

i

C. The Evidence Establishes that Detective Saldate Essentially Fabricated Petitioner's Purported Confession in Violation of her Constitutional Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

D. Detective Saldate's Interview Techniques Also Acted to Bias Witnesses Against Petitioner and Denied Her Right to a Fair Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

 1. Richard Sadeik . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

 2. Sandra Pickinpaugh . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

 3. Renate Janka (Debra's Mother) . . . . . . . . . . . . . . . . . . . . . . . 61

 4. Ernie Sweat (Debra's recent boyfriend) . . . . . . . . . . . . . . . . . . . 62

 5. Henry Milke (Debra's father-in-law) . . . . . . . . . . . . . . . . . . . . 63

E. Detective Saldate's Improper Techniques Tainted the Entire Trial in Debra's Case, Depriving her of Due Process of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

II. Defense Counsel was so Deficient in his Representation of Debra Milke During Her Trial and Sentencing as to Deny Her Right to Effective Assistance of Counsel in Violation of the Sixth Amendment (Claim VI (in part)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

A. Trial Counsel's Overall Investigation of Debra's Case Was So Deficient That Debra was Substantially Prejudiced by his Performance (Claim IV(A)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

 1. Trial Counsel Failed to Follow up on Petitioner's Information that Rosemary Houston Would be a Good Witness (Claim IV(4)(A)(3)) . . . . . . . . . . . . . . . . . . . . . . . . 68

 2. Trial Counsel Failed to Investigate Petitioner's Past and as, a Result, Failed to Locate Witnesses who would have been Willing to Testify on Petitioner's Behalf (Claim VI(A)(4)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

 3. Trial Counsel Failed to Interview Member of Petitioner's Family Prior to Trial (Claim IV(4)(A)(7)) . . . . . . . . . . . . . . . . . . 72

 4. Trial Counsel Made only Cursory Efforts to Obtain Impeachment Information Relating to Petitioner's Family Members who were Witnesses Against Her (Claim IV(4)(A)(8) . . . . . . 74

5.   Trial Counsel Failed to Obtain Petitioner's and the Victim's Medical and School Records (Claim IV(4)(A)(9)) . . . . . . . . . . . . . . . 75

B.   Trial Counsel's Investigation and Cross-Examination of Material Witness Armando Saldate was so Deficient that Debra was Significantly Prejudiced (Claim IV(B)) . . . . . . . . . . . . . . . 77

C.   Trial Counsel Prepared a Deficient Motion to Suppress, and his Conduct at the Voluntariness Hearing was so Incompetent as to be Ineffective Assistance of Counsel (Claim IV(E)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

D.   Trial Counsel Failed to Investigate or Present the Ample Mitigation Evidence Available in Debra's Case (Claim IV (G) . . . . . . . . 86

1.   Trial Counsel Made No Effort to Secure the Presence of Petitioner's Motion until the Day Prior to the Sentencing Hearing (Claim IV(G)(2)) . . . . . . . . . . . . . . . . . . . . . 88

2.   Trial Counsel Failed to Secure Petitioner's Records or Gain a Complete Social, Medical, or Psychological Evaluation of Petitioner (Claim IV(G)(3)) . . . . . . . . . . . . . . . . . . 89

3.   Trial Counsel Failed to Investigate Petitioner's Difficult Childhood and Prior Home Life (Claim IV(G)(6)) . . . . . . . . . . . . . 92

4.   Defense Counsel was also Ineffective for Failing to Provide Evidence of Petitioner's Close Family Ties Claim IV(G)(8)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

III.   Petitioner was Denied Effective Assistance of Appellate Counsel Under the Sixth Amendment for Failing to Argue the Voluntariness Issue on Direct Appeal (Claim VIII) . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

IV.   The Errors of the Trial Court in the Conduct of Debra's Trial Infringed Upon her rights to Due Process and a Fair Trial in Violation of the Fifth and Fourteenth Amendments to the United States Constitution (Claim III (in part)) . . . . . . . . . . . . . . . . . . . . . . . 99

A.   The Trial court Erroneously Struck, for Cause, Potential Jury Moquino . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

V.   The Arizona Supreme Court Violated the Eighth and Fourteenth Amendments by Relying on Constitutionally Insufficient Limiting Constructions of a Facially Vague Statutory Aggravating Circumstance (Claim X) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

A.  A Death Sentence Predicated Upon a Finding That the Offense was "Heinous . . . or Depraved" Under A.R.S. § 13-703(F)(6) Violates the Eighth and Fourteenth Amendment Unless That Aggravating Circumstances has been Given a Constitutionally Sufficient Limiting Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

B.  The "shockingly evil" limiting construction of heinous . . . or depraved" is vague and overbroad . . . . . . . . . . . . . . . . . . 106

C.  The "senselessness" limiting construction of heinous . . . or depraved" is vague and overbroad . . . . . . . . . . . . . . . . . . 107

VI.   The Arizona Death Penalty Statute Fails to Genuinely Narrow the Class of Persons Eligible to Receive the Death Penalty (Claim V(C))  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

VII.   Debra Milke Was Denied Her Right, Under the Fourteenth Amendment to the United States Constitution, to Equal Protection of the Law When she was Denied a Jury Trial on Aggravating Factors in a Capital Case While Defendants in Non-Capital Cases Have Juries to Determine Aggravating Factors (Claim VII)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

VIII.   The Aggregate of Errors in Debra's Trial, Sentencing and Appeal Violated her Fourteenth Amendment Rights Guaranteed to Her Through the United States Constitution (Claim XI (in part)) . . . . . . . . . . . . . . . . . . . . . . . . 119

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Certificate of Mailing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

## STATEMENT OF THE CASE

### I.    PRELIMINARY STATEMENT

Petitioner Debra Milke is innocent of the crimes for which she has been convicted and sentenced to die.  The State's entire case against her was founded upon a purported "confession," which never occurred.   To date, justice, in the form of a full and fair hearing of the issues, has been denied Debra Milke at every stage of the judicial process.  Multiple errors occurred in her trial and on appeal due to the fallibility of the key individuals who investigated, prosecuted, judged and defended this case.  And because the system is weighted so heavily toward sustaining prior decisions, these errors continued to go unchecked in the post conviction review process.  *See Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997)(case remanded for retrial after *en banc* consideration "because of the exceptional importance of the issues concerning whether the state may execute an individual whose guilt is shrouded by doubt and who has raised serious claims of constitutional error at trial.").

Before ever meeting or speaking with Debra Milke, Detective Armando Saldate was convinced of her involvement in the murder of her son.  His early rush to judge Petitioner caused him to ignore the procedural safeguards intended to protect her rights and to ensure the accuracy and reliability of his investigations.  The resulting "confession" by Debra was gained in a thirty minute interview without benefit of a witness, an audio or video tape recording, or a signed statement.   Worse, Detective Saldate destroyed his contemporaneous notes of the interview.  Nothing exists to corroborate his contention that Petitioner confessed.   She adamantly and consistently denies that she ever confessed to this crime.   The failure to suppress Petitioner's statement under these conditions amounts to constitutional error of the first magnitude.

Without other evidence to link Petitioner to her son's murder, this illusory confession became the backbone, the very foundation, of the State's case against Debra.  The lack of direct

evidence against Debra also rendered her character a critical issue for the jury.   Unfortunately, within five hours of the discovery of the child's death, Armando Saldate was touting Petitioner's "confession" to the murder to her family and friends, the character witnesses who were ultimately used  against her.  Armando Saldate's early judgment of Debra's guilt permeated and tainted the entirety of subsequent proceedings.  Thus, one police officer was able to have an incredible impact on the outcome of this case.

In addition, the pressure to "win" this case was intense.  Chris was a four year old boy, executed while thinking he was on his way to see Santa Clause.  A prosecutor's main priority must be to "do justice," but in a case such as this, the temptation to sacrifice that priority to "get the win" was overwhelming.  This particular prosecutor has established in another high profile murder case that constitutional barriers do not interfere with his goal of winning the case.  *See State v. Krone*, 182 Ariz. 319, 321, 897 P.2d 621, 623 (1995)(*en banc*).

The trial court's rulings in this case were in error.  For example, the court erred in striking potential juror Moquino for cause.   As a result of the errors of the trial court, Petitioner was denied due process of law.

Petitioner's trial counsel was also ineffective in violation of the Sixth Amendment. Defense attorneys are merely human and despite their best efforts, egregious error, fatal to a trial, sentencing or an appeal can occur.  Here, defense counsel failed to have Debra testify in the critical voluntariness hearing.  He failed to properly investigate the case or to adequately prepare to cross-examine Detective Saldate.  He did nothing to investigate or impeach the other critical witnesses in this case.  Counsel's key discovery request regarding Detective Saldate was late and insufficient.  Further, trial counsel failed to raise a meaningful defense on Petitioner's behalf or to investigate and present at sentencing the ample mitigation evidence available.  No good reasons or strategy exist to excuse such meaningful failures.

Petitioner's counsel raised very few issues on direct appeal.  His failure to recognize and preserve the voluntariness issue, among other issues, also denied Petitioner her right to effective assistance of counsel and grossly prejudiced her.

These are but few of the issues deserving of attention by this Court in this Habeas Corpus proceeding.  Other constitutional challenges to Petitioner's convictions and sentences exist and are addressed below as well.

"Execution is the most irremediable and unfathomable of penalties."  *Ake v. Oklahoma*, 470 U.S. 68, ___ (1985) (Burger, C.J., concurring).   Our Supreme Court has therefore **"demanded** *that fact finding procedures aspire to a heightened standard of reliability."   Id.* (emphasis added).  Because "death is different," Petitioner prays that this Court will evaluate with scrutiny her trial, appeal, and post conviction proceedings.  The evidence of actual guilt in this case is non-existent.  There was no physical evidence linking Petitioner to the crime.  Neither of her co-defendants testified against her, and one swears to this day that she is innocent.  The State's theory that Debra wanted her son killed so she could marry a recent boyfriend was simply not borne out by the evidence.  Nor was its theory of pecuniary gain, evidence of which was found not to exist by the Arizona Supreme Court on direct appeal.

Debra's conviction hangs on a tainted, unverifiable "confession" and character witnesses moved by that purported confession and the assurances by police that they had solved the crime. In a civilized society, the state sponsored taking of human life cannot be allowed to rest on such flimsy evidence.

## II.    FACTS

On October 2, 1985, Christopher Milke was born to Debra (Sadeik) Milke and Mark Milke. (See Social History, attached as Exhibit 1 at 48).[1]  During the course of Chris' short life, his mother acted primarily as a single parent. (Reporter's Transcript, hereinafter "R.T." 10/1/90 at 34-38; Exhibit 1 at 50-90).  Her marriage to Mark was tumultuous from its inception due to his "wild man" ways and his drug and alcohol related problems. (Id.)  Mark was incarcerated for DUI shortly after Christopher was born. (Id. at 48).  Although Petitioner and Mark tried repeatedly to make their marriage work, their widely divergent values made it impossible. (Id. at 50).

Petitioner was the oldest of two daughters of a career military man, Richard "Sam" Sadeik and his German wife, Renate.  Debra was a law abiding, successful young woman who attended community college and was productively employed before she was eighteen years old. (R.T. 10/1/90, pp. 11-12).  Although her father had a long history of alcohol abuse, her family was very conservative and traditional, placing their trust and belief in institutions of authority like the military and the government. (Exhibit 1 at 12-15; see also Dr. David Biegen Report, attached as Exhibit 2, at 7-8).

Petitioner's mother, Renate, was a young child in Berlin during the harsh privations of WWII and the reconstruction thereafter. (Id. at 2-5).  Renate met Air Force Sgt. Richard "Sam" Sadeik when he was stationed in Berlin. (Id. at 9-11).  Given her wartime experiences, Richard and his friends appeared like wealthy benefactors to Renate and her family – with gifts of laundry soap and foodstuffs.  Swept away, Renate married him.  It was Richard's third marriage and Renate's first. (Id.).

---

[1] The Social History was prepared by Arizona Attorney Liz Tyzco, who subsequently married and changed her name to Liz Hurley. (See Cover Letter attached to Exhibit 1).

Ironically, the marriage condemned Renate and, later her children to new economic privations. (Id. at 11-15). Richard drank heavily and his work and promotability suffered. The expense of the alcohol stressed their tight budget. (Id.). Renate raised two daughters on a military salary while living in a cramped mobile home, moving every few years, following Richard from military base to base. Richard's son from an earlier marriage, David, was also sent to live with Richard and Renate when his mother could no longer handle his teenage problems and drug abuse. David's presence further stressed the family's resources in terms of time, emotion, and money. (Id. at 11-15).

Debra's mother and father separated and later divorced when she was 14 years old and her younger sister 12. (Id. at 23-25). They divorced due to her father's chronic alcoholism, his domineering, controlling nature and his financial instability. (See Renate Janka Affidavit, attached as Exhibit 3). Richard did not want the divorce and deeply resented Petitioner's unswerving support for her mother's decision. (Id.). Richard swore that he would get even with Renate. (Id.). After the divorce, Richard completely left Sandra's and Debra's lives. (Id.). Richard then began to visit the girls and lie to them about the family breakup. (R.T. 10/1/90 at 26). Petitioner and her mother became confidants during this time. (Id. at 27-28). Richard refused to assist Petitioner at all once she married Mark. (Id. at 38).

After her parents' divorce, Petitioner, a high achieving, eager to please teenager, lived with her mother until she was just nineteen. Her younger sister, Sandra, however, always troubled and rebellious, became even more so after her parents' divorce. She was difficult to control, breaking rules and, ultimately, as a teenager, stealing all of her mother's money while Renate was traveling on business. As a result, Sandra was sent to live with her alcoholic father and his new wife, Maureen, at the age of fifteen. (Exhibit 1 at 17, 25-28). There, the divisive family relationship flourished: Sandra and Richard versus Renate and Petitioner. (Id.). The malicious relationship

continued to flourish through Petitioner's trial, and was apparent during Richard and Sandra's testimony against her. (R.T. 9/13/90 at 86-117; R.T. 9/14/90 at. 83-101).

Because of Sandra's intense rivalry with her older sister, had a complicated, love-hate relationship that proved destructive. (Social History, attached as Exhibit 1 at 31; Dr. David Biegan's Report, attached as Exhibit 2; Kirk Fowler's Affidavit #1, attached as Exhibit 4; Baerbel Jacks Affidavit, attached as Exhibit 5). Over the course of years, Sandra became very abusive toward her family members. (Exhibit 1 at 28-35). She lied to her family and about her family in order to get what she wanted. (Id. at 30). Sandra lied even when there was no apparent reason to do so. (Id.). She demonstrated a pattern of dysfunctional and detrimental behavior toward her family members, including Petitioner, that appears motivated by narcissism and her extreme competitive relationship with Petitioner. (Id.; see also Exhibit 2). Their rivalry was such that Sandra became pregnant shortly after Petitioner and gave birth to her first child, a son, one month after Petitioner had Christopher. (Id. at 47). Sandra was jealous of Petitioner for years. (Saldate's Interview of Sandra Pickinpaugh, attached as Exhibit 6, p. 32). She went years without even seeing or speaking to Debra. (Id.).

When Debra was just nineteen years old, her mother was laid off from her job and could not find another that paid well enough for her to meet their needs. (Exhibit 1 at 31). At that time, Petitioner and Renate lived together in a small apartment. Renate was offered an opportunity for a good job in Germany. (Id.). She eventually left the United States for work in Germany, leaving Petitioner on her own for the first time in her young life. (R.T. 10/1/90 at 9). Within two months of her mother's relocation to Germany, Petitioner met Mark Milke. (Id.).

Petitioner and Mark quickly moved in together, and their roller coaster relationship began. (Exhibit 1; R.T. 10/1/90 at 15). Shortly after they moved in together, Mark was arrested for possession of cocaine and paraphernalia, so Debra left him. (R.T. 10/1/90 at 23). He swore he

changed, they reconciled and married, and he was arrested for drug possession again.  (Id. at 30).

Within two months of marriage, Petitioner became pregnant with Christopher.  (Id. at 31).  During

her pregnancy, Mark wrecked their car and was again arrested, this time for DUI.  (Id. at 33-34).

Christopher was born on October 2, 1985, and Mark was sentenced to six months in prison

two months later in December.  (Id. at 34, 37).  When he got out of prison, Mark and Petitioner

continued to have problems.  (Id. at 43).  Within three months, Mark was arrested for domestic

violence and parole violation.  (Id. at 48).  After Mark got another DUI and went back to prison,

Debra filed for divorce.  (See Exhibit 1 at 64-65).

Despite their problems, Debra loved Mark and believed that her son needed his father.

(R.T. 10/1/90 at 66).  She was also aware that Mark, despite his serious problems, loved their son.

(Id. at 66-70).  She encouraged regular contact between them and tried repeatedly to allow them

long periods of time together.  (Id.).  For example, when Mark was released from prison, he lived

with Sandra for a short period, during which time he asked Debra to allow Chris to stay with him.

(Id. at 70).  Because he was supposedly in rehabilitation and living with Sandra, Debra permitted

this temporary arrangement.  (Id.).  Mark again began abusing drugs, however, and Debra had to

obtain a restraining order when Mark took Chris to a "drug house," then became verbally abusive

and made threats toward Debra and Chris.  (See Order of Protection, attached as Exhibit 7).  She

again allowed him visitation, however, but with increased supervision and for shorter time periods.

(R.T. 10/1/90 at 75-80).

Debra and Sandra soon met Jim Styers at the apartment complex where the two sisters

lived together during one of Debra's and Mark's separations.  (Id.).  Styers seemed to be a "nice

guy" who appeared to be a loving, caring father to his daughter, Wendy.  (R.T. 10/1/90 at 18, 63).

Sandra came to trust Styers and they considered him their friend.  (R.T. 9/17/90 at 25).  She

believed that Styers was sexually attracted to her, but their relationship remained platonic. (Id.). Both sisters allowed Styers to babysit their children on occasion. (Id.; R.T. 10/1/90 at 64).

Debra worked fulltime and sometimes worked two jobs as needed to support her son. (R.T. 10/1/90 at 35). She never relied on public assistance, but utilized her family and friends as a support system to provide babysitting and short periods of respite for her. (Id. at 40, 44-45, 49, 55). Christopher was a hyperactive, high energy child who was into everything. (R.T. 9/14/90 at 55). When she noticed a lump on Christopher's throat in December of 1988, Debra obtained medical attention for him immediately. (R.T. 10/1/90 at 102-103; see also Chris Milke's medical records, attached as Exhibit 8). During the three weeks Christopher was hospitalized for a tumor on his thyroid, Debra impressed the hospital staff with her dedication and attention to him. (Exhibit 8; see also Dr. Zuerlein Affidavit, attached as Exhibit 9). Christopher's behavior markedly improved after his release from the hospital. Much of his hyperactivity abated once his thyroid condition was recognized and treated. (R.T. 10/1/90 at 102-103).

From 1986 until July 1989, Debra had contact with Jim Styers only rarely, as she moved out of the apartment complex. (R.T. 10/1/90 at 90-91). In July 1989, Debra's relationship with her ex-husband, Mark, became hostile again. (Id. at 113). On one particular night, Mark confiscated Debra's only transportation, leaving her and Christopher stranded on the street alone. Because he lived close by, Debra called Styers for a ride, and he offered to let her and Christopher stay at his apartment. (R.T. 10/1/90 at 120-121; see also Exhibit 1 at 82). At the time, Debra and Christopher were living with Mark's mother and Debra decided it would be best to move in with Styers temporarily until she could get back on her feet. (R.T. 10/2/90 at 2-5). Debra did not feel comfortable moving back in with Mark's mother, Ilsa, because Ilsa felt Mark never did anything wrong. (Id.). Debra and Christopher shared one room in the two bedroom apartment with Styers' young daughter Wendy. (Id. at 32).

Although Debra was aware that Styers served in Vietnam, she was completely unaware that the forty year old man suffered severe psychological repercussions from his experience as a Marine combat soldier. (R.T. 10/1/90 at 62-64; see also Exhibit 1 at 84). In Vietnam from 1967 to 1969, Styers killed both women and children in combat. (R.T. (Styers) 10/29/90 at 19, attached as Exhibit 10; see also Exhibit 1 at 84). During the fall of 1969, Styers began to experience episodes of syncope (fainting, swooning). (See James Styers military records, attached as Exhibit 11). After examination, physicians and psychiatrists determined that his symptoms were psychological in origin. (Id.).

As a result of his disorder, Styers was transferred to a base in Yuma, Arizona to serve the remainder of his tour. (Id.; see also Exhibit 1 at 84). While in Yuma in 1971, Styers fell out of a truck and struck his head, suffering a skull fracture and brain contusion. (Exhibit 10; R.T. 10/29/90 at 20). He was only semiconscious while in a coma after the accident. (Id. at 21). He immediately began suffering generalized seizures for which he was prescribed Decadron, Phenobarbital, Paraldehyde, and Dilantin. (See Exhibit 11; see also Exhibit 1 at 84).

Thereafter, Styers experienced mental confusion, memory loss, and difficulty retaining information. (Exhibit 11). Test revealed that he had a very low I.Q., was not motivated and appeared not to benefit from incidental learning to the extent that most people do. (Id.). Styers was also later diagnosed as suffering from post traumatic stress disorder (PTSD) for which he was prescribed medication. (Id.). He was treated through regular counseling at the VA Hospital in Phoenix. (Id.).

Approximately one month after she moved in to Styers' apartment, Debra met Roger Scott for the first time. (See Exhibit 1 at 85). Styers was Roger Scott's only friend, moving in and out of Scott's lonely, isolated life for over twenty years. (R.T. (Scott) 1/31/91 at 20-22, attached as Exhibit 12; see also Scott's Presentence Investigation, attached as Exhibit 13). As a "passive

dependent person, Scott willingly did whatever he though was necessary to keep Styers in his life. (See Dr. Tatro's Psychological Evaluation, attached as Exhibit 14 at 10).  Clinical evaluation of Scott revealed that "his extreme passivity, coupled with his inability to openly stand up and say no, would make him an easily manipulated dupe of anyone who put enough of the right pressure on him." (Id. at 15).

Debra was uncomfortable around Scott and thought he was "kind of strange."  (R.T. 10/3/90 at 36).  Not long after he met her, Scott asked Debra for a loan of a few hundred dollars so he could appeal the denial of his social security disability benefits.  She refused him.  (See Renate Janka Affidavit, attached as Exhibit 3).

Over the course of the four months they lived together, Styers became increasingly obsessed with Debra.  She rebuffed his advances.  (See Exhibit 1 at 85).  Although she treated him as no more than her friend and roommate, Styers began to speak to Debra using endearments like "Honey" and "Sweetie."  (Id.; See also Redacted letters to Debra from James Styers, attached as Exhibit 16).  He also became very proprietary, informing Debra's mother during her visit from Europe in September 1989, that *he* would take care of Debra and not to interfere with his relationship with Debra.  (Renate Janka Affidavit, attached as Exhibit 3).

Unbeknownst to Debra, Styers did not share the same fond feelings for Christopher.  He complained, not in Debra's presence but to neighbors, that he had to discipline Chris and that Chris was a problem.  (R.T. 1/30/91 at 37; R.T. 1/29/91 at 50).  On October 4, 1989, at Chris' fourth birthday party, Styers told Chris to stop playing with a truck, and when Chris disobeyed him, Styers said to a neighbor, "I wish he were dead." (R.T. 1/29/91 at 27).  Debra, unaware of

Styers' ill feelings for her child, entrusted him to Styers' care regularly while they were roommates.[2]

Later in October 1989, Mark Milke took Debra back to court over custody and visitation issues. (R.T. 9/17/90 at 44-45). Debra prevailed there, retaining custody and control of her son. Due to harassment and violent behavior, she also had to obtain a full order of protection from Mark in Phoenix Municipal Court. (Id.). Despite these orders, Debra continued to allow Mark to visit with Chris regularly until Mark left for Texas in late November 1989. (R.T. 10/2/90 at 60). Chris was murdered December 2, 1989.

Despite his contention that he shunned guns due to his military experiences, Jim Styers began to purchase weapons. (R.T. 10/2/90 at 21). He went to a gun show in November 1989 where he purchased a .22 caliber handgun. (Id. at 21-23). Over the course of a short time, Styers accrued three handguns. (Id.). He also began to express interest in target shooting. (Id. at 19, 20, 24). During his only two visits with Debra to her father, Richard Sadeik's house in Florence, Arizona, Styers went target shooting with him, as he was a fellow veteran. (R.T. 9/13/90 at 98). Debra joined them in this diversion on one occasion. (Id.).

Debra then applied with and was hired by John Alden Insurance Company in September 1989. (R.T. 10/2/90 at 68). On September 22, 1989, Debra was given a Benefits Selection Form by her new employer. (See Benefits Selection Form, attached as Exhibit 18). She selected medical, dental, long term disability and life insurance for herself and for Christopher. (Id.). She did not "take out" an insurance policy on her son as alleged by the State. Chris' life insurance was one of her benefits, which she had also previously elected to have for Chris through benefits with

---

[2] According to Gail Lipshultz, mother of Styers' child, Wendy, Styers also negatively disciplined children in his care. This included one occasion involving Jason, Sandra Pickinpaugh's son, who Styers kicked and threw against the car when he was only three years old. (See Excerpt of Lipshultz Interview, attached as Exhibit 17).

prior employers.  (See 12/30/88 Application for Employee Benefit Plans for Lincoln National Insurance, attached as Exhibit 19; see also Excerpts of Transcripts, attached as Exhibit 20; R.T. 10/4/90 at 102-104).  Debra kept her application and insurance policy information out in the open in Jim Styers' room.  (Id. at 72).  She kept her limited paperwork, extra boxes and clothing in Styers' room, as there was no storage space in the room she shared with Chris and Jim's daughter, Wendy.  (R.T. 10/2/90 at 32-35).

Debra also discussed her insurance benefits with Styers when he asked her about them while driving her to work shortly after she started her new job with John Alden.  (See Excepts of Transcripts, attached as Exhibit 20; R.T. 10/3/90 at 31-35).  Roger Scott also had access to Debra's insurance benefit forms, as he was frequently at Jim and Debra's apartment when Debra was at work.  (Exhibit 20; R.T. 9/24/90 at 101-109 (Cuilla)).  Debra told Styers in late November that she was attempting to locate a new home for she and Chris, and that they would be moving to their own place in January.  (Exhibit 1).  One of her motivations for wanting to move out was Styers' purchase of a gun.  (Id.).  Debra did not want Chris to be exposed to weapons.  (Id.).  Styers attempted repeatedly to dissuade her from moving away, but Debra would not be deterred. (Exhibit 1).  Debra's Apartment Rental Application clearly shows Christopher listed as the other occupant who would be living with her.  (See 11/8/89 Application for Residency, attached as Exhibit 21).  She and Chris were scheduled to move in to their new apartment on January 13, 1990.  (Id.).

On December 2, 1989, Styers asked Debra if he could use her car to go shopping at the mall.  (R.T. 10/2/90 at 80).  Styers regularly used Debra's car, as his was broken down and he had no money to repair it.   In response to Chris' pleas, Debra allowed Chris to go with Styers to the mall to see Santa Clause.  (Id. at 80-81).  Debra stayed home to do laundry and clean.  (Id. at 89).  Between 2:40 and 2:45 p.m., Styers telephoned Debra and told her Chris was missing.  (R.T.

10/3/90 at 37).  Styers said that he was with a security guard at the mall and that they would notify police.  (R.T. 10/3/90, p. 37-38).  Hysterical, Debra telephoned her father several times over the next few hours.  (R.T. 9/24/90 at 103-104, 106-107).   She ended up calling Crime Stop notwithstanding Styers' assurances.  (R.T. 10/2/90 at 100).

In the late evening, Debra's stepmother and stepsister came from Florence, Arizona  while Debra's father, a prison guard, stayed in Florence due to his concern that Chris' disappearance was a prison related kidnapping.  (R.T. 9/13/90 at 108).  Police officers arrived at the apartment and interviewed Debra repeatedly over the course of the night.  She cooperated fully.  With friends by her side and other friends searching the mall with police, Debra kept a 21 hour vigil by the telephone.  (R.T. 9/24/90 at 93-95, 102, 117, 142).  Over the course of the night, recognizing her distressed state, friends and family plied Debra with alcoholic beverages and prescription medication.  (R.T. 9/24/90 at 126; R.T. 10/2/90 at 107, 109-110).

While Debra waited by the telephone, police combed Metrocenter looking for Chris.  (R.T. 9/20/90 at 22-25).  Their interviews with Styers led them to Scott.  (Id. at p. 26-28).  Police contacted Scott at home at approximately 12:30 a.m. on December 3, 1989  (R.T. (Scott) 1/31/91 at 50, attached as Exhibit 12).   Scott first told police the story he and Styers had concocted, and the police left.  (Id. at p. 53).  Once discrepancies appeared in the stories the two men told, however, police returned to Scott's home at 2:00 a.m.  (Id. at 50-60).  They re-interviewed him and took him for a lengthy drive before escorting him to the police station for further interrogation.  (R.T. (Scott) 1/28/91 at 27, 30-33, attached as Exhibit 12).

Over the course of the next eighteen hours of detention, police deprived Scott of food and drink, kept him from his seizure medication (Dilantin), and left him alone in an interrogation room for lengthy periods.  (See Select Scott Habeas Exhibits, attached as Exhibit 22).  Various police officers took turns questioning Scott and each time, he told them the same story.  (Id.).

13

At 12:50 p.m., Detective Armando Saldate began questioning Scott.  (R.T. (Scott) 1/14/91 at 6-10, attached as Exhibit 12).  Saldate later testified that he believed that Scott had "not been given the opportunity to be truthful."  (R.T. (Milke) 9/10/90 at 12).  Saldate chose not to record the interview.  (R.T. (Scott) 1/14/91 at 8-10, attached as Exhibit 12).  Eight minutes after the interview began, Saldate *Mirandized* Scott.  This was nearly eleven hours after Scott was taken into custody.  (Id.).  He accused Scott of lying and threatened to go out and interrogate Scott's mother, who was elderly and in extremely poor health.  (Id. at 26-28).  Scott lived with his mother and was her primary and sole caretaker.  (Id.).  Fearful for his mother, Scott begged Saldate not to disturb her.  (Id.).  Saldate told Scott to stop lying and at least have the decency to show them where the body was so that his family could have a proper opportunity to bury the child.  (Id. 10-12).  Scott then told Saldate that "Jim [Styers] killed him" and that he knew where Chris' body lay.  (Id.).

At about the same time Saldate interviewed Scott, Debra's stepmother, who was concerned about Debra's mental and physical state, urged her to go to Florence to see her father.  (R.T. 9/13/90 at 110; R.T. 10/2/90 at 115, 120-123).  Debra did so.  In Florence, Debra's father fed her, gave her beer to drink and put her to bed, knowing she hadn't slept or eaten and was exhausted.  (R.T. 9/13/90 at 110-111, 113).

While police were driving Scott to the desert location where Chris was killed, they continued to question him.  (R.T. 1/21/90 at 7-12).  During this time, Scott purportedly implicated Debra in her son's death.  (See Detective Mills' Supplemental Report of Scott's confession, attached as Exhibit 23; R.T. 9/1/0/90 at 30-31).  Upon his return to the police station after locating Chris' body, Saldate immediately set out by helicopter to Florence where he had learned Debra was staying.  Meanwhile, Detective Mills tape recorded a statement from Scott where he implicated Debra.  (See Detective Mills' Supplemental Police Report (Scott), attached as Exhibit 23).  That statement reveals how confused and uncertain Scott was about the course of events,

times, dates, locations, and the extent of Debra's supposed involvement. (Id.). Throughout the interview, Scott's statements were disjointed, illogical and inconsistent. (Id.). Detective Mills, who continually asked him leading questions filled with facts and information, goaded along Scott. (Id.).

Before Saldate left for Florence, his supervisor ordered him to tape record his interview with Debra. (R.T. 9/1/0/90 at 29, 41-43). Saldate ignored these order and did not even bother to take a recording device with him. (Id. at 43). At Saldate's instruction, Pinal County Sheriff's officers went to Debra's father's house and escorted Debra to the station in Florence. (Id. at 42; R.T. 10/2/90 at 124). After waiting two to three hours with the friend who drove her to the station, Debra met with Saldate. (R.T. 10/2/90 at 11).

Upon his arrival, Saldate entered the room where Debra sat, told her friend to leave with another officer and shut the door. (R.T. 9/12/90 at 64). He then sat down and told her that her son was murdered and that she was under arrest for his murder. (Id.). Debra became hysterical, screaming and crying out. (R.T. 10/3/90 at 13). For the next half hour, Saldate sat alone with Debra without the benefit of a witness, an audiotape, a videotape, or a signed document to memorialize her interrogation. (R.T. 9/10/90 at 44, 55). When he emerged from the interview room, Saldate told her family that Debra had confessed to participating in the murder of her son. (R.T. 9/12/90 at 80-81). After the interview, Saldate rode with Debra, who was not handcuffed, back to Phoenix where she was booked into jail for first-degree murder. (R.T. 9/13/90 at 14).

Detective Saldate prepared his written recollection of his interview with Debra on December 5, or 6, 1989, two or three days after the interview. (See Saldate's Supplemental Report of Debra Milke's Interrogation, attached as Exhibit 24). Saldate then destroyed his contemporaneous notes of the interview. (R.T. 9/13/90 at 34-35). There is nothing to corroborate

Saldate's account of the alleged confession.   (Id.).   Debra has consistently denied that any confession ever took place.  (R.T. 10/3/90 at 22-23, R.T. 1/18/91 at 15-27).

## III.    PROCEDURAL HISTORY

During pretrial proceedings and at trial, court-appointed attorney C. Kenneth Ray represented Debra.  On September 10, 1990, just prior to trial, a voluntariness hearing to establish the admissibility of Debra Milke's alleged statement was held.  Debra Milke did not testify at the voluntariness hearing, and the judge ruled that her alleged statement was admissible.  On October 12, 1990, a jury found Debra guilty of first-degree murder, conspiracy to commit murder, child abuse and kidnapping.  (R.T. 10/12/90 at 34-35).  On January 18, 1991, Judge Hendrix entered a judgment of guilt and sentenced Debra to death.  (See 1/18/91 Minute Entry, attached as Exhibit 25).

Debra is imprisoned at the Arizona State Prison – Perryville Complex in Phoenix, Arizona.

On direct appeal, the following issues were raised by court appointed counsel, James Kemper:

1.      The trial court erroneously struck, for cause, potential juror Moquino.

2.      The trial court's instruction to the jury on motive was erroneous.

3.      The record does not support a finding that the murder of Christopher Milke was especially heinous or depraved; if it does then this aggravating factor is unconstitutionally vague.

4.      The trial court erroneously failed to find grief as a mitigating factor.

5.      Petitioner was denied her right, under the Fourteenth Amendment to the United States Constitution, to equal protection under the law when she was denied a jury trial on aggravating factors in a capital case while defendants in non-capital cases have juries to determine aggravating factors.

6.      The Arizona Death Penalty Statute violates the Eighteen Amendment because it does not sufficiently channel the sentencer's discretion.

The Arizona Supreme Court affirmed Debra's sentence and most of her convictions. *State v. Milke,* 177 Ariz. 118, 865 P.2d 779 (1993).  Her conviction for child abuse was set aside pursuant to the appellate court's statutory obligation to review the entire record for fundamental error. *Id.*

James S. Liebman represented Debra in seeking a Writ of Certiorari, which the United States Supreme Court denied. *State v. Milke, cert. denied,* 114 S.Ct. 2726 (1994).

On November 1, 1995, private counsel, Anders v. Rosenquist, filed a Petition for Post Conviction Relief on Debra's behalf.  The following issues were raised:

1.      The overreaching tactics of Phoenix Police Detective Armando Saldate deprived Debra Milke of her constitutional rights against self-incrimination, to due process, a fair trial, and a just sentencing determination.

2.      The repeated instances of prosecutorial misconduct denied Debra Milke due process, a fair trial and a just sentencing process.

3.      The errors of the trial court in the conduct of Debra's trial and sentencing infringed upon her right to due process, a fair trial, and a just sentencing process.

4.      Defense counsel was so deficient in his representation of Debra Milke during her trial and sentencing as to deny her constitutional right to effective assistance of counsel.

5.      Debra Milke was denied her constitutional right to a representative jury.

6.      The trial court's denial of Debra's Motion to Acquit, her imposition of the death penalty, and the Arizona Supreme Court's decision to affirm Debra Milke's convictions and death sentence violated her constitutional rights.

7.     The aggregate of errors in Debra's trial, sentencing, and appeal violated her constitutional rights.

8.     Debra Milke was denied her constitutional rights by the Arizona Supreme Court's failure to determine whether her sentence was proportionate to sentences handed down in other cases.

9.     Debra Milke was denied her constitutional right to effective assistance of counsel on direct appeal.

On November 1, 1995, the same date that Petitioner filed her initial petition for post conviction relief, she also filed a motion pursuant to Rule 32.4(e), Ariz. R. Crim. P., requesting a change of judge due to bias.  The following day, Judge Hendrix denied the motion for a change of judge.  (See Exhibit 102 to Habeas Petition).  In her minute entry, she noted that "[I]f at some future time a claim is made that would require the trial judge to act as a witness, the request for change of judge will be granted."  (Id.).

On November 6, 1995, Judge Michael Ryan, acting as presiding criminal judge, also denied the same motion for a change of judge.  (See Exhibit 100 to Habeas Petition).  Judge Ryan noted that Debra failed to verify by affidavit, pursuant to Rule 10.1, Ariz. R. Crim. P., the specific grounds for relief.  (Id.).  He further stated that she failed to demonstrate how the trial court's testimony would be relevant.  (Id.).  When the reply in the post conviction proceeding was filed, Debra reurged her request for a change of judge pursuant to Rule 10.1, Ariz. R. Crim. P.  (Exhibit 101 to Habeas Petition).  She attached an affidavit verifying the importance of Judge Hendrix' testimony.  (Id.).  Judge Hendrix again denied Debra's motion for a change of judge.  (See Exhibit 102 to Habeas Petition).  She stated that Debra had not revealed the facts that she had uncovered within the previous ten days to trigger the motion for a change of judge for cause.  (Id.).  She then held that Debra's affidavit and argument failed to demonstrate that the trial court's testimony was relevant as mandated by "Rule 43.4(e) [six] of the Arizona Rules of Criminal Procedure."  (Id.).

Debra then filed a petition for special action to the Arizona Supreme Court seeking a change of judge.  (See Exhibit 103 to Habeas Petition).    The Court denied jurisdiction on May 21, 1996.  (See Exhibit 104 to Habeas Petition).

The trial court judge considered the petition for post conviction relief and rendered her decision on November 18, 1996.  (See 11/18/96 order, attached as Exhibit 26).  She summarily dismissed the petition as lacking any colorable claims for relief.  (Id.).

On August 31, 1998, a Petition for Writ of Habeas Corpus was filed in this case.    The following issues were raised:

I.    The overreaching tactics of Phoenix Police Detective Armando Saldate deprived Debra Milke of her constitutional rights against self-incrimination, to due process, a fair trial, and a just sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

II.    Repeated instances of prosecutorial misconduct denied Debra Milke due process,  a fair trial, and reliable sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

III.    The errors of the trial court in the conduct of Debra's trial and sentencing infringed upon her rights to due process, a fair trial, and just sentencing process in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

IV.    Defense counsel was so deficient in his representation of Debra Milke during her trial and sentencing as to deny her right to effective assistance of counsel in violation of the Sixth Amendment.

V.    The trial court's imposition of the death penalty violated Debra's Fifth Amendment right to due process and violates the Eighth Amendment prohibition against cruel and unusual punishment.

VI.     Debra Milke's death sentence amounts to cruel and unusual punishment.

VII.    Milke was denied her right under the Fourteenth Amendment to the United States Constitution to equal protection of the law when she was denied a jury trial on aggravating factors in a capital case while defendants in non-capital cases have juries to determine aggravating factors.

VIII.   Debra Milke was denied effective assistance of counsel on direct appeal in violation of the Sixth Amendment.

IX.     The Arizona Supreme Court violated Debra Milke's Fifth Amendment right to due process by imposing the death penalty without conducting a proportionality review.

X.      In upholding her death sentence on the basis that the "senselessness" and "shockingly evil" nature of her offense made it "heinous . . . or depraved," the Arizona Supreme Court violated the Eighth and Fourteenth Amendments by relying on constitutionality insufficient narrowing constructions of a facially vague statutory aggravating circumstance.

XI.     The aggregate of errors in Debra's trial, sentencing, and appeal violated her constitutional rights.

        On July 7, 2000, this Court granted review on Claims I, III (in part), IV(A) (in part), IV(B),  IV(G) (in part), V(C), VII, VIII (in part), X, and XI (in part). [3]  These claims have been renumbered as set forth in the Table of Contents.  However, each argument heading also contains parenthetical references to the Claim numbers listed in this Court's order.

---

[3] Petitioner notes that this Court's numbering in its July 7, 2000 Order differs from that used in the Petition for Writ of Habeas Corpus.  Counsel will refer to this Court's numbering as set forth in its Order.

## ARGUMENT ON THE MERITS

I.   **THE OVERREACHING TACTICS OF PHOENIX POLICE DETECTIVE ARMANDO SALDATE DENIED PETITIONER'S RIGHTS AGAINST SELF-INCRIMINATION, DUE PROCESS, A FAIR TRIAL, AND A JUST SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (CLAIM I)**

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. X. The privilege against self-incrimination reflects the notion that a system of law enforcement that comes to depend on the confession will, in the long run, be less reliable and more subject to abuses than a system relying on independent investigation. Cooke, Linda Perkins, *Colorado's Courts Consider Custody*, 23 Colo.Law. 1519 (July 1994)(citing *Escobedo v. Illinois*, 378 U.S. 478, 488-89 (1964)). The present case aptly demonstrates this important principle.  Detective Saldate's overreaching tactics violated Petitioner's fundamental constitutional rights and resulted in an alleged confession that is extremely unreliable and utterly fails to support her conviction.

A.   **The Interrogation Methods Employed By Police Detective Armando Saldate Rendered the Results of His Interrogation of Debra Milke Unreliable and Violated Debra Milke's Right to Due Process**

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV § 1  The United States Supreme Court has held that, by virtue of the Due Process Clause, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect are so offensive to a civilized system of justice that they must be condemned."  *Miller v. Fenton*, 474 U.S. 104, 109, (1985); *see also, Moran v. Burbine*, 475 U.S. 412, 432-34 (1986).

Over the course of nearly twenty-one years as a police officer, Armando Saldate developed a method of interrogating suspects that defied his supervisors' instructions, standard police procedure and the United States Constitution. (See Sample of Saldate Cases, attached as Exhibit 15; R.T. 9/10/90 at 41, 44, 56; R.T. 9/11/90 at 3-4, 7; R.T. 9/12/90 at 139-47; R.T. 9/13/90 at 35-45; see also New Times Article, attached as Exhibit 27). Over time, Detective Saldate became increasingly comfortable with his instincts to the point of relying on them in lieu of good, sound investigative techniques. (E.g., Exhibit 15). Motivated by overzealousness to make his case, Saldate's tactics are deserving of the "condemnation of a civilized system of justice." *Miller*, 474 U.S. at 109.

According to police interrogation expert, Professor Richard Leo,[4] Detective Saldate's account of what occurred in this case is "problematic, troubling, and at times altogether implausible, for several reasons." (See Professor Leo's Report, attached as Exhibit 28, at 6). First, Saldate's assertion that he did not presume Petitioner's guilt from the outset is contradicted by his behavior and statements prior to and during the interrogation. (Id.). Police are trained only to arrest and interrogate suspects they believe are guilty. (Id.). Had Detective Saldate not presumed Debra's guilt, he would have interviewed her in a non-custodial format. (Id.). Instead, "he arrested her prior to questioning her, instructed her to be quiet and calm down, and then read her *Miranda* rights – all hallmarks of a custodial interrogation, not a non-custodial interview." (Id.). According to Professor Leo, it is "telling" that Saldate told Debra

---

[4] Professor Leo is a nationally recognized authority in police interrogation practices, coercive interrogation techniques, false confessions and miscarriages of justice. (See Exhibit 28 at 5 and attached Curriculum Vitae ). He has conducted extensive research on interrogations and confessions since 1990 and has analyzed over 800 cases during that period. (Id.). He is widely published on these topics in scientific journals and has consulted on more than 300 cases involving disputed interrogations and/or confessions and has been qualified as an expert in these areas in sixteen states. (Id.). Professor Leo's opinions are admissible in these proceedings, as they assist the factfinder with evaluating and understanding the numerous, though sometimes subtle, discrepancies and the improprieties in Saldate's interrogation style and techniques. *See, e.g., Salem v. U.S. Lines Co.,* 370 U.S. 31 (1962).

early in the interrogation that she was not telling the truth when she denied committing the crime. (Id.).   "Its is well known in police work that while the purpose of a non-custodial interview is to get the truth by asking non-threatening and open-ended questions, the purpose of a custodial interrogation is to get a confession by using interrogation techniques that involve, among other things, accusing a suspect of having committed a crime, cutting off any denials, and pressuring them to confess." (Id.).   Thus, Detective Saldate's assertion that he was merely questioning Debra to find the truth, not to get a confession, is not credible. (Id.).   His rush to judgment also "appears to violate the Phoenix Police Department's stated investigative policy of keeping an open mind and allowing for the possibility that the suspect did not commit the crime."   (Id.; see also Phoenix Police Department's Interrogation Policies and Procedures, attached as Exhibit 29).

Second, Detective Saldate's failure to record the interrogation means that no one, other than Saldate and Debra, can ever know what transpired during the interrogation. (Exhibit 28 at 6).   In a number of states, constitutional provisions, statutes and/or caselaw dictate that all custodial interrogations *must* be electronically recorded where feasible, and *shall* be recorded if the questioning occurs in a place of detention.   *See, e.g.,* Art. 38.22(3)(a), Texas Statutes and Codes; *State v. Scales,* 518 N.W. 2d 587 (Minn. 1994); *Stephan v. State,* 711 P.2d 1156 (Alaska 1985).   The reason for such requirements is that "in the absence of a tape recording, the prosecuting authorities will win a swearing contest." *Harris v. State,* 678 P.2d 397, ____ (Alaska App. 1984).   Unfortunately for Debra, that was precisely what occurred here. Although Arizona does not have an explicit statutory or state constitutional requirement, the failure to record Debra's interrogation violated her due process rights under the Fourteenth Amendment, as there was **no other evidence** linking her to her son's murder.   Thus, Saldate's failure to

23

record Debra's interrogation essentially resulted in a complete inability for her to defend herself.

According to Professor Leo, Detective Saldate's failure to record this interrogation is "especially troubling in light of the fact that he was instructed by his superior to record his conversation with Ms. Milke and that tape recorders were readily accessible to him at the Phoenix Police Department prior to his departure . . ." (Exhibit 28 at 6).   According to Professor Leo, "[u]nder these circumstances, it was extremely unprofessional for Detective Saldate to fail to tape record or otherwise memorialize his interrogation of Ms. Milke." (Id.). He concludes that Saldate's failure to record is "tantamount to destroying the evidentiary record of the most significant piece of information in this case. . ." (Id.).

Third, Detective Saldate's assertion that he did not record the interrogation because Debra did not permit him to do so is, according to Professor Leo, "simply implausible, and . . . severely undermines [his] credibility." (Id. at 6-7).  Detective Saldate "clearly took control" over the interrogation early on when he told her to be quiet and calm down, and he read her *Miranda* rights.  (Id. at 7).  As noted by Professor Leo, "[i]t is hard to imagine that someone who was so commanding at the beginning of the interrogation and during the reading of the *Miranda* rights would suddenly become so accommodating when asking for permission to tape." (Id.).  Asking a suspect for permission for anything, other than the *Miranda* waiver, is "contrary to what is regarded as good police practice in the interrogation industry." (Id.).  In the more than 800 interrogations observed or studied by Professor Leo, he cannot recall ever seeing an interrogator ask a suspect for permission to tape record the interview.   (Id.). However, he has often seen interrogators record the session without even mentioning that fact

to the suspect. [5] (Id.).  Professor Leo also finds it very "curious" that Detective Saldate states on the final sentence in his report of Debra's interrogation that it was not tape recorded because she denied permission, when he does not make any such disclaimers on any of his other reports for his interviews and interrogations of Roger Scott, Mark Milke, Chris Landry or Sandra Pickinpaugh.  (Id.).  He further notes that Saldate openly acknowledges in testimony and in other cases that "it is simply not his practice to tape record interviews or interrogations."  (Id. at 7).

Fourth, Detective Saldate's other behavior, both during and after the interrogation, casts doubt on his credibility and professionalism.  (Id.).  The manner in which he states he elicited Debra's *Miranda* waiver is troubling, if not illegal.  (Id.).  His destruction of his contemporaneous notes of the interrogation is also suspicious, especially in light of the other circumstances surrounding this case.  (Id.).  According to Professor Leo, "[i]t is extraordinary that Detective Saldate not only failed to tape record the interrogation and then destroyed his notes, but that he also failed to write out or have Ms. Milke sign a confession statement and that he wrote up his recollection of the interrogation and alleged confession three days later."  (Id.). He describes this as "an extraordinary lapse of professionalism, if not outright negligence, in any case – but especially in a high-profile capital murder case such as this in which there is no physical evidence corroborating the alleged confession."  (Id.).  He also notes that all of these actions violated Phoenix Police Department Policy, which instructs detectives to "document everything said by the suspect."  (Id.; see also Exhibit 29, at 8(B)(2)(b)(ii)).

Fifth, many of Detective Saldate's assertions about what occurred during the interrogation are "simply implausible."  (Exhibit 28 at 7).  For example, his claim that he did

---

[5] As in many other states, taping with the consent of only one party to a conversation is permissible in Arizona.  *See, e.g., U.S. v. King*, 587 F.2d 956, 962 (9th Cir. 1978).

not use any interrogation techniques is "very hard to believe." (Id.). Police are taught in the

field and the classroom to use interrogation techniques to elicit confessions. (Id. at 7-8).

Professor Leo also notes that "[e]veryone in the police business knows that suspects do not give

spontaneous, unprompted, free-wheeling narratives to serious crimes such as murder. Yet, this

is exactly what Detective Saldate alleges occurred during his interrogation of Ms. Milke." (Id.

at 8). It normally takes a lot of pressure to get an individual to confess to murder, which is why

interrogation, by design, involves "accusation, confrontation, the overcoming of denials and

objections, and the use of inducements and appeals to motivate the suspect to comply with the

interrogator's demand that he or she confess." (Id.). Detective Saldate's claim that in his

interrogations, he usually talks for 10% in the beginning, the suspect then talks for 80% in the

middle, and he talks for 10% at the end, likely demonstrates confusion on Saldate's part

between what really does occur in his interrogations with "what he would like to believe

occurred *ex post facto.*" (Id.). According to Professor Leo, "it is completely contrary to police

interrogation training and practice that a suspect would do 80% of the talking in any

interrogation leading to an actual confession." (Id.).

Sixth, there is a "wide incongruity" between how police are trained to and actually do

interrogate, and Detective Saldate's claims regarding how he supposedly questioned Debra.

(Exhibit 28 at 8). He explains:

> Very few suspects actually report feeling better after confessing to police detectives. It
> is therefore very unlikely that Ms. Milke actually told Detective Saldate that she felt
> better or suddenly unburdened or as if she had taken a load off her shoulders after
> confessing to him. Or that she somehow regarded Detective Saldate as a friend (during
> merely one-half hour of interrogation!) or that she somehow felt comfortable with him
> because she knew she was under arrest and going to jail or that she felt relaxed when
> she left the interrogation.

(Id. at 8). As noted by Professor Leo, "[t]hese assertions literally make no sense." (Id.). He

also finds "too implausible, if not bizarre" Saldate's claim that Debra asked him if she could

get probation or just have her "tubes tied" during an interrogation while confessing to the crime of first degree murder of a child in a state that strongly endorses the death penalty.  (Id.). Detective Saldate's claim that Debra told him that she finally found someone to whom she could speak her mind "borders on the ludicrous."  (Id.).  As astutely set forth by Professor Leo:

> The only plausible explanation is that Detective Saldate's self-serving statements seek to cast the interrogation in the highly simplistic and idealized way he would like to have us believe this interrogation occurred -- that Detective Saldate used no interrogation techniques, that Ms. Milke did virtually all of the talking, that she experienced almost instantaneous bonding with, and moral catharsis from, Detective Saldate (as if speaking to a priest), because he was so uncommonly "straightforward" with her, and, in the short space of a half hour, felt rewarded because she had found a friend in Detective Saldate and was now at ease with herself because she had been arrested and knew she was going to be punished.

(Id.).  Professor Leo concludes that "[s]uch assertions fly in the face of all reason, logic and experience.  Detective Saldate's narrative of what occurred is wildly implausible and, in my professional opinion, therefore cannot be credited."  (Id.).

Seventh, Detective Saldate's assertions about the meaning of Debra's "body language" and behavior during the interrogation is not credible.  (Exhibit 28 at 9).  Professor Leo notes that Detective Saldate's report, testimony and pre-trial interview demonstrate that Saldate "too often treats his gut hunches, speculations and intuitions as if they are established facts, rather than treating them as hypotheses to be tested against the evidence."  (Id.).  For example, Saldate asserts that Debra "feigned grief" when told of her son's death and that she pretended to cry but no tears came out and he infers that this is clear evidence of her disingenuousness and guilt. (Id.).  In fact, this is nothing more than Detective Saldate's *presumption* of her guilt.  "It is well known that suspects react to the stress of accusation and interrogation differently.  Even if Ms. Milke had been crying without tears or acting hysterical, this is not a reliable indicator of guilt or deception."  (Id.).  Detective Saldate's treatment of his perceptions of Debra's body

language as "evidence" of her guilt "suggests his bias against her, his poor training and his inability to objectively investigate this case." (Id.).

Eighth, Detective Saldate's "demonstrable investigative bias" is particularly troubling, according to Professor Leo, "in light of the salient fact that there is no evidence, other than his word, that Debra Milke confessed to the capital murder of her only child, and that, as a result, she now awaits execution." (Id. at 9). Detective Saldate presumed Debra's guilt from the beginning (even prior to questioning) and immediately set out to confirm this belief by getting a confession. (Id.). According to Professor Leo, this "rush to judgment" and "investigative bias" explain how Saldate could have interpreted Debra's body language and behavior during the investigation in a way that generated his implausible scenario of how and why Debra purportedly confessed to the murder of her son. (Id.). Professor Leo also points out that Detective Saldate's interview of Debra's sister, Sandra Pickinpaugh, reveals the degree to which Saldate attempts to persuade and influence her perceptions of Debra's guilt rather than merely soliciting information from her "as if his role is to be an advocate rather than an investigator." (Id.). This interview was tape recorded by Ms. Pickinpaugh, not Saldate, and provides an insightful glimpse into some of Saldate's techniques, which Professor Leo describes as "contrary to any expectations of objectivity and contemporary standards of professional police investigation." (Id. at 9; see also Transcript of Sandra Pickinpaugh Interview, attached as Exhibit 6). Professor Leo further notes that Detective Saldate's investigative bias can also be seen in the discrepancies between his portrayal of what was said during his interview and what the transcript shows was actually said. (Exhibit 28 at 9; Exhibit 6 (Pickinpaugh transcript); Exhibit 30 (Saldate Supplemental Report of Sandra Pickinpaugh interview)).

Ninth, all of the foregoing concerns are especially troubling to Professor Leo in light of Detective Saldate's history and pattern of alleged and proven misconduct in criminal cases involving disputed interrogations and/or confessions. (Exhibit 28 at 9; Exhibit 15). This issue is addressed more fully below. However, Professor Leo concludes that Detective Saldate's pattern in the eighteen cases attached as Exhibit 15 casts "considerable doubt on Detective Saldate's credibility, integrity and professionalism." (Exhibit 28 at 9). So too does Saldate's disciplinary record with the Phoenix Police Department. (Id.; see also Separation Notice, attached as Exhibit 31). Professor Leo states, "[i]t is especially troubling to learn that Detective Saldate once pursued sexual favors from a female motorist in exchange for not arresting her on a traffic warrant and then lied to a supervisor about  this act of corruption, leading the Phoenix Police Department to question his 'honesty, competency and overall reliability.'" (Exhibit 28 at 9-10). He notes that Detective Saldate admitted to this conduct only after he failed a polygraph and was interrogated. (Id. at 10; see also Exhibit 31 (separation notice)).

Finally, Professor Leo believes that the statements elicited by Detective Saldate from Roger Scott to inculpate Debra[6] are "inherently unreliable" and "cannot reasonably be construed to corroborate Ms. Milke's alleged, but undocumented, confession." (Exhibit 28 at 10). This is due in part to the fact that, "by his own admission, Detective Saldate used coercive interrogation techniques to elicit statements from Mr. Scott." (Id.). Scott was detained for eighteen hours. He was not given food or medication for eleven hours. He was left alone for

---

[6]   In an untaped interrogation by Detective Saldate, Roger Scott conceded his involvement in the death of Christopher Milke. (R.T. 9/11/90 at 7, 20-21). While showing police the location of the child's body, Scott allegedly told Saldate that Petitioner was involved in the murder of her son. Id. With no further information than Scott's statement and the confirmation of his involvement in the murder, Saldate decided to arrest Petitioner. (See Pretrial Interview of Saldate, attached as Exhibit 32 at 4).

long periods of his interrogation. Finally, Detective Saldate threatened to go to the apartment of Scott's ailing mother and interrogate her if he did not cooperate. (Id.; see also Excerpts of Scott's Habeas Corpus Petition, attached as Exhibit 33). According to Professor Leo, "[t]hese coercive tactics – the threat to interrogate a vulnerable relative in poor health, the deprivation of food and medicine, and the lengthy, incommunicado interrogation – could easily have caused a person of normal intelligence and hardiness to make false statements to please his interrogator." (Exhibit 28 at 10). However, "[t]he risk of coercing false statements from Mr. Scott was heightened by his weak personality and history of psychological problems." (Id.).

According to a psychological assessment conducted by Dr. Tatro, Mr. Scott – a Vietnam Veteran with a history of mental illness and medical problems – has a "passive dependent personality," and is, by his nature, highly suggestible, submissive, and compliant." (Id.; see also Dr. Tatro's Evaluation, attached as Exhibit 14; see also Dr. Tatro's Affidavit, attached as Exhibit 34). Professor Leo notes that "[t]he statements from Mr. Scott's trial lawyers – that he would agree to or sign anything they put before him, even if he did not comprehend it or it is not the truth, just to please them and avoid conflict – bear out Dr. Tatro's diagnosis." (Exhibit 28 at 10; see also Roland Steinle Affidavit, attached as Exhibit 35). Professor Leo further finds that it is not surprising that "over the course of eighteen hours, Mr. Scott changes his story five times and, at times, appears to give confused, illogical, disjointed and/or inconsistent statements." (Exhibit 28 at 10). Professor Leo opines that, although Scott may have been an accessory to, or aider and abettor of, Chris Milke's murder, his statements about the alleged role of Debra Milke "appear to be inherently unreliable and do not . . . serve as corroboration for her undocumented, unsigned and disputed confession." (Id.).

Scott's situation is similar to the disputed confession at issue in *State v. Strayhand,* 184 Ariz. 571, 911 P.2d 577 (1995). In *Strayhand,* the defendant had been in custody for

approximately twelve hours. He had not slept or eaten since the previous morning. The first interrogation lasted for over two hours, during which the defendant broke down and cried and made at least one veiled suicide threat. *Id.* at 576, 911 P.2d at 582. *Strayhand* held that a court should evaluate voluntariness "in light of what the police should perceive from the objective manifestations of the suspect's physical or mental condition." *Id.* (quoting *State v. Carillo,* 156 Ariz. 125, 750 P.2d 883 (1988)). In *Strayhand*, police had also pressured the defendant until he eventually confessed. Police used threats and promises, which the court determined had caused the defendant to confess. 184 Ariz. at 579, 911 P.2d at 585. Relying on United States Supreme Court and Ninth Circuit Court caselaw, the court held that a confession obtained by any direct or implied promises, however slight, or by threats through which the will of the defendant is overborne, is involuntary and must be suppressed. *Id.* (citing *Hutto v. Ross,* 429 U.S. 28, 30 (1976), *Miller v. Fenton,* 474 U.S. 104, 116 (1985) and *United States v. Harrison,* 34 F.3d 886, 891 (9th Cir. 1994)). Similar elements of threats and implied promises existed in Scott's case. The *Strayhand* court ultimately concluded that the confession was involuntary. Unfortunately, trial counsel in Scott's case failed to adequately challenge the voluntariness of Scott's alleged statements to police. (See Excerpts of Scott's Habeas Petition, attached as Exhibit 33).

According to Professor Leo, in Petitioner's case, "[t]he combination of all these risk factors – the coercive interrogation, Mr. Scott's psychological disabilities, and a disputed confession that was neither documented nor signed nor corroborated – strongly raise the possibility that the ultimate miscarriage of justice may have occurred here: the wrongful conviction of a factually innocent person who awaits execution." (Exhibit 28 at 10). Clearly, the methods employed by Detective Saldate rendered the results of his interrogation of Debra unreliable and violated her right to due process of law.

**B.**     **Detective Saldate's Prior History Illustrates a Pattern of Unprofessional Conduct and Overreaching Tactics, which Violate the United States Constitution and Produce Unreliable Results**

In addition to what we know about Detective Saldate's tactics in Debra's case, research demonstrates that, during his lengthy tenure in the police force, Detective Saldate engaged in an egregious pattern of conduct designed to elicit alleged confessions and inculpatory statements regardless of their truth or falsity. (See Exhibit 15). A documented history of Saldate's cases shows that he is fixated on extracting confessions, *notwithstanding the truth*. (Id.). Exhibit 15 and its attached summary depict a man consumed with eliciting incriminating evidence -- a man who questions suspects who are impaired or incompetent and who engages in unorthodox and illegal tactics to elicit responses. (Id.). If those responses do not bolster his hypothesis, he will alter them until they do. (Id.).

Detective Saldate, by his own numerous admissions, refuses to tape record his interviews and has refused the company of other officers during interrogations. (Exhibit 15 at 9; R.T. 9/10/90, pp. 44-45). He interviews suspects with the premise that they are clearly guilty. (Exhibit 15). He will not cease interrogating until the suspect proves him right. (Id.). Thus, the evidence of Detective Saldate's history of illegal and inappropriate conduct surrounding alleged confessions is extremely relevant.[7] Based upon the evidence, it is clear Petitioner's alleged confession was involuntary if not completely fabricated. In addition, had the jury been given this crucial information regarding Saldate's pattern of conduct it would no

---

[7] Rule 406 of the Arizona Rules of Evidence provides for the admissibility of the pattern of conduct engaged in by Detective Saldate:

> Evidence of the habit of a person or of the routine practice of an organization whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

17A A.R.S., Rules of Evidence, Rule 406.

doubt, have given far less credence to Petitioner's alleged confession.   An assessment of
Saldate's history reveals several areas of unprofessional, overreaching tactics that have come
into question in numerous cases other than Debra Milke's.  These include the following.

>    **1.    Detective Saldate has an Affinity for Questioning Injured and
>             Mentally Impaired Suspects**

In *State v. Conde*, 174 Ariz. 30, 846 P.2d 843 (App. 1992), Detective Saldate appeared
at the hospital to question a suspect in a robbery/murder case.  The suspect, Mr. Conde, was
intubated and hooked up to intravenous lines when Saldate commenced the interrogation.  Mr.
Conde drifted in and out of consciousness during the questioning, and Saldate jostled him to get
his attention.  At one point during the questioning, Conde sought pain medication from his
medical attendant.  Nonetheless, Saldate was allegedly able to elicit incriminating statements
from Mr. Conde. As set forth above, questioning mentally and/or physically impaired suspects
is clearly improper.  *See, e.g., State v. Carillo,* 156 Ariz. 125, 750 P.2d 883 (1988); *Strayhand,*
184 Ariz. 571, 911 P.2d 577.   The statements in *Conde* resulting from Saldate's improper
interrogation were determined to be involuntary and inadmissible.  *Conde,* 174 Ariz. at 31, 35,
846 P.2d at 844, 848.  (Exhibit 15-O, R.T. 10/25/89 at 24).  The State did not even assert on
appeal that suppression was erroneous.  (Id.).

*State v. Yanes*, CR 130403, presented similar facts.  Saldate questioned Yanes, while he
was handcuffed and strapped to a hospital gurney, intoxicated and suffering from brain damage
resulting from a skull fracture.  The physician in charge of Mr. Yanes testified that, at the time
of the interrogation, Mr. Yanes was mostly unconscious, and when he was semi-conscious, he
was consistently incoherent.   Nonetheless, Detective Saldate persisted in questioning Mr.
Yanes and asserted that he received incriminating responses from him.  The defendant was
convicted by a jury of second degree murder.  Upon application for post-conviction relief, he

was granted a new trial.  At a subsequent voluntariness hearing, Mr. Yanes' statements were determined to be inadmissible.  The State dismissed the case.  (Exhibit 15-A).

In *State v. Salas*, CR 89-03252, the drunken defendant chased down the victim, stabbing him to death in front of witnesses.  Detective Saldate acknowledged that the defendant had been drinking heavily but surmised that he was not *too drunk* to be interrogated.  The defendant later entered into a plea agreement before the voluntariness hearing could be held.  (Exhibit 15-B).

Saldate's pattern of interrogating mentally impaired suspects and witnesses is further shown in *State v. Running Eagle,* CR 87-11508, a first degree murder case resulting in the defendant receiving the death penalty, where Saldate questioned an intoxicated witness.  The following colloquy shows Saldate's persistent refusal to accept a drunk witness' rendition of events.  It was elicited during defense counsel's cross-examination of Detective Saldate:

Q:     Isn't it true in talking to Orva, would it be fair to say, that you told him, "Tell us what happened."  He says, "I am too drunk to remember."  Then you said, "This is too important of a case.  We can't have an answer like that in a case like this.  This is too serious.  You got to do better than that."  Isn't that true?

A:     That is true.

Q:     You didn't testify to that on direct either did you, Detective?

A:     That was not asked of me – again, I just paraphrased his statement.

Q:     And in fact there were many – well, at least several times during your interview of Orva that you told him something similar, like, I don't believe that.  You are going to have to do better than that.  Isn't that true?

A:     That is true.

Q:     You went through days of, "I don't believe that."  He would feed you a little more and a little more as you went through these.  You got to do better.  You got to do better.  He would keep doing better.  Isn't that true?

(Exhibit 15-C).

In *State v. Kelly* and *State v. Moynihan*, CR 87-00882, the defendant asserted that he was intoxicated during his interview by Detective Saldate.  Additionally, during his interview with Kelly, Saldate reported that Kelly was evasive and non-committal.  Kelly explained that he was coming down from a methamphetamine high during the interview.  Both defendants accepted pleas to second-degree murder before a voluntariness hearing could be held.  (Exhibit 15-D).

Detective Saldate has also questioned children in alarmingly unorthodox manners without adhering to necessary legal safeguards.  For example, in *State v. Jones*, CR 90-05217, Saldate ordered that the juvenile suspect be locked in a room and chained to a desk.  The subsequent confession was later thrown out for lack of probable cause for arrest.  (Exhibit 15-E).

In *State v. Blackerby*, CR 88-07047, the defendant, a juvenile with a known history of mental impairment and psychological problems, was held for two hours before Saldate began interrogating him.  He and another detective then alternated questioning Blackerby for another two hours, until two o'clock in the morning.  Finally, Detective Saldate ordered that Blackerby "cleanse his soul" of the crimes he had committed.  At the voluntariness hearing, the following discourse transpired between Saldate and defense counsel:

Q:     In fact, you exhorted him to cleanse his soul, isn't that right?

A:     Yes.

Q:     You told him he should cleanse his soul of all crimes that he committed and that he'd feel better for it; isn't that what you told him?

A:     Yes.

Q:     And, in fact, when you did that, you obtained a – right after doing that you obtained an admission, didn't you?

A:     An admission to an armed robbery, yes.

35

Q:      He began to nod his head yes to almost everything you asked him.

.   .   .   .   .   .

A:      That's somewhat correct.

(Exhibit 15-F).  The motion to suppress was denied.  Mr. Blackerby waived a jury trial, was

convicted and sentenced to fifty years without possibility of release.  (Id.).

The foregoing cases demonstrate Saldate's eagerness to obtain confessions, from

injured and mentally impaired suspects, notwithstanding the reliability of the interviewee or the

truth.

### 2.    Detective Saldate has Demonstrated his Utter Disregard for *Miranda v. Arizona*

Saldate's interrogation techniques have been scrutinized by the Arizona Court of

Appeals in *State v. Mahler*, CR 90-06988.  There, the suspect stated to Saldate that he wished

to remain silent.  Saldate, after promising leniency to the suspect's girlfriend, responded that he

just wanted to hear the suspect's "side of the story."  In an unpublished decision, Division One

of the Court of Appeals stated:

> Here, Mahler made an unequivocal invocation to remain silent.  The law is clear
> that Saldate was required to immediately terminate the interview.  Instead,
> Saldate responded that he did not want an admission but that he just wanted
> Mahler's side of the story.  Officer Saldate's intent was clear.  As he testified, he
> wanted additional statements from Mahler.  This conduct violated Mahler's right
> to remain silent.   Any incriminating statements made following Mahler's
> unequivocal statement that he did not wish to talk about the murder are
> inadmissible.

(Exhibit 15-G).  Saldate's conduct here also violated the rule of law that a confession resulting

from any direct or implied promises, however slight, is involuntary.  *Hutto v. Ross,* 429 U.S. at

30; *State v. Williams*, 136 Ariz. 52, 56, 664 P.2d 202, 206 (1983).

In *State v. Jones*, CR 90-05217, Saldate again chose to ignore the requirements of *Miranda* in addition to ignoring the requirement for probable cause to arrest. The defendant was a passenger in an automobile owned by a missing person, later determined to be a murder victim. The driver of the automobile was taken in for questioning. While he was being questioned, Saldate had Jones, the juvenile defendant, locked in an interview room, handcuffed to a desk. Saldate later joined the defendant in the room and informed him that the driver had confessed. In response, Jones confessed. He was certified as an adult and charged with first-degree murder. The trial court suppressed the confession and subsequent fruits. A copy of the trial court's disposition is attached. (Exhibit 15-E). The State appealed. In an unpublished decision, the Court of Appeals *again* chastised Detective Saldate for his illegal approach to investigation and upheld the trial court's suppression order.

> An investigatory detention lacking probable cause is precisely the kind of invasion the exclusionary rule was designed to prevent. Although defendant introduced no evidence that Detective Saldate's intent was to coerce a confession, it is undisputed that his order to detain defendant was investigatory in purpose. Defendant was not isolated and detained by accident. Detective Saldate admits to not only directing placement of defendant in a room, but also having absolutely no information linking him to a crime at that time.
>
> . . .    . . .
>
> The illegal detention was no less flagrant because it arose from a policy to isolate potential witnesses, rather than a policy to coerce suspects to confess. In either case, this was a purposeful arrest lacking in probable cause, for the improper motive of investigation. The manner of the detention – handcuffing a juvenile alone to a desk in a locked room – increased the flagrancy of the illegal detention and the coercive nature of the confession.

(Exhibit 15-E). The State later dismissed the charges.

In another death penalty case, Saldate's fixation with eliciting incriminating evidence from suspects, notwithstanding their rights, came to light. *State v. Gallegos,* CR 90-03339. Gallegos involved two co-defendants, Gallegos and Smallwood. Saldate was in charge of questioning Gallegos. During the interrogation, Gallegos repeatedly requested counsel. His

requests were ignored.  Only when Gallegos admitted involvement in the murder did Saldate read him the *Miranda* warnings – long after custodial interrogation began and after Gallegos requested counsel.  Saldate then used Gallegos' confession to attempt to extract a confession from Smallwood.  Gallegos was convicted and sentenced to death.  (Exhibit 15-H); *See also State v. Gallegos*, 178 Ariz. 1, 870 P.2d 1097 (*en banc*) (1994), *cert. denied*, 513 U.S. 934 (1994).

In *State v. Running Eagle*, CR 87-11508, the defendant asserted his right to remain silent.  As is typical, Detective Saldate ignored this assertion.  (Exhibit 15-C).  Not only did he keep questioning Running Eagle, but he did so by continuously poking the defendant in the chest while keeping his face six to twelve inches from him.  (Id.).  The defendant allegedly confessed and was sentenced to death.  He still awaits execution.  *See State v. Running Eagle*, 176 Ariz. 59, 854 P.2d 169 (1993) (*en banc*), *reconsid. denied* (6/13/93), *cert. denied*, 510 U.S. 1015 (1993).  It was also alleged in *Running Eagle* that Detective Saldate mentioned while interrogating the intoxicated witness, Orva, that there might be the possibility of the gas chamber.  (See Exhibit 15-C).  Of course, such discussions are highly improper in an interrogation context and can result in suppression.  *E.g., State v. Emery*, 131 Ariz. 493, 502-03, 642 P.2d 838, 847-48 (1982).

In *State v. Stark*, CR 130819, the defendant issued several affidavits avowing that Detective Saldate interrogated him while he was in custody without informing him of his *Miranda* rights.  The defendant also swore that Saldate and his partner lied and threatened him in order to obtain incriminating statements.  Stark was denied protection when imprisoned during the investigation, despite the fact that he was a known State's witness.  Saldate also took the defendant's girlfriend into custody and threatened to charge her unless the defendant

confessed.  She also signed an affidavit alleging these facts.  (Exhibit 15-I). Eventually, the defendant confessed.  He entered a plea agreement before a voluntariness hearing could be held.  However, obtaining a confession through the use of threats that lack of cooperation may result in harsher treatment is clearly involuntary and violates a person's Fifth Amendment right to remain silent.   *See, e.g., Fenton,* 474 U.S. at 116; *Harrison,* 34 F.3d at 891; *Collazo v. Estelle,* 940 F.2d 411, 416-19 (9th Cir.  1991), *cert. denied,* 502 U.S. 1031 (1992); *United States. v. Tingle,* 658 F.2d 1332, 1336 n. 5 (9th Cir. 1981).

Detective Saldate has also been less than forthcoming about a suspect's invocation of his *Miranda* rights prior to a confession.  The defendant in *State v. King*, CR 90-0005, invoked his right to remain silent, yet Saldate continued the interrogation.   At the subsequent voluntariness hearing, Saldate denied that the defendant had ever attempted to stop the interrogation.  Yet, embodied in Saldate's own report was a quotation from the defendant taken at the time of the interrogation that read "I know exactly what you're trying to do, but I'm not going to answer any more of your questions."  (Exhibit 15-J).  The trial court suppressed all of the statements made after the invocation of the right to remain silent.  Despite the suppression of the statement, however, enough other evidence existed to convict and sentence the defendant to death.  *See State v. King*, 180 Ariz. 268, 883 P.2d 1024 (*en banc*) (1994), *cert. denied*, 516 U.S. 880 (1995).

In *State v. Rangel,* CR 89-08086, the defendant requested an attorney *three* times. Yet, Saldate kept right on questioning him.  During the grand jury proceedings, Saldate redacted portions of Rangel's confession, choosing only to give information that corroborated the charge of first-degree murder.  (Exhibit 15-K).  This case was remanded to the grand jury for a new determination of probable cause.  (Id.).

In addition, in *State v. Biggica*, CR 90-00715, Detective Saldate defied *Miranda* by informing the defendant that he was required to tell Saldate about the circumstances surrounding the crime, even though the defendant denied having any participation. The defendant moved to suppress his confession, but a plea agreement was reached before the suppression hearing was held. (Exhibit 15-L).

### 3.   Detective Saldate has a History of Lying to the Grand Jury in Order to Secure Indictments

On several occasions, Detective Saldate misled or lied to the grand jury, resulting in remands for new findings of probable cause. For example, in *State v. Rodriguez*, CR 161282, a first-degree murder case, Saldate went before the grand jury and swore that the victim had been shot four times, when in fact, it was completely undisputed that he had only been shot once. The court granted the defendant's motion for remand for redetermination of probable cause. (Exhibit 15-M).

In *State v. Reynolds*, CR 88-09605, Detective Saldate withheld evidence from the grand jury that was exculpatory to the defendant. Specifically, Detective Saldate failed to inform the grand jury, when *asked*, that an eyewitness placed the defendant with the victim at approximately 8:00 p.m. and that the victim was seen alive over two hours later. Furthermore, Detective Saldate testified that the defendant was not intoxicated the night of the murder, yet the evidence was clear that Saldate knew he was intoxicated and under the influence of marijuana to the point where he could not remember certain events. The trial court order the case remanded for a new probable cause determination. (Exhibit 15-N).

4.      **Detective Saldate has a History of Corrupting and Misusing the Outcomes of Line-Up Identifications**

In *State v. Ross*, CR 90-00296, the murder victim's wife participated in a photo line-up in an attempt to identify the persons who broke into her home and killed her husband. The defendant's photograph was not among the photos displayed. She identified one individual in the line-up as the perpetrator. Detective Saldate later informed her father-in-law that she had chosen the wrong individual, in violation of the condemnation of post line-up commentaries. *See, e.g., State v. Day*, 148 Ariz. 490, 755 P.2d 743 (1986). The defendant, Ross, was later taken into custody, but any line-up involving him was tainted by Saldate's post line-up comments. (Exhibit 15-P).

In *State v. Webster*, CR 143926, two robbery witnesses told Detective Saldate that they could only *possibly* identify the perpetrator. Saldate showed them a photo line-up in which the defendant's photo looked very little like any of the other photos. The witnesses stated that the defendant "looked like" the perpetrator. Subsequently, Saldate swore in his application for a search warrant that the witnesses had positively identified the defendant. The trial court refused to suppress the line up and the defendant was convicted for armed robbery. (Exhibit 15-Q).

5.      **Detective Saldate has Previously Been Accused of Fabricating Confessions**

Although criminal defendants often accuse their interrogators of fabricating incriminating statements, such accusations involving Detective Saldate have credibility when viewed with the attached records of numerous specific illegal circumstances surrounding his interrogations. (Exhibit 15). In addition, whereas other interrogators question in the company

of other law enforcement personnel or tape record interviews to insulate themselves and the product of their interrogations, Detective Saldate has refused these protections.

In *State v. Fraser*, CR 89-08277, Detective Saldate failed to tape record his interviews with any of the pertinent parties. During trial, the defendant accused Saldate of fabricating witness statements. Defense counsel attempted to show the unfairness to the defendant of Saldate's failure to substantiate his interviews.

Q:  You told Mr. Stalzer you didn't put words in Darrel Sweet's mouth, is that correct?

A:  That's correct.

Q:  Yet you had a couple of opportunities to interview Darrel Sweet, and none of them were tape recorded, is that correct?

A:  That's correct.

Q:  Darrel maintains that he never knew Nancy or Frank and that you kept telling him that he knew Nancy or Frank. Do you recall that?

A:  That's absolutely false.

Q:  But if he said it one way or the other, had you recorded it, we'd at least have his voice of record for that fact, wouldn't we?

A:  Sure.

In reference to another allegation of fabrication, defense counsel asked:

Q:  Again, that part wasn't recorded either?

A:  Mr. Seplow might as well – none of the interviews with Mr. Sweet were recorded. The only interview recorded in this case was the interview Detective Martinsen recorded.

(Exhibit 15-R).

In *State v. Running Eagle*, CR 87-11508, following Saldate's admission that he continuously poked the defendant in the chest and stood six to twelve inches from his face

during the interview, defense counsel engaged Detective Saldate in a discourse regarding his refusal to tape record his interviews.

> Q:  Was Mr. Running Eagle crying during his interview?  Did he have tears in his eyes?
>
> A:  At one point he did have tears in his eyes.
>
> Q:  And did you have the equipment to tape his conversation should you have desired to?
>
> A:  Definitely.
>
> Q:  Is there a reason you did not tape this conversation?
>
> A:  Certainly.
>
> Q:  Why was that?
>
> A:  I don't believe it's very good, a taped confession or an interview with someone, especially since it involves such a serious crime.  Because I think it hinders that person from coming out, discussing what he really wants to say.  I think that maybe that tape kind of keeps them from wanting to talk to us.

(Exhibit 15-C).

In addition to the foregoing examples of Saldate's prior history and pattern of coercing and fabricating confessions, another individual telephoned Debra's attorney during trial with the information that Detective Saldate had also fabricated a "confession" in his case.  (See Kirk Fowler's Sworn Statement to Terry Capozzi, attached as Exhibit 36).   Unfortunately, defense counsel never called this individual as a witness in Debra's case, perhaps due to the late hour his existence became known.  (Id.). The foregoing examples clearly demonstrate a pattern of extreme unprofessionalism, unreliability and untruthfulness on the part of Detective Saldate. This Court can and should take Detective Saldate's pattern and history into account in assessing the reliability and truthfulness of his claims in Petitioner's case.

C. **The Evidence Establishes that Detective Saldate Essentially Fabricated Petitioner's Purported Confession in Violation of her Constitutional Rights**

Each confession case turns on its own set of factors justifying the conclusion that police conduct was oppressive, but all contain a substantial element of police overreaching. *See Colorado v. Connolly*, 479 U.S. 157, 163-64 (1986). Both physical and psychological pressure can lead to involuntary confessions. *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). In coercion cases, the courts must consider the totality of circumstances involved and their effect upon the will of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *United States v. Guerrero*, 847 F.2d 1363, 1365-66 (9th Cir. 1988). The pivotal question is whether the defendant's will was overborne when the defendant confessed. *Schneckloth*, 412 U.S. at 226-26; *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981). Nevertheless, in some cases, the need for such an individual calculus is obvious by the "egregiousness of the custodian's conduct." *United States v. Jenkins*, 938 F.2d 934 (9th Cir. 1991).

This case is exactly the type where an individual analysis is needed. When scrutinized under the totality of the circumstances, it is apparent that Saldate's claims regarding Debra's purported confession are not reliable. Furthermore, Armando Saldate's oppressive, unconstitutional methods placed Petitioner in an indefensible position.

Consistent with his history, Detective Saldate prematurely concluded that Petitioner conspired with Scott and Styers to have her son murdered. He admitted that he based this conclusion solely upon a few words by Roger Scott. (R.T. 9/10/90 at 13-15, 40-43; Exhibit 32 at 3-4). True to form, every action Detective Saldate took once his mind was set was designed to support his belief. (See Exhibit 28 (Prof. Leo); Exhibit 15). He first acted to ensure that his investigative techniques were protected from scrutiny. Despite orders to the contrary from his supervisor, Saldate adhered to his spurious practice of refusing to tape or otherwise

memorialize his interrogation.  (Exhibit 32 at 10; R.T. 9/10/90 at 44; R.T. 9/11/90 at 7; R.T. 9/12/90 at 62-63).  Because he ordered everyone out of the room, there were no witnesses to what took place during his interrogation of Petitioner, despite the fact that another Phoenix police officer, Detective Hamrick, was present in Florence to assist Saldate.  (R.T. 9/10/90 at 47).  Further, Saldate destroyed the contemporaneous notes that he took during the interview, leaving only the "official version," a written, paraphrased report he prepared several days after the interview.

Once he was alone in a room with Petitioner, Armando Saldate employed the tactics and techniques espoused by experts "for the interrogation of suspects whose guilt is definite or reasonably certain."  (Inbau & Reid, *Criminal Interrogation and Confessions* (2nd ed., attached as Exhibit 37).  In his very first statement to Petitioner, Saldate told her that her son was dead and she was guilty of his murder.  (R.T. 10/3/90 at 13).  He drew his chair up to hers so that their knees were nearly touching and they sat face-to-face.  (Id. at 17-18).  A physically imposing man, Detective Saldate leaned close to Petitioner, serving to intimidate and dominate her as he controlled every aspect of the interrogation.  In moving his interrogation forward, Saldate engaged in a number of the other interrogation techniques espoused for the guilty in the well-known and studied treatise.  (Exhibit 37).  As he is accustomed to doing, when Petitioner requested a lawyer, Saldate ignored her.  (R.T. 10/3/90 at 17-18).

Given Saldate's history, his grasp of the facts at that time, and the techniques he chose to employ in dealing with Petitioner, Saldate's mindset during the interrogation of Petitioner was clearly prejudiced.  The nature of the crime – a very high profile Christmas season child killing – combined with the *hubris* of twenty years experience closed Armando Saldate's mind

to anything but Petitioner's guilt.  Thus, Armando Saldate was intent on interpreting every nuance of Petitioner's behavior and words in the worst possible light, and he did so.

Saldate described Petitioner's responses as staged, he discounted and minimized her instantaneous and emotional response to the death of her son.  He never allowed himself time to accurately assess her response to the death of her child because he accused her of her son's murder at the same moment he informed her of his death.  (R.T. 10/3/90 at 15-25).  He then used his intimidating and authoritative presence to squelch Petitioner's hysteria.  (Id.; R.T. 10/3/90 at 13, 18-20).  He ordered her to be quiet in the same manner that her father employed when she was a child, by raising his voice and squelching her emotional response.  (Id.; R.T. 9/13/90 at 104-05).  He interpreted her shock as coldness, then insinuated that she became provocative toward him.  (See Sandra Pickinpaugh Interview, attached as Exhibit 6 at 30).

Detective Saldate left the interrogation room after a relatively short period of time contending that he had secured a confession from Petitioner.  (Saldate's Pretrial Interview, attached as Exhibit 32 at 30; R.T. 9/10/90 at 55).  Yet, he never asked her to write or sign a statement acknowledging her participation in these crimes, even knowing that he had no videotape, no audio tape or witness to corroborate the alleged confession.  Saldate was *confident* in his ability to sway a jury, to make them believe him.  (See New Times Article, attached as Exhibit 27).  In testimony, where Saldate's memory failed him, he did not hesitate to fill in with exaggerated, inaccurate and inflammatory statements regarding this interrogation. (R.T. 9/12/90 at 78-79).

Under the totality of the circumstances in Petitioner's case, her purported "confession" was clearly involuntary.  *Schneckloth*, 412 U.S. 218.  The weight of evidence also demonstrates that it was essentially fabricated by Detective Saldate.

Petitioner has consistently denied confessing to Saldate,[8] contending that the rambling and disjointed statements she made were borne of shock, disbelief, confusion, and terror at the news that her son was found murdered and that she was being blamed in some way. (R.T. 10/3/90 at 13-14, 18, 42-46). Debra contends that Saldate has taken some of her statements, rendered them accurately, but out of context. (Id. at 11-59). Other statements attributed to her were made up out of whole cloth. (Id). Yet, precisely because of his oppressive and unprofessional interrogation tactics, neither Detective Saldate nor Petitioner have any means of corroborating that this alleged confession did or did not occur. Given his long tenure as a police officer and his confidence in his ability to sway a jury, Detective Saldate knew that benefit of any doubt would inure to him. (Exhibit 27).

As detailed in Professor Leo's report and set forth above, Saldate's interrogation techniques, both generally and as specifically employed in Debra's case, call into serious question the reliability of Debra's purported confession. (See Exhibit 28). This national authority on police interrogations and confessions concludes that much of Saldate's account of what transpired in his interrogation of Debra is not credible in light of what is known about police interrogation training and practice. (Id. at 10). Not only are the examples of Detective Saldate's "farfetched assertions" apparent in Debra's case, "the examples of Detective

---

[8] In addition to Debra's own trial testimony and affidavit, two other sources support the fact that she has consistently denied having confessed to Detective Saldate. The first is the sworn statement of an investigative reporter who saw Debra shortly after her arrest when he gained access to her in the "horseshoe" area of Madison Jail. (See Paul Huebl Affidavit, attached as Exhibit 38). This reporter avows that Debra was "astonished," "shocked" and "confused" when he told her police were claiming she had confessed, and "adamant" about her denial of any involvement or approval in her son's murder. (Id.). The second source is Kirk Fowler, the investigator who worked with trial counsel and former post-conviction. (See Kirk Fowler Affidavit #1, attached as Exhibit 4). Throughout the course of his work in this case, Mr. Fowler has never observed any behavior or statements from Debra supporting Saldate's claim that she had confessed. (Id.). To the contrary, he found her to be forthright, honest, cooperative and sincere in her grief over her lost child. (Id.).

Saldate's misrepresentations and interrogation misconduct in other disputed confession cases, including his failure to read or honor a suspect's *Miranda* warnings, also cast substantial doubt on Detective Saldate's assertions." (Id.).

Professor Leo's ultimate opinion is that "much of Detective Saldate's account of what occurred during his interrogation of Ms. Milke is simply not plausible or credible." (Id. at 11). He also concludes that "much of Detective Saldate's account reveals an inexcusably low level of professionalism that casts considerable doubt on his assertions about Ms. Milke's interrogation, as well as his integrity." (Id.).   Because of Detective Saldate's "inexcusable" failure to tape record and preserve a record of Debra's interrogation, Professor Leo notes that it is impossible to know with complete certainty whether Detective Saldate fabricated or coerced a confession from Debra, or whether, as he asserts, she provided a voluntary, truthful statement of guilt. (Id.).   However, it is Professor Leo's professional opinion that "Detective Saldate's account of the interrogation and alleged confession is too untrustworthy to support a conviction (especially a capital conviction) *and that he may very well have fabricated or coerced a false or non-existent confession from Debra Milke."*   (Id.)(emphasis added).  He adds that "[i]n the hundreds of cases I have studied, I have never seen a conviction rest on nothing more than a disputed, undocumented and unsigned confession." (Id.).

It is also the opinion of three law enforcement experts that, based on a set of hypothetical facts designed from those present in Debra's case, "there is a high probability the confession never occurred and was fabricated." (See Affidavits of Law Enforcement Experts, attached as Exhibit 39).   One of these experts, Bob Benson, retired in 1991 from the U.S. Department of Justice, Drug Enforcement Administration. (Id.).   He worked as a Federal Narcotics Agent from 1969 through 1991 in New York, Houston, Tucson and Nogales. (Id.).

Prior to that time, he worked as a Naval Intelligence Agent in the U.S. Navy. (Id.). Another expert, Kenneth Lindley, has diverse experiences such as a private investigator, a certified police instructor, police officer on the Navajo and Hopi Nations and training staff member for the Arizona Department of Public Safety, with over 23 years of experience as a law enforcement officer assigned to patrol, investigations and training. (Id.). The third, John Meyer, worked for the U.S. Department of Justice, Drug Enforcement Administration, from 1973 to 1986, prior to which he worked as an investigator in the U.S. Customs Service and the Naval Investigative Service. (Id.). Thereafter, he became employed as a supervisor for a company who contracts with the D.E.A. to conduct background investigations. (Id.).

As noted by Professor Leo, Detective Saldate's disciplinary records also illustrate that he is willing to lie in order to "cover up" his improper, unprofessional tactics. (Exhibit 31 (Separation Notice)). In 1973, Saldate was formally suspended and reprimanded for engaging in sexual conduct with a female motorist in exchange for not arresting her on an outstanding warrant. (Id.). He lied about the incident to his supervisors until a polygraph revealed deception, after which he finally confessed. (Id.).

Similar unprofessional behavior can be seen in Saldate's interrogation of Debra. First, Saldate interrogated Debra alone without a female officer (or any other officer) present. (R.T. 9/10/90 at 133). He also alleged during his interview of Debra's sister, Sandra Pickinpaugh, that Debra "flashed her breasts" at him during the interrogation in an attempt to "manipulate" him. (Exhibit 6 (Sandra's interview)). According to Sandra, Saldate seemed more interested in Debra's relationships with men than with the investigation of Chris' murder. (See Anders Rosenquist Affidavit, attached as Exhibit 40). In describing the interrogation, Detective Saldate also claimed in a newspaper interview that Debra tried "to get me in her stable of guys

who would do things for her." (Exhibit 27 (New Times Article)).  Strangely, Detective Saldate

failed to mention either of these very unusual alleged facts in his written report, and he testified

that nothing "unusual" occurred during his interrogation that was not contained in his report.

(See Exhibit 24 (Police Report of Debra Milke Interview); R.T. 9/13/90 at 28-40. Neither did

he mention these allegations in his pretrial interview.  (See Exhibit 32 (Saldate Interview)).

Nor does his claim make sense in light of the evidence of what Debra wore on the day of her

interrogation – a t-shirt tucked into her jeans with a sweater over the shirt, which she used to

wipe away her tears.  (R.T. 10/3/90 at 19-20).

Detective Saldate's unsworn, unsupported claims of Debra's behavior as a "seductress"

toward him illustrate a tremendous amount of arrogance and apparent "fantasy" on his part.

This unlikely scenario was likely spawned by a combination of Saldate's inflated opinion of

himself and protection of *his own* inappropriate conduct toward Debra, which included

interrogating her alone, moving his chair up to face her knee to knee and placing his hands on

both of her legs as he began the interrogation.  This likely led to a situation in which Saldate

incorrectly interpreted certain innocent behaviors by Debra (such as using her sweater to wipe

away tears) as those of a "seductress" (raising her shirt to flash her breasts at him).   These

serious misinterpretations and illusions further illustrate the unreliability of Detective Saldate's

claims regarding Debra's statements and behaviors, and show how he could have fabricated

and "warped" what occurred during the interrogation.

Additional evidence supporting the claim that Detective Saldate essentially fabricated

Debra's purported confession lies within Saldate's own testimony, police reports, interviews

and  other  statements.  Numerous  inconsistencies,  discrepancies,  exaggerations  and

misrepresentations are contained in these various written and oral statements, many of which

are set forth in detail for this Court's review in Exhibit 41.  These include Saldate's testimony to the Grand Jury that Debra formed the idea to have Chris killed approximately one month prior to the killing.  (Exhibit 41).  No evidence in the record or elsewhere supports this claim.  (Id.).  In his police report of his interrogation of Debra, Detective Saldate states that he told Debra that both Scott and Styers had implicated her in Chris' death.  (Id.).  He then acknowledged in his pretrial interview in June 1990 that this claim was false.  (Id.).  He also said in the June 1990 interview that he had checked the claim in his report regarding Scott and Styers implicating Debra against his "notes."  (Id.).  Yet, in response to questions about those notes at trial, Detective Saldate testified that he had destroyed them immediately after preparing his written report on December 6, 1989.  (Id.).   These are but a few of the inconsistencies and falsehoods apparent from Saldate's own written and oral statements.  Such inconsistencies and misrepresentations alone should cast serious doubt on the reliability of Saldate's claims and his ability to objectively interpret and convey information regarding Debra's statements and non-verbal behaviors.

Debra's purported confession is acknowledged by all parties to the "keystone" of the prosecution's case.  No physical or other evidence linked Debra to this crime.  Thus, she was clearly denied due process of law by Detective Saldate's overreaching and self-serving methods. These include Saldate's failure to record the interrogation, ignoring Debra's request for an attorney, use of coercive and unprofessional techniques, and essential fabrication of the confession by a combination of taking some of Debra's comments out of context and complete fabrication of other alleged statements and behaviors.   In this case, as with many others in which he has been involved, Detective Saldate's tactics are an affront to the United States Constitution.  *Schneckloth*, 412 U.S. at 218.  Under the circumstances, where Saldate had

nothing but his contemporaneous notes with which to corroborate the interview, his destruction of those notes alone violates Petitioner's due process rights.

Saldate's refusal to cease the interrogation when Debra requested an attorney also violated her constitutional rights. Detective Saldate has a lengthy history of violating defendants' *Miranda* rights. (See Saldate Records, attached as Exhibit 15). It is well-settled that a custodial interrogation conducted to obtain incriminating statements must (1) be preceded by procedural safeguards and (2) follow from a knowing, intelligent and voluntary waiver of Fifth and Sixth Amendment rights. *Miranda v. United States*, 384 U.S. 436 (1966). Moreover, the Government bears the burden of establishing that *Miranda* has been complied with. *See Unites States v. Heldt,* 745 F.2d 1275, 1277 (9th Cir. 1984)(citing *North Carolina v. Butler,* 441 U.S. 369, 373 (1979)). It did not meet that burden here. The record shows that Debra did not understand her Miranda rights. (R.T. 10/3/90 at 13). Debra told Saldate that she did not understand her rights. (Id. at 17). Saldate did not read them again or explain them. (Id.). He resumed questioning, and Debra asked for a lawyer. (Id.). Saldate ignored the request and continued the interrogation. (Id. at 18). This conduct was unquestionably in violation of *Miranda*.

While it is not unimaginable that state courts can ignore such heinous conduct by one of "its own," it is this Court's duty, in the nature of habeas corpus, to oversee the State of Arizona and rectify such grievous unconstitutional misconduct and error. Petitioner's convictions and sentences must be vacated.

**D.**   **Detective Saldate's Interview Techniques Also Acted to Bias Witnesses Against Petitioner and Denied Her Right to a Fair Trial**

**1.**   **Richard Sadeik (Debra's father)**

Petitioner's right to a fair trial was further abridged by Detective Saldate's conduct of witness interviews. Saldate's report stated that he telephoned Petitioner's father, Richard Sadeik, to inform him that Debra had confessed to her participation in this crime. (Exhibit 24 at 6). Saldate told Mr. Sadeik, career military man and Department of Corrections employee, that his daughter had killed her son because "she did not want him to grow up to be like his father." (Id.). According to Saldate, Richard refused to even speak to his daughter or to assist her with an attorney, suggesting instead that she get a public defender. (Id.).

Shortly before his death in March 1998, Mr. Sadeik spoke with Kirk Fowler, the investigator for both trial and the initial post-conviction proceedings. (See Kirk Fowler Affidavit (Sadeik), attached as Exhibit 42). Debra had written to her father when she learned he had terminal cancer in early 1998. (Id.). Mr. Sakiek wanted Mr. Fowler to meet with him for the purpose of learning what evidence demonstrated that Debra had not confessed. (Id.). Mr. Sadeik told Mr. Fowler that when Detective Saldate told him Debra had confessed to Chris' murder, he believed him because he was a law enforcement officer, and he did not believe that a law enforcement officer would mistake the facts. (Id.; See also Dr. Biegan's Report; attached as Exhibit 2 at 7-8). Mr. Sadeik explained that this was due to his background in the military and corrections industry, as well as his faith in the justice system. (Id.).

Based on those statements, Mr. Fowler wanted to learn more details about Saldate's conversation with Mr. Sadeik the night of Debra's arrest. (Id.). Mr. Sadeik angrily told Mr.

Fowler that if Debra is, in fact, not guilty and Saldate did not tell him the truth, "I'm killing the son of a bitch for what he's put me through and my family." (Id.). These statements and expressions of anger demonstrate the degree to which Mr. Sadeik relied upon Detective Saldate's representations in believing that his daughter had conspired to kill Christopher. Clearly, he was severely influenced by his discussion with Saldate. Unfortunately, Mr. Sadeik died from his illness before he and Mr. Fowler could meet, which was scheduled just four days after their telephone conversation. (Id.).

According to reputable local psychologist, Dr. David Biegan, Debra's father was a prime candidate for Saldate's influence and manipulation. (Exhibit 2 at 7-9). In addition to his strong bias toward believing law enforcement officers, Mr. Sadeik was a chronic alcoholic who apparently never received treatment. (Id.). He had a very dysfunctional history with his family, and had resentment toward Debra for "siding" with her mother, Renate, after the divorce. (Id. at 7-8). His history also demonstrates that "[n]ow things appeared to others was apparently more important to him than how they truly were." (Id. at 8). According to Dr. Biegan, Debra's father:

> wanted other people apparently to think of him as being capable, competent and a good provider, even if he wasn't. *It is not surprising then that father turned on Debbie with his trial testimony and then later recanted.*

(Id. at 8) (emphasis added). After reviewing the social history, trial testimony and numerous other documents in this case, Dr. Biegan's opinion was as follows:

> In my opinion, to a reasonable degree of psychological certainty, Debra's father, Richard Sadeik, was as much a victim of his own chronic alcoholism, which was never treated, or as far as we know, diminished, his relatively absolute and ongoing belief in the truth of the armed services, and his unflagging conviction that personnel in law enforcement and corrections would never misstate facts. In his affidavit, he almost used those exact words to describe his apparent

agreement with and extreme cooperation with the position and questions of Detective Saldate so revealing the truth of his motivation.

(Id. at 2).  Clearly, Mr. Sadeik was severely influenced by Detective Saldate.

According to Dr. Biegan, "[T]he most potent rage contained, nurtured and concealed by Sand[y] reached the surface with the death of Christopher and the accusation of Debra as responsible." (Id. at 5).  "Here, almost hand-delivered to her was the first opportunity to excel, exceed and step over her sister.  She was desperate to be admired by mother the way she perceived Debra to be favored by this parent." (Id.).

According to Dr. Biegan, once "removed from the pressure and her own neurotic vulnerability which, in my opinion, was relied upon and in some sense, abused by Detective Saldate, Sand[y] was able to describe her feelings about the situation so long as that detective was no longer pressuring or bullying her." (Id.).  Throughout their interview, Detective Saldate "relied on and exploited every neurotic weakness Sand[y] had." (Id.).  "He encouraged her to describe everything negative about Debra . . . (Id.).  Sandra also used this opportunity to portray herself as the "giving," available, loving sister who despite feeling put upon in the family, was available to help Debra any way she could without any due concern for herself." (Id. at 5-6).

In Dr. Biegan's opinion, to a reasonable degree of psychological certainty:

Sandy's testimony regarding Debbie changed because it is in the nature of neurotic problems . . . to contain ambivalence in them . . . . Place a person such that under what the experience as inordinate pressure, especially when they are highly vulnerable, and the results will follow one side of the ambivalence or the other.

(Id. at 6).  These dynamics explain why with pressure and subsequent influencing by Saldate, Sandra was so easily "turned against" her sister by Saldate.  Ultimately, Dr. Biegan concludes:

It is my opinion to a reasonable degree of psychological certainty, the family's social history is highly likely to have contributed to the fact that both Debra's father and sister testified against her and then altered their position post-trial. Further, I think it is highly likely that Debra's sister was particularly vulnerable, impressionable, and easily pressured by Detective Saldate who, despite his protestations to the contrary, seemed to me so eager to convict Debra that he could barely contain his enthusiasm leaning on, traipsing over, and stomping, if not legal, then certainly ethical boundaries in his interviews.

It is evident that Detective Saldate's pressing and influence significantly exploited and tainted these two family members against Debra.

## 2.    Sandra Pickinpaugh (Debra's sister)

Detective Saldate's efforts to turn Petitioner's sister, Sandra Pickinpaugh, against her are evident from Saldate's interview of Sandra, which she insisted on recording herself. (See Sandra Pickinpaugh Interview attached as Exhibit 6). He first tried to sell Sandra on Petitioner's guilt by telling her about the purported confession. (Id. at 10). Then, knowing of Sandra's prior close relationship with Styers and sensing the strong sibling rivalry between the sisters, Saldate revealed the fact that Styers continued to write "lovelorn" letters to Petitioner after their arrests. (Id. at 22). After Saldate portrayed Petitioner as a callous vixen who tried to seduce her way out of trouble by exposing her breasts to him, Sandra participated in trashing her sister's character. (Id. at 30).

The degree to which Saldate influenced and pressured Sandra is reprehensible. In an October 19, 1995 telephonic interview with Sandra, former habeas counsel, Anders Rosenquist, learned the details behind Saldate's pretrial interview of Sandra. (See Anders Rosenquist Affidavit, attached as Exhibit 40, p. 1).[9] Sandra's (and Debra's) mother, Renate, had told Mr.

---

[9] The information regarding Sandra's statements is included in an affidavit by former habeas counsel because subsequent problems resulted in an inability to obtain an affidavit from Sandra. Following their conversation, Mr. Rosenquist sent an affidavit to Sandra containing the information she conveyed to him, to which Sandra did not object. (Id. at 5-6).

Rosenquist that Sandra had no objection to speaking with him. (Id. at 1-2). During their conversation, Sandra told Mr. Rosenquist that Detective Saldate had made numerous misleading comments to her in an apparent attempt to persuade her to testify unfavorably against Debra. (Id. at 2). She said that, prior to Debra's trial, she was in her seventh month of pregnancy with her second child when Saldate and another investigator telephoned her repeatedly. (Id.). They were upset, she said, because she kept postponing her interview. (Id.). She explained that, in her condition, she did not want to become involved in the ordeal. (Id.). She said that Detective Saldate was frustrated and kept hounding her for a due date for the birth of her child. (Id.). Sandra stated that in their final telephone conversation, Saldate informed her that he had reservations and would be coming up to see her in Wyoming the following day. (Id.). When she told him that would not be convenient, he told her, "well, either you do it now or you get subpoenaed and you just have to deliver your baby early." (Id.).

Sandra reported that Saldate said he needed her to provide character evidence against her sister, because she knew Debra better than their parents did. (Id. at 2-3). She told him that she and Debra were never close, but they did generally know what was going on with each other. (Id. at 3). Sandra said Saldate told her that Debra worried him, because she had (what he told her in Spanish meant) a "split personality." (Id.). She said that he also misled her before her interview regarding the State's evidence against Debra. (Id.). She said he told her

---

Unfortunately, by the time she received the affidavit, Sandra had an apparent change of heart and instead forwarded the draft affidavit to the Attorney General's Office together with a request that they notify Mr. Rosenquist that he not contact her again, which they did. (Id.). Mr. Rosenquist made no further attempts to obtain the signed, notarized affidavit. (Id.) Several years later in 1998, however, former habeas counsel again received indications that Sandra might be willing to cooperate with the defense team in bringing forth this information about Saldate's influence and pressure. (Id.). The investigator, Kirk Fowler, met with Sandra for an extensive interview in which he said she was very helpful and willing to cooperate. (Id. at 8). Shortly thereafter, however, Mr. Rosenquist received yet another letter from the Attorney General's Office demanding that the defense team refrain from all further communication with Sandra. (Id.). These letters are all included as attachments to Mr. Rosenquist's Affidavit. (Id.).

that Debra had confessed. (Id.). He told her that Debra began confessing to him when she was in the car on her way to the Pinal County Sheriff's Office from her father's house.[10] (Id.). He also said Debra told him she felt much better after confessing because she had been hiding the secret for a long time. (Id.). She stated that Saldate claimed that Debra had tried to kill Chris twice before, once when their mother and her husband were in Phoenix, and once when Debra allegedly tried to put cyanide in Chris' cereal.[11] (Id.). Another time, he said they went out to the site to kill Chris, but there was too much traffic. (Id.). Sandra said that Saldate also told her that, en route from Florence to Phoenix, Debra wanted to exchange a sexual favor in return for her freedom. (Id. at 4). He also told her that Debra offered to be sterilized as a form of punishment. (Id.). He claimed that when Debra was in county jail, she told other inmates, "Yes, I did it, and I'd do it again."[12] (Id.).

Sandra said that during the course of their interview, Saldate seemed more interested in Debra's sexual practices with men than in her abilities as a mother. (Id.). She said that many of his questions had nothing to do with Debra's case, but seemed like some guy interested in her sister asking her what Debra likes to do on dates. (Id.). Sandra further stated that when she received the subpoena to testify, she took it to her obstetrician who arranged to induce her labor at least one week before her testimony. (Id.). Sandra's induced labor was scheduled for August 14, 1990 specifically because of the trial. (Id.). On the trip to Phoenix for her testimony at Debra's trial just one week later, her infant son was colicky, and she got little sleep. (Id.).

_____

[10] This is, of course, yet another inconsistency in Saldate's "story" of Debra's purported confession.

[11] This claim is also conspicuously absent in any other report or statement by Saldate or elsewhere in the record.

[12] Again, nowhere else in the record, interviews or written reports is this claim mentioned. This demonstrates the degree to which Saldate was trying to influence Debra's sister against her.

Sandra was extremely tired during her testimony and anxious to return to Wyoming. (Id.).  She also said that she was told what to do each day before trial from the victim/witness advocate who worked with the prosecutor, which made her feel like a "puppet." (Id.).  She noted that the questions asked of her at trial differed from those asked by Saldate, even though he told her they would be the same questions.  (Id.).  She was not allowed to elaborate on her answers. (Id.).

Unfortunately, following her conversation with former habeas counsel, Sandra shifted again and would not assist him in bringing forth these truths through an affidavit.  (Id. at 7-8).  Instead came a stern warning from the Attorney General's Office, who claimed that Sandra was a "designated victim" who had all the protections of the Victim's Rights Amendments.  (Id. and attachments).  This surprised former (and current) habeas counsel, as Sandra is Debra's sister (and Chris' Aunt), and was not a member of Christopher's immediate family.  In any event, Mr. Rosenquist ceased all communication with Sandra.  (Id.).

Three years later, however, former habeas counsel learned that Sandra was again willing to cooperate and assist him in bringing forth the information regarding Saldate's influence and pressure.  (Id. at 8).   Apparently, their father, Richard Sadeik, had asked Sandra to speak with the habeas defense team shortly before his death. (See Kirk Fowler Affidavit (Pickinpaugh), attached as Exhibit 43).  Mr. Rosenquist's investigator, Kirk Fowler, met at length with Sandra at her home where she surprised him with her cordial and friendly attitude. (Id. at 2).  She spoke with Mr. Fowler for approximately four hours.  (Id.).    Sandra told Mr. Fowler that neither she nor her father ever believed that Debra had anything to do with Christopher's death.  (Id.).  Among other things, she said, "Debbie is intelligent but she is too ditzy to balance a checkbook, let alone plot a murder conspiracy."  (Id.).  Mr. Fowler again

asked Sandra if she would be willing to sign an affidavit. (Id.). She said she would discuss it with her boyfriend and get back with him. (Id.). Approximately one week later, Mr. Fowler received a message saying Sandra had called. (Id.). He attempted to re-contact her three to five times over the following two weeks and finally left a message asking her to contact him. (Id.). She never returned his calls. (Id.). Shortly thereafter, yet another, more stern warning came from the Attorney General's Office telling habeas counsel to cease all contact with Sandra. (Exhibit 40 (Rosenquist Affidavit) at 8).

Two other sources confirm that Sandra did not believe Debra was capable of conspiring to have her son killed, and one further corroborates the fact that Detective Saldate placed immense pressure on Sandra to testify against her sister. The first is Debra and Sandra's mother, Renate. (See Renate Janka Affidavit, attached as Exhibit 3). According to Renate, Sandra called her while she was seven months pregnant and told Renate that Saldate had put her under extreme duress when he met with her in Wyoming. (Id.). She also told her mother that Saldate had pressured her into calling Renate to try to induce her into becoming a witness for the State. (Id.). As set forth below, Detective Saldate had already attempted to poison Renate against Debra. (Id).

The second source is a former investigative reporter for Focus TV Productions in Germany who prepared a program on Debra's case in 1998. (See Barbel Jacks Affidavit, attached as Exhibit 5). Ms. Jacks also met with Sandra, who said she did not believe her sister was capable of committing the crime for which she was convicted. (Id.). Sandra also told Ms. Jacks that her father also believed that Debra was innocent. (Id.). She stated that she felt the media had distorted her remarks and that she never intended to help "sink" her sister, as some had accused her of doing. (Id.). She also explained her conversation with Detective Saldate

and said that she never intended to implicate her sister as a murderer or as an instigator of the events surrounding the death of Debra's son.  (Id.).  She told Ms. Jacks that in the event of a re-trial, she would be willing to testify that Debra was not the kind of person who would have her son killed.  (Id.).  She would not, however, go "on record" at that point, and did not want Ms. Jacks to film or otherwise record their meeting.  (Id.).

Dr. Biegan also evaluated the materials pertaining to Sandra.  (Exhibit 2).  He concluded that the "multiple pressures applied on this sister by Detective Saldate in his interview of June 30, 1990," combined with her family's social history explained Sandra's "shifts" and "ambivalence about whether to love or hate her sister, Debra."  (Exhibit 2 at 3).  Sandra failed to achieve prior to adulthood, acceptance especially relative to Debra, who was trusted, admired and adored by her parents.  (Id. at 3).  Their sibling rivalry reached intense levels, particularly after their parents' divorce.  (Id.).  When their mother left for Germany, Debra "looked after" her younger sister, who wanted nothing to do with her.  (Id.).  Sandra also resented having to live with their alcoholic father and his new wife.  (Id. at 4).  The degree of the rivalry Sandra felt with her sister is illustrated by the fact that she became pregnant only months after Debra did.  (Id.).  In her parents' eyes, Sandra continued to be the "bad daughter," however, which fueled her resentment toward Debra.  (Id.).

### 3.    Renate Janka (Debra's mother)

Detective Saldate also attempted to "poison" Debra's mother, Renate Janka, against her.  (See Renate Janka Affidavit, attached as Exhibit 3).  Ms. Janka lived in Europe at the time of Christopher's death, as she does now.  (Id.).  She was divorced from Richard Sadeik, with whom she had their two daughters, Debra and Sandra.  (Id.).  Ms. Janka later remarried to Alex Janka.  (Id.).  According to Ms. Janka, she flew to Phoenix for Christopher's funeral on

December 7, 1989.  (Id.).  Afterward, she asked to be taken to the police department to meet with Detective Saldate and discuss what had happened to her daughter, Debra.  (Id.).  Ms. Janka stated that Saldate appeared cordial at first, but when she began asking questions, "he quickly tried to control me psychologically."  (Id.).  He made remarks such as, "She is guilty as hell,"  "I will make sure she will roast,"  "She will never see the light of day again," and "Ma'am you'd do better by returning to where you came from and fast."  (Id.).  She asked to see Debra's confession, to which Saldate stated that he was "done" with her and that she was wasting his time.  (Id.).  She then asked for the name of defense counsel, which Detective Saldate provided.  (Id.).  Unfortunately, defense counsel never returned Mrs. Janka's phone calls and did not attempt to call her as a witness.  (Id.).

### 4.  Ernie Sweat (Debra's recent boyfriend)

Detective Saldate's report of his interview with witness Ernie Sweat demonstrates that Saldate's perceptions are inherently unreliable and that he does not accurately report information conveyed to him.  During Mr. Sweat's pretrial interview by counsel, he reviewed Detective Saldate's report of his interview with Mr. Sweat.  He found a number of areas in which Saldate had erroneously reported what he had told him.  (See Ernie Sweat Pretrial Interview, attached as Exhibit 44, at 55-61).  Mr. Sweat told interviewers that "Detective Saldate just got some facts disconfigured as to what I had actually told Debra and what I thought."  (Id. at 58).

At trial, Mr. Sweat pointed out *five separate areas* in which Saldate had skewed against Debra the information he had given Saldate.  (R.T. 9/14/90 at 24-27, 34-38, attached as Exhibit 45).  For example, Detective Saldate wrote and subsequently reported to others that Mr. Sweat had discussed with Debra his unreadiness for marriage.  In fact, they never had such a

conversation, and Mr. Sweat did not tell Saldate that they did. (Exhibit 44 at  59-61; R.T. 9/14/90 at 21-22, 34-35, attached as Exhibit 45).   Yet, the State argued in accordance with Saldate's report that Mr. Sweat told Debra he was not ready for marriage.  (R.T. 10/10/90 at 145).    The State used this inaccurate information to support its theory that Debra had Christopher killed so she could "get" Ernie Sweat.  (Id. at 145-148).

Another inaccuracy in Saldate's report was his claim that Mr. Sweat told Debra she was neglecting Chris and needed to spend more time with him.  (R.T. 9/14/90 at 36; Exhibit 45).  In fact, Mr. Sweat testified that he had no such conversation with Debra and merely mentioned it to Saldate as a perception he had.  (Id.).  Mr. Sweat also testified that he saw many displays of affection (ie: hugs) between Debra and Christopher, and he acknowledged that Christopher was well dressed, appeared healthy, and had no bruises or unsightly marks on his body.  (Id. at 26-27).  Mr. Sweat also testified that Christopher appeared happy when he was with his mother and that Debra likewise appeared happy to be with Christopher.  (Id.).

Mr. Sweat's account of his interview by Detective Saldate relative to Saldate's report of that interview further demonstrates the degree to which Saldate twists information provided to him and his tendency to interject false information into his reports.   Saldate's warped perceptions and interpretations of information conveyed to him result in "facts" that support his "theory" of the case, rather than providing objective, accurate information in a case where the consequences are literally life or death.

### 5.  Henry Milke (Debra's father-in-law)

Although Henry Milke did not end up testifying at trial, his pretrial interview also reveals that he received "pressure" by Detective Saldate.  (See Excerpt of Henry Milke