Interview, attached as Exhibit 46).  According to Mr. Milke, Saldate "constantly called me and relayed messages to me" about some of Mr. Milke's comments to the media.  (Id. at 67).  He explained that Saldate had heard radio and television stories about Mr. Milke's stated disbelief that the motivation for Chris' murder was a $5,000 life insurance policy.  (Id. at 68-69).  He said that Saldate called  "and he started to give me hell about it, how could I make such a statement and where I heard it."  (Id. at 68).  Mr. Milke said "I didn't feel, you know, he should talk to me like that."  (Id. at 69).  This is yet another example of Saldate's influence, pressure and "control" in Debra's case.

###   E.   Detective Saldate's Improper Techniques Tainted the Entire Trial in Debra's Case, Depriving her of Due Process of Law

What may seem like relatively small misrepresentations in isolation take on serious implications when used to inflame witnesses' biases.  Such inaccurate information takes on massive dimensions where it was used by the prosecution to establish motive specific to Petitioner.  (R.T. 9/12/90 at 17; R.T. 10/10/90 at 145).  Such information and testimony is also highly suspect and prejudicial where it is the result of improper pressure, influence and controlling behavior by the lead detective in this case.

"In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases."  *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985).  Thus, the fact finding procedures in Debra's case must "aspire to a heightened standard of reliability."  *Id.* at 87.  Unfortunately, rather than meeting this higher standard, the fact finding procedures in Debra's case fell *far below* those allowed in non-capital cases.

No physical evidence linked Debra to this crime. No reliable circumstantial evidence linked this mother to the killing of her young son.[13] Neither co-defendant, actual participants in the crime, testified against Debra at trial. One co-defendant, James Styers, swears to this day that Petitioner is innocent. (See Styers' Letters to Judith Radalovich and "Olga," attached as Exhibit 47). And, the other, Roger Scott, supposedly "learned" about Debra's alleged involvement *from Styers*, making his information hearsay, and according to Styers, not accurate. Thus, motive and character evidence in this case was particularly persuasive. Under these circumstances, the unreliable, tainted results of Saldate's interview and reporting techniques, together with his "pressuring" of witnesses, robbed Petitioner of her constitutional right to due process and a fair trial, especially when combined with Saldate's improper tactics and biased reporting of Debra's interrogation. This is a case where the misconduct of a single police officer was allowed to taint the entire case. This Court should therefore reverse Petitioner's convictions and sentences.

## II.   DEFENSE COUNSEL WAS SO DEFICIENT IN HIS REPRESENTATION OF DEBRA MILKE DURING HER TRIAL AND SENTENCING AS TO DENY HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT (CLAIM IV (in part))

### A.   Trial Counsel's Overall Investigation of Debra's Case was so Deficient that Debra was Substantially Prejudiced by his Performance (Claim IV(A))

Defense counsel has a duty under the Sixth Amendment to the United States Constitution to effectively represent a defendant. *Strickland v. Washington*, 466 U.S. 668 (1984). U.S. Const. Amend. VI. In order to prevail on a claim of ineffective assistance of

---

[13]   The only circumstantial evidence from which any inference of involvement could arguably be drawn was the discovery after Debra's trial but before sentencing of a box of bullets in her purse. However, Debra avows that she found the bullets with Styers' laundry the Friday before Chris' death. (See Debra Milke Affidavit, attached as Exhibit 57). She temporarily stuck the box in her purse, which was nearby on the couch, to keep them away from the kids until she could give them back to Styers. (Id.). In light of Debra's stated concern to Styers regarding having guns around Christopher, this explanation makes perfect sense.

counsel, the petitioner must establish that counsel's actions were deficient and this shortcoming prejudiced the petitioner. *Hendricks v. Vasquez*, 974 F.2d 1109 (9th Cir. 1992). "Although there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and judicial scrutiny of counsel's performance must be highly deferential, . . . counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994)(internal citation and quotations omitted), *see also, Strickland*, 466 U.S. at 691.

The relevant inquiry under *Strickland* is not what defense counsel could have done, but rather whether counsel's choices were reasonable. *See Babbit v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998), *cert. denied,* 525 U.S. 1159 (1999). Courts have found counsel to be ineffective where an attorney neither conducted a reasonable investigation nor demonstrated a strategic reason for failing to do so. *Sanders*, 21 F.3d at 1456. (citations omitted). It is counsel's *duty* to investigate carefully all available defenses of fact and law. *See State v. Lopez*, 3 Ariz. App. 200, 204, 412 P. 2d 882, 886 (1966). "While a lawyer is under a duty to make reasonable investigations, a lawyer may make a reasonable decision that particular investigations are unnecessary." *Strickland,* 466 U.S. at 691. "To determine the reasonableness of a decision not to investigate, the court must apply 'a heavy measure of deference to counsel's judgments.'" *Babbit*, 151 F.3d at 1173-1174(quoting *Strickland*, 466 U.S. at 689).

This includes a duty to investigate client's most important defense and a duty to adequately investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict. *Strickland,* 466 U.S. at 691.

Here, trial counsel had been an attorney for nearly seven years, but he had only tried one prior death penalty case when he was appointed to defend Debra Milke. (See Ken Ray Affidavit, attached as Exhibit 48). An investigator was appointed to assist defense counsel immediately. (See Kirk Fowler Affidavit #1, attached as Exhibit 4; see also 2/13/90 Minute Entry, attached as Exhibit 49). However, counsel still failed to aggressively investigate this case in a number of areas. His failure severely prejudiced Debra. Both trial counsel and his investigator agree that their performance fell below acceptable standards and that Debra was prejudiced in her trial and sentencing as a result.[14]  (See 42; Exhibit 2).

Defense counsel's investigation in this case was so deficient that it deprived Debra of her right to effective assistance of counsel in violation of the Sixth Amendment. This Court has granted review on the merits in five specific areas in which defense counsel failed to conduct an adequate investigation:

1. The failure to follow up on Petitioner's information that Rosemary Houston would be a good witness;

2. The failure to investigate Petitioner's past and, as a result, failing to locate witnesses who would have been willing to testify on Petitioner's behalf;

3. The failure to interview members of Petitioner's family prior to trial;

4. Making only cursory efforts to obtain impeachment information relating to Petitioner's family members who were witnesses; and,

5. The failure to obtain Petitioner's and the victim's medical and school records.

We address these arguments in order.

---

[14] The investigation was apparently inadequate in part because of financial and time constraints. (See Kirk Fowler Affidavit #1, attached as Exhibit 4).

1. **Trial Counsel Failed to Follow up on Petitioner's Information that Rosemary Houston Would be a Good Witness (Claim IV(4)(A)(3)).**

Defense counsel failed to investigate or call Rosemary Houston to testify. In doing so, he failed in his duty to make a reasonable decision that makes particular investigations unnecessary. *Strickland*, 466 U.S. 668.

Debra wrote a letter to defense counsel in May 1990, telling him of potential witnesses who could help her at trial. (See Letter to defense counsel, attached as Exhibit 50). In the letter, Debra specifically explained to defense counsel why Rosemary Houston would be beneficial to her case. (Id.). Rosemary Houston worked with Debra and knew the extent of Debra's relationship with Mark. (Id.). Rosemary had valuable information about how frightened Debra was of Mark and the reasons she moved away with Chris. (Id.).

Defense counsel failed in his duty because he did not follow up on these leads. Rosemary Houston was never interviewed. She was not called to testify at trial. Counsel never did any investigation to ascertain whether Rosemary should have been called to testify on Debra's behalf. Due to the lack of a proper investigation, defense counsel prejudiced Debra by failing to present a key witness who knew about Debra's fears of Mark and her caring and concern for her son. Thus, this failure to investigate violated Debra's Sixth Amendment rights.

2. **Trial Counsel Failed to Investigate Petitioner's Past and, as a Result, Failed to Locate Witnesses who would have been Willing to Testify on Petitioner's Behalf. (Claim IV(A)(4)).**

A number of other key witnesses should have been contacted by defense counsel to testify on Debra's behalf. Significantly, defense counsel did not call, question or investigate Patricia (Bacon) Prust as a possible witness. Patricia attended high school with Debra, worked with her, and lived with Debra and another friend, Robin, after they graduated from high school. (See Patricia Prust Affidavit, attached as Exhibit 51). Patricia was with Debra when

Debra met her future husband, Mark. (Id.). Patricia had key information concerning how excited Debra was to be pregnant and how proud she was of Christopher. (Id.). When she learned of the charges, Patricia collapsed and cried. (Id.).

Patricia also had key information regarding Sandra Pickinpaugh and Dorothy Markwell, who both testified for the State. Patricia could have provided corroboration for the important point that Sandra testified against Debra because she wanted to be the "good sister" for once in her life. (Id.). Patricia also would have testified that Dorothy Markwell was not an honest person. (Id.). Patricia had key information concerning Dorothy's drug use, jealousy of Debra and possible motives for testifying the way she did. (Id.). This information could have been used to impeach the testimony of Sandra and Dorothy. It is reasonable to believe that this critical information in Debra's favor and against the credibility of the State's witnesses would have swayed the jury. Instead, not only was Sandra inadequately impeached (See Argument III(A)(3) below), but Dorothy was also an essentially unchallenged rebuttal witness who was called at the last minute by the State. (See Kirk Fowler Affidavit (Markwell), attached as Exhibit 52, see also Motion for Sanctions, attached as Exhibit 53). Defense counsel even failed to offer the evidence his investigator had obtained that could have shown Dorothy was an unreliable witness. (Id.).

Patricia made several efforts to contact Ken Ray, but he never called her back. (Id.). Trial counsel's failure to contact or call Patricia, or to investigate this information after it was made available to him, was clear ineffective assistance of counsel. This failure severely prejudiced Debra at trial and satisfies the two-prong analysis of *Strickland*. The State's theory was that everything was going downhill for Debra the last two years before Chris' death. Dorothy Markwell and Sandra both supported this theory by testifying that Debra was a poor mother who did not properly care for her child during that period. Yet, Dorothy had not seen or

spoken with Debra or Chris for *fifteen months* prior to Chris' death.  (R.T. 10/10/90 at 107).

Dorothy also acknowledged that they did not part on "good terms."  (Id. at 123-128).  Sandra

also did not have much contact with Debra or Chris for nearly six months prior to Chris' death,

as her family had moved to Wyoming in July 1989.  (R.T. 9/17/90 at 43).

In contrast, Patricia saw Debra **two months** before Chris' death, during which time

Debra told her that her hard times were behind her and she was looking forward to their kids

spending time together.  (Id.).  Patricia also had a lengthy history with Debra and witnessed

Debra's joy at being pregnant with Chris and her subsequent interactions with him. (Id.).

Patricia's testimony would have also corroborated the testimony of Ernie Sweat and Debra's

neighbors, who testified that they saw no bruising or signs of abuse on Christopher and

witnessed Debra and Chris interacting in a very happy and affectionate way.  (Id.).   Had the

jury received this key information, it is reasonable that they would have come to a different

decision. *Strickland*, 466 U.S. at 692.

Charles Jones dated Debra for three years from 1980 to 1983 and had valuable

information regarding Debra and her interactions with her family.  (See Charles Jones

Affidavit, attached as Exhibit 54).  Charles knew about the longstanding, destructive tension

between Sandra and Debra.  (Id.).  Charles also would have testified that Debra was not capable

of hating anyone or being involved in a plot to have her child killed.  (Id.).  Charles expected to

be called to testify for Debra, but he was also never even contacted by defense counsel. (Id.).

Defense counsel also failed to call Charles Jones' parents as potential witnesses.

Donald and Josephine Jones knew Debra well and hoped that she would someday be their

daughter-in-law.  (See Donald and Josephine Jones Affidavit, attached as Exhibit 55).  They

also had relevant information concerning why Sandra acted the way she did towards Debra.

(Id.).  They also could have testified regarding Debra's parenting skills and the way she took

care of Chris. (Id.).  These potential witnesses all would have testified that Debra could not have been involved in the alleged acts.  (Id.).

Defense counsel further failed to properly investigate or call other witnesses who had exculpatory evidence regarding Debra.  Defense counsel failed to call Lori Hoover, another friend of Debra's.  Defense counsel did not call Robin Ziluck who has been friends with Debra since the Ninth grade and lived with Debra and Patricia (Bacon) Prust.  (See Patricia Prust Affidavit, attached as Exhibit 51).  Robin also could have corroborated how excited Debra was to have Christopher, and could also have testified regarding Debra's character. (Id.).  Defense counsel also failed to call any of Debra's teachers, including Mr. Brockel, who could have testified regarding Debra as a student.  He also failed to investigate or call anyone from the Mary Moppets Pre-School or the Day Bridge Learning Center.  Debra took Christopher to these schools and interacted with Christopher there.  (See Kirk Fowler Affidavit (Markwell), attached as Exhibit 52).  Defense counsel failed to call Dr. Tefteller who performed a very serious surgery on Christopher and Dr. Zuerlein who treated Chris during this period.  (See Dr. Zuerlein Affidavit, attached as Exhibit 9)  Both doctors saw interactions between Debra and Chris at the hospital and could have testified as to how attentive and concerned Debra was as a mother. (Id.).

Defense counsel failed in his duty to conduct a proper investigation and provide a proper defense for Debra.  She was prejudiced by this failure as the State spent much of the trial attempting to attack Debra's character as a person and mother. The defense could have called the foregoing witnesses to testify to Debra's character and the fact that she was a loving person and mother.  Defense counsel's failure to contact these witnesses clearly prejudiced Debra.  This court should remand and set this case for a new trial as a result.

### 3.   Trial Counsel Failed to Interview Members of Petitioner's Family Prior to Trial (Claim IV(4)(A)(7))

Defense counsel was also ineffective in violation of the Sixth Amendment for failing to contact and interview Debra's mother and stepfather. This "representation fell below an objective standard of reasonableness." *Bonin v. Calderon*, 59 F.3d 815, 833 (9th Cir. 1995)(quoting *Strickland*, 466 U.S. at 687-690). An attorney's duty to prepare adequately imposes that attorney the responsibility to investigate and prepare every phase of his client's case. ABA Code of Prof.Resp., Canon 6; EC6-4; DR6-101(A)(2, 3).

Debra's mother and stepfather had vital information that should have been presented at trial. Debra's mother, Renate, attempted to contact defense counsel on numerous occasions, but none of her calls were returned. (See Renate Janka Affidavit, attached as Exhibit 3). Defense counsel never made *any* effort to call Renate as a defense witness. (Id.).

As set forth fully above, Renate had critical information concerning her conduct with Detective Saldate. (Id.). Saldate made remarks such as, "[Debra] is guilty as hell," "I will make sure she will roast," and "She will never see the light of day again." (Id.). Detective Saldate tried to intimidate Renate and told her to go back to Germany. (Id.). This evidence could have been used to impeach Detective Saldate and show that he had developed a strong bias and extremely personal subjective opinions about Debra and this case. It also could have been used to illustrate how Saldate pressured and influenced members of Debra's family, and thereby significantly tainted the trial against Debra.

Renate also had vital information concerning Sandra's meeting with Saldate. As noted above, Sandra told her mother that Saldate had put extreme pressure on her and that she was afraid of Saldate. (See Renate Janka Affidavit, attached as Exhibit 3). This information could have been used to further corroborate Saldate's coercive tactics and to impeach his and

Sandra's testimony.  The failure to even interview or call Debra's mother is clearly below an objective standard of reasonableness under *Strickland*.

Debra's stepfather, Alex Janka, was also never contacted by defense counsel to testify for Debra.  (See Alex Janka Affidavit, attached as Exhibit 56).  Alex Janka had witnessed interactions between Debra and her son Christopher.  (Id.).  Alex would have testified that Debra was a loving mother and was very affectionate towards Chris.  (Id.).  Alex also would have testified that Debra would not be involved in a conspiracy to have her child killed.  (Id.).  The failure to investigate the information Alex could have presented at trial was deficient.  *Strickland*, 466 U.S. 668.  This clearly prejudiced Debra within the meaning of *Strickland*.

The minimal professional standards of an attorney demanded that these family members *at least* be contacted to see what information they had.  *See Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir. 1987)(counsel's cursory attempts to locate witnesses ineffective); *Code v. Montgomery*, 799 F.2d 1481 (11th Cir. 1986)(counsel interviewing only one witness was unreasonable).  The United States Supreme Court stated in *Strickland* that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  466 U.S. at 690, 691.

The failure to investigate these valuable witnesses was particularly ineffective assistance within the context of a capital case.  *See, e.g., Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002); *Mayes v. Gibson*, 210 F.3d 1284, 1290-91 (10th Cir. 2000), *cert. denied,* 531 U.S. 1020 (2000); *Siripongs v. Calderon*, 35 F.3d 11308, 1315-1316 (9th Cir. 1994); *Wade v. Calderon*, 29 F.3d 1312, 1323-25 (9th Cir. 1994). Although some of these cases deal with the sentencing phase, the failure at the guilt phase was even more prejudicial to Debra in light of the State's witnesses who claimed that Debra was a poor mother who wanted to get rid of

Christopher. Unlike the typical death penalty case, Petitioner's guilt is in doubt. *See Russell v. Lynaugh*, 892 F.2d 1205, 1206 (5th Cir. 1989), *cert. denied*, 501 U.S. 1259 (1991). There is no physical evidence linking Debra to the crime. The testimony of these friends and other family members could have provided critical character evidence of Debra's conduct as a mother and how Saldate poisoned the family members against Debra. Defense counsel fell below prevailing standards and significantly prejudiced Debra by not calling these witnesses. As a result, this Court should remand for a new trial.

### 4. Trial Counsel Made only Cursory Efforts to Obtain Impeachment Information Relating to Petitioner's Family Members who were Witnesses Against Her  (Claim IV(4)(A)(8)

Defense counsel's failure to obtain adequate impeachment information regarding Petitioner's family members who testified against her was also deficient and highly prejudicial. As noted above, the State needed negative character evidence in order to bolster its weak case against Debra. Without such testimony, the jury would have had little means by which to judge the credibility of Saldate relative to Debra. What better way to persuade the jury that Debra was an uncaring, unfit mother than through the testimony of her own family members? Unfortunately, due to the failure of defense counsel to obtain available impeachment information, he was unable to explain their testimony in a satisfactory manner. Thus, Sandra Pickinpaugh's negativity toward Debra was only superficially challenged. (R.T. 9/14/90 at 95-101). And, Richard Sadeik's perspective of his daughter was also essentially unimpeached. (R.T. 9/13/90 at 103-17). This left the jury with the false impression that Debra was little more than a cold-hearted, narcissist who wanted to be rid of her child.

Had counsel obtained a social history or conducted a thorough investigation into Petitioner's family dynamics, he could have given the jury a complete and accurate picture of Debra's seriously dysfunctional family. (See Social History, attached as Exhibit 1; Dr.

Biegan's Report, attached as Exhibit 2). A large amount of impeachment information could have been obtained merely by taking the time to speak with Debra's mother, Renate, and her husband, Alex. (See Exhibit 1; see also Renate Janka Affidavit, attached as Exhibit 3; Alex Janka Affidavit, attached as Exhibit 56).

Patricia (Bacon) Prust also attempted to reach trial counsel to offer her insight into Debra's family. (See Patricia Prust Affidavit, attached as Exhibit 51). Her efforts were in vain. (Id.). As a long time friend of Debra's who also knew Sandra and the other family members, Patricia could have offered a third-party perspective regarding the relationship between Debra and Sandra, which was sorely missing from the evidence presented in this case. (Id.). As set forth above, Patricia also could have also offered critical impeachment testimony against Dorothy Markwell, whose essentially unchallenged claims as a rebuttal witness obviously harmed Petitioner. (Id.).

Additionally, had trial counsel adequately investigated this case and prepared for trial, he would have been able to obtain sound, logical explanations from Debra regarding the various prejudicial claims made against her by Saldate, Sandra, Dorothy and the State generally. (See Debra Milke Affidavit, attached as Exhibit 57).

The jurors needed the critical impeachment information above in order to give proper weight and credibility to the testimony of the State's primary character witnesses – members of Debra's own family and Ms. Markwell. Defense counsel's failure to obtain such readily available and vital information regarding these witnesses seriously prejudiced his client.

## 5. <u>Trial Counsel Failed to Obtain Petitioner's and the Victim's Medical and School Records  (Claim IV(4)(A)(9))</u>

Defense counsel was further ineffective for failing to obtain Debra's or the victim's medical and school records. (See Chris Milke's Medical Records, attached as Exhibit 8; Dr.

Zuerlein Affidavit, attached as Exhibit 9; Debra Milke's Medical Records, attached as Exhibit 58; Debra Milke's Elementary School Records, attached as Exhibit 59; Debra Milke's College Records, attached as Exhibit 60). Debra's school records were crucial, as the prosecutor spent a substantial amount of time trying to impeach Debra with testimony regarding her schoolwork. (R.T. 10/3/90 at 61-65). The school records would have also shown that Debra was never disciplined at school and that she was an above average student.

Debra's medical records also had probative information that should have been presented at trial. These records would have shown the difficulties Debra experienced while delivering Christopher. After significant labor, a cesarean section was required to deliver Christopher. (Debra's Medical Records, attached as Exhibit 58). This evidence could have been used to rebut inferences the prosecutor tried to raise implying that Debra did not want her child and that she resented her pregnancy. (R.T. 10/3/90 at 91-93). This evidence demonstrates the measures Debra was willing to take to ensure the safe delivery of her child. Her medical records also illustrate that Debra took good care of herself during her pregnancy. These are hardly the actions of a woman who resented her pregnancy and did not want her unborn child.

Christopher's medical records show that he was in good health and that Debra took good care of him. (See Chris' Medical Records, attached as Exhibit 8). They also showed that medical personnel observed Debra and Chris interact and saw how Debra cared for her son. Dr. Kevin Zeurlein was a pediatric intern who had significant firsthand knowledge concerning how well Debra treated Chris. (See Dr. Kevin Zuerlein Affidavit, attached as Exhibit 9). Less than one year before Chris' death, Christopher underwent a serious thyroid surgery. (Id.). Dr. Zuerlein helped Debra and Chris deal with their anxieties. (Id.). Dr. Zuerlein saw Debra as a caring and loving mother who was almost constantly at Chris' bedside. (Id.). He noticed a strong bond between mother and son. (Id.). He thought Debra's concern for her child was

*above average* compared with all the other mothers he had seen interact with their children. (Id.). He also noted that Chris showed *no* signs of physical or mental abuse. (Id.). This evidence was clearly probative and if presented, could have helped to sway the jury in Debra's favor. *Strickland*, 466 U.S. 668.

All of the foregoing failures to investigate by Defense Counsel individually and cumulatively prejudiced Debra within the meaning of *Strickland*. This court should reverse and remand this case for a new trial.

> **B.** **Trial Counsel's Investigation and Cross-Examination of Material Witness Armando Saldate was so Deficient that Debra was Significantly Prejudiced (Claim IV (B))**

Defense counsel failed to subpoena any of Detective Saldate's personnel records until September 18, 1990, or one full week after Saldate first testified in the voluntariness hearing and after counsel had cross-examined Saldate during trial in front of the jury. (See Subpoena Duces Tecum, attached as Exhibit 61; R.T. 9/10/90; RT 9/11/90; R.T. 9/12/90; R.T. 9/13/90). Worse, he only sought records showing training received by Saldate, if any, in interviews and interrogations. (Exhibit 61; see also R.T. 9/24/90, at 12-19, attached as Exhibit 62). He did not subpoena Saldate's disciplinary records. He did, however, subpoena any policies and practices of the Phoenix Police Department relating to interrogations and tape recording. (Id.). The police department moved to quash the subpoena, which the trial court granted except for an *in camera* review of the policies and procedures of the police department. (See Motion to Quash , attached as Exhibit 63; Exhibit 62 at 18, R.T.9/24/90 at 18; see also 9/24/90 & 10/1/90 Minute Entries, attached as Exhibit 64). After its review, the court disclosed to defense counsel that

Saldate had no training in interrogation procedures and provided a copy of some "documents" from the department.[15]

The impetus to explore Detective Saldate's veracity concerning his police work existed as early as December 3, 1989, when Debra revealed to defense counsel that she had not confessed.  Given the late date and advanced posture of the case, defense counsel's approach to the investigation of Detective Saldate's work record was singularly deficient.  (cite to case re: untimely requests for material discovery)  Additionally, counsel's request should have included a request for Detective Saldate's disciplinary records.  Had defense counsel requested those parts of Saldate's file, he might have obtained a copy of the Separation Notice attached to this Brief as Exhibit 31.  That document alone demonstrates Saldate's inappropriate conduct, particularly with female suspects, and the degree to which he was willing to lie in order to cover up that conduct.  (Id.).[16]

Defense counsel also failed to uncover or challenge Detective Saldate with the evidence of his past misconduct that was available through a search of the public record.  (See Exhibit 15; see also Affidavits from Maria Pulver and Robert Chermak, attached as Exhibits 65 and 66).  The information available through such a search would have provided ample ammunition with which to attack Detective Saldate's credibility.  (Exhibit 15).  Given the "keystone"

---

[15] It is not clear from the record or minute entry which (if any) documents were given to defense counsel.  Presumably, they were a portion of the policies and procedures relating to interrogations, however they cannot be located in the file.

[16] Petitioner still finds it incredible that only one record of disciplinary action was contained in Detective Saldate's personnel file.  Given Saldate's lengthy tenure with the department and his demonstrated history of improper interrogation techniques and practices (see Exhibit 15), it is unfathomable that only one such record was produced by the State in these proceedings.  Either not all of Saldate's disciplinary records were produced, or the Phoenix Police Department was derelict in its duty to reprimand and/or suspend a detective who continually demonstrated such high disregard for proper police practices and for suspects' constitutional rights. When combined with Saldate's destruction of his notes and the State's interference with defense counsel's investigation of Saldate's interview of Sandra, a pattern emerges which casts a shadow on the State's overall credibility in this case.

importance of Detective Saldate's testimony and the absence of physical evidence linking Debra to this offense, defense counsel's deficient performance severely prejudiced Debra. Presentation of the extensive evidence of Saldate's history and pattern of misconduct very likely would have affected the jury's verdict. *Strickland*, 466 U.S. 668.

Defense counsel knew of at least two other cases in which Saldate's improper tactics and results were questioned – one involved Sean Running Eagle, who was also sentenced to death as a result of Saldate's tactics and testimony. (See Exhibit 15-C; R.T. 9/10/90 at 18).[17] The other involved a man who contacted defense counsel during trial and told him that Saldate had also falsely claimed that he confessed, resulting in a conviction for a crime he did not commit. (See Sworn Statement from Kirk Fowler to Terry Capozzi, attached as Exhibit 36). Thus, defense counsel was clearly aware that other cases existed in which Detective Saldate's credibility and tactics were seriously at issue.   His failure to research Saldate's conduct in other cases was therefore highly deficient.

In cross-examining Detective Saldate, defense counsel failed to confront him with some of the obvious discrepancies in his various statements.  On June 26, 1990, in a taped  pretrial interview, Saldate reported that he interviewed Debra for approximately one and one half hours. (Exhibit 32 at 30).  Yet, at trial, Saldate testified that the interrogation lasted only thirty minutes.  (See Exhibit 24).  In the pretrial interview, Saldate also told defense counsel that he chose to take a helicopter to interrogate Debra because "I like helicopters."  (Exhibit 32 at 6). Before the jury, Saldate stated he was "not very happy" to go in the helicopter and had asked for other means of transportation.  (R.T. 9/12/90 at 60; R.T. 9/13/90 at 49).  As set forth in Argument I(C) above, numerous other inconsistencies and misrepresentations existed in

---

[17] Even more curiously, defense counsel only raised the topic of Mr. Running Eagle's case to Saldate during the voluntariness hearing.  He did not raise the problems with the confession in that case during his cross-examination of Saldate at trial.  (R.T. 9/13/90 at 17-68).

Saldate's various statements, which should have been brought forth by defense counsel.  Yet, he failed to challenge most of those discrepancies.

In his cross-examination of Detective Saldate, defense counsel also demonstrated a lack of familiarity with key facts that prevented him from adequately confronting Saldate's dishonesty and tendency to "twist" information provided to him.  For example, he examined Saldate regarding whether Detective Mills had taped his interview of Roger Scott.  (R.T. 9/13/90 at 47).  Saldate testified that Mills had not taped Scott's interview and implied that the practice was acceptable.  (Id.).  In fact, Detective Mills **had** memorialized Scott's statements on audio tape the evening of December 3, 1989.  (See Detective Mills' Supplemental Report (Scott), attached as Exhibit 23).

Defense counsel also attempted to impeach Detective Saldate with a previously undisclosed treatise.  (R.T. 9/13/90 at 27-30).  This material was relevant and persuasive and could have assisted in counsel's representation had it been properly introduced.  Counsel's deficient approach and the court's subsequent ruling hampered his effectiveness and prejudiced Debra's ability to adequately confront the witnesses against her.

Additionally, trial counsel failed to obtain **competent** expert opinion to challenge Saldate's tactics and the reliability of the results of his interrogation.  Counsel should have obtained an interrogation expert and/or law enforcement experts in order to assist him in adequately cross-examining Saldate and to refute the reliability of Saldate's claims regarding his interrogation of Debra and acceptable interrogation practices.  (See, e.g., Professor Leo's Report, attached as Exhibit 28; Affidavits of Law Enforcement Experts, attached as Exhibit 39).  His failure to do so left him to his own limited knowledge and experience with disputed confessions, which was clearly inadequate under the circumstances of this case.  *See, e.g., Salem v. U.S. Lines Co.,* 370 U.S. 31 (1962).  As noted above, the defense team also did not

receive adequate funding or time in order to properly prepare for this case.  (See Kirk Fowler Affidavit #1, attached as Exhibit 4; Ken Ray Affidavit, attached as Exhibit 48).

> ### C.   Trial Counsel Prepared a Deficient Motion to Suppress, and his Conduct at the Voluntariness Hearing was so Incompetent as to be Ineffective Assistance of Counsel (Claim IV (E))

Defense counsel filed a motion to supress Debra's statements to Saldate based *solely* on Saldate's violation of her rights under *Miranda*.[18]  Although Debra's *Miranda* rights were violated, there was much more evidence available to defense counsel that clearly should have been presented at the critical voluntariness hearing.

First and foremost, defense counsel was ineffective for failing to have Debra testify at the voluntariness hearing. The United States Supreme Court has noted that the testimony of the defendant on involuntariness, given out of the jury's presence, is "pertinent to the inquiry on admissibility and might be material and determinative." *Unites States v. Carignan*, 342 U.S. 36, 38 (1951). The Court also cited the *Jackson v. Denno* requirements and emphasized that one of the crucial considerations was to give the accused the chance to testify out of the presence of the jury so that the determination of voluntariness would not have to be "made upon less than all of the relevant evidence." *Id*. at 72, (citing *Jackson v. Denno*, 378 U.S. 389, 391 (1964)).  In *Wright v. United States*, the D.C. Court of Appeals likewise explained that, although it is possible to hypothesize facts from which a legal conclusion of involuntariness would be irresistible even without the defendant's testimony, normally "[t]o substantiate a defendant's contention that his confession was involuntary, it is generally *necessary* for him to take the stand." 250 F.2d 4, 14 (D.C.Cir. 1957).

---

[18] The *Miranda* argument is set forth fully above in Argument I (C).

A long line of caselaw has clarified that when a defendant takes the stand to protect his Fourth Amendment rights at a pretrial suppression hearing, his testimony cannot later be used against him to prove guilt. *See, e.g. Simmons v. United States*, 390 U.S. 377 (1968); *United States v. Beltran-Gutierrez*, 19 F.3d 1257 (9th Cir. 1994).   It is a matter of course that a defendant should be allowed to testify to the involuntariness of her confession without waiving her privilege against self-incrimination.   3 Wigmore, Evidence 345 (3d Ed. 1940).   Thus, a defendant need not worry about the risks of testifying at a voluntariness hearing.

Despite these safeguards, trial counsel did not call Debra to testify at the voluntariness hearing.  (See R.T. 9/10/90; R.T. 9/11/90).  Debra was the *only* witness to Saldate's coercive tactics and was the only person who could testify to what she actually said at the interrogation. There is absolutely no tactical strategy that could account for not calling Debra as a witness. Debra's statements could not have been used against her to prove guilt, and her testimony was imperative to show Saldate's fabrications.   Without Debra's testimony, the trial court was forced to make a decision on whether the confession was voluntary and fabricated without a very significant part of the relevant evidence.   The suppression hearing was Debra's chance to testify outside the presence of the jury regarding Saldate's fabrications and improper tactics and conduct.

Defense counsel also wrongly conceded that Debra's statements were inculpatory, thereby misrepresenting the facts of this case to the trial judge.  (See Motion to Suppress, attached as Exhibit 67).   Debra has never indicated to anyone that she was involved with or knew about Christopher's murder.  (E.g., R.T. 10/3/90 at 28, 37, 43-44; R.T.10/4/90 at 75, 77, 90).  She has only stated that Detective Saldate took innocent statements concerning her fears and anger out of context, and then twisted them into inculpatory responses.  (R.T. 10/3/90).

In the motion and presentation of evidence at the voluntariness hearing, defense counsel also completely neglected to address the coercive, intimidating and unreliable aspects of the entire interrogation.  (See Exhibit 67; R.T. 9/10/90 at 2-168; R.T. 9/11/90 at 2-31).   For example, Detective Saldate completely ignored Debra's questions regarding why she was being questioned.  (R.T. 10/3/90 at 13).  Saldate repeatedly told Debra to be quiet.  (Id. at 14).  Saldate physically placed himself directly in front of Debra.  (Id. at 18).  He leaned in towards Debra, inappropriately put his hands on both of her knees and told her that he would not tolerate any lies.  (Id. at 18).

Saldate repeatedly refused to accept Debra's answers to questions.  Instead, he would say, "You are not telling me the truth." (Id. at 22).  He also never gave her a chance to make a phone call.  (Id. at 39).  He kept telling Debra that she was going to jail.  (Id. at 43).  He told her that she made a bad judgment call by having her son killed.  (Id. at 47).  Detective Saldate also failed to tape-record the conversation, despite his supervisor's instructions to do so.  (Id. at 51). Debra never confessed at any point during the interview. (Id. at 12-60).  Defense counsel's failure to present this evidence severely prejudiced Debra, as only Saldate's version of events was presented and considered by the court.

Defense counsel also failed to uncover or present the ample evidence of Detective Saldate's past misconduct that was available through public records.  As set forth fully above, Detective Saldate has a lengthy history of fabricating and coercing confessions.  (See Exhibit 15).  Detective Saldate is an ex-marine who weighs 225 pounds and has poked defendants in the chest repeatedly to obtain a confession.  (See Excerpts of Transcript at 7/18/88; attached as Exhibit 15-C).  Saldate has repeatedly asked questions after defendants have invoked their right to remain silent.  (Id. at 15-C, 15-G, 15-I, 15-J, 15-L, 15-O).  Saldate has acknowledged in many cases under oath that he will do almost anything to get the defendant to admit to a crime.

(Id.).  Saldate has used threats and intimidation in a significant number of cases.  (Exhibit 15).
This evidence was available to defense counsel.  His failure to research and present it was
clearly ineffective, denying Debra her right to effective assistance of counsel under the Sixth
Amendment.

Defense counsel also failed to provide the trial court with objective experts who could
refute the propriety of Detective Saldate's methods in Debra's case.  (See e.g., Professor Leo's
Report, attached as Exhibit 28; Bob Benson Affidavit, attached as Exhibit 39; Ken Lindley
Affidavit, attached as Exhibit 39).  The trial court needed testimony on standard procedures for
interrogations and how officers are trained to elicit information from defendants.  The trial
judge needed an objective standard against which to measure Saldate's methods, so she could
accurately determine their appropriateness.

Defense counsel was also ineffective for calling underqualified and unprepared experts
to testify on Debra's behalf.  Dr. Fritz was not a competent expert.  The defense called Dr. Fritz
to testify at the voluntariness hearing as to the reliability of Saldate's police report.  (R.T.
9/10/90 at 127-151).  Dr. Fritz did testify that Saldate's report was either fabricated or altered.
(Id. at 148).   However, during cross-examination, he claimed he could only cite to one
paragraph that was fabricated and could not substantiate it with any evidence.  (Id. at 147-149).
He later admitted that he had not even familiarized himself with the Phoenix Police
Department's policy on interviews or interrogations of suspects.  (Id. at 149).

Dr. Fritz was also found in contempt of court.  (See 10/12/90 Minute Entry, attached as
Exhibit 68).  Dr. Fritz mishandled evidence and was unable to show good cause before the
court.  (See R.T. 9/12/90 at 87; R.T. 9/13/90 at 2-4; Order to Show Cause; attached as Exhibit
69).  Dr. Fritz's blunders cost him credibility with the judge.

Dr. Kassel was called at the voluntariness hearing as a last minute replacement for Dr. Garcia-Bunuel. Dr. Garcia-Bunuel later testified at the sentencing hearing. Dr. Kassel did not read the interviews Debra had given to police before Saldate interrogated her. (R.T. 9/10/90 at 97). Dr. Kassel had not reviewed Debra grade records or job history before their meeting. (Id. at 98). Further, Dr. Kassel's specific function was only to treat Debra. (Id. at 96). He qualified that he had no opinion as to whether Debra had her son murdered. (R.T. 1/11/91 at 73). Dr. Kassel also claimed that Debra showed no remorse, and that any sorrow was due to being in confinement. (Id. at 55).

By viewing Dr. Garcia's testimony at sentencing, it is clear that Debra was prejudiced by the testimony of Dr. Kassel. Unlike Dr. Kassel, Dr. Garcia had reviewed and obtained a nearly complete history of Debra. (Id. at 60; see also Dr. Garcia Affidavit, attached as Exhibit 70). Further, Dr. Kassel's specific function was only to treat Debra. (Id. at 64;). Dr. Garcia, who is the Clinical Director of the Maricopa County Department of Health Services, diagnosed and attempted to understand what was going on with Debra. (Id. at 42, 65). Dr. Garcia was able to form a medical opinion that Debra had not conspired to kill her son. (Id.). He was also able to pinpoint that Debra was grieving over her son and not the fact that she was in jail. (Id. at 48-49). Dr. Garcia also believed that Dr. Kassel was assuming that Debra was guilty and was therefore unobjective. (Id. at 55-58). Dr. Kassel was unprepared and incompetent to serve as an expert at the voluntariness hearing. Defense counsel prejudiced Debra by calling him to testify.

It is clear from the evidence (and lack thereof) that Debra's alleged confession to Saldate was the single most important piece of evidence against Debra. Without this piece of evidence, there is no "case" against Debra. Defense counsel relied solely on Saldate's testimony to support his motion to suppress. The voluntariness hearing was a crucial

proceeding in this case.   The fact that defense counsel fell below prevailing standards at this hearing is inexcusable and severely prejudiced Debra.   Research shows that Saldate had been involved in numerous questionable interrogations.   This should have alerted defense counsel that his client was likely telling him the truth and that he needed to launch a serious attack on the reliability and credibility of Saldate. Defense counsel's failure to provide effective assistance at such a critical stage satisfies the two-prong analysis of *Strickland*.   This Court should remand this case for a new trial on this basis alone.

### D.   Trial Counsel Failed to Investigate or Present the Ample Mitigation Evidence Available in Debra's case (Claim IV (G))

Defense counsel was ineffective for failing to provide proper mitigation evidence on Debra's behalf. "Counsel's general duty to investigate . . . . takes on supreme importance to a defendant in the context of developing mitigating evidence to  present to a judge or jury considering the sentence of death claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care."   Strickland, 466 at 706 (Brennan, J., concurring in part and dissenting in part).   In evaluating ineffective assistance of counsel in the context of capital sentencing proceedings, the United States Supreme Court has stated:

> When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Id.* at 620.   In a capital case, where counsel's failure to introduce "substantial and important mitigation evidence readily available" is not due to a reasonable tactical evaluation, his performance is constitutionally deficient.   *Mak v. Blodgett*, 970 F.2d 614, 618 (9th Cir. 1992), *cert. denied*, 507 U.S. 951 (1993).   Furthermore:

> Because of the potential consequences of deficient performance during capital sentencing, we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase of the trial. . . .[T]he issue for the jury is whether the defendant will live or die. . . The sentencing hearing is defense counsel's chance to show the jury the defendant, despite the crime, is worth saving as a human being . . . To fail to present important mitigating evidence in the penalty phase—if there is no risk in doing so--can be as devastating as a failure to present proof in the guilt phase."

*Id.* at 614. The American Bar Association has set forth particularized standards as guidance for presenting mitigating evidence, which are especially critical in a capital case. The A.B.A. states:

> The lawyer has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the Court at sentencing. This cannot effectively be done on the basis of broad emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships and the like will be relevant, as will mitigating circumstances surrounding the commission of the offense. Investigation is essential to the fulfillment of these functions.

1 ABA Standards, Standard 4-4.1, commentary at 4-55 (2d ed. 1980). The Ninth Circuit has also held that: "[I]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999), *cert. denied*, 528 U.S. 1105 (2000)(quoting *Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999), *cert. denied*, 527 U.S. 1049 (1999)). *See also, State v. Roscoe*, 145 Ariz. 212, 227, 700 P.2d 1312, 1327 (1985), *cert. denied*, 471 U.S. 1094 (1985); *State v. Poland*, 144 Ariz. 388, 406-07, 698 P.2d 183, 201-02 (1985), *cert. granted*, 474 U.S. 816 (1985); *State v. Fisher*, 141 Ariz. 227, 252-53, 686 P.2d 750, 775-76 (1984), *cert. denied*, 469 U.S. 1066 (1984); *State v. Ortiz*, 131 Ariz. 195, 211, 639 P.2d 1020, 1036 (1982), *cert. denied*, 456 U.S. 984 (1982).

Despite the foregoing emphasis in the law on the importance of mitigation evidence in capital sentencing, defense counsel failed to present available, key mitigating evidence on Debra's behalf. He was in no danger of opening the door for substantial rebuttal evidence harmful to Debra. Further, defense counsel waited until a month after Debra was convicted to

request the court to appoint associate counsel to assist him in preparing for the penalty phase of the case. (See Motion to Appoint Associate Counsel, attached as Exhibit 71). The court further rendered counsel ineffective for failing to grant defense counsel's request for associate counsel. (See 11/9/90 Minute Entry, attached as Exhibit 72)). Defense counsel admitted that he had a full trial schedule and was taking off for the holidays during the period prior to Debra's sentencing. (R.T. 12/7/90 at 116-118). Defense counsel then filed two motions to continue Debra's sentencing as he finally commenced mitigation efforts. (See Motions to Continue, attached as Exhibit 73).

This Court has granted review on the merits in four specific areas where trial counsel failed to investigate and present available mitigation evidence:

1. The failure to secure the presence of Petitioner's mother until the day prior to the sentencing hearing;

2. The failure to secure Petitioner's records or gain a complete social, medical, or psychological evaluation of Petitioner;

3. The failure to investigate Petitioner's difficult childhood and prior home life; and,

4. The failure to provide evidence of Petitioner's close family ties.

We address these points individually and in order.

### 1. Trial Counsel Made No Effort to Secure the Presence of Petitioner's Mother until the Day Prior to the Sentencing Hearing (Claim IV(G)(2))

As noted above, Debra's mother had key mitigating information that should have been presented on Debra's behalf. Yet, defense counsel did not attempt to contact her until one day before the mitigation hearing. (See Application for Transportation and Lodging Authorization, attached as Exhibit 74). This is despite the fact that Renate resided in Germany.

Renate would have testified to Debra's difficult childhood, the fact that she was a loving mother, the likely reasons why Sandra and Richard Sadeik testified negatively about Debra and Debra's interactions with Christopher. (See Renate Janka Affidavit, attached as Exhibit 3). The fact that Debra's other family members testified against her made it even more crucial to have her mother testify at the mitigation hearing. The failure to contact Debra's mother until one day prior to the sentencing hearing was clear ineffective assistance. *See Brewer v. Aiken*, 935 F.2d 850, 860 (7th Cir. 1991). This case should be remanded and set for a new sentencing hearing.

### 2. Trial Counsel Failed to Secure Petitioner's Records or Gain a Complete Social, Medical, or Psychological Evaluation of Petitioner (Claim IV(G)(3))

Defense counsel failed to secure any of Debra's medical or school records, or gain a complete social history evaluation of Debra. This was clearly ineffective assistance. *Waters v. Zant*, 979 F.2d 1473, 1478 (11th Cir. 1992). A thorough social history would have shown that Debra grew up in a hostile and difficult environment. (See Social History, attached as Exhibit 1; see also Dr. Biegan's Report, attached as Exhibit 2).

In *Waters*, the court found that defense counsel committed at least five "constitutionally significant errors" that when reviewed together undermined the court's confidence in the sentencing phase, requiring reversal and remand. 979 F.2d at 1478. One was defense counsel's complete failure to present mitigating evidence concerning the defendant's medical history and troubled childhood. *Id*; *see also, Blanco v. Singletary*, 943 F.2d 1477, 1499 (11th Cir. 1991), *cert denied*, 504 U.S. 943 (1992).

Similarly, defense counsel in Debra's case failed to present ample mitigation evidence that would have been available to him through a social history. Debra was born in a military hospital in Germany. (Social History, attached as Exhibit 1 at 2). Debra's father, Richard

Sadeik, constantly drank and wasted the family's income on alcohol.  (Id. at 12).  Debra's father was extremely abusive towards Renate.   (Id. at 13).   The family moved around constantly. (Id. at 14).  Debra's sister, Sandra, also became increasingly resentful of Debra.  (Id. at 17).  Sandra was routinely beaten for misbehaving while Debra was rarely disciplined.  (Id. at 17-18).  At one point, Debra witnessed her stepbrother try to beat her mother with a baseball bat.  (Id. at 20).  Debra's parents divorced, after which Debra and Sandra moved in alone with their mother.  (Id. at 21-22).  Renate eventually remarried and her new husband, Alex, came to live with them in Phoenix.  (Id. at 28).  Debra held numerous jobs to help care for herself and her family.  (Id. at 29).

Sandra and Debra continued to live together but their relationship became extremely strained.  After Renate could no longer handle Sandra's disciplinary problems, Sandra went to live with her father.  (Id. at 30).  Sandra did not like the way her father treated her and resented Renate for sending her to live with him.  (Id. at 31-33).  Soon thereafter, Renate and Alex moved to Germany and left Sandra and Debra alone in Phoenix.  (Id. at 31).

After Renate left, Debra lived in Renate's apartment with Patty (Bacon) Prust and Robin.  Shortly thereafter, Debra met and started a relationship with Mark Milke.  (Id. at 36).  Mark moved in with Debra and was soon arrested for drug possession.  (Id. at 37). In May of 1984, Renate learned of Debra's plan to marry Mark.  (Id. at 40).  On a visit to Phoenix, Renate told Debra she was not happy about the plan to marry because of Mark's drinking and drug problems.  (Id. at 40-45).  Debra and Mark had their only child, Christopher, in 1985.  (Id. at 48). Shortly thereafter, Mark Milke was sent to prison on drug charges and was later arrested on domestic violence charges toward Debra.  (Id. at 48).  Debra later left Mark due to his excessive drinking and drug use.  (Id. at 50).  Debra later moved forward and cared for her son

alone. She was forced to live in several different places and worked one to two jobs to make ends meet, as Mark did not pay child support. (Id.).

A complete social history was imperative to illustrate the difficulties Debra had in her childhood and adult life. Defense counsel severely prejudiced Debra by not obtaining a complete social history and presenting it as mitigation evidence.

Defense counsel was further ineffective for failing to obtain Debra's and Christopher's medical records and present them in mitigation. (See Debra Milke's medical records, attached as Exhibit 58; Christopher Milke medical records, attached as Exhibit 8). These medical histories were imperative to show Debra's difficulties in delivering Christopher, and the fact that she took good care of herself and her son. Debra was responsible for Christopher and was an exceptional mother during his surgery. (See Zuerlein Affidavit, attached as Exhibit 9). The fact that Debra took good care of herself and her child rebuts the inference that she was an unfit mother who did not want and failed to take care of her child. This evidence would have shown that Debra did everything possible to maintain the health of her son and herself. It would also have shown that Christopher had no signs of abuse. There is no indication that these failures of counsel were based on a reasoned decision or that submission of mitigation evidence would have resulted in harmful rebuttal evidence. Counsel simply failed to present available mitigating evidence, and his representation fell below an objective standard of reasonableness. Such failures violate the Sixth Amendment. *See, e.g., Deutscher v. Whitley,* 884 F.2d 1152, 1159-62 (9th Cir. 1989), *Mak v. Blodgett,* 970 F.2d at 621.

Defense Counsel was also ineffective for failing to obtain a psychiatric evaluation of Petitioner. *Pruett v. Thompson*, 771 F.Supp. 1428, 1440 (E.D.Va. 1991). Defense counsel could have obtained a complete evaluation that would have explained the dynamics of Debra's

family.  The evaluation would have been extremely helpful to explain why Sandra and Debra's father testified in the manner they did.  (See Dr. Biegan's Report, attached as Exhibit 2).

### 3.     Trial Counsel Failed to Investigate Petitioner's Difficult Childhood and Prior Home Life  (Claim IV(G)(6))

Defense counsel was also clearly ineffective for failing to investigate or establish existing evidence of Debra's early years or prior home life.  *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104 (1982); *State v. Lagrand*, 153 Ariz. 21, 36-37, 734 P.2d 563, 578-79 (1987), *cert. denied*, 484 U.S. 872 (1987); *State v. Castaneda*, 150 Ariz. 382, 394, 724 P.2d 1, 13 (1986); *State v. Correll*, 148 Ariz. 468, 482-83, 715 P.2d 721, 735-36 (1986); *Waters v. Zant*, 979 F.2d 1473, 1478 (11th Cir. 1992).  As set forth more fully above, extensive evidence existed that Debra's childhood and home life were extremely difficult. (See Dr. Biegan's Report, attached as Exhibit 2); Social History, attached as Exhibit 1;  Renate Janka Affidavit, attached as Exhibit 3).

### 4.     Defense Counsel was also Ineffective for Failing to Provide Evidence of Petitioner's Close Family Ties  (Claim IV(G)(8))

Debra was charged with conspiracy to have her child, Christopher, killed.  Christopher was the grandson of Renate Janka and the step-grandson of Alex Janka.  At trial, Debra's virtually estranged sister and father testified negatively about Debra.  The fact that Debra was able to maintain loving relationships with her mother and stepfather established nonstatutory mitigation.  *See, e.g., Eddings*, 455 U.S. 104.  Both Alex and Renate believed in Debra's innocence and were the closest family members she had.  (See Renate Janka's Affidavit, attached as Exhibit 3; Alex Janka Affidavit, attached as Exhibit 56).  Yet, neither were called by defense counsel.  This was clearly ineffective assistance.

After the sentencing hearing, defense counsel filed a sentencing memorandum.  (See Defendant's Memorandum of Points and Authorities Re: Sentencing, attached as Exhibit 75).

This memorandum was a minimal attempt to show that the mitigating circumstances outweighed the aggravating factors. Defense counsel failed to adequately set forth why the mitigating factors were established by a preponderance of the evidence. *Milke*, Ariz. at ____, 865 P.2d at 789. Defense counsel also failed to show that Debra should have been spared the death penalty when the aggravating factors were weighed against the mitigating factors. In part, this was due to counsel's failure to effectively show that the State did not prove pecuniary gain as a motive. *Id.*

Defense counsel's performance at sentencing fell far below prevailing standards. His limited investigation and presentation of evidence clearly prejudiced Debra. There is a reasonable probability that had defense counsel presented the evidence available to him or discoverable through minimal investigation, Debra would not have received the death penalty. The ineffective assistance of counsel was apparent when one reviews all the evidence available to him that would have mitigated against a death sentence. Thus, there is a "reasonable probability" that, had all the foregoing evidence been presented, Debra would have received a sentence of life in prison. *Strickland*, 466 U.S. at 694; *Blake v. Kemp*, 758 F.2d 523, 534-535 (11th Cir. Year), *cert. denied*, 474 U.S. 998 (1985). Because the ultimate result of counsel's errors is utterly reversible, Petitioner urges this Court to reverse and remand her case for a new sentencing hearing where all of her mitigating evidence can be presented.

### III. PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL UNDER THE SIXTH AMENDMENT FOR FAILING TO ARGUE THE VOLUNTARINESS ISSUE ON DIRECT APPEAL (CLAIM VIII)

Debra Milke was also denied her right to effective assistance of appellate counsel under the Sixth Amendment to the United States Constitution. "The court judges the performance of counsel on appeal by the same standard as that applied to trial counsel." *Wicker v. McCotter*,

783 F.2d 487, 497 (5th Cir. 1986), *cert. denied*, 478 U.S. 1010 (1986).   Thus, the two part test under *Strickland* applies.

In this case, Debra's appellate counsel failed, among other things, to raise those claims set forth in the habeas petition which are based on the record.   Competent counsel would not have failed to raise these issues on appeal.   Appellate counsel's omissions prejudiced Debra because the Arizona Supreme Court affirmed Debra's convictions and sentences without considering issues neglected by appellate counsel and without the benefit of the careful, partisan scrutiny by a zealous advocate.   *Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1992).

In particular, appellate counsel was ineffective for failing to raise the issue of the voluntariness of Debra's alleged statements.   All confessions are presumed to be involuntary, and the state bears the burden of proving by a preponderance of the evidence that any confession is voluntary and freely given.   *State v. Amaya-Ruiz*, 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990), *cert. denied*, 500 U.S. 929 (1991).   The trial court must consider the ***totality of circumstances*** to determine whether a confession is voluntary.   *Id.*

Notwithstanding the fact that trial counsel was ineffective for failing to call Debra as a witness at the voluntariness hearing, her failure to testify did not automatically preclude her from relief on the record.   *Blackburn v. Alabama*, 361 U.S. 199, 210 (1960).   It is well founded that when a confession appears to be involuntary ***at any stage of the proceedings***, it is the trial judge's duty to exclude it from evidence.   *Id.; See also Jackson v. Denno*, 378 U.S. 368 (1964).

Although trial counsel prepared a deficient motion to supress, the trial court erred in not supressing the alleged statements from Debra.   Appellate counsel was clearly ineffective for not arguing the voluntariness issue on appeal.   The overall record shows that Debra's alleged confession was fabricated and involuntary.

First, Debra invoked her right to an attorney, and Detective Saldate ignored this attempt to exercise her constitutional rights.  Debra told Detective Saldate that she did not understand her constitutional rights.  (R.T. 10/3/90 at 17).  Saldate did not cease questioning and did not adequately explain her rights.  (Id.).  Debra then asked to speak to an attorney.  (Id.).  Saldate improperly continued to question Debra without honoring her request.  (Id. at 18).  *See Miranda v. Arizona*, 384 U.S. 436, 474 (1966).  In *State v. Emery*, 131 Ariz. 493, 502, 642 P.2d at 847 (1982), the defendant and a friend were charged with murder.  The defendant was arrested and held in an isolation cell for six hours before he was given his *Miranda* warnings and questioned by detectives.  *Id.* at 496, 642 at 841.  The defendant stated he wanted to speak to a lawyer after he was told that his co-defendant had said the defendant had participated in many killings.  *Id.* at 497, 642 P.2d at 842.  The defendant later testified he had heard the detectives say it was too bad that he would have to take the blame for the murders and would wind up in the gas chamber.  *Id.*  The trial court denied the defendant's motion to suppress his confession.  *Id.*  The Supreme Court reversed because the state had not met its burden of proving the voluntariness of the statement obtained after the defendant had invoked his right to counsel.  *Id.* at 502-03, 642 P.2d at 847-48.

Saldate also used coercive techniques to try and coerce a confession.  He would not accept Debra's answers.  (R.T. 10/3/90 at 13-25).  He moved directly in front of Debra, knee to knee.  (Id. at 18).  He then inappropriately made physical contact with Debra by putting his hands on her knees.  (Id.).  He continuously leaned in towards Debra and told her he would not accept her denials.  (Id. at 13-30).   Saldate reported that he made her look into his eyes and stare at her face to face.  (R.T. 9/10/90 at 86).  Saldate testified that he and Debra were alone and that he did not have a tape-recorder with him.  (Id. at 55).   The combination of impermissible conduct by Saldate made any statements obtained involuntary.

Dr. Kassel's testimony provided further support for the claim that Saldate violated Debra's constitutional rights and fabricated a confession.  Dr. Kassel testified that Saldate did not validate his assumptions with facts.  (R.T. 9/10/90 at 84).  He testified that Saldate used false logic to make false conclusions.  (Id. 85).  He testified that Saldate wrongly assumed that Debra's grief was an act.  (Id. at 91).  Saldate had come to the interview with his mind made up, and he was going to arrest Debra for the crime.  (Id.).  Dr. Kassel testified that he doubts Debra fully understood her *Miranda* rights.  (Id. at 94).

Kirk Fowler also corroborated that Saldate violated Debra's constitutional rights.  Mr. Fowler worked as a investigator for numerous governmental agencies for over twenty-seven years.  (Id. at 153).  He indicated that he was always instructed to have two people available to interrogate someone.  (Id. at 154).  He also emphasized the importance of using tape-recorders in interrogations.  (Id.).  Mr. Fowler testified that Debra told him she did, in fact, ask for an attorney, but that Saldate's questioning continued.  (Id. at 157).  He also testified that in his experience, one should not be able to opine that a person is lying without hard facts that show the person is giving contradictory statements.  (Id. at 161).

Dr. Fritz, who had training in the field of interrogation protocol, testified that Saldate's methods were suspect and unreliable.[19]  Dr. Fritz testified that when a male is interrogating a female, a tape-recorder should always be used.  (Id. at 133).  Saldate was ordered to use a tape-recorder and disobeyed that order.  (Id. at 134).  Dr. Fritz's opinion was that Saldate's report was either fabricated or altered.  (Id. at 134).   He testified that Saldate violated established protocol and that it seemed, from Saldate's report, that Debra and Saldate were talking about

---

[19]  Dr. Fritz was found in contempt of court as fully set forth in Argument II(C). However, this was due to his failure to properly handle evidence and was not related to his assessment of Saldate's conduct or Debra's alleged statements during the interrogation.  (See 10/12/90 Minute Entry, attached as Exhibit 68; R.T. 9/12/90 at 87; R.T. 9/13/90 at 2-4).

two totally different things.   (Id. at 137).  In Dr. Fritz's opinion, Saldate violated Debra's *Miranda* rights, and her statements were involuntary.  *Miranda*, 384 U.S. at 474.

The only evidence presented by the government was Detective Saldate's testimony. However, Saldate's own testimony demonstrates that his methods are improper and suspect. Saldate admitted under oath that he willfully violates defendants' right to remain silent.  (R.T. 9/10/90 at 5).  He admitted that his supervisor directed him to tape-record Debra's interview but he failed to even bring a tape-recorder with him.  (Id. at 49-52).  He later testified that he does not even own a tape-recorder, and his habit is not to use one.  (Id. at 43-44).  When he interrogated Roger Scott, Saldate testified that "I was going to talk to him seriously about what I felt had happened."  (Id. at 11).  Again, this shows that Saldate walks into an interrogation with *his* story and talks to defendants about *his* story.  He also agreed under oath that he had no independent information suggesting Scott was lying; he just had his assumptions and suspicions.  (Id. at 13).  He testified that he had no facts to corroborate Roger Scott's claim that Debra was involved, but "thought" it was true.  (Id. at 38-41).  Saldate was never instructed to arrest Debra, but made up his mind to do so even before the interrogation began.  (Id. at 42). The fact that Saldate agreed he does not obey a defendant's right to remain silent alone makes his interrogation style unconstitutional.  *Miranda*, 384 U.S. at 474.

Saldate also testified to *specific instances* where he has violated a defendant's constitutional rights.  He testified that Sean Running Eagle asked to remain silent and requested an attorney.   (R.T. 9/10/90 at 17-19).   Yet after both requests, Saldate continued the questioning.  (Id.).  He claimed that his "job" is to obtain what he feels is the truth and he realizes that his technique may cause statements to be suppressed by the court.  (Id. at 19-20). Saldate claimed that he is "intolerant with lies."  (Id. at 26).  He admitted that when Roger Scott told him about his sick mother, Saldate threatened to send officers over to her house.  (Id.

at 26-30).  This demonstrates that Scott's statements were also not voluntary.  *See, e.g.*, *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (a confession obtained by any direct or implied promises, however slight is involuntary); *State v. Williams*, 136 Ariz. 52, 56, 664 P.2d 202, 206 (1983)(threats by a detective to obtain a confession make the confession involuntary); *State v. Strayhand*, 184 Ariz. 571, 911 P.2d 577 (1995) (the truth of the threats only strengthens their coercive effect).

The numerous inconsistencies in Saldate's testimony also illustrate that he was not telling the truth.  At one point in his testimony, Saldate claimed "I never confront nobody." (Id. at 25).  Later, however when explaining why he interfered in Scott's interview, he testified that it was because "he was not being confronted, interviewed as I would interview him."  (Id. at 29).  This is only one example of the numerous inconsistencies in Saldate's accounts of what occurred.  (See Exhibit 41).

The voluntariness hearing and trial record established that Debra's statements were involuntary and her confession was fabricated.  The State failed to meet its burden to show by a preponderance of the evidence that the statements were, in fact, voluntary.  *Emery*, 131 Ariz. at 502-503, 642 P.2d at 847-848.  The record clearly shows that Saldate "recited the litany of rights and then ran roughshod over them."  *Strayhand*, 184 Ariz. at 586, 911 P.2d at 592. Appellate counsel had ample evidence in the record to successfully argue that Debra's statements should have been suppressed.  Because this strong claim was not presented to the Arizona Supreme Court on direct appeal, Petitioner was denied her fundamental right to have her claims reviewed by an independent court and was thereby prejudiced.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  Appellate counsel was therefore ineffective within the meaning of *Strickland*.

IV.    THE ERRORS OF THE TRIAL COURT IN THE CONDUCT OF DEBRA'S
       TRIAL INFRINGED UPON HER RIGHTS TO DUE PROCESS AND A FAIR
       TRIAL IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS
       TO THE UNITED STATES CONSTITUTION (CLAIM III (in part))

A.    <u>The Trial Court Erroneously Struck, for Cause, Potential Juror Moquino</u>

The striking, for cause, of Pete Moquino was clearly erroneous.  The Constitution

guarantees a criminal defendant the right to a fair and impartial jury.  *Holland v. Illinois*, 493

U.S. 474 (1990); U.S. Const.Amend. VI.  Federal caselaw shows that this constitutional right is

violated where venire members expressing conscientious objections to capital punishment are

excused for cause.  *Witherspoon v. Illinois*, 391 U.S. 510 (1968).

Under Arizona's procedure for death penalty cases, a juror has the duty to determine

guilt or innocence, and the sentence of death is the sole responsibility of the trial judge.

Nevertheless, Arizona courts have held that jury questioning regarding capital punishment is

permissible where the questioning determines a bias that would prevent a certain juror from

performing his duty.  *E.g.*, *State v. Smith*, 123 Ariz. 231, 237, 599 P.2d 187, 193 (1979); *State

v. Clark*, 126 Ariz. 428, 431, 616 P.2d 888, 891, *cert. denied*, 449 U.S. 1067 (1980).  The test is

whether certain views would prevent or substantially impair the performance of the juror's duty

to decide the case in accordance with the juror's oath and the court's instructions.  *State v.

Martinez Villareal*, 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985), *cert. denied*, 474 U.S. 975

(1985).

Pete Moquino, an employee of the Salt River Project and father of 5 children, was

called as a potential juror in Petitioner's case.  (See Excerpt of Transcript, attached as Exhibit

76; R.T. 9/11/90 at 89).  The following questioning took place during voir dire:

THE COURT:  Is there anyone here who feels they would rather not sit as a juror on
this case because of the charge of first degree murder and because there is a possibility
that the death penalty could be imposed?  Mr. Moquino?

MR. MOQUINO: Yes.

THE COURT:   Would it make a difference if I told you that the jurors did not determine punishment; even in a capital case that decision is left to the judge?

MR. MOQUINO:  I don't think I'd want to have anything to do with it.  I don't believe in capital punishment.

THE COURT: All right.  Thank you, sir.  Anyone else?  Is there anyone here who is so opposed to capital punishment that you could not sit and listen to the evidence, listen to the law and make your determination solely upon the evidence and the law without considering the facts as to what the punishment might be?  Is there anyone here who is so opposed to the death penalty that it would cause you to vote not guilty, regardless of what you really thought the evidence showed?  Is there anyone here that has any feelings against the death penalty that might interfere with your ability to reach an impartial decision?  Thank you.  Counsel, any additional questions?

MR. LEVY:  No, Your Honor.

MR. RAY:  Your honor, may we approach?

(Id. at 98-100).

Shortly thereafter, the trial court asked the attorneys about strikes for cause.  (Id. at 103).  The prosecutor  requested the judge to strike Pete Moquino for cause.  (Id).  He gave no reasons or explanation as to why Mr. Moquino could not be an impartial juror.  (Id).  Yet, the court "excuse[d] Mr. Moquino for cause."  (Id. at 104).  However, the judge then inconsistently states, "The Court does not need to excuse Mr. Moquino for cause."  (Id).  The jury list shows that Mr. Moquino was, in fact, struck for cause.  (See Jury List, Attached as Exhibit 77).

The record shows that the *only* reason the court struck Mr. Moquino was his opposition to the death penalty.  Although Mr. Moquino stated that he didn't want "anything to do with it," neither the court nor the prosecutor followed up with additional questioning regarding precisely what Mr. Moquino was apprehensive about.  Thus, the State failed to establish whether Mr. Moquino was just opposed to capital punishment or whether he truly could not be impartial. Mr. Moquino's statement was ambiguous and required clarification before being struck for cause.

In *Martinez Villareal*, the appellant claimed that he was denied the right to a fair trial by the systematic exclusion of all the potential jurors who had objected to the death penalty. 145 Ariz. at 449, 702 P.2d at 678.  The appellant relied on *Witherspoon*, 391 U.S. 510.  The trial court in *Martinez Villareal* questioned four of the jurors individually who had expressed discomfort with the possibility of the death sentence if the defendant were convicted.  The trial judge excused three of them exclusively on the jurors' *expressed inability* to make an impartial determination of guilt or innocence in the case. *Martinez Villareal*, 145 Ariz. at 449, 702 P.2d at 678.  The appellate court held that as long as the jurors are excused based on their inability to be impartial, it does not violate the Sixth and Fourteenth Amendments.  *Id.* at 449, 702 P.2d at 678.

The United States Supreme Court examined the scope of *Witherspoon* in *Adams v. Texas*, 448 U.S. 38 (1980). It held that "[a] juror may not be challenged for cause based on his views about capital punishment unless those views would *prevent or substantially impair* the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 45 (emphasis added).  The court reaffirmed this standard in *Wainwright v. Witt*, 469 U.S. 412 (1985).  In *Adams*, the defendant was convicted of capital murder and appealed. The Supreme Court held:

> The exclusion of jurors in the instant case was impermissible where the statutory test could, and did, exclude jurors who stated that they would be "affected" by possibility of the death penalty but who apparently meant only that the potential lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally, or who were unable to state positively whether or not their deliberations would be in any way "affected."

*Id.* at 40. The Arizona courts have followed the *Adams* standard.

The record shows that Mr. Moquino was never specifically asked how his opposition to the death penalty would affect his deliberations as a juror. The voir dire only revealed that Mr.

Moquino was opposed to the death penalty. *Adams* clearly establishes that this is ***not permissible cause*** to excuse a potential juror. Thus, the State failed to meet its burden of showing that Mr. Moquino could not be an impartial juror.   To the contrary, the jury questionnaire shows that Mr. Moquino ***could have been*** an impartial juror.   The questionnaire asked whether he had formed an opinion on guilt or innocence, and he circled the answer "no." (See Jury Questionnaire, attached as Exhibit 78).   On this questionnaire, Mr. Moquino also indicated that if he had formed an opinion, he could set it aside.  (Id).  He also said that he had no personal or family experiences that might affect his ability to be fair and impartial.

By erroneously striking Mr. Moquino for cause, the trial court violated Debra's right to an impartial trial by jury pursuant to the Sixth and Fourteenth Amendments to the United States Constitution.  *See, e.g.*, *Witherspoon*, 391 U.S. at 511; *Adams* 448 U.S. at 40.  This case should be remanded for a new trial.

## V.   THE ARIZONA SUPREME COURT VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS BY RELYING ON CONSTITUTIONALLY INSUFFICIENT LIMITING CONSTRUCTIONS OF A FACIALLY VAGUE STATUTORY AGGRAVATING CIRCUMSTANCE (CLAIM X)

In sentencing Debra to death, the Arizona Supreme Court found and weighed statutory aggravating circumstance A.R.S. § 13-703(F)(6) — that the murder was "heinous . . . or depraved."  The United States Supreme Court has held that (F)(6) is "facially vague," *Richmond v. Lewis*, 506 U.S. 40 (1992), and that, therefore, (F)(6) cannot be weighed in the sentencing calculus unless it is given a constitutionally sufficient limiting construction.  *Id.*  In recognition of the inherent defect in the statutory scheme, the Arizona Supreme Court based its (F)(6) finding in this case on the further findings that the crime was "shockingly evil" and "senseless."  Neither finding can satisfy the Eighth and Fourteenth Amendments.  The Supreme Court has held foursquare that the "shockingly evil" limiting construction is vague and overbroad.  *Shell v.*

*Mississippi*, 498 U.S. 1 (1990).  And both the Eighth and Ninth Circuits have reached the same conclusion with respect to the "senselessness" limiting construction.  *Adamson v. Ricketts*, 865 F.2d 1011, 1032-35 (9th Cir. 1988) (en banc), *cert. denied*, 505 U.S. 1213 (1992); *Moore v. Clarke*, 904 F.2d 1226, 1232 (8th Cir. 1990).   Accordingly, Debra's death sentence is unconstitutional and must be set aside.

      **A.**      **A Death Sentence Predicated Upon a Finding That the Offense was "Heinous . . . or Depraved" Under A.R.S. § 13-703(F)(6) Violates the Eighth and Fourteenth Amendments Unless That Aggravating Circumstances has been Given a Constitutionally Sufficient Limiting Construction**

In *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court struck down all of the death penalty laws as they existed at the time.  *Id.* at 238 (per curiam).  The Court found that the laws allowed "untrammeled discretion" to decide who could be sentenced to death, *Id.* at 247-49 (Douglas, J., concurring), and that this lack of standards had resulted in death sentences that were "wantonly and ... freakishly imposed" on a "capriciously selected random handful" of defendants.  408 U.S. at 309-10 (Stewart, J., concurring).  Receiving a death sentence was, in Justice Stewart's words, akin to being "struck by lightning."  *Id.*  The Court held, therefore, that to satisfy the Eighth and Fourteenth Amendments, state law must guide sentencing discretion so as to provide a principled basis for distinguishing the "*few* cases in which [the death penalty] is imposed from the *many* cases in which it is not."  408 U.S. at 313 (White, J., concurring (emphasis added)); *see also Gregg v. Georgia*, 428 U.S. 153, 198 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

After *Furman*, Arizona, like many other capital-sentencing states, sought to comply with the Supreme Court's mandate by enacting A.R.S. § 13-703, a capital-sentencing scheme that prohibits imposition of a death sentence unless the sentencer finds at least one statutory

aggravating circumstance and concludes that such circumstances are not outweighed by any mitigating circumstances. The (F)(6) aggravating circumstance that was applied in this case that the murder was "especially heinous . . . or depraved" is one of 10 such circumstances that Arizona permits the capital sentencer to find and weigh in the sentencing calculus.

In reviewing the post-*Furman* statutes, the Supreme Court has held repeatedly that capital sentencing schemes like Arizona's satisfy the Eighth and Fourteenth Amendments *only* if *each* statutory aggravating circumstance complies with the principles set forth in *Furman* and channels discretion in a way that provides "specific and detailed guidance" that "make[s] rationally reviewable the process of imposing death sentences." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (citations omitted). "[I]t is constitutional error for the sentencer to give weight to an unconstitutionally vague aggravating factor even if other, valid aggravating factors obtain." *Richmond*, 506 U.S. at 46. Accordingly, "[w]here the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the state appellate court or some other state sentencer must actually perform a new sentencing calculus if the sentence is to stand." *Id.* at 49.

The Supreme Court has thus held that aggravating circumstances like (F)(6) that contain nothing more than strings of open-ended pejorative adverbs and adjectives such as "heinous, cruel, or depraved," *Walton v. Arizona*, 497 U.S. 639 (1990), "outrageously or wantonly vile, horrible and inhuman," *Godfrey*, 446 U.S at 428, "especially heinous, atrocious, or cruel," *Maynard v. Cartwright*, 486 U.S. 356, 362, 364 (1988), and "especially wicked, evil, atrocious or cruel," *Espinosa v. Florida*, 505 U.S. 1079, 1080 (1992), are facially unconstitutional. The reason is obvious: a person of "ordinary sensibility could fairly characterize every murder" in such terms. Godfrey, 446 U.S. at 428-429. Thus, if a state chooses to premise a death sentence on the characterization of an offense as "heinous" or "depraved," the state must "further

define[] the vague term[]" using a constitutionally sufficient limiting construction that guides the sentencer's discretion.  *Walton,* 497 U.S. 637; *Lewis v. Jeffers*, 497 U.S. 764 (1990).

In a judicial effort to save what is a facially unconstitutional statute, the Arizona Supreme Court has adopted various limiting constructions of "heinous . . . or depraved."  In *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (Ariz. 1983) (quoting *State v. Ortiz*, 131 Ariz. 195, 206, 639 P.2d 1020, 1031 (Ariz. 1981), *cert. denied*, 456 U.S. 984 (1982)), the Court culled from its prior "heinous . . . or depraved" decisions five separate factors, any one of which could contribute to, but none of which is necessary in order to justify, a "heinous . . . or depraved" finding.  The five factors — none of which are mentioned in A.R.S. § 13-703 — are that:  (1) the defendant relished the murder; (2) the defendant inflicted gratuitous violence on the victim; (3) the defendant mutilated the victim; (4) the crime was senseless; and (5) the victim was helpless.  *Id.* 51-53, 659 P.2d at 10-12.

In *Arave v. Creech*, 507 U.S. 463 (1993), the Supreme Court laid out the requirements for determining whether limiting constructions such as those outlined in *Gretzler* are constitutionally sufficient.  First, while a limiting construction need not live up to a standard of mathematical precision, it must be sufficiently definite, *i.e.*, "clear," "objective," and "ascertainable from the surrounding facts" and "circumstances" of the offense.  *Id.* at 474 (quotations omitted).  Second, a limiting construction must "'genuinely narrow the class of persons eligible for the death penalty'" to something less than all murders and "*every* defendant," *id.* at 474 (quoting *Zant v. Stephens*, 462 U.S. 862, 867 (1983)) (emphasis in original), while providing a "principled basis" "to distinguish those who deserve capital punishment from those who do not."  *Id.; see also Ceja v. Stewart*, 97 F.3d 1246, 1249 (9th Cir. 1996).  As will be demonstrated below, the "shockingly evil" and "senselessness" limiting

constructions of (F)(6) that were applied in this case fail both the definiteness and narrowing requirements.

**B.    The "shockingly evil" limiting construction of "heinous . . . or depraved" is vague and overbroad**

The "shockingly evil" limiting construction of "heinous . . . or depraved" brings Debra's death sentence into direct violation of the Supreme Court's decision in *Shell*, 498 U.S. at 1.   In *Shell*, the Supreme Court rejected the "shockingly evil" language as a constitutionally insufficient limiting construction of the facially vague "especially heinous, atrocious or cruel" aggravating circumstance.  *Id.* at 1; *see also Espinosa*, 505 U.S. at 1081 (aggravating factor that murder was "especially . . . evil" violates Eighth Amendment).

In short, the judicial gloss that the Arizona Supreme Court put on (F)(6) in this case does not pass Constitutional muster.  Nor can the State salvage the (F)(6) finding by arguing, as it has done previously, that the Arizona Supreme Court did not really rely on the "shockingly evil" limiting construction in sentencing Debra to death.  The Court began its (F)(6) analysis by acknowledging that "the term 'especially heinous, cruel, or depraved' is facially vague" and needs a narrowing "interpretation . . . [that] meets constitutional requirements."  *Milke*, 177 Ariz. at 125, 865 P.2d at 786.  It then cited two interpretations of (F)(6) it had used previously — *Gretzler*'s five factors and the definitions of "heinous" and "depraved" in *State v. Knapp*, 114 Ariz. at 543, 562 P.2d 704 (Ariz. 1977), *cert. denied*, 435 U.S. 908 (1978).  *Knapp* defined the terms as follows: "'Heinous' means 'hatefully or shockingly evil'; . . . 'depraved' means 'marked by debasement, corruption, perversion or deterioration.'"  *Milke*, 177 Ariz. 118, n. 4, 865 P.2d at 786 n.4 (quoting *Knapp*, 114 Ariz. at 543, 562 P.2d at 716).

Although *Gretzler*'s five factors had seemed to replace the *Knapp* definitions, *Gretzler*, 135 Ariz. at 51-52, 659 P.2d at 10-12, the Arizona Supreme Court pointedly declared its

intention to rely not only on the *Gretzler* factors but also on the *Knapp* factors; explaining that "In *Lewis v. Jeffers*, 497 U.S. 764, 777-78 (1990), the Court affirmed our interpretation of the (F)(6) factor ... which relied on the five *Gretzler* factors *and* the definition of heinous and depraved set forth in *State v. Knapp*." *Milke*, 177 Ariz. at 118, 865 P.2d at 786 (emphasis supplied by the Arizona Supreme Court). It was for this reason that the Arizona Supreme Court could acknowledge that "the parent/child relationship does not fit neatly within any of the five *Gretzler* factors" and still "hold that the use of the parent/child relationship ... is permissible and is within the *Gretzler-Knapp* parameters." *Id.* at 119, 865 P.2d at 787. As the Court concluded, Milke's crime "can be described without reservation as 'hatefully or shockingly evil' and 'marked by debasement, corruption, perversion, or deterioration.'" *Id.*[20]

Accordingly, because the "shockingly evil" limiting construction violates the Eighth and Fourteenth Amendments, (F)(6) cannot be weighed in the sentencing calculus, and Debra's death sentence must therefore be set aside.

### C.   The "senselessness" limiting construction of "heinous ... or depraved" is vague and overbroad

Alternatively, because the Arizona Supreme Court found that the "shockingly evil" finding provided only "partial support" for (F)(6) aggravation, *Milke*, 177 Ariz. at 185, 865 P.2d at 787, even if this Court upholds "shockingly evil" as a valid limiting construction, it nevertheless must set aside Debra's death sentence on the grounds that the "senselessness"

---

[20] Although in describing a lower court opinion in the case, *Jeffers* quotes the *Knapp* definitions, its affirmance of the death sentence rests entirely on two *Gretzler* factors (gratuitous violence and relishing). *Jeffers*, 497 U.S. at 769-71, 777. *Jeffers* decidedly did <u>not</u> uphold *Knapp*'s "shockingly evil" definition, as the United States Court revealed a few months later when it summarily reversed a death sentence based on that definition. *Shell*, 498 U.S. at 1.

limiting construction of (F)(6) is vague and overbroad, providing "no inherent restraint on the arbitrary and capricious infliction of the death sentence." *Godfrey*, 446 U.S. at 428.[21]

The Ninth Circuit has held that there is nothing about the word "senseless" that makes it a more appropriate modifier of the concept of murder than other words — for example, "heinous," "depraved," "cruel," "atrocious," "vile," or "evil" — that the Supreme Court has found to be unconstitutionally vague. Indeed, in *Adamson*, 865 F.2d at 1032-35, the Ninth Circuit pointed to Arizona's use of the "senselessness" limiting construction in holding that Arizona "had failed" to channel the sentencer's discretion in applying the (F)(6) circumstance because it had "set forth definitions for 'cruel,' 'heinous' and 'depraved' using terms and phrases that are equally vague, broad, and open to subjective interpretation." *Id.* at 1032-35.

The Eighth Circuit has reached the same result, holding that the "'senselessness of the crime'" is an unconstitutional limiting construction because it "has no objective meaning" and encompasses "virtually all murderers." *Moore*, 904 F.2d at 1232; *see also State v. Rhines*, 548 N.W.2d 415, 448-50 (S.D. 1996) (holding that "senselessness" limiting construction is vague and overbroad); *State v. Wallace*, 160 Ariz. 424, 428, 773 P.2d 983, 987 (Ariz. 1989) (acknowledging that "all murders may be considered senseless").[22]

---

[21] Conversely, if the Court concludes that the "senselessness" limiting construction is constitutionally sufficient, it nevertheless must set aside Milke's death sentence on the grounds that the "shockingly evil" limiting construction is not. That (F)(6) aggravation could not have been weighed in this case without the "shockingly evil" finding is evident from the fact that, under Arizona law, neither "senselessness" nor "helplessness" alone "will ordinarily lead to a finding of heinous . . . or depraved." *State v. Cornell*, 715 P.2d 721, 734 (Ariz. 1986); *see also* the decision of the sentencing judge in this case at R.T. 1/18/91 at 50. ("These last two elements alone, the senselessness of the crime and the helplessness of the victim, do not establish that the crime was especially heinous or depraved." (emphasis added)). Thus, if **either** the "shockingly evil" **or** the "senselessness" limiting constructions are vague and overbroad, (F)(6) must be removed from the sentencing calculus, and Debra's death sentence must be set aside.

[22] Both the Ninth and Eighth Circuits reconsidered their decisions in the wake of the Supreme Court's approval of two of *Gretzler*'s five factors — relishing the murder and the

It is clear that both the Eighth and Ninth Circuits were correct in recognizing that the "senselessness" limiting construction is vague and overbroad. As the Supreme Court explained in *Creech*, in determining whether a limiting construction satisfies the definiteness and narrowing requirements, the reviewing court must first consider whether the limiting construction has reliable, facial "content" in "ordinary usage" such that it defines some "subclass" of persons eligible for the death penalty. 507 U.S. at 471-72, 476.

Applying this test, it is evident that the simply pejorative word "senseless" lacks the content present in other valid limiting constructions. In *Creech*, for example, the Supreme Court found sufficient content in the "cold-blooded" limiting construction in its dictionary definition, which describes a "'killer who kills without feeling or sympathy.'" 507 U.S. at 476 (quoting Webster's Third New International Dictionary at 1726 (1986)). The Court found that "some within the broad class of first degree murderers *do* exhibit feeling," and kill "with anger, jealousy, revenge, or a variety of other emotions." *Id.* Here, however, the relevant dictionary definitions of the word "senseless" reveal no similarly definite content as the word is ordinarily used and do not come close to identifying a "subclass" of persons eligible for the death penalty. *See* Webster's Third New International Dictionary at 2067 (1986) (defining "senseless" as: "c: deficient in knowledge, appreciation, or reasoning power[,] stupid; d: lacking good sense[,] unwise, unreasonable, nonsensical; e: proceeding from or characterized by a lack of good sense or meaning[,] foolish, purposeless, meaningless.").

---

infliction of gratuitous violence in *Jeffers*, 497 U.S. at 770, 777-78, and *Walton*, 497 U.S. at 655 (1990). Both circuit courts left their original judgments intact. The Ninth Circuit concluded that *Jeffers* and *Walton* only abrogated the (F)(6) analysis in *Adamson v. Ricketts* in "some respects." *Adamson v. Lewis*, 955 F.2d 614, 619 (9th Cir.) (en banc), *cert. denied*, 505 U.S. 1213 (1992). And the Eighth Circuit found that the Court had only placed its "imprimatur on a portion of the *Gretzler* test." *Moore v. Clarke-II*, 951 F.2d 895, 897 (8th Cir. 1991), *cert. denied*, 504 U.S. 930 (1992) (reaffirming conclusion that Nebraska's "senselessly bereft" limiting construction violates the Eighth Amendment). Neither *Jeffers* nor *Walton* addressed

Accordingly, when applied to modify murder, the term "senseless," or any of its dictionary synonyms, add nothing.  No person of "ordinary sensibility" could describe any unjustified, unexcused, and deliberate taking of life as anything but "unreasonable," "purposeless," or "senseless."  *See Godfrey v. Georgia*, 446 U.S. at 428-29.  Nor could any murder be fairly characterized as "wise," "meaningful," or "sensible."

While the Arizona Supreme Court has provided further definitions and formulations of the "senselessness" limiting construction in an attempt to save it from unconstitutionality, none of these further definitions or formulations give the senselessness limiting construction sufficient content to satisfy *Creech*'s definiteness or narrowing requirements.  In *Creech*, an examination of state court cases revealed that the state court definitions and formulations of the "cold blooded" limiting construction were "consistent" and not "unclear."  507 U.S. at 476-77.  Here, however, an examination of Arizona's formulations and definitions of the "senselessness" limiting construction only confirms that the term applies to all murders.

First, although in this case the Arizona Supreme Court treated "shockingly evil" as a parallel limiting construction of "heinous . . . or depraved" rather than as a definition of the "senselessness" limiting construction, in other cases the Court has reasoned that the "shockingly evil" nature of an offense makes it "senseless" and hence "heinous . . . or depraved."  *See, e.g., State v. Kiles*, 175 Ariz. 358, 373 857 P.2d 1212, 1227 (1993), *cert. denied*, 510 U.S. 1058 (1994); *State v. Lopez*, 174 Ariz. 131, 144, 847 P.2d 1078, 1091 (1992), *cert. denied*, 510 U.S. 894 (1993); accord *Adamson*, 865 F.2d at 1032 n.37 (noting that "'senselessness' has been defined as a 'shockingly evil state of mind'").  But whether treated as a limiting construction of a facially vague aggravating circumstance, or as a formulation of a

---

either the "senselessness" or "shockingly evil" limiting constructions and neither case may be cited as approving the limiting construction of (F)(6) applied here.

facially vague limiting construction of a facially vague aggravating circumstance, "shockingly evil" violates the Eighth and Fourteenth Amendments. *See Shell*, 498 U.S. at 1.

Second, based on a thorough review of its own case law, the Arizona Supreme Court has defined "senselessness" to mean "outside normal behavioral parameters." *State v. Stanley*, 167 Ariz. 519, 531, 809 P.2d 944, 956, *cert. denied*, 502 U.S. 1014 (1991). But even more so than "heinous," "depraved," and "shockingly evil," the phrase "outside of normal behavioral parameters" lacks content as a modifier of murder. The phrase applies not only to all murders (none of which lie within "normal behavioral parameters"), but also to moral conduct that is simply "strange," "unusual," "peculiar," or "odd." *See Moore v. Clark, supra* (holding that statutory aggravating circumstance that the murderer "manifested exceptional depravity by ordinary standards of morality and intelligence," Neb. Rev. Stat. § 29-2523(1)(6), was facially vague).

Finally, in order to get beyond this daisy chain of vague formulations and definitions ("shockingly evil" and "outside normal behavioral parameters") of a vague limiting construction ("senseless") of a vague aggravating circumstance ("heinous . . . or depraved"), the Arizona courts have attempted to provide a definition of "senseless" based on the killer's "purpose" or lack thereof. That effort too has failed to produce any clear and consistent narrowing principle. The Arizona Supreme Court deems a murder to be "senseless" if (1) it was not committed to further any purpose,[23] or (2) it was committed for a noncriminal or a

---

[23] *See, e.g., State v. Amaya-Ruiz*, , 166 Ariz. 152, 178, 800 P.2d 1260, 1286 (1990), *cert. denied*, 500 U.S. 929 (1991) ("The victim and her husband befriended defendant and provided him with food, shelter, and clothing. Clearly, this was a senseless crime."); *State v. Jimenez*, 165 Ariz. 444, 455, 799 P.2d 785, 796 (1990) ("This was a senseless crime; defendant, for no apparent reason, murdered a helpless child who trusted him"); *State v. Vickers*, 159 Ariz. 532, 546, 768 P.2d 1177, 1191 (1989), *cert. denied*, 497 U.S. 1033 (1990) ("Vickers had not been harmed by Holsinger and gained nothing by the crime. Vickers . . . killed senselessly.")

criminal purpose but was not necessary to further that purpose,[24] or (3) it was committed for a noncriminal or criminal purpose and was necessary to achieve that purpose but the purpose was senseless.[25]

Thus, far from "'genuinely narrow[ing] the class of persons eligible for the death penalty,'" *Creech*, 507 U.S. at 474 (quoting *Zant v. Stephens*, 462 U.S. at 687), Arizona's various definitions and formulations of the senseless limiting construction based on the killer's purpose or lack thereof capture all murders imaginable in a seamless web of (F)(6) aggravation. The *only* murders that are not covered by these definitions and formulations are murders necessary to achieve a "sensible" purpose.   But neither Arizona law nor common usage defines

_____

[24] Cases applying this formulation of "senseless" to murders committed in order to achieve a "criminal purpose" include, *State v. Lopez*, 175 Ariz. 411, 857 P.2d 1261, 1265 ((1993), *cert. denied*, 511 U.S. 1046 (1994) ("The murder was senseless. . . . The sexual assault could have been committed without the murder"); *State v. Rossi*, 171 Ariz. 276, 279, 830 P.2d 797, 80, *cert. denied*, 506 U.S. 1003 (1992) (offense was "senseless" because "defendant could have escaped without firing the fatal shot"); *Correll*, 715 P.2d at 734 (the "murders were unnecessary to accomplish the robbery" and, therefore, "senseless"); *State v. Smith*, 141 Ariz. 510, 511, 687 P.2d 1265, 1266 (1984) ("It was senseless because Smith could have robbed the victim and escaped without harming the victim"); *State v. Zaragoza*, 135 Ariz. 63, 69, 659 P.2d 22, 28 (Ariz.), *cert. denied*, 462 U.S. 1124 (1983) ("[defendant] could have accomplished whatever criminal goals he desired without killing her," making the crime "senseless").   Cases applying this aspect of the definition of "purposeless" to murders committed in order to achieve a "noncriminal purpose" include this one, *Milke*, 865 P.2d at 786 ("This crime most certainly was senseless in that it was unnecessary for Debra Milke to kill her son to free herself from the responsibility of being a single mother or to prevent the boy from growing up like his father"), as well as *State v. West*, 176 Ariz. 432, 449, 862 P.2d 192, 208 (1993), (*cert. denied*, 511 U.S. 1063 (1994) ("A murder is senseless if it was unnecessary to achieve the defendant's goal."); *State v. Comer*, 165 Ariz. 413, 428, 799 P.2d 333, 348 (1990), *cert. denied*, 499 U.S. 943 (1991) ("The murder was 'senseless' in that it was not necessary to achieve appellant's goal of obtaining money and supplies . . . .").

[25] *See, e.g., State v. Martinez-Villareal*, 145 Ariz. 441, 451 702 P.2d 670, 680, *cert. denied*, 474 U.S. 975 (1985) ("Murdering another human being to show manliness constitutes depravity in that the killer senselessly takes life to demonstrate his superiority over his victims"); *State v. Salazar*, 173 Ariz. 399, 420, 844 P.2d 566, 587 (1992) (Zlaket, J., concurring), *cert. denied*, 509 U.S. 912 (1993) (murder was senseless because it "was an attempt to extract, if possible, information of where imagined valuables were hidden"); *State v. Gillies*, 142 Ariz. 564, 570, 691 P.2d 655, 661 (1984), *cert. denied*, 470 U.S. 1059 (1985) (murdering to eliminate a witness to the crimes of kidnapping, aggravated robbery, and sexual assault is senseless); *State v. James*, 141 Ariz. 141, 147, 685 P.2d 1293, 1299, *cert. denied*, 469 U.S. 990 (1984) ("[T]his was a totally senseless murder.   There was no reason for the killing other than the perpetrators' greed").

or identifies *any* sensible purpose for first-degree murder — i.e., for deliberately killing another human being *without legal justification or excuse*.[26]

For the reasons set forth above, the "senselessness" limiting construction of (F)(6), like the "shockingly evil" limiting construction of that same circumstance, violates the Eighth and Fourteenth Amendments.  Debra Milke's death sentence must be set aside.

## VI.   THE ARIZONA DEATH PENALTY STATUTE FAILS TO GENUINELY NARROW THE CLASS OF PERSONS ELIGIBLE TO RECEIVE THE DEATH PENALTY (CLAIM V (C))

To pass constitutional muster, a state's capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty.  In Arizona, the criteria is to weigh aggravating and mitigating circumstances.  But, there is absolutely no objective standard in place to determine whether someone fits within these certain circumstances.  Caselaw proves that the courts in Arizona cannot distinguish between what types of crimes fit within these aggravating circumstances and which do not. Specified statutory aggravators in death penalty schemes are designed to *narrow*, in a constitutional manner, the class of first-degree murderers who are death-eligible.  If proof of an aggravator does not rise to the necessary standard, the aggravator has not been proven and may not be considered at sentencing. A.R.S. § 13-703, (F)(6).

Arizona's statute, derived from the Model Penal Code (§ 210.6, Proposed Official Draft, 1962), and similar to the capital sentencing statutes upheld in other states, sets out

---

[26] Killings committed under an actual (even if negligent or reckless) apprehension of a reasonable need to use deadly force are exempted from murder liability under Arizona law — with reasonable need encompassing self-protection and protection of others and premises from the victim or from the coercive force of someone besides the victim, prevention of violent and serious nonviolent crimes, law enforcement, and provoked responses to "conduct or circumstances sufficient to deprive a reasonable person of self control."  Ariz. Rev. Stat. §§ 13-204(A)(1), 13-401(A), 13-404 to 13-406, 13-407(B), 13-410, 13-411, 13-1101(4), 13-1103(A)(2), 13-1103(A)(4); *Korzep v. Superior Court*, 838 P.2d 1295, 1299-301 (Ariz. 1991).

specific lists of aggravating and mitigating circumstances to be considered in capital sentencing decisions. Our statute also requires the court to consider any other relevant mitigating circumstances. The Arizona Supreme Court has explained that the statutory scheme *is intended* to "resolv[e] the need for flexibility in order to afford individualized decision-making in capital cases and the need for standards to prevent arbitrariness when unbridled discretion rests with the sentencer." *State v. Greenwalt,* 128 Ariz. 150, 175, 624 P.2d 828, 853 (1981), *cert. denied,* 454 U.S. 882 (1981).   The courts have also stated that "the purpose of an aggravation/mitigation hearing is to determine the character and propensities of the defendant. The punishment should fit the offender and not merely the crime." *Williams v. New York,* 337 U.S. 241, 244 (1949).

Arizona's capital sentencing statute requires the trial judge to choose a sentence of death, natural life or life imprisonment without the possibility of parole for twenty-five years, based on the evidence of aggravating and mitigating circumstances. A.R.S. § 13-703(E).

The aggravating circumstances are overly broad, and caselaw has made it even broader. Any murder that has no apparent motive, *State v. Wallace,* 151 Ariz. 363, 368, 728 P.2d 232, 237 (1986), or that is motivated by a desire to eliminate a witness, *State v. Smith,* 141 Ariz. 510, 511-12, 687 P.2d 1265-67 (1984), or that is motivated by hatred or revenge, is a death penalty crime.  Any murder in which the killer uses excessive force, *State v. Summerlin,* 138 Ariz. 426, 436, 675 P.2d 686, 696 (1983), or in which one uses insufficient force, *State v. Chaney,* 141 Ariz. 295, 312, 686 P.2d 1265, 1282 (1984), is a death penalty crime.  Any murder in which the victim experiences fear or uncertainty as to his fate, or in which he is conscious and able to feel pain during the killing, is "cruel" and therefore a death penalty crime. *State v. Correl,* 148 Ariz. 468, 480-81, 715 P.2d 721, 733 (1986).

The overbreadth is apparent on its face to the former Chief Justice of the Arizona Supreme Court:

> If there is some 'real science' to separating 'especially' heinous, cruel, or depraved killers from 'ordinary' heinous, cruel, or depraved killers, it escapes me. It also has escaped the court. *Compare State v. Jiminez*, 165 Ariz. 444, 454-55, 799 P.2d 785, 794-96 (1990) (although heinous and depraved, the court held that the evidence was insufficient to find that the murder was especially cruel where the defendant strangled his five year old victim and left her under a bed but returned after hearing her cry to strangle her again), with *State v. Baety*, 158 Ariz. 232, 237, 242, 762 P.2d 519, 524, 529 (1988)(court held that murder was especially cruel when defendant asphyxiated his thirteen year old victim by clamping his hand over her mouth, causing her to vomit), *cert. denied*, 491 U.S. 910 (1989); *compare also State v. Chaney*, 141 Ariz. 292, 312-13, 686 P.2d 1265, 1282-83 (1984)(court held that murder was especially heinous, cruel and depraved where defendant shot his victim with an automatic weapon), and *State v. Johnson*, 147 Ariz. 395, 397, 400-01, 710 P.2d 1050, 1052 (1985)(court held that senseless murder was not especially heinous, cruel or depraved where the defendant killed his victim with a shotgun blast while the victim was sleeping). . .

> . . . One becomes death eligible if, hand trembling because of fear, mental illness, or drug use, one fails to aim accurately or kill with the first blow and the victim fortuitously suffers and dies slowly. *See Chaney*, 141 Ariz. at 312, 686 P.2d at 1282 (affirming death penalty in case where defendant's gunfire did not kill the victim instantaneously, but, instead, the victim suffered for thirty minutes before losing consciousness and dying). The assassin who senselessly shoots with a steady hand and kills in cold blood or uses a weapon with ruthless efficiency and dispatches and instantly kills does not kill cruelly and is not eligible for death. *See Johnson*, 147 Ariz. at 397, 400-01, 710 P.2d 1052, 1055-56 (cruelty not even considered where the defendant shot his sleeping victim, who 'rapidly bled to death'). If this, too, is 'real science,' its logic escapes me. . .

*State v. Salazar*, 173 Ariz. 399, 420-21, 844 P.2d 566, 587-88 (1992).

If the overall goal is for the punishment to fit the crime and/or the individual, these cases show that the scheme in Arizona is not working. Debra was not at the scene of the crime and had absolutely no criminal history or history of violence. The trial judges are granted extreme discretion, which is unfortunately often abused. The caselaw shows that this is a colorable argument, even though it has been rejected previously in Arizona. The abuse of

discretion in this case is apparent.  Debra Milke should not have received the death penalty. Her

case should be reset for sentencing.

**VII.**     **DEBRA MILKE WAS DENIED HER RIGHT, UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, TO EQUAL PROTECTION OF THE LAW WHEN SHE WAS DENIED A JURY TRIAL ON AGGRAVATING FACTORS IN A CAPITAL CASE WHILE DEFENDANTS IN NON CAPITAL CASES HAVE JURIES TO DETERMINE AGGRAVATING FACTORS (CLAIM VII)**

The Ninth Circuit has held that irrational and unfair distinctions made by state courts in

the application of state law violate the Equal Protection clause of the Fourteenth Amendment.

*Myers v. Ylst*, 897 F.2d 417, 421 (9th Cir. 1990)("where the state has established a rule it must

be applied evenhandedly") (quoting *Larue v. McCarthy*, 833 F.2d 140, 142 (9th Cir. 1987)). "A

state should not be permitted to treat defendants differently [with respect to such matters] . . .

unless it has 'some rational basis, announced with reasonable precision' for doing so." *Myers,*

897 F.2d at 421  (quoting *Johnson v. Arizona*, 462 F.2d 1352, 1354 (9th Cir. 1972)).  Arizona

grants a jury trial, by rule and state constitution, on federal issues indistinguishable from those

under the Sixth Amendment in all but capital cases.  E.g., Ariz. R. Crim. P., Rule 19.2 (jury

trial on prior convictions); *State v. Powers*, 154 Ariz. 291, 742 P.2d 792 (1987)(right to a jury

trial on aggravating factors mandating life sentence).

The Arizona laws are treating similarly situated defendants in two completely different

ways.  This scheme violates the United States Constitution. "The equal protection clause

prohibits *de facto* as well as explicit, or open, unequal and arbitrary treatment." *Myers*, 897

F.2d at 424 (9th Cir. 1990).  The lack of any rational explanation for this distinction renders

this sentencing scheme unconstitutional.

Additionally, the *Timothy Stuart Ring v. State of Arizona* case, which is currently before

the United States Supreme Court, will have dramatic implications for Arizona deathrow

inmates.  200 Ariz. 267, 25 P.3d 1139 (2001), *cert. granted*, 122 U.S. 865 (2002)(S.Ct.No. 01-

488).  Milke's death sentence cannot stand because the sentencing scheme in Arizona violates her constitutional rights under the Sixth and Fourteenth Amendments.  In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), a statutory sentencing scheme that allowed factual findings made solely by a judge to "expose the defendant to a greater punishment than that authorized by the jury's guilty verdict" was found to be unconstitutional.  *Apprendi*, 530 U.S. at 494.  In Arizona, a petitioner can be sentenced to death solely on the basis of factual findings made by a judge. A criminal defendant is entitled under the Fourteenth and Sixth Amendments to a trial by jury in which a guilty verdict must be premised on proof beyond a reasonable doubt.  The court in *Apprendi* held unconstitutional that a scheme that removes from the jury the determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone.  *Id.* at 482-83.

The court found that the Fourteenth Amendment required a jury to find, beyond a reasonable doubt, any fact that would "expose the defendant to a greater punishment than authorized by the jury's guilty verdict."  *Id.* at 494.  This holding rejected the argument that *McMillan v. Pennsylvania*, 477 U.S. 79 (1986), required a different result.  *Apprendi* limited the holding of McMillan "to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict.  *Apprendi*, 530 U.S. at 487 n.13.

In Arizona, the greatest length of imprisonment allowed under a jury verdict is life imprisonment.  A defendant can only receive the death penalty if the trial judge makes a factual finding that at least one of the statutory aggravating factors in AR.S. § 13-703 is present.  The judge then weighs the mitigating and aggravating factors in deciding whether to impose the death penalty.  The *Apprendi* decision expressly found that a scheme such as the one in Arizona

violates constitutionally protected rights.  A.R.S. § 13-1105(c) expressly provides that death is only available as a sentence "as provided by § 13-703."  Furthermore, just as in the *Apprendi* case, an Arizona defendant does have formal statutory notice that he might be subjected to the death penalty if certain aggravating factors are found by the trial judge.  Thus, this "notice" cannot be used to conclude that Apprendi is inapplicable.

The statutory aggravators in A.R.S. § 13-703 are not "sentencing factors" but are instead "elements of first degree murder."  *Apprendi* reiterated this point by stating that "all the facts which must exist in order to subject the defendant to a legally prescribed punishment must be found by the jury."  *Apprendi*, 530 U.S. at 499.  *Apprendi* held that the inquiry is not one of form, but of effect as to whether the required finding exposes the defendant to a greater punishment than that authorized by the jury's guilty verdict.  *Id*. at 494.

In *Walton v. Arizona*, 497 U.S. 639 (1990), the majority was constrained to reject the petitioner's claim that that the Sixth Amendment guarantees a jury trial to determine aggravating factors in an Arizona capital case.  However, it is apparent that that the *Walton* decision no longer withstands scrutiny in light of *Apprendi*.  Further, all the *Apprendi* dissenters joined Justice O'Connor's conclusion that *Walton* cannot be effectively distinguished from *Apprendi*.  *Apprendi*, 530 U.S. at 538-39.  *See also Jones v. United States*, 526 U.S. 227, 272 (1999)(Kennedy, J., dissenting)("If it is constitutionally impermissible to allow a judge's finding to increase the maximum punishment for carjacking by ten years, it is not clear why a judge's finding may increase the maximum punishment for murder from imprisonment to death).  Because there is no distinction between the two schemes, *Walton* cannot be followed.

*Ring* presents the same constitutional violations as those presented in Debra Milke's case.  The Sixth Amendment principles articulated in *Apprendi* apply to capital sentencing.  *Apprendi* makes it very clear that if the State seeks the maximum punishment allowed by law

for a crime by either a term of years or death, the jury must find all the facts necessary to allow the imposition of that punishment. Thus, the jury must find any aggravating factors that need to be specifically found to allow for a sentence of death in Arizona. *See Apprendi*, 530 U.S. at 478. In Debra's case, the jury did not find the specific aggravating factors. (R.T. 1/18/91 at 1-5). The Sixth Amendment's guarantee of a jury trial applies to all facts necessary for the imposition of the death sentence. There is absolutely no justification in *Apprendi*, in history through common law, or in logic, for treating the factual findings necessary to impose a sentence of death in a constitutionally different way from those that increase a possible term of imprisonment from ten to twelve years. The Constitution requires that a jury, regardless of a state's definition of capital murder, must find any facts necessary to subject someone to the death penalty.

For the foregoing reasons, the failure to provide Petitioner with a jury trial on the aggravating factors in her sentencing violated both the Equal Protection Clause and her Due Process rights under the Fourteenth Amendment.

## VIII. THE AGGREGATE OF ERRORS IN DEBRA'S TRIAL, SENTENCING, AND APPEAL VIOLATED HER FOURTEENTH AMENDMENT RIGHTS GUARANTEED TO HER THROUGH THE UNITED STATES CONSTITUTION (CLAIM XI (in part))

In Debra's case, the accumulation of errors and irregularities that occurred during her trial, at sentencing and on appeal rise to the level of a denial of fundamental fairness guaranteed by the Fourteenth Amendment. Even though some errors may not rise to a denial of due process alone, when they accumulate to deprive an individual of the right to a fair trial and a fair sentencing, the result must be reversed as a violation of the Fourteenth Amendment. *See Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978), *cert. denied*, 440 U.S. 974

(1979)("prejudice may result from the cumulative impact of multiple deficiencies."). The Ninth Circuit does recognize that cumulative errors in a capital murder prosecution can warrant habeas relief as to the death sentence. *Mak v Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992)(citing *United States v. Tucker*, 716 F.2d 576, 595 (9th Cir. 1983); *Ewing v. Williams*, 596 F.2d 391, 395 (9th Cir. 1979)).

The accumulation of errors in this case rises to the level of a **complete** denial of fundamental fairness. Detective Saldate's overreaching tactics and influencing of witnesses improperly warped and tainted the bulk of the key witnesses against Debra. His conduct violated her rights under the 5th, 6th, 8th and 14th Amendments to the United States Constitution.

Additionally, Debra's trial and sentencing attorney was clearly ineffective in violation of the 6th Amendment. Debra gave him a multitude of information regarding possible witnesses, but defense counsel failed to investigate those leads and present the witnesses at trial. He failed to call or interview Rosemary Houston or other key witnesses from Debra's past. He also failed to call or contact Debra's mother, Renate, or her stepfather, Alex, both of whom were crucial witnesses, especially after Debra's father and sister testified against her. Defense counsel was further ineffective for failing to adequately investigate Detective Saldate and his prior history and habit of abuses with respect to criminal defendants.

Defense counsel further failed to present substantial mitigation evidence at the mitigation hearing. He failed to obtain Debra's and Christopher's medical and school records. This evidence showed that Debra was a loving mother who went to great lengths to take care of herself and her son. He also failed to call vital witnesses and to present other important, relevant mitigating evidence.

challenge the purported confession at the voluntariness hearing. Detective Saldate had a lengthy history of violating defendants' constitutional rights. Saldate fabricated Debra's "confession" and violated numerous constitutional protections afforded to her through the United States Constitution. Defense counsel failed in his duty to discover and present the ample evidence concerning Detective Saldate's improper and unreliable tactics during interrogations. The fabricated confession is the **only** evidence that places Debra in this conspiracy. Further, defense counsel was ineffective for not calling Debra at the crucial voluntariness hearing to challenge Saldate's claims regarding her statements to him.

Appellate counsel was also ineffective for failing to challenge the central piece of evidence against Debra, which was erroneously not suppressed at the voluntariness hearing. And, numerous constitutional violations render Debra's death sentence invalid.

These errors cumulatively and severely prejudiced Debra, resulting in a complete denial of Debra's Fourteenth Amendment right to fundamental fairness.

### CONCLUSION

Debra Milke is entitled to habeas corpus relief from this Court, pursuant to 28 U.S.C. § 2254. Debra has exhausted her state court remedies, and has set forth those issues for which she is properly before this Court.[27] Debra has demonstrated that she is entitled to release from incarceration, as her unlawful convictions and sentences do not withstand constitutional scrutiny. *See, e.g., Johnson v. Avery,* 393 U.S. 483 (1969)(purpose of the writ of habeas corpus is to enable those unlawfully incarcerated to obtain their freedom); *Baker v. Turnbo,* 553

---

[27] Debra incorporates by reference the Exhibits submitted to this Court simultaneously with her Brief on the Merits. (See Volumes I through IV to Brief on Merits). She also incorporates by reference her Habeas Corpus Petition and Exhibits. Debra also incorporates by reference the entire court file in her case, including the transcripts of the pretrial, trial and sentencing proceedings.

F.Supp. 53 (N.D.Calif. 1982)(Petitioner immediately released from imprisonment upon issuance of order granting habeas corpus relief).  She therefore requests this Court to:

1)      Discharge her from her unconstitutional confinement and restraint, relieve her of her unconstitutional sentences of death and imprisonment, grant a new trial or sentencing in accordance with constitutional mandates;

2)      Grant an evidentiary hearing, at which additional proof may be offered concerning the allegations of this petition;

3)      Grant Debra any additional necessary discovery in support of her claims;

4)      Suppress her purported confession to Detective Saldate in any further proceedings against her; and

5)      Grant any other and further relief as this Court deems just and proper.


RESPECTFULLY SUBMITTED this 11th day of June, 2002.

Kimerer & Derrick, P.C.

By:
Michael D. Kimerer
Lori L. Voepel
Attorneys for Petitioner


## CERTIFICATE OF MAILING

I hereby certify that on the 11th day of June, 2002, I caused to be delivered an original and one copy of Debra's Brief on the Merits to her Petitioner for Writ of Habeas Corpus by a person in State Custody (28 U.S.C. § 2254) and Exhibits to:

United States District Court
Attn: Clerk of the District Court
401 West Washington Street,
Phoenix, Arizona 85003

I hereby certify that on the 12th day of June, 2002, I caused to be delivered two copies of Debra's Brief on the Merits to her Petitioner for Writ of Habeas Corpus and one copy of the Exhibits to:

> J.D. Nielson, Esq.
> Assistant Attorney General
> 1275 West Washington Street
> Phoenix, Arizona 85007

and one copy to:

> Sarah Carlson, Esq.
> Death Penalty Clerk
> U.S. District Court
> 401 West Washington Street
> Phoenix, Arizona 85007

DATED this 11th day of June, 2002.

By: _____

**STATE OF ARIZONA**    )
                             ) ss.
**County of Maricopa**    )

SUBSCRIBED AND SWORN to before me this 11th day of June, 2002, by Lori L. Voepel.

_____
Notary Public

> **TRACY S. MCRAE**
> **Notary Public - Arizona**
> **MARICOPA COUNTY**
> **My Commission Expires**
> **October 20, 2003**

## LIST OF EXHIBITS

1.    SOCIAL HISTORY

2.    DR. DAVID BIEGAN'S REPORT

3.    AFFIDAVIT OF RENATE JANKA

4.    AFFIDAVIT #1 OF KIRK FOWLER

5.    AFFIDAVIT OF BAERBEL JACKS

6.    INTERVIEW OF SANDRA PICKINPAUGH BY SALDATE

7.    ORDER OF PROTECTION

8.    MEDICAL RECORDS OF CHRISTOPHER MILKE

9.    AFFIDAVIT OF DR. KEVIN ZUERLEIN

10.    EXCERPTS OF JIM STYERS' TRIAL TESTIMONY

11.    MILITARY RECORDS OF JIM STYERS

12.    EXCERPTS OF ROGER SCOTT'S TRIAL TRANSCRIPTS

13.    PRESENTENCE REPORT OF ROGER SCOTT

14.    DR. TATRO'S EVALUATION OF ROGER SCOTT

15.    SALDATE RESEARCH

16.    REDACTED LETTERS FROM JIM STYERS TO DEBRA MILKE

17.    EXCERPTS OF INTERVIEW OF GAIL LIPSHULTZ

18.    DEBRA MILKE'S EMPLOYEE BENEFITS SELECTION FORM FOR JOHN ALDEN INSURANCE

19.    DEBRA'S APPLICATION FOR EMPLOYEE BENEFITS FROM LINCOLN NATIONAL

20.    EXCERPTS OF TRANSCRIPTS RE: JIM STYERS' AND ROGER SCOTT'S KNOWLEDGE OF DEBRA'S EMPLOYMENT BENEFITS PLAN

21.    DEBRA'S APARTMENT RENTAL APPLICATION

22.    SELECT ROGER SCOTT HABEAS EXHIBITS

23.　　SUPPLEMENTAL REPORT OF ROGER SCOTT BY DETECTIVE MILLS

24.　　DETECTIVE SALDATE'S SUPPLEMENTAL REPORT OF DEBRA MILKE

25.　　MINUTE ENTRY DATED 1/18/91

26.　　ORDER DATED 11/18/96

27.　　NEW TIMES ARTICLE

28.　　PROFESSOR RICHARD LEO'S REPORT

29.　　PHOENIX POLICE DEPARTMENT INTERROGATION POLICIES AND PROCEDURES

30.　　DETECTIVE SALDATE'S SUPPLEMENTAL REPORT OF SANDRA PICKINPAUGH INTERVIEW

31.　　SALDATE'S SEPARATION NOTICE

32.　　SALDATE'S PRETRIAL INTERVIEW

33.　　EXCERPTS OF ROGER SCOTT'S HABEAS CORPUS PETITION

34.　　AFFIDAVIT OF DR. TATRO

35.　　AFFIDAVIT OF ROLAND STEINLE

36.　　KIRK FOWLER SWORN STATEMENT TO TERRY CAPOZZI

37.　　EXCERPTS FROM INBAU & REID

38.　　AFFIDAVIT OF PAUL HUEBEL

39.　　AFFIDAVITS OF LAW ENFORCEMENT EXPERTS

40.　　AFFIDAVIT OF ANDERS ROSENQUIST

41.　　LIST OF SALDATE'S INCONSISTENCIES AND DISCREPANCIES

42.　　AFFIDAVIT OF KIRK FOWLER (SADEIK)

43.　　AFFIDAVIT OF KIRK FOWLER (PICKINPAUGH)

44.　　EXCERPTS OF ERNIE SWEAT'S PRETRIAL INTERVIEW

45.　　EXCERPTS OF ERNIE SWEAT'S TRIAL TESTIMONY

46.    EXCERPTS OF HENRY MILKE INTERVIEW

47.    JAMES STYERS' LETTERS TO JUDITH RADALOVIC AND "OLGA"

48.    AFFIDAVIT OF KEN RAY

49.    MINUTE ENTRY DATED 2/13/90

50.    DEBRA MILKE LETTER TO DEFENSE COUNSEL

51.    AFFIDAVIT OF PATRICIA (BACON) PRUST

52.    AFFIDAVIT OF KIRK FOWLER (MARKWELL)

53.    MOTION FOR SANCTIONS

54.    AFFIDAVIT OF CHARLES JONES

55.    AFFIDAVIT OF DONALD AND JOSEPHINE JONES

56.    AFFIDAVIT OF ALEX JANKA

57.    AFFIDAVIT OF DEBRA MILKE

58.    DEBRA MILKE'S MEDICAL RECORDS

59.    DEBRA MILKE'S ELEMENTARY SCHOOL RECORDS

60.    DEBRA MILKE'S COLLEGE RECORDS

61.    SUBPOENA DUCES TECUM

62.    EXCERPT OF TESTIMONY RE: DISCOVERY REQUEST

63.    MOTION TO QUASH

64.    MINUTE ENTRIES DATED 9/24/90 & 10/1/90

65.    AFFIDAVIT OF MARIA PULVER

66.    AFFIDAVIT OF ROBERT CHERMAK

67.    MOTION TO SUPPRESS

68.    MINUTE ENTRY DATED 10/12/90

69.    ORDER TO SHOW CAUSE

70.    AFFIDAVIT OF DR. GARCIA

71.    MOTION TO APPOINT ASSOCIATE COUNSEL

72.    MINUTE ENTRY DATED 11/9/90

73.    MOTIONS TO CONTINUE MITIGATION HEARING

74.    APPLICATION FOR TRANSPORTATION AND LODGING

75.    DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES RE: SENTENCING

76.    EXCERPT OF TRANSCRIPT RE: JUROR MOQUINO

77.    JURY LIST

78.    JUROR MOQUINO'S QUESTIONARE