**MARICOPA MEDICAL CENTER**

A Division of Maricopa County Department of Health Services

**2601 EAST ROOSEVELT
PHOENIX, ARIZONA 85008**

```
124 77 1b 2
MILKE CHRISTOF
M 10 2 55
```

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATION and
PROGRESS NOTES and DISCHARGE SUMMARY.  (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 12/8/88 13:00 | PIPN<br>S: Pt had good night. Was alert & responsive during exam. Began crying for mother when siderails put up on crib. Appreciate Peds ID note!<br>O: WT 15.60 kg (+100 gms)<br>E/o 560 IV + 690 po (N/O ½ day for dose) / 1100<br>T 31' P100 R 24<br>Chest - CTA<br>Cardia - RRR<br>Abdomen - Benign<br>Neck - Ø erythema, no adjacent swelling<br>     No change in size of nodule, remains firm<br>Lab: Blood culture negative 72°<br>     TSH 0.5   T4 12.8 high<br>A/P 1) Suppurative thyroiditis - Day #5 Nafcillin<br>     Day #4 chloramphenicol. Will continue IV treatment for ten days. After Day #7 will repeat CT scan. Await ↓ swelling of nodule before attempting barium swallow. Will send for chloramphenicol level<br>     2) HCM - child doing well. Will continue with present diet.<br>              Kevin Zweilin MD |
| 12/8/88 2030 | Surg B<br>As above<br><br>Will sign off<br>           McMillen MD |

04-15 5058 9-83                                            (OVER)

| COUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|

scharge Date on Front of Form.

**1/9/88**  P/PN

':30   S: Pt had good night, no complaints

O:  WT NOT recorded   I/O  640 IV + 1220 po / 625 + 6 voids + 1 stool

T 36.3   P 94   R 20

Neck - no erythema, slight ↓ in size. Mass was
outlined today with magic marker

Chest, Cardiac & Abdominal Exam unchanged
NO NEW LAB    DAY #6 Nafcillin   DAY #5 Chloramphenicol

A/P:  Assessment unchanged, however will attempt
an ultrasound exam of neck mass on Monday.
Will do barium swallow if ↑ in size.

Ken Zuerlein MD

**1/10/88**  P/PN

07:15   S: pt had good night, awake watching cartoons, no complaints

O:  wt 15.42 (↓ 180 from 12/8)
I/O  575 IV + 810 po / 1370 & 1 stool
T 36.8   P 92   R 26
Chest - CTA
Cardiac RRR
Abdomen Benign
Neck: ∅ erythema, slight ↓ size from yesterday.
NO NEW LABS  except chlord level = 15.7   # 10-20

A/P  1) Suppurative thyroiditis  Day #6 Nafcillin, Day #5 chloro
Good chloro level. Size decreasing
Will continue antibiotics until resolved. Will get
U/S on Monday if size has decreased. Before
discharge will get Barium swallow

2) HCM - small wt loss. Will follow.

Ken Zuerlein MD

**1/10/88**  Resident Addendum
Will not need U/S as size is decreasing and
no longer worried about abscess.

Ken Zuerlein MD

# MARICOPA MEDICAL CENTER
### A Division of Maricopa County Department of Health Services

**2601 EAST ROOSEVELT**
**PHOENIX, ARIZONA 85008**



124 77 16 2
MILKE CHE...
M 10 2 85

milke

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATION and
PROGRESS NOTES and DISCHARGE SUMMARY.  (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 12-12-88 | Peds Cross Cover |
| 1250 | S Sleeping |
| | O TM 37.5    P 109    R 27    Wt 15.66 (1.24) |
| | I/ 480 Po, 681V |
| | O 1100 + |
| | lungs CTA |
| | CV HRRR S₁ S₂ S(III) |
| | abd soft ⊕ BS NT |
| | neck ∅ erythemia, indurated area, no ∆ |
| | A/P |
| | ① Suppurative thyroiditis |
| | Day # 7 Nafcillin, # 6 Chloramphenicol |
| | No ∆ in mass. |
| | - cont c̄ antibiotics |
| | - BS |
| | ② HCM |
| | 1240 gram. Stable. Good Po intake. |
| 12/12/88 | Lee McGarry MD |
| | Peds PN |
| | S: Pt good night, no complaints, playing in bed. |
| | O: wt 15.66 no ∆ , I/o 900 iv, 290 po /140° 2voids - doubt accuracy (I) |
| | Bcx ⊖ 72 hrs |
| | T 36.9   P 118   R 36 |
| | Exam unchanged except some ↓ size of neck mass since Saturday |
| | A/P ① Suppurative thyroiditis - improving Day # 8 Nafcillin, # 7 Chlor |
| | continue IV treatment. Barium swallow on Weds AM |
| | ② HCM - continue same diet. need better I/O sheets. |
| | Kari Zuerlein MD |

081 8035 9-82

(OVER)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 12/13/88 | P/PN |
| 08:50 | S: Pt up playing in crib, want to watch TV |
| | O: WT 34½ # no change |
| | E/o 700 IU & 1200 po / 1225 + 1 stool |
| | T 36 P 68 R 20 |
| | Chest · CTA |
| | Cardio · RRR |
| | Abdomen - Benign |
| | Neck · mass unchanged in size from yesterday |
| | Day #9 Nafcillin   Day #8 chloro |
| | A/P   Assessment unchanged   Will attempt Barium Swallow |
| | tomorrow AM.   Continue antibiotics until |
| | mass resolved |
| | Kevin Zueler MD |
| 1/13/88 | SOCIAL SERVICES PROGRESS FOR D/C PLANNING: S/O: Chart reviewed, |
| | rounded yesterday a.m. |
| | A: No d/c problems identified @ this time. |
| | P: Plan consult me should need arise.   K Day, ASW : |
| | Peds SW |
| 12/14/88 | P/PN |
| | S: Child doing well this AM.  Cheerful & playful at this |
| | time.   Pt was NOT kept NPO as ordered and so |
| | must reschedule. BARIUM Swallow. |
| | O: T 36  P 68  R 20 |
| | I/o 660 IU + 960 p.o.  /725 + 3 voids and  1 stool |
| | Neck · no erythema,  well localized swelling c̄ no |
| | significant change |
| | Remainder of exam unremarkable |
| | Day #10 Nafcillin  Day #9 chloro |
| | CBC   WBC 7.1  31 L, 5 M, 64 Grm   (WBC & L on 9.8) |
| | H/H 12.7 /38·8   MCV 82.8 · PLTS 325 |
| | A/P  1) Suppurative Thyroiditis — Continue Antibiotics, Attempt |
| | Barium swallow in AM.   Continue antibiotics |
| | until mass resolved. |
| | Kevin Zueler MD |

**MARICOPA MEDICAL CENTER**

A Division of Maricopa County Department of Health Services

**2601 EAST ROOSEVELT**
**PHOENIX, ARIZONA 85008**

PATIENT ID PLATE IMPRINT
0 0 60



124 77 16 2
MILKE CH
M 10 2 03

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATION and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 12/15/88 | P/PN: |
| 14:15 | S: Pt had a good night. Had Barium swallow today. No complaints |
|  | O. WT 34 (1½ #) t/o 600cc + 109% / grow uncc output + 1 stool |
|  | T 36° P 97 R 20 BP 101/60 |
|  | Neck - swelling slightly ↓, but some overlying erythema |
|  | Chest - CTA   DAY 11 Nafallin |
|  | Cardio - RRR   DAY 10 Chloro |
|  | Abdomen - Benign |
|  | Barium swallow — not yet read by Radiologist but |
|  | no sinus tract noted by this writer. |
|  | A/P   Assessment unchanged but must r/o Abcess because of |
|  | new overlying erythema. Will schedule for US of |
|  | neck |
|  | Kevin Zuerlein MD |
|  |  |
| 12-16-88 | Peds Surg |
| 1130 | Pt has a ① neck mass + has been |
|  | treated as thyroiditis. Now a |
|  | new descrete mass has reappeared. |
|  | Dr. Shermeta saw the pt + |
|  | the CT scan. We will set |
|  | him up for excision of the |
|  | lesion on Mon. |
|  | Jamewock |

PIPN

12:55  S: Pt doing well. in Good spirits

O: wT 34ᵗʰ STABLE                    Day #12 Nafcillin / Day #11

I/o 5500IU + 570 po /1575 out

physical exam unremarkable except neck mass.

Mass now more protuberant c̄ ↑ erythema

R. Swallow negative

A/P  1) Suppurative Thyroiditis — mass more erythematous &
protuberant , ? Abcess , ultrasound pending.
Surgery to excise mass on monday.
Will continue antibiotics , Will recheck
Chloro level and CBC awaiting
ultrasound results. Day # 12 antibiotics

Kevin Zuerlein

12/17/88  PIPN

07:30  S: Pt sleeping quietly , awakens for exam but
returns to sleep

O: wT 14.54 (different scale )

T 37   P 118   R 18

Chest – CTA

Cardio RRR

ABDomen – Benign

Neck – MASS slightly ↑ in size Laterally
Remains erythematous

ultrasound shows MOSTLY solid c̄ few cystic
areas. superficial , transverse in neck.
Radiologist believes plane exists
between thyroid & MASS

A)  Neck MASS — ? Suppurative thyroiditis
Day #13 Nafcillin   DAY #12 Chloro
Surgery to excise MASS on Monday.

Kevin Zuerlein MD

12/18/88  preop anesthesia

4:30  See preop Summary Sheet.

A Division of Maricopa County Department ___ Health Services

**2601 EAST ROOSEVELT**

**PHOENIX, ARIZONA 85008**

124 77 16 2
MILKE CHE___
M 10 2 85

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATION and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 12-18-88 | Dr. B (Peds) |
| 1200 | Pt is ready for excision of mass tomorrow. Trying to get mom for consent. |
| 12/18/88 | PIPN                                    ___ |
| 13:20 | S: Child had a good night, cheerful, eating breakfast |
| | O: WT 15.0 kg (↓ 420gms) |
| | I/O 660 IU + 834 po / 1035 |
| | T 37² P 120 R 20 |
| | Physical exam unchanged. |
| | " neck mass still erythematous. no significant |
| | size change |
| | Lab: UA - spGrav 1.005, ph 6.5, NEG |
| | CBC - 7 $\frac{13.5}{39.9}$ 39.7 L, 9.9 M, 50.4 G, 82.7 MCV |
| | 354 PLTS |
| | ASTRA 8    138/105/13/79 |
| |            4.9/24/0.5/10 |
| | A/P  1) Neck mass - possibly suppurative thyroiditis |
| | Day #14 Ancef # 13 illoro. |
| | Scheduled for Excision tomorrow. |
| | Continue antibiotics |
| 12/19/88 | PIPN                           Kevin Zueckin M |
| 06:20 | S: Child doing well. quiet in crib. |
| | O: WT 15.76 (↑ 76gms)   I/O 660 IU + 300 po /315 |
| | T 36⁷ P94 R24 BP 93/63 |
| | Physical exam unchanged |
| | A/P  Neck mass. awaiting excision this am of neck mass |
| | Surgery to do cultures and send specimen for path |
| | analysis. |
| |                           Kevin Zueckin M |

061 6035                                                    (OVER)

1/88   Op Note
       Pre op Dx - Cervical Mass
       Post op Dx - Same
       Procedure - Excision mass - looked to be
       inflammatory tissue & in sternocleidomastoid
       Surgeon - Farnworth, Shawatha
       Anes - GETA
       EBL = min        Fluids - 75cc
       Specimen sent for fungal, AFB, aerobic, anaerobic
       Cx's as well as usual path

                              M Culbolsen

/88    Anesthesia Post-Op
       Awake, crying. No apparent anesthetic complications

                              [signature]

1/88   PT Item Post op
.48    Pt sleeping comfortably, lungs clear c good air movement.
       Appears to be subcuticular sutures & drainage or
       inflammation.   Pt stable & doing well.

                              Kar Zuelin MD

2-20-88   Surg B (Peds) - POD #1
945       Pt S / compl
          VSS   Afeb.
          mild erythematous happiness to skin

          (A)/(Rec)  Doing well. Needs wound
                     observed + cont abx.

                              Farnworth

A Division of Maricopa County Department of health Services

**2601 EAST ROOSEVELT**

**PHOENIX, ARIZONA 85008**

This form will be used by the medical staff for:
    PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATION and
    PROGRESS NOTES and DISCHARGE SUMMARY.  (In & Out Patients)

124 77 16 2
MILKE CHRISTOPHER C
M 10 2 85

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 12/20/58 | P1PN |
| 13:30 | S: Child eating breakfast, in good spirits |
| | O: I/O 850 IV + 550 po / 705 urine |
| | T 37⁵ P 96 R 22 |
| | Neck - some mild erythematous hues and local swelling, no drainage |
| | Chest - CTA |
| | Cardio - RRR S1N |
| | Abdomen - Benign |
| | Lab - chloro level & cultures pending |
| | Frozen section diagnosis - acute & chronic inflammatory |
| | process. |
| | A/P: Will change to oral Nafcillin & Chloro. Will follow |
| | & if doing well will D/c to home c f/u |
| | c Peds Surgery and Gen Peds Clinic. |
| | Will need Thyroid tests in 1 month. |
| | Kevin Zuerlein |
| 12/21/8 | Anesthesia Post - Op |
| | Breathing easily |
| 1240 | Vitals stable |
| | No evidence of any anesthetic complication @ this time |
| | Booth |

081 6035

| ENCOUNTER DATE: | PLEASE DATE AND / ALL ENTRIES. |
|---|---|
| 12/21/88 | P/P N |
| 13:20 | S: Pt had a good night, afebrile, I & O not recorded on Du Lox of oral chloramphenicol |
| | O: T 368  P 108  RR 22-32 |
| | Chest - CTA |
| | Cardio - RRR 's con |
| | Abdomen - Benign |
| | neck - ↑ swelling, fluctuance, wound separation ; Some whitish coloration of lower wound edge |
| | CABG - C & S of wound ⊖ 24° |
| | Path - Acute & chronic inflammation c̄ microabscesses. |
| | A/P Neck mass s̄/p̄ Excision c̄ ↑ swelling & fluctuance. Will restart IV f Nafcillin a chloramphenicol. Will have surgery check wound & if they agree will check for pus & drain. Consider CT of neck if no obvious pus. |
| | Kim Guerler  MD |
| 12-21-88 | PEDS ID Med Student Note |
| | s/p pt with suppurative thyroiditis, s/p excision of neck mass which remained after original swelling went down. Now ↑ swelling, moderate fluctuance f wound separation s/p incision |
| | T = 368 |
| | A/P ① S/P Suppurative thyroiditis, R/o abscess formation. This does not represent antibiotic failure, but is the most common consequence of suppurative thyroiditis. - CT scan r̄ P/o abscess - Restart Nafcillin & Chloro - Naf = 100 mg/kg/day, Chloro = 65 mg/kg/day - Have surgery check wound |
| | Regina M Grace MD |
| | [signature] |

2601 EAST ROOSEVELT
PHOENIX, ARIZONA 85008

124 77 1b c
MILKE CHRISTOPHER C
M 10 2 85

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATION and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 2-21-88 1530 | Peds Surg — Procedure : I + D neck wound. Pt with erythema & swelling at prev. operative site. Wound probed under IV sedation. Sero-sanguinous (slightly brownish) fluid obtained → entire wound opened. Wet → dry NS 2x2 gauze placed. C&S taken. Cont med dressing D's — will be available for help c̄ this prn. /Jamsworth m̄ |
| 2/88 0730 | Peds Surg Afeb VSS Incision clean & dry, ↓ erythema C/w Am Continue Abx's Continue Dressing D's M.Gallaghi(j) |
| 2-22-88 1°00 | PEDS ID Med Student Note S: incision was drained by surgery & serosanguinous fluid was obtained. Wound is clean & dry ē very little erythema at this time. ⊖ swelling C: afebrile VSS Gramstain of wound = Gram⊖ cocci (Rare) in singles + pairs - this may be true Gram⊖ or represent diseased char affected Gram⊕. Culture-Gram⊕ cocci in clusters. A/P: ① Suppurative thyroiditis / Abscess - pt doing well |

(OVER)

PLEASE DATE AND SIG    L ENTRIES.

| DATE: | |
|---|---|
| (cont'd) | Since swelling & erythema have ↓H after. I&D do not feel that CT is necessary. Pt may go home after mom learns how to change packing. Recommend 2wks of Augmentin outpatient since organism were cultured (but of the wound Close follow up is essential |
| | Regina M Kjær MD |
| | |
| 12-22-88 | Ped Pt Education |
| 1450 | Mother instructed by S. Bower, RN re: dressing Δ. NS wet → dry b.i.d. |
| | Supplies ordered. Mary Stokes, RN discharge planner for Maricopa |
| | Health Plan, notified re: PHN doing dsg Δs, as mother will need as- |
| | sistance & restraining child during procedure. Discharge medication: |
| | Augmentin (250mg/5cc) 4cc po q 8hrs, x 14 days. Scripts for refill. |
| | F/u in peds General Clinic Tues. a.m. 12/27; peds Surg. Clinic Fri. 12/30. Mother |
| | will pick up supplies tonight ~ 8PM. Dsg will need to be changed |
| | @ that time. ——— S.H. Bower RN |
| | Pt will be staying c godmother (Linda) @ 6740 N. 32nd Ave, Phx. |
| | Phone: 973-0055. ——— S.H. Bower RN |
| | Procedure: Fold 2x2 & stick in wound as far as possible (& saturating c |
| | NS). Put dry 4x4 over wound. Use double-backed adhesive tape to |
| | secure dressing in place. ——— ——— S.H. Bower RN |
| | |
| -22-88 | PIPN |
| -:18 | S: Pt c̄ complaints |
| | O: afebrile, VSS   I/O not recorded |
| | PExam unremarkable except neck |
| | neck - swelling & erythema ↓ p̄ I&D |
| | some drainage on 4x4 - Serosanguinous. |
| | |
| | A/P Suppurative thyroiditis c̄ Abscess. |
| | D/c to home on Augmentin x14 days. |
| | MHP nurse to assist BID c̄ dressing changes |
| | Pt to f/u at peds clinic on Tuesday on and |
| | at peds surg on Friday. |
| | |
| | Kevin Zweli MD |

| | SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| **COMPLAINTS** | TYPE / LOCATION | | none noted | none noted |
| | INTERVENTION | | | |
| | RESPONSE | | | |
| **SLEEP** | SLEEP | awake | 07-09 11-1300 awake 09-1100 1300-1500 | @ intervals |
| **OB** | FUNDUS | | | N/A |
| | LOCHIA | | | |
| | BREASTS | | | |
| | NIPPLES | | | |
| **EQUIP.** | IV PUMP | O | travenol X 1 08-10-12+14 | Travenol X 1 |
| **TEACHING** | | | | N/A |
| | NURSE'S SIGNATURE | | J. Frantina LP | B McCarty Jr |

**NARRATIVE NOTES**

| TIME | |
|---|---|
| 0200 | Admitted to Room 11 from ER carried by mom. Awake. Alert Shy M Pauloni |
| 0400 | Blood culture drawn et IV started per RN. Tol. procedure well. Ret. to sleep quickly. mom left approx. 0300 M.Pauloni |
| 0500 | Sleeping quietly, IV patent. M Pauloni |
| 0900 | Sitting ↑ in bed eating breakfast- mom at bedside - no resp. distress noted J. Frantina LP |
| 1300 | asleep in bed c̄ side rails ↑X2, mom at bedside - Resp. even & unlabored, no distress noted. J. Frantina LP |
| 1500 | playing in bed c̄ color book, no distress noted J. Frantina LP |
| 1555 | Assessment completed VSS c̄ in NAD. (1730) Ate 50% of reg diet (1830) (1930) asleep — B McCarty Jr |
| 2000 | Cont to sleep 2230 Awake watching TV Assessment unchanged & in NAD B McCarty Jr |

**NURSE'S SIGNATURE AND TITLE**

| SHIFT | | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| COMPLAINTS | TYPE/LOCATION | 0 % pain or di- | none voiced | 0 |
| | INTERVENTION | Comfort voiced | as noted. | |
| | RESPONSE | as noted - | | |
| SLEEP | SLEEP | Well, all nve. | 1300-1420 awake 08-1300 | intervals |
| OB | FUNDUS | | na | N/a |
| | LOCHIA | | | |
| | BREASTS | N/A | | |
| | NIPPLES | | | |
| EQUIP. | IV PUMP | Travenol X1 | Travenol X7 08-10-12 | Travenol |
| TEACHING | | | na | na |
| | | | | |
| NURSE'S SIGNATURE | | Kathleen Buds LPN | J. Martin LP | P Sorester LPN |

**NARRATIVE NOTES**

| TIME | |
|---|---|
| 630 | Pt. slept well all noc. Roused easily to weigh. — K Buck LPN |
| 130 | Sitting ↑ in bed eating lunch, mom at bedside J. Martin LP |
| 1420 | Transported to CAT c̄ transport via W/C |
| 500 | Returned to floor via W/C c̄ transport - R. nce.- restarted IV. — J. Martin LP |
| 630 | To CT Scan via cart. VSS mom + grandma @ bedside. — |
| 1645 | Return to floor pt awakened for procedure. |
| 715 | Demerol 15mg I V given as premedication for CT Scan. mom + grandma remain @ bedside. |
| 1800 | Demerol 10mg for further sedation for CT Scan. |
| 130 | To CT Scan via cart pt asleep. mom + Grandma in attendence |
| 2000 | Pt awake and alert. Placed in cage CRIB for safty P Sprester LPN |

**NURSE'S SIGNATURE AND TITLE**

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| SHIFT | | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| COMPLAINTS | TYPE / LOCATION | none | none | Na |
| | INTERVENTION | | | |
| | RESPONSE | | | |
| SLEEP | SLEEP | soundly | awake | untorunes |
| OB | FUNDUS | NA | n/a | |
| | LOCHIA | | n/a | Na |
| | BREASTS | | n/a | |
| | NIPPLES | | n/a | |
| EQUIP | IV PUMP | TKO | | Traver ol |
| NG | | | | Na |
| TE | | | | |
| NURSE'S SIGNATURE | | D. Stevens RN | CMarcia SPN | P. Sprester&PN |

| TIME | NARRATIVE NOTES |
|---|---|
| 00 | UA sent to lab. — D.Stevens RN |
| 0130 | At site changed to Diand. — D.Stevens |
| 00 | awake in crib. Cmarcia SPN |
| 0430 | trys to get out of bed. complains hes in a cage. complains of pain in right hand. up out of bed in mothers arms. CMarcia SPN |
| 1200 | Being feed lunch by mother. ate poorly. R.Chavez SPN |
| 420 | used urinal. Playing in room, mother and grandma here |
| 1.52 | IV restarted gauge #22 by RN. — L.Chavez SPN |

| NURSE'S SIGNATURE AND TITLE | | | | |
|---|---|---|---|---|
| Stevens RN | LC L.Chavez SPN | | | |
| CMarcia SPN | | | | |
| danVess RN | | | | |

| SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|
| TYPE / LOCATION | | | ∅ |
| INTERVENTION | | No complaints | |
| RESPONSE | | | |
| SLEEP | soundly all not | awake | intervals |
| FUNDUS | | | Na |
| LOCHIA | N/A | N/A | |
| BREASTS | | | |
| NIPPLES | | | |
| IV PUMP | Travenol | Travenol | Travenol |
| (EC) | | | Na |
| (CHI) | | N/A | |
| NURSE'S SIGNATURE | m.leal LPN | LC Linda Chavez SPN | P. Sprester LPN |

| TIME | NARRATIVE NOTES |
|---|---|
| 0600 | urine sp. gr. 10.18. urine clear, pale yellow m.leal LPN |
| 800 | asleep, awoke up easily to take vitals, up in cage watching TV- C. Lucio SPN |
| 0900 | NPO, am care given, complains of pain (L) hand IV site - C. Lucia SPN |
| 925 | To X-ray c̄ staff via wheelchair for Barium Swallow - Chalcio SPN |
| 1200 | In room playful and active. Ba swallow x-ray not done child return to floor via wheelchair. Assisted to eat. Jello, yogurt, juice, by mother. 1430- voided clear yellow urine. resting in crib c̄ mother. L. Chavez SPN— Maylander W |
| 500 | In cage crib - side rails up x2 - no distress noted IV in (L) hand s̄ redness or edema - good blood return - watching T.V. — J. Rantera LP |

**NURSE'S SIGNATURE AND TITLE**

| | | | |
|---|---|---|---|
| C. Lucia SPN | L. Chavez SPN | | |
| Faye Vander W | | | |
| instructor | | | |
| METRO TECH | | | |

MARICOPA COUNTY DEPARTME.  )F HEALTH SERVICES
**MARICOPA MEDICAL CENTER**

124 77 15 2
MILKE CHRISTOP
M 10 2 85

# NURSING ASSESSMENT FLOWSHEET

N/A NOT APPLICABLE

DATE: 12-8-88

| | SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| **NEURO** | ASSESSMENT: TIME | 0015 | 0830 | 1600 |
| | MENTAL STATUS | Sleeping - Arouses easily for assessment | awake, alert & oppro | alert active. |
| **SKIN** | TEMP / MOISTURE | W + D | Warm + dry | W & D |
| | COLOR | WNL - MM pink | pink tones | Pink |
| | EXTREMITIES | W+D - MAE | warm + dry / MAE | MAE |
| **RESPIRATORY** | LUNG SOUNDS | Clear bilat. | Clear bilate | clear bilat |
| | INCENTIVE SPIROMETER | na | na | Na |
| | COUGH / RESULTS | none noted | none noted | |
| | SUCTION / RESULTS | na | na | |
| | O₂ THERAPY | R.A | room air | |
| **CARDIO-VASCULAR** | RHYTHM | Reg. | Regular, Strong | Strong+ reg, |
| | PERIPHERIAL PULSES | ppp+ = strong | present + = | strong+ EQUAL |
| | EDEMA: TYPE / SITE | ① lateral neck | lump w/ater st. (at on neck of cm Thrombus Thinking | ∅ |
| **GI / GU** | ABDOMEN | Soft | flat, soft | flat soft |
| | BOWEL SOUNDS | active | present | ⊕ |
| | TUBES / DRAINS: TYPE | na | na | na |
| | IRRIGATION | na | | na |
| | DRAINAGE | na | | na |
| **WOUNDS** | | Sm. firm mass on ① lateral neck area | See edema. | ∅ |
| | | | | |
| | | | | |
| | | | | |
| **IV THERAPY** | SITE / APPEARANCE | ① hand s redness edema | IV ① hand s redness or edema. | Lt hand s edema or redness |
| | TUBING / DRSG. CHANGE | | | |
| | SITE CHANGE | | | |

061 3622 R6-86

| SHIFT | | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| COMPLAINTS | TYPE / LOCATION | None | mens noted | |
| | INTERVENTION | | or voiced by | Na |
| | RESPONSE | | mom | |
| SLEEP | SLEEP | Long intervals | 1300-1500 | intervals |
| | | | awoke 08-1300 | |
| | FUNDUS | No | | |
| | LOCHIA | | | |
| | BREASTS | | | |
| | NIPPLES | | | |
| I.P. | IV PUMP | Travenal | Travenol ✓ | Travenol |
| | | | 08-10-12-14 | |
| TEAC. | | | | NG |
| | | | | |
| | URSE'S SIGNATURE | M. Cord LPN | G Trantina LPN | P Sprester LPN |

| TIME | NARRATIVE NOTES |
|---|---|
| 0600 | No Δ in assessment slept all noc. ——— M. Cord LPN |
| 700 | Am care done - watching T.V. no distress noted - |
| | cath good Urine out - mom at bedside ♀ Trantina LN - |
| 1300 | Resting in bed ♀ mom at bedside. no change in assessment |
| | noted. ♀ Trantina LN |
| 1500 | mom went home - asleep in cage crib - ♀ side rails up |
| | X 2 - no change in assessment ♀ Trantina LPN |
| | |
| | |
| | |
| | |
| | |
| | |

| NURSE'S SIGNATURE AND TITLE |
|---|

| SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|
| TYPE / LOCATION TERVENTION | N | N | NA |
| RESPONSE | A | A | |
| SLEEP | Intervals | awake | intervals |
| JNDUS | N | N | NA |
| OCHIA | | | |
| BEASTS | | | |
| NIPPLES | A | A | |
| IV PUMP | Travenol x T | Travenol | Travenols |
| | N/A | | NA |
| SE'S SIGNATURE | Florence Bradshaw | A Bowers | P Sprester LPN |

**NARRATIVE NOTES**

TIME

350  Initial assessment done. V.S. WNL; resp even. No sign of distress noted. Call light within reach. Side rails ↑ X TT. ——— Florence Bonds LP

145  IV noted to be infiltrated. D'c'd per R.N. Quick. Cath intact. Taken to tx room. New IV inserted ® forearm x T stick 20ga Quick cath. Tx procedure well. Side rails ↑ X TT. ——— Florence Bonds LPN

730  Assessment completed. VSS. [0830] ate breakfast 80%. Tolerated well. [0845] Labs drawn. [1100] ate food brought in by room 100%. [1330] In bed resting. IV cont continues at cribside. [1430] IV cont continues at cribside. Pt sleeping assessment IV A'd ——— A Bowes RN

**NURSE'S SIGNATURE AND TITLE**

| SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|
| TYPE / LOCATION | | | ⊘ |
| INTERVENTION | | more noted | |
| RESPONSE | | & voiced by mom | |
| SLEEP | thru Nov | 1300-1500 | intervals |
| | | awake 08-1300 | |
| FUNDUS | | N/A | Na |
| LOCHIA | | | |
| BREASTS | | | |
| NIPPLES | | | |
| IV PUMP | | Travenol x I | Travenol |
| | | 08-10-12+15 | |
| | ⊘ | | Na |
| NURSE'S SIGNATURE | | J Trantina LPN | P Spresser LPN |

| TIME | NARRATIVE NOTES |
|---|---|
| 1200 | |
| 1300 | Slept thru Nov — |
| 1300 | upsin hall c nurse · no distress noted J Trantina LPN |
| 1300 | Sitting up in bed eating lunch - mom at bedside J Trantina LPN |
| 1500 | Asleep in bed - mom at bedside ——— J Trantina LPN |

| NURSE'S SIGNATURE AND TITLE | | | | | |
|---|---|---|---|---|---|
| | | | | | |

| SHIFT | | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| COMPLAINTS | TYPE / LOCATION | ∅ | no ω?? | ⊘ |
| | INTERVENTION | | | |
| | RESPONSE | | | |
| SLEEP | SLEEP | intervals | prn | awake |
| OB | FUNDUS | | | |
| | LOCHIA | | | |
| | BREASTS | | | N |
| | NIPPLES | | | A |
| | | V | A. | |
| EQUIP | IV PUMP | Travenol | Travenol | Travenol |
| | | | | |
| TEACHING | | | | |
| | | | | |
| NURSE'S SIGNATURE | | D Rogers LPN | Unsecured ? | B Sharp |

| TIME | NARRATIVE NOTES |
|---|---|
| 0800 | A.A. & O for breakfast. ① neck swollen area marked out. |
| 1200 | No diff swallowing foods-flds - complaining talking breathing |
| | T vads at about ō stg it more. No ω answered by |
| 7/1500 | In bed playing quietly. No sig problems this 8°. |
| | Report given ——————— unnamed ? |
| 1600 | assumed afebrile. Playing in bed. ——— B Sharp |
| 2100 | Sleeping — side rail up. NAD. ——— B Sharp |

| NURSE'S SIGNATURE AND TITLE | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |

| | SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| **COMPLAINTS** | TYPE / LOCATION | none voiced | none voiced or | |
| | INTERVENTION | | noted | |
| | RESPONSE | | | |
| **SLEEP** | SLEEP | @ long. intervals | awake 08-1500 | intervals |
| **OB** | FUNDUS | N/A | no | |
| | LOCHIA | | | |
| | BREASTS | | | O |
| | NIPPLES | | | |
| **EQUIP.** | IV PUMP | Travenol x 1 | Travenol x i 08-10-12+14 | Travenol |
| **TEACHING** | | N/A | no | 8 |
| | NURSE'S SIGNATURE | BM Carleyb RN | J Trantina RN | |

| TIME | NARRATIVE NOTES |
|---|---|
| 0010 | Awakened for assessment. V55% in. NAD (6230) back to sleep ↑ BM Carleyb RN |
| 0900 | Playing in cage crib c̄ side rails ↑↑ J Trantina RN |
| 1300 | up playing in play room c̄ aunt & Godmother J Trantina RN |

**NURSE'S SIGNATURE AND TITLE**

| | SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| COMPLAINTS | TYPE / LOCATION | | none noted on | none voiced |
| | INTERVENTION | No c/o | voiced by pt | |
| | RESPONSE | | or grandmother | |
| SLEEP | SLEEP | intervals | intervals | @ intervals |
| OB | FUNDUS | | | N/A |
| | LOCHIA | | | |
| | BREASTS | N/A | | |
| | NIPPLES | | | |
| EQUIP. | IV PUMP | Travenol | Travenol x 1 08-10-12-14 | Travenol X1 |
| TEACHING | | N/A | | N/A |
| | NURSE'S SIGNATURE | C Helmers RN | J Trantina LP | B McCarty RN |

### NARRATIVE NOTES

| TIME | |
|---|---|
| 0100 | Assessment done. Afebrile. SJ-4 neck swollen area. No respitory or swallowing difficulties — C Helmers RN |
| 0600 | Slept all nite - up to BR - voided. Gait steady. C Helmers RN |
| 1100 | playing in room - no change in assessment - grandmother at bedside. J Trantina LP |
| 1430 | ↑ playing in room - no change in assessment - taking P.O. solids & fluids well - grandmother at bedside J Trantina LP |
| 1550 | Assessment completed VSS & in NAD 1800 Nite req diet poorly. Likes "snacks" 2000 Asleep in crib 2200 Assessment unchanged & in NAD B McCarty RN |

NURSE'S SIGNATURE AND TITLE

| SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|
| TYPE / LOCATION | | None voiced | ☺ C/o discomfort |
| INTERVENTION | | | |
| RESPONSE | | | |
| SLEEP | long intent | nap | |
| FUNDUS | | | |
| LOCHIA | | | |
| BREASTS | | | |
| NIPPLES | | | |
| PUMP | Cranenpmp | travenl | travenll pump |
| | | | |
| | | | |
| NURSE'S SIGNATURE | Bey alele | D.Newscom. | L. Sisto Rn |

NARRATIVE NOTES

| | |
|---|---|
| :30 | NPO p̄ mn for BE in Am— Took only 30 cc c̄ OWN— accidentally. ↑ te BR— voided 150 cc clear urine, ỹs clear |
| :00 | Slept well— reg— poseted ỹs clear |
| :00 | Mom in to visit— gave him a tub bath. |
| :00 | Mom went home. ↑ to day rm to play. |
| :45 | Back in crib, watching cartoons — L Sisto Rn |
| :00 | Asleep. Resp even unlabored. IV patent L Sisto Rn |

NURSE'S SIGNATURE AND TITLE

| Sisto Rn | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |

| SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|
| TYPE / LOCATION | | no c/o | NG |
| INTERVENTION | | | |
| RESPONSE | 5 | | |
| SLEEP | thru noc | awake | intervals |
| FUNDUS | | | |
| LOCHIA | | | NG |
| BREASTS | | | |
| NIPPLES | | | |
| IV PUMP | Travenol | Travenol | Travenol |
| | | | |
| | | | NG |
| NURSE'S SIGNATURE | D Rogers RN | A Pitman RN | P Spreeter RN |

| TIME | NARRATIVE NOTES |
|---|---|
| | Sleeping thru noc — NAD \bar{s} MN — Assessment |
| | 5 |
| 0900 | down to RU — IV mfltr related — M Ellenberger RN |
| 45 | Back from B.Sa via circuit NAD — |
| 1330 | eating well — grma visiting — M Ellenberger RN |

NURSE'S SIGNATURE AND TITLE

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

| SHIFT | | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| CC INTS | TYPE / LOCATION | | IV site fluts restarted | 0 |
| | INTERVENTION | | | |
| | RESPONSE | | | |
| SL | SLEEP | 90% | 0 | intervals |
| | FUNDUS | | | N/a |
| | LOCHIA | | | |
| | BREASTS | | | |
| | NIPPLES | | | |
| QUIP. | IV PUMP | Travenol | Travenol | Travenol |
| TF...NG | | | | N/a |
| | RSE'S SIGNATURE | O Rogas LPN | BMTabell RN | P Spreoter LPN |

| .IME | NARRATIVE NOTES |
|---|---|
| '20 | Deep assessment flow sheet — O Rogas LPN |
| 600 | Pt assessment unchanged — D Rogas LPN |
| '0 | Awake, sent to US lab IV site patent — K abell RN |
| 000 | Returned from US. Breakfast given IV site patent — K abell RN |
| 40 | Bath given no SK breakdown noted. IV site dc'd — K abell RN |
| 00 | IV site restarted by Reed RN. Difficulty lab specimen drawn — K abell RN |
| 500 | ↑ to XR c nurse for Br. — K abell RN |
| | |
| | |
| | |
| | |
| | |

| NURSE'S SIGNATURE AND TITLE | | | |
|---|---|---|---|
| T. abell RN | | | |
| | | | |

| SHIFT | | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| COMPLAINTS | TYPE / LOCATION | None | None | none voiced |
| | INTERVENTION | | | |
| | RESPONSE | | | |
| SLEEP | SLEEP | Long intervals | @ Short interv | @ intervals |
| OB | FUNDUS | NA | | |
| | LOCHIA | | | |
| | BREASTS | | | R.O. |
| | NIPPLES | | NA | |
| EQUIP | IV PUMP | + as needed | as needed | as needed |
| | | | | |
| | NURSE'S SIGNATURE | Edna U. H. RN | A. Gould, RN | Renn Jones LPN |

| TIME | NARRATIVE NOTES |
|---|---|
| 2400 | Awakened. Caressed. Afebrile. No C/o Voiced. #IV patent. Resp |
| | unlabored. [0300] Resting well. [0600] Stable. Edna U. H. RN |
| 1300 | Swelling to neck. sadre. Playful / Active — |
| | Mother visited. ——————— ( Gould R |
| 2200 | (1300) Initial assessment complete. warm, enlarged reddened lymph node |
| | noted on anterior neck, no c/o, playing in crib. A. Gould RN |
| | (1800) Sleeping - resp unlabored. (1800) Ate in toto 30% diet. |
| | (2000) ↑ at nurses station, hallway, playroom c assist c IV |
| | pole. (2100) In bed playing, no c/o assess unchanged. (2200) |
| | Sleeping, resp even unlabored. ——— Renn Jones LPN |

| NURSE'S SIGNATURE AND TITLE |
|---|
| |
| |

| SHIFT | | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| COMPLAINTS | TYPE / LOCATION | | | Ø |
| | INTERVENTION | None offered | | |
| | RESPONSE | | | |
| SLEEP | SLEEP | Slept well - 90% ~ intervals | | |
| OB | FUNDUS | | na | |
| | LOCHIA | N/A | | |
| | BREASTS | | | N/A |
| | NIPPLES | | | |
| EQUIP. | IV PUMP | Travenol | Travenol XI 08-10-12-14 | Travenol |
| TEACHING | | N/A | | |
| NURSE'S SIGNATURE | | M. abegar | J.Trantina LP | J.Taylor |

| TIME | NARRATIVE NOTES |
|---|---|
| 2400 | Sleeping soundly  V.S.S.  afebrile  IV infusing well  T to 50° NPO → O.R.  No acute distress ———————— M. abegar. |
| 2430 | Perineal voided ē Hibiclens  bath given in tub M. abegar |
| 1530 | 1° pre-op call received.  Pre-ops done  M. abegar. |
| 5640 | to OR via crib ——————————— m. abegar. |
| 80 | Returned to rm. via bed ē nurse - R.N. Teamleader took report - child fussing & crying off & on - alert - active - incision site covered ē dry 4 X 4 ē drainage J.Trantina LP |
| 1030 | up sitting in nurse's lap - quiet - no change noted J.Trantina LP |
| 1330 | asleep in cage crib ē side rails up - incision clean & dry & intact ē redness or edema - no change in assessment. ——————————— J.Trantina LP |

**NURSE'S SIGNATURE AND TITLE**

| | | | | |
|---|---|---|---|---|
| | | | | |

| SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|
| LOCATION | None Offered | | Ø |
| RVENTION | | | |
| NSE | | | |
| EP | Slept well - 90% | intervals | |
| IOUS | | ma | |
| | n/a | | |
| ASTS | | | N/a |
| S | | | |
| IP | Travent | Travent XT 08-10-12-14 | Travent |
| | | | |
| | n/a | | |
| E'S SIGNATURE | M. obegon | J. hantina LP | H. layton |

NARRATIVE NOTES

Sleeping soundly. VSS afebrile. IV infusing well T to 50°
NPO > 0R. No acute distress. — M. obegon.
Awoke. voided. qs Hibiclens bath given in tub-M.obegon
1° pre-op coit received. Pre-ups done. M. obegon
to OR via crib. — M.C.begon.
Returned to rm. via bed c nurse- R.N. teamleader
took report - child fussing & crying off + on- alert-
active - incision site covered & dry 4x8 c drainage J.hantina LP
up sitting on nurse's lap- quiet - no change noted J.hantina LP
asleep in cage crib c side rails up- incision clean
+ dry & intact c no redness or edema - no change in
assessment. — J. hantina LP

NURSE'S SIGNATURE AND TITLE

| | | | |
|---|---|---|---|
| | | | |
| | | | |

| | SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| **COMPLAINTS** | TYPE / LOCATION | | | |
| | INTERVENTION | Ø | | |
| | RESPONSE | | | |
| **SLEEP** | SLEEP | well until 3Am | awake | |
| **OB** | FUNDUS | Ø | | |
| | LOCHIA | | | |
| | BREASTS | | ↓ | |
| | NIPPLES | | | |
| **EQUIP.** | IV PUMP | Travenol | trav---s bel | |
| | | | | |
| **TEACHING** | | Ø | | |
| NURSE'S SIGNATURE | | Sandra Wilkeson | c-F----- | |

| TIME | NARRATIVE NOTES |
|---|---|
| 0300 | Up & Alert. Watching T.V. coloring. Uncision site swollen sm. Amt drainage. Covered ē 2x2. Drank 100 cc Grape Jc. % elv. site painful to get 2 stickers. ————————— Sandra Wilkes LPN |
| 0700 | Up in chair p. Lg BM this Am. Doesn't like Nurse to leave. ———— Sandra Wilkeson |
| 08 | Bkfst between well am, care done amb in hallway ō Syrup ossi2i b-----t-- noon by P.M. ---- s/pit. |
| 12 | took lunch Great I.V. d-d |
| 13 | Napping (400) P.O. amb biales swan t----h |
| | |
| | |

| NURSE'S SIGNATURE AND TITLE | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |

| | SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| **COMPLAINTS** | TYPE / LOCATION | Ø | | |
| | INTERVENTION | | | |
| | RESPONSE | | | |
| **SLEEP** | SLEEP | well | aware | |
| **OB** | FUNDUS | | | |
| | LOCHIA | N/A | N/A | N/A |
| | BREASTS | | | |
| | NIPPLES | | | |
| **EQUIP.** | IV PUMP | N/A | N/A | |
| **TEACHING** | | | | |
| | NURSE'S SIGNATURE | | L. Bauer | |

| TIME | NARRATIVE NOTES |
|---|---|
| 730 | (Assessment Complete) [1000] to bathroom |
| | & assist. (1330) (IV started) (1400) Assess- |
| | ment, vs. d |
| 700 | slept through dinner |
| 1600 | |
| 2100 | Continues sleeping |

**NURSE'S SIGNATURE AND TITLE**

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |

| | SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|---|
| **COMPLAINTS** | TYPE / LOCATION | | | |
| | INTERVENTION | | | |
| | RESPONSE | | | |
| **SLEEP** | SLEEP | 24-02 — | Awake | |
| **OB** | FUNDUS | | | |
| | LOCHIA | | | |
| | BREASTS | N | | |
| | NIPPLES | | A | |
| **EQUIP.** | IV PUMP | ✓ IVAC | Travi Hal | |
| **TEACHING** | | | | |

NURSE'S SIGNATURE: _Dromaso R / J. Squires RN_

**NARRATIVE NOTES**

| TIME | |
|---|---|
| 2400 | Sleeping w/o distress aw awakens briefly for VS & assess. IV patent DSNs to neck intact 0200) cont to sleep w/o distress — 0400) cont to sleep assessment unchanged 0600) Awake Alert / cheerful assess unchanged & BK voided QS c sgt formed brownstool — amb in halls 0730) Surgeons in to see pt removed drsng – replaced c NS 2x2 covered c 4x4 slt redness @ site & mod. serose / sangtrun drainage _____ R Lomaso R / |
| 730 | Assessment Complete VS (0830) & c Christ- mas party in playroom (1330) ↑↑ fm at Crib side c brog A (J-0 |

NURSE'S SIGNATURE AND TITLE

| | | | |
|---|---|---|---|
| | | | |
| | | | |

| SHIFT | 2300-0700 | 0700-1500 | 1500-2300 |
|---|---|---|---|
| PE / LOCATION | | — none — | none. |
| TERVENTION | | | |
| SPONSE | | | |
| FEP | long intervals | | from 1600-1830 |
| NDUS | N.A. | n/a | n/a |
| CHIA | | | |
| ASTS | | | |
| PLES | | | |
| PUMP | Tracional | Tracional | Tracional |
| 'S SIGNATURE | Edna Uther Rn | D. Conway, RN. | D Conway |

NARRATIVE NOTES

Awakened, Assessed, Afebrile. PIV (R) hand occluded. PCd 6100 To Sta. 32 for restart by pediatric nurse/per w/c. Size 20 scath BuyCapid for convenience of transferring. Hep flush instilled. Blood work obtained Hemoʒanol & Sata8. Juice given Settled for sleep. IV solution connected Antibiotic absorbing Hoedlin absorbed flushed Chloramphenicol infusion. Transferred to Sta. 32 in bed c IV infusing well. — Edna Uther Rn. male child in crib c toys SRT×2. Watching TV ō complaint 0800 Assessment done. Afebrile. Eating breakfast per self. Hd Lumist flushed c NS. 2cc Nafcillin infused Hd flushed c NS Chloropenical infused Hd flush instilled. — Bate Lone, linens changed. OOB ×20 min in chair playing c toys. Back to crib SRT×2 Playing quietly c toys. Dr. at BS. wt & Lt done wt 37.5" wt 5.2 Kg. 1200 ate 1/2 of lunch per self. Nafcillin infusing. Mom at BS. 1400 Unable to flush IV Restarted in RT forearm. Chloropenical infused. 1530 Mom leaves BS. 1600 Assessment done Nafcillin infusing. Pt. fallen asleep. 1830 Awiake & eating dinner in bed 1900 Report given C Conway RN

NURSE'S SIGNATURE AND TITLE

D. Conway, RN.

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | CR 89-12631 |
| v. | ) | |
| | ) | |
| DEBRA JEAN MILKE, | ) | AFFIDAVIT |
| | ) | |
| Petitioner. | ) | |
| | ) | |

My name is Dr. Kevin Zuerlein, M.D.. I am over the age of eighteen. I have never been convicted of a felony and I am competent to make this affidavit. I have personal knowledge of the facts stated in this affidavit, and if called to testify, under penalty of perjury, I would testify to the following:

1.  In 1988 I was a doctor of medicine in my first year of psychiatric residence training. I was, as a part of my internship, assigned to the pediatric ward of Maricopa Medical Center.

2.  I have reviewed the medical records of Christopher Milke, to refresh my memory, however, I have an independent recollection of him and his mother, Debra Jean Milke, while Christopher was receiving treatment at the Medical Center, which was from 12-4-1988 to 12-22-88. I was the intern assigned to Christopher's case.

3.  I interacted with Christopher and his mother in the capacity of a pediatric intern. I helped both of them deal with their fears, which related to the serious surgery Christopher was to undergo. I dealt with both of them before and after Christopher under went surgery.

4.  Christopher was treated for a swelling on the front of his neck, on his thyroid gland. It was diagnosed as Suppurative Thyroiditis. The surgery and recovery were successful and he was released in good condition. My involvement ended when he was discharged from the hospital.

5.  I interacted with Christopher and his mother, several times a day, during the 19 days he was hospitalized.

6.  Based on my interaction with them I made the following observations, and based on my training I formed the following conclusions:

a. Christopher was well mannered and displayed the usual age appropriate developmental milestones.

b. During his hospitalization, his mother, Debra Milke, was very concerned about him. She sought treatment within days of noticing a change in his physical condition.

c. Debra was often at his bedside.

d. Debra interacted well with the hospital staff.

e. Debra appeared to be well bonded to Christopher, and Christopher appeared to be well bonded to his mother.

f. There were no abnormalities noted in Christopher and his mother's relationship.

g. Compared to the many other families who's children were being treated at the Medical Center, and seen by me, Debra's presence and concern for Christopher was above average.

h. Debra did not display an increased nervousness during any of the questioning involving the history and relationship of her and her child.

i. Debra was genuinely concerned for her child. She was cooperative, helpful, informative, and pleasant, throughout Christopher's stay in the hospital.

j. Christopher showed no signs of failure to progress at a normal rate; he appeared to be growing both physically and mentally at a normal rate.

k. Christopher showed no signs of physical or mental abuse.


Further affiant saith not.

## VERIFICATION

DR. KEVIN ZUERLEIN, M.D., being first duly sworn, under penalty of perjury, upon his oath deposes and states:

That he has read the attached affidavit and all facts contained therein (paragraphs 1 - 6 inclusive) are true.

_____
DR. KEVIN ZUERLEIN, M.D.

SUBSCRIBED AND SWORN to before me this 6 day of October, 1995, by Dr. Kevin Zuerlein, M.D..

_____
NOTARY PUBLIC

OFFICIAL SEAL
Michael B. Plowman
Notary Public-State of Arizona
MARICOPA COUNTY
My Comm. Exp. Aug. 16, 1997

MARICOPA MEDICAL CENTER

MILKE, CHRISTOPHER
124 77 16 2

DISCHARGE SUMMARY

KEVIN ZUERLEIN, M.D.

DATE OF ADMISSION:  12-04-88
DATE OF DISCHARGE:  12-22-88

ATTENDING STAFF PHYSICIAN: KAY MILLER, M.D.

IDENTIFYING DATA:  The patient is a 3 year old Caucasian male who
resides at 10955 N. 79th Ave. #66, Peoria, AZ 83545.  Date of birth
10-02-85.

CHIEF COMPLAINT:  Neck swelling.

HISTORY OF PRESENT ILLNESS:  The patient is a 3 year old Caucasian male
who was in good health until approximately 1700 hours on the evening
prior to admission when his mother noticed a red, slightly swollen area
on his anterior neck.  She states positively that this was not present
earlier in the day.  She denies any trauma or bug bite.  She reports
that since her arrival at the hospital the swelling has increased as
has the erythema.  She notes a decrease in appetite but denies any
fever, chills, vomiting or diarrhea.  This area is slightly tender to
palpation.

PAST MEDICAL HISTORY:  Birth weight 6 pounds, 12 ounce full term male
who was in the hospital with his mother for 5 days. Pregnancy was
uncomplicated.  There was a failure to progress  and a cesarean section
was done.  There were no neonatal problems, no previous
hospitalization.

CURRENT MEDICATIONS:  None.

ALLERGIES:  NO KNOWN DRUG ALLERGIES.

IMMUNIZATIONS:  Up to date.

NUTRITION and DIET:  Age appropriate, although mother notes that the
child is a picky eater.

DEVELOPMENTAL HISTORY:  Age appropriate.

SOCIAL HISTORY:  The patient resides with mother, father and paternal
grandmother. Means of support, the mother and father both work and he
does have a baby sitter as a primary caretaker during the day.

FAMILY HISTORY:  Not contributory.

RECENT EXPOSURES:  Babysitter does have strep throat.  No childhood
illnesses.

MILKE, CHRISTOPHER
124 77 16 2
PAGE 2

PHYSICAL EXAMINATION: VITAL SIGNS: Revealed a temperature of 37.3,
pulse 88, respiratory rate 24, blood pressure 114/71, weight 39 pounds
height 34 inches. GENERAL: A well developed, well nourished Caucasian
male in no acute distress with an obvious anterior neck mass. HEENT:
Head was normocephalic and atraumatic. Pupils equal, round and
reactive to light and accommodation. Extraocular movements intact. The
tympanic membranes were clear bilaterally. Nose patent without
discharge. Mucous membranes in the mouth were moist and the oropharyn
was clear. NECK: Supple, a 7 X 8 cm firm, nonfluctuate mass, more on
the left side of midline with some overlying warmth and erythema.
There were no other lymph nodes detected. CHEST: Clear to auscultation
BACK: No costovertebral angle tenderness. HEART: Revealed a regular
rate and rhythm without murmur. ABDOMEN: Soft, nontender, no masses
and no hepatosplenomegaly. GU: Normal males. RECTAL: Rectum patent.
SKIN: Warm and dry. EXTREMITIES: No clubbing, cyanosis or edema.
NEUROLOGICAL: Alert and responsive. Cranial nerves II through XII
intact. Motor and sensory grossly intact. Reflexes 2/4 bilaterally.

LABORATORY DATA: The complete blood count done on 12-04 showed a white
blood count of 9.8, 32.9 lymphs, 7.2 monos, 59.9 granulocytes,
hemoglobin 12.1, hematocrit 35.9, MCV 82.2, platelet count 450,000.
There was a left shift present. Sed rate done on 12-04 was 48 which
was elevated above normal of 0 to 10. Latex agglutination was negative.
Thyroid studies showed TSH 0.5 which was within normal limits, T4 12.8
which was slightly elevated above the 11.5 normal. The urinalysis done
12-06 was within normal limits. Blood cultures showed no growth after
7 days. Minor chem profile performed on 12-18 was within normal limits.
Repeat urinalysis on 12-18 was again unremarkable. Several cultures of
aspirates of neck mass and drainage were done and these revealed either
no growth or ultimately staph coagulase negative. CT scan of the neck
of 12-05 revealed large soft tissue mass or swelling in the left side
of the neck, probably in the large thyroid with surrounding soft tissue
swelling. A neck ultrasound on 12-16-88 showed a relatively
uperficial transversely oriented inhomogenous and principally soft
tissue nodules or mass in the lower neck area. It was principally
solid echoes with scattered cystic areas, margins were slightly ill
defined. It was felt that there were tissue planes between the
thyroid. An esophagram was done to rule out a sinus  fistula tract and
this was negative.

HOSPITAL COURSE: The patient was admitted to the hospital initially to
the pediatric ward and started on IV DW PMS to keep open and Nafcillin
450 mg IV q4h, 152 mg per kg per day. The CT scan was ordered on 12-05,
and Chloramphenicol was also started at that time at 75 mg per kg per
day. Initially the mass decreased in erythema until it arrived at
normal skin color and decreased somewhat in size, however it did then
form a solid elevated nodule, more in the anterior midline region of
the neck and this did not decrease any in size. The patient was doing

MILKE, CHRISTOPHER
124 77 16 2
PAGE 3

well, however at the time this mass consolidated in the anterior neck,
it was felt he would need incision and drainage and he was scheduled
for excision of the mass. This was performed on 12-19-88 and it looked
to be inflammatory tissue within the sternocleidomastoid muscle.
The patient did well the 1st day or so after surgery, however it was
noted that the wound edges were a little bit ragged on 12-21 and that
there was increased swelling and fluctuantes and surgery was asked to
look at the wound again. This was then incised and drained once more
and packing were started with new gauze. After the incision and
drainage, the wound was very clean and dry with very little erythema
and no swelling.  The cultures again did grow out a gram positive cocci
in clusters and it was felt that the child should be started on
Augmentin.  Mother was on Maricopa Medical Center health plan and
arrangements were made for a nurse to come twice daily to change the
dressings.  On 12-27 the patient was doing well, he had good oral
intake and good urine output, he was afebrile, the wound had very
little erythema or swelling left and it was felt that he could be
discharged to home.

DISCHARGE MEDICATIONS:  Augmentin 250 mg for 5 ml to take  4  cc po tid
X 14 days.

FOLLOW UP:  The patient is to follow up in the pediatric clinic in
approximately 3 days and then in the pediatric surgery clinic in 5
days.

DISCHARGE DIAGNOSIS: 1.  Suppurative thyroiditis with abscess.


KEVIN ZUERLEIN, M.D.

kz:dwxj 154 105
D: 01-22-89
T: 01-23-89                        COUNTERSIGNATURE

1         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2           IN AND FOR THE COUNTY OF MARICOPA

3

4

5

    STATE OF ARIZONA,          )

6                       )

            PLAINTIFF,    )

7                       )

             VS.        )

8                       )     NO.  CR89-12631

                       )

9    JAMES LYNN STYERS,     )

                       )

10          DEFENDANT.    )

    _____)

11

12

                   Phoenix, Arizona

13          October 29, 1990 - October 30, 1990

14

15

16    BEFORE:  THE HONORABLE PETER T. D'ANGELO, JUDGE

17

18

19        REPORTER'S TRANSCRIPT OF PROCEEDINGS

20          TESTIMONY OF JAMES LYNN STYERS

21

22

23                            LISA VITOFF

24                     OFFICIAL COURT REPORTER

25

1                         A P P E A R A N C E S

2

3

4      FOR THE PLAINTIFf:

5          MR. NOEL LEVY,
            Deputy County Attorney
6

7      FOR THE DEFENDANT:

8          MR. JESSE MIRANDA,
            Attorney at Law
9

10

11

12

13                         I N D E X

14

15     WITNESS:                EXAMINATION:            PAGE NO.:

16
        STYERS, James          direct                 3
17
                               cross                  75, 119
18
                               redirect               145
19

20

21

22

23

24

25

```
 1

 2                    P R O C E E D I N G S

 3      (The following proceedings were held in open court:)

 4

 5                    JAMES LYNN STYERS,

 6      called as a witness herein, having been first duly sworn,

 7      was examined and testified as follows:

 8

 9                    THE COURT:    Take this seat, please.    Watch

10      your step, pull the microphone up.

11

12                    DIRECT EXAMINATION

13

14      BY MR. MIRANDA:

15           Q     Would you state your name, please?

16           A     James Styers.

17           Q     Jim, your middle name is Lynn?

18           A     Yes, it is.

19           Q     Jim, if you don't understand any of my

20      questions, I want you to ask me to clarify them, the

21      questions, will you do that?

22           A     Yes.

23           Q     Jim, you know Debra Milke?

24           A     Yes, I do.

25           Q     Do you know Chris Milke?
```

1          Q     Why were you give -- and it was giving

2    money, wasn't it?

3          A     Yes.

4          Q     Why were you giving Debra money?

5          A     Nobody else would, everybody disowned her.

6          Q     Jim, the next letter that we have is from

7    February 24th of 1990.  Again, you start off with Dear

8    Debbie, and you write, I hate Roger too.  In fact, I

9    don't know what words that would be bad enough to use to

10   say what I think of him.  Your benefits book is probably

11   how he got his information, but I never saw him look at

12   it.  I told him no for the $250 also.  He needed it for

13   his Social Security -- apparently it's suppose to be

14   lawyer?

15         A     Yeah.

16         Q     What do you think of Roger at this point in

17   time?

18         A     Right now?

19         Q     Yeah.

20         A     I can't say.

21         Q     You talk about the benefits booklet.  Were

22   you aware that the benefits booklet was in the house?

23         A     Yes, I was.

24         Q     And how were you aware of that, Jim?

25         A     Debbie come home with it and we went over

1       it.

2               Q       So, you and Debbie went over the benefits

3       booklet, before she filled out the form?

4               A       Yes.

5               Q       You helped her fill out the form?

6               A       No, I didn't help her fill it out.  She

7       filled it out herself.

8               Q       Were you helping her along, talking to her?

9               A       I was talking with her, yes.

10              Q       Were you aware that there was a $5,000

11      insurance policy?

12              A       Yes, I was.

13              Q       Would you kill Christopher Milke for $5,000?

14              A       No, I would not.

15              Q       When you and Debra talked about the $5,000

16      insurance policy that was issued, or was being paid for,

17      did you talk about killing Christopher Milke?

18              A       No, we did not.

19              Q       Did you ever talk with Debra Milke about

20      killing Christopher Milke?

21              A       No, I did not.

22              Q       Did you ever discuss it or was there ever

23      any discussion between you and Debra Milke which could be

24      interpreted as you talking about killing Christopher?

25              A       No, there was nothing.

```
 1              Q      So, just so I understand, you were aware of

 2      the $5,000 --

 3              A      Yes.

 4              Q      -- that Debra requested.

 5                     Do you regularly apply for life insurance?

 6              A      Do I apply for life insurance?

 7              Q      Yes.

 8              A      Got life insurance for my kids.

 9              Q      Which kids?

10              A      Jeff, Chris, Heather and Wendy.

11              Q      Is it for more than $5,000?

12              A      I believe so.

13              Q      Okay.  Next in here you talk about, you say,

14      I quote, I told him no for the $250 also.  He needed it

15      for his Social Security lawyer.

16                     What was that about?

17              A      He was trying to get Social Security

18      disability.

19              Q      What did he need $250 for?

20              A      To, I guess, like an advance payment to the

21      lawyer.

22              Q      He had talked to you about it?

23              A      Yes, he talked --

24              Q      He had asked you for the $250?

25              A      Yes, he did.
```

1      Q      What did you tell him when he asked you for

2   the $250?

3      A      That I don't have it.

4      Q      What was his reaction to you when you told

5   him I don't have $250 to give you?

6      A      Well, he knew if I had it I'd probably would

7   have gave it to him.  So, he asked Debbie.

8      Q      How do you know he asked Debbie?

9      A      I was there.

10     Q      What did Debbie tell him?

11     A      No way.

12     Q      Why would Roger Scott ask Debra Milke for

13  $250, when apparently she was well aware she didn't care

14  for him?

15     A      Because he needed the money.

16     Q      Did you ever agree with Roger Scott to give

17  him $250 if he would kill Christopher Milke?

18     A      No, I did not.

19     Q      Did you ever agree with Debra Milke to pay

20  Roger Scott $250, or for that matter any amount of money,

21  to kill Christopher?

22     A      No, I did not.

23     Q      Were you hurting for money so badly that you

24  would kill Christopher Milke for $5,000?

25     A      No, I was not.

```
 1          Q      Did you know his wife?

 2          A      Yes, I did.

 3          Q      Did you know his wife very well?

 4          A      How do you mean very well?

 5          Q      Did you and Roger and his wife get together?

 6          A      Oh, yeah, once in a while we'd be at their

 7    house somewhere.

 8          Q      You were able to call her on a first name

 9    basis?

10          A      Yes.

11          Q      When had you last started contact with Roger

12    Scott?

13          A      About a year before this came up.

14          Q      So, about 19- -- late 1988 you again ran

15    into Roger?

16          A      Yes, I did.

17          Q      This was the boat show, where he was with

18    Jim?

19          A      Yes, it was some kind of a show.

20          Q      After that, what kind of contact did you

21    have with Roger Scott?

22          A      He'd call me every once in a while, need a

23    ride somewhere.  Every once in a while we'd go out.

24          Q      You bought a gun, a revolver for Roger

25    Scott; is that right?
```

1        A      Yes, I did.

2        Q      You bought that in late November?

3        A      Yes.

4        Q      How much did you pay for that revolver?

5        A      $20.

6        Q      Why would you buy Roger Scott a gun?

7        A      Because he wanted one and I had one already,

8    so I was going to go out shooting.

9        Q      You were going to go out shooting?

10       A      Yes.

11       Q      You by yourself, you and Roger Scott, you

12   and Roger Scott and others; who?

13       A      Roger and I and maybe Jim Wallford.

14       Q      Jim Wallford liked guns?

15       A      Yes, he does.

16       Q      As much or more than Roger Scott?

17       A      Yeah, I think so.  I think he likes them

18   more than I do.

19       Q      Had Roger Scott ever had any other firearms

20   that you're aware of?

21       A      Yes, he did.

22       Q      What firearms did he have before?

23       A      He had a .22 rifle.

24       Q      And how do you know he had a .22 rifle, Jim?

25       A      I've seen him shoot it.  I've seen it at his

1      house.  I've taken it from him once.

2              Q      Why would you -- did you take it from him?

3              A      Because he was drunk and he was going to

4      shoot his wife.

5              Q      Did you --

6              MR. LEVY:   Objection.  I couldn't foresee

7      this irrelevancy coming.  I believe it's not probative of

8      anything.  Ask that it be stricken.

9              THE COURT:   Overruled, the answer may

10     stand.

11             Q      BY MR. MIRANDA:  Jim, had you ever talked to

12     Roger about his -- him firing weapons?

13             A      Not really talked to him, no.

14             Q      Did he ever say anything about firing the

15     gun?

16             A      He liked them.  He said he liked to do it.

17     He said -- he has talked to me about times he has fired

18     the guns, shooting them down the alleys, and his mother

19     verified that.

20             Q      In your opinion, does Roger Scott appreciate

21     -- well, strike that question.

22             Has Roger ever fired the weapon, in your

23     presence, in a manner which was unsafe?

24             A      Yes, he has.

25             Q      When he fired the weapon as you've just

1    indicated, was there any concern by Roger about the

2    safety of anyone around him?

3            A    No, there wasn't.

4            Q    Jim, you called John after or towards the

5    end of Debra Milke's trial?

6            A    Yes, I did.

7            Q    What's John's last name?

8            A    Is it Ciulla?

9            Q    He testified earlier today?

10           A    Pardon?

11           Q    He testified earlier today?

12           A    Yes, he did.

13           Q    What did you tell John in that conversation?

14           A    First off, I asked him what about what all

15   he said in Debby's trial.  I asked him what he thought of

16   the findings.  So, it was after the trial was over

17   because Debby was already found guilty.  And I told him I

18   thought it was a set-up, and I have a feeling that Mark

19   was involved with it, Mark and Roger Scott.

20           Q    Did you tell John anything about Christopher

21   wearing tennis shoes?

22           A    Yes, I did.  The newspapers said that

23   Christopher was wearing tennis shoes and I knew he was

24   wearing his cowboy boots.

25           Q    You know that when Christopher walked out of

1     the apartment, on December 2nd, he was wearing the cowboy

2     boots?

3          A     Yes, I do.

4          Q     Do you remember what Roger Scott was wearing

5     that day, as far as footwear is concerned?

6          A     No, I do not.

7          Q     Did you ever tell John that you saw Mark at

8     the wash or near the wash?

9          A     No, I did not.  I didn't see anybody at the

10    wash.

11         Q     Do you remember the incident that Pat

12    Murphey spoke about, with the four-by-four motorized

13    truck?

14         A     There was a couple of incidents.

15         Q     Did you hear Patrick Murphey testify that he

16    went to your apartment, he heard Christopher crying in

17    the bedroom, and you walking down the hall?  Do you

18    remember that?

19         A     Yes.

20         Q     Did you ever spank or physically strike, in

21    any shape, way or form, Christopher Milke?

22         A     No, I did not.

23         Q     Was he crying that day?

24         A     Yes, he was.

25         Q     Did that, did that occur as Patrick Murphy

1     .related it?

2          A     Well, he was crying as Pat come in and

3     everything.  If I said that I spanked him and enjoyed it,

4     I was just kidding anyway though.  I won't say I didn't

5     say that.

6          Q     Do you remember saying it?

7          A     No, I don't remember it.

8          Q     Jim, you were planning on moving from this

9     state?

10         A     Yes, I was.

11         Q     Where were you going to move to?

12         A     I was thinking about going to Wyoming.

13         Q     Who did you talk to about moving?

14         A     Debbie Pickinpaugh.

15         Q     Debbie --

16         A     Uh-huh -- excuse me, Sandy Pickinpaugh,

17    Debby's sister.

18         Q     Did you talk to John and Karen about it?

19         A     Yes, I did.  I also talked to Ron about it,

20    Sandy's husband.

21         Q     Why were you going to move out of state?

22         A     I was tired of this state.

23         Q     Weren't you concerned about Debra?

24         A     No, she was all right.

25         Q     Well, you were going to move out of the

1    apartment; correct?

2          A     Yes, I was.

3          Q     Weren't you concerned about what Debra was

4    going to do, as far as a place to live?

5          A     She was getting an apartment in January.

6          Q     This was the apartment that she told you was

7    close to -- closer to work?

8          A     Yes, it was.

9          Q     When did you start talking about moving out

10   of state?

11         A     Well, it was right after Sandy and her

12   husband moved to Wyoming.

13         Q     When was that?

14         A     When they had got married in November,

15   something like that, October maybe.

16         Q     You got along well with Sandra?

17         A     Yes, I did.

18         Q     You got along well with her husband Ron?

19         A     Yes, I did.

20         Q     Were you going to move to Wyoming

21   permanently?

22         A     No.  I was going up to just find out if I

23   wanted to stay there or not.  I talked to my wife about

24   it too.

25         Q     Karen Styers?

1        A       Yes.

2        Q       What did Karen -- what was Karen's reaction

3    to that?

4        A       Well, she thought it would be all right if

5    it worked out okay.

6        Q       Jim, just a couple of points:  One, why, if

7    you bought the gun towards the end of November, did you

8    not give the gun to Roger Scott before December 2nd?

9        A       Because I hadn't really seen Roger anymore

10   in there.  And when I talked to him on the phone, he had

11   said he didn't want to take it on the bus if he came

12   over.

13       Q       How many years did you serve in Vietnam?

14       A       I spent 16 months in Vietnam.

15       Q       Did you receive any decorations while you

16   were there?

17       A       Yes, I did.

18       Q       What were those decorations, Jim?

19       A       I don't remember what they all are.  Combat

20   ribbons, they're Vietnamese Cross of Gallantry, with a

21   cluster.

22       Q       Is that -- is there an equivalent in U.S.

23   ranks?

24       A       That's suppose to be next to the Metal of

25   Honor in the U.S.

```
 1    Metrocenter, didn't you?

 2          A     Yes, I did.

 3          Q     He believed you, didn't he?

 4          A     Yes, he did.

 5          Q     That's why he went along, isn't that so?

 6          A     Yes.  He also knew we were going over to get

 7    Roger too.

 8                MR. LEVY:   Your Honor, I don't believe I

 9    posed a question.

10                THE COURT:   Mr. Styers, please answer the

11    question, not volunteer any information.

12                THE WITNESS:  All right.

13          Q     BY MR. LEVY:  You hear voices, don't you?

14          A     Yes, I do.

15          Q     You hear children's voices, don't you?

16          A     Yes, I do.

17          Q     And this is a -- started off when you hear

18    children crying?

19          A     Yes.

20          Q     Christopher Milke, from time to time, cried,

21    didn't he?

22          A     Yes, he did.

23          Q     And when you hear children's voices crying

24    then, you hear these voices of children and women in your

25    dreams, don't you?
```

1          A     Yes, I do.

2          Q     You can't sleep then, can you?

3          A     No, I can't.

4          Q     And so your doctor -- you tried to put them

5     out of your mind, don't you?

6          A     Yes, I do.

7          Q     Now, Christopher Milke, you had to take care

8     of him a lot, didn't you?

9          A     Yes.

10          Q     And you had to take care of Christopher

11     Milke all day long while Debra Milke went to work?

12          A     That's right.

13          Q     And then during the romance with Ernie

14     Sweat, he would come over Friday and you wouldn't see

15     Debra Milke until either Saturday or Sunday?

16          A     That's right.

17          Q     They spent the weekend together?

18          A     That's right.

19          Q     And you had to stay and take care of

20     Christopher?

21          A     Yes.

22          Q     When Ernie Sweat came to pick up Debra

23     Milke, he would cry and hang on to Debra Milke because he

24     knew that his mother would be going away for the weekend

25     with Ernie Sweat?

1       A       Sometimes.

2       Q       And that crying of a child produced dreams

3   to you, and you dreamt of children and women in Vietnam?

4       A       No, I did not.

5       Q       You don't tend to dream and be bothered by

6   the crying of children and women from Vietnam?

7       A       I do have that problem.

8       Q       And it's initiated by children crying?

9       A       No, it is not.

10      Q       I thought you just testified that it was?

11      A       I did not.

12      Q       I see.

13      A       You're so wrong.

14      Q       You have a memory problem?

15      A       Yes, I do.

16      Q       And it's not really a problem though, isn't

17  it, is it?

18      A       Yes, it is a problem.

19      Q       Actually you have at least average memory,

20  don't you?

21      A       No, I do not.

22      Q       Your memory is a memory of convenience,

23  isn't it?

24      A       No, it is not.

25      Q       You only remember what's convenient to you,

1      don't you?

2              A      No, I do not.

3              Q      If you don't wish to remember something then

4      you say you don't remember, is that so?

5              A      No, it is not.

6              Q      Isn't that what you told your own defense

7      counsel upon his direct examination several times?

8              A      No, it is not.

9              Q      You're the one who is on trial here, aren't

10     you, Mr. Styers?

11             A      Yes, I am.

12             Q      And it is significant to you that in

13     testifying before this jury, it is significant to you as

14     to what you say or don't say, isn't that so?

15             A      Yes, it is.

16             Q      Now, you went to Metrocenter and you spoke

17     for a long time with an Officer Corey, did you not?

18             A      I don't know what his name is.

19             Q      You saw him testify here, don't you

20     remember?

21             A      Yes, I do.

22             Q      Is that the Officer --

23             A      Yes, I don't know his name is though.

24             Q      You spent a long time with him, from late

25     afternoon until late evening, until Detective Yost came,

1    mentioned if you were of age, with regard to Vietnam, and

2    you related to him certain things about Vietnam, did you

3    not?

4         A    Yes, I do.

5         Q    You related it was necessary to kill women

6    and children in villages.  Is that what you said?

7         A    Yes, I did.

8         Q    That just came to your mind spontaneously,

9    is that so?

10        A    Yes.

11        Q    Killing women and children?

12        A    Yes.

13        Q    Killing children?

14        A    Yes.

15        Q    And is that because it was a recent event

16   that you partook --

17        A    No.

18        Q    -- killing children?

19        A    No.

20        Q    And then you asked Officer Corey, in part of

21   the give and take, do they think I did it or something.

22   Did you not?

23        A    I asked if they think I was involved, yes.

24        Q    During all of this period of time, he was a

25   uniformed police officer and carried a gun?

97

1    Q     Did you not go to the car and get the gun

2    and the shoes out and give it to Roger Scott and tell him

3    to get rid of them?

4    A     No, we did not.

5    Q     But simply walked through the parking lot,

6    and you knew he was going on the bus?

7    A     Yes.

8    Q     And knowing that he went on the bus,

9    nevertheless, you never told Officer Corey or Detective

10   Yost, or for that matter Detective Masino, that

11   purportedly Roger Scott shot Christopher; is that

12   correct?

13   A     No, I did not.

14   Q     In the meantime, you, according to this

15   version, would have known that Christopher Milke lay

16   unburied in a wash, in a desert, in a remote desert

17   location, is that so?

18   A     Yes.

19   Q     Then you also told Detective Masino, did you

20   not, that you heard children's voices and you heard

21   crying, noises, and you heard them last night?

22   A     Probably.

23   Q     If you talked to Detective Masino at about

24   1:10 in the morning, then last night would have probably

25   been Saturday night, is that so?

1          A     No.

2          Q     Those crying voices was the voice of

3     Christopher Milke, was it not?

4                MR. MIRANDA:   Objection, your Honor.

5                THE COURT:   State your objection.

6                MR. MIRANDA:   It's argumentative.

7                THE COURT:   Overruled.

8                THE WITNESS:   No, they were not.

9          Q     BY MR. LEVY:   What did Christopher Milke say

10     just before he was shot Mr. Styers?

11          A     I have no idea.

12          Q     What were the last words you ever heard out

13     of Christopher Milke's mouth?

14          A     I have no idea.

15          Q     And then Detective Masino also taped this

16     conversation, did he not?

17          A     Somebody taped it.

18          Q     You saw it was moved into evidence here,

19     microcassette tape, did you not?

20          A     I saw a tape, yes.

21          Q     Then at the end do you recollect Detective

22     Masino asking and answering, okay, that's all you

23     remember about today?   Yeah.

24                Do you remember that?

25          A     No, I don't.

```
 1    evidence, your Honor.

 2                       THE COURT:   What?

 3                       MR. LEVY:   I need to show some objects.

 4                       THE COURT:   Just show them.

 5         Q    BY MR. LEVY:  I show you Exhibit 138.   Is

 6    this your gun, Mr. Styers?

 7         A    No, it isn't.

 8         Q    It is not your gun?

 9         A    No, it isn't.

10         Q    You just testified earlier --

11         A    That is Roger's gun.

12         Q    Let me rephrase that.  Did you purchase this

13    gun, Exhibit 138, in about mid-November from a Steve

14    Hicks?

15         A    Yes, I did.

16         Q    And you gave him a postdated check?

17         A    Yes, I did.

18         Q    This is the gun you purchased?

19         A    It's one of them.

20         Q    And so when you purchased this gun, you

21    purchased it for you, James Styers, at that time?

22         A    No, I did not.

23         Q    You did not.  Did someone instruct you to

24    purchase this?

25         A    No, they did not.
```

1      Q      You just purchased it, and you gave your

2      check; is that correct?

3      A      Yes, I did.

4      Q      I show you Exhibit 120, these Nike tennis

5      shoes.  Do you recognize them?

6      A      No, I do not.

7      Q      Are you admitting or denying that these are

8      your shoes?

9      A      I'm denying they are my shoes.

10     Q      You said to your defense counsel that the

11     tennis shoes in the car were Nikes and they were yours.

12     Do you recollect --

13     A      Yes, I do.

14     Q      Do you now change your testimony?

15     A      I do not.

16     Q      Are you aware that when the white Toyota

17     automobile was searched that there were no such tennis or

18     tennis shoes in that car?

19     A      I know it now, yes, I do.

20     Q      Showing you Exhibit 108, specifically, the

21     check for $80 from James Styers to Steve Hicks dated

22     December 1, 1989.  Is that your check?

23     A      Yes, it is.

24     Q      And that's the check you paid for the gun,

25     being Exhibit 138 that I just showed you?

```
 1          A      Yes, that was one of the guns.

 2          Q      There was more than one gun; correct?

 3          A      Yes, there is.

 4          Q      You already had a gun besides that, did you

 5     not?

 6          A      Yes, I did.

 7          Q      The guns that you had were, one of them was

 8     Exhibit 137, this chrome .22 revolver; is that correct?

 9          A      Let me see it better.

10          Q      No, I won't show it to you.

11          A      Let me see the handle.  No, that's, that's

12     the one I bought with it.

13          Q      So, this is your gun?

14          A      Doesn't really look like my gun.  No.

15          Q      You denying or admitting it's your gun?

16          A      If I could see it a little better I'd be

17     able to tell you.

18          Q      Do you see it?

19          A      Yes, that's my gun.  That's the one I bought

20     with the other one.

21          Q      You kept it in this brown sock?

22          A      Yes, I did.

23          Q      You kept it in your closet?

24          A      Yes, I did.

25          Q      You kept it in your closet as shown in
```

1    Exhibit 87, at the top shelf?

2          A     Yes.

3          Q     You kept it loaded as per Exhibit 141, is

4    that so?

5          A     I didn't have it loaded all the time, but I

6    did at that time, yes.

7          Q     You kept it loaded even though Christopher

8    Milke was in the house, as well as your daughter Wendy?

9          A     Yes, I did.

10         Q     And in addition, you owned Exhibit 136, this

11   gun and this holster.  Do you see it?

12         A     Yes, I do.

13         Q     Is this your gun?

14         A     Yes, it is.

15         Q     You also kept it in the top shelf of your

16   closet, is that so?

17         A     Yes, I did.

18         Q     You kept it as shown in Exhibit 86, is that

19   so?

20         A     Yes.

21         Q     In addition in your -- this is your closet

22   per 85, is it not?

23         A     Yes, it is.

24         Q     The guns were up here in the shelf; is that

25   correct?

```
1           A      Yes, it is.

2           Q      The clothing in your closet, besides yours,

3      are the clothing of Debra Milke's; is that correct?

4           A      Yes, they are.

5           Q      There was no room in the other closet in the

6      other room where she slept because the closet was full of

7      Gail's clothing, is that so?

8           A      It was Gail's, Wendy's and Christopher's

9      clothes in there.

10          Q      So, she had to put your clothes in your

11     bedroom closet?

12          A      Yes, she did.

13          Q      Along with her other things; is that

14     correct?

15          A      That's right.

16          Q      Showing you Exhibit 147, the .22 long rifle

17     Stinger ammunition, you've seen this before, have you

18     not?

19          A      I believe so.

20          Q      It was in the glove compartment of Debra

21     Milke's car; is that correct?

22          A      Is that the ones that were in it?

23          Q      You said you knew.

24          A      I don't know if those were in it or not.  I

25     had shells at the house too.
```

```
 1          Q      You knew however there were .22 CCI Stinger,

 2     box of Stinger ammunition in the glove box of the car?

 3          A      Yes, I do.

 4          Q      You put them in there?

 5          A      Yes, I did.

 6          Q      Or did Debra Milke put them --

 7          A      I put them there.

 8          Q      Who purchased them?

 9          A      I did.

10          Q      Or did Debra Milke?

11          A      I did.

12          Q      Did you together?

13          A      No.

14          Q      .22 Stinger CCI ammunition, you knew that to

15     be hypervelocity, did you not?

16          A      Yes, I did.

17          Q      Has more impact; correct?

18          A      Yes, it does.

19          Q      More killing power; correct?

20          A      Probably.

21          Q      Normally at your house you kept Super X long

22     rifle .22 ammunition, did you not?

23          A      No.

24          Q      You did not?

25          A      I had both there.
```

*LISA VITOFF, RPR*
*SUPERIOR COURT*

1     Q     Oh, you kept this Stinger ammunition there

2     as well?

3     A     Yes, I did.

4     Q     Where did you keep it?

5     A     Kept it with the guns.

6     Q     In your closet?

7     A     Yes.

8     Q     For what reason did you put it in the glove

9     compartment, knowing that Christopher Milke was going to

10    be going to see Santa Claus that day at Metrocenter?

11    A     Because they were going with the guns to

12    Roger's.

13    Q     Yes.  And you already testified on direct

14    examination, Mr. Styers, that according to you, Roger

15    Scott was careless with guns, shot at people, shot in the

16    alley, shot in an unsafe way, yet you took the gun on

17    that day, with Christopher Milke with you in the car, to

18    take the gun to Roger Scott.  Is that so?

19    A     Yes, that's right.

20    Q     And that if that's so, Mr. Styers, you claim

21    that you never went into the house of Roger Scott but

22    only stayed in the parking lot, you talked for a while,

23    he got in and you drove off; is that correct?

24    A     Yes, that's right.

25    Q     Yet you could have easily, according to your

*LISA VITOFF, RPR*
*SUPERIOR COURT*

1   version, have insisted, under these conditions, that he

2   take that gun into his house, but you forgot to mention

3   that, or what, Mr. Styers?

4        A    No, Roger wasn't drinking at the time, so he

5   was all right.

6        Q    So, it's perfectly all right to have the

7   gun, that you claim suddenly to give him that day for no

8   known reason, and also have the box of .22 Stinger

9   ammunition in the glove box; is that right?

10       A    No.

11       Q    But you did have the .22 Stinger ammunition

12   in the glove box, did you not?

13       A    Yes, I did.

14       Q    You testified on direct examination, Mr.

15   Styers, that when you got out of the car at the wash,

16   99th Avenue north of Happy Valley Road, that's where the

17   gun was in the glove box.

18       A    Yes.

19       Q    And the gun then was in the glove box per

20   Exhibit 74 and 75, with the Stinger ammunition?

21       A    Yes, it was.

22       Q    And the Stinger ammunition was covered up

23   with a -- this Cardinals child's logo shirt; correct?

24       A    Yes, it was.

25       Q    So, you knew then in the same glove box was

1    a gun and ammunition, and Christopher Milke, age four, in

2    the same car with Roger Scott, whom you claim to be

3    unsafe; is that correct?

4         A    No.   Roger Scott was safe at the time.

5         Q    Now he's safe?

6         A    He was at the time.

7         Q    When did he become safe, Mr. Styers?

8              MR. MIRANDA:   Objection, argumentative.

9              THE COURT:   Sustained.

10        Q    BY MR. LEVY:  Mr. Styers, on the way back

11   from the wash, it was you and Roger Styers in Debra's

12   car; is that correct?

13        A    Roger Scott, yes.

14        Q    Roger Scott was driving?

15        A    Yes.

16        Q    And the route back, I show you Exhibit 149,

17   was it down 99th Avenue to Union Hills and the freeway

18   then to Metrocenter?

19        A    I'm not sure of the route.

20        Q    Does that sound about right?

21        A    I don't know.

22        Q    And then Mr. Styers, Roger Scott driving, as

23   you say, with the gun in his lap, and you, I take it,

24   were riding in the passenger seat?

25        A    Yes.

1      Q      You did?   What year?

2      A      First year Alhambra opened up.

3      Q      What year?

4      A      I have no idea.

5      Q      And you knew him ever since, Roger Scott?

6      A      Off and on.

7      Q      Did you know, Mr. Styers, in that -- in --

8   during November -- well, let's put it this way, rephrase

9   it.  I believe you testified on direct with regard to

10  Exhibit 124, for example, you were asked about Alden

11  Insurance benefits, and you said that you went over with

12  Debra Milke the benefits, including the 5,000 insurance

13  policy on Christopher; is that so?

14     A      Yes.

15     Q      Did you go through a booklet like this?

16     A      Yes, we did.

17     Q      And did you go through the forms?

18     A      No, I didn't go through the forms.

19     Q      And was it your understanding that she was

20  going to apply for a 5,000 policy for Chris?

21     A      Yes.

22     Q      Did he -- did she tell you that she did

23  later and he was insured?

24     A      Yes.

25     Q      So, I take it, while you were talking with

1    her then you must have known, by looking at the booklet,

2    that she was the beneficiary?

3          A     Yes.

4          Q     Did she have other conversations with you,

5    Mr. Styers, about Mark Milke?

6          A     What do you mean?

7          Q     Well, for example, did she ever share with

8    you the thoughts that she never wanted Christopher to

9    grow up to be like his father, Mark Milke?

10         A     Yes, she did.

11         Q     Then I believe you testified on direct that

12   when Mark Milke had visitation with the child, when he

13   came back that he misbehaved and you had to discipline

14   him?

15         A     Yes.

16         Q     Did she have other conversations with you

17   about things that bothered her, that affected her life?

18         A     Yes, she did.

19         Q     Would that include the conversations about

20   Ernie Sweat?

21         A     Yes, it did.

22         Q     Besides knowing that they were going

23   together, were you aware, during the month of November,

24   Mr. Styers, that Ernie Sweat was distancing himself from

25   her and she couldn't reach him?

1      A      No, I was not.

2      Q      She never shared with you that the romance

3    was -- looked like it was maybe breaking up?

4      A      No, she did not.

5      Q      Did you -- you knew Mark Milke was leaving

6    for Texas about a week or so before the weekend of

7    December 2nd, did you not?

8      A      Yes, I did.

9      Q      And were you aware that Debra Milke had

10   tried to have, for example, her sister, Sandra

11   Pickinpaugh, take Christopher Milke?

12     A      Yes, I was.

13     Q      And you were aware that Debra Milke was

14   going to be moving to another apartment?

15     A      Yes.

16     Q      Effective January 1990?

17     A      Yes.

18     Q      Now, Christopher Milke, how old was he, to

19   your recollection, in November of '89?

20     A      Four years old.

21     Q      Now, he was growing up to be a lot like his

22   father; is that so?

23     A      Somewhat.

24     Q      And he was getting hard to handle?

25     A      Yes.

1       Q       And he slept in the bed with Debra Milke?

2       A       Yes.

3       Q       Another thing, Mr. Styers, John Ciulla said

4    that one time you told him that you tried to get in bed

5    with Debra Milke but she kicked you out.  Is that what

6    you said?

7       A       Yes.  We were clowning around.

8       Q       And, but otherwise Christopher Milke slept

9    in the bed with her?

10      A       Yes.

11      Q       You always had to take care of Christopher

12   Milke?

13      A       Not always, most of the time.

14      Q       Most of the time.  And he was getting more

15   and more difficult to handle?

16      A       No.  He was starting to straighten out a

17   little bit.

18      Q       Well, Mr. Styers, about that time, did Debra

19   Milke share with you that Christopher Milke was getting

20   to be a real problem and he was in the way of her having

21   a further romance with Ernie Sweat?

22      A       No, she did not.

23      Q       But you were aware that Christopher Milke

24   nevertheless was -- gave you problems, and that you had

25   to discipline him quite a bit?

1        A      He gave problems.  At times he had to be

2    disciplined.

3        Q      Well, Mr. Styers, about that time of the

4    weekend of December 2, 1989, if Mark Milke was out of

5    state, and if the romance between Debra and Ernie Sweat

6    was going bad, Christopher Milke was in the way, and you

7    wanted Debra Milke, Christopher Milke slept in her bed,

8    and you knew she was moving out, wasn't that a real

9    opportune time for you to then take the child out and

10   shoot him to death?

11       A      No, it was not.

12       Q      It was not an opportune time?

13       A      I didn't do it.  I never really thought of

14   doing it.

15       Q      You never saw anyone do it, did you?

16       A      No, I did not.

17       Q      And you never went to help Christopher?

18       A      No, I did not.

19       Q      You just left Christopher out there and went

20   back to Metrocenter with Roger Scott?

21       A      That's right.

22       Q      And you told the police all of these stories

23   for two days, Saturday and Sunday, is that so?

24       A      I told a lot of stories.

25       Q      And where did you think Christopher was, as

1    take it a.m. -- witnessed by Detective Mills, for consent

2    to search the '86 Toyota, white Toyota.

3              If it was unlocked, do you have any -- if it

4    was unlocked, do you have any reason that you needed to

5    give a consent search, insofar as in your own mind?

6              MR. MIRANDA:   Your Honor, this calls for a

7    legal conclusion on the witness, also misleading as to

8    the form that it's asked it.

9              THE COURT:   Sustained.

10        Q    BY MR. LEVY:  You do recollect the testimony

11   of Officer Lee, if you do, when he said when he checked

12   the car in the early morning hours in the parking lot it

13   was locked?

14        A    No, I don't remember that.

15        Q    Just briefly, pardon me for doing this,

16   Mr. Styers, going back to that situation with Ernie, I

17   happen to turn to a note here, I believe on direct

18   examination you said that you were aware of the problem

19   Debra was having with Ernie about having Chris around.   I

20   believe you further testified that Ernie did not want her

21   son around and he didn't want children.  You were aware

22   of those problems after all?

23        A    No.

24        Q    Mr. Styers, I believe you testified that

25   Roger Scott wanted $250 to pay an attorney as an advance

1      on presenting some kind of Social Security claim?

2              A      That's right.

3              Q      I believe you also testified that according

4      to you, Roger Scott shot Christopher?

5              A      Yes.

6              Q      Tell me, Mr. Styers, was it somehow or

7      another Roger shooting Christopher going to somehow or

8      another get him $250?

9              A      I don't know.

10             Q      Are you then -- you have no idea, while

11     saying that Roger Scott shot Christopher, you have no

12     idea in the world why this would have been?

13             A      That's right.

14             Q      You don't even know if he shot Christopher?

15             A      Not for sure.

16             Q      Did you happen in the wash to see the

17     shrubbery and the trees, and did you happen to see any

18     Vietnamese children or women perhaps in the wash?

19             A      No, I did not.

20             Q      Well, perhaps you could tell us, what all

21     you did see?

22             A      I saw shrubbery.

23             Q      Anything else?

24             A      Just the stuff that's there, trees and

25     shrubbery and that's it.

1      A      Yes, I do.

2      Q      Did you have or do you have a clear

3  recollection of everything that happened on December 2nd,

4  1989?

5      A      No, I do not.

6      Q      How would you characterize your memory of

7  the events of December 2nd, 1989?

8      A      Cloudy.

9      Q      When you went to the area of 99th Avenue and

10  Happy Valley Road, Jim, did you go there for the specific

11  purpose of stopping at that wash?

12      A      No, I did not.

13      Q      Why were you in that area?

14      A      Because it's a road on the way out to the

15  lake.

16      Q      And what's at the lake?

17      A      Out near the lake is a glider school.

18      Q      And whose idea was it to stop at that

19  particular location?

20      A      It was Roger's.

21      Q      Did you suggest, in any way, shape or form,

22  that you stop at that particular location?

23      A      No, I did not.

24      Q      You knew the gun was in the glove

25  compartment?

1       A     Yes, I did.

2       Q     Did you know that the ammunition was also in

3   the glove compartment?

4       A     Yes, I did.

5       Q     Did you know the gun was loaded?

6       A     No, I did not.

7       Q     When was the first time that you saw that

8   gun outside that vehicle?

9       A     When Roger pointed it at me.

10      Q     Did you know how Roger got the gun out of

11  the glove compartment?

12      A     No, I do not.

13      Q     Were you watching Roger constantly?

14      A     No, I was not.

15      Q     Did you expect Roger to do anything like

16  this to --

17      A     No.

18      Q     -- to Christopher?

19      A     No, I did not.

20      Q     Were you expecting anything to happen out

21  there?

22      A     No, I do not.

23      Q     This gun that you put in the glove

24  compartment, and you did put in the glove compartment; is

25  that right?

154

```
 1        A      Yes, I did.

 2        Q      You bought that gun in late November?

 3        A      Yes, I did.

 4        Q      And you hadn't driven over to Roger's to

 5   drop it off?

 6        A      No, I did not.

 7        Q      You had discussed the fact that you had a

 8   gun that you had bought for him with Roger?

 9        A      Yes, I did.

10        Q      And you bought the gun for Roger because he

11   liked guns?

12        A      Yes, I did.

13        Q      Now, these letters that we're talking about,

14   that we went over in detail yesterday, Jim, do you recall

15   those letters?

16        A      Yes, I do.

17        Q      When you wrote those letters, did you know

18   Debra was going to give them to her attorney?

19        A      No, I did not.

20        Q      Mr. Levy asked you whether Debra asked for

21   your consent to give them to her attorney?

22        A      Yes, she did.

23        Q      Did you -- did she ask for that consent

24   before or after you wrote those letters?

25        A      After I wrote the letters.
```

155

```
 1          Q     So, she -- what happened was, she didn't ask
 2     you, can I turn over some letters to my attorney; right?
 3          A     No, she doesn't, she couldn't have.
 4          Q     Do you know how those black Nike shoes got
 5     into the planter?
 6          A     No, I do not.
 7          Q     You know they were found in the planter out
 8     by Metrocenter?
 9          A     I know they were found at the Metrocenter,
10     yeah.
11          Q     Did you ever tell Roger Scott to take the
12     pistol, that he shot Christopher with, to his apartment?
13          A     No, I did not.
14          Q     Did you know whatever happened to that
15     pistol?
16          A     No, I don't.
17          Q     Jim, are you taking medications now?
18          A     Yes, I am.
19          Q     Are you taking them on the basis -- on a
20     prescribed basis?
21          A     Yes, I am.
22          Q     You indicated that after Roger shot
23     Christopher, and you assumed that he shot Christopher;
24     right?
25          A     Right.
```

159

1     A      On the weekends there is, yes.

2     Q      Why?

3     A      Because it's on the way to the lake.

4     Q      Now, Mr. Levy asked you, well, in fact, I

5     asked you also about the $5,000 insurance policy.  Do you

6     remember those questions?

7     A      Yeah, I remember some questions.

8     Q      Yesterday, and again today, you admitted to

9     not only knowing about that insurance policy, but that

10    you actually sat down with Debra Milke and went over the

11    benefits booklet before she applied or requested the

12    insurance life insurance coverage?

13    A      Yes.

14    Q      You knew before you testified to that that

15    the theory, one of the theories of the State is that you

16    participated in the conspiracy to kill Mark Milke for

17    that insurance policy?

18    A      To kill Mark Milke?

19    Q      Excuse me, Christopher Milke.

20    A      Restate the question.

21    Q      Okay.  You knew, before you testified, that

22    one of the theories of the state was that you

23    participated in the conspiracy to kill Christopher Milke?

24    A      Yes.

25    Q      For the $5,000 insurance policy?

1      A      Yes.

2      Q      And yet you admitted to the jury that you

3      were aware of that policy?

4      A      Yes.

5      Q      Why?

6      A      Because I knew it it was the truth.

7      Q      Were you having financial problems?

8      A      Not real difficult ones, no.

9      Q      Why don't you tell me what you consider not

10     real ones.  What kind of financial problems were you

11     having?

12     A      I had a couple bad checks and my car was

13     down.  I had some bad checks and my car was down, but I

14     had the money coming in within the month or so to fix the

15     car up.

16     Q      When were your checks going to come in?

17     A      When were they going to come in?

18     Q      Yes.

19     A      They had already come in.

20     Q      On December 2nd the checks were already

21     there?

22     A      Yes.

23     Q      On December 2nd, did you have money in your

24     account?

25     A      Little bit, yes.

1          Q      And had you paid your expenses for that

2    month?

3          A      Yes.

4          Q      Had you taken care of the problems with

5    Security Pacific?

6          A      Not yet.

7          Q      Did you have plans to do that?

8          A      Yes, they were going to be taken care of in

9    a couple of months.

10          Q      This morning you indicated that Debra told

11    you she didn't want to have Christopher Milke grow up to

12    be like his father Mark Milke?

13          A      That's right.

14          Q      Did she ever indicate to you that because of

15    that, she wanted Christopher dead?

16          A      No, she never did.

17          Q      Did she ever indicate to you that she would

18    rather have Christopher Milke dead, rather than grow up

19    to be like his father?

20          A      No, she never did.

21          Q      Christopher Milke was hard to handle?

22          A      At times.

23          Q      You indicated this morning that he was

24    improving?

25          A      Yes, he was.

1    Q    How was he improving?

2    A    Well, he wasn't going to his dad's as often,

3    and he was starting to listen a little bit more.

4    Q    Had there been a recent court hearing in

5    regards to the custody of Christopher?

6    A    Yes, there was.

7    Q    Do you remember when that occurred?

8    A    No, I do not.

9    Q    Was it after that hearing that Mark Milke

10   started seeing less of his son?

11   A    Yes.

12   Q    How did you get along with Mark Milke?

13   A    We got along all right.

14   Q    But apparently Debra Milke didn't?

15   A    Not too well.

16   Q    Mr. Levy asked you a series of questions

17   this morning about what time you were at different places

18   on December 2nd of 1989.  Do you recall any time?

19   A    Not really.

20   Q    Did you look at your watch?

21   A    I might have.

22   Q    Did you have a watch throughout this day?

23   A    Yes, I did.

24   Q    Was there any reason for you to look at your

25   watch throughout the day to keep track of where you were

164

1              MR. MIRANDA:  Strike that question.

2              Your Honor, I don't believe I have any more

3     questions of this witness.

4              THE COURT:   Thank you, sir.  You may step

5     down.  Watch your step, please.  Take the noon recess.

6     Do you have any other witnesses?

7              MR. MIRANDA:   I believe some short ones

8     this afternoon, your Honor.

9

10

11                         *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## REPLY TO SUBPOENA / COURT ORDER

DATE   SEP 1 4 1990

Re: *Styers, James Lynn U.S. Marine Corps 2360917*

Date of Subpoena/Order    Case/File Number    Issuing Judge

*7/17/90*    *CR 89-12631*    *Peter T. D'Angelo*

Plaintiff    Defendant

*State of Arizona*    *James Styers*

THE REPLY TO THE INQUIRY WILL BE FOUND IN THE CHECKED ITEM(S). IF IT IS NECESSARY TO **WRITE** TO US  AGAIN CONCERNING THIS SUBJECT, PLEASE RETURN ALL PAPERS TO THIS CENTER.

[X] Enclosed is a certificate under seal authenticating copies of the military [X] personnel   [ ] medical records of the individual named above.

[ ] Enclosed is a certificate under seal attesting to the presence/absence of certain information in the military records of the individual named above.

[ ] Enclosed is a certificate under seal attesting to the absence of records for the individual named above.

[ ] We regret some of the copies are of poor quality;  however, they are the best copies obtainable.

[ ] The copies of the enclosed military records contain the names of and certain personal information relating to individuals other than the veteran named in the court order.  Under the Privacy Act of 1974, such personal information should be safeguarded.  Further release of this information should be in accordance with the rules and regulations implementing the Privacy Act of 1974.

[ ] The enclosed authenticated military records contain drug/alcohol rehabilitation records which are furnished with the understanding that the court order/subpoena signed by a judge was issued upon application showing good cause therefor, i.e.,  that the court has weighed the public interest and considered the provisions of the Drug Abuse Office and Treatment Act of 1972 (P.L. 92-255).  The confidential nature of the records is protected under the provisions of the Act, regardless of whether the serviceperson successfully completed the REHABILITATION TREATMENT program or NOT.

[ ] Some of the information contained in these records may prove injurious to the physical or mental health of the subject individual if released to him/her; therefore, appropriate measures should be taken to ensure that it is not disclosed to the individual except to the extent that such disclosure be essential to the issues of the pending proceedings.

[ ] The military record needed to answer this inquiry is not in our files.  If the record were here on July 12, 1973, it would have been in the area that suffered the most damage in the fire on that date and may have been destroyed.

[ ] Enclosed are copies of the service and medical records which were obtained from an alternate records source.

[ ] The enclosed NA Form 13038  Certification of Military Service, verifies the military service and may be used for any official purpose.  Information used to prepare this document was obtained from an alternate records source.

[ ] The medical records needed to answer this request have been lent to the Veterans Administration under claim number _____ , and may be obtained from the office shown below.

[ ]

Enclosures

*Thomas Buckner*
*Maricopa County Attorneys Office*
*111 W. Monroe Suite 1800*
*Phoenix, AZ. 85003*

NCPM N

*RM Schrader*
RICHARD M. SCHRADER
Chief, Navy Reference Branch

NATIONAL PERSONNEL RECORDS CENTER
(Military Personnel Records)
9700 Page Boulevard
St. Louis, MO  63132

NA FORM 13122 (12-85)

Former GSA Form 7149

# NATIONAL PERSONNEL RECORDS CENTER

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### ST. LOUIS, MISSOURI

### ADMISSIBILITY IN EVIDENCE OF COPIES OF RECORDS AUTHENTICATED BY THE

### NATIONAL PERSONNEL RECORDS CENTER

1. **GENERAL.** The Archivist of the United States (hereinafter called the "Archivist"), appointed by the President of the United States with the advice and consent of the Senate, is the head of the National Archives and Records Administration. *(Ref.: 44 U.S.C. 2103(a))*

2. **AUTHORITY FOR THE NATIONAL PERSONNEL RECORDS CENTER TO MAINTAIN AND SERVICE RECORDS.**

   a. The Archivist, maintains and operates the National Personnel Records Center (hereinafter referred to as "NPRC" or "this center") for the storage and servicing of certain records. *(Ref.: 44 U.S.C. 2907.)*

   b. The records on file at NPRC were transferred, for reasons of substantial economy, to this center for storage and servicing. *(Ref.: 44 U.S.C. 3103.)*

3. **AUTHORITY FOR NPRC TO HONOR LEGAL DEMANDS.** This center is authorized to honor legal demands for protection of records on file here if no restrictions have been imposed upon their use by the transferring agency. If restrictions have been imposed by the transferring agency, the authority issuing the legal demand is to be so notified and asked to take the matter up with that agency. *(Ref.: 36 CFR 1254.9.)*

4. **AUTHORITY FOR NPRC OFFICIALS TO AUTHENTICATE COPIES OF RECORDS.** 36 CFR 1254.76 authorizes the responsible director, or any of his superiors, to authenticate and attest copies of records on deposit in Federal records centers. The word "director," as it applies to NPRC, is defined in 36 CFR 1252.2 to mean, in part, the "head of a Reference Service Branch in a Federal Records Center." The Reference Branches, NPRC, are Reference Service Branches. The NPRC is a Federal Records Center *(Ref.: 36 CFR 1228.150)*. Consequently, the Chiefs of the Reference Branches, NPRC, are the "heads of Reference Service Branches in a Federal Records Center" and therefore are "directors." The Assistant Directors, NPRC, and the Director, NPRC, are the superiors of the Chiefs of the Reference Branches, NPRC, and therefore are "superiors of directors."

5. **ADMISSIBILITY OF RECORDS AUTHENTICATED BY NPRC OFFICIALS.** Government records are not admissible in legal proceedings until authenticated by the offering party. Records which meet the requirements of Rule 902 of the Federal Rules of Evidence, 28 U.S.C. Appendix, are self-authenticating. Satisfaction of the Rule 902 requirements is sufficient also to satisfy other Federal evidentiary requirements for proof of official records. *(Ref.: Fed. R. Civ. P. 44(a), (c) (1982); Fed. R. Crim. P. 27 (1982).)*

   In order to comply with Rule 902, authorized NPRC officials should certify, under seal of the National Archives and Records Administration, all subpoenaed records. The seal certifies that the attesting official is authorized to authenticate records; the signature of the official attests to the authenticity of the records in his legal custody.

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION
### National Personnel Records Center

# 𝔗𝔬 𝔴𝔥𝔬𝔪 𝔱𝔥𝔢𝔰𝔢 𝔭𝔯𝔢𝔰𝔢𝔫𝔱𝔰 𝔰𝔥𝔞𝔩𝔩 𝔠𝔬𝔪𝔢. 𝔊𝔯𝔢𝔢𝔱𝔦𝔫𝔤:

By          f the authority vested in me by the Archivist of the United States, I certify on his behalf,
unde          f the National Archives and Records Administration, that the attached reproduction(s) is
a tru     d      ct copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *R M Schrader* | |
| NAME | DATE |
| RICHARD M. SCHRADER | SEP 1 4 1990 |
| TITLE | |
| Chief, Navy Reference Branch | |
| NAME AND ADDRESS OF DEPOSITORY | |
| National Personnel Records Center (Military Personnel Records) 9700 Page Boulevard St. Louis, MO 63132 | |

NA FORM 13040-B (9-85)




**UNITED STATES MARINE CORPS**
ENLISTMENT CONTRACT AND RECORD

MCRC 11R(7)-PD (REV. 10-43)

4Mar67-AFQT-7-44

| NAME (Last, First, Middle) 1 | TERM OF ACDU 2 (USMCR Only) | SERVICE NO. 3 | INITIALS 4 |
|---|---|---|---|
| STYERS, James Lynn | 00 MONTHS | 2360927 | SJL |
| HOME OF RECORD 5 | DATE OF RANK 6 | GRADE APPOINTED 7 OR REAPPOINTED | PRIMARY MOS 8 | SEX 9 |
| 4514 W. Thomas Rd., Phoenix, Maricopa, Arizona 85031 | 67 Apr 24 | Private | 9900 | Male |
| PLACE OF BIRTH 10 | DATE OF BIRTH 11 | COMPONENT/CLASS 12 | CONTRACT LIMITATION 13 | RACE 14 |
| New Castle, Lawrence, Pennsylvania | 47 Sept 03 | USMCR(σ) | None | Caucasian |
| ENLISTED AT 15 | DATE OF ENLISTMENT 16 | LENGTH OF ENLISTMENT 17 | PROGRAM ENLISTED FOR 18 | CITIZENSHIP 19 |
| Phoenix, Maricopa, Arizona | 67 Apr 24 | 6 Years | None | U.S. |
| TRANSFERRED TO 20 | EST DATE ARRIVAL 21 | ACTIVITY CODE 22 | PULHES 23 | RELIGION 24 |
| CL III SPL VOL RESERVE 12th MCD SFran, California | N/A | N/A | 111121 B | NO. PREF. |
| RECRUITING OFFICER 25 | DATE LAST DIS/REL FR ACDU 26 | 27 | FOR DPI USE ONLY 28 | 29 |
| LINGENFELTER W. M., CAPTAIN | N/A | | | |

PRIOR SERVICE

| 30 | DATE ENLISTED 31 | DATE DISCHARGED 33 | NUMBER OF DAYS TIME LOST 33 | 34 |
|---|---|---|---|---|
| NONE CLAIMED | | | | |

**SR DISCHARGED** 1Mar67 **COFG**
**TO ENL REG MC**

DO NOT FAIL TO COMPLETE AND SIGN REVERSE SIDE OF CONTRACT
(Over)

35. For and in consideration of the pay or wages due in the grades which may from time to time be assigned me during the continuance of my service, I do hereby acknowledge to have voluntarily enlisted in the: _____ (Check one)

☐ UNITED STATES MARINE CORPS   ☒ RESERVE OF THE UNITED STATES MARINE CORPS

as a private, and I agree to and with the Recruiting Officer (named in block 25 of reverse hereof), an officer of the United States Marine Corps as follows:

36. To enter the service of the United States Marine Corps and to report to such post or station of the Marine Corps as I may be ordered to join, and to the utmost of my power and ability discharge my several services or duties and be in everything conformable and obedient to the several requirements and lawful commands of the officers who may be placed over me.

37. I oblige and subject myself to serve | WORD  FOUR YEARS | FIGURE 6 YEARS | *(Word and figure to be in applicant's handwriting.)*
unless sooner discharged, by proper authority and/or the conditions provided by Section 5540 of Title 10 of the U.S. Code as follows:

(a) The senior officer present afloat in foreign waters shall send to the United States by Government or other transportation as soon as possible each enlisted member of the naval service who is serving on a naval vessel, whose term of enlistment has expired, and who desires to return to the United States. However, when the senior officer present afloat considers it essential to the public interest, he may retain such a member on active duty until the vessel returns to the United States.

(b) Each member retained under this section
(1) shall be discharged not later than 30 days after his arrival in the United States; and
(2) except in time of war is entitled to an increase in basic pay of 25 percent.

38. In the event of war or national emergency declared by the President to exist during my term of service, I oblige and subject myself to serve until 6 months after the end of that war or national emergency if so required by the Secretary of the Navy unless I voluntarily reenlist or extend my enlistment. I understand that when so retained the addition of one-quarter pay as specified in Section 5540 of Title 10 of the U.S. Code is not applicable in time of war.

39. I am of legal age to enlist; I have never been found guilty of a crime except as stated by me to the recruiting officer; I have never deserted from any of the Armed Forces of the United States, and have never been discharged therefrom for any reason other than recorded herein.

40. I understand that upon enlistment in the Reserve of the United States Marine Corps, or upon transfer or assignment thereto, I may not be ordered to active duty without my consent except in time of war, or when in the opinion of the President a national emergency exists, or when otherwise prescribed by law, and that I may be required to perform active duty during such periods.

41. I HAVE HAD THIS CONTRACT FULLY EXPLAINED TO ME. I UNDERSTAND IT, AND CERTIFY THAT NO PROMISE OF ANY KIND HAS BEEN MADE TO ME CONCERNING ASSIGNMENT TO DUTY, OR PROMOTION DURING MY ENLISTMENT.

42. I, JAMES LYNN STYERS do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice. So help me God.

SIGNATURE _James_ _Lynn_ _Styers_
(First name) (Middle name) (Last name)

Subscribed and sworn to before me this 24th day of April A.D. 1967

SIGNATURE AND RANK OF RECRUITING OFFICER _____, CAPTAIN, USMC.

STATEMENT OF UNDERSTANDING UPON ENLISTMENT IN MARINE CORPS OR MARINE CORPS RESERVE
NAVMC 10479-PD (REV. 12-61)
PREVIOUS EDITION IS OBSOLETE AND WILL NOT BE USED.

## STATEMENT OF UNDERSTANDING OF MILITARY OBLIGATIONS ASSUMED BY ME UPON MY ENLISTMENT IN THE MARINE CORPS OR MARINE CORPS RESERVE

Place: MCRS, Phoenix, Arizona

Date: 24 Apr 1967

I, JAMES LYNN STYERS , being an applicant for enlistment in the Marine Corps (Reserve), hereby state that there has been explained to me and that I fully understand that upon my enlistment I shall assume the obligations and responsibilities stated herein:

a. That upon my enlistment I assumed a total 6-year military obligation. Any portion of that 6-year period not served on active duty must be served as a member of the Marine Corps Reserve (unless I am sooner discharged by competent authority).

b. That upon my becoming a member of the Reserve (either by enlistment therein or transfer thereto from the regular Marine Corps) I will be placed in the Ready Reserve.

c. That as a member of the Ready Reserve I may be required (1) to participate in not less than 48 scheduled drills or training periods and to perform not more than 17 days of active duty for training during each year, or, (2) perform annually not more than 30 days of active duty for training. If I fail to perform satisfactorily one or the other of the above in any year, I may be ordered, without my consent, to perform additional active duty for training for not more than 45 days. After this provision has once been invoked and my participation remains unsatisfactory, I may be subject to the priority induction features of the UMT&SA, as amended.

d. That, except in time of war or national emergency, I will be transferred to the Standby Reserve upon my request if I am not serving on active duty and if my active duty service, plus satisfactory service, in the Ready Reserve totals not less than 5 years; and that, as a member of the Standby Reserve, I will not be subject to the reserve training requirements stated herein.

e. That as a member of the Ready Reserve I will be liable for involuntary call to active duty in time of future national emergency proclaimed by the President of the United States and may be required to serve for not more than 24 months; and that in time of national emergency or war declared by the Congress of the United States, I may be required to serve for the duration of that national emergency or war and for 6 months thereafter.

f. That as a member of the Standby Reserve, I will be liable for involuntary call to active duty ONLY in time of war or national emergency declared by the Congress of the United States.

James Lynn Styers

JAMES LYNN STYERS
(Signature of applicant)