Michael D. Kimerer, #002492
Lori L. Voepel, #015342
Kimerer & Derrick, P.C.
221 East Indianola Avenue
Phoenix, Arizona 85012
Telephone: 602/279-5900
Facsimile: 602/264-5566
Attorneys for Petitioner

FILED_____ LODGED_____
RECEIVED X____ COPY_____

2002 JUN 11  PM 6: 44

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

07-99001

| | | |
|---|---|---|
| DEBRA JEAN MILKE, | ) | No. CV-98-0060-PHX-RCB |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TERRY STEWART, et al., | ) | |
| | ) | |
| Respondent. | ) | |

## EXHIBITS TO PETITIONER'S
## BRIEF ON THE MERITS

## VOLUME II
## (EXHIBITS 12-15)



LIST OF EXHIBITS

1.   SOCIAL HISTORY

2.   DR. DAVID BIEGAN'S REPORT

3.   AFFIDAVIT OF RENATE JANKA

4.   AFFIDAVIT #1 OF KIRK FOWLER

5.   AFFIDAVIT OF BAERBEL JACKS

6.   INTERVIEW OF SANDRA PICKINPAUGH BY SALDATE

7.   ORDER OF PROTECTION

8.   MEDICAL RECORDS OF CHRISTOPHER MILKE

9.   AFFIDAVIT OF DR. KEVIN ZUERLEIN

10.  EXCERPTS OF JIM STYERS' TRIAL TESTIMONY

11.  MILITARY RECORDS OF JIM STYERS

12.  EXCERPTS OF ROGER SCOTT'S TRIAL TRANSCRIPTS

13.  PRESENTENCE REPORT OF ROGER SCOTT

14.  DR. TATRO'S EVALUATION OF ROGER SCOTT

15.  SALDATE RESEARCH

16.  REDACTED LETTERS FROM JIM STYERS TO DEBRA MILKE

17.  EXCERPTS OF INTERVIEW OF GAIL LIPSHULTZ

18.  DEBRA MILKE'S EMPLOYEE BENEFITS SELECTION FORM FOR JOHN ALDEN INSURANCE

19.  DEBRA'S APPLICATION FOR EMPLOYEE BENEFITS FROM LINCOLN NATIONAL

20.  EXCERPTS OF TRANSCRIPTS RE: JIM STYERS' AND ROGER SCOTT'S KNOWLEDGE OF DEBRA'S EMPLOYMENT BENEFITS PLAN

21.  DEBRA'S APARTMENT RENTAL APPLICATION

22.  SELECT ROGER SCOTT HABEAS EXHIBITS

23.   SUPPLEMENTAL REPORT OF ROGER SCOTT BY DETECTIVE MILLS

24.   DETECTIVE SALDATE'S SUPPLEMENTAL REPORT OF DEBRA MILKE

25.   MINUTE ENTRY DATED 1/18/91

26.   ORDER DATED 11/18/96

27.   NEW TIMES ARTICLE

28.   PROFESSOR RICHARD LEO'S REPORT

29.   PHOENIX POLICE DEPARTMENT INTERROGATION POLICIES AND
      PROCEDURES

30.   DETECTIVE SALDATE'S SUPPLEMENTAL REPORT OF SANDRA
      PICKINPAUGH INTERVIEW

31.   SALDATE'S SEPARATION NOTICE

32.   SALDATE'S PRETRIAL INTERVIEW

33.   EXCERPTS OF ROGER SCOTT'S HABEAS CORPUS PETITION

34.   AFFIDAVIT OF DR. TATRO

35.   AFFIDAVIT OF ROLAND STEINLE

36.   KIRK FOWLER SWORN STATEMENT TO TERRY CAPOZZI

37.   EXCERPTS FROM INBAU & REID

38.   AFFIDAVIT OF PAUL HUEBEL

39.   AFFIDAVITS OF LAW ENFORCEMENT EXPERTS

40.   AFFIDAVIT OF ANDERS ROSENQUIST

41.   LIST OF SALDATE'S INCONSISTENCIES AND DISCREPANCIES

42.   AFFIDAVIT OF KIRK FOWLER (SADEIK)

43.   AFFIDAVIT OF KIRK FOWLER (PICKINPAUGH)

44.   EXCERPTS OF ERNIE SWEAT'S PRETRIAL INTERVIEW

45.   EXCERPTS OF ERNIE SWEAT'S TRIAL TESTIMONY

46.   EXCERPTS OF HENRY MILKE INTERVIEW

47.   JAMES STYERS' LETTERS TO JUDITH RADALOVIC AND "OLGA"

48.   AFFIDAVIT OF KEN RAY

49.   MINUTE ENTRY DATED 2/13/90

50.   DEBRA MILKE LETTER TO DEFENSE COUNSEL

51.   AFFIDAVIT OF PATRICIA (BACON) PRUST

52.   AFFIDAVIT OF KIRK FOWLER (MARKWELL)

53.   MOTION FOR SANCTIONS

54.   AFFIDAVIT OF CHARLES JONES

55.   AFFIDAVIT OF DONALD AND JOSEPHINE JONES

56.   AFFIDAVIT OF ALEX JANKA

57.   AFFIDAVIT OF DEBRA MILKE

58.   DEBRA MILKE'S MEDICAL RECORDS

59.   DEBRA MILKE'S ELEMENTARY SCHOOL RECORDS

60.   DEBRA MILKE'S COLLEGE RECORDS

61.   SUBPOENA DUCES TECUM

62.   EXCERPT OF TESTIMONY RE: DISCOVERY REQUEST

63.   MOTION TO QUASH

64.   MINUTE ENTRIES DATED 9/24/90 & 10/1/90

65.   AFFIDAVIT OF MARIA PULVER

66.   AFFIDAVIT OF ROBERT CHERMAK

67.   MOTION TO SUPPRESS

68.   MINUTE ENTRY DATED 10/12/90

69.   ORDER TO SHOW CAUSE

70.   AFFIDAVIT OF DR. GARCIA

71.   MOTION TO APPOINT ASSOCIATE COUNSEL

72.   MINUTE ENTRY DATED 11/9/90

73.   MOTIONS TO CONTINUE MITIGATION HEARING

74.   APPLICATION FOR TRANSPORTATION AND LODGING

75.   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES RE: SENTENCING

76.   EXCERPT OF TRANSCRIPT RE: JUROR MOQUINO

77.   JURY LIST

78.   JUROR MOQUINO'S QUESTIONARE

(11)

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,    )
                         )
          Plaintiff,     )
                         )
     vs.                 )
                         )
ROGER MARK SCOTT,        )
                         )
          Defendant.     )
_____)

CIV '97   1554 PHX PGR

No. CR 89-12631

Jury Trial. CR-91-0124-AP

FILED

JUDITH ALLEN, CLERK
BY
DEP.
JUN 25 PM 12:
FILED

FILED
JUN 27 1991
NOEL K. DESSAINT
CLERK SUPREME COURT

Phoenix, Arizona

January 31, 1991

___ FILED   ___ LODGED
_X_ RECEIVED ___ COPY

APR 2 0 1999

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

BEFORE:  The Hon. David R. Cole, Judge

APPEARANCES:

     Noel Levy, Deputy County Attorney,
     appearing for the Plaintiff;

     Roland Steinle and William Foreman,
     Assistants Public Defender,
     appearing for the Defendant.

APPEAL TRANSCRIPT

     George G. Silbernagel
     RPR & Official Court Reporter
     Maricopa County Superior Court
     Phoenix, Arizona  85003

DISCOVERY AND CONFIDENTIAL MATERIAL

I_N_D_E_X

Witness                                                    Page

1.   MARK HENRY MILKE

          Direct by Mr. Steinle                            13

2.   ROGER MARK SCOTT

          Direct by Mr. Steinle                            20
          Cross by Mr. Levy                                63

15

50

1  and he was looked like he was almost getting ready to

2  point towards his apartment.  And I thought "Now, what

3  are you trying to pull?"

4         And so that's when I turned

5  seventy-year-old Phil into a high school friend -- well,

6  not a friend, somebody I had known from Alhambra High

7  School.

8         Q    After coming back from Metrocenter, what

9  did you do the rest of the evening?

10        A    After I got home?

11        Q    Yes.

12        A    I stayed around the house.  I tried to stay

13  busy in the kitchen and walking around the house, acting

14  like I was dizzy.  My mother was watching TV, and I -- I

15  just couldn't face it without telling everybody what

16  happened, and that it would be probably too much for

17  her.

18        Q    Did you eat dinner that night?

19        A    No.

20        Q    What time did you turn in and go to sleep?

21        A    I believe it was 12:30, maybe 1:00 o'clock.

22        It was -- it wasn't long before Jim

23  brought the detectives.  I had thought that maybe if I

24  turn in, she'd decide that she was tired.  And if I

25  could leave her a note and go down to the police station

51

1   at Washington and Seventh Avenue, I figured it would be

2   a lot better if I went to them.  But Jim had brought the

3   detective over.

4        Q    Okay.

5        A    I later, then, proceeded to get ready to go

6   down and leave the note.  I -- she was getting ready to

7   go to bed, and the detective came back in a short time

8   and he asked me to come back to Metrocenter, and then he

9   would take me down to the station on Seventh Avenue and

10  Washington and asked me just to sign a paper stating

11  that I would sign -- that I would agree to a lie

12  detector test at a later date, and then he would return

13  me home.

14       Q    You went down to the station, did you not?

15       A    Yes.

16       Q    And you didn't tell him what really

17  happened, did you?

18       A    No.  I was -- I was brought by the same

19  detective that Jim had brought to the house.  And, yeah,

20  the idea that was going through my head at that time was

21  just to -- going on my own and start over.  That was my

22  idea at the time.

23       Q    Had you been asleep at all that night prior

24  to being woken up or getting out of your bedroom with

25  the detective?

52

1   A  No, I was simply in my room watching a

2 small TV I have back there, waiting for her to go to

3 sleep.

4   Q  You went down to the station?

5   A Yes.

6   Q  You talked to a number of detectives, did

7 you not?

8   A Yes.

9   Q  Detectives that have testified at

10 trial ----

11   A Yes.

12   Q  -- is that correct?

13   A Yes.

14   Q  And you eventually talked with Detective

15 Soldate; is that not true?

16   A Yes.

17   Q  And there came a point during that

18 interview where you made certain statements, did you

19 not?

20   A Yes.

21   Q  Up to that point in time had you slept at

22 all in the last two days?

23   A No.

24   Q  Do you take medication?

25   A I do.

53

1   Q  What type of medication?

2   A  Medication called Dredis (phonetic) for

3 back pain, and Dilantin for seizures.

4   Q  Had you taken any medication on the day of

5 the 3rd?

6   A  I don't believe I had.

7      I had taken some extra pills the

8 night of the 2nd.  I thought that it would maybe calm me

9 down.  I was very nervous with what all had happened and

10 with the death and Jim bringing the detectives over and

11 starting the story about Phil.  And I wanted to go down

12 to the police station, and I was just trying to calm

13 myself down by taking some extra pills.

14   Q  Before you started to tell Detective

15 Soldate what actually transpired out at the wash, you

16 had not slept?

17   A  No.

18   Q  You had not taken your medication?

19   A  No.

20   Q  Had you eaten at all?

21   A  No.

22   Q  When was the last time you had eaten before

23 you made any statements to Detective Soldate?

24   A  When we stopped to have the pizza.

25   Q  Did you request any food during the course

54

1  of the day of December 3rd while you were at the police

2  station?

3       A    No.  I didn't feel like it was -- I would

4  have a right to just stop and say "You mind, I'm hungry.

5  I've had nothing to eat."

6               I was talked to by a number of

7  detectives.  At one time it was pair after pair,

8  until -- and put into very small rooms where I'd sit,

9  and sometimes I'd start to doze off in the chair, and

10  there'd be somebody else wanting to talk, until I talked

11  to Soldate.

12       Q    The interview with Soldate, was it a

13  lengthy one?

14       A    Yes.

15       Q    There came a point in that interview where

16  he indicated that he didn't believe you; is that

17  correct?

18       A    Yes.

19       Q    What was he going to do?

20       A    He told me that "I don't believe what

21  you're telling me, Roger.  And if you don't tell me the

22  truth, I'm going to have to read you your Miranda

23  rights.  You know what that means, don't you?"

24               I said "Yes."

25               He said "Then, I'm going to have to

55

1    go to your house and I'm going to have to tear it apart

2    and search.  And that would be hard on your mother,

3    wouldn't it?"

4              You had talked to Soldate for some

5    time about your relationship with your mother?

6         A    I'd talked to various people that day.

7              And I ----

8         Q    Are you very close to your mother?

9         A    Yes.

10        Q    Is she in good health?

11        A    No.

12        Q    When you started to tell Detective Soldate

13   what happened, did you indicate to him that you didn't

14   think Jim would do it?

15        A    Yes.

16        Q    Was he taking any notes during this

17   interview?

18        A    We were mainly talking, conversing between

19   ourselves.

20        Q    Did you see him with a pencil and a pad of

21   paper, taking notes?

22        A    I don't remember.  If he did, it was very,

23   very little.

24        Q    Okay.

25        A    It was mainly a conversation.

53

1      Q      Did he provide you with any means to take

2  your own notes as to different topics you talked about

3  and the different questions that were asked of you?

4      A      No, I didn't know that I needed ----

5      Q      Did he ever ask whether or not you would

6  consent to having a tape recording?

7      A      No, I don't believe he did.

8      Q      Later on the subject of tape recording the

9  interview came up, did it not?

10     A      Yes.

11     Q      But Detective Soldate never asked you

12 whether or not you wanted to have this interview taped,

13 did he?

14     A      No.

15     Q      During the course of the interview, did you

16 tell Detective Soldate the same things that you've told

17 us today?

18     A      No, I -- until he told me he was going to

19 go and tear the house apart, and that would be hard on

20 my mother, I had still been talking about Phil.  And

21 before he said he was going to go over to search the

22 house, he was going to get to the truth one way or

23 another, I believe he put it.

24     Q      After that point, though, did you tell

25 Detective Soldate what you told us today?

SUPERIOR COURT PIMA COUNTY

57

1      A.    No.

2      Q     Why were there differences?

3      A     Well, all I could see is police storming in

4  the door, scaring my mother to the point of a heart

5  attack and possibly death.

6      Q     Were they asking you questions and allowing

7  you to give narrative answers as you're doing today, or

8  were they asking you questions and asking for yes-or-no

9  answers?

10      A     They were asking me questions for answers.

11  And as I tried to answer them, sometimes get cut off.

12  Of course, I'm sort of a long-winded person when I get

13  to talking.

14      Q     If you'd go into an explanation on certain

15  subjects, would they cut you off?

16      A     Yes.

17      Q     Interrupt you?

18      A     Yes.

19      Q     Allow you to explain what you really meant?

20      A     It was mainly ----

21      Q     We'll get back to that.

22            You've heard the tape recording of

23  your conversation with Detective Mills?

24      A     Yes.

25      Q     At the point in time you did that, what was

58

1 your state of mind?

2    A    Well, I was very tired.  I -- I told him

3 that -- that it would be good to finally get this off my

4 chest.

5    Q    And you talked to -- and you talked to him

6 for some period of time?

7    A    Yes.

8    Q    During the course of that interview,

9 especially right at the end of the first side, there's a

10 part in there that discusses what took place once Jim

11 got out of the car.  And during the course of -- that is

12 the discussion about Jim coming up to you and saying to

13 you that he was going to do the child, or kill the

14 child, do you remember hearing that on the tape?

15    A    Yes, I do.

16    Q    That's different from what you've told us

17 today, is it not?

18    A    Yes.

19    Q    Why is that different?

20    A    At the time I was trying to tell everything

21 that had happened, and I wasn't getting everything

22 straight according to the tape.  But -- but all in all,

23 it -- it's more of a mix of words.  It's there, but it's

24 mixed up.  I was tired.  I was trying to cooperate and

25 tell -- tell them everything, and my words did get mixed

55

1   up at times.

2          Q     Do you have trouble expressing yourself?

3          A     Lot of people say so.  I must have.  I -- I

4   very often try hard to have myself understood, and

5   sometimes I try too hard and it seems to make it even

6   worse.  I have to repeat myself to people.

7          Q     You have a fear that a lot of people don't

8   understand what you're saying to them, do you not?

9          A     I like to be understood when I'm talking to

10  them as far as a simple job on their car.  What I'm

11  going to do.  Especially something as important as this,

12  I wanted to be understood.  I thought that actually we

13  already had some understanding of what had gone on after

14  the -- I had signed for the Search Warrant and had

15  talked to them, and I figured they knew what was going

16  on.

17         Q     At any time before you heard the shots, did

18  you know that Jim Styers was going to kill Christopher

19  Milke?

20         A     No, sir.

21         Q     When you went out there that day, did you

22  intend to assist Jim in the killing of Christopher

23  Milke?

24         A     No, sir.

25         Q     Did you ever agree with Debra or Jim to

60

1    help participate in a conspiracy to kill him for five

2    thousand dollars life insurance?

3         A    No, sir.

4         Q    You've known Jim Styers for many years,

5    have you not?

6         A    Yes.

7         Q    He has a number of his own children?

8         A    Yes.

9         Q    Even as you sit here today, do you believe

10   that Jim Styers did what he did?

11        A    It's hard to believe.  I know it's true.

12                   And in '68 he got married, and by the

13   time I saw him again in '71 he had two girls by his

14   first marriage.  And I know he had a daughter, Heather,

15   by his second marriage.  And by Gail, common-law wife,

16   he had Wendy.

17        Q    On Saturday the 2nd, did Jim Styers ever

18   tell you that he had to pick up his daughter, Wendy, by

19   2:00 o'clock?

20        A    No, he hadn't said anything at that time.

21        Q    In November -- we've heard testimony in the

22   form of a stipulation that Jim Styers went to a VFW post

23   and bought two guns, one of which was the was the murder

24   weapon.

25                   You've heard this testimony?

SUPERIOR COURT PIMA COUNTY

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
              PLAINTIFF,             )
                                     )
      V.                             )     NO. CR89-12631(C)
                                     )
ROGER MARK SCOTT,                    )
                                     )
              DEFENDANT.             )
_____     )

PHOENIX, ARIZONA
JANUARY 14, 1991

BEFORE:   THE HONORABLE DAVID COLE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

PREPARED ON APPEAL
ORIGINAL
COPY

COLLEEN M. GRUNOW
RPR, CM, CSR

SUPERIOR COURT

2

1                        A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:  MR. NOEL LEVY, DEPUTY COUNTY ATTORNEY

4    FOR THE DEFENDANT:  MR. ROLAND STEINLE

5

6

7

8                          I N D E X

9    WITNESS:              EXAMINATION BY:              ON PAGE:

10   ARMANDO SALDATE       MR. LEVY                        4

11                         MR. STEINLE                    19

12                         MR. LEVY                       33

13

14   ROBERT MILLS          MR. LEVY                       34

15                         MR. STEINLE                    58

16

17

18

19

20

21

22

23

24

25

1    OPPORTUNITY TO INTERVIEW ROGER SCOTT?

2        A.  THERE DID, YES.

3        Q.  IS HE IN THE COURTROOM TODAY?

4        A.  YES.

5        Q.  WOULD YOU INTERVIEW HIM BY -- DID YOU IDENTIFY

6    HIM BY INDICATING WHERE HE IS SITTING AND WHAT HE'S WEARING?

7        A.  YEAH.  ROGER IS WEARING THE BROWNISH SHIRT,

8    SITTING BETWEEN COUNSEL, THIN MUSTACHE, BROWN HAIR.

9        Q.  IS THIS THE COUNSEL WEARING MATCHING CAMEL HAIR

10   COATS?

11       A.  MATCHING JACKETS, YES.

12           MR. LEVY:  MAY THE RECORD SHOW

13   IDENTIFICATION?

14            THE COURT:  IT MAY.

15       Q.(BY MR. LEVY):  WHAT WAS THE PURPOSE FOR YOUR

16   INTERVIEWING ROGER SCOTT AT THIS POINT AND LET'S ESTABLISH

17   ABOUT WHAT TIME IT WAS THAT YOU HAD INITIAL CONTACT.

18        A.  WELL, WHEN I FIRST ARRIVED AT THE MAIN STATION,

19   I WAS OF COURSE ASSIGNED ONE OF THE INTERVIEWS.  I HAD

20   FINISHED THAT INTERVIEW AND WAS IN A BRIEFING WITH DETECTIVE

21   BOB MILLS, JUST BEFORE I WALKED IN TO THE INTERVIEW ROOM

22   WHERE HE SAID HE WAS GOING TO CONTINUE HIS INTERVIEW WITH

23   ROGER SCOTT.

24         I THEN ASKED HIM IF I COULD GO INTO THE ROOM

25   ALSO WITH HIM, AND HE AGREED.  AND I ENTERED THE ROOM WITH

1      HIM.  HE CONTINUED THE INTERVIEW FOR FIVE, TEN MINUTES OR

2      SO.

3              Q.  WHO DID?

4              A.  DETECTIVE MILLS.  AND THEN I INTERRUPTED HIM

5      AND TOOK OVER THE INTERVIEW.

6              Q.  AT THIS POINT IN TIME HAD ROGER SCOTT YET BEEN

7      ARRESTED OR PLACED IN CUSTODY TO YOUR KNOWLEDGE?

8              A.  NOT TO MY KNOWLEDGE.

9              Q.  AND WHAT WAS THE STATUS OF ROGER SCOTT'S BEING

10     THERE UP TO THAT POINT IN TIME?

11             A.  I BELIEVE HE WAS ASSISTING THE POLICE AS I WAS

12     TOLD.  HE WAS THERE TRYING TO SEE IF THEY COULD FIND

13     CHRISTOPHER MILKE.

14             Q.  UP TO THIS POINT, WHAT WAS THE STATUS OF THE

15     CHRISTOPHER MILKE INVESTIGATION?  WHAT WAS THE --

16             A.  THE STATUS WAS STILL AN OPEN CASE.  THE CHILD

17     WAS STILL MISSING.  THEY HAD CONTACT WITH JIM STYERS AND

18     ROGER SCOTT AND TRY TO INVESTIGATE AND SEE WHERE THIS CHILD

19     COULD HAVE POSSIBLY GONE.

20             Q.  NOW YOU INDICATED THAT DETECTIVE MILLS TALKED

21     TO ROGER SCOTT FOR A LITTLE BIT AND YOU TOOK OVER.  WHEN YOU

22     TOOK OVER, DID -- WHAT WAS THE SITUATION OF YOU TAKING OVER?

23     WHAT WERE YOU TAKING OVER?  WHAT WERE YOU ABOUT TO DO?

24             A.  I WAS ABOUT TO CHALLENGE THE FACT THAT THE

25     STORY THAT HE WAS GIVING.

1        Q.   WHAT HAD, TO YOUR -- JUST FOR PURPOSES OF

2   CONTRAST, WHAT WAS YOUR ESSENTIAL INFORMATION AS -- YOUR

3   ESSENTIAL KNOWLEDGE AS TO THE INFORMATION ROGER SCOTT HAD

4   BEEN GIVING PRIOR TO THIS TIME?

5        A.   HE HAD INDICATED THAT HE HAD BEEN DROPPED OFF

6   BY JIM STYERS AND JIM STYERS AND THE CHILD LEFT.  HE HAD

7   INDICATED THAT HE DECIDED TO GO TO I BELIEVE THE CIRCLE K OR

8   SOMETHING LIKE THAT, AND AT THAT POINT ME MET A FRIEND NAMED

9   PHIL AND THAT PHIL JUST HAPPENED TO WANT TO GO TO THE

10  METROCENTER TO SEARS OR SOMETHING TO THAT EFFECT; AND THAT

11  HE WENT TO SEARS AND THAT HE HADN'T SEEN THIS FRIEND IN 40

12  YEARS OR 20 YEARS, I FORGET THE AMOUNT OF TIME; AND THAT HE

13  JUST HAPPENED TO RUN INTO HIM IN THE CIRCLE K; AND THAT

14  BECAUSE OF THEIR FRIENDSHIP, HE WENT WITH HIM AND THAT HE

15  LOST TRACK OF HIM AT THE METROCENTER, AND HE FOUND HIMSELF

16  TALKING WITH THE POLICE AND THEN ABOUT -- THEN TO JIM AND

17  FINDING OUT THE CHILD THAT HE HAD BEEN PREVIOUSLY WITH WAS

18  MISSING OR BASICALLY THAT INFORMATION WAS WHAT INFORMATION

19  WAS GIVEN TO ME.

20       Q.   AND DID YOU HAVE REASON TO HAVE SOME DOUBTS

21  ABOUT THAT INFORMATION?

22       A.   YES.

23       Q.   SO WHAT DID YOU PROCEED TO DO?

24       A.   I -- AFTER HEARING THE SHORT INTERVIEW THAT

25  DETECTIVE BOB MILLS WAS HAVING WITH HIM, I INTERRUPTED THE

1    INTERVIEW, AND SINCE IT WAS GOING TO BE MY CASE, I

2    INTERRUPTED THE INTERVIEW AND ASKED BOB IF I COULD TAKE

3    OVER.  AND I CHALLENGED ROGER AND I TOLD HIM THAT I DIDN'T

4    BELIEVE WHAT HE WAS TELLING US.  AND BECAUSE OF THAT I WAS

5    GOING TO READ HIM HIS RIGHTS.

6          Q.  DID YOU?

7          A.  YES, I DID.

8          Q.  AND WHAT RIGHTS DID YOU READ HIM?

9          A.  I READ HIM HIS STANDARD MIRANDA RIGHTS AS

10   ISSUED BY OUR DEPARTMENT AND GIVEN TO ME ON A RIGHTS CARD.

11         Q.  AND DO YOU HAPPEN TO HAVE THE CARD WITH YOU?

12         A.  I MAY HAVE ONE.  HOLD ON.  I DO.

13         Q.  AND STATE TO THE COURT AND FOR THE RECORD WHAT

14   RIGHTS YOU TOLD ROGER SCOTT AT THAT TIME.

15         A.  THIS IS THE FORM THAT'S SUPPLIED BY THE PHOENIX

16   POLICE DEPARTMENT.  AND WE'RE REVISED ON NOVEMBER '87 AND

17   THE RIGHTS I GAVE HIM:  YOU HAVE THE RIGHT TO REMAIN SILENT.

18   ANYTHING YOU SAY CAN BE USED AGAINST YOU IN A COURT OF LAW.

19   YOU HAVE THE RIGHT TO THE PRESENCE OF AN ATTORNEY PRIOR TO

20   QUESTIONING AND TO BE WITH YOU DURING QUESTIONING, IF YOU GO

21   SO DESIRE.  IF YOU CANNOT AFFORD AN ATTORNEY, YOU HAVE THE

22   RIGHT TO HAVE AN ATTORNEY APPOINTED FOR YOU PRIOR TO

23   QUESTIONING.  DO YOU UNDERSTAND THESE RIGHTS.

24         Q.  WHAT WAS THE RESPONSE OF ROGER SCOTT?

25         A.  HE SAID YES.

1      Q.  AND WHAT FURTHER DID YOU ASK HIM OR WHAT

2  FURTHER DID YOU DO WITH REGARD TO ANY QUESTIONS?

3      A.  I, OF COURSE, IMMEDIATELY CHALLENGED HIM ON THE

4  FACT OF THIS PHIL.  I TOLD HIM THAT --

5      Q.  DID HE INDICATE HE WAS WILLING TO TALK?

6      A.  YES, YES.  I CHALLENGED HIM IMMEDIATELY ON

7  PHIL.  I TOLD HIM THAT I WASN'T ABOUT TO LOOK FOR SOMEBODY

8  THAT DIDN'T EXIST.  I CHALLENEGED HIM ON THAT PORTION OF THE

9  INTERVIEW.  ULTIMATELY HE TOLD ME THAT PHIL DID NOT EXIST

10  ACTUALLY, NOT THE PHIL THAT HE HAD MENTIONED.  AND THAT HE

11  HAD GONE TO THE METROCENTER WITH JIM STYERS AND THE CHILD,

12  CHRISTOPHER MILKE.

13      Q.  WENT TO METROCENTER?

14      A.  YES.  HE SAID THAT HE LIED ABOUT PHIL BECAUSE

15  HE DIDN'T WANT TO GET INVOLVED.

16      Q.  OKAY.  AND THEN WHAT DID YOU RESPOND TO THAT?

17      A.  WELL, INITIALLY I TOLD HIM THAT WE WENT BACK

18  AFTER THAT CONVERSATION REGARDING PHIL, I SPOKE TO HIM AND I

19  TOLD HIM THAT I THOUGHT THAT HE WAS RESPONSIBLE FOR THE

20  DISAPPEARANCE OR KNEW SOMETHING ABOUT DISAPPEARANCE OF CHRIS

21  AND THAT I WANTED THE TRUTH.

22      Q.  THEN WHAT?

23      A.  AND WE CONTINUED ON AND SPOKE ABOUT THE --

24  ABOUT HIM SAYING THAT THAT'S -- DENYING OF COURSE THAT HE

25  HAD NO INVOLVEMENT WITH THE DISAPPEARANCE AND THE FACT THAT

1  HE LIED TO ME ABOUT PHIL, THAT I BELIEVED THAT HE WAS

2  INVOLVED.  WE CONTINUED.  I STOPPED THE INTERVIEW ON TWO

3  OCCASIONS, I BELIEVE THE FIRST TIME WAS FOR APPROXIMATELY 15

4  MINUTES, SECOND TIME MAYBE ABOUT 30 MINUTES.

5       Q.   WHAT DID YOU DO WHEN YOU STOPPED?

6       A.   ON BOTH OCCASIONS, I STOPPED, FIRST OF ALL, I

7  THINK -- THE FIRST ONE MAY HAVE BEEN TO ADVISE MY

8  SUPERVISORS THAT THE PHIL DID NOT EXIST.  BECAUSE WE HAD

9  OTHER OFFICERS LOOKING FOR OR MY SUPERVISORS HAD OTHER

10  OFFICERS LOOKING FOR YEARBOOKS AND GOING THROUGH A LOT OF

11  TRYING TO RUN DOWN THIS PHIL.

12       SO THAT WAS THE FIRST REASON I STOPPED THE

13  INTERVIEW THERE.  AND ALSO THE FACT THAT I TOLD HIM THAT I

14  DIDN'T BELIEVE HIM AND THAT HE NEEDED TO TELL ME THE TRUTH

15  AND I WANTED HIM TO JUST WAIT A FEW MINUTES UNTIL I GOT

16  BACK, THINK ABOUT IT AND I'LL BE BACK AND TALK TO HIM.

17  WHICH I DID.

18       AND THEN WE TALKED ABOUT SEVERAL THINGS.  OF

19  COURSE HE DENIED IT.  AND THEN I STOPPED THE INTERVIEW AGAIN

20  FOR ABOUT 30 MINUTES, AGAIN TRYING TO BRIEF MY SUPERVISORS.

21  I DON'T RECALL WHETHER ON THAT OCCASION WHETHER SOMEONE

22  KNOCKED ON THE DOOR OR NOT.  I BELIEVE SOMEBODY DID.  THERE,

23  OF COURSE, HAVING OTHER PEOPLE WORKING, THEY WANTED TO KNOW

24  WHAT'S GOING ON.

25       SO I THINK I HAD TO GET OUT OF THERE TO BRIEF

1   THEM.  THEN I RETURNED AND WE TALKED ABOUT IT SOME MORE AND

2   FINALLY HE ADMITTED THAT HE TOLD ME -- I TOLD HIM THAT I

3   KNEW THAT HE WAS RESPONSIBLE FOR THE DEATH OF CHRIS.  I KNEW

4   THAT HE KNEW WHERE THE BODY WAS AT.  I TOLD HIM INITIALLY IN

5   OUR SECOND INTERVIEW I TOLD HIM THAT I DIDN'T WANT -- THE

6   FINDING OF THE BODY WASN'T AS IMPORTANT AS HIM TELLING ME

7   THE TRUTH.

8          THE THIRD INTERVIEW I TOLD HIM I DEFINITELY

9   WANTED TO FIND THE BODY NOW.  BASICALLY BECAUSE IT WAS

10  GETTING LATE.  AND HE FINALLY TOLD ME THAT -- I TOLD HIM

11  THAT I KNEW THAT HE KNEW WHERE THE BODY WAS AT, AND I WANTED

12  HIM TO HELP ME RECOVER THAT BODY AND HE TOLD ME THAT HE

13  DIDN'T KNOW WHERE THAT BODY WAS AT.  I SAYS -- I ASKED HIM

14  IF CHRIS WAS DEAD AND HE SAID HE WAS.  AND I BELIEVE HE SAID

15  JIM SHOT HIM.

16         Q.  UP TO THIS POINT, WHAT -- WITH REGARD TO YOUR

17  OBSERVATIONS OF ROGER SCOTT, DID HE APPEAR TO YOU TO BE

18  ALERT?

19         A.  YES.

20         Q.  WAS HE ARTICULATE?  DID HE RESPOND

21  APPROPRIATELY TO YOUR QUESTIONS; THAT IS TO SAY IF YOU ASKED

22  A QUESTION, DID HE RESPOND?

23         A.  YES.

24         Q.  SAME SUBJECT MATTER?

25         A.  YES.

1      Q.  YES.

2      A.  I DON'T KNOW THAT, NO.

3      Q.  WAS THERE A POLICE OFFICER STATIONED OUTSIDE

4  THE INTERVIEW ROOM WHEN YOU FIRST WALKED IN?

5      A.  THERE MAY HAVE BEEN, BUT I'M NOT SURE.

6      Q.  ISN'T IT A COMMON PRACTICE -- ISN'T IT

7  PROCEDURE WITHIN THE POLICE DEPARTMENT THAT WHEN SOMEONE IS

8  IN AN INTERROGATION ROOM, EITHER THE PERSON IS HANDCUFFED TO

9  THE TABLE OR SOMEONE IS STATIONED OUTSIDE THE ROOM TO MAKE

10  SURE THAT HE DOESN'T LEAVE?

11      A.  SOMEONE IS -- I DON'T KNOW ABOUT MAKING SURE HE

12  DOESN'T LEAVE.  DEFINITELY FOR HIS SAFETY AND THE SAFETY OF

13  THE POLICE DEPARTMENT, THAT IS TRUE.

14      Q.  YOU DON'T WANT PEOPLE WANDERING AROUND THE

15  POLICE DEPARTMENT?

16      A.  THAT'S CORRECT.

17      Q.  AND IN THIS CASE, IF MR. SCOTT HAD GOT UP AND

18  WALKED OUT THE DOOR AND WANTED TO GO HOME, HE WASN'T GOING

19  TO BE ALLOWED TO DO THAT, WAS HE?

20      A.  WHAT PROBABLY WOULD HAVE HAPPENED IS UNIFORMED

21  OFFICER, IF THERE WAS ONE OUT THERE, AND AGAIN I DON'T

22  REMEMBER, MYSELF AND DETECTIVE MILLS WERE AT ANOTHER

23  LOCATION, I'M SURE THE UNIFORMED OFFICER WOULD HAVE SAID

24  ROGER SCOTT WANTS TO LEAVE.  AND DO YOU HAVE ANYTHING TO

25  HOLD HIM ON AND WE WOULD HAVE SAID NO.

1    INITIALLY TO HELP, AND I WAS PLAYING THEN ON THE FACT THAT

2    MR. SCOTT WOULD HELP ME AND THAT'S BY TELLING ME THE TRUTH.

3            Q.   HAD YOU INTERVIEWED STYERS AT ALL?

4            A.   I DID.

5            Q.   SO YOU KNEW BETWEEN THE TWO PEOPLE, THE ONE

6    MOST LIKELY TO BE ABLE TO IN EFFECT CAVE IN WOULD HAVE BEEN

7    ROGER SCOTT, DID YOU NOT?

8            A.   NO, NO, I DIDN'T.

9            Q.   OTHER THAN TELLING YOU THAT PHIL REALLY DIDN'T

10   EXIST, UP UNTIL THE POINT WHERE YOU STARTED TALKING ABOUT

11   GOING OUT AND TALKING TO HIS MOTHER, DOES HE MAKE ANY

12   ADMISSIONS AS TO KNOWING WHERE THE BODY WAS?

13           A.   NO.

14           Q.   IT'S ONLY AT THE POINT IN TIME WHERE YOU SAY

15   "WE'RE GOING TO SEND OUT DETECTIVES TO TALK TO YOUR MOTHER

16   AND SEARCH YOUR HOME" THAT HE STARTS TO COOPERATE?

17           A.   I THINK WE SAID TALK TO YOUR MOTHER, I DON'T

18   KNOW ABOUT SEARCH HIS HOME.  HE INDICATED HE WANTED SOME

19   CIGARETTES AND MOUNTAIN DEW THEN AND WE TALKED AFTER THAT.

20   HE SAID IT WOULD KILL HER OR SOMETHING LIKE THAT.  I TOLD

21   HIM WE'RE STILL GOING TO HAVE TO DO IT.  WE ULTIMATELY ENDED

22   UP DOING IT ANY WAY.  HE KNEW THAT.

23           Q.   BUT IT WAS AT THAT POINT WHERE YOU SAY THAT IF

24   HE'S NOT GOING TO TALK TO YOU, YOU'RE GOING TO SEND SOMEONE

25   OUT TO INTERVIEW HIS MOTHER AND HE BECAME CONCERNED ENOUGH

1    THAT THAT MAY KILL HIS MOTHER?

2              A.   THAT'S WHAT HE SAID.

3              Q.   AND IT'S AT THAT POINT HE DECIDED TO COOPERATE

4    WITH YOU?

5              A.   THAT'S WHEN HE STARTED TALKING TO ME ABOUT IT,

6    YES.

7              Q.   JUST PRIOR TO THAT THOUGH, YOU HAD MADE THE

8    STATEMENT TO HIM, DID YOU NOT, BEFORE THAT THING ABOUT HIS

9    MOTHER, YOU HAD HAD A CONVERSATION WITH HIM ABOUT HIS

10   MOTHER, PEOPLE TAKING CARE OF HIS MOTHER, WHAT WAS GOING TO

11   HAPPEN TO HIS MOTHER.  YOU TALKED TO HIM ABOUT THAT, DID YOU

12   NOT, HIS RESPONSIBILITIES TOWARDS HIS MOTHER?

13             A.   WHAT PAGE IS THAT?

14             Q.   PAGE TWO OF YOUR REPORT, THIRD PARAGRAPH --

15   SECOND FULL PARAGRAPH BUT THIRD.

16             A.   WE -- HE STARTED TALKING ABOUT THE FACT THAT HE

17   HAD HIS MOTHER TO TAKE CARE OF AND HE ALSO TOOK CARE OF

18   OTHER NEIGHBORS.

19             Q.   SO WHEN THIS WHOLE THING CAME UP ABOUT SENDING

20   THE POLICE OFFICERS OUT TO THE HOUSE TO TALK TO HIS MOTHER,

21   THAT HAD COME SUBSEQUENT IN TIME TO WHERE HE TOLD YOU OF HIS

22   RESPONSIBILITIES TOWARDS HIS MOTHER?

23             A.   REPEAT THAT QUESTION AGAIN, PLEASE.

24             Q.   YOUR INDICATION TO HIM THAT YOU WERE GOING TO

25   SEND OFFICERS OUT TO TALK TO HIS MOTHER CAME SUBSEQUENT IN

COUNTY OF MARICOPA — ADULT PROBATION DEPARTMENT
L. HELBER, CHIEF PROBATION OFFICER

P.O.: ANDREW LEMBO     NOS.                     PRIMARY     ENGLISH

NAME     ROGER MARK SCOTT
RESIDENCE 4816 West Bethany
          Glendale, AZ           ZIP 85301
PHONE     None        MESSAGE PHONE None
AKA OR MAIDEN None
ID MARKS      Scar-R-Arm
EMPLOYER/ADDRESS/PHONE None

OCCUPATION Auto mechanic   EDUCATION 21A
MARITAL    Divorced        RELIGION None

RACE White  SEX M
EYES Haz    HAIR Bro
DOB  06-04-48              AGE 42
CITIZEN OF U.S.A.
BIRTHPLACE Omaha, NB
DRIVER'S LIC. NO. Suspended/AZ
S.S. NO. 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
FBI NO. 845 565 F
BOOKING NO. 169158
CHILDREN 0

CURRENT OFFENSE

CAUSE NO. CR8912631C    OFFENSE DATE 12-02-89           NCIC 0949D
   CHARGE Count I:  Murder in the First Degree, a Class 1 Felony
A.R.S. NOS. 13-1105, 1101, 703, 801, 203(A)(B-2), 301, 302, 304, 812
CAUSE NO. CR8912631C    OFFENSE DATE 12-02-89           NCIC C0949D
   CHARGE Count II: Conspiracy to Commit Murder in the First Degree, a
          Class 1 Felony
A.R.S. NOS. 13-1003, 1105, 203(A)(B-2), 301, 302, 303, 304
CAUSE NO. CR8912631C    OFFENSE DATE 12-02-89           NCIC 1099D
   CHARGE Count III: Kidnapping, a Class 2 Felony and Dangerous Crime
          Against Children
A.R.S. NOS. 13-3623(A)(B), 604.01, 702, 801, 203(A)(B-2), 301, 302, 303, 304,
          812
DATE OF ARREST 12-04-91
DATE INCAR. 12-04-91                   ARRESTING AGENCY PPD
DAYS IN JAIL THIS ARREST 494   REL. DATE          REL. STATUS Jail
DEFENSE COUNSEL Roland Steinle, DPD   REMAND JUVENILE COURT/DATE--NO
GUILT BY/DATE  Jury/02-07-91          PROSECUTOR Noel Levy
DATE OF SENTENCE  04-12-91            SENTENCING JUDGE DAVID R. COLE
CODEF/DISPOS See Companion Action

CRIMINAL HISTORY                          WARRANTS OUTSTANDING

                                   CASE NO.    CHARGE     STATE
NO. CONVICTIONS:    FEL   MISD 5 JUV
NO. INCARCERATIONS: PRISON    JAIL   _____  _____  _____
                    ESCAPE    OTHER  _____  _____  _____
NO. SUPERVISIONS:   PROB      PAROLE _____  _____  _____
                                   OTHER:

GENERAL INFORMATION

NARCOTICS/ALCOHOL HISTORY PA-Alcohol/PU-Marijuana
TREATMENT/PROGRAMS Alcoholics Anonymous--Past Involvement

MILITARY HISTORY NOT APPLICABLE

SPOUSE/RELATIVES/CHILDREN                              

   NAME        RELATION  AGE      ADDRESS                    PHONE
Wilma Scott    Mother    71   Same as defendant
Dennis Scott   Brother   43   Apache Junction, Arizona, area
0037W/03-27-91/faith                                  

THE STATE OF ARIZONA
          Plaintiff

     vs.

ROGER MARK SCOTT
          Defendant

CAUSE NO. CR8912631C

HONORABLE DAVID R. COLE

CRIMINAL DIVISION L

SUPERIOR COURT

## PRESENTENCE INVESTIGATION

### PRESENT OFFENSE:

The following information is taken from Phoenix Police Departmental Report #89-179406:

On December 2, 1989, James Lynn Styers filed a missing child report advising police that his roommate's son, Christopher Milke (age four), had disappeared during their visit to Metrocenter Mall that date. Present with Mr. Styers during the time period the report was filed was Roger Mark Scott, the defendant.

On December 3, 1989, Mr. Scott admitted during a police interview that he accompanied Styers the previous day to a desert wash in the area of Ninety-ninth Avenue and Jomax Road, where Styers shot and killed Christopher Milke. Scott told police that they had gone out several times before to "kill the kid." However, there were generally "too many people around." Scott agreed to accompany Styers because he needed $250.00 to file a Social Security case. Styers agreed to provide him with the money, as he believed he was to receive some of Christopher's $5,000.00 life insurance policy. At the conclusion of the interview, Mr. Scott escorted police to the desert area where Christopher Milke's body was recovered. A subsequent autopsy revealed three entry gunshot wounds to the child's head.

On December 3, 1989, Christopher's mother, Debra Jean Milke, was interviewed by Phoenix Police Detective Saldate. During the interview, Ms. Milke conceded that she had conspired with Styers to have her son killed. She indicated that "it would be better to have her son die than to have him grow up like his father." Debra indicated that her only agreement with Styers was that he would not tell her the specifics of the killing. She advised that on one previous occasion she had gone out with Styers to have her son killed but that they never went through with it. On the occasion of the actual shooting, Mr. Styers had informed Debra Milke of his intentions, at which point Ms. Milke instructed her son to go with him to see "Santa Claus."

### RELATED OFFENSES/STIPULATIONS:

On December 8, 1989, the defendant was charged by grand jury indictment for the crimes of count I, first degree murder, a class 1



ROGER MARK SCOTT                           CAUSE NO. CR8912631C
            Defendant

_____

felony; count II, conspiracy to commit murder in the first degree, a class 1
felony; and count IV, kidnapping, a class 2 felony and dangerous crime against
children.

On February 7, 1991, before the Honorable David R. Cole, a
jury found the defendant guilty of counts I and II of the indictment, as
charged. The Court minute also reflects that the defendant was found guilty
of the charge of count III, kidnapping, a class 2 felony and dangerous crime
against children (however, the kidnapping charge was initially referred to as
count IV in the indictment).

DEFENDANT'S STATEMENT:

The defendant advised that on the occasion of the
shooting, Styers had requested that he be driven to a specific desert location
in Phoenix where he could inquire about receiving a glider's pilot license.
The defendant explained that he was given Debra Milke's vehicle to drive and
was surprised to learn that Christopher Milke would be coming along with them
for the ride. Scott explained that Styers was more of a parent to the child
than the child's own mother, and that Christopher generally followed Styers
around "like a puppy dog." He advised, however, that Styers only viewed the
child as a "responsibility." Scott explained that Styers approached him on a
previous occasion and, in a joking manner, conveyed Debra Milke's "plans and
thoughts" of having her child murdered. According to Scott, Styers went as
far as to say that Milke would even pay us from the insurance proceeds "if we
did it." Scott advised that his response to Styers was simply that he was
crazy and that he would "not have anything to do with it." Although this
conversation took place, the defendant maintains that he was not aware of
Styers' intentions on the occasion of the shooting, and that it was a surprise
to him when Styers asked him to pull over at a desert site where the shooting
would take place. The defendant commented that he never went with Styers and
Christopher on any previous occasions in contemplation of shooting the child,
as police have suggested. The defendant commented that, after the shooting,
Styers commented, "That little bastard will never bother me again." The
defendant concluded that he intended eventually to tell police of the
shooting; however, he feared somehow that Styers or law enforcement personnel
would somehow implicate him in the shooting.

If and when he is released from custody, he plans to
petition to gain his Social Security benefits so that he can "buy a pickup
truck and go back to work." He is requesting leniency in this matter because
"I did not know what was to happen that day...I would not have anything to do
with any crime...I was set up. I have people who need me out there...I am
innocent."

PAGE 2



ROGER MARK SCOTT
        Defendant

CAUSE NO. CR8912631C

---

## COMPANION ACTION:

On October 12, 1990, before the Honorable Cheryl K. Hendrix, a jury found Debra Milke guilty of count I, first degree murder, a class 1 felony; count II, conspiracy to commit murder, first degree, a felony; count III, child abuse, a class 2 felony and dangerous crime against children; and count IV, kidnapping, a class 2 felony and dangerous crime against children. On January 18, 1991, Ms. Milke received the death sentence for her involvement in count I of the indictment; was sentenced to life imprisonment on count II; and received two twenty-year Department of Corrections commitments for her involvement in counts III and IV of the indictment.

On November 2, 1990, before the Honorable Peter T. D'Angelo, a jury found James Lynn Styers guilty of count I, murder in the first degree, a class 1 felony; count II, conspiracy to commit murder in the first degree, a class 1 felony; count III, child abuse, a class 2 felony and dangerous crime against children; and count IV, kidnapping, a class 2 felony and dangerous crime against children. On December 14, 1990, Mr. Styers received the death sentence for his involvement in count I of the indictment. On count II, he received a life sentence; on count III, he was committed to the Arizona Department of Corrections for a period of twenty-two years; and on count IV, he was committed to the Arizona Department of Corrections for a period of twenty-two years.

## STATEMENT OF VICTIMS:

Mr. Mark Milke, the victim's father, relayed that "Christopher was the most important thing in my life, and when he was taken away from me, I felt that I myself had died." Mr. Milke advised that he is a recovering alcoholic and acknowledges that he has been dealing with the loss of his son through his involvement in Alcoholics Anonymous. He advised that there is little question in his mind that his former wife initiated the conspiracy to have his son killed and that codefendant Styers was equally responsible for causing the son's death. Although Mr. Milke acknowledges Mr. Scott's involvement in this matter as an atrocious act, he does feel that, of the three defendants, Scott should be shown some leniency, as he did lead police to his son's body and was instrumental in solving this case. Mr. Milke commented that if his son's remains were never found, this incident would have proven to be an even greater tragedy. He commented that it was his ex-father-in-law, Richard Sadeik, who was responsible for his son's funeral expenses.

Mr. Richard Albert Sadeik, the victim's maternal grandfather, advised that he has suffered greatly over the loss of his grandson, and he feels that all parties involved in his death should,



ROGER MARK SCOTT
        Defendant

CAUSE NO. CR8912631C

---

themselves, receive the death sentence. Mr. Sadeik informed that Christopher had "two strikes against him from the start, that being both his mother and father." Mr. Sadeik was responsible for his grandson's funeral services, which were performed through the Brown Colonial Mortuary in Phoenix, at a cost of $1,772.43 (verified). He is requesting full restitution.

Denise Pickinpaugh, the victim's maternal aunt, advised that she, more than the child's mother, had been responsible for raising Christopher throughout most of his short life, and that she had grown to love Christopher as her own son. Most of Mrs. Pickinpaugh's statements concerned her feelings about her sister, Debra Milke, and how she continually abused the child from shortly after his birth. She advised that she has become well acquainted with Roger Scott over the years and has come to know him as a relatively "dumb" individual who was simply not capable of hurting anyone or of developing a conspiracy of this nature. There is little doubt in her mind that Mr. Scott was "sucked into this" by her sister and Styers, and that Scott just "followed along." She does not feel that Mr. Scott should be subjected to the death sentence in this matter.

Mr. Henry Milke, the victim's paternal grandfather, advised that the loss of his grandson has "affected me very hard, at times I sit in my home and cry uncontrollably like a child." Mr. Milke is recommending that the defendant receive the "death sentence" as a result of his involvement in this offense.

Mrs. Ilse Milke, the victim's paternal grandmother, advised that Christopher resided with her on and off since birth, and that the two had developed a particularly close relationship with each other. Mrs. Milke would like the Court to be made aware of the fact that the defendant's actions have not only affected her, but have affected many people whose life Christopher had touched. Although she feels that the defendant should receive a significant period of confinement in this matter, she is not requesting the death sentence because he was instrumental in recovering her grandson's body.

<u>STATEMENT OF INTERESTED PARTIES</u>:

Detective Mills of the Phoenix Police Department is recommending that the defendant receive the "death sentence" in this matter, essentially because the defendant committed the offense in expectation of pecuniary gain and because the defendant knew all along of the conspiracy initiated by Milke and Styers, and he could have stopped the occurrence at any given time by advising police of the situation. Detective Mills is also concerned that the defendant showed absolutely no signs of remorse throughout the investigative process and, in his opinion, he is as culpable in this homicide as the other defendants.

PAGE 4



ROGER MARK SCOTT
       Defendant

CAUSE NO. CR8912631C

Deputy County Attorney Noel Levy has outlined his interests in a sentencing memorandum which has been made available to this Court. Mr. Levy is recommending the death penalty be imposed in this matter for the reasons enumerated in the memorandum. Mr. Levy did emphasize that the defendant was "not just the driver," and that he was deeply involved in this offense which he feels would not have occurred had Scott agreed not to accompany Styers on the occasion of the shooting.

Deputy Public Defender Roland Steinle informs that he is preparing an extensive memorandum in which he will be making his comments available to the Court. He will defer any additional comments he has to make until the time of sentencing.

ARREST HISTORY:

### JUVENILE:

The defendant informs that he was never arrested as a juvenile. His age precludes the availability of juvenile arrest records.

### ADULT:

The following information was obtained from records provided by the Arizona Department of Public Safety, Maricopa County Sheriff's Office, City of Phoenix Police Department, LEJIS information, and the F.B.I.:

| ARREST DATE | PLACE OF ARREST | CRIME/DISPOSITION |
|---|---|---|
| 11-04-66 | Phoenix, AZ | Burglary and larceny/No disposition recorded. The defendant advised that he was apprehended after he stole a set of golf clubs from someone's garage. |
| 12-18-67 | Phoenix, AZ | Petty theft/Sixty days jail. The defendant informs that he was apprehended after he was caught siphoning a gallon of gasoline from someone's car. |
| 07-08-68 | Tempe, AZ | Public order crime/No disposition recorded. Per defendant, he was apprehended after he and 2 of his friends were discovered by police drinking beer and engaging in disorderly conduct. He believes this offense was ultimately dismissed. |
| 01-24-82 | Phoenix, AZ | Assault/No complaint filed. |

PAGE 5



ROGER MARK SCOTT
     Defendant

CAUSE NO. CR8912631C

---

09-27-85    Phoenix, AZ    Public sexual indecency/Fined $100.00. Per police report, the defendant was apprehended after he was found having sexual contact with another male at an adult bookstore.

12-03-89    Phoenix, AZ    Homicide and conspiracy to commit homicide/Instant offense.

Although this writer has been unable to confirm the following through official police or Court records, the defendant informed that between 1972 and 1974, he was arrested on four separate occasions for D.W.I. offenses committed in Phoenix, Arizona. He informs that in each of the cases, he was subsequently fined, directed to involve himself in Alcoholics Anonymous meetings, and ordered to participate in a driver's education course.

SOCIAL HISTORY: Unless otherwise noted, the following information was provided by the defendant:

Family: Roger Mark Scott was born June 4, 1948, in Omaha, Nebraska. He is the youngest of two children born to his parents. His father was an alcoholic who often physically abused the various family members. The defendant was approximately five years old when his parents separated. Although his mother maintained part-time employment throughout the defendant's formative years, she often depended on other family members for financial assistance. The defendant informs that he has always maintained a favorable relationship with his mother.

Education: The defendant quit school after completing the tenth grade. As a student, he generally received average grades and was never subjected to any disciplinary measures. He did obtain his G.E.D. in 1971.

The defendant participated in the M.D.T.A. Training Program in Phoenix for a period of six months in 1971, where he participated in some course work in the field of auto mechanics. He states that he became discouraged with the program, however, and quit before receiving a completion certificate.

A Word Recognition Aptitude Test administered to the defendant indicates a reading ability above the sixth grade level.

Employment: The defendant has been unemployed since 1977. He cites his last position as a maintenance worker for Fountain Apartments in Phoenix, a position he held for approximately six months in 1977. He quit his job after his employer was "hassling" him regarding his work performance. The defendant cites additional job experiences as an auto and truck mechanic, a wallpaper hanger, and a lawnmower mechanic.



ROGER MARK SCOTT
          Defendant

CAUSE NO. CR8912631C

_____

<u>Substance Use:</u>  The defendant informs that he began consuming alcoholic beverages at the age of twenty-three and regularly abused the substance until he was thirty-three years old. He participated in a number of A.A. meetings between 1972 and 1974; however, he has not been involved in any recent treatment effort. He maintains that he does not consume alcoholic beverages anymore, and that it has not presented him with any difficulties in over nine years.

The defendant maintains that marijuana is the only illicit substance he has ever used, and that he last used the substance approximately fifteen years ago.

<u>Marital:</u>  The defendant married Patricia Ann Jackson in 1971, and divorced in 1974. No children were born of this union, and he has attributed the marital difficulties to his wife's infidelity and to the fact that they simply "got tired of each other."

<u>Military:</u>  The defendant was classified as a 4F because of his asthma and, as a consequence, he was never drafted into military service.

<u>Health:</u>  The defendant was involved in an automobile accident in 1974, which resulted in his suffering from a severe back and neck injury. These injuries, the defendant claims, have, over the years, handicapped his efforts to secure and maintain stable employment. The defendant has also suffered a seizure disorder which he acquired in 1983, and as a result he is currently being prescribed Dilantin, an anticonvulsant medication.

<u>Mental Health:</u>  On or about August 2, 1990, Donald Tatro, Ph.D., met with the defendant pursuant to a request for a Rule 11 evaluation. Dr. Tatro included some of the following assessments of the defendant in his evaluation: "This is a man who cannot make decisions when it comes to even the most trivial of matters. It is difficult to conceive of him conspiring to commit murder, deciding to commit murder, and then, over a protracted period of time, taking the steps necessary to carry out the murder...since Mr. Scott is not psychotic and, as a consequence, dangerous to either himself or to other people, there is no indication of a need for inpatient treatment. His type of neurotic disorder is classically difficult to treat by means of psychological counseling, since his defenses are so rigid and denial of psychological problems is so essential to the kind of self-image he needs to maintain."

On or about July 2, 1990, Alexander M. Don, M.D., P.C., also met with the defendant pursuant to a Rule 11 request for evaluation. Dr. Don included some of the following assessments of the defendant in his report: "He has no present difficulty in communicating and is able to provide a coherent account within the constraints that he has imposed on himself of the events leading to his arrest, as well as considerable detail relating to his recent and past life circumstances...Roger Scott has no history of prior psychiatric disorder

PAGE 7



ROGER MARK SCOTT                          CAUSE NO. CR8912631C
            Defendant

other than alcohol abuse, and in particular has not experienced any mental
illness of a psychotic nature which might thus impair his contact with
reality."

FINANCIAL STATUS AND EVALUATION:

        Restitution in the amount of $1,772.43 will be recommended
to be paid to Richard Albert Sadeik.

        The probation officer has considered the following factors
in determining the manner of payment:

  1.  Defendant's age:  forty-two years.
  2.  Defendant's income:  none.
  3.  Defendant's expenses:  none.
  4.  Defendant's assets:  none.
  5.  Defendant's education:  G.E.D.
  6.  Defendant's obligation to support dependents:  none.
  7.  Defendant's employment history:  poor.
  8.  Defendant's prospects for employment:  poor.
  9.  Others:  The defendant appears to suffer from a number of physical
      disabilities which may very probably handicap any future .efforts to
      secure employment.

        Based on the above, it is recommended the defendant pay
restitution through the Clerk of the Court per the attached restitution ledger
sheet.

DISCUSSION AND EVALUATION:

        Roger Mark Scott is a forty-two-year-old divorced male who
has been intermittently involved with the courts since 1966.  The current
matters, however, will represent the defendant's first felony convictions.
His previous criminal history reflects a particular pattern of property and
drinking-related offenses, although it is noted that his last conviction was
for a (misdemeanor) public sexual indecency offense occurring in 1985.

        In the pending matters, the victim, four-year-old
Christopher Milke, was found shot to death in a desert wash after he was told
by his mother (Debra Milke) that he was going to see "Santa Claus."
Indications are that the conspiracy was initiated by the child's mother and
perhaps James Styers, the apparent "trigger man."  The defendant claims that
he had no insight into Mr. Styers' intentions on the occasion of the shooting
and only participated in the cover-up because he feared he would somehow be
implicated in the offense.  It is easy to understand why he would have feared
being implicated, as he was admittedly approached by Mr. Styers sometime prior

PAGE 8



ROGER MARK SCOTT
      Defendant

CAUSE NO. CR8912631C

to the shooting, at which point Styers had made known his intentions to Mr. Scott. In his confession to police on December 3, 1989, the defendant also conceded that he had accompanied Styers on several previous occasions to "kill the kid." However, there were generally "too many people around" at the time. Mr. Scott apparently participated in this offense after Styers had promised him the $250.00 he would need to file a Social Security claim. It is noted that much of the information the defendant reported to this writer does contradict his initial account of the incident and his confession to the investigating police officers. The Court is reminded that the defendant was instrumental in recovering the victim's body, which seems to have provided the surviving family members with some consolation.

In reviewing the available social and psychological data, it appears that the defendant does not possess a history of severe emotional disorders, is probably more of a follower than a leader, and has found it difficult over the years to "make decisions when it comes to even the most trivial of matters." Although the argument could be made that the defendant was the least culpable of the three defendants, he was certainly an active participant in the offense, stood to gain financially from his involvement, and could have prevented the incident from occurring at any given time. Mr. Scott has an apparent history of alcohol abuse, although his past difficulties are dated and do not appear to be an issue in the matters at hand. As indicated previously, he also has a history of physical and medical disabilities which, seemingly, have prevented him from securing and maintaining stable employment for over the past fifteen years. His inability (or unwillingness) to be a productive member of the community and to earn legitimate wages may have, unfortunately, provided him with the necessary incentive to involve himself in this offense.

In conclusion, the defendant has certainly demonstrated himself to be a serious risk to the community, as evidenced by the conspiracy and the fatal shooting of four-year-old Christopher Milke. It particularly concerns this writer that the victim was a helpless child who posed no threat to the defendant, and that he apparently committed the offense in expectation of pecuniary gain. It is also noted that, throughout the presentence interview, the defendant seemed to focus his efforts on extricating himself from guilt, showing no signs of concern for the victim or his surviving family members, in the process. Mr. Scott has been found guilty of murder, conspiracy, and kidnapping charges, and the law is quite specific in providing sentencing ranges for these charges. For the reasons outlined and discussed in this report, aggravated sentences appear appropriate.

These factors were considered in making the sentencing recommendation:

1. The age and the relative helplessness of the victim.
2. The defendant committed this offense in expectation of pecuniary gain.

PAGE 9

ROGER MARK SCOTT
         Defendant

CAUSE NO. CR8912631C

---

3.  Although the defendant does not possess any prior felony convictions,
    he has, nonetheless, had a number of previous encounters with the
    criminal justice system.
4.  Social and psychological data made available on this defendant.
5.  The manner in which this offense was executed.
6.  Statements from the various references and interested parties, to
    include those elicited from the victim's family members.
7.  The defendant was instrumental in recovering the victim's body.

## RECOMMENDATION:

As to counts I and II, it is respectfully recommended that
the defendant be sentenced in accordance with the law and pay a felony penalty
assessment in the amount of $200.00, and pay an $8.00 time payment fee per
A.R.S. 12-116, unless all penalties, fines, and sanctions are paid in full on
this sentencing date.

As to count III, it is respectfully recommended that the
defendant be committed to the Department of Corrections for a term greater
than the presumptive and pay a felony penalty assessment of $100.00.

It is also recommended that the defendant pay restitution
per the attached ledger sheet.

The defendant has served 494 days of presentence
incarceration.

Respectfully submitted,

I have reviewed and considered
the probation officer's report.

By: _____
Andrew Lembe
Senior Deputy Adult Probation Officer
262-3648

Judge: _David R. Cole_

Date: _April 18, 1991_

AL:fh:0031W
March 27, 1991