

## Donald _ .tro, Ph.D.
### Clinical Psychologist

3420 E. Shea Boulevard, Suite 199        Phoenix, Arizona 85028        Phone: 494-9845

August 2, 1990

Preliminary Proceedings Court
12th Floor, Central Court Building
201 W. Jefferson Street
Phoenix, Arizona 85003

Dear Judge:

As you ordered, I did a psychological evaluation of the defendant, Roger Scott, a 42-year-old, caucasian male, who has been charged with first degree murder, conspiracy to commit murder, and kidnapping. The examination, which was to assess competency to stand trial and the probable mental condition of the defendant at the time of the offense, was conducted at the Madison Street Jail on July 30, 1990 and took approximately three-and-a-half hours.

## Defendant's Account

Mr. Scott denied taking any knowing part in the murder. He said that he had no idea that the victim, a young boy named Chris, was going to be harmed and that he was made an unwitting accomplice of the man, Jim Styers, who was actually the perpetrator of the crime. *"I have no involvement as a partner in this sick crime,"* he said.

The only advance indication he had that any thought was even being given to the idea of murdering the boy, he said, was when Styers told him that the boy's mother, Debbie, had talked to him about killing her ex-husband and her son. According to what Styers had told him, Debbie wanted her son dead so she could collect on a $5000 insurance policy. Mr. Scott said that he did not attach much significance to what Styers had told him because Styers shared the information with him to illustrate how disturbed Debbie was in her thinking. It was related in a "can-you-believe-how-sick-minded-this-woman-is?" context. To further illustrate how irrational Debbie was in her thinking, Mr. Scott said, Styers mentioned that Debbie had suggested that he, Styers, might be able to enlist his, Mr. Scott's, help in carrying out the murders of her ex-husband and son. She thought that he might be persuaded to take part for $250, since she knew through Styers that he was in need of that amount to retain the services of a lawyer to help him get Social Security Disability benefits. *"I advised him to get that broad out of his house. I even offered to tell her to get out for him, but he said he was going tell her he wanted nothing more to do with her."*

There was a point when Mr. Scott wondered if he ought not to take the matter more seriously. This was when Styers told him that he had actually taken the boy out to a remote location with the idea of acting on Debbie's request, but that he changed his

mind when he encountered a National Guard unit doing some exercises in the area. *"He told me that he took the National Guard's being out there as a message from God that he wasn't supposed to do this,"* Mr. Scott said. When Mr. Scott observed Styers and the boy Chris together afterward, the atmosphere was convivial and good-humored, so he returned to the idea that there was nothing to be concerned about. He said, *"I saw him three days afterward, and everything seemed okay. Everything seemed all right. He was very good with the boy. He was so damn convincing. He convinced me that he was not going to go on with this. He had told me that he was either going to tell Debbie to get out, or that he was going to get out, himself."* Mr. Scott explained that Styers and Debbie lived in the same residence, sharing rent and expenses.

Nothing more had been said about the matter, Mr. Scott said, when Styers, in the company of the boy, Chris, came by his home to pick him up to do some light Christmas shopping. After going to a few stores, the three of them stopped to get some pizza. It was decided then that they would drive out to a glider school, where Chris could watch the gliders in flight. Styers told Mr. Scott that it was for this purpose that the binoculars that Mr. Scott had seen in the car had been brought along. Mr. Scott said that the idea of going out to the glider school did not strike him as unusual, since they had gone out there before with the boy.

Mr. Scott said that when the three of them got in the vicinity of Sun City, Styers, who had been driving, pulled over and asked him to drive for awhile. He made nothing of this either, since Styers often did this kind of thing when he got tired of driving. He knew that Mr. Scott liked to drive, and had frequently asked him to take the wheel in the past. Mr. Scott said, *"We went on toward the glider school. On the way, Jim decided to take a piss, so he asked me to pull over to the side of the road. I did. Both he and Chris got out. They were both going to take a leak. I didn't have any idea. I thought everything was fine. The boy was happy."*

Mr. Scott said he sat in the car as Styers and the boy walked off looking for a more concealed spot. He heard what sounded like a gunshot, but made nothing of it, since it is not uncommon for people to shoot guns in the desert setting where they had stopped. In a few moments, he saw Styers walking back toward the car, but he did not see the boy. Again, he made nothing of this, since Styers is fat and he assumed the boy was tagging along behind him and could not be seen. When Styers opened the front door to get in, Mr. Scott said he looked to the back door, expecting to see it open and Chris get in. It did not. Instead, he heard Styers say, *"Come on, take off! That little bastard won't bother me again."* Mr. Scott said, *"That's when I saw the gun in his hand."*

Mr. Scott said that he was shocked as soon as he realized what must have happened, but he was also quite frightened. He said nothing and did as Styers was directing, which was to drive away. *"What are you going to say to someone with a gun in his hand out in the desert?"* Mr. Scott asked. *"I was scared. He had just shot the little boy and I was thinking I might be next. What are you going to say to a man with a gun in his hand? I just did what he said and drove off. I was trying to think, but nothing was going together. Nothing's working in my mind till he tells me to turn somewhere."*

Mr. Scott, Styers, and Debbie were arrested within a matter of hours following the death of the boy. Describing himself as a person who has difficulty expressing himself, especially when he is feeling pressured and stressed, Mr. Scott said he did not communicate his story about what had happened to the police very well, and, as a consequence, he and his role in the crime were misunderstood. He tried to tell the police about Styers having brought up the idea with him as an example of Debbie's sick-mindedness, but they interpreted him to mean that he had conspired with Styers and Debbie to murder the boy.

Styers had been a long-time acquaintance of Mr. Scott's. He had a on-again, off-again kind of relationship with him, depending upon whether Styers was involved with a woman or with one of the various religious ideologies to which he regularly became attached. Mr. Scott described Styers as a man of intense involvements. His dealings with him generally took place when he was *"in-between"* such involvements, since, once he became involved, he would devote himself more or less completely to his newfound passion and not have any time or interest left over for other people or pursuits. Mr. Scott described Styers as *"almost a fanatic."* One time he would see him and he would be enthusiastic about some religion and talking about going to Bible school and becoming a preacher. Another time, he might be out drinking, cheating at cards, and running around with loose women. When he would become religiously preoccupied, he would pressure Mr. Scott, a recovering alcoholic, to forswear demon alcohol. When he would swing back to a party mood, he would try to talk Mr. Scott, now on the wagon, into having a couple of drinks to loosen up.

Mr. Scott said that Styers had *"a semi sort of relationship"* with the woman, Debbie. She lived with him, but this was basically with the understanding that there was nothing between them — at least nothing that would exclude Debbie from coming and going as she pleased and having relationships with other men. It was Mr. Scott's understanding that Styers had had sexual relationships with her on a couple of occasions, but that theirs was a casual, non-serious involvement. He revised his opinion of this, however, after what Styers did to the boy. *"He must have been in love with her,"* he said, *"to do what he did for her."*

When asked what he understands that Styers and Debbie have had to say about his role in the murder of the boy, he said, *"At one time, they said that I was hired to do it, and another time they said they didn't know anything about the car being gone and Jim's gun being missing. They tried to say that I had taken the boy and done this on my own and that they didn't know anything about it."* When asked what they alleged as his motive for doing such a thing, he replied, *"Supposedly, I did it over jealousy, money, and so on. Different things. Supposedly, I was jealous of her and the boy because they were taking up my time with Jim. That's one of the things that they laid on me. They were guessing that I was homosexual and jealous of not having enough of his time. Actually, I didn't give a damn."* When asked if there is anything to the allegation of his being homosexual, Mr. Scott noted that, much to his dislike, because of physical problems, he has been housed on the unit of the jail where the homosexual population resides. He said, *"I have no use*

*for a fucking queer. You don't know hard it is for me to be on the same floor with 'em without hitting 'em."*

## Observations

Mr. Scott is extremely nervous and jumpy from the outset of the examination. His voice is tremulous and his hands are shaky. He seems on edge and ready at any moment to take a defensive posture. He constantly wavers back and forth between the wish to cooperate and an attitude of mistrustful reluctance to offer information. It takes him several minutes to decide whether he wants to talk to me at all about the circumstances of the crime. First he decides he will not, then he changes his mind and starts telling his story, but in fitful starts and stops. Periodically, he changes his mind, thinks he ought not be saying anything, and abruptly stops, saying that he better not say anything more until he first talks to his lawyer.

Throughout, I point out to him that I am not a lawyer and cannot advise him what is in his best interests legally. I suggest to him that if he feels it is not in his best interests to share with me his perception of events, then he ought to consult with his attorney, since I will be communicating what he has to say to me when I submit my report to the court. Having commented several times about his habitual indecisiveness, he illustrates it by going on with his account of events in spite of his recurrent seizures of reluctance to do so and the caveats I raise.

He describes himself as having an extremely hard time making himself adequately understood and as feeling very tense and nervous when he tries and realizes that he is not getting across his exact meaning. He says that his thinking often becomes very disorganized and he cannot pull it together in the way that he wants to when he feels pressured to talk by others and, at the same time, detects that they are not understanding him. His mind begins to reel at such times, he says, and he cannot think straight, let alone express himself with any degree of clarity. Throughout the interview and testing, he gives example of this. He is massively self-doubting, and, often, he no sooner says something than he is trying to retract or amend it. Because his amendments do not come out as he wants them, either, it is not uncommon for him to keep qualifying an idea until it becomes so convoluted and garbled that his voice gets weaker and weaker as his comments dwindle into incomplete, almost disconnected utterances.

When I assure him that I am having no difficulty understanding him and promise him that if he is having trouble getting an idea across I will give him all the time he needs to do so to his satisfaction, he seems to relax a little. When several times I reiterate my understanding of what he has taken a considerably long time to say and he perceives that he has, in fact, been understood, he expresses gratitude at having found someone at last who seems to grasp what he has been trying to communicate. It is in this context that he complains about his lawyer and the defense he has been getting. He states, *"My lawyer and I couldn't get any understanding. There was no communication. It was like he was talking about somebody else."* At first he seemed to be blaming himself and the

problem he has expressing himself, since he said, *"When I get under pressure, only a sentence, here, and a word, there, gets understood. When I get pressured, it's like my head's in a vice and wants to explode."* He then shifted the focus of the blame, however, indicating that he has felt very pressured by his attorney's abruptness with him. *"At times, he comes flying at me,"* he complained. *"It's like he's on somebody else's side— Styer's side. If he does his job like he's supposed to, he's for me. I've called his supervisor and contacted the Bar Association trying to get understanding."*

When I confront Mr. Scott with the paranoid-like tone to what he is saying, he says, *"Yes, I guess that's the way you can put it. I try to help people. I live my life in a way that I don't have to explain to people. How am I supposed to react as far as somebody jumping on me, pressuring me, and putting me in a corner? When people put pressure on me, that's where the paranoia starts."* When I point out that his attorney has been sufficiently interested in him and his welfare to move to have him examined and to take time to call and discuss his case with me, he backpedals a bit and says, *"Well, now, maybe he's back to what I call reality between a lawyer and his client. He's having other tests done, too. He's working on it instead of sitting around, playing golf, and saying, 'Here, sign this.'"* It appears that as soon as Mr. Scott gets it into his head that someone in a position of authority is not in agreement with him, he becomes exceedingly distrustful, suspicious of motives, unrealistically defensive, and accusatory, even to the point of alleging actions that he cannot possibly know of. It also appears that once he starts viewing someone in this way, it is very difficult for him to shift to a more trusting attitude.

It becomes apparent after awhile that a lot of the difficulty that Mr. Scott has when it comes to communicating boils down to the fact that, although he presents himself as a mild-mannered, weakly insecure, exquisitely self-doubting, overly-submissive kind of guy, he is, just under the surface, an extremely hostile, critical person, who continuously finds fault with the way that other people do things, and he is constantly wary lest he say or do anything to signal his antagonism and invite a retaliative response. I point this out to him after he spends time criticizing just about everyone in a position of authority who has had anything to do with him. He complains, for example, about his jailers and the inconsistent way they carry out established procedures, saying, *"I know they got a training school, but none of 'em understood it."* He complains about the food he is made to eat, commenting, *"It's like out of a dumpster."* He complains about the pod assignment he has been given. He complains about the guards lack of sympathy for his physical problems. Most of his complaints embody the notion that people in positions of authority and power are not doing their jobs properly—that is, as he understands and expects them to be done.

Of course, Mr. Scott resists and denies the suggestion that he is a very opinionated, critical, stubbornly-oppositional sort of person. However, he does so stubbornly, insisting upon the rightfulness of his critical opinions. When I rephrase and put it to him that he is a very perfectionistic person, who holds himself as well as others to very high standards of performance, he relents. He concedes that if he feels that he is right about something, even though he may not come right out and criticize someone who disagrees with him, he cannot easily be budged from his point of view. I suggest to him that his

ability to communicate adequately is again failing him and that he might better describe himself as having the tenacity of bulldog once he clamps his mind around a given point-of-view. He does not attempt to correct this description.

Mr. Scott also conveys a marked tendency to somaticize. That is, he rationalizes many of his failures to perform up to the level of his own expectations or to meet other peoples' expectations on the grounds of physical illness and incapacity. Throughout the interview he alludes to his physical ailments when trying to account for his upsets or his inability to always do things the way he thinks they should be done. He attributes his failure to adequately understand what was going on leading up to the murder of the boy, Chris, at least in part, to the severity of his back pains and the medication he takes for this problem and to control seizures. He blames his failure to communicate effectively on the pressure headaches he gets whenever he is required to cope with stressful situations. He explains much of the pique he feels toward his warders on the grounds that he is made irritable by physical problems, which they do not seem to care about or take into consideration. Before he was arrested, he was quite angry at the Social Security system for not recognizing the seriousness of his physical disabilities and refusing to grant him the benefits he had applied for. He attributes the fact that he has not had a steady job in thirteen years and has been living at home with his mother during that time to physical incapacity, as well.

There are multiple signs of neurosis in Mr. Scott's behavior during the examination, periods during which his tension and anxiety get so high as to disrupt his thinking, and indications that his distrust and suspiciousness sometimes rise to near-paranoid levels, but there is no indication that he is seriously out of touch with reality, or psychotic. His paranoid feelings do not appear to be associated with delusional thinking. The periodic displays of disorganized, scattered thought appear to have more to do with elevated levels of tension and anxiety than with any kind of ongoing autistic process. His extreme self-doubting and indecisiveness appear to be correlates of a severe obsessive-compulsive neurosis. His somaticizing appears to be a symptom of an equally severe hysterical neurosis.

## Background Information

Mr. Scott was born in Omaha, Nebraska, where he lived until he was almost eleven, when his family moved to Phoenix, thinking, because he was asthmatic, that it would be a better environment for him. He is the younger of two siblings. His bother, who is mentally retarded, is two years older than him.

His mother and father were separated when Mr. Scott was five years old. It was his alcoholic father's habit, he said, to go out and get drunk and then to come home and beat on his wife and children, so when he left, he was not particularly missed. His mother did not remarry until Mr. Scott was 17, but this marriage ended in divorce after only a year. When Mr. Scott was around 18, his natural father came back on the scene for awhile, but did not stay long. He is not sure where his father is living now, or even if he

is alive. His mother, who is now 70, lives in Phoenix, and he, Mr. Scott, has been living with her since 1974, when, at age 26, he injured his back in a motorcycle accident.

Asked to describe his childhood, Mr. Scott said, "*Well, I defended my brother a lot. He was mentally retarded, and the kids in the neighborhood would push him around and make fun of him. Sometimes, I had to punch a couple.*" He said that because of his brother's intellectual slowness, even though he was younger than him, he ended up playing the role of big brother to him. He saw himself as taking a kind of substitute-father role with his brother and his mother as being his partner in this responsibility. He said, "*We had kind of a buddy relationship. We both watched out for my brother.*"

Describing himself as a youngster, he said, "*I had asthma, so I couldn't play a lot of physical sports. I spent a lot of time riding my bicycle instead of playing football. Still, I was all right. I did a lot of drawing and things to stay busy. It was an all right childhood, but I had to put up a front — an 'I-could-do-it, but-I-don't-want-to' front. I could really, but I didn't want to. Before I got out here, I was a straight-A student in school. When I got out here, though, I seemed to get in a lot of trouble for talking big words that nobody understood. They figured I was trying to put them down, so I got to talking like them to stay out of fights.*" It appears that even as a child, Mr. Scott was fearful of saying the wrong thing, being misunderstood, and prompting a hurtful response from bigger, stronger, more powerful peers. Back then, too, he was afraid that if he was perceived as criticizing someone with whom he could not adequately compete, he would be attacked. His response was to check himself before expressing himself in order to make sure he did so in a way that was more agreeable to his perceived antagonists.

When asked to describe his mother, he said, "*Very busy. She was a hard-working person. She was always working trying to make a living for us. My grandmother came to live with us after the divorce, when we were still in Nebraska. She did the cooking, which was all right because mom wasn't much of a cook. My mother was always working hard. She'd get lower-type jobs, which seemed to push her more.*" He said that either his mother or his grandmother was usually at home until he was 10, when he, his brother, and mother moved to Arizona. After that, he had to look pretty much after himself while his mother was at work. He was a so-called latch-key kid. He would come home from school to an empty house and provide for his own needs. His brother, by that time, was almost always away at some special school or living in a group home for the mentally retarded. "*It was all right,*" he said, "*I was a pretty good cook.*"

When Mr. Scott was asked if he thought it had been the case that he had gotten lots of time and attention from his mother during the first five years of his life, then lots of time and attention from his grandmother during the second five years of his life, and, after moving to Phoenix, almost no time and attention from his mother or a surrogate, he thought it probably was. When he thought about what he had liked most about his mother when he was very young and she had been more available to him, he said, "*She was a protecting mom.*" Then, apparently sensing that he had conveyed something about his dependently-attached attitude toward his mother that he had not meant to, he added, "*Like anybody else's.*"

Responding to the question, "What was it that your mother most expected of you as a youngster?" he said, "*I don't know, to be honest, work hard, and do the best you can.*" When asked if he thought he may have picked up some of his perfectionism from his always busy, hard-working mother, he said, "*I don't think so. I always thought I got it from having to take care of the house. It was important to keep the house clean and not make a mess.*" He denied that these were his mother's expectations, however, and said that he just developed them on his own.

Echoing the kind of criticism he had earlier voiced about people in positions of authority who do not do their jobs properly, when Mr. Scott was asked why he quit school in the 10th grade, he said, "*The school stank and the teachers were rotten. They weren't teaching me anything, so I figured, 'Why go?'*" He said that where he had been an excellent student back in Omaha, he had difficulty earning good grades when he moved to Phoenix. His grades dropped from A's to C's and D's. He said that he was sent to a psychiatrist because of the difficulty that he was having adjusting to the new school environment. He did not recall it having been suggested that the problem may not have been so much with ineffective teachers as it may have been with his inability to adjust to the sudden requirement that he grow up, be independent, and start looking after his own needs.

When he was asked if he had been rebellious as a teenager, he replied, "*Not to a degree of greatness. Just a little.*" He admitted that to the extent he was rebellious at all, it was not through open, active defiance of expectations, but much more in a passive-aggressive way. Instead of acting out, he was inclined to refuse to act. His stubborn, oppositional, "I-won't," "you-can't-make-me" attitude was already well in place. While he generally took pains to conform himself outwardly to expectations, inwardly he nourished an image of himself as a extraordinarily intelligent and gifted individual. If he did not express this, it was to avoid making others feel inferior and, perhaps, provoke them to a hostile reaction. Summing up his adolescent social posture, Mr. Scott said, "*When in Rome, do what the Roman's do.*" When asked if he had many friends as a teen, he said, "*I knew a lot of people.*" When it was put to him that he had been pretty much of a loner, he said that this was true.

Again, trying to dodge the import of the question, when asked how he had gotten along with members of the opposite sex as an adolescent, he replied, "*I got along with them. While the other guys were trying to prove themselves in sports, I was being friendly with the girls.*" When it was put to him more directly that, given his description of himself up to this point in his life, he was probably an overly self-conscious, shy, awkward, and passively reticent person when it came to approaching females, he conceded that it had been his style to stand back and wait for females to make the first move.

Mr. Scott was 21 when he got married. The marriage lasted a little over three years before ending in divorce. He said that the woman he married, consistent with his description of himself as passively waiting for females to come after him, "*chased after*" him. His attitude at the time, he said, was one of not caring enough one way or the other to either encourage or resist her advances. So, passively, he just went along with her

more aggressive maneuverings and, as a consequence, ended up impregnating her. He said that although he was not in love with her, he agreed to marry her in order to *"give the kid a name."* He told her that he would try marriage for a year.

The "trial marriage" lasted longer than a year, but it was not much to his liking. When he got involved with his wife, she had seemed eager to get away from her parents. After they were married a short while, though, she became way too over-involved with her parents. He said. *"She was their little girl. Her damn mother was always dragging her off or wanting us to be there. My wife didn't like my mother, so we spent hardly any time with her. We were with her parents all the time."* It was after he got married that he started to drink heavily. As the problems between him and his wife grew worse, he started drinking heavier and heavier, which, of course, only added to their problems. *"She was never around,"* he said. *"She was always at her damned mother's house."* There were several times when his wife left him altogether and went back to live with her parents. *"She was always leaving to go to her mother,"* he said. *"I got sick and tired of going over and getting her and dragging her home."*

Mr. Scott made an oblique approach to another problem in his marriage. He said, *"After I had my motorcycle accident, she didn't like it that I scarred my arm and hurt my back and that I wasn't bouncing around on her enough, I guess."* When this comment was interpreted to mean that she also was making him feel sexually inadequate, he replied, *"She even moved out on me one time with a guy a thought was my friend. He ended up bouncing on her, but I took her back. She had the idea that the only way she could lose weight was to fuck it off. She was eating and getting as fat as her mother. I wanted her to lose weight, but by not eating as much as she was."* Mr. Scott said that his five-foot, eight-inch wife weighed over a hundred-and-eighty-five pounds. The marriage came to an end, he said, when his wife went home to her mother one too many times. Instead of going after her, he went home to his mother. He has been there ever since. The reason, he said, is because the back injuries he sustained in the motorcycle accident made it impossible for him to work and independently support himself.

At the point of his heaviest drinking, which was toward the end of his marriage, he was drinking large amounts of whiskey on a daily basis. He estimates that he typically consumed two fifths of whiskey every day for a two-year period. He tapered off after he began getting DWI's, but he did not quit completely. While he was still married, he was arrested twice on driving while intoxicated charges. Five years ago, after his fourth DWI, he decided to stop drinking altogether. He has not been completely successful, however, since he will have a drink once in awhile, but, given the severity of the habit he once had, he has, in his mind, been successful for all practical purposes. *"I can't even stand beer anymore, but I'll have some wine once in awhile, or a rum and coke once in a great while,"* he said.

He denies any serious involvement with illegal drugs. He did use dexedrine as an energizer at work for awhile when he was 19 and, for awhile, just prior to and for a short while after he got married, he smoked a little marijuana, but that has been the extent of his use.

Apart from the four DWI's and arrests for a couple of petty thefts back in 1968, Mr. Scott reports that he has not been in trouble with the law until now.

He has worked occasionally during the last fourteen years, but only at what he describes as *"petty little jobs that don't amount to enough money in a year to even file an income tax return."* He said, *"What they amount to is cigarette money."*

## Findings and Conclusions

In addition to the clinical interview, the following psychological tests were administered: Bender Visual-Motor Gestalt Test, Figure Drawing Test, and Sentence Completion Test.

Test and interview data reveal strong obsessive-compulsive and histrionic traits in Mr. Scott's personality. The obsessive-compulsive component is associated with exaggerated concern with living up to extremely high, perfectionistic standards of performance and achievement and obsessive preoccupation with his failure to do so. Considerable tension, nervousness, and anxiety are aroused when Mr. Scott is confronted with competitive challenges to his sense of competence and worth, and he employs a variety of defenses against such feelings. At the obsessive-compulsive level, his sense of self-worth is threatened most when he is faced with tests of mental competence, and, in this area, he makes heavy use of defenses such as rationalization, intellectualization, isolation of affect, reaction formation, and denial.

The histrionic component of Mr. Scott's personality is associated with threats to his sense of competency as a male. He is an overly passive-dependent person, who, beneath his defenses, feels very inferior and inadequate about his ability to perform successfully as a male in typically masculine areas of involvement. He is particularly threatened by any suggestion that he is not a normally virile, sexually potent, properly heterosexually-interested man. In this area of conflict, he makes heavy use of the defense mechanisms of repression and somatization. Rather than face intense-anxiety-arousing challenges to his masculine competence, he makes a passive-dependent retreat into sickness and ill-health. He tells himself and others that it is not that he does not have the intrinsic ability to compete successfully as a man among other men, but that he is prevented from doing so by disabling physical problems. This, apparently, has been his pattern since childhood, when he was allowed to spend long periods of time at home and in bed rather than going to school because of his asthma. Throughout his childhood and adolescence, he told himself that the only reason he was not more involved in and successful at the kinds of things that his male peers took pride in was because he was prevented by his illnesses. Thus, at age 42, he has been living a passive-dependent existence in his mother's home for the past fourteen years — since the failure of his marriage — and he insists that this is because his physical problems prevent him from doing otherwise.

Mr. Scott has structured his adult adjustment around the need to avoid challenges to his mental and masculine competencies and at the same time to maintain an image of himself as a person of superior ability and potential. He is, for the most part, a very socially withdrawn person, whose primary satisfaction in life derives from his ability to perpetuate the protective, security-providing, passive-dependent relationship that he had with his mother when he was a youngster. Since the life that he has chosen for himself is so at odds with the high achievement standards he has always set himself, defensive extremes are required to bring the self-image that any objective reading of reality would give into alignment with the self-image that his conscience demands he maintain. Consequently, he is so massively defended against threats to his self-image that, at times, he is made to appear absurd by the far-fetched attempts he makes to deny his inadequacies and justify his failures. Because he is a fairly intelligent man, painfully self-conscious, and exquisitely sensitive to any sign that he is being judged negatively by others, as he is pushed by his defensive rigidities to extremes of absurdity, he detects the critical reactions of others and, instead of becoming less defensive, he becomes more defensive. Often this goes on to the point that Mr. Scott is no longer making sense. He gets so anxious and confused, his thinking becomes so disorganized and fragmented, and his self-conscious focus on personal deficiency becomes so compelling that he is reduced to either incoherence or silence.

Because the need to defend his ego is so great, however, he even converts these failures to communicate effectively into support for the defensive adjustment he has made to life. He shifts the focus from the problem he has communicating non-defensively to the problem of other people's failure to understand and then justifies what might reasonably be viewed as his own shortcomings on the grounds that he is a terribly misunderstood person. He uses the idea that nobody ever understands him to fortify his view of an unjust, intolerant, unfair world and justify his passive-dependent retreat from it.

When Mr. Scott is required to interact with his social environment, his anxiety escalates and he does his best to keep a low profile. That is, if he cannot avoid interacting with people, he tries to avoid conflicting with them. Thus, while it is very important to him to see himself as a strong, competent, even superior, person who is capable of standing up to and prevailing in situations that are tests of his potentials, he usually keeps this view of himself concealed, and instead of asserting himself, he assumes a excessively passive, compliant outward facade. Whatever private thoughts and feelings he may have, he usually wears an agreeable smile, shakes his head in affirmation of other peoples' points-of-view, takes care to conform himself to conventional expectations, and goes along. Most of the time, he does what he is told to do by other people. His passive, submissive response to people is so at odds with his private view of himself as a person of above-average ability and potential, however, that he inwardly smarts with resentment and hostility whenever he perceives himself as being either ignored or pushed around by someone better able than he to act with authority.

Because he is so paralyzed by the threat of retaliation, however, he assiduously avoids any open, direct show of the resentment and hostility he feels. It comes out, but only indirectly and passively. Mr. Scott is an extremely passive-aggressive individual. His life

has been one prolonged power struggle. He is habitually set to resist and oppose anyone who, in his view, is in power and inclined to use that power to move him in directions that he does not want to move. He rarely opposes openly with an active show of disagreement or defiance. Most typically, he opposes passively by stubbornly insisting that he is unable to do what other people expect him to do. He does not say, "I will not;" he says, "I would like to, but I cannot." Usually, he uses the excuse of physical incapacity to justify his helpless inability to comply with expectations. He cannot work because he is physically disabled. He cannot respond to people's demands for explanations because his head feels like a pressure cooker whenever somebody "*corners*" him and insists on answers. He cannot comply with the usual rules and regulations because his infirmities require that he be given special consideration. While he openly resists people in power through weakness, he challenges them and their competence much more directly in thoughts which he usually keeps to himself. He focuses his attention on every indication of authoritative error or failure to perform up to the highest standards of whatever positions are involved and, as if from a lofty, superior height, privately decries their inadequacies.

It is important to note that Mr. Scott does not employ these defenses consciously. He does not, for example, make up his mind to oppose and then deliberately set about being obstructionistic. He actually perceives himself as a victim of unjust, arbitrary, and demeaning abuse of authority and feels compelled to defend himself against it in the only way he knows how. He does not pretend to be sick or in pain. He actually feels sick most of the time. His pains are as real to him if their etiology is psychological as it is if it is physiological. It is not enough to convince other people that his reactions are legitimate. First and foremost, he must convince himself, or, more accurately, his extremely strict, excessively demanding, harshly punitive conscience. Unless he is able to delude his conscience about his motivation, he is made to suffer extremely painful bouts of self-criticism, shame, and guilt. That he suffers as much self-criticism, shame, and guilt as he does in spite all of the defenses he employs indicates, first, that his defenses are so extreme that they often do not do the job they are intended to do, and, second, that if he were to be stripped of them, he would be overwhelmed by an intolerable flood of self-deprecatory thoughts and feelings.

Because Mr. Scott devotes so much defensive energy to keeping unacceptable thoughts, feelings, and impulses bottled up and hidden from a potentially punitive environment, he is constantly under pressure. He views this pressure as coming from outside, but actually it comes from inside, as frustrated, pent-up feelings and impulses press for release. The standards of behavior that he internalized as a youngster make any open display of the kinds of thoughts, feelings, and impulses that he harbors totally unacceptable. Primarily, these are hostile and sexual impulses which his upbringing conditioned him to regard as taboo. From his obsessive-compulsive point-of-view they are unacceptably "messy" thoughts, feelings, and impulses that, if discharged, would have the effect of messing up the important, passive-dependent relationships in his life and exposing him to the critical, shaming reactions of whomever he might manage to offend.

Because he is so afraid of exposing unacceptable impulses, he is constantly on guard against "slipping" and revealing something he should not. This makes him very wary about getting too close or emotionally involved with other people and causes him to subject everything he says or does to careful scrutiny before he says or does it. This, of course, robs him of all spontaneity and imposes a very rigid, stilted, nervously-uptight quality to his interactions. This is what makes him hesitate so long before responding to people and try so often to amend and retract his responses even as he is making them. At every step of the way, he fears that he is revealing something that will shame and embarrass him and is suffused with feelings of indecision and self-doubt, so he constantly tries to modify and refine his responses in order that they perfectly convey the proper image he intends to convey. He does not want any of his responses to be amenable to the slightest misinterpretation, but, of course, they always are, particularly as he is driven to extremes of over-qualification.

As bad as this problem is, even in well-structured circumstances, it becomes much worse when there is any degree of ambiguity to situations demanding his response. He is extremely threatened by circumstances that are vaguely defined, and without adequate structuring, his anxiety reaches disabling proportions. Mr. Scott needs all the structure he can get, since without it, he is inclined to become cognitively disorganized and highly confused. When it is not clear to him what is going on or what is being demanded of him, his sense of threat rises to paranoid levels. This is when he is most likely to start feeling cornered, pressured, and at the mercy of critical people with punitive motives. Under such circumstances he becomes an obstinate stickler for clear-cut rules, regulations, and procedures and insists upon strict adherence to the letter of things. He can become so rigid in his demand for structure and conformity to the strictest procedural definitions as to become intractably non-communicative. The alternative for him is an intolerable fragmenting of his thinking. The experience, as he describes it, is one of not being able to string his thoughts together in any kind of logical, coherent fashion. *"I try to think,"* he said, *"but nothing comes together. Nothing is working....It's a sentence, here, a word, there... it's like my head's in a vice and wants to explode."*

## Opinion

Ability to understand the nature of the proceedings against him and to assist counsel in the preparation of his own defense:

> There is nothing wrong with Mr. Scott's ability to understand the nature of the proceedings against him. Indications are that he may have some difficulty in adequately assisting counsel in the preparation of a defense, however. During the interview, he communicated strong feelings of distrust and suspicion toward his attorney, ostensibly because he perceived him as not understanding his point-of-view and confronting him too ambiguously, in a hurry-up-and-decide manner.

> The results of this examination suggest that the problem is much more Mr. Scott's than his attorney's, since he is neurotically unable to assert himself in any situation in which there is the slightest room for misunderstanding, and especially when there is any degree

of ambiguity. He is the type of person who, because his fear of making mistakes is so great, has unusual difficulty making decisions in even the most mundane of situations. In his present situation, where he is being asked (in his mind, pressured) to make decisions affecting his status as a defendant accused of murder, the fear of making a mistake is all but paralyzing. He is so wary of making a wrong decision that he suspects the motivation of anyone—including his attorney—who seems to be pushing him to decide about anything, especially as he is able to anticipate—as he always is—the probable errors associated with any course of action. In his situation, it is not unlikely that he would end up passively putting off the making of any kind of decision, telling himself that he must wait until everything is perfectly clear, perfectly understood, and perfectly to his satisfaction. Since this kind of perfect outcome—one which would give him perfect assurance that he is not making some fatal error—is not achievable, it is possible that could endlessly manage to find something wrong with the way his attorney is doing his job, no matter who the attorney is.

Mr. Scott's response to this examination, however, shows that if he is dealt with patiently and given as much structure as possible, he is able to get past his neurotic blocks and express himself adequately. Although his neurotic symptoms are so severe that they sometimes rise to the level of cutting him off from reality and disrupting his thought processes, he is not psychotic. When his anxieties subside, his symptoms subside in intensity and he is capable of recognizing and responding appropriately to the reality of his situation. Therefore, even though Mr. Scott's neurosis may provide a most difficult test for any attorney attempting to counsel him, it is my opinion that if proper attention is paid to his neurotic needs, he is competent to adequately assist counsel in the preparation of his defense.

## Ability to make a competent decision concerning waiver of rights and to have a rational as well as factual understanding of the consequences of entering a plea of guilty:

Mr. Scott's mental problems do not interfere with his ability to understand his rights or the consequences of entering a plea of guilty. As indicated, they may very well interfere with his ability to actually make a decision about waiving his rights, but this need not be an insurmountable problem.

## Probable mental condition of the defendant at the time of the offense:

Mr. Scott's construction of events surrounding the commission of the crime with which he is charged may or may not be accurate. There is no way to tell. Since he denies culpability and talks only of his reactions to a crime committed by others, he gives little clue to what his mental condition may have been if he was, in fact, a more witting, willing participant in the crime than he admits.

About all that can be said is that it would not be at all typical of someone with Mr. Scott's obsessive-compulsive, histrionic, passive-aggressive personality to actively engage in behavior so violently antisocial in nature, particularly if that behavior involved any degree of forethought. All of his defenses are typically mobilized against the kinds of impulses involved in such behavior. Typically, he cannot even let himself think or give verbal utterance to hostile, aggressive, socially-unacceptable impulses, let alone act out on them deliberately with malice aforethought. This is a man who cannot make decisions when it comes to even the most trivial of matters. It is difficult to conceive of him conspiring to commit murder, deciding to commit murder, and then, over any protracted period of time, taking the steps necessary to carry out the murder.

Mr. Scott's does harbor a great deal of hostility, but, because he is so indisposed to express it in any open, direct way, his whole adjustment is built around the use of passive-aggressive defense mechanisms. It is not his style to aggressively defy his frustrators. His style is to succumb to feelings of incapacity and do nothing when he is expected to do something. Usually, he is so afraid of consequences that he does not dare even speak his mind. It would be quite uncharacteristic of him to dare something so fraught with negative consequence as the commission of a serious crime.

The results of this examination are much more consistent with the story that Mr. Scott tells than with the idea that he was a willing, active conspirator to commit murder and participant in the act of murder, itself. His extreme passivity, coupled with his inability to openly stand up and say no, would make him an easily manipulated dupe of anyone who put enough of the right kind of pressure on him. As set as he is to passive-aggressively resist people in positions of authority whom he perceives as trying to make him do something he does not want to do, he is just as passive-submissively set to agree and go along with powerful-seeming people who appear to like and respect him and to want to help him out in some way. With such people, he becomes an extreme "people-pleaser" — that is, he is willing to bend over backwards to do for them what they want him to do. It is quite conceivable, therefore, that Mr. Scott's account of what happened is essentially accurate, and that he was made the unwitting accomplice of the man, Styers, and the mother of the murdered boy. He may have had more of an idea about what Styers and the boy's mother were talking about than he admits to, but, as fragmented and confused as he gets in the face of ambiguity and insistent pressure, it is quite possible that he did not see or grasp the real significance of what was transpiring. The problem he has in understanding and making himself understood is serious enough that he may have understood one thing to be going on while Styers was thinking that he had quite a different understanding.

In any event, there is no present evidence of psychosis or serious misperception of reality, nor is there good reason to think that Mr. Scott was psychotic and out of touch with reality at the time the crime was committed. Whatever his role in the murder was, once he understood that murder had been, was being, or was about to be committed (as the case may be), he would have had full understanding of the nature and quality of the act and been well aware of its wrongfulness.

**Danger to self or danger to others:**

There is no indication that Mr. Scott is dangerous to himself or to others.

**Recommended place and form of treatment for the defendant in. view of therapeutic needs and potential dangerousness:**

Since Mr. Scott is not psychotic and, as a consequence, dangerous to either himself or to other people, there is no indication of need for inpatient treatment. His type of neurotic disorder is classically difficult to treat by means of psychological counseling, since his defenses are so rigid and denial of psychological problems is so essential to the kind of self-image he needs to maintain. Because he is defensively inclined to view all of his problems as physical in nature — as results of sickness and ill-health — he is most likely to respond favorably to a medical approach, where chemotherapy is the primary form of treatment. He ought to be evaluated for this purpose by a psychiatrist. A chemotherapeutic approach to anxiety reduction, particularly if offered in a patiently supportive and reassuring atmosphere, would, in my estimation, go furthest toward

ameliorating the neurotic symptoms that can, at times, become so seriously disruptive of Mr. Scott's functioning.

Diagnosis:    1. Generalized anxiety disorder, with obsessive-compulsive and hysterical features
              2. Mixed obsessive-compulsive and histrionic personality disorder
              3. Passive-aggressive personality disorder

Sincerely,

Donald Tatro, Ph.D.

FROM:  ROBERT CHERMAK
TO:  TERRY CAPOZZI
RE:  SALDATE CHRONOLOGY
DATE:  SEPTEMBER 19, 1995

DR 81-095490  State v. Barnwell

On August 29, 1981, the defendant attempted to rob a convenience store at gunpoint. When the clerk said she could not open the register, he shot her, but she did not die. In 1981, Det. Saldate investigated an armed robbery for which John Barnwell was arrested. On June 30, 1982, Det. Saldate met with a confidential informant who had detailed information about the crime, and who stated that a Mark Balady had committed the robbery. Unfortunately, Saldate failed to promptly investigate this lead, and Mark Balady committed suicide several days after June 30, thereby destroying potentially exculpatory information.


CR-130403  State v. Yanes  (See 15 A)

The defendant was a security guard at a tire shop. He lived with the victim, Eleanor Paez, in a trailer on the premises. On November 23, 1982, the defendant was seen drinking at a tavern near the tire shop. The defendant left the bar, only to return at 8:30 p.m. in an hysterical state, shouting that someone had shot his wife. He ran back to the tire shop while two bar patrons followed him. When the patron arrived, the defendant was telling his dead wife to wake up. Ray Silva, one of the patrons, pushed him away and began mouth-to-mouth resuscitation, at which time the defendant went berserk and charged him. Silva picked him up and dropped him on his head, rendering him unconscious. The defendant was later charged with second degree murder.

On November 24, 1982, Detective Saldate questioned the incoherent defendant while he was strapped and handcuffed to a hospital gurney. At the time of the interview, the defendant was intoxicated, and was also suffering from brain damage caused by a skull fracture.

The case was tried to a jury, and the defendant was found guilty of second degree murder. Upon an application for post conviction relief, the trial court granted a new trial. The statements were suppressed in a voluntariness hearing, causing the State to dismiss the case due to insufficient evidence.

See Appendix A.


CR-130819  State v. Starks  (See 15 I)

On December 14, 1982, the defendant robbed the manager of a gas station at gunpoint. The defendant wore gloves on his hands and a black stocking over his head. The defendant fled on foot with $ 61.00.

On December 16, 1982, the defendant went to a different gas station and asked the manager for a job application. When finished filling out the application, the defendant robbed the manager at gunpoint and fled with $ 1,666.37.

On December 16, 1982, Detectives Espindola and Saldate interrogated Richard Starks. In several affidavits, the defendant swore that during the interrogation, the Detectives asked him questions without reading him his Miranda rights. They also took his girlfriend into custody, and threatened to book her into jail if he did not sign a confession. The defendant's girlfriend also signed an affidavit confirming the above events.

Next, Detective Espindola told him that he would get 40 years in prison, and that he better say goodbye to his family. Furthermore, the detectives purposely gave him false information in an attempt to coerce a confession. Finally, the detectives refused to give him protection from other suspects, even though he was already a witness for the State. The defendant eventually signed a confession written by the detectives, and was charged with armed robbery.

The defendant plead guilty to both counts of armed robbery and was sentenced to 5.25 years in prison. The defendant entered a plea agreement before the court could rule on a Voluntariness Hearing. Upon an application for post conviction relief, the sentence was vacated, and the defendant was sentenced to seven years probation. (due to defendant's medication?)

See Appendix B

CR-143926  State v. Webster  (See 15 a)

On September 27, 1984, the defendant robbed a restaurant at gunpoint while three witnesses were present. The defendant was charged with armed robbery and aggravated assault.

On October 17, 1984, Detective Saldate showed a photo line-up to two robbery witnesses. After they tentatively identified the defendant, Det. Saldate applied for a search warrant. In his affidavit, Det. Saldate swore that both witnesses had identified the defendant as the perpetrator, when in reality both had merely stated that the defendant "looked" like the perpetrator. Det. Saldate also failed to mention that both witnesses had stated earlier that they could only "possibly" identify the suspect. Also, the suspect had been described as very dark complected, while the defendant was very light complected. Finally, Saldate failed to note that the others in the photo line-up looked very little like either the suspect or the defendant.

Even if the warrant had been valid, Saldate and other officers seized items outside the scope of the warrant. The items seized were not stolen, embezzled, or used in a crime, and therefore had no evidentiary value.

Finally, assuming the police did have probable cause to arrest the defendant, they could have arrested him on October 17, 1984. Instead, they kept him under surveillance until he got into his car

. so that they could conduct a pretextual contemporaneous search of the vehicle.

During trial, Saldate testified that the defendant was in jail for the offense, even though counsel did not ask him for that information. Defense counsel· immediately requested a mistrial, which the court denied.

The court refused to suppress the photo line up. The defendant was convicted of armed robbery by a jury and sentenced to

CR-161282   State v. Rodriguez   (See 15 M)

On August 29, 1986, the victim and a witness were riding their bicycles when they were stopped by the defendant. The defendant struck the victim, and when the victim and witness proceeded to leave, the defendant shot the victim with a shotgun. The defendant was charged with first degree murder.

On September 5, 1986, Detective Saldate testified before the Grand Jury. At that time, Saldate stated that the victim had been shot four times, when in fact he had been shot only once.

Due to Saldate's error, the court remanded for redetermination of probable cause. Later, the defendant plead guilty to manslaughter under a plea agreement, and was sentenced to 10 years in prison.

See Appendix C

CR 87-00882   State v. Moynihan   (See 15 O)

On December 31, 1986, the defendant went into his roommates's room and shot him. The defendant later bludgeoned the victim with a pistol in an attempt to get the victim to die. Later, the defendant returned and suffocated the victim to death. The defendant was charged with first degree murder.

On January 22, 1987, Det. Saldate elicited an incriminating statement from the defendant. Defense counsel, in its motion to suppress the defendant's statements, argued that Saldate violated the defendant's Miranda rights during the interrogation. Defense counsel also raised the possibility that the defendant was intoxicated during the interview, and that his confession was therefore involuntary. The defendant entered a plea agreement before the voluntariness hearing was held. Pursuant to the agreement, the defendant plead guilty to second degree murder and was sentenced to ten years in prison.

CR 87-00882   State v. Kelley

On December 31, 1986, the defendant was playing poker when he heard Chris Moynihan shoot Scott Solliday. He went into Scott's room and saw Moynihan bludgeon Scott with a BB pistol. Later, Kelley helped hold the victim's arms as Moynihan attempted to

suffocate Scott, but Kelley left before Scott died.   Later, he
helped Moynihan dump the corpse into a canal.
     On March 17, 1987, Det. Saldate interrogated Anthony Kelley.
According to Saldate, Kelley was evasive and noncommittal during
the interview.   The defendant later explained this behavior by
saying that he was "messed up, coming off of crystal" when Det.
Saldate questioned him.
     The   defendant   entered   a   plea   agreement   before   the
voluntariness hearing was held.  Pursuant to the agreement, the
defendant plead guilty to hindering prosecution and was sentenced
to one year in prison.

CR 87-02256  State v. Nordman

     On March 4, 1987, Saldate allegedly interviewed a murder
witness while she was intoxicated.
     The court denied the defendant's motion for a new trial.

CR 88-00044  State v. Reyes

     On December 26, 1987, an argument broke out between several
men in a parking lot.   The defendant shot one victim in the
buttocks, and another victim in the head, mortally wounding him.
The defendant was charged with aggravated assault and second degree
murder.
     On December 27, 1987, Detective Saldate interrogated the
defendant, even though Saldate knew that the defendant had been
drinking.
     The trial court found the statement admissible.   The jury
found the defendant guilty of aggravated assault and second degree
murder.  He was sentenced to 17.5 years in prison.


See Appendix D


CR 87-11508  State v. Running Eagle  (See 15c)

     On        1987, Running Eagle and Cory Tilden burglarized the
garage next to the victims' house.   The victims confronted the
defendants during the burglary.   An argument ensued, and the
victims fled into their house, where the defendants bludgeoned and
stabbed them to death.  Running Eagle was charged with two counts
of first degree murder, one count of first degree burglary, and one
count of second degree burglary.
     On June 20, 1988, Detective Saldate testified that during his
interrogation of Running Eagle, the defendant stated that he wanted
to remain silent.  In spite of this, Saldate continued to question
him.  Saldate also testified that he repeatedly poked the defendant
in the chest during questioning, and that he generally stays within
6 to 12 inches from a suspect's face during an interrogation.
Saldate stated that at one point the defendant had tears in his
eyes.
     Saldate  also  testified  that  he  questioned  a  witness  who

claimed he was too drunk to remember anything.  Saldate repeatedly told the witness that he "had to do better than that," until the witness eventually agreed with Saldate's understanding of the facts.

The trial court found the defendant's statements admissible. A jury found the defendant guilty of two counts of first degree murder, one count of first degree burglary, and one count of second degree burglary.  The defendant was sentenced to death.

See Appendix E

CR 88-07047  State v. Blackerby   (See 15 F.)

On March 2, 1988, the defendant approached a cabdriver and asked to be taken to his friend's house.  At the end of the ride, the defendant told the cabdriver that he did not have any money and could not pay the fare.  When the driver began to question him about this, the defendant shot him in the head.  The defendant took the driver's wallet and left.

On March 18, 1988, the defendant picked up a hitchhiker. During the ride, the hitchhiker offered to sell the defendant a rifle.  They arrived at the hitchhiker's apartment, whereupon the hitchhiker obtained his rifle.  As he was waling back to the car to show the defendant the gun, the defendant got out of the car and shot the hitchhiker to death.  The defendant was charged with 2 counts of first degree murder and one count of armed robbery.

On April 4, 1988 at 10 p.m., the 17 year old defendant was taken into custody by means of a "street jump" and held incommunicado for two hours before Detective Saldate and Detective Chambers began to interrogate him.  The detectives alternated every 15 minutes for two hours until 2 a.m., in spite of their awareness that the defendant had psychological problems.

Finally, Saldate exhorted him to "cleanse his soul," after which the defendant began to nod his head in agreement with everything Saldate said.  In fact, the defendant asked Saldate to provide him with the details of other crimes so that he might remember them.

The trial court found the statements admissible.  The defendant waived a jury trial and submitted his case to the court for judgment.  He was convicted and sentenced to life imprisonment without possibility of release for 50 years.

See Appendix F

CR 88-05881(B)  State v. Conde  (See 150)

On May 27, 1988, the defendant and his partner robbed a bank at gunpoint.  He then stole a customer's car keys, and then he stole a car at gunpoint.  As they fled, they shot and killed a security guard.  Later, they robbed another victim of her car.  An off-duty police officer observed them driving erratically and began pursuit.  The officer followed them until they stopped.  When the

officer got out of his car and identified himself, they opened fire and fled in a vehicle. The suspects then stole another car at gunpoint. Later, police discovered Conde at an apartment complex. Several officers accosted him and ordered him to stop, when Conde responded by firing at them. They returned fire, and Conde received multiple wounds. He was taken to a hospital for treatment. The other suspect was not apprehended. Conde was charged with first degree murder, first degree burglary, 5 counts of armed robbery, attempted robbery, and 5 counts of aggravated assault.

On or about May 30, 1988, Detective Saldate interrogated the defendant while the defendant was in a hospital bed. According to Saldate, Mr. Conde was drifting in and out of consciousness. After Saldate read him his rights, Saldate was not sure whether the defendant understood them, yet he continued to ask questions even though he noticed that the defendant was in pain. Saldate had to jostle Mr. Conde several times in order to get his attention. At that point, the defendant requested some pain medication, and the nurse said she would give it to him when the questioning was over. Finally, Saldate terminated the interview, but only after the defendant had made inculpatory statements.

On October 30, 1989, Det. Saldate testified at trial. Upon cross examination, the defense asked Saldate whether he had threatened to put a witness in jail if the witness refused to talk to Saldate regarding the crime.

On November 1, 1989, the defense asked Saldate whether he had threatened to revoke a different witness' probation if she refused to talk to Saldate.

The court found the statements involuntary and therefore suppressed them. (There was also a problem with whether the police brought Conde before a magistrate in time, but is this Saldate's fault?). A jury found the defendant guilty of first degree murder, first degree burglary, five counts of armed robbery, 8 counts of aggravated assault, and one count of attempted armed robbery. The defendant was sentenced to life in prison.(check this)

See Appendix G

CR 88-09605  State v. Reynolds  (See 15N)

On September 6, 1988 the defendant broke into the victim's apartment via an arcadia door. He grabbed the female victim by the hair and legs and dragged her upstairs. At that point, a witness heard the sounds of a struggle, after which the defendant came back downstairs and left. Several witnesses saw the victim alive later that night. The defendant was charged with first degree murder.

On October 18, 1988, Saldate testified before the Grand Jury. According to Saldate, a witness had stated that he had seen the suspect enter the victim's apartment "late at night," when in fact the same witness had told Det. Addington (Saldate's associate) that the suspect came in at 8 p.m. Because several other witnesses had seen the victim alive 2 hours later, long after the suspect had left, Saldate's misstatement was extremely prejudicial.

Likewise, in the same Grand Jury proceeding, a juror asked Det. Saldate whether the defendant had been drunk on the night of the murder. Saldate answered that the defendant had been drinking but was not drunk, when in fact the defendant had told Saldate that he dad been drinking beer and smoking marijuana, and was therefore "too drunk" to remember certain events.

Due to the above, the trial court remanded for a new finding of probable cause, after which the State dismissed the case.

See Appendix H

CR 89-03252   State v. Salas   (See 15B)

On March 25, 1989, the defendant entered his sister-in-law's apartment. He asked for a beer, and was refused. The victim, Ascencion Hernandez, then opened the curtains to an arcadia door in the apartment. The defendant drew a knife and chased the victim into an alley where he stabbed him to death. The defendant was charged with first degree murder.

On March 25, 1989, Saldate interrogated the defendant. During the interview, Saldate noticed that the defendant's eyes were watery and bloodshot, and felt that the defendant had been drinking heavily. The defendant stated that he was drunk during the interrogation.

The defendant entered a plea agreement before the voluntariness hearing was held. Pursuant to the agreement, the defendant plead guilty to manslaughter and was sentenced to 12 years in prison.

See Appendix I

CR 89-08086   State v. Rangel   (See 15K)

On June 24, 1989, the defendant picked up his girlfriend from work. While driving, they got into an argument. The defendant stopped and got out of the truck. His girlfriend came out with a gun she had found in the vehicle. When she began complaining about the gun, the defendant grabbed the gun and shot her to death. The defendant was charged with first degree murder.

On August 3, 1989, Rangel was interrogated by Detective Saldate. During the interview, Rangel requested an attorney three separate times. Detective Saldate refused his request each time, and continued to question him.

After Rangel confessed, Detective Saldate testified before a Grand Jury on August 9, 1989. In order to obtain an indictment for first degree murder, Saldate failed to present the entirety of the information that the State had in its possession at the time of the Grand Jury hearing.

For instance, Saldate stated that Rangel denied having a gun, but failed to mention that he later admitted that he did in fact have a gun on the night of the victim's death. Additionally, Saldate testified that police had not found the weapon , but he

specifically failed to disclose that fact that Rangel had specified where he had hidden the gun. Finally, Saldate testified that the defendant stated that he saw the victim drive away from the crime scene. However, Saldate failed to mention that Rangel later confessed that the victim did not drive away, but rather stayed with him until the time of her death.

On October 16, 1989, due to the above, the court granted Rangel's motion to remand to the Grand Jury. After being indicted a second time, the defendant plead guilty to second degree murder pursuant to a plea agreement. He was sentenced to 15 years in prison.

See Appendix J


CR 90-00715   State v. Biggica   (See ¶ L)

On January 16, 1990, the defendant and victim were drinking with a group of friends. Eventually, the victim began to tease the defendant. The defendant left with a friend to buy beer. While at the store, the defendant purchased a handgun. They returned to the group, whereupon the victim continued to insult the defendant. The defendant finally shot the victim in a fit of anger. The defendant was charged with second degree murder.

On January 16, 1990, Detective Saldate interrogated Mr. Biggica. Upon questioning, the defendant immediately denied responsibility for the crime. In violation of the defendant's right to remain silent, Det. Saldate then told the defendant that it was "necessary" for the defendant to tell him what happened. Because Det. Saldate make it clear that the defendant had no choice but to discuss his involvement, the defendant confessed to the crime.

The defendant entered a plea agreement before the suppression hearing was held. Pursuant to the agreement, the defendant plead no contest to manslaughter and was sentenced to 8 years in prison.

See Appendix K


CR 90-00296   State v. Mahler   (See ¶ G)

On January 19, 1990, Detective Saldate interrogated Mr. Mahler. Mr. Mahler immediately refused to answer any questions. At that point, Saldate should have ceased interrogation, but he did not. Saldate stated that he wanted to "...get [Mahler's] side of the story." Mr. Mahler answered that the police would have to either cut his girlfriend a deal, or provide him with a lawyer before he would answer anymore questions. Det. Saldate then assured the defendant that his girlfriend would be released. Here, Saldate's promise of leniency for Mahler's girlfriend made the confession involuntary and therefore inadmissible. Finally, Saldate ignored Mahler's previous request for a lawyer.

Due to the above, the Court of Appeals suppressed Mr. Mahler's confession.

See Appendix L

CR 90-03339 State v. Gallegos/Smallwood   (See 15 H)

On March 16, 1990, Michael Gallegos and George Smallwood had been drinking all day when Gallegos entered the room of Smallwood's 8 year old sister. He held his hand over her mouth and nose, causing her to suffocate while he sexually assaulted her. After she died, Gallegos proceeded to sodomize her. Gallegos was charged with first degree murder, child molestation, and engaging in sexual conduct with a minor.

On March 16, 1990, Detective Saldate interrogated Michael Gallegos while Saldate's partner, Det. Chambers, interrogated George Smallwood. Gallegos repeatedly asked for counsel and was repeatedly ignored by Saldate. Once he admitted involvement, Saldate read him his rights, and continued questioning.

When Det. Saldate finished with Mr. Gallegos, he joined Det. Chambers in the continuing interrogation of Smallwood, who repeatedly denied involvement in the crime. Eventually, Smallwood told Saldate that he would not answer any more questions without a lawyer. Thereafter, the questioning ceased, but Det. Chambers made a "statement" to him in an attempt to elicit an incriminating response.

The trial court found the statements admissible. A jury found the defendant guilty of first degree murder and of engaging in sexual conduct with a minor. He was sentenced to death.

See Appendix M

CR 90-05217  State v. Jones  (See 15 E)

On March 9, 1990, the victim met one of the defendant's female friends in Metrocenter and agreed to give her and her friends a ride home. Once on the highway, the group commandeered the victim's car. The group drove for a while, and then stopped and forced the victim to walk deep into the desert, where the victim was shot to death.

On March 22, 1990, police stopped a vehicle that belonged to a missing person. Samuel Knott was driving, and John Jones was a passenger. The police took Knott in for questioning, while Jones voluntarily drove to the police station to wait for Knott. While Jones was waiting in the police station lobby, Detective Saldate directed an officer to lock him in an interview room. Jones was handcuffed to a desk inside the room.

Later, Knott implicated Jones in a murder, after which police interrogated Jones, who eventually confessed. The trial court found that Detective Saldate had placed Jones in custody by locking him in the room, that he had no probable cause to arrest Jones, that therefore Jones' confession was the product of an unlawful arrest, that the taint thereof was not purged by intervening circumstances, and that Jones' confession was therefore inadmissible.

In the defendant's response to the State's request for a pre-trial hearing, the issue was whether police would have inevitably discovered the victim's corpse. When questioned on this matter, Det. Saldate "...attempted to create the possibility that Samuel Knott could have led police to the crime scene." However, that possibility was negated by the information that Det. Saldate had at the time of the inquiry.

In affirming the trial court's ruling, the Court of Appeals stated that Saldate had detained the defendant without probable cause in the hope that something might turn up. Without the confession, the State dismissed the charges.

See Appendix N


CR 90-04928   State v. Jones


On April 24, 1990, the victim died from a gunshot wound to the head. Several people were present when the shooting occurred, but did not see the actual shooting. The defendant was arrested and charged with first degree murder.

On April 24, 1990, Jones was interrogated by Detective Saldate. The defendant initially denied any involvement in the crime. At this point, the defendant learned that his girlfriend was in custody and being questioned by the police. The defendant then told Saldate that he would like to talk to her so that she would not lie for him and consequently be arrested for lying. Detective Saldate never informed the defendant that the police did not intend to arrest her. The defendant's girlfriend was brought in to the interviewing room, whereupon the defendant made an inculpatory statement. Because Det. Saldate never disabused the defendant of the notion that his girlfriend would be arrested, the defendant confessed in exchange for what he believed to be an implicit "promise" that his girlfriend would not be arrested.

The trial court denied the defendant's motion to suppress. The defendant was acquitted in a trial to a jury.

See Appendix O

CR 90-00050   State v. King   (See 15J)


On December 27, 1987, the defendant and his partner robbed a convenience store. The defendant shot and killed the clerk and the security Guard. The defendant was charged with two counts of first degree murder and one count of armed robbery.

On December 28, 1990, Detective Saldate interrogated the defendant. Halfway through the interview, the defendant said he would not answer anymore questions, and yet Det. Saldate continued to question him. In addition, at the voluntariness hearing held on June 22, 1990, Detective Saldate stated on direct examination that the defendant never said he did not want to answer any more questions. On cross examination, defense counsel read Saldate's report of the interview, wherein the defendant had stated "...I'm

not going to answer anymore of your questions."
     The court excluded all of the defendant's statement made after
that point in the interview.  A jury found the defendant guilty of
2 counts of first degree murder.  The defendant was sentenced to
death.

See Appendix P

CR  90-00296  State v. Ross   (See 15 P)

     In State v. Ross, Detective Saldate displayed a photo lineup
to Samantha Tingue, the sole eyewitness to the murder of her
husband.   After she failed to identify the defendant, Saldate
informed her father-in-law that she had chosen the wrong person.
The father-in-law then relayed this information back to Mrs.
Tingue.
     Comments by the police following an identification are
routinely condemned.  See State v. Day, 148 Ariz. 490, 755 P.2d 743
(1986).  (Check disposition and date).

See Appendix Q


CR 89-08277  State v. Fraser  (See 15 R)

     On August 1, 1989, the defendant shot and killed his
girlfriend's stepfather in the victim's front yard.  Between August
2, 1989 and August 6, 1989, the defendant fraudulently forged and
passed forty-three of the victim's checks.   The defendant was
charged with first degree murder and fraudulent schemes and
artifices.
     On July 29, 1991, Det. Saldate testified at trial.  Upon cross
examination, defense counsel asked Saldate several questions that
implied that Saldate had put words in the defendant's mouth during
the interrogation.
     The Court found the statements admissible.  The defendant was
convicted by a jury and sentenced to 21 years in prison.

**EXHIBIT 15A**

IN THE SUPERIOR COURT OF MARICOPA COUNTY, ARIZONA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR-130403 |
| Respondent, | ATTACHMENT A TO PETITION |
| v. | FOR POST-CONVICTION RELIEF |
| MANUEL YANES, | |
| Petitioner, | |

Petitioner-defendant, hereinafter referred to as defendant, submits that he was denied the effective assistance of counsel guaranteed by the sixth and fourteenth amendments to the United States Constitution because his trial counsel failed to present at the voluntariness hearing the available crucial evidence concerning whether the defendant's statements were obtained in violation of Miranda v. Arizona, and its progeny, and whether said statements were involuntary.

Defendant submits that his trial counsel did not show minimal competence in presenting the available testimony and this failure resulted in the loss of an opportunity to have the trial court suppress the statements.

In State v. Watson, 134 Ariz. 1, 653 P.2d 351 (1982), (see copy attached hereto), the Arizona Supreme Court discarded the prior standard regarding measuring the competence of counsel in a criminal case and stated:

"We believe the time has come to reconsider the 'farce, sham, or mockery of justice' standard for counsel's ineffectiveness. . .

. . . . we believe that a better standard would focus directly upon basic notions of competence rather than upon the reasonableness of counsel's actions. . . . We believe the proper standard is whether under the circumstances the attorney showed at least minimal competence in representing the criminal defendant. . . . The focus is thus on the quality of counsel's performance, rather than on the effect of that performance on the outcome of the proceeding.

- 1 -

> "Generally, the concept of minimal professional competence can be described and applied without great difficulty. There is general agreement on many of the areas of what constitutes proper defense practice in criminal cases. In representation of a person accused of crime, every defense attorney would be expected to file pre-trial motions when the facts raise issues concerning the voluntariness of statements, the legality of searches, or the suggestiveness of identification. Failure by an attorney to pursue such matters would be considered representation which falls below the minimum standards of professional competence required of defense counsel."
> (134 Ariz. at 4, 5, 653 P.2d at 354-355).

In State v. Watson, supra, the court reversed the jury verdicts regarding charges of assault with a deadly weapon, armed robbery, and burglary because trial counsel had failed to file a timely motion requesting a Dessureault hearing.

In the case subjudice, the record reflects that trial counsel for the defendant requested a voluntariness hearing concerning Detective Saldante's interrogation of the defendant. Trial counsel indicated that he was not contesting statements allegedly made to Officer Vasquez, a uniformed officer. (RT, 5-31-83 at p. 10-11). Defense counsel did not file a written motion or any pleading with respect to the voluntariness issues involved in this case, at any time. The prosecution filed a 5-page pleading entitled Memorandum of Law Voluntariness of Statements.

Officer Saldante testified at the voluntariness hearing that he had conducted two separate interrogations with the defendant on November 24, 1982, the first commencing at 12:51 a.m. (RT, 5-31-83 at p. 13) and the second commencing at 1:43 a.m. Both took place in the hospital. (Id. at 22). Prior to interviewing the defendant, he had spoken to an unnamed medical staff member, who had related that they "had not had any occasion to check the defendant out thoroughly." A nurse or someone told this officer the defendant had not been treated yet. (Id. at 23). The interview occurred while the defendant was strapped to a hospital bed. The defendant may have had a slight odor of alcohol. The officer observed some clotted blood in the defendant's hair. (Id.)

- 2 -

The officer related that when he first had spoken to the defendant, he began to mumble several things that were not understandable. During the questioning, the officer noted in his report that the defendant appeared "inattentive." (Id. at 25). He opined the inattentive appearance of the defendant during questioning was the result of intoxication and lack of sleep. (Id.) The officer related that he never had spoken to any medical personnel regarding the extent of the defendant's injuries, except briefly when he arrived (Id. at 27).

Saldante testified that the defendant had been obviously upset during questioning because he was tied down to a gurney. (Id. at 29). This, the officer felt may also have explained why he appeared "inattentive."

The officer testified that during the 12:51 a.m. interview, he had advised the defendant of his Miranda rights in both English and Spanish. The defendant allegedly stated he understood his rights. (Id. at 14). The record reflects that the officer was called upon to interpret various gestures that the defendant was making in response to questions. These gestures included tilting his head and closing his eyes.

During the 1:43 a.m. interview, the defendant was not re-advised of the Miranda rights but was questioned regarding if he still understood his rights. The defendant nodded in an up and down fashion. (Id. at 16).

Officer Saldante described the "inattention" of the defendant in response to the following questioning:

> Q. There came a time, I believe, at the end of your second interview when you wrote your report that you felt that he was inattentive to your questioning. Do you recall stating that?
>
> A. Yeah, in regards to that statement I felt that his inattention, meaning that when I asked him a question I would have to get to him and get his attention to ask him that question. I felt that he was very attentive when I asked him that question and when he answered it. However, his inattention would be between questioning.

- 3 -

Officer Saldante testified that the second interview terminated when the defendant's brother arrived at the hospital and told him not to say anything until he had spoken with an attorney. The defendant did not ask for an attorney at this point, but Saldante stopped the questioning. (Id. at 27).

At the conclusion of Officer Saldante's voluntariness hearing testimony, the prosecution offered no further witnesses but offered the 5-page pleading. Trial counsel for the defendant called no witnesses at the voluntariness hearing and filed no pleading.

After defense counsel indicated no evidence or witnesses would be presented for the defense, the trial court held that the statements made were voluntarily and that no force or threats were used or promises made.

Defendant's trial counsel then, for the record, urged reconsideration and argued that the defendant had had a skull fracture (Id. at 30.), but no evidence had been presented to support this argument. It was argued that the defendant was coerced into making the statements. (Id. at 30). No argument was presented to the court regarding the defendant being incapable of waiving his Miranda rights. No case law was presented by the court regarding the heavy burden imposed upon the prosecution to prove that the defendant intelligently and knowingly waived his constitutional rights under Miranda v. Arizona and its progeny. No medical evidence was presented to the court regarding the true nature of the defendant's medical condition during police interrogation. At this point the trial court had been called upon to rule on the "voluntariness" issue twice without the benefit of a scintilla of evidence from the defense. No lay witnesses were called regarding the extent of the defendant's injuries, although clearly available. No evidence regarding why the defendant was in the hospital was presented.

On June 1, 1983, the trial court granted trial counsel's request to re-urge the motion for a voluntariness hearing. (RT 6-1-83 at 110).

- 4 -

Defense counsel told the court that he had reports from the County Hospital which indicate that the defendant was admitted to the emergency room at 9:40 p.m. on November 23, 1982, in an incoherent state. He had blood on his hair but there was no evidence of trauma. He was handcuffed and in leather restraints. In the standard physical examination report the defendant was described as acutely ill. His mental status was listed as disoriented. The report contained evidence of a basal skull fracture. A November 24, 1982, medical record notation states ". . . he remains confused. He is unable to remember the day or the month." (Id. at 111-112).

Counsel then urged the court to reconsider its earlier ruling on voluntariness because the evidence offered, plus the psychiatric report of Dr. Melendez, indicated that the defendant did not understand his <u>Miranda</u> rights and that the statements were involuntary because the defendant was in a incoherent state. (Id. at 112-114).

The court held that "even if we had the people here testifying that it would still go to the weight, so I will stand on my ruling." (Id. at 113).

During the trial additional evidence was presented which should have been presented to the trial court during the voluntariness hearing by defense counsel.

Officer Saldante testified that he delayed conducting the second interview because the medical personnel were treating the defendant. (RT 6-2-82 at 82).

Saldante testified:

> "The reason I did not go and interview him again was because they were conducting some medical functions with him, and that's how come the interview, the second interview did not take place for almost an hour." (Id. at 82). . .

Saldante pointed out that the defendant was being treated behind a curtain for nearly an hour between the interrogations. (Id. at 82).

Crucial testimony which defense counsel failed to present during the voluntariness hearing was that of Thomas Kolb, M.D., who was one of the

emergency room physicians that examined the defendant. (RT 6-5-83 at 7-20).

He related that the defendant had been handcuffed, with his arms and legs in leather restraints, due to his alleged "combativeness." Physical observation revealed that the defendant had a significant head injury (Id.). The doctor attempted to speak with the defendant and thereby ascertain the extent of his injuries. He was unable to converse in English. A Spanish interpreter was used and it was the doctor's opinion that the defendant was disoriented. "He did not know who he was, what year it was, who the president was." (Id.). His response to questions regarding his name were mumbled and incoherent. (id.). He gave the wrong date, wrong year. (Id. at 10). The defendant was questioned by Dr. Kolb at approximately 1:00 a.m. (Id.).

Dr. Kolb indicated that the medical records showed that Dr. Tamsen (phonetic) observed the defendant at 9:45 p.m. on November 23, 1983. (Id.). Dr. Tucker's notes indicated the head injury was significant enough that he should be admitted. (Id. at 12). When Dr. Kolb examined the defendant the first time, he was being fed intravenously, which gave him drugs and medication (Id. at 12). Dr. Kolb saw the defendant several times while he was in the emergency room, which was described as very busy.

When the doctor spoke to the defendant at 3:30 a.m., his responses remained mumbled, shouted, incoherent, and he did not say anything that could be understood. (Id. at 13). He still was not aware of the year, the president's name, what his name was, or where he was at. (Id. at 13).

Dr. Kolb testified that a computerized tomographic scan of the defendant's brain was done two days after admission, and it showed a left temporal lobe hemorrhage and contusion, which he related was a bruise on the brain. He related that such a hemorrhage explains the defendant's behavior in the emergency room because a hemorrhage can cause confusion and disorientation. (Id. at 15).

- 6 -

Other important evidence concerning the defendant's mental state during the interrogations was presented by the state during the trial, but was not offered by the defense regarding the voluntariness issue.

Ray Silva related that he personally has been told by the defendant to leave the victim alone at the scene at which time the defendant started to swing at Ray. Mr. Silva related that he had wrestling experience, picked the defendant up, and tossed him on his head, causing the back of the defendant's head to be opened and the defendant was rendered unconscious.

Defendant submits that his trial counsel did not display competence in presenting the evidence available regarding the voluntariness of statements and the waiver of Miranda rights. It is submitted that the mere requesting of a hearing or the filing of a motion does satisfy the requirements of the sixth and fourteenth amendments to the United States Constitution.

Defendant requests that an evidentiary hearing be ordered so that this court can have an opportunity to ascertain whether trial counsel's failures were tactical or otherwise.

Respectfully submitted this 14th day of November, 1983.

ROSS P. LEE
Maricopa County Public Defender

By James L. Edgar

JAMES L. EDGAR
Deputy Public Defender
Attorney for Petitioner
132 South Central, 2nd Floor
Phoenix, Arizona 85004

Copy of the foregoing mailed
this 14th day of November, 1983, to:

THE HONORABLE IRWIN CANTOR
Judge of the Superior Court
East Court Building - 9th Floor
101 West Jefferson
Phoenix, Arizona 85004

- 7 -

ROBERT CORBIN
Attorney General of Arizona
1275 W. Washington
Criminal Division - 2nd Floor
Phoenix, Arizona 85007

THOMAS E. COLLINS
County Attorney

By _____

JAMES L. EDGAR
Deputy Public Defender

O. K. FILE
REMOVE CARD

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | No. CR-130403 |
| Plaintiff, | ) | |
| | ) | SUPPLEMENTAL MOTION TO |
| | ) | SUPPRESS |
| v. | ) | |
| | ) | (Judge D'Angelo - Div. 38) |
| MANUEL MARTINEZ YANES, | ) | |
| | ) | Oral Argument and Evidentiary |
| Defendant. | ) | Hearings Requested |
| | ) | |

Defendant, by his attorney undersigned, moves to suppress all statements to the

police pursuant to interrogation for the reasons set for below.

Respectfully submitted this *26* day of September, 1984.

ROSS P. LEE
Maricopa County Public Defender


By
DAVID BRAUER
Deputy Public Defender
Attorney for Defendant


## MEMORANDUM OF POINTS AND AUTHORITIES

A)   Facts

On July 18, 1983, defendant was convicted of Murder, second degree. He filed a

Petition for Post-Conviction Relief asserting that he was denied effective assistance

of counsel at his voluntariness hearing. He was granted a new trial on July 26, 1984.

Defendant was employed as a security guard at Charlie's Tire and Custom Wheel

shop at 2801 West Buckeye Road, Phoenix, Arizona. He lived in a small trailer behind

the shop with Eleanor A. Paez. This shop had been broken into about four times in the

previous two years and there were a lot of security problems. The rear of the shop

- 1 -

was dark with easy access over a three-foot fence at the northeast corner and then a six-foot fence. Three previous guards had been given a handgun for their protection by defendant's employer. When he was hired, defendant requested a gun for his protection, but his employer refused to do so until he got to know him a little better. Shortly thereafter, defendant borrowed a shotgun from his brother. He carried it loaded, and on one occasion showed it to his employer.

About two weeks after defendant was so employed, Eleanor Paez was killed with one close range blast from said shotgun. The killing occurred on November 23, 1982, at about 8:30 p.m. At about 6 p.m. that evening, after closing hours, defendant's employer asked him to perform a small task. At that time they had a short conversation and defendant again asked his employer for a firearm for his protection, but was again refused. (A few days previously, defendant told his employer he was going to return his brother's shotgun to him).

During the same evening of the killing, defendant was seen drinking at a tavern on Buckeye Road directly across the street from the tire shop. He appeared intoxicated and was bothering people. He was wearing a shirt at that time. Defendant left the bar at some point. Around 8:30 p.m., he ran into the bar. He was not wearing a shirt and he was hysterical. Although he is bilingual, he shouted in Spanish that someone had shot his wife and that he needed help. Defendant then ran from the tavern and across Buckeye Road toward the tire shop. In the process, a tractor-trailer almost jackknifed to avoid hitting him. Defendant was shouting in an hysterical manner. Two bar patrons followed after him. Defendant jumped over a short fence at the northeast corner of the tire business and ran toward the main building. When he reached a small gate to the building yard, he picked up a shotgun, threw it over the fence toward the shop, and then ran into the shop itself. A witness, Ray Silva, followed defendant into the shop and found him kneeling over Eleanor Paez saying, "Wake up, wake up." Silva told defendant to leave Paez alone and pushed him away.

-2-

Silva began mouth-to-mouth resuscitation on Eleanor Paez at which time defendant went berserk and charged him. Silva, a former wrestler, picked the defendant up and dropped him on his head on a concrete floor rendering him completely unconscious. Defendant was found by the police in a small pool of his own blood lying next to Eleanor Paez who was now dead.

At the request of medics at the scene, Officer Vasquez asked defendant in Spanish where he was hurting. Vasquez reports that defendant "mumbled several times that he wanted to see her." Vasquez could smell a very strong odor of liquor on defendant's breath, defendant's speech was mumbled and slurred, and Vasquez could hardly understand "most of what he was saying."

Defendant was transported to county hospital by ambulance. There, he was handcuffed by the police and further restrained on a gurney by leather straps. Vasquez again tried to interrogate defendant. He asked defendant his name and defendant "again continued to mumble words which were hardly understandable." According to Vasquez, defendant said that his name was Manuel Yanes. Defendant told Vasquez he was born in 1942. (This was incorrect information; defendant was born in 1940). Defendant again stated "he wanted to see Eleanor." Defendant became "very unresponsive" to Vasquez' questions and muttered words Vasquez "could not understand." Defendant was also unresponsive "to any attempts by hospital personnel who tried to find out the extent of his injuries."

Detective Saldate attempted his interrogation at about 12:45 a.m. with Officer Vasquez standing close by. When Saldate told Mr. Yanes that he was there to interview him, Mr. Yanes began to mumble several things both in English and Spanish, which were not understandable. According to Saldate, he asked defendant if he was from Mexico and defendant said he was from Texas and understood English. According to Saldate, he read the Miranda rights to defendant in both English and Spanish. When asked if he understood his rights, Saldate indicates defendant said "yes." Saldate felt

the need to paraphrase the Miranda rights due to the defendant's mumbling both in Spanish and English.   Saldate proceeded to question defendant regarding what happened to Eleanor Paez and what caused defendant's injury.  According to Saldate's police report, Mr. Yanes did not respond for several minutes, and his head was turned in another direction.  Mr. Yanes then began mumbling about Eleanor.  Saldate again tried to question him and defendant stated: "I don't know.  I don't know."  Mr. Yanes then told Saldate that he was at a bar, "went home," heard a shot, went "inside" and saw "his woman" who was unconscious.  (This was an inaccurate account; the evidence clearly shows that Eleanor was shot and killed in the tire shop -- not inside the home).   According to Saldate, Mr. Yanes made a loud sound in describing the shot.  Saldate says that defendant told him that a man was there with Eleanor and asked for help. Mr. Yanes said he went to Eleanor and asked her who did it.  Mr. Yanes then closed his eyes and tilted his head to one side.  Apparently while his eyes were closed, he was questioned further.  He allegedly stated Eleanor had passed out and said nothing. According to Saldate, defendant then said he got up and ran to the bar and spoke to a Mexican and at this point Mr. Yanes turned his head away and began to mumble about seeing Eleanor.  Saldate had to try to get defendant's attention so he could question him further regarding what happened in the bar.  Mr. Yanes stated he wanted to see Eleanor first.  Saldate continued to question Mr. Yanes.  He asked him how he sustained his head injuries to which defendant replied he did not know.  According to Saldate's police report, defendant once again began to mumble in both English and Spanish, and he noted in his report "at that point it was obvious that I had lost the attention of the suspect, and then ended my interview."

Saldate's report indicates that he again attempted to interrogate Mr.  Yanes after conferring with police officers, and during this interview the defendant angrily stated he knew his rights by stating, "yes."  According to Saldate, defendant said he had three or four beers.  When questioned regarding when he started drinking Mr.

-4-

Yanes did not answer the question. The question was repeated and Mr. Yanes said he did not know. Mr. Yanes denied using drugs. According to Saldate, he then interrogated the defendant by asking a series of questions (each in Spanish and English) about the shotgun his brother loaned him and the defendant answered every such question either with the word "no" or by shaking his head "from side to side." Saldate says that the defendant expressed some anger when he answered these questions by monosyllable answers and movement of his head and he testified that the defendant denied ever borrowing or possessing a shotgun or having one at the tire shop. This interrogation lasted for approximately 15 minutes.

Detective Ronald Quaife will testify that he observed Mr. Yanes at about 2 a.m. on November 24, 1982, while he was strapped down and handcuffed on the gurney; that he was present while Detective Saldate was attempting his interview and that Detective Saldate told him that he believed Mr. Yanes to be drunk.

Neither Vasquez, Saldate, nor Quaife were aware that during interrogation, Mr. Yanes was suffering from a substantial brain injury.

At the hearing on this motion, Thomas Kulb, M.D., will testify that on the dates in question he was a trauma surgeon employed at the Maricopa County Hospital and had substantial contact with Mr. Yanes throughout the evening and morning hours. He has described the conditions in the emergency room during defendant's interrogation as "mayhem." He will testify he had occasion to observe Mr. Yanes on 10 to 15 occasions throughout the night because Mr. Yanes was strapped to the gurney directly in front of his office. Dr. Kulb will testify that Mr. Yanes was, at most times, unconscious throughout the evening; and that even when he was semiconscious, he was incoherent. He will testify that he never received any coherent response from Mr. Yanes at any time; that a Spanish interpreter assisted him; that when Mr. Yanes was first questioned he did not know who he was, what year it was, or who the president was. He will testify that Mr. Yanes' responses were mumbled and incoherent regarding his

name. He will testify that he first attempted to speak to Mr. Yanes around 1 a.m. on November 24, 1982, and that his condition had not changed by 3:30 a.m. on that date when again he was unable to relate his name or where he was located.

Dr. Kulb will testify that in his professional opinion Mr. Yanes was not capable of thinking clearly enough to understand the significance of making a statement to the police or waiving his constitutional rights. Further, he does not believe that Mr. Yanes was mentally competent to make important decisions, and Dr. Kulb is adamant on this point.

Dr. Kulb will testify that two days after admission to the hospital, a computerized tomographic scan of Mr. Yanes' brain was performed, which revealed that he suffered a left temporal lobe hemmorage and contusion. He describes this as a bruise to the brain and will testify that such brain damage can definitely cause disorientation and confusion.

James Tucker will testify that he was a resident at the Maricopa County Hospital and examined Mr. Yanes around midnight on November 23, 1982; that Mr. Yanes had a basil skull fracture; that blood was coming out of his ear; and that he was uncooperative and incoherent. He will further testify that uncooperativeness is a strong sign of brain injury. This is often the first behavior of a person with brain damage. Combativeness is not unusual. He will testify Mr. Yanes was unable to provide a personal history and that the hospital obtained this from the police. He will testify that blood was drawn to determine the presence of alcohol; that the reading was .14; and that such reading indicates that alcohol was not the cause of Mr. Yanes' unconsciousness or incoherency. He will testify that a drug scan was negative and that he would expect Mr. Yanes to be experiencing severe headaches during the time period when he was interrogated by the police. He will further testify that a brain injury must be fairly severe to be detected by a C.T. scan; that no drugs were administered to Mr. Yanes; that the C.T. scan verified brain damage and swelling; and that a contracoup brain injury was noted.

The chief resident in neurosurgery, Alan Murphy, M.D., will testify that he noted that Mr. Yanes was still confused two days after admission.

Mr. Yanes was admitted to the hospital by reason of a basal skull fracture on November 24, 1982, at 4 a.m. Dr. Tucker will testify that he is of the opinion that Mr. Yanes was not capable of knowingly and intelligently waiving his constitutional rights or intelligently deciding whether to speak to the police. He will testify that Mr. Yanes was not aware of his own name or why he was in the hospital. He did not understand what was occurring, and in his opinion, the defendant was incapable of grasping the significance of his rights due to his brain damage and the resulting incoherency.

B)   Issues

The issues presented by this motion are:

(1)   Did Mr. Yanes understand his constitutional rights and knowingly, voluntarily and intelligently waive them before police interrogation thus permitting the introduction of those statements in the state's case-in-chief and,

(2)   If not, are the statements of Mr. Yanes nevertheless voluntary, legally reliable and the product of his free and rational choice thus permitting them to be used by the state to impeach his credibility should he choose to testify?

C)   Law and Argument

Statements of an accused obtained during police interrogation without the presence of his counsel are admissible in the state's case-in-chief only if: (1) prior to interrogation, the police interrogator warns the accused of his right to remain silent, that anything he says can be used as evidence against him, that he has a right to have an attorney present during questioning and to have an attorney appointed if he cannot afford one, and (2) the accused understands these rights and (3) the accused knowingly, voluntarily and intelligently waives those rights and answers the questions of his interrogator. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

-7-

In the case herein, Mr. Yanes clearly did not understand his constitutional rights, nor did he knowingly, voluntarily and intelligently waive those rights prior to speaking to his interrogators. The testimony of the several medical doctors, supra, will clearly establish that at the time of his interrogation by the police, Mr. Yanes was suffering from a bruise to the brain, that it was a substantial injury, that he was probably experiencing great pain from headaches, that he was incoherent and very unresponsive to any attempts to obtain information and to find out the nature of his injuries. At the time of his interrogation, Mr. Yanes was not only suffering pain and disorientation caused by his brain injury, but he was also strapped down flat on a gurney with leather straps and handcuffed. He requested on several occasions to see the victim, Eleanor, and it is clear that her welfare was the only thing on his mind. Although Mr. Yanes indicated to his interrogator that he wished the questioning to stop, the interrogator proceeded to question this man until statements in the form of monosyllable answers and movement of his head were obtained such that the police felt they could be used against him in the hope of establishing he shot his wife.

It is submitted that the defendant's statements were obtained under circumstances wherein he was clearly incapable of both understanding his constitutional rights or knowingly, voluntarily and intelligently waiving them.

Statements of an accused obtained during police interrogation which do not satisfy the requirements of Miranda, supra, and which are therefore inadmissible in the state's case-in-chief are admissible for purposes of impeaching the defendant's credibility provided the "trustworthiness of the evidence satisfies legal standards." Harris v. New York, 401 U.S. 222, 91 S.Ct. 643 (1971).

It is submitted that in the case herein, Mr. Yanes' statements to the police were not the product of his free will and choice and that they should not be admissible at the trial for any purpose whatsoever. In Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408 (1978), a defendant was shot in the hip with damage to his sciatic nerve and was

partially paralyzed in the right leg.   He was interrogated by the police in the emergency room. He had tubes in his throat to help him breathe and in his stomach to keep him from vomiting.   He had a catheter in his bladder.   He was being fed intravenously.  An attending physician testified that he was depressed almost to the point of coma.  He was lying on his back, not able to move about, encumbered by tubes, needles and breathing apparatus.  Mincey gave unresponsive or uninformative answers to questions before he asked for a lawyer.  The trial court found that he was painfully wounded on the edge of unconsciousness.  However, he never did actually lose consciousness.  A nurse testified he appeared to her to be alert and able to understand questions and it was her opinion that he was not under the influence of any drugs and gave answers that were generally responsive.  The United States Supreme Court pointed out that in his debilitated and helpless condition, Mincey expressed his wish not to be interrogated.  When he told the police "this is all I can say without a lawyer," the police nevertheless continued to question him.  The Supreme Court said:

> But Mincey was weakened by pain and shock, isolated from his family, friends, and legal counsel, and barely conscious, and his will was simply overborne.  Due process of law requires that statements obtained as these were cannot be used in any way against the defendant at his trial.  (98 S.Ct. at 2418)

It is respectfully submitted that the case of Mr. Yanes is even more aggravated than that of Mincey.  Mr. Yanes was being fed intravenously, he was tied down flat to a hospital gurney with leather straps and he was also handcuffed by the police.  Mr. Yanes mumbled repeatedly that he wished the interrogation stopped until he could see Eleanor.  The evidence is overwhelming that he was confused, disoriented, incoherent or unconscious, suffering pain and functioning with brain damage.  He manifested clinical and scientific symptoms of brain damage.  The standard physical examination report described him as acutely ill.  His responses to questioning both by the police and the doctors were incoherent and mumbled.  Blood was coming out of his ear.  His blood alcohol reading was .14 which indicates alcohol was not the cause of his unconscious-

ness or incoherency.  A drug scan was negative.  Unlike Mincey, Mr. Yanes gave _inaccurate_ answers to questions asked by Officers Vasquez and Saldate.  He told Vasquez he was born in 1942, but in fact he was born in 1940.  He told Saldate that he went home, heard a shot, went inside and saw his woman who was unconscious when, in fact, Eleanor was shot and killed inside the tire shop and not at their home.  These inaccurate facts uttered by Mr. Yanes clearly indicate that all of his utterances or signals by his head to the police are unreliable.  Such was not the case in _Mincey_, _supra_.  The defendant Yanes had no motive to lie about the year in which he was born. Further, he had no motive to lie concerning where he found the body and it is clear that he knew where the body was -- it was in the tire shop.  If Mr.  Yanes shot Eleanor, the factually incorrect answers he gave to the police would have no bearing on hiding the ultimate question from the police.

It is respectfully submitted that the statements obtained from Mr. Yanes by the police were not obtained under circumstances in which he understood his constitutional rights or was capable of knowingly, voluntarily and intelligently relinquishing them.  It is further submitted that those statements were not voluntary or sufficiently trust- worthy to satisfy legal standards of admissibility for any purpose.

Respectfully submitted this _26_ day of September, 1984.

ROSS P. LEE
Maricopa County Public Defender

By _____
DAVID BRAUER
Deputy Public Defender
Attorney for Defendant
132 South Central, 2nd Floor
Phoenix, Arizona 85004

Copy of the foregoing motion
mailed/delivered this _26_
day of September, 1984 to:

HON. PETER D'ANGELO
Judge of the Superior Court

-10-

JAMES MINTER
Deputy County Attorney

By: _____
DAVID BRAUER
Deputy Public Defender

a. K. FILE.

| OFFICE DISTRIBUTION | |
|---|---|
| APPEALS | |
| BONDS Refund | |
| Forfeiture | |
| CHANGE OF VENUE | |
| JURY FEES | |
| REMANDS | |
| SENTENCING | |

SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

CLERK OF THE COURT
MAIL DISTRIBUTION CENTER

Received:     JUL 27 1984

Processed:   JUL 30 1984

VIVIAN KRINGLE, Clerk

3        July 26, 1984     HON.  IRWIN CANTOR
Div        Date             Judge or Commissioner

J.  Mofford
Deputy

NO.     CR-130403

M.C.S.O.

STATE OF ARIZONA

vs.

MANUEL YANES

County Attorney by:
James Minter

Dept. of Corrections

James Edgar, P.D.

Judge John Seidel

      This is the time set for informal conference.  The
State is represented by Deputy County Attorney James Minter.  The
Defendant is not present, but is represented by James Edgar, Public
Defender.  A Court Reporter is not present.

      The Court heard oral argument as to the Motion for
New Trial and it was stipulated by counsel that the matter be sub-
mitted to the Court based upon argument and the entire record  and
pleadings.

      THE RECORD MAY SHOW that the foregoing stipulation by
the State does not waive any legal or factual basis to present
evidence that the statement was voluntary, but that the Court may
consider the pleadings for the purpose of this motion only.
      IT IS ORDERED taking the matter under advisement.

LATER...

      IT IS ORDERED granting the Motion for New Trial
based upon the pleadings and argument.

(CONTINUED)

49

Page

FORM 43-17 REV 7-83

| OFFICE DISTRIBUTION | | |
|---|---|---|
| APPEALS | | |
| BONDS  Refund | | |
| Forfeiture | | |
| CHANGE OF VENUE | | |
| JURY FEES | | |
| REMANDS | | |
| SENTENCING | | |

**SUPERIOR COURT OF ARIZONA**

**MARICOPA COUNTY**

...RK OF THE COURT
MAIL DISTRIBUTION CENTER

Received: JUL 27 1984

Processed: J... 30 1984

VIVIAN KRINGLE, Clerk

| 3 | July 26, 1984 | HON. IRWIN CANTOR | J. Mofford |
|---|---|---|---|
| Div | Date | Judge or Commissioner | Deputy |

NO. CR-130403

ARIZONA vs. YANES                            (CONTINUED)

IT IS ORDERED, vacating the judgment of guild and sentence imposed and,

FURTHER ORDERED pursuant to 17 A.R.S., Rules of Criminal Procedure, Rule 32, that Petitioner, Manuel Yanes, be granted a new trial for the reason that Petitioner's trial counsel, Benito Salazar, did not exhibit the minimal competency demanded of a criminal defense lawyer, State v. Watson, 134 Ariz. 1, 653 P.2d 351 (1982). Trial counsel failed to adequately investigate and present to the trial court available and important evidence regarding the issues of the voluntariness of the statements and of whether said statements were obtained in violation of the Petitioner's constitutional rights.

FURTHER ORDERED that the original conditions of release are reinstated.

FORM 43-17 REV 7-83

Page 50