IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

        Plaintiff,

   vs.                         NO. CR-130403

MANUEL M. YANES,

        Defendant.

Phoenix, Arizona
May 31, 1983

BEFORE:  THE HONORABLE IRWIN CANTOR, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

VOLUME I of VII - MOTIONS AND TRIAL

(ORIGINAL)
PREPARED FOR APPEAL

Jerri Ann Carter
Court Reporter

SUPERIOR COURT

3

I N D E X

PAGE

Opening Statement – Mr. Minter                    73

Opening Statement – Mr. Salazar                   80


NAME:                    EXAMINATION BY:

SALDATE, Jr., Armand     Mr. Minter               11
                         Mr. Salazar              21
                         Mr. Minter               28

GIBBS, James             Mr. Minter               86
                         Mr. Salazar              106
                         Mr. Minter               111


E X H I B I T S


45 –                     Diagram                  90

46 –                     Diagram                  96

SUPERIOR COURT

1    A.   He advised me that he really didn't know that much

2  because he had just arrived, and the main investigator was Detec-

3  tive Quaife and for me to contact Detective Quaife at the main

4  police station.  He would give me directions.

5    Q.   Now, you discovered that Mr. Yanes had been taken to

6  the hospital; did you not?

7    A.   Yes, I did.

8    Q.   And that's where you went?

9    A.   Yes, I was directed there, yes.

10    Q.   Who was on duty when you arrived?

11    A.   Who was on duty?

12    Q.   Who was?

13    A.   Medical staff?

14    Q.   No, who was guarding Mr. Yanes?

15    A.   Oh, uniformed Officer Vasquez.

16    Q.   Now, prior to your arrival did you have any informa-

17  tion with regard to Mr. Yanes's injury?

18    A.   No, I did not.

19    Q.   When you arrived, did you speak to any medical per-

20  sonnel about Mr. Yanes's injury?

21    A.   I had spoken to some medical personnel.  They indi-

22  cated to me that they had not had any occasion to check him out

23  thoroughly.  That it would be some time yet.

24    Q.   Who did you speak with?

25    A.   I believe it was a nurse or someone there.  I

1  basically wanted to know whether I could talk to him.

2      Q.  So they told you that he hadn't been treated yet?

3      A.  He had not been treated or checked very thoroughly

4  at that point.

5      Q.  Did you subsequently discover what happened to Mr.

6  Yanes with regard to the injury?

7      A.  I subsequently found after the last interview that

8  he was being taken up for x-rays and then questioned the nurse

9  there further and she stated that he may possibly have a skull

10  fracture but x-rays would have to tell.

11      Q.  When you first saw him, he was lying down on a bed,

12  wasn't he?

13      A.  He was.

14      Q.  Was he bleeding?

15      A.  There was some signs of blood, but I don't think he

16  was bleeding.

17      Q.  Where was the blood coming from?  What origin?

18      A.  I believe there was some clotted blood around his

19  hair, I believe, it would be his left side or --

20      Q.  Did you see any bumps or bruises on his head?

21      A.  Not that I could see, no.

22      Q.  Did he smell of alcohol?

23      A.  He may have had a slight odor of alcohol.

24      Q.  Was he strapped down to that hospital bed?

25      A.  He was strapped down to the hospital bed.

1    Q.   Was he handcuffed?

2    A.   I cannot independently recall whether he was hand-

3    cuffed.  I remember he was strapped down.

4    Q.   He couldn't get out, though, he couldn't leave from

5    that bed, could he?

6    A.   No, I don't believe he could.

7    Q.   You wrote a report on your interviews, did you not?

8    A.   That is correct.

9    Q.   Do you recall stating in your report that when you

10   first spoke to Mr. Yanes that he began to mumble several things

11   and that they were not understandable.  Do you recall saying

12   that in your report?

13   A.   That is correct, yes.

14   Q.   Do you recall stating that immediately after this you

15   read him his constitutional rights in English and then para-

16   phrased them in Spanish?

17   A.   I believe I indicated in my report that at that point

18   I gained his attention thoroughly and then read him his rights,

19   yes.

20   Q.   You repeated these rights a couple of time, did you

21   not?

22   A.   The verbatim rights and the rights card were read to

23   him verbatim, very slowly and very carefully to insure that he

24   understood them.  The paraphrased Spanish rights were also just

25   read or told to him very slowly and very clearly.

1   Q.   Because you were concerned that he understand them,

2   right?

3   A.   Well, my main concern was that I was told that I

4   was called out because they thought he only had spoken Spanish.

5   He indicated to me that he spoke English and understood English.

6   I wanted to insure that I gave them to him in both.

7   Q.   There came a time, I believe, at the end of your

8   second interview when you wrote your report that you felt that

9   he was inattentive to your questioning.  Do you recall stating

10  that?

11  A.   Yeah, in regards to that statement I felt that his

12  inattention, meaning that when I asked him a question I would

13  have to get to him and get his attention to ask him that question.

14  I felt that he was very attentive when I asked him that question

15  and when he answered it.  However, his inattention would be be-

16  tween questioning.

17  Q.   Didn't you state, according to your statement, that

18  his inattention was a combination of what had occurred, his

19  intoxication and lack of sleep?

20  A.   Yes, that was my personal opinion in regards to his

21  inattention between questioning.

22  Q.   You didn't state that on your -- specifically on your

23  statement, did you?

24  A.   Yes, that's my personal opinion.

25  Q.   But that's different from what you stated on your

1    MR. SALAZAR: No, your Honor, no witnesses.

2    THE COURT: All right. The Court would find that the

3    statements made were voluntary and that no force or threats

4    were used or benefit or promise, and the Court would allow

5    them in.

6    All right. Did you wish to make a statement?

7    MR. SALAZAR: Yes, your Honor. May I, for the record?

8    THE COURT: Yes.

9    MR. SALAZAR: Your Honor, it's quite clear to me that

10   there are a number of things that occurred here during the ques-

11   tioning that were indeed not voluntary.

12   First of all, Mr. Yanes was taken to the hospital in

13   an injured situation. He had suffered, as it was later discovered,

14   a skull fracture. In addition to that, he was somewhat intoxi-

15   cated. When he was taken to the hospital, he was tied down to

16   a bed, was strapped down, as the officer has testified. He

17   hadn't been treated either before or during the time that the

18   officer was questioning him. He didn't really become aware that

19   he could stop answering any questions until his brother walked in.

20   It's clear to me that the combination of these factors

21   led to him responding to the questions because he was being co-

22   erced or at least he thought he was being coerced, and with that

23   in mind I would urge the Court to reconsider his decision and

24   find these answers were indeed not voluntary.

25   THE COURT: Your statements may be shown. The Court will

1   chambers.  So we'll ask the jury to please return tomorrow morn-

2   ing at 10:30 in the morning, and remember the full admonition of

3   the Court.

4           I'll see counsel and the court reporter and the clerk

5   in chambers.  We'll stand in recess.

6           (Whereupon, a recess was taken at 4:22 P.M. and the

7   proceedings reconvened in chambers.)

8       THE COURT:  The record may show that we are in chambers

9   out of the hearing and presence of the jury, and for the purpose

10  of this motion only the presence of the defendant is waived, and

11  the defense counsel, Mr. Salazar, indicated to opposing counsel

12  and the Court that he wished to make a motion this morning and

13  the Court inquired if it was of an emergency nature and he said

14  no, so it was agreed that it could be made at this time as though

15  made this morning.

16          Mr. Salazar.

17      MR. SALAZAR:  Your Honor, my motion concerns the voluntari-

18  ness of the statements that Mr. Yanes made to Detective Saldate

19  in the early morning of November 24th.  I know the Court has

20  already ruled allowing those statements to be heard as in effect

21  saying that they were voluntary, but I want to reurge that motion.

22      THE COURT:  All right.  You may.

23      MR. SALAZAR:  I think it's important, and what I want to

24  do is reurge it on the basis of -- basically on the basis of the

25  medical reports that I have in my file from the Maricopa County

SUPERIOR COURT

1  Hospital.

2  These reports were based on observations that the

3  medical personnel took in the early morning hours on that same

4  day.  I want to cite several instances of where medical personnel

5  give their opinion of the defendant's physical and mental state

6  of mind.

7  Initially, they state --

8  MR. MINTER:  I'm going -- I realize we are making a

9  record.  There is no jury.  But I'm going to object to that as

10  hearsay and certainly not the best evidence.

11  THE COURT:  You can show your objection.  I will allow

12  you to continue.

13  MR. SALAZAR:  All right.  As I was saying, Judge, this

14  document is from the Maricopa County Hospital.  It's a record of

15  their observations of Mr. Yanes dated November 23rd.  The time

16  begins at 2140 hours.  The observation states "That the defendant

17  was admitted to ER -- I believe that's emergency, some sort of

18  emergency treatment -- in an incoherent state.  He had blood in

19  his hair but there is no evidence of trauma."

20  A little bit further down it states that "He is also

21  handcuffed and has apparently leather restraints on."

22  The next observation is taken from the standard physi-

23  cal examination, which I believe was done on that same evening

24  or early morning of the 23rd and 24th, where they state the

25  general description of the defendant as acutely ill.  His mental

1  status is listed as disoriented.

2        Further down on number 20, continuing with the physi-
3  cal exam, apparently they say that there is evidence of -- I
4  believe they call it a basal skull fracture, and in addition
5  to that, evidence of alcohol abuse.

6        Continuing on to November the 24th, again in the
7  early hours, the observations are that "He remains confused.  He
8  is unable to remember the day or the month."

9        November the 25th, the observation is that "He remains
10  confused.  In fact, he believes that he is in Texas."

11        Your Honor, that combined with Dr. Melendez's report
12  which indicated that at the time of the incident he believed the
13  defendant to be suffering from alcoholic blackout, acute in nature,
14  and that during such a blackout his behaviour would not be subject
15  to rational control, and it was quite likely that his ability to
16  assess reality in a correct and accurate manner would be extremely
17  limited if not altogether suspended, combined with his report,
18  your Honor, I want to reurge the Court to reconsider its earlier
19  ruling on the voluntariness of the defendant's statements.

20        If we are to believe these observations by the Maricopa
21  County personnel people and by Dr. Melendez, then the defendant,
22  Mr. Yanes, was really in an incoherent state and that any state-
23  ments that he made during the 23rd or 24th were really statements
24  that I don't believe he clearly understood and also that he didn't
25  understand what his rights were at that time.  So I want to

113

1   strongly urge this Court to reconsider its earlier ruling and
2   suppress any statements that were made by Mr. Yanes to Detective
3   Saldate on the early morning of November 24th.

4       THE COURT:  Okay.  I understand your argument and that
5   you feel strongly on it.  I will stand on my ruling.  I feel
6   that even if we had the people here testifying that it would
7   still go to the weight, so I will stand on my ruling.

8       I think also I'll rule on Exhibit 36.  Wasn't that
9   the picture?

10      MR. SALAZAR:  Before you do that, your Honor, may I
11  interrupt for just a second?

12      THE COURT:  Sure.

13      MR. SALAZAR:  And cite a case.  I believe it's State
14  versus Hicks as a basis for my motion that I've just stated.

15      THE COURT:  Yes.

16      MR. SALAZAR:  In that case, the appellant maintained that
17  his confession was involuntary because he was so intoxicated that
18  he could not validly waive his constitutional rights.  The Court
19  said that it was a denial of due process to admit an incriminatory
20  statement that is involuntary by reason of intoxication but proof
21  that the accused was intoxicated at the time he made the statement
22  would not be, without more, prevent the admission of the statement
23  However, the Court did go on to say before the statement can be
24  held inadmissible it must be shown that the appellant was intoxi-
25  cated to such an extent that he was unable to understand the

1   meaning of his comments.

2        Your Honor, I want to state to this Court that I

3   believe this case should follow State versus Hicks.  That the

4   situation is almost the same.  That there has been substantial

5   testimony by both police officers and medical personnel that the

6   defendant was indeed intoxicated and also suffering from a skull

7   fracture.

8        THE COURT:  All right.  Your case may be shown, and I'll

9   stand on the ruling.

10        As to the 36, I think normally it's relevant and would

11   be admissible.  However, in this case where the doctor's testimony

12   came in unchallenged and with the stipulation, I think that balan-

13   cing that it would be unduly prejudicial so I'll sustain the

14   objection as to 36.  I do feel that it's relevant otherwise and

15   would be admissible.

16        Okay.  See you in the morning then.

17        (Whereupon, the proceedings recessed at 4:33 P.M..)

18

19                    *        *        *

20

21

22

23

24

25

O. R. FILE

IN THE SUPERIOR COURT OF MARICOPA COUNTY, ARIZONA

STATE OF ARIZONA,          )
                           )      No. CR-130403
          Plaintiff,       )
                           )      REPLY TO STATE'S RESPONSE TO
     v.                    )      PETITION FOR POST-CONVICTION
                           )      RELIEF
MANUEL YANES,             )
                           )      (Judge Cantor - Division J)
          Defendant.       )
_____)

The prosecution in its pleading entitled State's Response to Petition for Post-Conviction Relief indicates that trial counsel for the defendant, Mr. Benito Salazar,

"Clearly + + + sought to present this potentially exculpatory information to the jury and did in fact so argue in closing argument (i.e., that someone else had in fact shot the victim). Since the defendant elected not to testify himself, trial counsel tactically had no other means of presenting this information about an alleged third party." (See State's Response to Petition for Post-Conviction Relief, at p. 2).

It is submitted that Mr. Salazar did not tactically decide that he wanted the statement made to Detective Saldate in evidence. Otherwise, why would he have urged, then re-urged, the voluntariness issues at all? The crucial evidence was not presented to this court because of lack of preparation, investigation, organization, and possibly knowledge of the relevant case law. The evidentiary hearing to be held in this matter should shed light onto the issue raised by the prosecutor.

LAW

It is submitted that trial counsel's failure to properly present to this court the available evidence regarding the defendant's mental state during the voluntariness hearing deprived this court of a fair opportunity: (1) to rule upon the question of whether the statements were rendered as a product of free will and choice under Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), (See copy of decision attached hereto), and (2) to determine whether the state had met its burden to prove that

statements made by the defendant were made knowingly and intelligently, with a full understanding of his rights to remain silent and to have an attorney present during questioning, as well as to appointment of counsel, as is required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 and its progeny.

The trial record is devoid of any citation by trial counsel for the defense to a virtually identical Arizona case which was recently litigated before the United States Supreme Court in Mincey v. Arizona, supra. In Mincey the United States Supreme Court held that a statement made by a hospitalized defendant therein was involuntary and that due process precluded its use for any purpose, including impeachment. The United States Supreme Court reversed the Arizona Supreme Court which had affirmed a trial court finding that the statement made was voluntary.

In Mincey the defendant was severely wounded and in the emergency room during the police interrogation. He had been shot in the hip and sustained damage to the sciatic nerve and was partially paralyzed in the right leg. He had tubes in his throat to help him breath and in his stomach to keep him from vomitting. He had a cathiter in his bladder. He was being fed intravenously. An attending physcian testified that he was depressed almost to the point of coma. Mincey was lying on his back, not able to move about, encumbered by tubes, needles and breathing apparatus. Mincey gave unresponsive or uninformative answers to questions before he asked for a lawyer. The trial court found that Mincey was painfully wounded, on the edge of unconsciousness. Mincey never did lose consciousness. A nurse testified that Mincey appeared to her to be alert and able to understand questions. She opined that he was not under the influence of any drugs and gave answers that were generally responsive. He was able only to write out answers to interrogation questions; some of the answers were incoherent. The United States Supreme Court pointed out that in his debilitated and helpless condition, Mincey clearly expressed his wish not to be interogated. When the questions addressed the details of the afternoon's events Mincey wrote: "This is all I can say without a lawyer." 98 S.Ct., at 2417. The police nevertheless questioned him. The court held: "But Mincey was weakened by pain

- 2 -

and shock, isolated from his family, friends, and legal counsel, and barely conscious, and his will was simply overborne. Due process of law requires that statements obtained as these were cannot be used in any way against a defendant at his trial." (98 S.Ct., at 2418).

The cases cited by the prosecution during the Voluntariness Hearing in its pleading entitled Memorandum of Law Voluntariness of Statements, do not involve statements made by individuals where physicians had observed and confirmed the existence of brain damage. Nor do those cases invlove incoherence or muttering when the statements were made.

A recent Arizona case cited by the prosecutor is State v. Rodriguez, 137 Ariz. 168, 669 P.2d 601 (Ariz.App 1983). In Rodriguez the charges arose when the defendant rammed into the victim's car for no apparent reason other than that words had been exchanged at a traffic light. An altercation ensued and the defendant stabbed the victim in the back. The police pursued the defendant, which ended in a foot race, where, at night , the defendant fell into a steep ravine and was found unconscious. He was taken to the hospital and interviewed by the police, with permission of the hospital staff. During the interview he complained that his mouth hurt (he sustained a severe injury to his mouth), but did not complain of dizziness or nausea, or difficulty in remaining conscious. He was treated and released. The court distinguished Mincey v. Arizona, supra, pointing out that Rodriguez was not physically encumbered by medical paraphernalia and did not request that the interrogation stop. Rodriguez' responses did not indicate that he was confused.

Mr. Yanes was being fed intravenously and strapped to the hospital gurney and handcuffed. Mr. Yanes mumbled repeatedly that he wished the interrogation stopped until he could see Eleanor. The evidence is overwhelming that Mr. Yanes was confused, disoriented, incoherent or unconscious and functioning with brain damage. Mr. Yanes manifested clinical and scientific symptoms of brain damage. Unlike Rodriguez, Mr. Yanes was incoherent throughout the evening, and remained confused even two (2) days later. Mr. Yanes' head injuries necessitated hospitalization.

In United States v. Martinez-Perez, 625 F.2d 541 (5th Cir. 1980), the Fifth Circuit Court of Appeals held that the statement made by the hospitalized defendant was voluntary based upon the "totality of circumstances." It indicated that the prosecution bears the burden to show by a preponderance of the evidence that the confession was voluntary, which means a product of the accused's free and rational choice. The statement in question was made to an FBI agent who had checked with the defendant's doctor regarding the defendant's medical condition. The doctor testified at the voluntariness hearing that the drugs administered would have had no effect at the time of the interview, or would be minimal. Prior to the interview the defendant told the FBI he was in some discomfort in his shoulder, but was willing to talk. The FBI agent testified that the defendant was alert.

In United States v. Knife, 592 F.2d 472 (8th Cir, 1979), the Eighth Circuit Court of Appeals held that the prosecution met its burden of proof by calling the attending physician and nurse of the defendant. The trial court found that defendant was alert, articulate, knew where he was and knew who he was talking to, and was not under the influence of drugs to the extent that he was unaware of what he was saying or talking about.

In Mayer v. State, 618 P.2d 127 (Wyo. 1980), the Wyoming Supreme Court affirmed the trial court's finding of voluntariness in a case which neither involved a hospitalized defendant nor brain damage. Further, the officers related that the defendant did not appear to be intoxicated, was coherent, cooperative, able to understand all questions, and willing to answer all questions. He had a .09 alcohol reading, a scrape on the chest, a split lip and small lump by the eye.

In State v. Snook, 18 Wash.App. 339, 567 P.2d 687 (1977), the Washington State Court of Appeals noted the confession was made by the defendant in a logical and well-articulated manner. The defendant requested to speak to the officers. No evidence was presented to indicate that the defendant was on medication, except by the defendant

himself. No expert testimony was presented. The officer testified that the defendant appeared to be in control of himself and not under the influence of any medication.

## SYNOPSIS OF THE FACTS OF CASE SUB JUDICE

Mr. Yanes received brain damage caused by Ray Silva tossing him onto his head, causing his head to open up, a basal skull fracture and unconsciousness. The defendant was found by the police unconscious at approximately 8:45 p.m. on November 23, 1982. He was taken to the hospital by paramedics and was in the emergency room during the interrogation. He was laying on his back, handcuffed, with his arms and legs in leather restraints due to his apparently "uncooperative condition" and "combativeness."

The defendant was admitted to the emergency room at 9:40 p.m., in an incoherent state. The standard physical examination report described him as acutely ill. His mental status was listed as disoriented after admission to the hospital; he was fed intravenously.

Phoenix Police Officer Vasquez had contact with Mr. Yanes from 9:00 p.m. to at least 2:00 a.m. on 11-24-82. At the scene he notes that the defendant's speech was slurred. He was mumbling and also muttering. When Vasquez questioned the defendant at the scene he mumbled that he wished to see her. "It was very hard to understand most of what he was saying." Vasquez accompanied the ambulance to the hospital.

At the hospital, when Officer Vasquez asked the defendant for his name, he continued to mumble words which were hardly understandable. He indicated his name, that he was born in 1942 and wanted to see Eleanor. He muttered and was unresponsive to other general questions by the officer and hospital personnel.

Thomas Kulb, M.D., was a trauma surgeon, employed at the Maricopa County Hospital and had substantial contact with Mr. Yanes throughout the evening and morning hours. He indicates that he had occasion to observe Mr. Yanes on ten to fifteen occasions throughout the night because Mr. Yanes was strapped to the gurney directly in

front of his office.  Dr. Kulb indicates that Mr. Yanes was at most times unconscious throughout the evening and that even when he was semi-conscious, he was incoherent. He never received any coherent response from Mr. Yanes at any time.  A Spanish interpreter was used to assist Dr. Kulb. The doctor related that Mr. Yanes, when first questioned by him, did not know who he was, what year it was, or whom the president was. Mr. Yanes' responses were mumbled and incoherent regarding name.  Dr. Kolb first attempted to speak to Mr. Yanes around 1:00 a.m. on November 24, 1982.  Mr. Yanes' condition had not changed by 3:30 a.m., when again he was unable to relate his name or where he was at to Dr. Kulb.

Dr. Kulb indicates that in his professional opinion the defendant was not capable of thinking clearly enough to understand the importance of making a statement to the police or waiving constitutional rights.  He does not believe that the defendant was mentally competent to make important decisions. Dr. Kulb is adamant on this point.

Dr. Kulb indicates that two days after admission to the hospital, a computerized tomographic scan of Mr. Yanes' brain was performed, which revealed that he suffered a left temporal lobe hemmorrhage and contusion. He describes this as a bruise to the brain.  He indicates that a brain hemmorrhage can definitely cause disorientation and confusion.

James Tucker, M.D., a resident at the Maricopa County Hospital indicates that he examined Mr. Yanes around midnight on 11-23-83. He indicates that Mr. Yanes had a basal skull fracture, blood was coming out of his ear and that he was uncooperative and incoherent.  Being uncooperative is a strong sign of brain injury.  This often is the first behavior of a person with brain damage.  Combativeness is not unusual.  Mr. Yanes was unable to provide a history.  This was provided by the police to hospital personnel.  Blood was drawn to determine the alcohol level.  The reading was .14, which indicates that alcohol was not the cause of the defendant's unconsciousness or incoherency.  A drug scan was negative.  Dr. Tucker indicates that he would expect the defendant to be experiencing

severe headaches during the time period when the police interrogated him. He indicates that a brain injury must be fairly severe to be detected by a CT scan. No drugs were administered to Mr. Yanes as is the custom with brain injured patients. The CT scan verified the brain damage and swelling. A contracoup brain injury was noted. The Chief Resident in Nuerosurgery, Allen Murphy, M.D., noted that Mr. Yanes was still confused two (2) days after admission. At 4:00 a.m. on 11-23-82, Mr. Yanes was admitted to the hospital due to basal skull fracture. Dr. Tucker's opinion is that Mr. Yanes was not capable of knowingly and intelligently waiving constitutional rights or intelligently deciding to speak to the police. He was not even aware of his name, nor why he was in the hospital. He did not understand what was occurring. In his opinion, the defendant was incapable of grasping the significance of his rights due to his brain damage and resulting incoherency.

. On November 24, 1982, at approximately 2:00 a.m. Homicide Detective Ronald Quaife, of the Phoenix Police Department, observed Mr. Yanes, while Detective Saldate was attempting to interview him. Detective Quaife relates that Mr. Yanes appeared to him to be intoxicated. Detective Saldate told Detective Quaife that Mr. Yanes was drunk.

At 12:45 a.m. Detective Saldate attempted to interview the defendant. Officer Vasquez was standing by. When Detective Saldate told Mr. Yanes that he was there to interview him, Mr. Yanes began to mumble several things both in English and Spanish, which were not understandable. He asked the defendant if he were from Mexico. Defendant said he was from Texas and understood English, according to Detective Saldate. The Miranda rights were read in English and Spanish. When asked if he understood his rights, Detective Saldate indicates that the defendant said "Yes." Detective Saldate felt the need, according to him, to paraphrase the Miranda rights due to the defendant's mumbling both in Spanish and English. Detective Saldate proceeded to question the defendant regarding what had happened to his wife and what had caused his injury. According to Saldate's police report, Mr. Yanes did not respond for several minutes, and

his head was turned in another direction. Mr. Yanes then began mumbling about Eleanor. The Detective again tried to question him. The defendant stated: "I don't know. I don't know." Mr. Yanes told Saldate that when he returned from the bar he had heard a loud shot. Mr. Yanes made a loud sound in describing the shot. He went inside the house and saw Eleanor. A man was there with him. Mr. Yanes said he went to Eleanor and asked her who had done this. Mr. Yanes then closed his eyes and tilted his head to one side. Apparently while his eyes were closed, Mr. Yanes was questioned further. Mr. Yanes allegedly stated that Eleanor had passed out and had said nothing; defendant then said he got up and ran to the bar and spoke to a Mexican. At this point, Mr. Yanes turned his head away and began to mumble about seeing Eleanor. Detective Saldate had to try to get his attention so he could question him regarding what had happened in the bar. Mr. Yanes repeatedly stated that he wanted to see Eleanor before talking to the police any further. Detective Saldate continued to question Mr. Yanes. He asked him how he sustained his head injuries, to which the defendant stated that he did not know. According to Detective Saldate's police report the defendant once again began to mumble in both English and Spanish. The detective noted in his report: " + + + at that point it was obvious that I had lost the attention of the SUSPECT, and then ended my interview."

Saldate's report indicates that after his initial interview several medical functions were being performed on Mr. Yanes. At 1:43 a.m. he again attempted to interrogate Mr. Yanes. During this interview the defendant angrily stated that he knew his rights according to Detective Saldate, by stating "Yes." He related he had had three or four beers. When questioned regarding when he started drinking, Mr. Yanes did not answer the question. The question was repeated and the defendant said "I don't know exactly." He denied using drugs that day. He said he did not have a shotgun, in response to both Spanish and English questions. He related that his brother did not lend him a shotgun. He related that he did not have a shotgun at his business by stating, "No." His responses were one word answers or nodding or shaking of his head. At 1:59 a.m. the defendant's brother insisted on talking to Mr. Yanes and came into the examination room

- 8 -

and told Mr. Yanes that the family had retained an attorney.  Detective Saldate noted in his report that he felt that the defendant's mumbling and inattention to questions was due to a combination of what occurred, his intoxication, and lack of sleep.  Of course, Detective Saldate was unaware that Mr. Yanes was brain injured.

CONCLUSION

From the entire trial record below, including facts addressed during the trial and voluntariness hearing, as well as facts discovered by undersigned counsel, which will be presented during the hearing on this Petition for Post-Conviction Relief, which were negligently not presented during the voluntariness hearing, it respectfully submitted that the <u>Mincey</u> case is virtually identical to if not less aggravated than, the circumstances involved in the <u>case sub judice</u>.  Had this court been apprised of the relevant case law by Mr. Salazar and presented with all of the below discussed evidence, it is submitted that this court would have most likely felt constitutionally bound to suppress the statement of Mr. Yanes.  Moreover, this court should have been given an opportunity to rule upon the constitutional issues involved herein based upon a complete understanding of both the facts and the law.

Mr. Salazar agrees that the voluntariness issue was the crucial part of the defense, as was the identification issue in <u>State v. Watson</u>, 134 Ariz. 1, 653 P.2d 351 (1982).  While in Arizona confessions are presumed to be involuntary, <u>State v. Hein</u>, ____ Ariz ____, ____ P.2d ____, slip opinion, Arizona Supreme Court, December 2, 1983, it is nevertheless defense counsel's duty to gather and present the relevant facts and case law.

Respectfully submitted this 12th day of April, 1984.

ROSS P. LEE<br>
Public Defender<br>
<br>
<br>
By _____<br>
JAMES L. EDGAR<br>
Deputy Public Defender

Copy of the foregoing motion delivered this 12th day of April, 1984, to:

9

THE HONORABLE IRWIN CANTOR
Judge of the Superior Court

JIM MINTER, Deputy County Attorney

By
JAMES L. EDGAR
Deputy Public Defender

**EXHIBIT 15B**

THE STATE OF ARIZONA
       Plaintiff

    vs.

VICTOR MANUEL SALAS
       Defendant

CAUSE NO. CR8903252

HONORABLE PETER T. D'ANGELO

CRIMINAL DIVISION 15

SUPERIOR COURT

## PRESENTENCE INVESTIGATION

PRESENT OFFENSE:

        The following information is taken from Phoenix Police Departmental Report #89-042622:

        On March 25, 1989, at approximately 1:25 a.m., the defendant, Victor Salas, stabbed and killed victim Ascencion Hernandez at 2201 East Roosevelt.

        On March 25, 1989, at approximately 3:00 a.m., Phoenix Police Officer Saldate was directed to proceed to 2210 East Roosevelt reference a stabbing. Subsequent to a short briefing with Sergeant Bryant and Detective Fuqua, Officer Saldate was assigned as the case agent.

        Officer Saldate interviewed Annette Salas, who identified herself as being legally married to the defendant. She advised she had witnessed the stabbing but did not understand why it occurred. She then identified her husband, Victor Salas, as the suspect in the stabbing offense. She further advised that on March 24, 1989, at approximately 8:30 p.m., she, Sanford Whatoname and Sandra Martinez went to the Copperstate Bar located at Twentieth Street and Washington. They remained there until approximately 1:00 a.m. Annette Salas advised that they returned to the apartment building located at 2201 East Roosevelt and decided to contact her sister who resides in apartment #6. Mrs. Salas entered the apartment and sat next to her sister. They were talking when the defendant walked in the apartment through an opened arcadia door. She advised that her husband walked up to her, stood in front of her, and when he did this, she thought he was going to strike her. She said she leaned back on the bed away from him to protect herself.

        The defendant asked Lahoma Perez, the sister of Annette Salas, for a beer. Lahoma asked Annette if the defendant was with her. Annette advised that he was not and the defendant was not given a beer.

        At this time, Annette Salas observed the victim pull open the curtains of the opened arcadia door and ask for her sister. Her sister then invited the victim inside, and as he stepped through the arcadia door, Annette Salas could see her husband reaching with his right hand and removing his knife from a leather case on his belt. Annette was able to identify this

PAGE 1

242

VICTOR MANUEL SALAS                    CAUSE NO. CR8903252
              Defendant

---

knife as she had given it to her husband approximately one year ago as a gift. She saw her husband turn to his left and then lunge at the victim, who ran out of the apartment and across the parking lot. The defendant immediately chased the victim and Annette lost sight of them when they reached the alley.

Annette Salas said she could not give a motive for the stabbing. The defendant may have believed that the victim was there to visit her. She advised that her husband is a jealous person and that they had been separated since February 7, 1989. She also indicated that she had not seen him since this separation until the night of the offense.

Lahoma Perez advised officers of essentially the same circumstances as described by Annette Salas. Ms. Perez advised she thought that she saw something in the defendant's right hand but was unsure whether it was a knife. She did see the defendant strike the victim, and when he did, the victim immediately turned and ran out the arcadia door. She advised that the defendant followed the victim, and when she looked out the arcadia door, she saw the suspect chasing the victim.

A review of the crime scene did not reveal any extensive evidence. The weapon was not located at this time. The victim was transported to Maricopa Medical Center for emergency treatment. He was later pronounced dead by medical personnel at the County Hospital. The victim's death certificate indicates the cause of death was a stab wound to the abdomen.

On March 25, 1989, at approximately 4:00 p.m., the defendant was located and placed under arrest. Officer Saldate interviewed the defendant's roommate, Loreto Torrez, who was with the defendant when he was arrested. Mr. Torrez advised that last night or early this same morning the defendant arrived at their apartment and went to sleep. At approximately 10:00 a.m., the defendant woke up and told Loreto that he had stabbed a guy last night because the guy kept messing with him. Mr. Torrez stated that he believed the defendant told him that the guy may have offended him but later told him that the reason he stabbed him was because he thought this guy was trying to date his wife. Torrez additionally stated that the defendant cried after telling him this and said that he stabbed him with the knife he always carries.

Officer Saldate interviewed the defendant while in custody. He observed that the defendant had been drinking. There was some slur to the defendant's speech and his eyes were watery and bloodshot. Officer Saldate determined that the defendant was not drunk but that he had been drinking heavily.

PAGE 2

246

VICTOR MANUEL SALAS
    Defendant

CAUSE NO. CR8903252

---

The defendant advised that he and Annette Salas, his wife, had not been together for several weeks. He advised that he had been drinking and decided to go see Annette at their home which they once shared at 727-1/2 East Portland. The defendant did not find her there and went to her sister's house on East Roosevelt. When he arrived at his sister-in-law's house, he noticed that the arcadia door was opened so he walked in. The defendant noticed that Lahoma Perez and his wife were the only ones present in the apartment and both were seated on the bed. He walked up to his wife and wanted to talk to her about their problems, however, she did not want to discuss this matter. While he was talking to her, he noticed the victim come into the apartment through the same opened arcadia door and stand in the doorway. The defendant advised he continued to try to talk with his wife and she did not want to listen. The defendant said the subject, who he had never seen before, began to ask him questions about what he was doing there. The defendant told the subject that he had better leave him alone because it was none of his business. The defendant advised that all he wanted to do was talk to his wife and straighten out their problems and that the subject did not need to get involved.

The defendant advised that the victim insisted on talking to him and he, the defendant, told the victim on several occasions that he should leave him alone. The defendant said that the victim was standing almost next to him when he decided to take his knife out and stab him. When questioned why he felt it necessary to stab the victim, the defendant stated he did this as he was trying to protect what was his and that part of it was probably because he and the victim were drunk.

The defendant advised that he did not chase the victim but only ran out of the apartment to get to his car. The defendant also indicated that the victim did not have a weapon. The defendant further indicated that the weapon used in this offense was given to him by his wife. He advised the knife had gotten all bloody from the stabbing, however, he washed it at his apartment.

In conclusion, the defendant indicated that he did not know the victim and did not feel that there was anything going on between the victim and his wife. He therefore was not jealous of this person and that the victim, to his knowledge, had nothing against him. The defendant was subsequently booked into Maricopa County Jail.

On March 25, 1989, at 1:42 a.m., Phoenix Police Officer M. Talman responded to 2147 East Garfield reference a victim of a stabbing. Upon arrival, Officer Talman observed a Mexican male lying on his back who had blood covering his clothing and hands. Officer Talman contacted the occupants of the house located at 2147 East Garfield. Witnesses indicated they were inside when they heard noises at the front door. When they went to the front

24C

VICTOR MANUEL SALAS
      Defendant                          CAUSE NO. CR8903252

---

door, they heard the victim say, "They're coming." The victim then tried to climb into the back of a pickup truck but fell to the ground where he was found.

On March 25, 1989, Phoenix Police Officer R. Heinrich went to 1200 East Roosevelt and located the listed homicide weapon in a leather sheath. This knife was impounded as evidence and was submitted for examination for blood trace evidence.

## RELATED OFFENSES/STIPULATIONS:

On March 30, 1989, the defendant was charged by the indictment with murder in the first degree, a class 1 felony. On August 7, 1989, the defendant pled guilty by Alford of Manslaughter, a class 3 felony.

Per the plea agreement, the defendant shall be sentenced to twelve years in the Department of Corrections. Additionally, the defendant is to be responsible for restitution not to exceed $5,000.00. There were no additional agreements.

## DEFENDANT'S STATEMENT:

In response to what led the defendant being charged with this offense, the defendant indicated, "Don't remember committing the crime I'm charged with." This was the entire statement provided by the defendant.

Upon questioning, the defendant indicated that he was drinking on the day of the offense at several local bars. He advised that he was drunk during the offense, drunk when he was arrested, and drunk when he was interviewed by Detective Saldate.

The defendant advised this officer that he does not remember telling his roommate that he had stabbed the victim or that the victim was attempting to date his wife.

The defendant advised that he feels the Court should give him the minimum sentence as "I'm not guilty, I don't remember committing this crime."

## STATEMENT OF VICTIMS:

Sylvia Conchos of the Victim Advocate Program attempted to contact the victim's brother, Eloy Hernandez. She advised that her letter was returned and she had no additional information on family relatives.

This officer spoke with a representative of Botimer Funeral Home who advised that David Hernandez of 1425 East Taylor, #12, in

PAGE 4

a4d

**EXHIBIT 15C**

16 |.

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2               IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5              Plaintiff,           )
                                    )
6         vs.                       )      No. CR-87-11508
                                    )      CR-89-0048-AP
7    SEAN RUNNINGEAGLE,             )
                                    )
8    COREY TILDEN,                  )
                                    )      CR-89-0048-AP
9              Defendants.          )
                                    )
     _____

10

11

12                    Phoenix, Arizona
13                    July 18, 1988

14

15   BEFORE:  The Honorable GLORIA G. YBARRA, Judge

16

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19

20                    Jury Trial

21

22

23

24   ORIGINAL

25   PREPARED FOR APPEAL
     For Supreme Court

     LYDIA ESTRADA
     Official Court Reporter

PROPERTY AND CONFIDENTIAL MATERIAL

FILED
APR 13 1989
NOEL K. DESSAINT
CLERK SUPREME COURT
BY

3

1

2                          I N D E X

3

4
     WITNESS                    DR     CB    RDR    RCR

5

6    Kevin DeNomie

7    Armando Saldate, Jr.      18     37
                                      73    94

8

9

10

11                        E X H I B I T S

12                                                    Admt.

13

14   Number 130          Photograph               18

15   Number 131          Photograph               18

16   Number 153          Report                   94

17

18

19

20

21

22

23

24

25

42

1    A.   "Just let me fall.  It must be my destiny."

2    Q.   Okay.  Your statement to this jury is that

3  you didn't have to ask him what he meant.  You knew that.

4  Is that what you are saying?

5    A.   Let's see.  I interpreted those words to

6  mean that he needed to fall.

7    Q.   Right.  By that I guess to you it means

8  conviction.  Is that what you are saying?

9    A.   That may have been, yes.

10   Q.   But he never told you that.  Isn't that

11  true?

12   A.   No.

13   Q.   Nor did you ask him if that is what he

14  meant?

15   A.   No.

16   Q.   Now, in regards to making Orva a deal, you

17  mentioned the gas chamber to Orva while you were talking

18  to him, didn't you?  You dropped a little hit in there

19  that there might be a gas chamber involved in this

20  situation, didn't you?

21   A.   I don't believe so.  I don't believe so.

22   Q.   So if Orva said you mentioned the gas

23  chamber while you were talking to him, is he mistaken?

24   A.   He may be.  I don't believe I said a gas

25  chamber.  However, I did tell him he was under arrest for

1    true, yes.

2           Q.   Right.   So you haven't testified that Sean

3    kept breaking away looking at the wall or looking at his

4    shoes or trying to not pay attention to you.   Isn't that

5    true?

6           A.   That is correct.

7           Q.   So isn't it a fact that your technique is

8    used by you mostly because it intimidates the person, it

9    creates an aura of your presence being all over them, and

10   it's easier for you to control the person and get what

11   you want from them?

12          A.   My techniques, again, is not intimidation.

13   Intimidation is yelling and screaming and pounding on the

14   table.   That's not my technique, Mr. Iniguez.   My

15   technique is being face-to-face with that person, to tell

16   him the truth, for him to want -- I want him to tell me

17   the truth.   That is all I know.

18          Q.   Well, it's true, isn't it, that there were

19   different types of intimidation.   Is that true?

20          A.   I am sure there is intimidation also of

21   every kind, yes.

22          Q.   Would you venture to say that the presence

23   of a 225 pound man, six inches away from your face,

24   poking his finger in your chest, asking you some

25   questions after question, could that have an intimidating

1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2        IN AND FOR THE COUNTY OF MARICOPA

3                                              CR 88 1216

4    STATE OF ARIZONA,              )
                                    )
5              Plaintiff,           )
                                    )
6         vs.                       )     No. CR 88-00044
                                    )     1 CA CR 88-1216
7    ESTEBAN LUIS REYES,            )
                                    )
8              Defendant.           )
                                    )
9    _____

10

11

12                    Phoenix, Arizona
                      August 19, 1988
13                       10:30 a.m.

14

15   BEFORE:  THE HONORABLE PATRICK O'NEIL

16

17

18        REPORTER'S TRANSCRIPT OF PROCEEDINGS        DIVISION 1
                    VOLUME III                      COURT OF APPEALS
19                                                  STATE OF ARIZONA

20                                              FILED  DEC  5 1988

21                                              GLEN D. CLARK, CLERK
22                                              By _____

23                                              Prepared by:

24   ORIGINAL                                   Cecilia Boledovich, CSR
                                                Official Court Reporter
25   Prepared on Appeal

DISCOVERY AND CONFIDENTIAL MATERIAL

SUPERIOR COURT - MARICOPA COUNTY

2

1

2
<u>I N D E X</u>

3
<u>WITNESSES</u>                                          <u>DX</u>    <u>CX</u>    <u>RDX</u>    <u>RCX</u>

4
Thomas Takei, M.D.                               4      6

5
Abraham Mercado                                  7
  (Voir Dire Examination by
6   Mr. Lorona, Page 18.)                        18    22     37     41

7

8
Armando Saldate, Jr.                            43    74

9
Larry Martinsen                                 122
  (Voir Dire Examination by
10   Mr. Lorona, Page 133.)
                                                134   139
11

12

13
<u>E X H I B I T S</u>

14                                                          <u>MARKED</u>   <u>RECEIVED</u>

15
Plaintiff's Exhibit Nos. 1 A and 1 B                                 12

16
Plaintiff's Exhibit No. 15                                 15        21

17
Plaintiff's Exhibit No. 12                                          18

18
Plaintiff's Exhibit No. 13                                          45

19
Plaintiff's Exhibit No. 14                                          49

20
Plaintiff's Exhibit No. 6 A and 6 B                                127

21
Plaintiff's Exhibit No. 7 A                                        132

22
Plaintiff's Exhibit No. 7 B                                        134

23
Plaintiff's Exhibit No. 7 C                                        138

24

25

SUPERIOR COURT - MARICOPA COUNTY

1    effect on a person?

2           Q.  Again, I think you are mischaracterizing the

3    poking in the chest.  Took maybe minutes of the 45

4    minutes.

5           Q.  My question was, can what I have just

6    described have a tendency to be intimidating to a person

7    whether you are doing it or not?

8           MR. AHLER:  Your Honor, I object.

9    Argumentative.  Calls for speculation.

10          THE COURT:  Overruled.

11          THE WITNESS:  My intention was not intimidation.

12   BY MR. INIGUEZ:

13          Q.  Again, sir, I hate to cut you off.  My

14   question is, do you think that a person being six inches

15   from another person's face, 225 pounds, leaning in his

16   face, putting his hands or poking him or touching him in

17   the chest with his finger, anyway you characterize this

18   aspect of it, do you feel a personal might find that

19   intimidating?

20          A.  He may find it intimidating.

21          Q.  Were you ever in the Marines?

22          A.  Yes, I was.

23          Q.  Do you remember boot camp?

24          A.  Yes, I do.

25          Q.  How far away were the instructors from your

1    responsible for this case?

2           A.   Yes, I am.  But my professional

3    responsibility is to report what is told to me, not to

4    manufacture items or delete items.

5           Q.   Well, isn't it true that when Orva was

6    telling you what happened, at some point he told you that

7    Corey struck the man?  Isn't that true?

8           A.   At one point he mentioned something to Corey

9    striking someone, yes.

10          Q.   Right.  You didn't testify on direct as to

11   that.  Is that correct?

12          A.   There were several things that Orva told me.

13   I, again, paraphrased his statement.

14          Q.   Right.  Isn't it true in talking to Orva,

15   would it be fair to say that you told him, "Tell us what

16   happened."

17               He says, "I am too drunk to remember."

18               Then you said that, "This is too important

19   of a case.  We can't have an answer like that in a case

20   like this.  This is too serious.  You got to do better

21   than that."

22               Isn't that true?

23          A.   That is true.

24          Q.   You didn't testify to that on direct either,

25   did you, Detective?

1        A.   That was not asked for me -- again, I just

2   paraphrased his statement.

3        Q.   And in fact there were many -- well, at

4   least several times during your interview of Orva that

5   you told him something similar like, I don't believe

6   that.  You are going to have to do better than that.

7   Isn't that true?

8        A.   That is true.

9        Q.   You went through days of, "I don't believe

10  that."

11              He would feed you a little more and a little

12  more as you went through these.  You got to do better.

13  You got to do better.  He would keep doing better.  Isn't

14  that true?

15       A.   I don't think you saying feeding me is

16  correct.  I think as I stated before, I think he tried to

17  minimize his involvement as often done.  And as I told

18  him or I continued to tell him that I did not believe a

19  certain area.  Then he realized that I knew probably more

20  than he thought I knew.  For that reason decided to tell

21  me the truth.

22       Q.   In fact, Detective, isn't it true when you

23  started with this you told him, "I want you to tell me

24  what happened that night when you were with Sean and

25  Corey."  Isn't than true?

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,           )
                            )
            Plaintiff,      )
                            )
    vs.                     )      No. CR-87-11508
                            )
SEAN RUNNING EAGLE, and     )      CR-89-0049-AP
COREY TILDEN,               )
                            )      CR-89-0048-AP
            Defendants.     )

FILED
APR 28 1989
NOEL K. DESSAINT
CLERK SUPREME COURT
BY _____

Phoenix, Arizona
June 20, 1988

BEFORE:  The Honorable GLORIA G. YBARRA, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Motions

ORIGINAL

PREPARED FOR APPEAL
For Supreme Court

LYDIA ESTRADA
Official Court Reporter

DISCOVERY AND CONFIDENTIAL MATERIAL

SUPERIOR COURT

3

1

2                          I N D E X

3      WITNESS                    DR      CR      RDR      RCR

4

5      Armando Saldate            14      24      35

6      Larry Martinsen            42      44      49       50

7      Sean Running Eagle         51      61

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   talked to Sheryl, I had talked to Sean, that it would

2   probably be important for him, best for him to tell us

3   the truth and exactly what had occurred, what was his

4   involvement in the murder.  And he indicated that,

5   something to the effect that he hadn't finished all of

6   his justice courses or something like that.  Probably

7   would have -- if he had, he probably would have told me

8   everything he wanted to know.  But that at the time he

9   hadn't finished all his justice courses.

10          We then continued into, I believe, where he

11  had been that night.  I think that's where we continued

12  to, and he didn't respond.  I pointed particularly to the

13  night in December, and he said he still would not

14  respond.  He finally said that -- oh, I then commented if

15  he remembered being at Sheryl's house, whether he also

16  remembered leaving Sheryl's house late that night, going

17  to Corey's, picking up Corey, then going around Deer

18  Valley area and cruising around that area until he seen a

19  car with a plower on it.  And he stopped and he again

20  commented that he didn't remember anything like that

21  occurring.

22          Q.  At some point during the conversation did he

23  ask to remain silent?

24          A.  Yes, he did.

25          Q.  At what point did that occur?

21

1    A.   Shortly after we had gone into conversations

2  about psychiatrists and him wanting one, to see a police

3  psychiatrist.

4    THE COURT:  Mr. Ahler, let me interrupt you for

5  just one second.  I should have done this earlier.  I

6  would like to have Mr. Running Eagle seated next to his

7  Attorney Iniguez so he can confer with him.

8    MR. INIGUEZ:  Thank you, Judge.

9    THE COURT:  Mr. Ahler?

10 BY MR. AHLER:

11   Q.   What did the Defendant Running Eagle tell

12 you that would indicate that he wanted to remain silent?

13 What words did he use?

14   A.   I believe he said he just wanted to remain

15 silent.

16   Q.   Did you continue to have a conversation with

17 him after he had asked to remain silent?

18   A.   Yes, I did.  I continued to speak with him,

19 and finally he told me that he wanted his attorney.

20   Q.   Did he make any statements to you after the

21 time that he had asked to remain silent?

22   A.   If I may, can I refresh my memory with my

23 report?

24   MR. AHLER:  Yes, if it would assist you.

25   THE WITNESS:  No, he did not.

24

MR. INIGUEZ:  Thank you.


CROSS-EXAMINATION

BY MR. INIGUEZ:

Q.  Officer, how many murder cases have you worked on so far?

A.  Approximately 20.  Twenty that I -- approximately 20 that I have been assigned as case agent. I worked on approximately -- this would only be a guess, 40.

Q.  Okay.  In this particular case would it be fair to say that it was a very important aspect of this case to try to elicit some information from Mr. Running Eagle?

A.  Mr. Iniguez, every case where it's a criminal matter, it's very important to elicit a confession from the suspect.

Q.  Yes.  But in some cases you may have 10 or 15 eyewitnesses, or it may have been a family matter or you may have had a number of other pieces of evidence. In this case isn't it true that the only thing you had when you initiated this contact with Sean was a print, a fingerprint or some sort?

A.  That in regards to the palmprint, that was the only thing other than testimony or evidence from

1    Sheryl that he was present, and Orva, of course.

2    However, again, I would have to disagree with you because

3    I think I have worked burglary, I have worked several

4    other areas of police work in uniform, also.  I have

5    always thought that it's very important to get a

6    confession from someone.  You know, you try so hard to

7    elicit that confession.

8          Q.  Now, trying very hard to elicit the

9    confession, you discussed with Sean his involvement for

10   how many hours?  You read us earlier your starting time

11   and your ending time.  You read those two.  You would

12   probably figure out --

13         A.  An hour and 10 minutes.

14         Q.  Right.  Now, you have been testifying for

15   about 10 or 15 minutes you think?

16         A.  Correct.

17         Q.  So you two or you three -- I'm sorry, Det.

18   Martinsen was in the room also.  Is that right?

19         A.  Yes.

20         Q.  And he was also asking questions.  Is that

21   correct?

22         A.  I don't believe so.

23         Q.  He didn't ask a single question the whole

24   time you were there?

25         A.  I wouldn't say that he didn't ask a single

1  question.  However, if he did it was just a few.

2      Q.  Okay.  So you were doing most of the

3  questioning?

4      A.  I was doing the questioning, yes.

5      Q.  During the course of your questioning did

6  you at any time hit Sean in the head or the chest?

7      Q.  I hit him with a finger.

8      Q.  You hit him with a finger?

9      A.  I wouldn't say hit him, I poked him with my

10  finger, yes.

11      Q.  In the chest?

12      A.  On several occasions, yes.

13      Q.  On several occasions?  Was that your

14  frustration or was he attacking you?

15      A.  Not either one.  It was my way of trying to

16  get his attention.  His attention was drawn to something

17  else, obviously, and his smiling, that I wanted to get --

18  draw his attention to what I was speaking about, not

19  something else that he was thinking about.

20      Q.  Did you for any length of time consider that

21  your poking him continuously would have been interpreted

22  by him as force?

23      A.  Of course not.

24      Q.  And were you angry when you were poking him

25  in the chest?

27

1              A.   During -- no, I was not.  But during my

2    interview --

3              Q.   Were you smiling?

4              A.   If you let me explain, Mr. Iniguez, and

5    answer your question.  During my interview --

6              Q.   You already answered my question, sir.  You

7    said no.  I asked you if you were smiling.  You said no.

8    That was the answer.

9              MR. AHLER:  Your Honor, I am going to object.

10   He is arguing with the witness.

11             THE COURT:  The question has been answered.  You

12   may proceed to another question.

13   BY MR. INIGUEZ:

14             Q.   During the course of this poking about how

15   many different times do you feel you poked him in the

16   chest with your fingers?

17             A.   Several times.

18             Q.   And how many times did he poke you in your

19   chest with his finger?

20             A.   None.

21             Q.   In fact, if he had poked you in your chest

22   with your finger you probably would have taken him to the

23   ground and handcuffed him.  Is that correct?

24             A.   I wouldn't speculate on that, Mr. Iniguez.

25             Q.   You don't allow people to poke you in the

28

1    chest while you are questioning them, do you?

2         A.   Depends on what I am getting out of them.

3    If I am getting a confession they can poke all day.

4         Q.   If you are not getting a confession then you

5    may poke all day?

6         A.   It depends on whether it's needed to get his

7    attention to what I wanted to speak about.   If his memory

8    or if his attention span is somewhere else I may poke

9    them on the chest.   I may poke them on the arm trying to

10   get him diverted to that part where I want his attention

11   to be.

12        Q.   Did you at any time think of asking him,

13   just pay attention when I am speaking to you, rather than

14   putting your finger in his chest?

15        A.   I think that was mentioned during the time I

16   was poking him in the chest.

17        Q.   That didn't -- was this report in your

18   police report, sir?

19        A.   No, it was not.

20        Q.   How far from Sean Running Eagle were you

21   while you were questioning him most, during most of the

22   interrogation, in feet or inches?

23        A.   I try to stay within six to 12 inches from

24   someone I am talking to.

25        Q.   So would you say that right now I am 12

1    inches away from his face?

2         A.   At the most, yes.

3         Q.   So is it possible you were this close to

4    him?

5         A.   Very definitely.

6         Q.   Okay.   And for the record, I would like to

7    reflect that I am sitting right by Mr. Sean Running

8    Eagle, approximately, as the police officers agree, six

9    inches to 12 from his face.   Did Mr. Running Eagle ask

10   you for an attorney right away when you started

11   questioning him?

12        A.   No, he did not.

13        Q.   About how many minutes had passed, if you

14   remember, before he asked for an attorney?

15        A.   It was shortly before we terminated the

16   interview that he asked for an attorney.   He had asked to

17   remain silent, however, did not ask for an attorney.

18   Shortly after that he asked for his attorney.

19        Q.   Okay.   About how many minutes after the

20   interview commenced that he asked to remain silent?

21        A.   Again, just shortly before he asked for an

22   attorney.   I would say the interview took an hour and 10

23   minutes.   Maybe an hour when he asked to remain silent

24   and we continued to talk or I continued to talk and try

25   to elicit statements from him and he refused.   Of course

1   he said he was going to remain silent, then said he

2   wanted an attorney.

3          Q.  When you said he remained silent, did you

4   tell him he had the right to remain silent?

5          A.  Mr. Iniguez, we had already gone by the

6   Miranda Rights.  He had expressed or told me his Miranda

7   Rights.  I read the Miranda Rights.  Part of them are

8   that he has a right to  remain silent.  That is what he

9   explained to me later on.

10         Q.  When he asked you that he wanted to remain

11  silent, did you and Det. Martinsen get up and leave the

12  room and quit questioning him?

13         A.  No.

14         Q.  How many times -- isn't it true about three

15  times he asked you not to be questioned anymore and you

16  continued?

17         A.  No.  He only asked to remain silent on one

18  occasison.  That was when -- shortly before he asked for

19  an attorney.  He did remain silent.  He is correct, he

20  did remain silent and I continued to talk to him.

21         Q.  Isn't it true that these statements that you

22  have just testified to that he made, in particular, the

23  statement, "Let me fall.  It's my destiny", isn't it true

24  that that statement was made after he requested to remain

25  silent?

A.   No, it's not.

Q.   Okay.  Is it also not true that this statement was made after he requested to speak with an attorney?

A.   No.  He had made that statement before.

Q.   Okay.  How long is this interview room where he was being interviewed?  Do you remember?

A.   I don't know the exact measurements.  I would say four by six or five by eight room maybe.  Something to that.  I am sure you have seen those rooms before.

Q.   Was Mr. Running Eagle crying during his interview?  Did he have tears in his eyes?

A.   At one point he did have tears in his eyes.

Q.   And did you have the equipment to tape this conversation should you have desired to?

A.   Definitely.

Q.   Is there a reason why you didn't tape this conversation?

A.   Certainly.

Q.   Why was that?

A.   I don't believe it's very good, a taped confession or an interview with someone, especially since it involves such a serious crime.  Because I think it hinders that person from coming out, discussing what he

32

1    really wants to say.  I think maybe that tape kind of

2    keeps them from wanting to talk to us.

3         Q.  Yes, sir.  Is it true, Mr. Saldate, that at

4    some point during the interview you told Mr. Running

5    Eagle, "I want to see you go to the gas chamber.  I want

6    to see you die"?

7         A.  No, it's not.

8         Q.  Is it also true that when you were poking

9    him in his chest you were asking him, is this how you did

10   it?  Is this how you did it?

11        A.  I may have said that, yes.

12        Q.  So then is it fair to say that it wasn't

13   just an interrogation, it was more also an accusation

14   between you and Mr. Running Eagle?

15        A.  I think any interrogation at one point or

16   another becomes accusatory.  At one point you do accuse a

17   person.  I had earlier done it.  Almost every

18   interrogation that you have a suspect you become

19   accusatory and accuse him of doing that crime, of course.

20        Q.  Are you telling this Court that in every

21   interrogation you accuse the person being interrogated of

22   committing the crime?

23        A.  I said in almost every interview that you

24   have you become -- the interview does point in that

25   direction of accusatory.  That you accuse that person of

33

1    committing an offense to see what he responds.

2         Q.   In this particular interrogation do you

3    remember his immediate response when you told him he did

4    it, and put your finger into his chest?

5         A.   Most of the time that we are speaking in

6    regards to the homicide, the actual killing of the

7    Williams, Mr. Running Eagle remained very calm, very

8    quiet, usually was just smiling.  So I really couldn't

9    elicit that much of response from him.

10        Q.   Excuse me.  I think my question was, do you

11   remember his response immediately following your poking

12   him in the chest and asking him?

13        A.   I think it was none.

14        Q.   Okay.  Did you tell Mr. Running Eagle

15   anything that someone else had said that you knew was

16   false, like did you tell him, "Corey already confessed.

17   He told me you guys did it", or did you tell him that

18   "Orva had already told us you did it", or anything of

19   that type?

20        A.   No, I did not.  I had told Sean that I had

21   spoken to Corey and I had already spoken to Sheryl.  That

22   was my only indication that I had spoken to either one of

23   them.

24        Q.   Did you tell Mr. Running Eagle that Sheryl

25   had told you that she did not want to have anything to do

1 with Mr. Running Eagle anymore?

2         A.   Of course not.

3         Q.   Is there any other type of force either

4 verbal or physical that was used there that day by either

5 you or someone else from the police department that you

6 have not discussed here today?

7         A.   I don't think no more was used, Mr. Iniguez.

I think that's your opinion that force was used.

9         Q.   It's correct, is it not, that you have

10 testified that you poked Mr. Running Eagle in the chest

11 several times with your finger during the interview?

12         A.   That's correct.

13         Q.   How much do you weigh, Mr. Saldate?

14         A.   About 225.   But my finger doesn't weigh that

15 much.

16         Q.   But you didn't take your finger off your

17 body when you poked him with it?

18         A.   No, I did not.

19         Q.   You are aware, are you not, Mr. Saldate,

20 that a person can put considerable pressure to another

21 individual with the use of one finger.   Isn't that true?

22         A.   A person could, yes.

23         MR. INIGUEZ: I have no further questions.

24         THE COURT:  Mr. Ahler?

**EXHIBIT 15D**

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | CR-87-00882 |
| Plaintiff, | ) | |
| | ) | MOTION TO SUPPRESS |
| V. | ) | DEFENDANT'S STATEMENTS |
| | ) | |
| CHRISTOPHER MOYNIHAN, | ) | (Assigned to the Honorable |
| Defendant. | ) | Armando De Leon - Division L) |
| | ) | |

COMES NOW, the above-named defendant, by his attorney undersigned, and respectfully moves this Court for the entry of an order suppressing for use as evidence any and all statements allegedly made by the defendant either which are incriminatory of him or which are alleged to be false exculpatory statements. Defendant respectfully asserts that said statements were involuntary, taken in the absence of counsel, taken prior to warnings being given to him sufficient to apprise him that he did not have to make such statements, and were obtained during a time when the defendant was under arrest in violation of rights guaranteed him by the Fourth Amendment to the United States Constitution and Article 2 Section 8 of the Arizona Constitution. The defendant respectfully asserts that these statements must be suppressed for the reason that they violate rights guaranteed to him by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and by Aricle 2 Section 8, 10 and 24 of the Arizona Constitution.

The defendant would move the Court for the further order suppressing for use as evidence any and all leads, tangible or otherwise, derived directly or indirectly from the statements sought to be suppressed.

Further, the defendant would request a voluntariness hearing in order to adduce evidence to form a factual basis for this motion.

Respectfully submitted this 12th day of May, 1987.

STEPHEN M. R. REMPE
Maricopa County Public Defender (Acting)

By _____
ROLAND J. STEINLE, III
Deputy Public Defender
132 South Central, Suite 6
Phoenix, Arizona 85004

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant asserts that his confession was obtained in violation of _Miranda v. Arizona_, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and was involuntary.  Voluntariness and _Miranda_ violations are two separate inquiries.  _State v. Montes_, 136 Ariz. 491, 494, 667 P.2d 191, 194 (1983).  These principles were recently reaffirmed by the Supreme Court in _State v. Rivera_ (No. 6673 dated March 10, 1987) _____ Ariz. _____.

A.  _Miranda Warnings_

The necessity of giving _Miranda_ warnings relates to the admissibility of a confession and not to its voluntariness.  _Montes_, 136 Ariz. at 494, 667 P.2d at 194.  A suspect may make a voluntary statement that will nonetheless be inadmissible at trial because law enforcement officers did not advise the suspect in custody of his _Miranda_ rights before questioning him.  _Id._  To satisfy _Miranda_, the State must show that defendant understood his Fifth and Sixth Amendment rights and intelligently and knowingly relinquished those rights before any custodial interrogation began.  _See id._ at 495, 667 P.2d at 195.  This determination should focus on the particular facts and circumstances of a case, "including the defendant's background, experience and conduct."  _Id._

The threshold inquiry, then, is whether the statement elicited from

-2-

appellant occurred during "custodial interrogation."   For purposes of the
Miranda requirements, it does not matter that appellant was in custody for an
unrelated offense. Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20
L.Ed.2d 381 (1968).   The critical issue is whether appellant was subjected to
an interrogation before Miranda warnings were given.

In Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d
297 (1980), the Court defined "interrogation" as referring "not only to
express questioning, but also to any words or actions on the part of the
police (other than those normally attendant to arrest and custody) that the
police should know are reasonably likely to elicit an incriminating response
from the suspect. . . A practice that the police should know is reasonably
likely to evoke an incriminating response from a suspect thus amounts to
interrogation.   But, since the police surely cannot be held accountable for
the unforeseeable results of their words or actions, the definition of
interrogaton can extend only to words or actions on the part of police
officers that they should have known were reasonably likely to elicit an
incriminating response." Id. at 301-02, 100 S.Ct. at 1690.   Adopted in
Arizona in Montes, 136 Ariz. at 494.

B.   Voluntariness

"Confessions are prima facie involuntary and the State must show by a
preponderance of the evidence that the confession was freely and voluntarily
made." Montes, 136 Ariz. at 496, 667 P.2d at 196.   A confession is not proven
voluntary merely because the suspect has been advised of his Miranda rights;
Courts must consider the totality of the circumstances to determine whether
the suspect's will was overborne.   See generally State v. Tison, 129 Ariz.
526, 537, 633 P.2d 335, 346 (1981), cert. denied, 459 U.S. 882, 103 S.Ct. 180,
74 L.Ed.2d 147 (1982).   The Supreme Court will not disturb a trial court's

-3-

determination of voluntariness absent clear and manifest error. <u>Montes</u>, 136 Ariz. at 496, 667 P.2d at 196. "A confession will be found involuntary where the Court, considering all the circumstances, determines that one of the following factors exists: (1) impermissible conduct by police, (2) coercive pressures not dispelled, or (3) confession derived directly from prior involuntary statement." <u>State v. Gretzler</u>, 126 Ariz. 60, 82, 612 P.2d 1023, 1045 (1980). Affirmed in <u>State v. Rivera</u>, supra.

The fact that defendant may still have been intoxicated at the time of his confession may make the statement involuntary and thus inadmissible; the Court must consider once again this factor in the totality of the circumstances. <u>State v. Rivera</u>, supra and <u>State v. Porter</u>, 122 Ariz. 453, 595 P.2d 998 (1979). It is a denial of due process to admit into evidence an incriminatory statement that is involuntary because of extreme intoxication. However, the confession is inadmissible only if it is shown "that the accused was intoxicated to such an extent that he was unable to understand the meaning of his comments." <u>State v. Rivera</u>, supra.; see also <u>State v. Ferguson</u>, 149 Ariz. 200, 208-09, 717 P.2d 879, 887-88 (1986).

Finally, if a defendant is rendered unable to understand the meaning of his statement by some other disability including mental illness that statement would be inadmissible. <u>State v. Porter</u>, supra. <u>State v. Godinez</u>, 111 Ariz. 397, 531 P.2d 154 (1975).

Respectfully submitted this 12th day of May, 1987.

STEPHEN M. R. REMPE
Maricopa County Public Defender (Acting)

By _____
ROLAND J. STEINLE, III
Deputy Public Defender
132 South Central, Suite 6
Phoenix, Arizona 85004

-4-

Copy of the foregoing motion
mailed/delivered this 12
day of May, 1987 to:

HON. ARMANDO DE LEON
Judge of the Superior Court
8th Floor, East Court Building
101 West Jefferson
Phoenix, Arizona 85003

CLEVE LYNCH
Deputy County Attorney
4th Floor, East Court Building
101 West Jefferson
Phoenix, Arizona 85003

By

ROLAND J. STEINLE, III
Deputy Public Defender



JUDITH ALLEN, CLERK

'87 MAY -6 PM 4:21

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | NO. CR-87-00882 |
| Plaintiff, | REQUEST FOR VOLUNTARINESS HEARING |
| vs. | |
| ANTHONY ROBERT KELLEY, | (Assigned to The Honorable Armando de Leon) |
| Defendant. | |

COMES NOW the defendant Anthony Robert Kelley, by and through counsel undersigned, and hereby requests that a voluntariness hearing be set in this matter prior to trial for the purpose of determining the admissibility of any and all statements made by the defendant, State of Arizona v. Bruce Duane Porter, 122 Ariz. 453, 595 P.2d 998 (1979).

RESPECTFULLY SUBMITTED this 7th day of May, 1987.

WOODS AND HART

J. Grant Woods
151 N. Centennial Way
Suite 2000
Mesa, Arizona 85201
Attorneys for Defendant

COPY of the foregoing
mailed/delivered this
7th day of May, 1987,
to the following:

The Honorable Armando de Leon (delivered)
Judge of the Superior Court
101 West Jefferson Street
Phoenix, Arizona 85003

WOODS AND HART



Cleve __ __ Esq.  (delivered)
Deputy ____ Attorney
Mari___ ____ty Attorney's Office
101 W__ __fferson Street
4th Fl___
Phoenix, Arizona 85003

Roland J. Steinle, III, Esq,  (mailed)
Deputy Public Defender
Maricopa County Public Defender's Office
132 __th Central Avenue
1st Floor
Phoenix, Arizona  85004

By: _____

WOODS AND HART
ATTORNEYS AT LAW
SUITE 2000 __
__ NORTH CENTRAL __
MESA, ARIZONA 85201

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

CR-87-00882

Request for Voluntariness
Hearing



JUDITH ALLEN, CLERK
_____ DEP

FILED

1987 MAY -6 PM 4: 31

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                ) NO. CR-87-00882
                                 )
        Plaintiff,               ) MOTION TO SUPPRESS STATEMENTS
                                 )
vs.                              ) (Oral argument requested)
                                 )
ANTHONY ROBERT KELLEY,           ) (Assigned to The Honorable
                                 ) Armando de Leon)
        Defendant.               )
_____)

        COMES NOW the defendant Anthony Robert Kelley, by
and through counsel undersigned, and hereby requests that all
statements made by the defendant to any and all police agencies
be suppressed.  Miranda v. State of Arizona, 384 U.S. 436,
86 S.Ct. 1620, 16 L.Ed.2d 694 (1966).  Defendant requests
that oral argument of this motion be set at the time of
voluntariness hearing, defendant's Request for Voluntariness
Hearing having been filed with the Court simultaneously
herewith.

        RESPECTFULLY SUBMITTED this 7th day of May, 1987.

                              WOODS AND HART

                              J. Grant Woods
                              151 North Centennial Way
                              Suite 2000
                              Mesa, Arizona 85201
                              Attorneys for Defendant

COPY of the foregoing mailed/
delivered this 7th day of May
1987, to the following:

The Honorable Armando de Leon   (delivered)
Judge of the Superior Court
101 West Jefferson Street
Phoenix, Arizona 85003

Cleve Lynch, Esq.   (delivered)
Deputy County Attorney
Maricopa County Attorney's Office
101 West Jefferson Street
4th Floor
Phoenix, Arizona 85003

Roland J. Steinle, III, Esq.   (mailed)
Deputy Public Defender
Maricopa County Public Defender's Office
132 South Central Avenue
1st Floor
Phoenix, Arizona  85003

By_____

JUDITH ALLEN, CLERK
BY
Johnson DEP.
FILED

1987 MAR 19  PM 4: 06

SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

           Plaintiff,

    v.

CHRISTOPHER T. MOYNIHAN,

           Defendant.

No. CR-87-00882

REQUEST FOR VOLUNTARINESS
        HEARING

(Assigned to the Honorable
Armando De Leon - Division - L)

        COMES NOW the defendant, by and through his undersigned attorney, and respectfully moves the court to set a voluntariness hearing in the above-captioned matter, pursuant to the Rules of Criminal Procedure, 17 A.R.S., as amended 1975.  The defendant requests that the said voluntariness hearing be set at a time prior to the trial. The last day for trial is April 11, 1987.

        RESPECTFULLY SUBMITTED this 19th day of March, 1987.

ROSS P. LEE
Maricopa County Public Defender

By _____
ROLAND J. STEINLE, III
Deputy Public Defender

Copy of the foregoing request
mailed/delivered this 19th
day of March, 1987 to:

HON. ARMANDO DE LEON
Judge of the Superior Court

CLEVE LYNCH
Deputy County Attorney

By _____
ROLAND J. STEINLE, III
Deputy Public Defender