Michael D. Kimerer, #002492
Lori L. Voepel, #015342
Kimerer & Derrick, P.C.
221 East Indianola Avenue
Phoenix, Arizona 85012
Telephone: 602/279-5900
Facsimile: 602/264-5566
Attorneys for Petitioner

FILED_____LODGED_____
RECEIVED___X___COPY____ ___

2002 JUN 11  PM 6: 44

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

07-99001

| | |
|---|---|
| DEBRA JEAN MILKE, ) | No. CV-98-0060-PHX-RCB |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | |
| TERRY STEWART, et al., ) | |
| ) | |
| Respondent. ) | |
| ) | |

## EXHIBITS TO PETITIONER'S
## BRIEF ON THE MERITS

## VOLUME IV
## (EXHIBITS 36-78)

102

Michael D. Kimerer, #002492
Lori L. Voepel, #015342
Kimerer & Derrick, P.C.
221 East Indianola Avenue
Phoenix, Arizona 85012
Telephone: 602/279-5900
Facsimile: 602/264-5566
Attorneys for Petitioner

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| DEBRA JEAN MILKE, | No. CV-98-0060-PHX-RCB |
| Petitioner, | |
| v. | |
| TERRY STEWART, et al., | |
| Respondent. | |

## EXHIBITS TO PETITIONER'S
## BRIEF ON THE MERITS

## VOLUME IV
## (EXHIBITS 36-78)

## LIST OF EXHIBITS

1. SOCIAL HISTORY

2. DR. DAVID BIEGAN'S REPORT

3. AFFIDAVIT OF RENATE JANKA

4. AFFIDAVIT #1 OF KIRK FOWLER

5. AFFIDAVIT OF BAERBEL JACKS

6. INTERVIEW OF SANDRA PICKINPAUGH BY SALDATE

7. ORDER OF PROTECTION

8. MEDICAL RECORDS OF CHRISTOPHER MILKE

9. AFFIDAVIT OF DR. KEVIN ZUERLEIN

10. EXCERPTS OF JIM STYERS' TRIAL TESTIMONY

11. MILITARY RECORDS OF JIM STYERS

12. EXCERPTS OF ROGER SCOTT'S TRIAL TRANSCRIPTS

13. PRESENTENCE REPORT OF ROGER SCOTT

14. DR. TATRO'S EVALUATION OF ROGER SCOTT

15. SALDATE RESEARCH

16. REDACTED LETTERS FROM JIM STYERS TO DEBRA MILKE

17. EXCERPTS OF INTERVIEW OF GAIL LIPSHULTZ

18. DEBRA MILKE'S EMPLOYEE BENEFITS SELECTION FORM FOR JOHN ALDEN INSURANCE

19. DEBRA'S APPLICATION FOR EMPLOYEE BENEFITS FROM LINCOLN NATIONAL

20. EXCERPTS OF TRANSCRIPTS RE: JIM STYERS' AND ROGER SCOTT'S KNOWLEDGE OF DEBRA'S EMPLOYMENT BENEFITS PLAN

21. DEBRA'S APARTMENT RENTAL APPLICATION

22. SELECT ROGER SCOTT HABEAS EXHIBITS

23. SUPPLEMENTAL REPORT OF ROGER SCOTT BY DETECTIVE MILLS

24. DETECTIVE SALDATE'S SUPPLEMENTAL REPORT OF DEBRA MILKE

25. MINUTE ENTRY DATED 1/18/91

26. ORDER DATED 11/18/96

27. NEW TIMES ARTICLE

28. PROFESSOR RICHARD LEO'S REPORT

29. PHOENIX POLICE DEPARTMENT INTERROGATION POLICIES AND PROCEDURES

30. DETECTIVE SALDATE'S SUPPLEMENTAL REPORT OF SANDRA PICKINPAUGH INTERVIEW

31. SALDATE'S SEPARATION NOTICE

32. SALDATE'S PRETRIAL INTERVIEW

33. EXCERPTS OF ROGER SCOTT'S HABEAS CORPUS PETITION

34. AFFIDAVIT OF DR. TATRO

35. AFFIDAVIT OF ROLAND STEINLE

36. KIRK FOWLER SWORN STATEMENT TO TERRY CAPOZZI

37. EXCERPTS FROM INBAU & REID

38. AFFIDAVIT OF PAUL HUEBEL

39. AFFIDAVITS OF LAW ENFORCEMENT EXPERTS

40. AFFIDAVIT OF ANDERS ROSENQUIST

41. LIST OF SALDATE'S INCONSISTENCIES AND DISCREPANCIES

42. AFFIDAVIT OF KIRK FOWLER (SADEIK)

43. AFFIDAVIT OF KIRK FOWLER (PICKINPAUGH)

44. EXCERPTS OF ERNIE SWEAT'S PRETRIAL INTERVIEW

45. EXCERPTS OF ERNIE SWEAT'S TRIAL TESTIMONY

46.   EXCERPTS OF HENRY MILKE INTERVIEW

47.   JAMES STYERS' LETTERS TO JUDITH RADALOVIC AND "OLGA"

48.   AFFIDAVIT OF KEN RAY

49.   MINUTE ENTRY DATED 2/13/90

50.   DEBRA MILKE LETTER TO DEFENSE COUNSEL

51.   AFFIDAVIT OF PATRICIA (BACON) PRUST

52.   AFFIDAVIT OF KIRK FOWLER (MARKWELL)

53.   MOTION FOR SANCTIONS

54.   AFFIDAVIT OF CHARLES JONES

55.   AFFIDAVIT OF DONALD AND JOSEPHINE JONES

56.   AFFIDAVIT OF ALEX JANKA

57.   AFFIDAVIT OF DEBRA MILKE

58.   DEBRA MILKE'S MEDICAL RECORDS

59.   DEBRA MILKE'S ELEMENTARY SCHOOL RECORDS

60.   DEBRA MILKE'S COLLEGE RECORDS

61.   SUBPOENA DUCES TECUM

62.   EXCERPT OF TESTIMONY RE: DISCOVERY REQUEST

63.   MOTION TO QUASH

64.   MINUTE ENTRIES DATED 9/24/90 & 10/1/90

65.   AFFIDAVIT OF MARIA PULVER

66.   AFFIDAVIT OF ROBERT CHERMAK

67.   MOTION TO SUPPRESS

68.   MINUTE ENTRY DATED 10/12/90

69.   ORDER TO SHOW CAUSE

70.   **AFFIDAVIT OF DR. GARCIA**

71.   **MOTION TO APPOINT ASSOCIATE COUNSEL**

72.   **MINUTE ENTRY DATED 11/9/90**

73.   **MOTIONS TO CONTINUE MITIGATION HEARING**

74.   **APPLICATION FOR TRANSPORTATION AND LODGING**

75.   **DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES RE: SENTENCING**

76.   **EXCERPT OF TRANSCRIPT RE: JUROR MOQUINO**

77.   **JURY LIST**

78.   **JUROR MOQUINO'S QUESTIONARE**

**KIRK FOWLER INVESTIGATIONS**
**7845 EAST EVANS DRIVE SUITE F**
**SCOTTSDALE, ARIZONA 85260**
**PHONE 602-443-4740**
**FAX 602-443-0529**

July 27, 1999

Terry Capozzi
1325 W. Nido Way
Mesa, Arizona 85202

Dear Ms Capozzi;

In our earlier conversations concerning the Milke case I
forgot to mention the following.

During the trial an individual called Debbie's attorney,
Kenneth Ray and told him the following. "I was arrested by
Phoenix Police Officer Armando Saldate. I was convicted and
sentenced for a crime that I did commit. The problem with
my conviction was that Officer Saldate stated that he
obtained a confession from me. This was an absolute lie. I
did do the crime but I never confessed. I would be willing
to testify in this case if you would like me to. I have
changed my ways and I am now and will be in the future a
law-abiding man".

I asked Ken Ray who this was and for some reason he would
not give me the man's name and phone number. When I
questioned Mr. Ray about bringing this individual into
court as a witness he stated that it was not necessary. I
do not understand why he believed this and why he would not
give me the name and number of this individual.

I apologize for not bringing this matter to your attention
at an earlier date.

Sincerely,

Kirk Fowler

STATE OF ARIZONA
COUNTY OF MARICOPA } ss.
This instrument was acknowledged before me this 28 day of
July , 19 99 , by Kirk Fowler
In witness whereof I herewith set my hand and official seal.

_____ NOTARY PUBLIC

OFFICIAL SEAL
MYLA L. BUSHMAN
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires April 30, 2000

# Inbau & Reid,

# pp.25-93

propriate for the occasion. As to the first phase of the task—the sizing-up—there is not much an experienced interrogator can offer in the form of written instructions to less experienced persons. Even with the opportunity of utilizing actual case demonstrations for instructional purposes, the development of this ability to size-up a person must remain largely a matter of practical experience, although even then the degree of efficiency attainable by the interrogator will be dependent to some extent upon his own native ability and capacity for such psychological insight. However, with regard to the selection and application of available tactics and techniques, an experienced interrogator's recommendations may be reduced to writing and thereby rendered of value to other interrogators not possessed of comparable experience or training.

Rather than offer to the reader a random and generalized discussion of various interrogation tactics and techniques, an effort has been made to organize and classify the following material so as to render it of greater practical utility. First of all, there is a major classification on the basis of the subject's presumed relationship to the offense in question—that is, whether he is considered as (1) a suspect, or (2) merely as a witness or other prospective informant. Consequently, in conformity with this primary classification, one part of the following discussion of interrogation methods will deal with *Suspects* and the other part will be devoted to *Witnesses and Other Prospective Informants.*

## THE INTERROGATION OF SUSPECTS

There are two general groups of suspects:
1. Suspects whose guilt is definite or reasonably certain.
2. Suspects whose guilt is doubtful or uncertain.

In dealing with suspects whose guilt is definite or reasonably certain, the interrogator will usually make known his belief in the suspect's guilt and attempt from the very outset to secure a confession or incriminating statement. On the other hand, with suspects whose guilt is doubtful or uncertain, the interrogator must "feel his way around" until he arrives at a decision of guilt or innocence. This difference in objective and interrogation approach

obviously necessitates a separate discussion of the interrogation techniques to be used on each group of suspects.

## TACTICS AND TECHNIQUES FOR THE INTERROGATION OF SUSPECTS WHOSE GUILT IS DEFINITE OR REASONABLY CERTAIN

The interrogation approach to be used in an effort to obtain a confession or other incriminating information will depend to a considerable extent upon the nature of the offense, the offender's motivation, and the offender's reaction to the commission of the offense. On the basis of these considerations, criminal offender are subject to a rather loose and flexible classification as either *emotional offenders* or *non-emotional offenders.*

By ~~emotional offenders we mean primarily offenders who commit~~ ~~mit crimes against persons~~—that is, the infliction of physical harm or the taking of a life, ~~in the heat of passion, anger, or revenge~~ (for example, a sex offense, or the killing of one's wife in order to marry another woman), ~~or as the result of an accidental occurrence~~—such as negligent homicides or "hit-and-run" automobile cases. This group also includes some first offenders in certain other types of cases.

We classify a person who commits an offense of this type as "emotional," because he ~~usually experiences a greater feeling of remorse,~~ ~~mental anguish, or compunction as a result of his act~~ than is true with most other types of offenders; he has a greater sense of moral guilt—in other words, a troubled conscience. Because of this feeling of guilt, the most effective interrogation tactics and techniques to ~~use on him are those based primarily upon sympathetic con-~~ ~~siderations regarding his offense~~ and his present difficulty. We refer to this as the *sympathetic approach.*

By ~~non-emotional offenders we mean primarily offenders who~~ ~~commit crimes for financial gain,~~ such as larceny, burglary, robbery, or killings and physical harms inflicted for money reasons. The individual who commits a crime of this type is considered a "non-emotional" because he ordinarily does not experience the troubled conscience that is so characteristic of the emotional offender, and when he does react in that manner, it usually is of

lesser degree than that experienced by members of the "emotional" group. As a rule, the only or primary concern of the money-motivated offender is whether he will be caught or convicted. On him, therefore, a sympathetic approach is usually not nearly so effective as is it on the emotional criminal. The most effective tactics and techniques to use on the non-emotional criminal are those which are based primarily upon a *factual analysis approach*. By this we mean the employment of tactics and techniques that appeal to the subject's common sense and reasoning rather than to his emotions; they are designed and intended to convince him that his guilt is already established, or that it will be established soon, and that consequently there is nothing else for him to do but to admit it.

In our previously published materials on criminal interrogation we prescribed separate sets of tactics and techniques for each of the main interrogation approaches: the sympathetic approach for emotional offenders, and the factual analysis approach for the non-emotional group. We intended it only as a matter of emphasis. In the present publication, however, we are departing from that mode of presentation in order to avoid creating the impression that there are no exceptions to be made, either as to the groups themselves or with respect to the individual subjects within each group. Accordingly, we will set forth all the various tactics and techniques that we consider effective in the interrogation of criminal offenders without placing them under one classification or the other. Then, as the individual tactics and techniques are discussed, we will point out wherein each one is more, or less, applicable or effective on one group than on the other, and we will also indicate the modifications that may be warranted by particular case situations.

The sequence in which these various interrogation tactics and techniques are discussed and the lettering used to identify them are merely for reference purposes. They in no way signify a letter-by-letter application.

## A. Display an Air of Confidence in the Subject's Guilt

By an air of confidence we do not mean a supercilious or bullying attitude, but rather one which will convey to the subject

the impression that the interrogator is sure of himself. As part of this impression, of course, the interrogator must give no indication that he is being influenced by what the subject may state by way of a disclaimer of guilt; and he should do this even when the interrogator actually realizes the reasonable implication of some fact or evidence referred to by the subject.

(Lest we be misunderstood we wish to make it make it clear that we are now talking, of course, about subjects whose guilt is definite or reasonably certain, and not about subjects whose guilt is doubtful or uncertain.)

The manner and form of the initial meeting or contact with the person to be interrogated are of considerable importance. What happens at this stage of the interrogation may determine the success or failure of the entire effort.

Following is an illustration of the way in which the interrogator might proceed; it describes a procedure which the authors have found to be effective:

Where circumstances permit, the subject should be escorted into the interrogation room by one of the investigators who instructs him to have a seat and that Mr. (giving the name of the interrogator) will be in shortly to talk to him. When the interrogator enters he should greet the subject in somewhat the same manner as a doctor greets a patient—cordially, but not in an overly friendly manner, and there should be no offer of a handshake. Only when the subject himself extends his hand should the interrogator indulge in any handshaking, and even then it is well to do it rather casually.

As previously suggested, the interrogator should occupy a chair relatively near to, and in front of, the subject, or else the interrogator should move a chair into that position. At the beginning of the interrogation the interrogator's chair may be two or three feet from the subject's chair, but after the interrogation is under way the interrogator should move his chair in closer, so that, ultimately, one of the subject's knees is just about in between the interrogator's knees.

Following the *Miranda* warnings, the interrogator should proceed as follows, and while doing so the interrogator should look

Case 2:98-cv-00060-RCB   Document 102-1   Filed 06/11/02   Page 13 of 71

denials of guilt. The innocent, truthful subject will not be adversely affected by this tactic, while at the same time it will materially assist the interrogator in his efforts to secure a confession from the guilty.

As part of this procedure for discouraging denials of guilt, the interrogator should direct his comments toward the reasons why the subject committed the act. In this way the interrogator avoids the implication the subject did it.

To avoid any misunderstanding of what the authors have in mind with respect to the foregoing suggestions we wish to emphasize that we are talking here about a suspect whose guilt is definite or at least reasonably certain. Moreover, this recommended procedure for an avoidance of denials of guilt possesses the already stated attribute of disclosing responses evidencing truth-telling by an innocent person whom the interrogator may have mistakenly assumed to be guilty at the start of the interrogation. Then, too, this technique is not apt to induce a confession of guilt from an innocent subject; it involves no threats or other factors that tend to provoke false confessions.

In developing and maintaining an air of confidence in a subject's guilt, the interrogator must always remain in psychological control of the interview. A "big-shot" subject such as the proprietor business or professional man should never be allowed to capitalize on his status. One little procedure toward that end is to address such a person by his first name (e.g., Joe) rather than by the appel-

The fact that a suspect has a criminal record or has served time in a penitentiary should not be assumed to present an insurmountable barrier to securing a confession. Subjects of that type—who have waived their self-incrimination privilege and their right to counsel—may still be vulnerable to the tactics and techniques which will be subsequently described. In any event, if an interrogator becomes concerned over the fact that his subject has a criminal record and is probably too "wised up" to confess, he will be defeating himself before he even starts.

Along the same line, it should be pointed out that a person willing to serve as a law enforcement officer is not any more difficult

directly at the subject with an obvious air of confidence in what he says: "There's been a considerable amount of investigation in this case and it indicates that you haven't told the whole truth." The interrogator should then pause momentarily for the subject's reaction, since it can be very revealing. It will, for one thing, serve as a gauge as to whether the interrogator is correct in his assumption of the subject's guilt. If he registers an immediate and strong resentment following the accusation of his not having told the truth, that fact may be viewed as a possible indication of innocence. In such instances the interrogator's further interrogation should be conducted along the lines subsequently described for the interrogation of suspects whose guilt is doubtful or uncertain. On the other hand, if the subject displays no resentment to the accusation, that fact is consistent with the original assumption of guilt.

At various times during the interrogation the subject should be reminded that the investigation has established the fact that he committed the offense; that there is no doubt about it; and that moreover, his general behavior plainly shows that he is not now telling the truth.

In the early stages of the interrogation, if the subject interrupts the interrogator and asks, "May I say something?" it is well to respond by telling him, "Wait until I've finished with what I have to say." Incidentally, a guilty person will usually drop his request to say something; he eventually just listens.

Care must be exercised to avoid having the subject indulge in repeated denials of guilt. If the interrogator lures him out on his denials of guilt he will become more and more fortified, and the chances of obtaining a confession from him become less and less. The psychological considerations involved are these: The more often a subject repeats his lie the harder it becomes for him to tell the truth, and the task of the interrogator is rendered that much more difficult. In such a case there will be two major factors standing in the way of a confession: not only the subject's basic reluctance to admit his guilt, but also, now, his reluctance to admit that he had previously lied to the interrogator. Consequently, every discreet effort should be made to prevent the subject from uttering

Case 2:98-cv-00060-RCB   Document 102-1   Filed 06/11/02   Page 14 of 71

even without any incriminating statement from the subject himself.

## B. Point out Some, but by No Means All, of the Circumstantial Evidence Indicative of a Subject's Guilt

A mistake which criminal interrogators frequently make is to reveal to the subject all that is known about the case and about the suspect himself. Seldom is anything gained by this approach, and frequently much is lost. On the other hand, ~~it is helpful to point out to the subject some one-piece of-evidence-bearing-on-his-guilt~~ For instance, in a hit-and-run automobile case, let the subject know (if it be a fact) that a dent has been observed on the left front fender of his car and that human hair and blood have been found around the dented area. In a theft case, the interrogator can and should be told (if it be a fact) that the interrogator knows that a substantial loan was paid off by the subject soon after the theft. In other words, some one thing should be told the subject in order to satisfy him that there is good reason for questioning him, and that the investigators are not just on a "fishing expedition."

Another approach which should be ~~avoided is~~ that which may be described as "~~high pressure salesmanship~~," whereby the interrogator goes into a ~~rapid-fire monologue~~, indulging in accusation and perhaps telling the subject all the interrogator knows about the case and about the circumstances pointing toward the subject's guilt. In such instances very little of what the interrogator says will soak in or have any effect whatsoever.

~~Once the subject's attention is called to particular piece of in~~ criminating evidence the interrogator must be on guard (to cut off immediately any explanation the subject ~~may start to offer at that~~ time. This can be done by saying, "Wait a minute. Wait until I'm through and then I'll hear what you have to say." In this way, the ~~interrogator may retain control or mastery of the situation~~. On the other hand, to permit the subject to offer an explanation of the incriminating evidence will serve to bolster his confidence, for the he is putting the interrogator on the defensive and this should never be permitted to occur. The psychological considerations here involved are very important, for the impression created at th

to interrogate ~~than anyone else-in-fact-he-is-frequently moreover~~ ~~interrogation techniques than the person without~~ such a background. Perhaps the reason for this is the subject's own awareness of the significance that will be attached to even minor contradictions and slip-ups in a false story; he also knows from his own professional experiences that a guilty person may exhibit symptoms of deception by his behavior and general conduct. He may also know something of the particular interrogator's skill in obtaining confessions. In short, the subject with a background in the field of law enforcement may have less confidence in himself as ~~a... than the ordinary criminal suspect.~~

An interrogator should never adopt or drift into an indifferent, passive, or lethargic attitude. If those are his usual personality characteristics, he probably should not be in the interrogation field at all. However, if that attitude is the result of only a temporary "letdown" mood, it is advisable to have someone else serve as interrogator until that attitude changes.

~~The most effective attitude is generally one which reveal a calm confidence,~~ wherein there is a constrained display of a vital, intense interest in the interrogation mission, but which at the same time implies an understanding, considerate, and sympathetic feeling toward the subject himself. There will be some subjects, of course, for whom the interrogator will find it necessary to assume an ~~abrupt, accusative attitude. The ones who may require this ap~~ proach are those who are seemingly indifferent or lethargic, or those who indulge in a "know it all" kind of conduct and behavior. In general, however, the ~~previously described attitude is the more~~ ~~suitable one for the average criminal suspect.~~

With subjects who fall within the category of non-emotional criminals (i.e., those whose offenses were money-motivated, such as the thief, burglar, robber, etc.), the interrogator's display of an air of confidence in the subject's guilt is of even greater importance than when the subject is of the emotional type. As regards the non-emotional group, the interrogator should emphasize the futility of the subject's resistance. The suspect must be made to realize that his guilt is not only already known but also that it will soon be provable. The interrogator should imply that this is, or will be so,

Case 2:98-cv-00060-RCB   Document 102-1   Filed 06/11/02   Page 15 of 71

early stage of the interrogation may set the pattern for all that follows. (Again we wish to remind the reader that we are here speaking only of a person whose guilt is definite or reasonably certain.)

In addition to calling some particular circumstantial evidence to the subject's attention, the interrogator may resort to the following stageplay, in an appropriate case situation, for the purpose of having the subject believe there is considerably more evidence against him. It consists of having on a table in the interrogation room, a large file folder or batch of papers, into which the interrogator may look at the beginning of the interrogation, and at other times too, for the purpose of leading the subject to believe that it contains information and material of incriminating significance.

Where the interrogator does have something specific by way of incriminating evidence, he may mention it while going through the file, as though the information were actually contained therein. All this is done in a manner which conveys the impression that the particular bit of information or material is only a small part of the incriminating data embodied in the complete file.

The foregoing tactic is particularly effective when the subject is a professional or business man who is himself accustomed to working with files and records. To him the consultation of the file by the interrogator may have a special impact. However, it can be effective on certain other types of subjects as well.

Apart from the psychological considerations underlying the suggestion that a subject should not be told all the details known about the crime, there is another, and very practical, reason for withholding many of the details. On those rare occasions when a subject may be a pathological liar, or when the interrogator may have some concern over that possibility, it is extremely helpful to be able to check what the subject says against the known facts which had not been disclosed to him and which he could know about only by reason of his having actually committed the crime. Following is a case which illustrates the point.

An elderly woman was brutally assaulted sexually and killed while in the kitchen of her home. The suspect, who confessed to the offense, did so rather quickly and in such a manner that the interrogator wondered whether the confession was genuine. Fortu-

nately, no one had told the suspect the details of the offense, such as the exact nature of the victim's injuries, and the place where certain objects had been thrown; nor had anyone described the kitchen itself to the subject. An accurate revelation by the subject of these various details, including an accurate description of the kitchen, quickly allayed the interrogator's concern as to the validity of the confession. Had the subject been told all this before h... confession, the case would have given the interrogator considerabl... concern.

While on the subject of circumstantial evidence, perhaps a sug... gestion is in order regarding the rather common mistake crimina... investigators make by failing to face up to the stark reality that ... when circumstantial evidence points toward a particular person— that person is usually the one who committed the offense. Some in... vestigators and interrogators seem overwhelmed by the fact tha... the circumstantial evidence does point so strongly to a particula... person—to someone closely connected to the victim or to the scen... of the crime, or to someone with a good opportunity and motive fo... its commission. It all appears too good to be true, and thus the ob... vious is overlooked. This attitude develops quite often in cases i... which the circumstantially incriminated person is one of social o... professional prominence. A good example is that of a clergyma... who is circumstantially implicated in a sex-motivated murder. B... reason of his exalted position the clergyman may be interrogate... only casually or perhaps not at all, and yet it is an established fa... that occasionally clergymen do commit such offenses.

### C. Call Attention to the Subject's Physiological and Psychological Symptoms of Guilt

An offender who is led to believe that his appearance and d... meanor are betraying him is thereby placed in a much more vu... nerable position. His belief that he is exhibiting symptoms of guil... has the effect of destroying or diminishing his confidence in h... ability to deceive and tends to convince him of the futility of fu... ther resistance. This attitude, of course, places him much near... the confession stage.

This technique of calling attention to various physiological an...

34   CRIMINAL INTERROGATION AND CONFESSIONS

psychological phenomena as symptoms of guilt may be utilized somewhat as follows, but the reader should bear in mind that, with one possible exception, none of these phenomena is a reliable indication of guilt.

## 1. Pulsation of Carotid Artery

Although an accelerated pulsation of the carotid artery in the neck is experienced by some innocent persons as well as a certain number of guilty ones, such a phenomenon exhibited by a guilty subject can be commented upon to good advantage. In doing so, the interrogator, pointing to the pulsations of his own neck artery, may remark, "You are so concerned over the fact you have not told the whole truth that this artery in your neck is pumping away so fast it can be seen clear across the room; that sort of thing doesn't happen when a man is telling the truth, regardless of how nervous he may be."

## 2. Excessive Activity of the Adam's Apple

For much the same reason, and in much the same way as with No. 1 above, it is well to comment upon the over-activity of a subject's epiglottis or Adam's apple. The fact that an acceleration of its up and down movement is experienced by many offenders when questioned—and particularly when first accused—is well recognized among experienced interrogators.

## 3. Looking at Floor or Ceiling Rather Than Looking the Interrogator "Straight in the Eye"; Swinging One Leg over the Other; Foot-Wiggling; Wringing of the Hands, or Tapping with the Fingers; Picking Fingernails, etc.

When a subject fails to look the interrogator straight in the eye (and looks at the floor, wall, or ceiling instead), or when he exhibits a restlessness by leg-swinging, foot-wiggling, hand-wringing, finger-tapping, the picking of his fingernails, or the fumbling with objects such as a tie clasp or pencil, it is well for the interrogator to get the idea across that he is aware of such reactions and that he views them as manifestations of lying. A glance at the subject's face or hand movement, even without any accompanying comment,

CRIMINAL INTERROGATION   35

will probably cause the subject some concern that he is thereby "giving himself away." As to his not looking the interrogator straight in the eye (which many people associate with truth-telling) there are several procedures available. If the look at the floor, wall, or ceiling happens at the beginning or during the early stages of the interrogation, an emphatic opening of the interrogation followed by a slight pause before anything further is said, will convey the idea that the interrogator would look at the subject and not away from him.

No challenge should ever be issued to subjects who do not look the interrogator straight in the eye, such as, "Joe, you can't look me straight in the eye and tell me that," because the subject may respond by saying, "Oh yes I can," and proceed to look the interrogator straight in the eye. Thereafter the subject will have greater confidence in himself and succeed in keeping the interrogator on the defensive.

Many subjects who are on the verge of confessing will start picking their fingernails, or scratching themselves, or dusting their clothing with hand movements, or they will begin fumbling with a tie clasp or other small object. As politely as the interrogator can he should seek to terminate such conduct. He may do so by gently lifting the subject's hand or by removing the object from his hand, always avoiding any rudeness as he seeks to end such tension-relieving activities.

## 4. The "Peculiar Feeling Inside"

When a subject of the emotional offender type is being interrogated, it is advisable to remind the subject that he "would feel very good inside," and that this peculiar feeling (as if "all his insides were tied in a knot") is the result of a troubled conscience.

## 5. Dryness of the Mouth

A fairly reliable symptom of deception is a condition describable as "dryness of the mouth," provided the interrogator can be reasonably sure that the subject is not under some kind of medication that may have produced such a side-effect.

Dryness of the mouth may be observed in a subject by hi

36    CRIMINAL INTERROGATION AND CONFESSIONS

swallowing motions accompanied by repeated attempts to wet the lips, which are sometimes so dry and sticky that upon parting they emit a smacking sound. (This condition is apparently due to an inhibition in the functioning of the salivary glands, which thereby produces a deficiency of saliva in the mouth.)

Whenever this condition is observed, the interrogator should call it to the subject's attention by first asking the question, "Your mouth's very dry, isn't it?" After receiving the usual affirmative reply, it is well to supplement this question with another, "Feels like you have a mouthful of cotton, doesn't it?" Then the interrogator should comment as follows: "That's the result of your not telling the truth. The glands in your mouth that produce the saliva are not functioning properly—they've just about quit for the time being; you can drink all the water your stomach can hold without getting any relief. There's only one remedy, and that is to tell the

### 6. Swearing to the Truthfulness of Assertions

Quite often a guilty subject will invoke such expressions as, "I swear to God I'm telling the truth," "I hope my mother drops dead if I'm lying," "I'll swear on a stack of Bibles," etc. Although expressions of this type cannot be considered as symptoms of deception, they frequently are used by guilty subjects in an effort to lend forcefulness or conviction to their assertions of innocence. Consequently, whenever a subject swears as to the truthfulness of his statements, or, better yet, whenever he starts to raise his hand with that apparent purpose in mind, the interrogator should comment upon the psychological significance of his conduct somewhat as follows: "Put your hand down! When you're telling the truth I'll know it; you won't have to swear to it. The reason for your swearing is that you know you're not telling the truth and you know I know it. You're trying to make your story sound convincing by swearing to it. From now on let's have no more of that."

### 7. "Spotless Past Record"—"Religious Man"

The same psychological motivation for swearing is involved in the use of such expressions as, "I have a spotless record," or, "I'm

CRIMINAL INTERROGATION

a very religious man; I couldn't do anything like that." In stances where expressions of this type are used, the interrogator should counter with comments to the effect that even assuming that to be true, he knows that the subject is still responsible for act under investigation. Moreover, the interrogator should point out to him the reason for his assertions of a spotless past record or religious nature—that they are made in an effort to lend support to statements which he knows, and realizes the interrogator knows, to be false. The following comments will serve the purpose: "I don't care how religious you are; I don't care how spotless your past record may be. The fact of the matter is you are not telling the truth now. You're dragging your religion into this and giving this business about a spotless record in an effort to make your story sound convincing. The only thing that's going to be convincing is the truth, and ... At this point the interrogator should go right into his interrogation, without pausing for any comments or explanations from the subject.

### 8. "Not That I Remember" Expression

... response when answering a question pertaining to facts or events which, in view of their nature, or the time and place of occurrence, might reasonably be expected to have been so definitely impressed upon the subject's mind that an unequivocal "Yes" or "No" answer should be forthcoming.

This response, or any other similar one such as, "Not that I call," or, "As far as I know," should be treated as a veiled admission or "half-truth." The interrogator should immediately

instance, in the investigation of the stabbing of John Jones at corner of Fifth and Main Street, a suspect may be asked if it is in fact that he was at the corner about the time of the stabbing. If says, "Not that I remember," the interrogator should immediately ask a question such as, "What did you do with the knife, Joe?"

other words, the "Not that I remember" should be treated as though he admitted the stabbing.

**D. Sympathize with the Subject by Telling Him That Anyone Else under Similar Conditions or Circumstances Might Have Done the Same Thing**

~~A criminal offender, and particularly one of the emotional type,~~ derives considerable mental relief and comfort from an interrogator's assurance that anyone else under similar conditions or circumstances might have done the same thing. He is thereby enabled to at least partially justify or excuse in his own mind his offensive act or behavior. There still remains the realization that a wrong has been committed or a mistake made that has been injurious or ~~detrimental to another person.~~ The self-condonation, therefore, does not completely satisfy the offender's desire for relief from a troubled conscience. As a matter of fact, the comfort derived from the interrogator's assurances that another person might have committed a similar offense merely offers an added incentive to him for obtaining the greater degree of relief and comfort that would be provided by a confession of guilt. ~~While such objectivity in the~~ frame of mind, the solicitations of a sympathetic interrogator seem to cast a shadow over the subject's previously clear vision of the ~~consequences of his guilt.~~

An illustration of the type of case in which this technique may be used very effectively is one involving the interrogation of a hit-and-run driver in a fatal automobile accident. For instance, when a hit-and-run driver is made to believe—and often rightly so—that anyone else under similar conditions of panic might also have fled from the scene, he is afforded an opportunity to "square himself" with his own conscience. Meanwhile, his realization that he was less savage-like in his behavior than he first assumed himself to be renders his task of confessing a much easier one than would otherwise be the case. In the sense in which Orientals use the term, ~~he~~ ~~was permitted to "save face."~~

Following is a presentation of the line of conversation that has been found to be effective in the interrogation of an offender such as a hit-and-run driver: "I'm sure in my own mind that a man like

you wouldn't deliberately run over anyone. I think I know why it happened; your car hit something, and only then did you realize it was a person. You then got so excited and nervous that you didn't think there was anything else you could do but to keep on driving. But the farther you went the worse you felt, and you felt pretty awful now. My advice to you is to tell what happened and get this load off your chest. You'll feel better deep down inside—I know you will. I have talked to a lot of people like you—good people—who got involved in things like this."

In hit-and-run cases, and in fact in all other types of crimes as well, it is helpful for the interrogator to bear in mind the various factors that may account for a person's behavior in such circumstances. For instance, in the published literature regarding hit-and-run automobile cases, the following factors are known to account for flight from the scene of the accident: the motorist responds to panic or is psychologically numbed by the shock of the occurrence; he is under the influence of alcohol; he is driving without a license; he fears financial loss or the passenger in the car whose presence would cause him or the passenger considerable embarrassment; or he has stolen goods or other evidence of a crime in the car, or else he is fearful of exposure for some other criminal offense.

Suggesting to the subject any appropriate one of the foregoing reasons why he fled the scene of the accident will contribute greatly to the success of the interrogation.

As regards non-emotional offenders, when financial gain is the objective, the subject may be told: "I know how financially pressed you are. You were so hemmed in you could see no way out but to do what you did. Anyone else confronted with a similar situation might have done the same thing."

In addition to utilizing this technique for the purpose of justifying or excusing the offense itself, the interrogator should pursue a similar course with regard to the subject's conduct in previously denying his guilt to the investigating officers or perhaps even to the present interrogator himself during the initial stages of the interrogation. Therefore, in an effort to pave the way for an incriminating statement, the subject should be told that neither the interrogator

nor any of the investigators resent his previous or persistent lying up to the present time—since anyone else, including the investigators themselves, probably would have done likewise under similar circumstances. The interrogator should then state that now, however, he should proceed to tell the truth. By this assurance the interrogator removes another barrier from the subject's mind—namely, the deterrent effect of his previous lies told to a person, or persons, to whom he now desires to be truthful.

In applying the present technique the interrogator must be careful not to violate the legal prohibition against making promises of immunity or diminution of punishment as an inducement for confessing, but there is no legal objection to extending sympathy to an accused person in an effort to get him to tell the truth.

### E. Reduce the Subject's Guilt Feeling by Minimizing the Moral Seriousness of his Offense

Although this technique is of value in many types of cases, it is particularly effective in sex cases. In such cases it is desirable for the interrogator to pursue a practice of having the subject believe that his particular sexual irregularity is not an unusual one, but rather one that occurs quite frequently, even among so-called normal and respectable persons. In this connection it has been found effective to comment as follows: "We humans are accustomed to thinking of ourselves as far removed from animals, but we're only kidding ourselves. In matters of sex we're very close to most animals, so don't think you're the only human being—or that you're one of the very few—who ever did anything like this. There are plenty of others, and these things happen every day and to many persons, and they will continue to happen for many, many years to come." In appropriate instances, with the so-called "intellectual" type of subject, it may be helpful to support these statements by a reference to the Kinsey reports, which reveal a high incidence of "irregular" sexual practices among both males and females.[8]

[8] See KINSEY, POMEROY, AND MARTIN, SEXUAL BEHAVIOR IN THE HUMAN MALE (1948), and KINSEY, POMEROY, MARTIN, AND GEBHARD, SEXUAL BEHAVIOR IN THE HUMAN FEMALE (1953).

terrogation has heard many persons tell about sex activities far worse than any the subject can relate about himself.

Whenever referring to the particular sex act about which the subject is being questioned, the interrogator should never describe it in vulgar terms, unless, of course, the subject is incapable of understanding more acceptable terminology. If the act is of a homosexual nature, the harshly descriptive expression of the act itself should never be mentioned. It is far better to refer to the act as "kissing off," or some other similar expression. Then, too, the conduct itself should be discussed as though it were actually normal, either by reason of its prevalence among certain groups, or by reason of the particular physiological or psychological personality of the subject, in which event the interrogator should speak as though the subject had no control over the development of his homosexual tendencies.

With non-emotional offenders—a thief, for example—the inner appeal to conscience is not appropriate, and a different technique is necessary. The subject's attention may be called to published reports which disclose the high incidence of larceny and embezzlement among employees, etc. A published article by one of the authors might be used for this purpose; the article contains the statement that "about 85 out of every 100 persons will 'steal' if the opportunity to do so is presented to them." [9]

Following is an illustration of the application of this technique in a wife-killing case, in which the investigation revealed that the deceased wife had treated the subject, her husband, very miserably over the years: "Joe, as recently as just last week my wife made me so angry with her nagging that I felt I couldn't stand it anymore, but just as she was at her worst the doorbell rang and we had some out-of-town company. Was I glad they came! Otherwise I don't know what I would have done. You were not as lucky as I was on this occasion. Wasn't it something like that? Or was it over her spending all your money? Or did you find out she was running around with some other man? It must have been something of this sort that touched you off, or maybe it was a combination of several

[9] Inbau, The Social and Ethical Requirements of Criminal Prosecution, 52 J. CRIM. L. C. & P. S. 209, 211(1961).

things like that. You've never been in trouble before, so it must have been something like what I've just mentioned—something that got you on the spur of the moment and you couldn't stop yourself.''

Not only is it effective to compare the subject's conduct with that of "lots of other people," including the interrogator himself, but also, where circumstances permit, to compare the subject's present offense with his prior similar (or lesser) offenses. This too, serves to minimize the moral seriousness of the offense about which the subject is being questioned. The application of this technique in the interrogation of a rapist-murderer was instrumental in eliciting his confession of the killing of his latest rape victim. During the subject's interrogation, the interrogator told him that his rape-murder was no worse than the many other non-fatal rapes he had committed (and to which he had confessed during an earlier period of his interrogation). He was told that in the one case where death had resulted he "merely got a tough break"—as was true to a considerable extent, because from all indications he apparently only wanted to subdue his victim's resistance rather than kill her. (He had choked and slugged the victim in a fit of passion, which was his usual practice with others, but in this particular instance the girl failed to recover consciousness soon enough, with the result that he assumed she was dead and disposed of her body by throwing it from his car. Her life might have been spared if he had only given her sufficient time to recover from the effects of his prior acts of violence.) During an interview which one of the authors had with the subject a few days before his execution, the latter stated that at the time of his interrogation just prior to his confession he had been comforted by the interrogator's remarks regarding the "no worse" aspect of his present offense in comparison with his previous ones.

As previously stated with respect to Technique D, the interrogator must avoid any expressed or intentionally implied statement to the effect that because of the minimized seriousness of the offense, the subject is to receive a lighter punishment. Nevertheless, there is no legal objection to minimizing in the subject's mind the moral seriousness of the offense in his particular case.

## F. Suggest a Less Revolting and More Morally Acceptable Motivation or Reason for the Offense Than That Which Is Known or Presumed

A criminal offender should always be afforded an opportunity to save face by letting him base his initial admission of guilt upon a motivation or reason that is less offensive, morally speaking, than the real motivation or reason for his act.

A good example of the application of the present technique is the sex-motivated arsonist. The true motivation for the offense is now very revolting to him, and it is difficult for him to acknowledge it right away. Consequently, the interrogator should suggest that perhaps the subject accidentally started the fire. The objective at this point is to have the subject place himself at the scene of the occurrence. Once that is done, an acknowledgment of the true facts is rather easily obtainable.

Another illustration is the sex-motivated murderer. The sex feature of the killing is now not only extremely revolting to the subject, but he also realizes that it is very revolting to others. Therefore, when he reaches the confession state—when he feels the compulsion to admit the offense—it is much easier for him to start by attributing the victim's death to an accident, or to the result of an attempted robbery, or to some other such factor. Intoxication at the time of the occurrence is another face-saver. Therefore, in order to secure the initial admission of guilt, the interrogator should suggest such possible reasons, motives, or excuses. The important thing is to have the subject place himself at the scene or to connect himself with the event in some way or another. Thereafter it is relatively easy to obtain a full, truthful disclosure of the true reason or motivation.

As to the specific way in which this technique can be used in a case such as a sex-motivated murder, here is the language the interrogator may use: "Joe, what happened? Did this girl go along with you at first, and then all of a sudden she let out a scream? You then had no alternative but to stop her yelling, and that's all you were trying to do, but she caused you to use more force than you ever intended. That's about it, isn't it, Joe?"

In a robbery-killing case, the interrogator should suggest that

the embezzled funds far exceeded the money needed by the son. The suggested motive, however, served the purpose of securing the initial admission, after which the subject eventually disclosed the real reason for the theft.

Occasionally the real reason for an embezzlement is, in fact, the suggested one—a sick child or a pregnant wife and the need to pay doctor and hospital bills. In many such instances the authors have recommended to the employers that they continue such confessed embezzlers in their employment. Apart from the humanitarian considerations involved, a persuasive practical argument in support of this practice is the fact that there is no assurance that a replacement of the confessed embezzler would be any better security risk. On the other hand, if the motive for embezzlement was to cover up or recoup gambling losses, the embezzler should be dismissed. He is a poor security risk. Moreover, for his own future welfare it is probably better that he not continue in a situation where he has access to cash belonging to a bank or other employer.

A female thief or embezzler is particularly vulnerable to the suggestion that her stealing was for the benefit of someone else—a child, her husband, her boy friend, etc. In fact, that is very often the reason why a female steals. Her thievery ordinarily is less selfishly motivated than a man's.

In a theft case, ████████████████████████████████████

████████████████████████████████████████████████████████

Also, in a theft case where the interrogator knows or has good reason to believe that gambling losses or the subject's propensity to gamble constitute the probable reason for his thievery, it is well to talk to the subject somewhat as follows: "Joe, we are all human beings and we all have our faults and weaknesses. There's the good and the bad in all of us. Some people go nuts over women; others over whiskey. In your case it's gambling, and, except for the fact that it got too good a grip on you, you're no different from a lot of other people! Ninety-nine out of a hundred people gamble at one time or another, and a good percentage of us are chronic gamblers—we can keep away from it. But one thing about gambling; it's a clean

the subject did not intend or plan to kill, and that his only motive was to get money, but that he had to shoot to save his own life after the person he tried to rob pulled a gun or knife on him.

████████████████████████████████████████████████████████

████ For instance, where the known or presumed motive for a shooting was revenge, the interrogator may say to the subject: "Joe, you probably didn't go out looking for this fellow with the purpose of shooting him. My guess is, however, that you expected something from him and that's why you carried a gun—for your own protection. You knew him for what he was, no good. Then when you met him he probably started using foul, abusive language and he gave some indication that he was about to pull a gun on you, and that's when you had to act to save your own life. That's about it, isn't it, Joe?"

Following an admission of the shooting in a case such as the one described above, the interrogator can then proceed to point out that the circumstantial evidence (location of the wound, position of the body, etc.) negates the self-defense explanation. Thereafter, with relative ease, the interrogator will be able to secure the true explanation. Even if he fails to do so, the inconsistency between the subject's original denial of the shooting and his present admission of at least doing the shooting will serve to deprive him of a self-defense "out" at the time of trial.

████████████████████████████████████████████████████████

This is particularly effective when the interrogator knows that such a person was in need of financial aid and did actually receive aid from some source. For instance, a suspected bank teller was known to be financing his son's attendance at a theological seminary, which the teller could not afford on his bank salary. The interrogator suggested that the teller's desire to assist his son was the motive for the embezzlement, although the interrogator knew that

weakness than some of the others—like an irresistible urge to rape, or to drink excessively, or to use dope. Joe, what bit of gambling got you in the hole so that you had to make up for it by taking this money the other day?"

In all cases where an interrogator uses this technique of suggesting a less revolting and more morally acceptable motivation or reason than the one that is known or presumed, it is very important that he follow up by seeking an admission of the actual one. He should do this even though the criminal responsibility is in no way altered by the kind of motivation or reason for the criminal act. For instance, although it is immaterial, in the legal sense, whether a person embezzles to aid a sick child or to gamble, the interrogator should nevertheless seek the true explanation for the offender's conduct. Preceding this, however, the interrogator should obtain from the subject a full disclosure of the various details of the offense.

The importance of securing a true explanation for the offense lies in the fact that, in many cases, the real reason or motivation for an offense may be subject to corroboration by subsequent investigation, whereas an untruthful one is obviously not subject to supporting proof.

There will be occasions, of course, when a subject adheres to the face-saving explanation suggested by the interrogator. This risk, however, is not a serious one, particularly in view of the fact that many subjects will resort to this facesaving device without the benefit of any suggestion from the interrogator himself. Moreover, it is also a fact that most confessors to crimes of a serious nature will lie about some aspect of the occurrence, even though they disclose the full truth regarding the main event. They will lie about some detail of the crime for which they have a greater feeling of shame than that which they experience with respect to the main event. For instance, a sex-motivated murderer may make a complete and truthful disclosure of the killing, but at the same time lie may lie about his sexual conduct. A burglar-murderer may freely reveal all the details of killing but still lie about taking a gold crucifix from the victim's home. These are psychological realities and it is well for judges, prosecutors, defense counsel, and criminal

interrogators to recognize them in evaluating the trustworthiness of confessions which are obviously lacking in completely accurate disclosures of the details of the admitted criminal offense.[10]

**G. Sympathize with the Subject by (1) Condemning His Victim, (2) Condemning His Accomplice, or (3) Condemning Anyone Else upon Whom Some Degree of Moral Responsibility Might Conceivably Be Placed for the Commission of the Crime in Question**

The psychological basis for this suggested technique can be appreciated quite readily by anyone who will reflect upon his own non-criminal wrongdoings and upon the occasions (particularly during childhood) when he had to "own up" to them. In such instances there is a natural inclination to preface the admissions with a condemnation of the victimized person or thing, or with a statement purporting to place part or even all of the blame on someone else. The same mental forces are in operation in matters involving criminal offenses—and to an even greater degree by reason of their more serious nature.

In view of the fact that self-condonation of this type so frequently accompanies a confession of guilt—with the offender seeking by this means to more or less justify or excuse the offense in his own mind—it seems only reasonable to presume that an interrogator's condemnation of the offender's victim, accomplice, or others would prove to be effective in provoking or expediting a confession. Moreover, actual experience has demonstrated this to be so.

The following description of several case situations illustrates the manner in which this technique can be applied.

*1. Condemn the Victim*

The propensity of a wrongdoer to put all or part of the blame for his conduct upon his victim will be readily apparent by a re-

[*] "An excellent illustration of this point is the case of State v. Rogers, 233 N.C. 390, 64 S.E. 572 (1951), where the defendant had confessed to the killing of a woman who had been raped and robbed, but denied the rape and robbery, even though the evidence was conclusive of the defendant's responsibility for all three offenses.

flection upon our own childhood experiences. Let us recall an event such as this one, which must lurk in the memory of many of us. One Sunday morning you saw little Johnny, your next door neighbor, standing on the sidewalk all ready for Sunday school or church. Just because of your own disagreeable mood, and for no other recognizable reason, you pushed Johnny down. The fall tore a hole in the knee of his trousers. He ran crying to his mother, and then your mother had you before her for an explanation of the event and a possible reprimand or punishment. What was your initial reaction? To deny it all; to deny you pushed Johnny down! But that cannot be done under present circumstances since your own mother saw you push Johnny, and she only inquires of you, "Why did you do it?"

If you conducted yourself according to the usual pattern, you probably responded somewhat as follows: "Mother, he pushed me first," or, "He called me a bad name," (or better yet, "Mother, he called you a bad name!"). "That's why I pushed him." All this was untrue, of course, but you defended your actions in this manner. You condemned the victim, and in doing so you reacted in a perfectly normal way. Even today, as adults, we still resort to the same kind of blame-escaping tactics and techniques.

In view of the normality and prevalence of this victim-blaming characteristic in wrongdoers, what does this suggest, then, by way of an interrogation device? It suggests that the interrogator use it as "bait" in the interrogation of criminal suspects—in other words, during the course of an interrogation the interrogator should develop the thesis that the primary blame, or at least some of the blame, for what the subject did rests upon the victim himself.

For purposes of illustration, take the case of a man suspected of killing his wife, in which the investigation reveals that the wife had treated the suspect very miserably over the years. Under such circumstances it is well for the interrogator to let the subject know that he is aware of what the suspect was up against. The interrogator should condemn the wife for her conduct, and the point should be made that by her own conduct she herself brought on the incident of the killing.

~~In case of this type, much can be gained by the interrogator's~~

~~doption of an emotional ("shocked-up") feeling about it all as he relates what he thinks about the victim's conduct toward her husband.~~ This demonstrable attitude of sympathy and understanding may be rather easily assumed by placing one's self in the other fellow's shoes and asking himself, "What might I have done under similar circumstances?"

Some outstanding examples of the effectiveness of this technique are to be found in sex cases involving offenses in which the victims are children. In such cases, when an adult offender confesses, he almost always places the blame upon his victim, even though the victim may be an eight-year-old child. The presence of this trait should in itself suggest the technique to be used in the interrogation of offenders of this type—namely, the condemnation of the victim: the placing of the blame on the child for doing something that triggered the subject's emotional outburst.

In a case of one of the authors, which involved the interrogation of a fifty-year-old man who was accused of having taken indecent liberties with a ten-year-old girl, the subject was told: "This girl is well-developed for her age. She probably learned a lot about sex from the boys in the neighborhood and from the movies and TV; and knowing what she did about it, she may have deliberately tried to excite you to see what you would do." The offender then confessed, but, true to the characteristics of his group, he proceeded to place the blame on the child. Even if this were so, of course he would still be just as guilty in the eyes of the law.

~~Whenever a sex offense involving a child has resulted in some~~ actual physical harm to her, it is well for the interrogator to supplement the placing of blame on the child ~~on the child~~ with a statement that the subject must have been only trying to please the child—just trying to ~~make this happy—and that any hurt to her was purely accidental.~~

The interrogation technique of condemning the victim can also be used advantageously in other types of sex cases—for example, a forcible rape—by suggesting to the subject that the victim was to blame for dressing or behaving in such a way as to unduly excite a man's passion. The discussion might go somewhat as follows: "Joe, no woman should be on the street alone at night looking as sexy as she did. Even here today she's got on a low-cut dress that

makes visible damn near all of her breasts. That's wrong! It's too much of a temptation for any normal man. If she hadn't gone around dressed like that you wouldn't be in this room now."

If the forcible rape occurred in the suspect's car or in his or the victim's residence, she can be blamed for behaving in such a way as to arouse the subject sexually to a point where he just had to have an outlet for his feelings. For instance: "Joe, this girl was having a lot of fun for herself by letting you kiss her and feel her breasts. For her that would have been sufficient. But men aren't built the same way. There's a limit to the teasing and excitement they can take; then something's got to give. A female ought to realize this, and if she's not willing to go all the way, she ought to stop way short of what this gal did to you."

Where circumstances permit, the suggestion might be offered that the rape victim acted like she might be a prostitute and that the suspect assumed she was a willing partner. In fact, the interrogator may even say that the police knew she had engaged in acts of prostitution on other occasions; the question may then be asked, "Did she try to get some money out of you—perhaps more than you actually had, but where you were that close to her you couldn't help but complete what she started?" Any such condemnation will make it easier for the subject to admit the act of intercourse, or at least his presence in the company of the victim.

The degrading of the character of the victim can also be used in cases such as one in which the subject is being interrogated regarding the killing of a fellow criminal or of a police officer. The victim can be pictured as "no good"—as one who was always up to crooked deals, shakedowns, etc.

In assault cases, the victim may be referred to as someone who was always "pushing other people around," and that perhaps he finally got what was coming to him.

The main objective of the interrogator in many instances is to have the subject place himself at the scene or in contact with the victim. Once that is accomplished the interrogator will later on be able to have the subject relate the true facts of what occurred. For instance, in an assault case, once the subject admits he was in-

volved in the incident, the exercise of a little patience will ultimately result in a disclosure of a guilty subject's full responsibility for the occurrence.

In burglary cases—and here we refer particularly to first offenders and to those whose motive arises more or less from a need or desire for more money than is represented by their salary, rather than from a scheme to "get rich quick"—it is well to condemn the employer for paying inadequate and insufficient salaries, or for some unethical or careless practice which may have created a temptation to steal. For example, in interrogating a bank teller, the subject might be asked, "Where did you get all the extra money, Joe?" after which the interrogator mentions a purposely overstated amount. Then when the subject states the actual salary amount, the interrogator may say, "Ye gods, man, how in the world can anybody with a family the size of yours get along on that kind of money? It's a crime. Moreover, the temptations you face every day! You handle thousands upon thousands of dollars, and for a salary like that. And you're not only supposed to live on it but be a first-rate dresser as well. That's something common laborers don't have to do. They can go around in old, dirty clothes, and they make twice as much money a day as you do. Joe, when did you start taking the money?" (Or "What did you do with the money, Joe?" or "Where is it now?" etc.)

Following is an example of how the technique of condemning the employer for his or her carelessness may be used with employees such as household maids. Assume that the missing item about which the maid is being questioned is a fur coat. "Helen, your employer had several fur coats and I'll bet she threw them down all around the house or else treated them like they were cheap pieces of cloth. Many times you probably had to pick them up and put them away yourself. You probably got the idea she didn't much care for the coats and wouldn't even miss one if it did disappear. That's probably what gave you the idea. Then after you took the coat maybe you got to thinking about what you had done and would like to have brought it back but couldn't. That's the story, Helen. Right?"

## 2. Condemn the Accomplice

For much the same reason that a youngster with a baseball bat in hand alleges to an irate home-owner near the playing field that "we" (he and his teammates) broke the window—rather than stating that "I" did it (meaning the batsman who struck the ball its damaging blow), the criminal offender is naturally inclined to have someone else share the blame or even be blamed altogether for the commission of the crime in question. Any ~~line of interrogation,~~ therefore, which tends to lift from him ~~some of the burden of guilt~~ he bears for his ~~criminal act will~~ make him that much less reluctant ~~to confess.~~

It was always a temptation, or even an instinctive reaction, for us as children to blame our playmates, in full or in part, for the mischief we ourselves did, either alone or with their help. For instance, recall such an occurrence as this one.

You and one or more youngsters were at a loss as to what to do some summer afternoon. You gazed at a neighbor's tomato patch and got the idea that it would be fun to engage in a "tomato war" —plucking the ripe tomatoes and throwing them at each other. This you did, all as a result of your own bright idea, but when your father began to question you about the event after he received the neighbor's complaint, what did you say? Did you own up to the deed and accept responsibility for leading your playmates into the tomato patch? You did not! First of all you tried to lie about it all, to deny any participation whatsoever in the act of destruction. But someone saw you throwing the tomatoes, and this your father knew. So what next? You instinctively tried to put the blame on "the other fellows": "Dad, I didn't pull any tomatoes off the vines. The only ones I threw were the ones that had been thrown at me." Today, as adults, we would seek the same way out if we were confronted with an accusation of wrongdoing which involved the participation of other persons. All this suggests, then, that in the interrogation of a suspect in a case involving another participant or participants, it is well to suggest that the primary blame, or at least some of the blame, belongs to the other fellow.

The manner in which the technique of condemning the ac-

---

complice may be utilized is aptly illustrated in the following description of an interrogation of a property owner who was accused of arson.

The subject had invested heavily in a real estate project which, as it neared completion, seemed doomed as a financial failure. In charge of the property in question was a handy man whose mental capacity was somewhat deficient. After a fire of suspicious origin, in which a large and heavily insured building was destroyed, the handy man, upon being questioned by investigators, confessed that he had set fire to the place at the request of the owner. On the basis of this confession, together with the evidence that the fire was of incendiary origin, the owner was arrested and charged with the offense. At first he denied his guilt, and he continued to do so even when confronted with the testimony of his employee. However, during a subsequent interrogation period, another interrogator proceeded to apply the above suggested technique of condemning the accomplice. The interrogator's expressions in this respect were somewhat as follows: "We all know—and you know—that there's considerable truth to what your employee says about the fire. We also know that a man of your type may not have done such a thing had it not been suggested or hinted at by someone else. It looks to me as if this fellow you have working for you may be the one who conceived this idea. He knew you were having a tough time financially, and he probably wanted to be sure his pay would go on, or perhaps he was looking for even more than that. For all I know he might have done this just for the purpose of getting you in trouble. Maybe he wanted to get even with you for something; he thought you had done to him. That I don't know, and we won't know the true explanation unless you tell us. We know this much: the place was set afire; your employee did it; he says you told him to do it. We also know you haven't told the whole truth." (Along with all this, of course, the interrogator also freely applied the previously described Technique D.)

After an hour or so of such conversation, the subject admitted that he knew the property was to be set afire and had approved of the burning. At first he insisted, as the interrogator had indicated

...s a possibility, that it was the employee's idea, etc. This version, of course, was false; nevertheless, for a few minutes the interrogator permitted the subject to bask in the sunshine of this partial and reflected guilt and to derive therefrom the attending mental comfort and relief. However, soon thereafter the interrogator began to point out the lack of logic and reasonableness in the subject's fixation of primary blame upon his employee. The subject was told that he still did not look as relieved as a man should look after telling the truth. Then the interrogator proceeded to explain sympathetically that by coming out first with only part of the truth he was doing what all human beings do under similar circumstances. Finally, as a climax to such comments, the interrogator urged the subject to tell the whole truth. He then admitted that the idea of burning the building was his own. For the purpose of inducing the subject to begin his confession, however, it was necessary and effective for the interrogator to start off by first blaming the accomplice.

Another example of the "condemning the accomplice" technique is the following case of a robbery-murder, in which the police were convinced of the guilt of a seventy-two-year-old man and a thirty-year-old accomplice. The younger man, during his interrogation, was told: "That guy's always getting younger men and boys into trouble. He's been in trouble all his life, but he's never been in jail himself, although he's certainly been responsible for some younger fellows going there. It's time he got what was coming to him; he's long overdue."

In applying this technique of condemning the accomplice, the interrogator must proceed cautiously and refrain from making any comments to the effect that the blame cast on an accomplice thereby relieves the subject of legal responsibility for his part in the commission of the offense. By suggesting the application of this technique we merely recommend a moral condonation in the form of expressions of sympathy for the subject's "unfortunate" experience in having been influenced by his "criminally minded associate."

### 3. Condemn Others

In addition to victims and accomplices, there are others who may be condemned to good advantage. Toward this end the interrogator in some instances may find it effective to cast blame on government and society for permitting the existence of social and economic conditions which are conducive to the commission of crimes such as that for which the offender is accused. On other occasions the offender's parents, wife, etc., may be alleged blameworthy for the offender's conduct. Numerous other possible recipients of the interrogator's condemnation might be mentioned, but the following case descriptions will suffice to illustrate the application and effectiveness of this technique.

In the interrogation of an accused wife-killer (the one referred to in the previous discussion of privacy), the interrogator proceeded to condemn the wife's relatives, who were known to have meddled in the offender's marital affairs. They were blamed for having deliberately set about to render the subject's married life an unhappy one. At one point the interrogator remarked that probably the relatives themselves deserved to be shot. During the discussion the interrogator did not spare the wife either—nor wives in general. The subject's wife was alleged to be a provocative, unreasonable, and unbearable creature, a woman who would either drive a man insane or else to the commission of an act such as that perpetrated by the subject. In this respect, however, the interrogator stated that the subject's wife was just like most other women. The subject was also told that many married men avoid similar difficulties by becoming drunkards, cheats, and deserters, but unfortunately the subject tried to do what was right by sticking it out, and it got the better of him in the end. All of this, of course, rendered the subject's offense less reprehensible in his own mind, and his self-condonation finally overcame his desire to avoid an exposure of his guilt.

During the interrogation of a married rape suspect, blame may be cast upon the subject's wife for not providing him with the necessary sexual gratification. The discussion may proceed upon the following lines: "If your wife had taken care of you sexually, as

she should have done, you wouldn't be here now. You're a healthy male; you needed, and were entitled to, sexual intercourse. And when a fellow like you doesn't get it at home he seeks it elsewhere. Moreover, since you're not able to search for and court a female as a single man is free to do, a fellow like you has to take what he finds; and sometimes, because of his terrific, pent-up urge he has to go about it in a rather hurried-up fashion. That's what you did here; that's the reason you did it. That's the story, isn't it, Joe?'

When the offense is theft or embezzlement, a spendthrift wife or child may be blamed for the subject's thievery. He may be told: "Your wife (or daughter, or son, if such is the case) has been pressuring you for more money than you were earning. You cared enough for her so that you wanted her to have all she asked for—even though you didn't have it to give, Joe. What you did here was for her; not for your own selfish interests. She shouldn't have asked for all she got from you. Now she will probably understand, and she should stick by you in your present difficulty. It's time now, Joe, for you to tell the truth."

A person who has taken indecent sexual liberties with a child, or hurt her in some other way, may be told that her parents are to blame for letting the child roam around by herself as they did. In instances where the subject had lured the child into his car or elsewhere by offering her candy, or something else in the way of a gift, the parents may be blamed for not providing such things themselves. Along with the blame-fixing upon the parents, the child herself may be blamed, as was suggested in the discussion of the earlier technique of condemning the victim. A moral coward of this type finds it very comforting to have his conduct understood on the basis of one or more of these considerations.

A thief such as a burglar or robber may be told that if there were no "fences" who bought and sold such stolen goods, the thief probably would not have done what he did. The interrogator may talk to him somewhat as follows, and particularly where the principal objective is to build up a case against the "fence" himself. "Men like you wouldn't do the things you do if there were no 'fences.' Fellows like that are making monkeys out of people like you. You go out and risk your neck doing the job and taking all the chances

of getting shot and killed. Then you bring what you took to one of these jerks and he gives you about 10 per cent of its value, after which he unloads it at a 90 per cent profit, minus, of course, what he has to give to the police as a 'payoff.' He makes a big haul. You take the chances; he makes the money. If there were no such people like that, men like you probably wouldn't get into this kind of trouble, because if you couldn't get rid of the stuff there would be no use taking it. Did any of these fences ever help you or any other men like you when you got in trouble? Hell, No! When a fellow like you gets put away the 'fence' gets himself someone else to do business with, and when that one gets sent away he finds another replacement. Everyone knows this, but when a 'fence' is questioned he grins and says, 'You don't have anything on me; I didn't do anything.'" We want to get at these fellows. If we can shut them off, you and a lot of others wouldn't be getting in trouble. They've been making suckers out of you guys long enough. It's time they be put out of business. They've been riding in Cadillacs long enough. What's this guy's name, Joe?'

Blame may be cast on high interest moneylenders (the so-called "loan sharks") for pressuring the subject for the payment of his loan at a time when he was unable to pay; in other words, his creditors "forced" him to steal. In such instances the subject may be told: "Joe, I know that it's hard today to get by without going into debt. I'm in debt myself, but fortunately I'm not over my head and my creditors are not loan sharks. You, however, have those fellows breathing down your neck, and they don't give a damn about men like you. All they're interested in is the big interest rates they get. And they suck people like you into believing that they are giving you a pretty good, easy-to-handle deal when they make a loan to you. I can't understand why the state allows them to get by with that kind of operation. They know damn well at the time a loan is made that you can't possibly keep up with it. It's hard enough to keep up the interest payments, to say nothing of the loan itself. You end up working for the loan sharks, and finally when they have you backed to the wall, you find that the only way out is to take someone else's money, just as you did the other day. That's about what got you into this difficulty, isn't it, Joe?'"

In an arson case, blame may be placed upon the insurance company for permitting the accused and others to take out excessive insurance and to insure property far in excess of its actual value. The point to be made is that by this excessive insurance practice the insurance company presented too much of a temptation to set property afire for the insurance money, and particularly in those cases where the owner is hard pressed financially.

When the subject has committed a theft or embezzlement because of the apparent or surmised necessity of replenishing losses he sustained as a result of his own gambling activities, it is well for the interrogator to blame the police, or the prosecuting attorney, or the community as a whole for permitting gambling opportunities to exist. For instance, the subject may be told: "Joe, I know you've been doing a bit of gambling, and you got into the habit through little or no fault of your own. Too much temptation was put in front of you. The police and politicians are the ones to blame for letting the gambling joints operate. If they had shut up these places you probably wouldn't be here now, Joe, because you wouldn't have gambled and there would have been no occasion for you to take this money (or property)."

A suspected embezzler can be told, to good advantage, that we are living in times when money is treated rather casually by everyone, and particularly by the national government. We have, therefore, lost the old time regard for the money or possessions belonging to others. As an illustration the subject may be told that since the government squeezes us with burdensome taxes to obtain money to waste on foreign countries, it is no wonder that individuals like himself lose their own sense of values with respect to the money and property of other individuals.

Where the subject's home or neighborhood environment appears to be a factor accounting for his criminal conduct (as is so often the case), the interrogator should point out that fact to the subject. The application of this technique may be illustrated by the following statements made to a young robbery-murder suspect, who had actually encountered many of the experiences to which the interrogator referred: "Joe, you started out about the same way I did—the same way as a lot of kids. You had a mother

and father, and then your luck changed and your father died when you were ten. Your mother had other children too, with very little to live on. You had to scratch for a living, and whatever you got you had to share or give to your mother and brothers. A child is a child and soon you probably had to take things from other people; otherwise you got nothing. That became a habit when you were a kid and it looked easy and then this thing happened. This would not have happened to you if your father had lived and been able to care for you and give you, your mother, and your brothers the necessities of life. If he had lived, you probably wouldn't be in this room today. Society should be blamed for not having found some way to help your poor mother when your father died so that it would have been unnecessary for you to develop the habits you did."

In a case where one or both parents were drunkards or otherwise neglected the subject as a child, the interrogator may say: "I can pretty well understand what would have happened to me if that condition existed in my home. No one to cook your meals or care whether you were living or dead. No wonder you finally got into something like this. You were worse off than an orphan. There are good homes for orphan kids but you couldn't have gotten into one because you were supposed to have a home and a father and a mother. Actually you didn't, and that's why you're in this trouble now."

## H. Utilize Displays of Understanding and Sympathy in Urging the Subject to Tell the Truth

Although expressions of understanding and sympathy are essential factors in the successful application of the preceding techniques, under the present title we wish to suggest specific overtures which may be made toward that objective.

### 1. Extend Sympathy by Such Gestures as a Pat on the Shoulder or a Grip of the Hand

It is surprising how effective a well-timed pat on the shoulder or a grip of the hand can be in obtaining a confession. Coming as a climax to a series of sympathetic expressions constituting the

basis for the previously employed techniques, a gesture of this sort may expedite a confession of guilt.

Considerable discretion must be exercised in the usage of the above suggested gestures. The pat on the shoulder should be reserved for males who are either (a) younger or of approximately the same age as the interrogator, or (b) of the first offender type. It should not be employed on a career criminal, or on the "cocky" type of person. Only rarely should it be used on older people, since to them the pretentiousness of the gesture may be too obvious.

With female offenders, it is most effective for the interrogator to place his hand on top of the subject's hand or hold her hand in the palm of his. If she begins to cry during the interrogation the interrogator may offer her the support of his shoulder, but within a very short time he should have her straighten up and the interrogation should be resumed.

Gestures of this type produce very desirable psychological effect. They impart to the subject an attitude of understanding and sympathy far better than any combination of words the interrogator might together.

*2. Tell the Subject That Even if He Were Your Own Brother (or Father, Sister, etc.) You Would Still Advise Him to Speak the Truth*

...to this effort, help to establish the subject's confidence in the interrogator and thereby renders it easier for the subject to tell the truth.

*3. Urge the Subject to Tell the Truth for the Sake of His Own Conscience, Mental Relief, or Moral Well-being, as Well as "for the Sake of Everybody Concerned," and Also Because It Is "the Only Decent and Honorable Thing to Do"*

In urging or advising an offender to tell the truth the interrogator must avoid expressions which are objectionable on the grounds that they constitute illegal promises or threats. However, by speaking in generalities such as "for the sake of your conscience," or "for the sake of everybody concerned," etc., the interrogator can state that he or his parents or close friends belong

A line of discussion which has been used to good advantage on many occasions (particularly in sex or embezzlement cases) is one in which the subject is advised that by telling the truth he performs somewhat of a mental operation on himself—an operation equally as important and necessary as the removal or destruction of injurious tissue in a cancer patient. In this respect it may be helpful to draw a circle on a piece of paper, mark off a small area on the rim of it, and tell the subject that in effect the marked-off portion represents a piece of infected tissue on his mind or soul which, if unarrested and unremoved, will continue to spread and produce other and more serious offenses than the one for which he is now accused. He should then be told that there is only one way that the necessary mental operation may be performed, and that is by telling the truth.

"...for the sake of everybody concerned" is an expression which lends itself to many interpretations conducive to truth-telling. One consideration which is commonsthing to mind is the suffering of the victim or of his dependents..., or the wrong committed against other persons adversely affected as a result of the offender's conduct. It is advisable, therefore, to briefly mention these consequences for the purpose of placing the subject in a more regretful mood.

The expression, "the the only decent and honorable thing to do" ...

relating the details of the offense committed against her; and in such instances it is occasionally helpful to ask the subject how he would like to have his own wife or ...

In playing upon this potential weakness, if the subject happens to be a religious person, discuss with him the tenets of his particular creed. Mention to him the fact that his religion becomes meaningless unless he tells the truth with regard to the offense in question. Likewise, if he belongs to a fraternal order, appeal to him in its name. It is also quite helpful if the interrogator can state that he or his parents or close friends belong

to the same church or fraternity and that therefore he, the interrogator, knows and appreciates what the subject's moral obligations are in the present situation.

In a sex-murder case, in which the interrogator knew that the subject had an invalid mother, the appeal to the subject's "decency" was somewhat as follows: "Joe, a mother—and particularly one like yours—is the most understanding person in the world. Her real concern is about the reason for your doing this. That's what we all want to know—the reason. And your mother, in particular, is most entitled to know." The subject eventually responded by saying, "I'll tell you the whole story if I can first talk to my mother." The interrogator agreed and said he would send a car for the mother, but within a few minutes after making the request to see his mother, the subject made a full confession.

## 4. The "Friendly-Unfriendly" Act

When the various techniques of sympathy and understanding have proved ineffective, the interrogator may resort to a so-called "friendly-unfriendly" act. It may be carried on either by two interrogators cooperating together, or by one interrogator working alone.

When two interrogators are used, the technique may be applied somewhat as follows: Interrogator $A$, after having employed a sympathetic, understanding approach throughout his interrogation, expresses his regret over the subject's continued lying. $A$ then leaves the room. Interrogator $B$ enters and starts lying. $A$ berate the subject, by referring to him as a rather despicable character, or perhaps as one who probably has been in a penitentiary or at least in prior police difficulties. (Or, $B$ may enter while $A$ is still in the room, and $B$ can start his efforts by admonishing $A$ for wasting his time on such an undesirable person; whereupon $A$ will leave the room with pretended hurt feelings over the subject's refusal to tell him the truth.)

After Interrogator $B$ (the unfriendly one) has been in the interrogation room for a short while, Interrogator $A$ (the friendly one) re-enters and scolds $B$ for his unfriendly conduct. $A$ asks $B$ to leave, and $B$ goes out of the door with a pretended feeling of disgust

toward both the subject and $A$. $A$ then resumes his friendly, sympathetic approach.

This technique has been effectively applied by using a detective as the friendly interrogator and a police captain as the unfriendly one. As the captain leaves the room after playing his unfriendly role, the detective may say, "Joe, I'm glad you didn't tell him a damn thing. He treats everybody that way—persons like you, as well as men like me within his own department. I'd like to show him up by having you tell me the truth. It's time he learns a lesson or two about decent human behavior."

The psychological reason for the effectiveness of the friendly-unfriendly act is the fact that the contrast between the methods used by each interrogator serves to accentuate the friendly, sympathetic attitude of the first one and thereby renders his approach more effective.

In the employment of the friendly-unfriendly act, the second (unfriendly) interrogator should resort not only to verbal condemnation of the subject; under no circumstances should he ever employ physical abuse or threats of abuse or other mistreatment.

Although the friendly-unfriendly act is usually performed by two persons, one interrogator can play both roles. In fact, the authors are of the opinion that this is the more effective way to apply the technique.

When a single interrogator acts out both parts he feigns impatience and unfriendliness by getting up from his chair and addressing the subject somewhat as follows: "Joe, I thought that there was something basically decent and honorable in you but apparently there isn't. The hell with it, if that's the way you want to leave it; I don't give a damn." The interrogator then sits down in the chair again, and after a brief pause, with no conversation at all, may say, "Joe, you'd tax the patience of a saint the way you've been acting. But I guess there is something worthwhile in you anyway." Or, the interrogator may even apologize for his loss of patience by saying, "I'm sorry. That's the first time I've lost my head like that." The interrogator then starts all over with the resumption of the sympathetic approach that formed the basis for his efforts prior to the above described outburst of impatience.

Now, by reason of the contrast with which he has been presented, the subject finds the interrogator's sympathetic, understanding attitude to be much more appealing. This places him in a much more vulnerable position for a disclosure of the truth.

The friendly-unfriendly act is particularly appropriate in the interrogation of a subject who is politely apathetic—the person who just nods his head as though in agreement with the interrogator, but says nothing in response except possibly a denial of guilt. With a subject of this type, a change in the interrogator's attitude from friendly to unfriendly and back to friendly again will at times produce a change in the subject's attitude. He may then become more responsive to the interrogator's efforts at truth disclosure.

## I. Point out the Possibility of Exaggeration on the Part of the Accuser or Victim or Exaggerate the Nature and Seriousness of the Offense Itself

In many instances when an offender is accused by his victim, or by a witness to the crime, the interrogator should tell the subject that even though there must be a basis for the accusation there is the ever present possibility of exaggeration—which, if true, can be determined only by first obtaining the subject's own version of the occurrence in question. For example, in a case where the subject is accused of rape—and he denies not only the rape but even the act of intercourse itself—it is effective to interrogate the subject as follows: "We know that there's some truth to what the girl says. We also know that you're not telling the whole truth, even though she may be lying about certain things. For instance, perhaps she had intercourse with you voluntarily, and then after it was all over she became fearful of a possible pregnancy or of a venereal disease, or of her indiscretion being otherwise discovered by her parents. So in order to have an explanation for the occurrence, she concocted the rape story. If this is what happened, we have no way of finding out—unless we hear your own explanation. Now I'm not saying that this is what happened. I'm merely looking at this matter from all possible angles, but in any event we're interested in the truth. If the truth is what she states, we want to know

it; on the other hand, if it's anything less than that, we're just as anxious to find that out. My advice to you, therefore, is to tell the truth." (All this may be preceded or supplemented, of course, by a condemnation of the victim, or of women in general, etc., as previously suggested in Technique G).

After an offender has succumbed to this technique, he may try to cling to his partial admission as representing the whole truth, but once he has acknowledged the fact that previously he had lied to the interrogator, it becomes very difficult for him to continue his resistance. He then can be told that if his present admission represented the complete truth he would not have delayed so long in stating it, and that he still does not have the relieved look of a man who has told the truth.

Pointing out the possibility of exaggeration on the part of an accuser is not only helpful in obtaining confessions from the guilty, but it may also serve the purpose of exonerating the innocent. A good illustration of the point is a case in which the thirty-five-year-old daughter of a police lieutenant accused a taxicab driver of rape. The interrogator was satisfied that the accused was telling the truth when he denied raping the accuser, but it also appeared that the subject lied when he denied having the accuser as a passenger in his cab. The interrogator then talked to the subject as follows: "Joe, you're not telling the whole truth. We also know that this woman is at least telling part of the truth. It may well be that she's grossly exaggerating what happened. But she was in your cab, and she probably had intercourse with you voluntarily. Then when she left she may have feared a pregnancy, or a venereal disease, or she may have had some other reason for coming up with this rape story. But unless you tell us the truth as you know it, we'll just have to take what she says at its face value. My advice to you, Joe, is to tell the truth." To this the subject responded by saying, "All right. Now that you put it up to me that way, I'll tell you what actually happened." He then related that the accuser had hailed his cab from in front of a tavern; that she was intoxicated; that as he approached the address she gave him, she directed him to go into an alley back of her family home, and told him to stop at a particular place and to turn the lights out;

that she invited him to have sexual intercourse with her, which he did. The interrogator then confronted the accuser with the cab driver's statement, and she admitted that he was telling the truth. She explained her false accusation by saying that after the affair she feared pregnancy and also was concerned over the possibility that a member of her family had seen her get out of the cab in the alley, and that her ruffled clothing would provoke suspicion. Furthermore, she did not think the cab driver would be located since she had only hailed a passing cab and was not in one sent to the pickup location by the cab company, which would have a record of the driver sent out on the call. But once she started with her lie it was difficult for her to retract her accusation.

In this case, therefore, had it not been for the utilization of the exaggeration technique the accused probably would have been sent to the penitentiary for a crime he did not commit.

Following are a number of case illustrations of the utility of the other phases of the present technique, whereby the interrogator himself actually exaggerates the accusation or the nature and seriousness of the offense.

In the interrogation of a person who is guilty of statutory rape, the interrogator may report to the subject that the girl has accused him of forcible rape. The subject will usually react immediately by making a denial of any force, while at the same time admitting the act of intercourse itself.

Where the case is one of a theft of money or property by means of larceny, embezzlement, or burglary, ~~the interrogator should refer to the reported loss in terms of just about double or triple the actual amount involved.~~ For instance, where the amount is reported to be $500, the interrogator may talk in terms of $1000 or $1500. He may also say that at the time the money was taken, other items of value were also carried away (e.g., a diamond ring, a negotiable bond, etc.), according to the victim of the loss. The interrogator should then suggest that the actual amount of the loss may be much less than reported, that perhaps nothing but money was taken, or that the person or company reporting the loss may be trying to cheat the insurance company covering the risk by adding to the loss actually sustained. As an alternative, the in-

terrogator may suggest that perhaps the person who reported the loss—for example, a company manager—may have taken some money or property himself and is now trying to cover his own thievery by adding that amount to the actual loss in question.

The suggestion that the manager or other boss may be dishonest will frequently strike a responsive chord because of the employee's dislike of him for one reason or another. In some instances, of course, the suggestion that a manager or other boss may be covering up his own thievery by exaggerating the loss is well founded in fact!

To add to the effectiveness of the exaggeration of the accusation or the nature and seriousness of the offense, the verbal statements of the interrogator may be augmented by resorting to some documentary "evidence" in support of the interrogator's exaggerated statement of the amount of money or property stolen. For instance, in the interrogation of an embezzler of $500, ~~the interrogator may arrange to have a letter or a memorandum typed (perhaps even on the employee's stationery) and addressed to the insurance company, or to the police department, in which a statement is made that since the loss was originally reported it is now proper that the amount taken was not just $500, but rather $1500,~~ and that some negotiable bonds worth $3000 were also taken. The letter may even name the subject as the one the company manager believes to be responsible for everything. After some repeated foldings and handling of the letter or memorandum, to make it look more authentic, it should be shown to the subject. At that point the interrogator should proceed to suggest that the reported loss may be exaggerated and he should then give the possible reasons for the exaggeration (e.g., trying to cheat the insurance company, or a company manager covering up his own thefts).

For an idea of the specific conversation that may develop between the interrogator and an embezzler during the application of this exaggeration technique, consider the following case situation. A company sustained a considerable loss of merchandise over a period of several months. An audit and inventory disclosed the amount to be about $20,000. The manager of the company warehouse was strongly suspected. He had been observed in the ware-

house on a Sunday night, in company with two other men, when the warehouse was closed for business, and when there was no reason in the interest of the company for the presence of anyone there at that time. Furthermore, auditors ascertained that carbon copies of a number of invoices were missing; the safekeeping of such carbon copies was the manager's responsibility.

When the manager was interrogated, on the well-founded assumption that he was responsible for all or part of the loss, the interrogator began by saying:

"Joe, there's a big shortage of merchandise here at the company, and it looks like you're in the middle of it. You were seen at the warehouse with two other men on Sunday night, February 16, and the auditors found that a lot of carbon copies of your invoices are missing. Joe, you got $40,000 since you started taking this stuff, didn't you?"

Joe's reply was, "Ye Gods no!" Then followed this line of conversation:

Interrogator: "Was it about $30,000?"
Joe: "Hell, no!"
Interrogator: "Was it about $20,000?"
Joe (speaking less firmly now): "No."
Interrogator: "Was it as little as $15,000?"
Joe: "Not even that much."
Interrogator: "Well, how much was it, Joe? Be fair and honest about it. Was it $14,000?"
Joe: "It's not even $10,000 worth."
Interrogator: "Joe, it's more than $10,000 worth, and you know it."

(At this stage of the interrogation the interrogator asked the subject to relate the details of the thefts—the ways and means employed, the specific items taken and the disposition made of them, or their present location. Then the interrogator confronted the subject with the audit figure of the actual value of the missing merchandise—$20,000. The point was also made that since all the merchandise disappeared in the same manner, the subject must

be responsible for the entire loss. The manager soon thereafter admitted a total theft of merchandise valued at $20,000. He also revealed exactly how and where he had disposed of everything he had taken.)

In a case such as the one just described, which involves a series of thefts from a single source, it is essential that the interrogator start with a figure considerably higher than the specific amount of money or merchandise actually involved. The subject's reaction to that figure will be very revealing, for a statement such as, "Hell, no. They don't have that much around the whole place," is obviously not the response of an innocent person. An innocent person will almost always respond by saying, with a feeling of resentment, something like, "I didn't take anything!"

As the interrogator lowers the loss figure by various stages he should carefully observe the subject's physical activities, such as squirming about in the chair, dusting his trousers, crossing his legs, picking his fingernails, fumbling with a tie clasp or other object, etc. Such activities, along with the subject's verbal responses, will furnish some indication of his approach to the confession stage, and, where the exact amount of the actual loss is not presently known, may even furnish a clue as to the correct figure which is in the subject's mind.

~~The person who becomes involved in a series of losses such the kind to which we have been referring is usually one who is well liked by fellow employees and who has been in a position to draw, or let them take, company merchandise, etc.,~~ in small amounts, acts for which he has a strong ulterior motive. He has thereby sought immunity from other employees reporting his own irregular activities, such as violating various company rules, or even his own thievery. He is the one who may say to a new employee, as he hands him some item of merchandise, or a tool, etc., "Here, take this home with you." If the new employee says, "But that would be stealing," or words to that effect, the response is apt to be. "This company's rich. And you're a damn fool if you don't take something; all the rest of the employees do." On rare occasions, of course, such efforts may backfire; the induced employee may become conscience-stricken and confess his own wrongdoing

and at the same time reveal what he knows about the other employees too.

Where investigation of a series of losses involving a substantial sum of money or merchandise is being conducted, it is well to first interrogate the newly employed personnel, and in doing so they should be told that someone is a big thief around here and it's got to stop. New employees will confess their own wrongdoing more readily than the confirmed employee-thief, and they are less reluctant to reveal what they know about those who are responsible for the much larger thefts.

### J. Have the Subject Place Himself at the Scene of the Crime or in Some Sort of Contact with the Victim or the Occurrence

The value of the present technique—having the subject place himself at the scene of the crime or in contact with the victim, even though he denies doing the act itself—has been referred to earlier in our discussion of certain other techniques (e.g., F and I). However, since the present technique is, in itself, a major one, we will treat it as such under the present heading.

The technique's basic validity is illustrated in the questioning of a child regarding his mischievous conduct, or even the taking of something which did not belong to him. If he will admit that he was present when the act occurred, or that he saw the missing object earlier, his acceptance of full responsibility is not far off. For instance, if he took some money or some object from his parent's bedroom, he may first be asked, "Johnny, did you see that dollar bill on my dresser when you were in my room a while ago?" An admission that he saw the money, or that he was merely in the room from which it was taken, will constitute a substantial step toward a disclosure of the taking itself.

In an actual criminal case situation the technique can be utilized in the following fashion. Assume that money has been taken from a company safe, to which only a few employees had access during the day when it was kept open. As regards any other employee who may be under suspicion, it is important to establish by his own admission that he had an opportunity to take the money. Therefore, the interrogator may say to him, "Joe, I understand that the com-

pany safe is left open all day. That's right, isn't it?' (Assume "Yes" is the answer.) "You saw it open last Friday. Right?' (Assume that again the answer is "Yes.") "Joe, how many times did you go into the office that day?" These questions will then be followed by others of a more specific nature; finally the interrogator makes it clear that he believes that the subject took the money, and then proceeds to utilize the other techniques that are appropriate for such cases.

The placing of the subject at the scene should be done early during the interrogation and before the subject fully realizes the implication of his presence there.

### K. Seek an Admission of Lying about Some Incidental Aspect of the Occurrence

Whenever the subject is caught in a lie about some incidental aspect of the occurrence under investigation, he loses a great deal of ground, for thereafter, as he tries to convince the interrogator he is telling the truth, he can always be politely reminded that he was not telling the truth just a short while ago. This will bring him much nearer the confession stage.

An illustration of the present technique is a case involving indecent liberties with a child, where the subject had denied to the investigators that he even saw the child. In such instances the interrogator should try to get the subject to admit he saw the child and that he talked to her. The interrogator may say, "Joe, there's no question but that you were in this kid's presence and that you talked to her, and there's nothing wrong with that! There's also nothing wrong with giving her candy, or even patting her on the head. Joe, what did she say to you?" At this point the subject may think he can avoid any further suspicion by acknowledging the conversation with the child. Thereafter the interrogator can proceed to utilize the other appropriate techniques such as blaming the child, etc.

In the application of the present technique the interrogator must bear in mind that there are times and circumstances when a person may have lied about some incidental aspect of the offense without being guilty of its commission. Here is an actual case il-

lustration: An investigation of the murder of a married woman disclosed that the subject, who was also married, had been having an affair with the deceased. When the subject was questioned about his whereabouts at the time of the murder he gave an alibi which was quickly established to be a falsehood. This convinced the investigators that he was the murderer. Subsequently, however, the subject admitted to a more skillful and cautious interrogator that at the time of the murder he was in bed with *another* married woman, and that was the reason for his having lied when he gave his previous alibi; in other words he lied in order to avoid an exposure of his latest indiscretion. The second alibi proved to be a truthful one!

Whenever a subject appears to be telling the truth regarding an event under investigation but is reluctant to tell where he was at the time of its occurrence, the interrogator may say, "Joe, if what you were doing at the time has nothing to do with this case, I give you my word I'll treat whatever you tell me as confidential. I'm not interested in your personal affairs. So tell me where you were at the time;" and whatever an innocent person says in reply should be kept confidential.

Following is a case illustration of the fact that a person may be telling the truth about a principal offense but lying about some particular aspect of it: A delivery truck driver reported to the police that he had been robbed of his employer's money collections. Because of the driver's general behavior and certain other factors the police suspected him of making a false report and taking the money himself. He finally admitted that although a robbery had actually occurred, only a small amount of money had been taken because he had previously hidden most of the collection money in the truck as a precaution against just such an eventuality. Nevertheless, after the robbery the driver decided to, and did, take the remaining funds, which, but for his foresight of concealment, would have been taken by the robber.

Another practical consideration that must be kept in mind regarding the present technique is that in the investigation of a particularly large embezzlement an employee suspect who will admit taking a much smaller sum or sums of money is rarely the one who

is guilty of the principal sum under investigation. The guilty party, however, will seldom admit any smaller thefts or even any kind of wrongdoing, because, since he knows he is guilty of taking the large sum, he assumes that any minor admission will have the effect of creating a presumption of guilt regarding the principal sum. An exception to this general rule occurs, of course, in cases involving a series of losses, such as stock shrinkage of merchandise over a period of time, or a series of relatively small money shortages; in this type of case the minor admissions of any employee are of considerable significance as regards his possible responsibility for all, or a large part of, the accumulated losses.

## L. Appeal to the Subject's Pride by Well-Selected Flattery or by a Challenge to His Honor

It is basic human trait to seek and enjoy the approval of other persons. In our professional activities or in our ordinary, everyday living most of us receive a satisfying amount of approving remarks or compliments. At times, of course, it comes from members of our immediate family and actually may not be deserved. However, persons who operate alone, may seldom receive approving remarks and compliments; moreover, the need for such attention and status is just as great or even greater than it is with the rest of us. In the course of the interrogation of a criminal suspect, therefore, the establishment of effective rapport between interrogator and suspect may be aided very considerably by praise and flattery.

Consider the case of a juvenile or even an adult who is being interrogated as the suspected driver of a "getaway car" used in the robbery-murder of a gas station attendant. Assume that a police patrol car had given chase but was outdistanced by the fleeing vehicle because the officers could not run the risk of injuring innocent pedestrians or motorists. The driver of the fleeing vehicle, of course, had no such consideration, and his reckless driving made the escape possible. In such cases there is much to be gained by speaking to the subsequently apprehended suspect somewhat as follows: "Joe, the officers who were chasing that car tell me that in

all their years on the force they have never seen a car maneuvered like that one was. It really took the corners on two wheels."

Why is flattery of this type helpful? Perhaps the explanation rests upon the following considerations, and again, for purposes of illustration, we use the case of the driver of the "getaway car." The driver may have developed into a criminal offender by reason of parental neglect and other such circumstances. ~~As a result he~~ accorded no love, affection, attention, ~~or status. In school the only~~ way he could attract ~~attention or~~ acquire any status was by being ~~rude and troublesome.~~ To further distinguish himself he may have resorted to destructive acts such as breaking windows, stealing store merchandise; then automobile tires, automobiles, etc. A natural development beyond that was robbery, and murder. Here, then, may be a person starved for attention, recognition, and status. He is, in many instances, particularly vulnerable to an interrogator's compliments and flattery. This does not mean, of course, that ordinarily a confession is immediately forthcoming because of the flattering remarks, but along with all else the interrogator says and does, it can be very helpful in obtaining the confession of guilt.

In a case of one of the authors involving a robbery-murder suspect, the subject was told, with good effect, "I've been in investigative work a long time and I've talked to a lot of people who have done things like what you did, but I've never seen or talked to anyone who had as much guts as you do. I don't know how you could be as calm as you were under those circumstances. Moreover, this was the best planning job I've ever come across for a guy working alone. It's amazing how you found out where those materials [the stolen articles] were kept. And then when you got into action you made John Dillinger look like a piker. (The reference is to a well-known gunman in the early 1930's.) He had all kinds of help from others, but you worked alone. Joe, how did you feel before you pulled off a job? I guess your nerves of steel didn't have any room for nervousness."

In a case involving a rapist who was in military service and aspired to an advanced military career, the interrogator flattered the subject regarding his desire for public service and suggested

that his interest in a military career was good evidence of the subject's basically honorable character. The interrogator then urged that the subject should be honorable as regards the case under investigation and tell the truth. A confession followed shortly thereafter.

A clergyman accused of taking indecent liberties with a child was complimented on his "dedication to God" and all the sacrifices he had made as "a man of God." It was then suggested that basically he had the same human frailties as all the rest of us and that on this unusual occasion he just could not sufficiently suppress his feelings. He was then advised to go into the chapel of the jail where the interrogation was being conducted and there, while alone "with God," write out an account of what happened. Within an hour he presented the interrogator with a fully detailed confession.

Flattery is especially effective on women subjects. Reference may be made to their beauty, youthful appearance, attire, family background, good reputation, and unselfishness, etc.

~~The uneducated and underprivileged are more susceptible to flattery than the educated person or the person in favorable financial or social circumstances. With the latter type, flattery should be used sparingly and very discreetly.~~

~~When interrogating persons of low social status it is advisable to address them as "Mr.," "Mrs.," or "Miss," rather than by their first name. On the other hand, it is usually better to address persons of high social or professional status by their first name, or by their last name without attaching the "Mr.," "Mrs.," or "Miss."~~

The advantages of this practice are as follows: The person of low social status is flattered and acquires a feeling of satisfaction and dignity from such unaccustomed courtesy. By according the subject this consideration the interrogator enhances the effectiveness of whatever he says or does thereafter. As regards the second type, the use of the first name, or the last name only (without the accustomed "Mr.," Mrs.," or "Miss"), has the effect of dispelling the subject's usual feeling of superiority and independence. He is made to realize that the examiner is in command of the present situation.

Case 2:98-cv-00060-RCB   Document 102-1   Filed 06/11/02   Page 37 of 71

An exception to the foregoing suggestion should be made in a case involving the interrogation of a married woman criminal suspect who is known to have been having sexual relations with other men. It is better to address her by her first name rather than as "Mrs." In this way the interrogator minimizes to some extent the guilt feeling that may prevail because of the wife connotation in the "Mrs."

Occasionally a subject may attempt to utilize flattery on the interrogator in order to make a favorable impression. He may address the interrogator by a title obviously beyond that which the interrogator actually possesses—"Captain" instead of "Sergeant"; "Doctor" instead of "Mr." In such instances the subject should be corrected, and where the motive is obvious it is well to add, "Never mind trying to butter me up, Joe." In other words the subject should never be given the opportunity to think he has fooled his own interrogator.

It is occasionally helpful to appeal to the subject's loyalty to a group of persons or to an organization whose reputation and honor has been jeopardized by the subject's unlawful behavior. For instance, an appeal may be made in the name of the subject's church, or any other organization or group toward which the subject appears to have some loyalty or allegiance.

Another form of appeal to the subject's pride is challenging his honor, by calling into question his possible lack of manliness in not telling the truth about his offense. For instance, the interrogator may inquire, "Is the reason you're not telling me the truth the fact that you're afraid of the other fellows?"

In a variety of cases the offender—as well as an interrogator—counteract the feeling of honor and loyalty a subject may possess with regard to his fellow participants. Toward this end the interrogator should speak somewhat as follows: "In asking you to tell me the truth I'm not trying to use you as a stool pigeon or to get you to squeal on anybody. I merely want you to tell the truth and to take your share of blame along with the others. And that's the difference between a stool pigeon or a squealer and a person in your position. You are not holding your hand out for any dirty money to sell someone down the river, and I'm not jingling any

before your eyes. To the contrary, by assuming your share of the blame you put yourself above any blame from anyone. So don't let a notion of honor stand between you and the truth."

## M. Point out the Futility of Resistance to Telling the Truth

With all offenders, and in particular the non-emotional ones, the interrogator must not only convince the subject that his guilt has been detected, but also that it can be established by the evidence that currently is available—which will be developed before the investigation is completed. In other words, an effort should be made to have the subject realize that it is futile for him to continue his resistance to telling the truth.

When the subject had accomplices in the planning or commission of the crime, the interrogator should capitalize on the fear that already exists in the subject's mind—the fear that his accomplice will "talk." The manner in which this can be done is as follows: "You know as well as I do, Joe, that in all these cases where two or more fellows pull off a job like this, sooner or later somebody talks, and in this case it might just as well be you. So let's get before somebody leaves you holding the bag. Don't let the other fellow get his oars in first and splash all the blame on you. What you say now, before that happens, we can believe. But it isn't likely to believe what you say, even though at that time it may be the absolute truth."

By thus stirring up the already existing concern that the accomplice may talk, the interrogator may achieve either of two objectives: The initial and immediate one of perhaps persuading the subject to tell the truth now, and at the same time, the establishment of the groundwork for the application of the subsequently described technique (P) of "playing one against the other."

## N. Point out to the Subject the Grave Consequences and Futility of a Continuation of His Criminal Behavior

In the course of their criminal careers, many offenders experience a fleeting desire or intention to reform. This is particularly true with regard to youthful offenders, or adults who are arrested for the first time in the early stages of their careers of

crime. While in such a mood, which at times manifests itself during an offender's period of failure, that is, when he is accused or under arrest, and when thus brought face to face with the stark realities on the debit side of his activities—he becomes quite vulnerable to comments regarding the future consequences and futility of a continuation of his criminal behavior. This is particularly true when the offense is not of the most serious sort and when the offender is not too well-seasoned by a long series of offenses and police experiences. Under these circumstances he might heed the advice that he was caught "early in the game," since this experience may serve to avoid much more trouble for him later on.

In the course of this discussion—for instance in a larceny case—the interrogator may say, "You know what will happen to you if you keep this up, don't you? This time you've taken a relatively small amount of money; next time it will be more, and then you'll do it more often. You'll finally decide it's easier and more exciting to get what you're looking for at the point of a gun. You'll begin packing a rod. Then someday you'll get excited and pull the trigger when the muzzle's resting against somebody's belly. You'll run away and try to hide out from the police. You'll get caught. There'll be a trial, and when it's all over, despite the efforts of your parents and relatives, who in the meantime have probably spent their last dime in trying to save your neck, you'll either have to spend the rest of your life in the penitentiary or else sit down on the hot seat and have a lot of electricity shot through your body until your life's been snuffed out. Now's the time to put the brakes on—before it's too late."

It is also advisable, whenever possible, to point out the relative insignificance of the offense in terms of how much worse it might have been. For instance in a burglary case the interrogator may say to the subject, "Joe, all that happened the other night was the taking of some money. But if you keep this up, some night you'll crawl in a window thinking that no one is home. Someone is home, however, and he comes at you with a gun or a knife. Sure, you didn't intend to kill anybody; you didn't even carry a gun or a knife. But to save your own life you try to grab the gun or the

knife and you have to use it on him. Joe, then it's the hot seat for you. Or, if you don't kill someone yourself, eventually someone may kill or cripple you for life. One of your intended victims, or perhaps a policeman, may do this to you. You may not realize it now, fellow, but getting caught early like this may be the best thing that could have happened to you. Joe, put the brakes on now before it's too late."

Statements such as the one above tend to make the subject feel that he is indeed rather fortunate in having escaped more serious difficulty. Once in that frame of mind he becomes less reluctant to confess his crime.

Youthful offenders or adults who are not confirmed criminals and who have not committed the most serious of crimes, may also be told, "Everyone makes mistakes, and we can all profit by such mistakes. A person with any brains at all can look upon them as lessons regarding his future conduct. And, after all, that's really what penitentiaries are for—to teach a fellow a lesson, in the hope that he'll straighten himself out. Joe, if you don't own up to your present mistake and you think you've gotten away with something, you're bound to get yourself in worse trouble later on, and maybe then you won't have a chance to straighten yourself out. The police may do it for you when they catch you in a burglary or robbery; you may end up straightened out on a marble slab in the morgue."

The basic validity and effectiveness of the present technique may be explained by the fact that many offenders do have some awareness of the ultimate consequences of their continued criminal behavior. Moreover, when an offender vows that he will go straight he usually means it at that time. Perhaps that is the reason for the appealing effect of pointing out the grave consequences and futility of continuing with a criminal career.

**O. Rather Than Seek a General Admission of Guilt, First Ask the Subject a Question as to Some Detail of the Offense, or Inquire as to the Reason for Its Commission**

A properly conducted interrogation based upon the application of techniques such as the ones we have been discussing will

ordinarily have the effect of producing in the subject moments of indecision, during which his struggle to avoid the consequences of his criminal act will be partially overcome by, or temporarily deadlocked with, his impulse to confess. He becomes pensive, he is no longer talkative, and he gives the impression of not even listening to what the interrogator is saying. He may turn his head aside; he may fiddle with his tie clasp or tie, or with a coin or other object; he may pick his fingernails or indulge in some other gesture such as dusting off his clothes with his hands; he may exhibit a wry smile; he may also display a "far away" look in his eyes as he ponders the question, "Shall I tell him the truth or keep on lying?"

When the subject is in this frame of mind, if the interrogator himself remains silent, or if he should leave the subject alone in the interrogation room, or if the interrogator at that point accedes to the subject's request for a cigarette or even a drink of water, or to go to the washroom (when there is every reason to believe it is merely a stall for time), the subject may quickly regain his composure and all of the interrogator's prior efforts will be lost. It is highly important, therefore, that this critical stage of the interrogation be recognized immediately, for then is the time for the interrogator to "move in" by asking a question regarding some *detail of the offense*—and preferably something *preceding or following the occurrence itself.* Or the interrogator may inquire as to *the reason or excuse for the commission of the offense.* In appropriate instances (as with most emotional offenders), such questions should be accompanied by one of the previously described friendly gestures such as a pat on the shoulder.

By a "detail" question we mean one based upon the *where,* the *when,* or the *how* of an act or event that is pertinent to the crime under investigation but yet removed in point of time or place from the main occurrence itself. As to questions regarding the reason or excuse for the subject's offense, we have in mind a question such as, "What is the reason for this, Joe?" Whenever the "what is the reason" question is asked, it should be coupled with a suggestion of the possible reason or excuse for what the subject did; in other words, the interrogator should offer a tentative answer to his own question.

An interrogator should always be mindful of the fact that when a criminal offender is asked to confess a crime, an awful lot is being asked of him. First of all, it is not easy to own up to any kind of wrongdoing. Furthermore, in a criminal case the subject may be well aware of the specific serious consequences of his telling the truth: it may be a long penitentiary sentence or even the electric chair. Therefore, the task of confessing should be made as easy as possible for the subject. That is done when the interrogator asks a general admission-of-guilt question such as, "You did kill him, didn't you?"; "You did rape her, didn't you?"; "You did hit him with your car, didn't you?"; or "Tell us all about it, Joe." Any such questions will recall to the subject's mind a revolting picture of the crime itself—the scream of the victim, the blood spurting from a wound, or the pedestrian's body being thrown over the hood of an automobile or dragged along the street. It is much better, as a confession starter, to inquire about a detail of the offense by the asking of such questions as, "Where did you get the gun?"; "Where did you get the gun?"; or, in a rape case, in which the subject has denied ever seeing the victim, "How did you happen to meet this girl?" The same desirable effect is present when the question is asked, "What is *the reason* for this, Joe?"

As to the effectiveness of the "what is the reason" question, we all know from ordinary, everyday, non-criminal experiences that it is much easier to admit a mistake or any kind of wrongdoing at the time of the admission we are permitted to explain why we did it. The same psychological factors prevail in a criminal case situation; it is much easier for a criminal offender to confess a crime if he is given an opportunity to couple his admission with an explanation or excuse for his conduct. This opportunity is afforded him when the interrogator inquires, "What is the reason for this, Joe?", especially when followed by the interrogator's suggestion of the possible reason or excuse, such as, "Was it because the loan shark had your back to the wall and your only way out was to take this money?"; or "Was it in self-defense?"; etc.

Questions of this type, asked at the proper psychological moment, possess a number of advantages which make them much more effective than inquiries or solicitations calling for an out-

right or general admission of guilt. In the first place, by delving into details of *where, when, how,* or *if the reason* for the offense, the interrogator effectively displays a greater certainty in the subject—for otherwise there would be no interest in details—and this, in itself, has a tendency to weaken the subject's resistance to telling the truth. Then there is the very desirable element of surprise in a question of this type. It catches the subject off guard at a very crucial time, and it stimulates to greater activity the already aroused impulse to confess. Also, a detail question with respect to the reason for the crime, when put to a subject who feels impelled to confess but who is thwarted by the task of bursting forth with the complete admission all at once, offers an opportunity for him to preface or combine his admission of guilt with whatever excuses or explanations he cares to make in an effort to ease his conscience, as well as to have the interrogator believe that the crime is less odious or less reprehensible than is actually the case. Moreover, an inquiry into a detail of the offense—it gives the impression that he is not particularly interested in a confession but rather in ascertaining and understanding the reasons for the offender's behavior, or in being informed of the circumstances or conditions which contributed to the consummation of the deed.

Occasionally, in the application of this detail question technique, the interrogator will encounter a subject who may grasp any one of the suggested explanations or excuses and persist thereafter in relying upon it for his legal defense, even though it may not represent the truth. Once the subject has admitted the act itself, however, the interrogator can almost always follow through successfully and obtain the accurate version by pointing out to the subject the flaws in the explanation or excuse given. Nevertheless, despite such eventualities, the tactical advantages to be gained from any admission which contradicts the subject's previous denials will sufficiently compensate for the risk involved in procuring the initial admission by the interrogator's suggestion of possible explanations or excuses.

The psychological principles involved in the foregoing situations of crime guilt are also applicable to other inquiries of a re-

lated nature. For example, when the interrogator has reason to believe that the subject possesses or knows the whereabouts of an instrument or article which might have some connection with the crime, instead of merely asking, "Do you have such-and-such?" or "Do you know where such-and-such is?", it is much better to assume in the question that the subject does have, or does know the location of, the object being sought. The effectiveness of this approach is well illustrated by the following case. In the course of an interrogation of a suspect in a rape-murder case, the interrogator received the impression that, regardless of the question as to the subject's guilt or innocence, he was a sex deviate. The interrogator's previous experience in the interrogation of sex deviates of various sorts brought to mind the possibility that this suspect, like so many others of his class, may have been keeping a diary of his sex affairs and practices. Since such an instrument might be of some value in an interrogation, the interrogator was interested in finding out if one existed. Toward this end the interrogator asked the question, "Where is your diary?" The subject paused momentarily and then replied, "It's home—hidden underneath my desk." His permission was obtained to pick up the diary. Officers dispatched to the subject's home discovered a diary replete with records of numerous daily sexual experiences, running the gamut from "struggles" with girls he had picked up in his car to sexual stimulations and ejaculations provoked by reading his accounts of the past acts recorded in the diary. (His "struggles" in many instances actually were rapes, which, unfortunately, had never been reported to the police.) When confronted with these diary entries the subject readily admitted a long series of rapes, and although no entry had been made in the diary of the most recent experience, the rape-murder, the interrogator became more and more convinced, as the interrogation continued, that the subject was guilty of the principal crime under investigation. The subject was constantly reminded of the significance attending his previous offenses and particularly as regards one of them in which the *modus operandi* was quite similar to many aspects of the principal offense. Eventually the subject admitted his guilt of the rape-murder, for which he was subsequently executed.

There is every reason to believe that in the foregoing case, if

the issue of the diary had been brought up in any way other than by the question, "Where is your diary?" the subject probably would not have divulged its existence or its whereabouts, and the investigators would have been deprived of a very valuable means of eliciting the confession. Had the interrogator merely asked, "Do you have a diary?" the subject probably would have inferred that its existence was not already known and therefore denied that he had one. With the question phrased in such a way as to imply a certainty of its existence, however, it became difficult for the subject to make a denial—because for all he knew the interrogator or other investigators might already be aware of its existence or actually have it in their possession.[11]

Another possible application of this detail question technique is in cases in which the interrogator seeks to establish the identity of an accomplice or of another person who is in some way connected with the offense under investigation. Rather than confine the inquiry to, "Who is the person?" it is often much more effective to supplement the inquiry with, or perhaps use as a substitute, certain "piecemeal" questions, such as, "What part of the city does he live in?" or "What's his first name?" In this way the questions appear rather innocuous and render much less difficult the subject's task of giving the information. Once some piecemeal information is obtained, the complete identification usually follows immediately thereafter.

**P. When Co-offenders Are Being Interrogated and the Previously Described Techniques Have Been Ineffective,**

"Play One against the Other"

When two or more persons have collaborated in the commission of a criminal offense and are later apprehended for questioning, there is usually a constant fear on the part of each participant that one of them will "talk." Individually they all may feel confident of their own ability to evade detection and to stand up under the police interrogation, but no one seems to experience a comparable degree of confidence with regard to his co-offender's

---

[11] It is of interest to note that there was an entry in the subject's diary describing the rape of another one of his victims who had previously identified another man as her rapist.

---

ability or even willingness to do so. Uppermost in their minds is the possibility that one of them will confess in an effort to obtain special consideration for himself.

This fear and mutual distrust among co-offenders can be made the basis for a very effective interrogation technique known as "playing one against the other." ~~Since it consists largely of a bluff on the part of the interrogator, however, it should be used as a last resort,~~ to be used only after other possible techniques have failed to produce the desired result.

As previously stated with reference to the technique of pointing out the futility of resistance, the interrogator should always indicate to co-offenders, at the very outset of the interrogation, the strong probability that eventually some one of them is going to talk. The interrogator's early comments to this effect (as discussed in Technique M) constitute a desirable build-up for the subsequent utilization of this technique.

There are, in general, two principal methods which may be used in playing one offender against another. The interrogator may merely *intimate* to one offender that the other has confessed, or else he may actually *tell* him so.

In either event, there are two basic rules to follow: (1) keep the subjects separated from sight and sound of each other (except as regards the one variation subsequently to be discussed); (2) use the one to play against the other, the less criminally hardened of the follower rather than the leader of the two or more offenders, or the one who acted out the lesser role in the crime. (In such instances, of course, the *Miranda* warnings must be given.)

A simple form of intimation may consist of the practice of taking one subject into the interrogation room soon after the interrogation of the first one and then telling him, "This other fellow is trying to straighten himself out; how about you? Or do you want to let this thing stand as is? I'm not going to tell you what I know now about your part in this job. I don't want to put the words in your mouth and then have you nod your head in agreement. I want to see if you have in you what it takes to tell the truth. I want to hear your story—straight from your own lips."

The following procedure has been successfully employed in intimating to one subject that his accomplice has confessed:

Case 2:98-cv-00060-RCB   Document 102-1   Filed 06/11/02   Page 42 of 71

After subject No. 1 has been unsuccessfully interrogated, he is returned to the reception room occupied by a secretary who is engaged in carrying out her usual secretarial duties; then subject No. 2 is taken to the interrogation room. If likewise unsuccessful in this second interrogation, the interrogator returns to the receiving room and instructs the secretary, "Come in the back with your pencil and notebook." This instruction is given within hearing distance of subject No. 1, but in such a natural manner that it does not appear to be an act performed for his benefit. The secretary then proceeds to sharpen her pencils, turn back some pages of her stenographic notebook—all within the observation of subject No. 1—and then departs in the direction of the interrogation room. After thus absenting herself for the period of time that would ordinarily be required for the actual taking of a confession, she returns to the reception room and begins typing what might appear to be shorthand notes taken during the period of her absence. She uses legal size paper and provides for carbon copies also; and, again, this is all done within view of subject No. 1. After several minutes she pauses and inquires of an officer seated near subject No. 1, "How does this man [referring to subject No. 1] spell his last name?" (Or if the name is a simple one, then the inquiry is directed to his exact address, etc.) After receiving the information she continues with her typing. When finished, she takes the papers and carbons from the typewriter and, after sorting out the carbon sheets, she departs with the typewritten material in the direction of the interrogation room. Thereafter she returns to her desk without the papers, and resumes her usual secretarial duties.

After the lapse of fifteen or twenty minutes, the interrogator enters the receiving room and escorts subject No. 1 to the interrogation room (now vacated by subject No. 2 who has been taken to another room). After subject No. 1 is seated, the interrogator says, "Well, what have you got to say for yourself?" At this point the subject may confess, being under the impression that his co-offender has done so already.

Following is another way in which effective intimation may be employed, even before any interrogation has begun. Assume that two robbery suspects have been apprehended and that it is ob-

vious that at least one, if not both, will be a difficult subject to interrogate, perhaps by reason of a prior penitentiary experience. Both may be placed in the same jail cell and shortly thereafter one of them (preferably the one who was perhaps the follower, rather than the leader, of the two) is taken from the cell and brought to an upstairs room in which he is then left alone, without anyone saying a word to him, for about an hour. Afterward he is returned to the cell and left with his accomplice, who, we may reasonably assume, will inquire, "What did they ask you?" to which, of course, the answer will be a truthful "Nothing." This, however, will appear to be untrue to the accomplice, because it will seem to him rather nonsensical that either one of them would be taken away for that long a time for "nothing." A doubt will thereby be created as to whether the cellmate has talked. Then the accomplice himself is taken from the cell and actually interrogated. He is not told that the other fellow has talked, but there is a strong intimation to that effect (e.g., "What have you got to say for yourself, Joe?"). The subject will therefore find himself in a position in which he is afraid to lie, because of his suspicion that his partner has already confessed; that suspicion may be further encouraged by the interrogator's looking at some typewritten sheets of paper as though he were reviewing some information in the other subject's "confession" before beginning the interrogation of the present one.

When two or more subjects are suspected of a series of offenses (e.g., a number of robberies), and the interrogator has been successful in obtaining a confession from one subject regarding perhaps only one or two of the offenses (which, in fact, may be all that particular subject committed, although he may know of the other offenses committed by his partner or partners), the interrogator may employ the following stratagem. Several sheets of paper, including the written confession obtained from the first subject, should be looked at within view of the present subject, before an interrogation of him is begun. Then the interrogator relates what the first subject told him about one of the offenses. If the present subject admits his implication he should then be told, "All right, now tell me about the others." If he balks at saying anything fur-

ther, and this he might do on the assumption that the one case is all the interrogator knows about, then he may be told about the second offense. At this point the interrogator should then look at the papers again—as though they contained information about other additional offenses, and the subject should be told, in a tone of voice indicative of displeasure at the subject's attitude, "Let's hear from you about this one and all the others too."

Another kind of intimation that may be employed is illustrated by a case in which perhaps a father and son are involved in the commission of a crime, and they have consistently maintained that they were innocent, even when questioned separately. In such a case situation the interrogator may say to the father, "O.K., if you are both telling the truth, as you say you are, here's a piece of paper and a pencil. Write a note to your son; tell him that you have told the truth and that he too should tell the truth. You don't have to say anything else." As this is said, the actions and facial expressions of the subject should be carefully observed. If the delays in responding, or if he equivocates in his answer, this will be further assurance of deception, because if he and his son are telling the truth there should be no reluctance or unwillingness to write out such a message. The dilemma that is thereby presented to the subject may result in his writing and signing of the message to his son. Then, when the message is presented to the son, his actions, facial expressions, and verbal responses will be of helpful significance. If he questions the authenticity of the writing, or the signature, he will in effect be saying, "This is a trick; I won't fall for it," which, of course, will clearly indicate his guilt. On the other hand, if he is innocent, he will respond by saying something to the effect of, "I am telling the truth, and so is my father; so don't try to trick me into anything different."

If the son in the above described case is guilty and confesses, his subsequent written confession can then be shown to the father, or the interrogator may have the son orally relate what he has already stated in his signed confession.

The following case is an excellent illustration of the advisability of having some basis for any statement offered to one offender by way of proof that the co-offender has confessed. Several years ago

one of the authors was interrogating two boys (brothers) who were suspected of committing a series of burglaries. Each one of them persisted in his denial of any of the offenses, including the particular offense which brought about their arrest and which was the chief object of the present interrogation. Finally the younger one of the boys made an admission concerning one burglary. He stated that he had assisted the other offender, his older brother, in throwing into a river some of the loot from a burglary. Equipped with this bit of information the interrogator resumed his interrogation of the other subject, this time with a view to making him believe that his younger brother had made a complete confession of all the burglaries. The subject was told, "Well, your kid brother has told us everything; now let's see if you can straighten yourself out." Since the subject seemed unimpressed and skeptical of what the interrogator had said, he was then told, "Just to show you I'm not kidding, how about that job when you and your younger brother unloaded the brass metal in the river when things got too hot for you?"

Thereupon the subject smiled and said, "You're bluffing; my brother didn't say that because it isn't true." Feeling quite confident that the younger boy was telling the truth about the brass disposal job, the interrogator decided to have him repeat the statement in the presence of the older boy. This was done, and the two boys then began to argue over who was telling the truth. However, soon thereafter the younger boy stated that he was mistaken about this particular job—adding that as regards this one particular offense he had his brother confused with another boy whom he named and identified as his confederate in the theft of the brass. Nevertheless, he did implicate his brother in several other burglaries. When confronted with such admissions the older boy also acknowledged his guilt.

In this case the boy to whom the interrogator had transmitted the incorrect information had every reason in the world to believe it was a bluff. Quite naturally he was not influenced by such a statement, and the same would be true in any case in which an interrogator was inaccurate in his guess as to some detail offered as proof of the fact that a co-offender had already confessed.

Whenever the more direct bluff is attempted—that is, whenever the subject is actually told that his co-offender has confessed —the interrogator must be careful not to make any statement, purporting to come from the co-offender, which the person to whom it is related will recognize as an inaccuracy and therefore as a wild guess—and a bluff on the part of the interrogator. Once the interrogator makes such a mistake the entire bluff is exposed, and then it becomes useless to continue with the act of playing one against the other. Moreover, the interrogator himself is then exposed as a trickster and thereafter there is very little he can do to regain the confidence of his subject. Therefore, unless from his own independent knowledge the interrogator is quite certain of the accuracy of any detail of the offense which he intends to offer to one subject as representing a statement made by his co-offender, it is better to confine his remarks to generalities only.

An exception to the foregoing precautionary measure is to be made in a case where one of the offenders is definitely known to have played a secondary role in the commission of the offense. In such a case the subject may be told that the other offender has put the blame on him for the planning of the offense, or for the actual shooting, etc. At the same time the interrogator may add, "I don't think this is so, but that's what he says. If it's not the truth, then you let us know the truth." In this way the interrogator avoids any danger to his bluff, since he concedes the possibility of the statement being a falsehood.

In addition to its application to the "playing one against the other technique," there is a basic utility in emphasizing to an offender the fact that he performed the less offensive role in the commission of the offense. Moreover, he is the offender upon whom the interrogator should devote his principal efforts. For instance, in the investigation of a robbery-murder, of the two suspects who were to be interrogated, one was taller than the other, and a witness had reported that the taller of the two robbers was the one who struck the robbery victim the blow on the head that resulted in his death. In this situation, therefore, the offender who is generally easier to interrogate successfully is the shorter one who merely took the money and not the one who did the killing.

Such a subject may be told, "Joe, you're a thief, of course, but you're not a deliberate killer," and throughout the interrogation the idea should be emphasized that the other offender bears the primary responsibility for what occurred.

In a case such as the one above, after the offender who played the lesser role has confessed, it is usually a relatively easy matter to obtain the other offender's acknowledgement of guilt, even though he may not have admitted his guilt if his accomplice had not previously confessed.

TACTICS AND TECHNIQUES FOR THE INTERROGATION OF SUSPECTS WHOSE GUILT IS UNCERTAIN

The warnings as to the constitutional rights of a criminal suspect who is in police custody must be issued to him even though, in the opinion of the interrogator, the suspect's guilt is uncertain. Thereafter, there are, in general, three courses or approaches available to the interrogator: (1) from the very outset of the interrogation he may treat the subject as though he were actually considered guilty of the offense in question; (2) he may immediately treat the subject as though he were actually considered innocent of the offense; or (3) he may assume a neutral position and refrain from making any statement or implications one way or the other until the subject discloses some information or indications pointing either to his innocence or his guilt. What are the advantages and disadvantages attending each one of these three possible approaches?

The first approach, consisting of an implication or accusation of guilt, possesses the desirable element of surprise, and a guilty subject's consequent lack of composure may result in a disclosure of truth about certain pertinent information, or perhaps even an early confession of guilt. Another advantage is the significance of the general reaction of the subject when he is treated as though he were considered guilty. A guilty person will usually display no resentment to such treatment; on the other hand an innocent subject will usually express his resentment, to the extent of doing so very forcefully, or perhaps even in a highly insulting manner. A guilty subject is also more likely to react to the suggestion of

92    CRIMINAL INTERROGATION AND CONFESSIONS

guilt by fiddling with his tie clasp or tie, crossing his legs back and forth, squirming in his chair, dusting off his clothes with his hand, or turning his head away as the interrogator talks to him. These differences in reaction can be very helpful in determining whether or not the subject is guilty or innocent.

There are, however, two disadvantages to this first approach of an implication or accusation of guilt. If a guilty subject does not immediately make some incriminating "slip-up" or confess his guilt, he is thereby placed on his guard during the remainder of the interview, and if he eventually senses the fact that the approach is nothing more than a bluff, he is that much more fortified, psychologically, to continue with his lying and resistance to telling the truth. On the other hand, if he is innocent, he may become so disturbed and confused that it will be more difficult for the interrogator to ascertain the fact of the subject's innocence, or even to obtain possible clues or helpful information which might otherwise have been obtainable.

The second approach, consisting of an implication or statement of a belief in the subject's innocence, possesses two distinct advantages, but these are offset to some extent by an attending disadvantage. The advantages may be stated as follows: (a) the interrogator's statement or implication of a belief in the subject's innocence will undoubtedly place an innocent subject at greater ease, and, as a result, the fact of his innocence may become more readily apparent to the interrogator; moreover, under such circumstances the interrogator can more successfully elicit whatever pertinent information or clues the subject may be in a position to divulge; (b) If the subject is actually guilty, this approach may cause him to lower his guard: he may become less cautious or even careless in his answers and in his conversation, as a result of which he is more apt to make a remark or contradiction that will not only make evident the fact of his guilt but which also can be used as a wedge for eliciting a confession. On the other hand, there is a disadvantage attending this approach when used on a guilty subject. Once an interrogator has committed himself as a believer in the subject's innocence, he must more or less confine his inquiries to those based upon an assumption of innocence, for to do

93    CRIMINAL INTERROGATION

otherwise would tend to destroy the very relationship or rapport which he seeks to establish by this approach. In other words, he is handicapped to the extent that he cannot freely adjust his methods and questioning to meet the subject's changing attitudes or inconsistencies. This is not an insurmountable difficulty, of course, but it is nevertheless a possible disadvantage which the interrogator should consider before embarking upon this particular course.

The third approach, based upon a neutral position in which the interrogator refrains from making any commitments or implications as to the subject's innocence or guilt, obviously possesses neither the advantages nor the disadvantages of the other two. For this very reason, therefore, it may be considered the best approach to use in the average case where the interrogator's study and observation of his subject have given no encouraging indication that the subject might be particularly vulnerable to either one of the other two approaches.

Since the first approach is based upon an assumption of guilt, it calls for the immediate application of tactics and techniques designed to elicit an admission or confession. On the other hand, the second and third approaches require that the interrogator's efforts be directed immediately toward the detection of possible deception. As a matter of fact, if the first approach fails to produce the desired result, then even in that case the interrogator's problem becomes very much the same as that involved in the other two instances—the detection of deception.

It is not often possible to merely look at a person and determine whether or not he is lying (and guilty) or telling the truth (and innocent). Something more is necessary. The subject must be questioned and engaged in conversation in order to permit the interrogator to study his behavior and conduct, to search for significant remarks or contradictions in his statements, and to check his statements in the light of known facts and circumstances. The following techniques are submitted as useful aids toward the end of providing an interrogator with such an opportunity.

The alphabetical sequence of technique lettering has been con-

1  Michael D. Kimerer, #002492
2  Lori L. Voepel, #015342
   Kimerer & Derrick, P.C.
3  221 East Indianola Avenue
   Phoenix, Arizona 85012
4  Telephone: 602/279-5900
   Facsimile: 602/264-5566
5  Attorneys for Petitioner
6
7
8
9
             IN THE UNITED STATES DISTRICT COURT
10
             DISTRICT OF ARIZONA
11
12  DEBRA JEAN MILKE,            )    No. CV-98-0060-PHX-RCB
                                 )
13         Petitioner,           )
                                 )    **AFFIDAVIT**
14  v.                           )
                                 )
15                               )
    TERRY STEWART, et al.,       )
16                               )
           Respondent.           )
17  _____)
18
19       My name is PAUL HUEBL.  I am over the age of eighteen
20  years and have personal knowledge, which forms the basis for
21  this affidavit.  I have never been convicted of a crime and I
22  am competent to make this affidavit.  If I was called to
23  testify, under penalty of perjury, I would testify to the
24  following:
25
26       1.   I am a former Cook County and Chicago police officer
27            and am a licensed private investigator.
28

                                 1

2.     For the last 13 years I have been working for TV news organizations on local and national levels as an investigative field producer in addition to operating my private investigation agency.

3.     My investigation of the Christopher Milke murder case began with a request from KSAZ-TV producer Jim Lemay. I showed my private investigator's license and asked to see Debra. When Debra was brought out I told her that I was a private investigator and that I had been asked by Channel 10 News to look into the investigation of her son's murder. Debra agreed to talk to me.

4.     I interviewed Debra within hours of her arrival at the Madison Street Jail receiving area of the "horseshoe" with a hidden tape recorder. She was still wearing the clothes at the time she was arrested.

5.     I had hoped to capture on tape some incriminating statements from her that would be played during the dinner hour newscast.

6.     As a result of my 20 years of combined experience in law enforcement, investigations and investigative reporting, I have found that most suspects who confess to crimes subsequently make incriminating

2

statements.   I expected Debra to make such statements out of feelings of guilt or hopes of obtaining a reduced sentence.

7.   Instead of making incriminating statements, Debra was distraught and was adamant about her denial of any involvement or approval in the murder of Christopher. Debra was astonished to hear me ask her if she told the police she wanted her son dead.

8.   When I told her the police alleged she had confessed, she was shocked and confused, and she strongly denied that she had confessed to anything.

9.   Debra's perplexed state and denial of any confession appeared genuine to me, and I believed that she had no conception of how her interview with Detective Saldate could be construed as a confession.

10.   I told Debra that the police were saying that the motive for the murder was to collect insurance. Debra responded by stating, "I heard that too. That's off the wall.   Who told you that?"

11.   Debra stated to me that she would not hurt her son, and to the contrary, she protected Christopher from her ex-husband, Mark Milke, who abused drugs.

3

AFFIANT FURTHER SAYETH NAUGHT.

PAUL HUEBL

STATE OF ~~ARIZONA~~ CALIFORNIA   )
                                  ) ss.
County of ~~Maricopa~~ LOS ANGELES )

SUBSCRIBED AND SWORN to before this 23RD day of May, 2002, by PAUL HUEBL.

Notary Public

My Commission Expires:

JULY 16, 2002

STEPHEN H. LAWHORN
COMMISSION 1188460
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
Commission Expires July 16, 2002

4

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

COUNTY OF MARICOPA

STATE OF ARIZONA,       )
                        )
        Respondent,     )
                        )        CR 89-12631
        v.              )
                        )        AFFIDAVIT
DEBRA JEAN MILKE,       )
                        )
        Petitioner.     )
                        )
_____)

        My name is Bob Benson. I am over the age of eighteen.   I
have never been convicted of a felony and am competent to make
this affidavit.   I have personal knowledge of the facts stated in
this affidavit, except for the facts stated in (5), the
hypothetical set of facts, and if called to testify, under
penalty of perjury, I would testify to the following:

1.   I retired in 1991 from the U. S. Department of Justice, Drug
Enforcement Administration.

2    I worked as a Federal Narcotics Agent from 1969 to 1991.
From 1969 to 1974 I worked out of the New York regional office,
as a member of the New York Joint Narcotics Task Force.   From
1974 to 1991 I worked out of Houston, Texas; Tucson, Arizona; and
Nogales, Arizona.

3    From 1966 to 1969 I was in the U. S. Navy, and worked as a
Naval Intelligence Agent.

4.   I attended Tufts University and graduated with a Bachelor's
degree from the University of Massachusetts.

5.   HYPOTHETICAL SET OF FACTS:

        One Saturday afternoon in early December, two men took a four
year old boy to a remote desert area and killed him by shooting
him three times in the back of the head.   To cover their tracks,
the men then went to a local area mall where they separated.   One
of the men, a platonic roommate of the mother, called her at home
and told her that the child was missing from the mall.   He
enlisted the aid of a mall security guard and they called police
to report the child missing.   The mother also called Crimestop,
even though the man told her that he and a security guard were
going to call police.

Over the evening, police closed and searched the mall while the mother remained by the telephone at home in case her young son called her.  Friends and relatives gathered at her apartment, and then searched the mall over the next several hours.  The mother cooperated fully with police, undergoing interview after interview over the course of the long, sleepless, tear filled night.  The mother explained to the police that she had met her roommate three years before when her sister befriended him.  They had become and remained friends over the course of those years, staying in touch with one another sporadically.  When the situation with her ex-husband became increasingly difficult, the mother and her son had moved in with the man three months before on a temporary basis.  Thereafter, she secured a good job and had recently placed a deposit on a new apartment for herself and her son.  With no word from police about her son, the following afternoon the mother's family drove her to a neighboring city to see her father.

During the night and over the next morning, police repeatedly interviewed the two men involved.  Police learned that the men were friends for over twenty years.  Both men were Viet Nam veterans with histories of mental illness and were being treated and prescribed medication through the local VA hospital.  The story the two men had fabricated began to unravel with inconsistencies developing between the statements of the two men.

That morning, as police began to suspect that foul play may be involved, they called in a homicide detective who subsequently became the case agent.  A twenty year veteran of the police department, this detective had spent the last six years as a homicide investigator.  The detective subsequently retired before this case came to trial.  After being briefed and monitoring an interview of the friend of the roommate, this detective interrogated the man again.  Without benefit of an audio or video tape of the interview, the detective emerged from the interview with a confession.

The man claimed that he was only the driver and that his friend was responsible for shooting the child.  He then led the detectives to the child's body and by the locations where other evidence was deposited.  While so doing, the man implicated the mother in the death of her son.  There was no physical evidence of the mother's involvement.  Another detective later taped an interview of this man to memorialize the prior interrogation.

Immediately thereafter, and possessing no further information, the detective telephoned the local sheriffs office and had the mother escorted to their offices where she sat for over two hours waiting for the detective to arrive.  The detective recruited a police helicopter and flew the fifty miles to the small town where the mother was staying with her parents.  Though he was ordered by his superior officer to interview the mother and to tape record his interview, the detective did not take a tape recorder with him.  He later stated that he assumed

that the local sheriffs office would have one.  He never asked anyone for the tape recorder.

Upon arrival, the detective went to a small room in the office where the mother was waiting with a family friend.  He introduced himself and ordered the others out of the room, shutting the door behind him.  A large man, approximately 6' and 230 lbs., the detective sat himself down in front of the mother. When she asked him whether he had heard anything about her son, the detective ignored her, took out his notebook and checked his watch.  He then told her that "We found your son, he was murdered and you are under arrest."  When she began screaming and crying, he told her that he would not tolerate her crying and to be quiet.  He then read her rights under Miranda.

After the subsequent half hour interrogation, the detective emerged claiming that he was able to make the mother so comfortable with him that she confessed her involvement.  Despite this, the detective never made any effort to record her statement or to get a written, signed statement from the mother.  He stated that she did not want her statement recorded and that she asked for an attorney after she confessed.  The detective later said that the mother faked her tears, and pulled up her blouse during the interview to expose her breasts to him.

The detective escorted the mother back to Phoenix.  He told her to be quiet during the trip, not to ask him any questions. He did not handcuff her as he rode in the back seat of the car with her during the fifty mile trip.

The mother subsequently denied that she ever confessed to the officer.  She acknowledged that he told her of her Miranda rights but states that she was so shocked by her son's death and her own arrest that she was unable to think of her rights.  She told the detective early on that she didn't want a tape recorder, she wanted a lawyer.  She explained that she pulled the corner of her sweater, the sweater she wore over her shirt, to dry her eyes and wipe here nose during the interrogation.

Three days after the interrogation, the detective wrote his report, and then destroyed the notes he took contemporaneous to the interrogation.  The report contained no unequivocal statements of guilt by the mother.  Rather, the report was full of statements that could be interpreted as either inculpatory or exculpatory depending on the context in which the statements were made.  The report was written such that the reader is dependent upon the writer to provide the proper context for the statements.

6.  Based on the hypothetical set of facts set out in 5, above, if materially true, it is my opinion that there is a high probability the confession never occurred and was fabricated.

Further affiant saith not.

## VERIFICATION

BOB BENSON, being first duly sworn, under penalty of perjury, upon his oath deposes and states:

That he has read the attached affidavit and all facts contained therein (paragraphs 1 - 6 inclusive, except paragraph 5, the hypothetical set of facts) and they are true.

BOB BENSON

SUBSCRIBED AND SWORN to before me this _20_ day of October, 1995, by Bob Benson.

OFFICIAL SEAL
NELDEAN SOTO
NOTARY PUBLIC-STATE OF NEW MEXICO
My commission expires _9/19/99_

NOTARY PUBLIC

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | CR 89-12631 |
| v. | ) | |
| | ) | |
| DEBRA JEAN MILKE, | ) | AFFIDAVIT |
| | ) | |
| Petitioner. | ) | |
| | ) | |
| _____ | ) | |

My name is KEN LINDLEY. I am over the age of eighteen. I have never been convicted of a felony and am competent to make this affidavit. I have personal knowledge of the facts stated in this affidavit, except for the facts stated in (2), the hypothetical set of facts, and if called to testify, under penalty of perjury, I would testify to the following:

1. My education and trianing are set out in the herein attached Resume, which is incorporated by reference.

2. HYPOTHETICAL SET OF FACTS:

One Saturday afternoon in early December, two men took a four year old boy to a remote desert area and killed him by shooting him three times in the back of the head. To cover their tracks, the men then went to a local area mall where they separated. One of the men, a platonic roommate of the mother, called her at home and told her that the child was missing from the mall. He enlisted the aid of a mall security guard and they called police to report the child missing. The mother also called Crimestop, even though the man told her that he and a security guard were going to call police.

Over the evening, police closed and searched the mall while the mother remained by the telephone at home in case her young son called her. Friends and relatives gathered at her apartment, and then searched the mall over the next several hours. The mother cooperated fully with police, undergoing interview after interview over the course of the long, sleepless, tear filled night. The mother explained to the police that she had met her roommate three years before when her sister befriended him. They had become and remained friends over the course of those years, staying in touch with one another sporadically. When the situation with her ex-husband became increasingly difficult, the mother and her son had moved in with the man three months before

on a temporary basis. Thereafter, she secured a good job and had recently placed a deposit on a new apartment for herself and her son. With no word from police about her son, the following afternoon the mother's family drove her to a neighboring city to see her father.

During the night and over the next morning, police repeatedly interviewed the two men involved. Police learned that the men were friends for over twenty years. Both men were Viet Nam veterans with histories of mental illness and were being treated and prescribed medication through the local VA hospital. The story the two men had fabricated began to unravel with inconsistencies developing between the statements of the two men.

That morning, as police began to suspect that foul play may be involved, they called in a homicide detective who subsequently became the case agent. A twenty year veteran of the police department, this detective had spent the last six years as a homicide investigator. The detective subsequently retired before this case came to trial. After being briefed and monitoring an interview of the friend of the roommate, this detective interrogated the man again. Without benefit of an audio or video tape of the interview, the detective emerged from the interview with a confession.

The man claimed that he was only the driver and that his friend was responsible for shooting the child. He then led the detectives to the child's body and by the locations where other evidence was deposited. While so doing, the man implicated the mother in the death of her son. There was no physical evidence of the mother's involvement. Another detective later taped an interview of this man to memorialize the prior interrogation.

Immediately thereafter, and possessing no further information, the detective telephoned the local sheriffs office and had the mother escorted to their offices where she sat for over two hours waiting for the detective to arrive. The detective recruited a police helicopter and flew the fifty miles to the small town where the mother was staying with her parents. Though he was ordered by his superior officer to interview the mother and to tape record his interview, the detective did not take a tape recorder with him. He later stated that he assumed that the local sheriffs office would have one. He never asked anyone for the tape recorder.

Upon arrival, the detective went to a small room in the office where the mother was waiting with a family friend. He introduced himself and ordered the others out of the room, shutting the door behind him. A large man, approximately 6' and 230 lbs., the detective sat himself down in front of the mother. When she asked him whether he had heard anything about her son, the detective ignored her, took out his notebook and checked his watch. He then told her that "We found your son, he was murdered and you are under arrest." When she began screaming and crying,

he told her that he would not tolerate her crying and to be quiet. He then read her rights under Miranda.

After the subsequent half hour interrogation, the detective emerged claiming that he was able to make the mother so comfortable with him that she confessed her involvement. Despite this, the detective never made any effort to record her statement or to get a written, signed statement from the mother. He stated that she did not want her statement recorded and that she asked for an attorney after she confessed. The detective later said that the mother faked her tears, and pulled up her blouse during the interview to expose her breasts to him.

The detective escorted the mother back to Phoenix. He told her to be quiet during the trip, not to ask him any questions. He did not handcuff her as he rode in the back seat of the car with her during the fifty mile trip.

The mother subsequently denied that she ever confessed to the officer. She acknowledged that he told her of her Miranda rights but states that she was so shocked by her son's death and her own arrest that she was unable to think of her rights. She told the detective early on that she didn't want a tape recorder, she wanted a lawyer. She explained that she pulled the corner of her sweater, the sweater she wore over her shirt, to dry her eyes and wipe here nose during the interrogation.

Three days after the interrogation, the detective wrote his report, and then destroyed the notes he took contemporaneous to the interrogation. The report contained no unequivocal statements of guilt by the mother. Rather, the report was full of statements that could be interpreted as either inculpatory or exculpatory depending on the context in which the statements were made. The report was written such that the reader is dependent upon the writer to provide the proper context for the statements.

3. Based on the hypothetical set of facts set out in 5, above, if materially true, it is my opinion that there is a high probability the confession never occurred and was fabricated.

Further affiant saith not.

### KENNETH D. LINDLEY
### 611 W. GILMORE
### WINSLOW, AZ. 86047

*October 25, 1995*

*OBJECTIVE*                  Update personal resume.

*SUMMARY OF*
*QUALIFICATIONS, AND*
*CERTIFICATIONS*

Owner - Operator Investigative services business. Licensed Private Investigator

Teaching Certificate; State Board of Directors for Community Colleges of Arizona. Teaching field: Criminal Justice, Fire Science, Hazardous Materials & OSHA Safety.

Arizona P.O.S.T. Certified Police Instructor, Certified Peace Officer

U.S. Bureau Of Indian Affairs. Special Agent

Navajo Nation. Police Officer

Hopi Nation. Police Officer

U.S. EPA. Hazardous Materials Technician

U.S. DOT. Az. DPS. Commercial Vehicle Safety Specialist, Hazardous Materials Enforcement Specialist & Cargo Tank Inspector.

Az. DPS. Officer, Training Coordinator, Investigator & Instructor.

Az. DPS. Hazardous Materials Emergency On Scene Coordinator.

Navajo County Sheriff's Office. Deputy, Training Coordinator & Emergency Response Coordinator.

P.O.S.T. Training Academy. Training Supervisor and Instructor.

ADA. Az. Detention Academy. Training Supervisor and Instructor.

*EMPLOYMENT*
*HISTORY*

1992 - Current  Owner Lindley Investigative Services.  Perform Investigations, Interviews and conduct technical tasks pertaining to personal injury criminal and civil cases.

1993 - Current  Navajo County Sheriff's Office.  Deputy Sheriff responsible for Managing Critical Incidents, Disasters and Hazardous Materials Emergencies. Training Coordinator responsible for continued training for all certified officers in department.

1987 - 1992 Az. DPS Commercial Vehicle Safety Specialist & Hazardous Materials State On Scene Coordinator for Haz. Mat. Emergencies.

1984 - 1987 Az. DPS Advanced Officer Training Coordinator.  Responsible for providing advanced courses to Officers; ensure all officers maintained and passed requirements to maintain certification.  Conducted management courses for command staff; Supervisory courses for Supervisors; developed specific programs and training modules; projected and recommended training budget and expenditures; coordinated training requirements; evaluated performance of students and instructors.

1984 - 1989  Owner Lindley Trucking Company.  Managed the business, responsible for hiring, budgets, equipment and expenditures.

1983 - 1984 Staff member during Morenci mine strikes as technical advisor to field commanders and trainer for riot and crowd control; under emergency situations responsible for testing, evaluating, recommending and purchasing of riot control equipment.

1976 - 1978 DPS Training staff; provided training to law enforcement agencies around the state; managed defensive driving school and Supervised instructors and students.

1972 - Current 23 years experience as law enforcement officer assigned to patrol, investigations and training.

*EDUCATION*

A.A. Degree in Criminal Justice, A.A. Degree in Fire Science.  Currently pursuing Bachelor's degree.  Have over 3,000 hours in police studies; 1,000 hours in technical studies.

*GENERAL*
*BACKGROUND*

| *MARITAL STATUS* | *MILITARY* |
|---|---|
| Married | 1967 - 1971 US navy |
| | Honorable Discharge |

```
              NAVAJO COUNTY SHERIFF'S DEPARTMENT PERSONNEL DATABASE

*****************************************************************************
LN: LINDLEY        FN: KENNETH   MI: D ID#: 933  SS: 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 DOB: 04/24/49
 TREET: 611 W. GILMORE                          PH: (520) 289-5549
 AIL: P.O. BOX 362               CITY: WINSLOW       ST: AZ. ZIP: 86047
 SPOUSE: JUDDIE                          MARRIED DATE:
 -------------------------------------------------------------------------
 ATE OF HIRE: 03/01/93            PROMOTION DATE: 08/16/94
 ANK: DEPUTY I     POSITION: TRAINING OFF ASSIGNMENT: ADMINISTRATION DIV.
 -------------------------------------------------------------------------
 EH ASSIGNED:         MAKE:             MODEL:        YEAR:
 -------------------------------------------------------------------------
                     EMERGENCY INFORMATION
 -------------------------------------------------------------------------
 ONTACT PERSON: JUDDIE LINDLEY              PHONE: 289-5549
 BLOOD TYPE: A+     ALLERGIES: NONE
 -------------------------------------------------------------------------
                            TRAINING
 -------------------------------------------------------------------------
 UPDATE DATE: 08-15-95   AOT HRS TO DATE:  85.5      AOT YEAR: 1995

 FATS:Y  FIREARM: Y PATHOEGEN: Y HAZMAT: Y CPR: Y DRIVE:  Y

 -------------------------------------------------------------------------
 EDUCATION:
   AAS - ADMINISTRATION OF CRIMINAL JUSTICE
   AAS - FIRE SCIENCE

 QUALIFICATIONS/CERTIFICATIONS:

 P.O.S.T. CERTIFIED POLICE OFFICER
 TECHNICAL COMMERCIAL VEHICLE ACCIDENT INVESTIGATOR - AZ. DPS
 STATE ON - SCENE COORDINATOR FOR HAZARDOUS MATERIALS EMERGENCIES - ADEM/EPA
 STATE OF ARIZONA HAZARDOUS MATERIALS TECHNICIAN - ADEM
 IAFF HAZARDOUS MATERIALS TECHNICIAN
 IAFF HAZARDOUS MATERIALS INCIDENT COMMANDER
 STATE OF ARIZONA COMMERCIAL VEHICLE SAFETY SPECIALIST - US DOT
 STATE OF ARIZONA HAZARDOUS MATERIALS ENFORCEMENT SPECIALIST - US DOT
 STATE OF ARIZONA HAZARDOUS MATERIALS CARGO TANK INSPECTOR - US DOT
 STATE OF ARIZONA DRUG LAB ENTRY TEAM MEMBER/SAFETY OFFICER US DEA
 STATE OF ARIZONA POLICE MOTORCYCLE OPERATOR CLASS I
 STATE OF ARIZONA POLICE MOTORCYCLE FIELD INSTRUCTOR CLASS II

 OTHER CERTIFICATIONS:

 STATE OF ARIZONA - LICENSED PRIVATE INVESITGATIOR

 INSTRUCTOR QUALIFICATIONS:

 P.O.S.T. PEACE OFFICERS STANDARDS & TRAINING INSTURCTOR

    POLICE SIDE HANDLE BATON AND IMPACT WEAPONS
    CHEMICAL AGENTS, MACE, TEAR GAS AND VARIOUS DELIVERY EQUIPMENT
    DEFENSIVE TACTICS INSRUCTOR (AIKIDO).
    OFFICER SURVIVAL
    COMMERCIAL DRIVER/VEHICLE INSPECTION COURSE
    HAZARDOUS MATERIALS ENFORCEMENT COURSE
    DRUG LAB TEAM SAFETY COURSE
    R.A.D.A.R
    V.A.S.C.A.R
```

COMMUNITY COLLEGE INSTRTUCTOR – ARIZONA CERTIFIED:

   ADMINISTRATION OF CRIMINAL JUSTICE

      ALL ADMINISTRATION OF CRIMINAL JUSTICE AS LEVEL COURSES

   FIRE SCIENCE/HAZARDOUS MATERIALS

      ALL FIRE SCIENCE AS LEVEL COURSES INCLUDING –

         HAZARDOUS MATERIALS AWARENESS
         HAZARDOUS MATERIALS FIRST RESPONDER
         HAZARDOUS MATERIALS TECHNICIAN – EPA
         HAZARDOUS MATERIALS TECHNICIAN – IAFF
         HAZARDOUS MATERIALS INCIDENT COMMAND – IAFF

  OSHA SAFETY

      FIRE SAFETY IN JAILS
      S.C.B.A. SELF CONTAINED BREATHING APPARATUS
      BLOOD/AIRBORNE PATHOGHENS – T.B. FOR WORKERS
      EMPLOYEE RIGHT TO KNOW – HAZARDOUS MATERIALS IN THE WORK LPLACE
      HAZARDOUS MATERIALS SHIPPING, TRANSPORTING AND HANDLING HM 181
      WAREHOUSE SAFETY, FORKLIFT OPERATIONS – HANDLING HAZ. MAT.

POST ACCREDITED/AOT:         ACADEMY JUNE 2, 1972

| Date | Course | Hours |
|------|--------|-------|
| 04-14-72 | NRA POLICE MARKSMANSHIP – EXPERT – | 80 HRS. |
| 05-00-72 | ADVANCED FIRST AID – AMERICAN RED CROSS | 80 HRS. |
| 06-02-72 | DPS TRAINING ACADEMY | 400 HRS. |
| 11-12-72 | PRIMARY EMT – NATIONAL HIGHWAY SAFETY ADMIN. | 20 HRS. |
| 03-01-73 | POLICE BATON INSTRUCTOR COURSE | 80 HRS. |
| 03-01-73 | POLICE SIDE HANDLE BATON INSTRUCTOR COURSE | 80 HRS. |
| 05-06-73 | DOPPLER TRAFFIC RADAR – KUSTOM SIGNALS – | 8 HRS. |
| 07-13-74 | DOPPLER TRAFFIC RADAR – DPS – | 8 HRS. |
| 09-21-74 | VASCAR- DPS – | 20 HRS. |
| 08-10-75 | DOPPLER TRAFFIC RADAR – DECATUR – | 8 HRS. |
| 10-31-75 | DOPPLER TRAFFIC RADAR INSTRUCTOR – DPS – | 40 HRS. |
| 12-16-75 | 08-11-75 – 12-16-75 DPS ACADEMY COUNSILOR | 400 HRS. |
| 04-14-76 | ASU RESEARCH FOR LAWL ENFORCEMENT | 24 HRS. |
| 09-00-76 | DEFENSIVE DRIVER TRAINING INSTRUCTOR – DPS – | 40 HRS. |
| 04-22-77 | OFFICER SAFETY & SECURITY – LERA – | 40 HRS. |
| 08-12-77 | ALEOAC INSTRUCTOR CERT. – GENERAL – | 40 HRS. |
| 09-16-77 | BASIC HOSTAGE NEGOTIATION – LERA – | 40 HRS. |
| 08-25-78 | AOT SELF DEFENSE | 8 HRS. |
| 09-28-78 | BASIC POLICE MOTOTCYCLE OPERATION – DPS – | 80 HRS. |
| 02-09-79 | CLASS II POLICE MOTORCYCLE OPERATION – DPS – | 160 HRS. |
| 06-29-79 | KOGA INST. ARREST & CONTROL TECH. –ALEOAC – | 40 HRS. |
| 01-14-80 | DOPPLER RADAR OPERATOR | 8 HRS. |
| 01-21-80 | AOT – IN SERVICE TRAINING | 40 HRS. |
| 03-09-81 | CMI INTOXILYZER OPERATOR | 8 HRS. |
| 04-10-81 | INTOXILYZER OPERATION & MAINTAINANCE | 24 HRS. |
| 07-21-81 | FIRST RESPONDER REFRESHER FIRST AID | 16 HRS. |
| 08-25-82 | COMPLAINTS & DISCIPLINE PROCESS | 3 HRS. |
| 08-25-82 | DATA PROCESSING IN LAYMANS LANGUAGE | 3 HRS. |
| 08-19-82 | AOT IN SERVICE TRAINING | 24 HRS. |
| 01-20-83 | INTOXILYZER MAINTAINANCE SCHOOL | 24 HRS. |
| 02-28-83 | OFFICER SURVIVAL INSTRUCTOR UPDATE | 3 HRS. |
| 10-31-84 | TACTICAL POLICE DRIVERS TRAINING | 24 HRS. |

| Date | Course | Hours |
|------|--------|-------|
| 11-16-84 | INTOXILYZER UPDATE | 1 HR. |
| 06-21-85 | AOT IN SERVICE TRAINING | 32 HRS. |
| 02-21-86 | CRIMINAL INVESTIGATIONS TRANSITIONAL SCHOOL | 80 HRS. |
| 01-28-88 | COMMERCIAL VEHICLE/DRIVER INSPECTION COURSE | 32 HRS. |
| 04-15-88 | HAZARDOUS MATERIALS COMPLIANCE & ENFORCEMENT | 40 HRS. |
| 04-25-88 | AOT - BASIC EMERGENCY CARE "MEDICAL EMERGENCIES" | 8 HRS. |
| 04-26-88 | AOT - AVOIDING COMPLAINTS | 2 HRS. |
| 04-26-88 | AOT - GAMBLING SCAMS | 2 HRS. |
| 04-26-88 | AOT - SEARCH AND SEIZURE | 2 HRS. |
| 04-26-88 | AOT - RECENT COURT DECISIONS | 2 HRS. |
| 05-10-88 | AOT - BOOBY TRAPS & EXPLOSIVE DEVICES | 4 HRS. |
| 05-10-88 | AOT - INTELLIGENCE | 2 HRS. |
| 05-10-88 | AOT - DEATH NOTIFICATION PROCESS | 2 HRS. |
| 05-19-88 | CARGO TANK ROADSIDE INSPECTION COURSE | 40 HRS. |
| 08-12-88 | NORTH AMERICAN STANDARDS COMM. VEH. INSPECTION | 40 HRS. |
| 09-29-88 | HAZARDOUS MATERIALS FIRST - ON - SCENE | 8 HRS. |
| 08-10-90 | HAZARDOUS MATERIALS COMPLIANCE AND ENFORCEMENT | 40 HRS. |
| 05-27-93 | FIREARMS DISC. FATS 1993 - PASSED - | 1 HR. |
| 03-17-94 | DOMESTIC VIOLENCE | 3 HRS. |
| 06-22-94 | FIREARMS CERT. (1993) SHOOT PASSED | 2 HRS. |
| 08-31-94 | DRIVERS TRAINING REFRESHER - ALEOAC - | 8 HRS. |
| 09-13-94 | CHILD ABUSE PART I TELECOURSE | 3 HRS. |
| 11-16-94 | 1994 FIREARMS CERT. - PASSED - | 2 HRS. |
| 11-16-94 | 1994 FATS SHOOT - PASSED | 2 HRS. |
| 12-15-94 | AOT - LAW LEGAL UPDATE/COURTROOM SKILLS | 3 HRS. |
| 03-09-95 | AOT - LAW & LEGAL UPDATE/COURTROOM SKILLS | 3 HRS. |
| 04-13-95 | AOT - RECOGNIZING CRIMINAL PERSONALITIES - | 3 HRS. |
| 04-28-95 | BASIC GANG COURSE -G.I.T.E.M. | 24 HRS. |
| 06-03-95 | HIGH RISK STOPS   DAY | 8 HRS. |
| 09-13-95 | HIGH RISK STOPS   NIGHT | 8 HRS. |
| 09-22-95 | TRANSPT. HAZ.MAT. HM 181 ENFORCEMENT COURSE | 40 HRS. |

SPECIALTY TRAINING:

| Date | Course | Hours |
|------|--------|-------|
| 03-03-72 | NAT. SAFETY COUNCIL DEFENSIVE DRIVING | 8 HRS. |
| 10-01-75 | NAT. SAFETY COUNCIL DEFENSIVE DRIVING | 8 HRS. |
| 03-11-77 | GREYHOUND LINES INC. BUS DRIVER CERT. | 24 HRS. |
| 04-11-79 | NAT. SAFETY COUNCIL DRIVING INSTRUCTOR | 16 HRS. |
| 06-04-80 | MOTORCYCLE SAFETY FOUNDATION - INSTRUCTOR - | 48 HRS. |
| 10-20-88 | SIG SAUER SEMI - AUTO CERTIFICATION | 16 HR. |
| 03-09-89 | CLANDESTINE DRUG LAB SAFETY SEMINAR | 4 HRS. |
| 04-13-89 | RADIOLOGICAL MONITORS | 8 HRS. |
| 05-26-89 | RADIOLOGICAL EMERGENCY RESPONSE TRAINING | 68 HRS. |
| 06-23-89 | CHEMISTRY OF HAZARDOUS MATERIALS NAT. FIRE ACAD. | 80 HRS. |
| 07-30-89 | HAZARDOUS MATERIALS TECHNICIAN COURSE | 160 HRS. |
| 10-16-90 | COMMERCIAL VEHICLE DRUG ITERDICTION TECH. | 8 HRS. |
| 01-18-91 | US EPA  HAZARDOUS MATERIALS PERSONNEL PROTECTION AND SAFETY COURSE | 40 HRS. |
| 04-08-93 | SUDDEN INFANT DEATH SYNDROME, HIGH STRESS, DEALING WITH DEATH, SIDS CRIB DEATH, DOMESTIC VIOLENCE & DISTURBANCE - VIDEO'S - | 2 HRS. |
| 05-00-93 | NORTHLAND PIONEER COLLEGE - AAS FIRE SCIENCE - | |
| 05-00-93 | NORTHLAND PIONEER COLLEGE - AAS ADMINISTRATION OF CRIMINAL JUSTICE | |
| 03-20-93 | BLOODBORNE PATHOGENS - OSHA - | 3 HRS. |
| 05-27-93 | BLOODBORNE PATHOGENS - OSHA - | 3 HRS. |
| 01-13-94 | O.C. SPRAY CERT. | 2 HRS. |
| 03-10-94 | JAIL HOSTAGE - STAFF | 2 HRS. |
| 03-24-94 | JAIL LIABILITY TRAINING | 4 HRS. |

```
06-09-94    IAFF - HAZARDOUS MATERIALS INSTRUCTOR TRAINING        40 HRS.
10-29-94    BLOOD/AIRBORNE PATHOGENS TRAINING - OSHA -             1 HR.
12-16-94    SCBA AND FIRE EXTINGUISHERS FOR JAIL                   4 HRS.
12-16-94    BLOOD/AIRBORNE PATHOGENS - OSHA -                      3 HRS.
12-16-94    CPR CERT.                                             4 HRS.
02-17-95    ADA ACADEMY INSTRUCTOR/COUNSELOR                    240 HRS.
03-24-95    INTRODUCTION TO EMERGENCY MANAGEMENT (FEMA)           40 HRS.
05-11-95    SATANIC CRIMES COURSE                                 2 HRS.
05-16-95    VIDEO COURSE:
            RITUAL OCCULT AND SATANIC CRIME INVESTIGATION.      1.5 HRS.
            SATANIC CRIMES                                       .5 HRS.
            RITUAL CRIME GUIDELINES FOR INDETIFICATION           .5 HRS.
06-14-95    ADA ACADEMY INSTRUCTOR/COUNSELOR                    240 HRS.
08-10-95    SEARCH & SEIZURE - LAWS OF ARREST REVIEW              3 HRS.
10-12-95    WARRANT SERVICE & BUILDING ENTRY TACTICS              3 HRS.


                            TOTAL TRAINING HOURS:      3,350.5
```

## VERIFICATION


KEN LINDLEY, being first duly sworn, under penalty of perjury, upon his oath deposes and states:

That he has read the attached affidavit and all facts contained therein (paragraphs 1 - 3 inclusive, except paragraph 2, the hypothetical set of facts) are true.


_____
KEN LINDLEY


SUBSCRIBED AND SWORN to before me this 25 day of October, 1995, by Ken Lindley.


_____
NOTARY PUBLIC                         10-20-96

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

COUNTY OF MARICOPA

STATE OF ARIZONA,      )
                       )
        Respondent,    )
                       )          CR 89-12631
        v.             )
                       )
DEBRA JEAN MILKE,      )          AFFIDAVIT
                       )
        Petitioner.    )
                       )
_____)


       My name is JOHN A. MEYER. I am over the age of eighteen.  I
have never been convicted of a felony and am competent to make
this affidavit.  I have personal knowledge of the facts stated in
this affidavit, except for the facts stated in (2), the
hypothetical set of facts, and if called to testify, under
penalty of perjury, I would testify to the following:

1.  My education and trianing are set out in the herein attached
Resume, which is incorporated by reference.

2.  HYPOTHETICAL SET OF FACTS:

     One Saturday afternoon in early December, two men took a four
year old boy to a remote desert area and killed him by shooting
him three times in the back of the head.  To cover their tracks,
the men then went to a local area mall where they separated.  One
of the men, a platonic roommate of the mother, called her at home
and told her that the child was missing from the mall.  He
enlisted the aid of a mall security guard and they called police
to report the child missing.  The mother also called Crimestop,
even though the man told her that he and a security guard were
going to call police.

     Over the evening, police closed and searched the mall while
the mother remained by the telephone at home in case her young
son called her.  Friends and relatives gathered at her apartment,
and then searched the mall over the next several hours.  The
mother cooperated fully with police, undergoing interview after
interview over the course of the long, sleepless, tear filled
night.  The mother explained to the police that she had met her
roommate three years before when her sister befriended him.  They
had become and remained friends over the course of those years,
staying in touch with one another sporadically.  When the
situation with her ex-husband became increasingly difficult, the
mother and her son had moved in with the man three months before

on a temporary basis.  Thereafter, she secured a good job and had recently placed a deposit on a new apartment for herself and her son.  With no word from police about her son, the following afternoon the mother's family drove her to a neighboring city to see her father.

During the night and over the next morning, police repeatedly interviewed the two men involved.  Police learned that the men were friends for over twenty years.  Both men were Viet Nam veterans with histories of mental illness and were being treated and prescribed medication through the local VA hospital.  The story the two men had fabricated began to unravel with inconsistencies developing between the statements of the two men.

That morning, as police began to suspect that foul play may be involved, they called in a homicide detective who subsequently became the case agent.  A twenty year veteran of the police department, this detective had spent the last six years as a homicide investigator.  The detective subsequently retired before this case came to trial.  After being briefed and monitoring an interview of the friend of the roommate, this detective interrogated the man again.  Without benefit of an audio or video tape of the interview, the detective emerged from the interview with a confession.

The man claimed that he was only the driver and that his friend was responsible for shooting the child.  He then led the detectives to the child's body and by the locations where other evidence was deposited.  While so doing, the man implicated the mother in the death of her son.  There was no physical evidence of the mother's involvement.  Another detective later taped an interview of this man to memorialize the prior interrogation.

Immediately thereafter, and possessing no further information, the detective telephoned the local sheriffs office and had the mother escorted to their offices where she sat for over two hours waiting for the detective to arrive.  The detective recruited a police helicopter and flew the fifty miles to the small town where the mother was staying with her parents.  Though he was ordered by his superior officer to interview the mother and to tape record his interview, the detective did not take a tape recorder with him.  He later stated that he assumed that the local sheriffs office would have one.  He never asked anyone for the tape recorder.

Upon arrival, the detective went to a small room in the office where the mother was waiting with a family friend.  He introduced himself and ordered the others out of the room, shutting the door behind him.  A large man, approximately 6' and 230 lbs., the detective sat himself down in front of the mother.  When she asked him whether he had heard anything about her son, the detective ignored her, took out his notebook and checked his watch.  He then told her that "We found your son, he was murdered and you are under arrest."  When she began screaming and crying,

he told her that he would not tolerate her crying and to be quiet.  He then read her rights under Miranda.

After the subsequent half hour interrogation, the detective emerged claiming that he was able to make the mother so comfortable with him that she confessed her involvement.  Despite this, the detective never made any effort to record her statement or to get a written, signed statement from the mother.  He stated that she did not want her statement recorded and that she asked for an attorney after she confessed.  The detective later said that the mother faked her tears, and pulled up her blouse during the interview to expose her breasts to him.

The detective escorted the mother back to Phoenix.  He told her to be quiet during the trip, not to ask him any questions.  He did not handcuff her as he rode in the back seat of the car with her during the fifty mile trip.

The mother subsequently denied that she ever confessed to the officer.  She acknowledged that he told her of her Miranda rights but states that she was so shocked by her son's death and her own arrest that she was unable to think of her rights.  She told the detective early on that she didn't want a tape recorder, she wanted a lawyer.  She explained that she pulled the corner of her sweater, the sweater she wore over her shirt, to dry her eyes and wipe here nose during the interrogation.

Three days after the interrogation, the detective wrote his report, and then destroyed the notes he took contemporaneous to the interrogation.  The report contained no unequivocal statements of guilt by the mother.  Rather, the report was full of statements that could be interpreted as either inculpatory or exculpatory depending on the context in which the statements were made.  The report was written such that the reader is dependent upon the writer to provide the proper context for the statements.

3.  Based on the hypothetical set of facts set out in 5, above, if materially true, it is my opinion that there is a high probability the confession never occurred and was fabricated.

Further affiant saith not.

RESUME



## EDUCATION

Michigan State University, B.S., Police Administration, 1958

U.S. Army Polygraph School, 1969, 1974, 1985

## CAPABILITIES

Broad experience in personnel background and criminal investigations and specialist in polygraphic techniques. For past seven years, involved exclusively in personnel background investigations. Over twenty five years experience with various U.S. Government agencies involved with security matters. Excellent interpersonal and management abilities.

## WORK EXPERIENCE

### VARICON INTERNATIONAL (1991 - Present)

**Supervisor** - Varicon's contract with DEA to conduct background investigations and reinvestigations of prospective DEA employees and contractors.

### SAHLEN & ASSOCIATES, INC. (1987 - 1991)

**Supervisor** - Sahlen's contract with DEA to conduct pre-employment background investigations on prospective DEA employees.

### U.S. DEPT. OF JUSTICE, DRUG ENFORCEMENT ADMINISTRATION (1973 - 1986)

1986-1987: **Independent Contractor** - Conducted background investigations.

1973-1986: **Chief, Polygraph Program**

Developed and implemented DEA polygraph program and determined the feasibility of utilizing the polygraph in narcotic investigations.

**Staff Coordinator**

Monitored and coordinated DEA enforcement operations.

**Criminal Investigator**

Provided technical and administrative supervision to a staff of 14, supervised the activities of several Special Agents investigating the role of organized crime in drug trafficking.

**Inspector**

Inspected DEA Headquarters and field offices.

**Special Agent/Criminal Investigator**

Conducted criminal investigations.

## U.S. DEPARTMENT OF TREASURY, U.S. CUSTOMS SERVICE (1971-1973)

1971-1973: **Investigator**

Involved with detecting illegal narcotics activities.

## NAVAL INVESTIGATIVE SERVICE (1961-1971)

1961-1971: **Criminal Investigator/Special Agent**

Developed the Naval Investigative Service worldwide polygraph program and supervised Special Agents conducting investigations in industrial personnel security, counterintelligence, and criminal activities.

## SECURITY CLEARANCE

Top Secret

## VERIFICATION

JOHN A. MEYER, being first duly sworn, under penalty of perjury, upon his oath deposes and states:

That he has read the attached affidavit and all facts contained therein (paragraphs 1 - 3 inclusive, except paragraph 2, the hypothetical set of facts) are true.

_____
JOHN A. MEYER

SUBSCRIBED AND SWORN to before me this _23_ day of October, 1995, by John A. Meyer.

_____
NOTARY PUBLIC