```
1  Michael D. Kimerer, #002492
   Lori L. Voepel, #015342
2  Kimerer & Derrick, P.C.
   221 East Indianola Avenue
3  Phoenix, Arizona 85012
   Telephone: 602/279-5900
4  Facsimile: 602/264-5566
   Attorneys for Petitioner
5
```

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| DEBRA JEAN MILKE, | ) | No. CV-98-0060-PHX-RCB |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | **AFFIDAVIT** |
| TERRY STEWART, et al., | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

My name is Anders Rosenquist. I am over the age of eighteen years and have personal knowledge, which forms the basis for this affidavit. I have never been convicted of a felony and am competent to make this affidavit. If I were called to testify, under the penalty of perjury, I would testify to the following:

    1.   I formerly represented the Petitioner, Debra Milke, in post-conviction proceedings, both before Maricopa County Superior Court and this Court.

    2.   In the course of my representation, I spoke with Debra's sister, Sandra Pickenpaugh, by telephone on

October 19, 1995, after her mother, Renate, informed me that Sandra had no objection to me calling her.

3.    During our conversation, Sandra revealed that Detective Saldate had made numerous misleading comments to her in an apparent attempt to persuade her to testify unfavorably against her sister, Debra.

4.    She stated that she was in her seventh month of pregnancy with her second child, when Armando Saldate and another investigator telephoned her repeatedly. They were upset because Sandra kept postponing the interview.  She said that in her condition, she did not want to really bother with the ordeal. She said that Detective Saldate was frustrated and kept hounding her for a due date for the birth of her baby.

5.    Sandra stated that in her final phone conversation with Detective Saldate, he informed her that he had reservations and would be coming up the next day. When she told him it would not be convenient, he said, "Well, either you do it now or you get subpoenaed and you just have to deliver your baby early."

6.    She said that Detective Saldate told her that he needed her to provide character evidence against

Debra, because she knew Debra better than their parents did. She said that she and Debra were never close, but did know what was going on with each other.

7.   Sandra stated that Detective Saldate told her that Debra worried him because Debra had (what Saldate told her in Spanish meant) a split personality.

8.   Sandra also told me that before she was interviewed by Saldate, she believes he misled her regarding the evidence the State had against Debra. He told her that Debra had confessed. He told her that Debra began confessing to him when she was in the car on her way to the Pinal County Sheriff's Office from her father's house. He then said Debra told him that she felt much better because she had been hiding the secret for a long time.

9.   Sandra also said that Saldate told her that Debra had tried to kill Chris twice before, once when their mother and Alex were there. She said that Saldate claimed that once, Debra had put cyanide in Chris' cereal. Another time, he said, they actually went out to the site to do it, but there was too much traffic.

10.   Sandra said that Saldate also told her that, en route from Florence to Phoenix, Debra wanted to exchange a sexual favor in return for her freedom.  He told Sandra that Debra offered to be sterilized as a form of punishment.  Detective Saldate also claimed that when Debra was in county jail, the other inmates were harassing her and she told them, "Yes, I did it, and I'd do it again."

11.   Sandra said that in the course of their interview, Detective Saldate seemed to be more interested in Debra's sexual practices with men than in her abilities as a mother.  Many of the questions he asked her at her home had, in her opinion, nothing to do with Debra's case.  She said he was like some guy interested in her sister asking her what Debra likes to do on dates.  She said that struck her as very odd.

12.   Sandra said that when she received the subpoena to testify, she took it to her obstetrician who arranged to induce her labor at least one week before she had to testify so her child would have a week before having to travel.  They scheduled the delivery for August 14, 1990, specifically because of the trial.

13. Sandra said that her son was very colicky during the trip to Phoenix, and that she got little sleep. She had to be in court early. She was extremely tired and anxious to get back to Wyoming.

14. Sandra said that the victim witness advocates who worked for the prosecutor, Noel Levy, told her how to testify. She said that in the back room before trial started everyday, they told her new things to do. They told her not to hesitate for one minute, just answer the questions and try to elaborate as much as she could. They told her how to sit, how to look, where to look, when to put her emphasis on sympathy and when to emphasize her anger. She told me she felt like a "puppet."

15. Sandra said that Saldate told her that the questions he asked her prior to trial would be the ones asked of her at trial. She said Noel Levy also told her she would be asked the same questions as Saldate had asked her. She said that the questions Mr. Levy asked her at trial were not, in fact, the same. She said there were some similarities, but she was not allowed to elaborate on her answers.

16. At the end of my conversation with Sandra, I said that I would send her an affidavit containing the

information discussed in our conversation for her review and signature. She had no objection to my request. I immediately drafted and mailed an affidavit to her the next day, on October 20, 1995.

17. Rather than receiving Sandra's signed, notarized affidavit, I received a letter from Assistant Attorney General, Randall Howe, saying that Sandra had written to their office informing them of my contact with her and claiming that my contact with her was "unwelcome harassment." (See Attachment 1).

18. Mr. Howe's letter shocked me because Sandra was very cooperative and pleasant during our telephone conversation the previous week. She never indicated that she considered my contact to be harassment, and her conversation with me indicated just the contrary. Additionally, Sandra had cooperated previously by flying to Las Vegas in 1993 (at her mother's expense) to ask Dorothy Markwell if she would be willing to speak with me regarding Debra's case.

19. Nevertheless, after receiving Sandra's letter, Mr. Howe strongly requested that we refrain from further contact with Sandra. He claimed that Sandra had been designated a victim in this case, just like Christopher's father, Mark Milke, and that all

victim's rights applied to her, pursuant to Article 2, Section 2.1 of the Arizona Constitution.

20. Mr. Howe's warning struck me as very odd, as Sandra was not a member of Christopher's immediate family. She was his Aunt and my client's sister. I also thought it was unusual for the State to claim that Sandra is a designated victim despite the fact that she apparently did not have a right to refuse a pretrial interview by defense counsel, and the fact that Sandra and Debra have corresponded by mail without any victim's rights issues being raised. I was also surprised, as no other members of Christopher's extended family (including his grandparents) were listed as victims.

21. I felt that the State was trying to use the victim's rights provisions to block our access to a mere witness, despite the fact that Sandra had willingly spoken to me at length the preceding week by telephone. However, due to Sandra's apparent change of heart since I had spoken with her by phone, together with the Assistant Attorney General's stern warning, we did not attempt to re-contact Sandra to obtain a signed, notarized affidavit.

22. Several years later, in 1998, we again received indications that Sandra might be willing to cooperate with our defense team. My investigator, Kirk Fowler, contacted and met with Sandra for an extensive interview, in which he said she was very helpful and willing to cooperate. Shortly thereafter, however, I received a second letter from Mr. Howe, demanding that our defense team refrain from all further communication with Sandra. (See Attachment 2). Mr. Howe again cited victim's rights provisions, claiming that Sandra is a designated victim in Debra's case. He threatened to seek a protective order against me if we attempted any further contact with Sandra. (Id.).

23. I still felt that the State's designation of Sandra as a victim was improper, and I was concerned about how Sandra had once again shifted her position back and forth regarding her experiences with Debra and with Debra's case. Nevertheless, I was hesitant to re-contact Sandra in light of the threats by the Assistant Attorney General.

AFFIANT FURTHER SAYETH NAUGHT.

ANDERS ROSENQUIST, JR.

1  STATE OF HAWAII              )
                                )  ss.
2  County of  Honolulu          )

3

4        SUBSCRIBED AND SWORN to before this  17th  day of May

5  _____ , 2002.

6                                    _____
                                     Notary Public
7

8  My Commission Expires:

9      9/05/05

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



STATE OF ARIZONA

OFFICE OF THE ATTORNEY GENERAL

GRANT WOODS
ATTORNEY GENERAL

1275 WEST WASHINGTON, PHOENIX 85007

MAIN PHONE : 542-5025
TELECOPIER : 542-4085

October 27, 1995

Anders Rosenquist, Jr., Esq.
80 East Columbus
Phoenix, Arizona  85012

     Re:   *State v. Milke*

Dear Mr. Rosenquist:

     I have received a letter from Mrs. Pickinpaugh dated October 23, 1995, informing me of your contact with her. She considers the contact that you and your staff have had with her to be unwelcome harassment. On her behalf and on the behalf of the Office of the Attorney General, I request that you desist from further contact with Mrs. Pickinpaugh unless you first contact me.

     Mrs. Pickinpaugh, along with Mr. Mark Milke, have been designated the victims in this case pursuant to A.R.S. § 13-4403(B). Consequently, Mrs. Pickinpaugh and Mr. Milke have certain rights guaranteed by Article 2, Section 2.1 of the Arizona Constitution and implemented by legislation, A.R.S. §§ 13-4401 to -4438. My office, at the request of the victims, may assert their rights. A.R.S. § 13-4437(C). I write to notify you that you and your staff may contact Mrs. Pickinpaugh *only* through me or my office. A.R.S. § 13-4433(B). If you wish to interview Mrs. Pickinpaugh, I will relay that request to her and inform her that she has the right to refuse an interview. A.R.S. § 13-4433(A). Moreover, if she ever consents to an interview, I shall be at the interview unless she does not want me present. A.R.S. § 13-4433(D).

     If you continue to attempt to contact Mrs. Pickinpaugh directly, she has standing to seek the enforcement of her rights, as does my office should she request that we do so. A.R.S. §§ 13-4437(A), (C).

     If you have any questions, please call me at 542-4686.

                        Sincerely,

                        RANDALL M. HOWE
                        Assistant Attorney General

Encl.
RMH:lmm

DP

91-0146
Howe

October 23, 1995

Dear Mr. Howe -
        I am writing to you in
reference to the harrassing attitude
towards me by the law office
of Mr. Anders Rosenquist JR,
(Bar # 002724) and his staff.
        I have been repeatedly harrassed
by telephone calls from his office
in hopes of my signing the
enclosed affidavit, as well as
being led to believe that my
husband's job would be in
jepardy, or that I will be
subpoened by him if I do not
sign. I have tried on all
occasions to let it be known
that I do not wish to be
bothered, however, all to no
avail.
        I would appreciate it if your
office could stop the ongoing
harrassment of Mr. Rosenquist
and his staff, as again
I am letting it be known

to all parties involved in this
case that I do not wish to
take part in any of it.

Thank you -
Sandy Pickenpaugh



STATE OF ARIZONA

OFFICE OF THE ATTORNEY GENERAL

GRANT WOODS
ATTORNEY GENERAL

1275 WEST WASHINGTON, PHOENIX 85007

MAIN PHONE : 542-5025
TELECOPIER : 542-4085

July 23, 1998

Anders V. Rosenquist, Jr., Esq.
80 East Columbus
Phoenix, Arizona 85012

RE: *State v. Milke*

Dear Mr. Rosenquist:

Ms. Pickinpaugh, your client's sister, has informed me that your investigator, Kirk Fowler, has in the last few months contacted her twice at her residence, left his business card at her residence on several occasions, and telephoned her several times. Ms. Pickinpaugh considers this contact unwelcome harassment. On her behalf and on the behalf of the Office of the Attorney General, I demand that you, your staff, and those who act at your direction, including Mr. Fowler, refrain from further contact with her.

On October 27, 1995, after similar complaints from Ms. Pickinpaugh, I requested in a letter that you cease any contact with her unless you first contacted me. As I explained, Ms. Pickinpaugh was designated the victim in this case pursuant to A.R.S. § 13-4403(B). As the victim, Ms. Pickinpaugh has certain rights guaranteed by Article 2, Section 2.1 of the Arizona Constitution and implemented by legislation, A.R.S. §§ 13-4401 to -4438. Among those rights is the right to refuse to be interviewed by you, your staff, or an agent of you or your client. A.R.S. § 13-4433(A). Moreover, as I expressly stated, you could *not* contact Ms. Pickinpaugh to request an interview except through me or my office. A.R.S. § 13-4433(B).

Despite the law and my previous letter, Mr. Fowler has continued to contact Ms. Pickinpaugh without my knowledge. As the prosecutor in this case, I have the duty to protect Ms. Pickinpaugh from harassment, intimidation, or abuse. A.R.S. § 13-4433(C). If you, your staff, or anyone under your direction, including Mr. Fowler, has any further contact with Ms. Pickinpaugh, I will seek a protective order against you on Ms. Pickinpaugh's behalf. *Id.* In addition, you should be aware that any further contact may violate the Arizona Rules of Professional Conduct.

Ethical Rule 4.4 provides as follows:

In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.

Anders V. Rosenquist, Jr.
Page Two


     Because your contact with Ms. Pickinpaugh violates her rights under the Arizona Constitution and applicable statutes, please have no further contact with her.

     If you have any questions, please call me at 542-4686.

Sincerely,

RANDALL M. HOWE
Assistant Attorney General


RMH/Leslie M. Fisher


cc:   Ms. Sandra Pickinpaugh
      Judge Robert Broomfield
      Judge Cheryl Hendrix

# ARMANDO SALDATE INCONSISTENCIES/DISCREPANCIES

## GRAND JURY HEARING, DECEMBER 8, 1989

1.   Saldate testified at the Grand Jury Hearing that a plan existed one month prior to Chris' death, which included a previous visit to the murder-scene, checking out the time frame from that location to Metrocenter, if the stores would still be open, etc. He gave an exact picture on how the pre-planned murder should have taken place. This statement is directly conflicted by the record.

**CONFLICTS WITH:** Interview of Roger Scott, Saldate's Supplemental Report of Debra's Interrogation. Both of these reports filed by Saldate contradict his Grand Jury testimony. This illustrates that Saldate was willing to misrepresent facts to ensure an indictment.

2.   Saldate told the Grand Jury that Debra had left her apartment after Jim Styers had called from Metrocenter. He did not tell the Grand Jury that this was 22 hours after Christopher had been reported missing and upon the suggestion of her family and the police (who had installed a trap and trace on the telephone line). Again, Saldate was trying to show that Debra was indifferent and this was not substantiated by the facts.

**CONFLICTS WITH:** Timetable of police investigations & court dates.

3.   Saldate told the Grand Jury that Debra confessed she loved the child and wanted him to go up with God and not have to live in the house that her husband did. Saldate did not elaborate on Debra's true-life situation. Instead, he led the Grand Jurors to believe she was still involved with her husband. The facts clearly show that Debra was not living with Mark at the time of Christopher's death.

**CONFLICTS WITH:** Social History

4.   Saldate claimed that "Roger Scott said that he believes their motivation was a $5,000 life insurance policy. . ." This is not substantiated by the record. In his taped interview Roger Scott alleged "That she just had to get away from him and she just wasn't cut out to be a mother. . ." And that the victim was never liked by Jim Styers or his mother. Roger Scott did not make this statement and therefore it is an unfounded allegation made to help create a scenario for the crime that included Debra. Saldate's allegation shows that he was eager to find a motive, even if he needed to misrepresent statements.

1

SOURCE: Police Report

**CONFLICTS WITH:** Interview of Roger Scott, Saldate's Supplemental Report Roger Scott's interrogation.

## SALDATE'S PRETRIAL INTERVIEW, JUNE 26, 1990

1.    In his pretrial interview, Saldate claimed he had checked his notes regarding Jim Styers' and Roger Scott's statements implicating Debra. However, Saldate claimed at trial he had destroyed them after he had written his reports on December 6, 1989. During trial, Noel Levy stated to the press that it is normal for detectives to destroy handwritten notes after a report was complete. How could Saldate check his notes, which he stated previously that they had been destroyed?

**CONFLICTS WITH:** Saldate's testimony at trial.

2.    In his pretrial interview, Saldate initially alleged that both, Roger Scott and Jim Styers had implicated Debra in the murder of Christopher. Actually, the statement that Scott and Styers had implicated Debra was from Saldate's report of the confession (page 1, last paragraph); the questions asked by Ken Ray during Saldate's pretrial interview were regarding his statement in the report, which was inaccurate. This claim originated from Saldate's own report and it was only Roger Scott who implicated Debra in her son's murder.

**CONFLICTS WITH:** Saldate's subsequent statements

3.    In the pretrial interview with Mr. Ray, Saldate stated he was sure Detective Hamrick told him that he told Debra that he was en route and that Saldate wanted to talk to her and he was sure that Debra knew that he wanted to talk to her. Detective Hamrick's report (typed on December 6, 1989; 00.30 a.m.) explicitly stated that he had not spoken to Debra, and Detective Hamrick testified at trial that he had not spoken to Debra. By suggesting Detective Hamrick had talked to Debra, Saldate's claim that he had arrested her because of her feigned emotion, sounded more reasonable. This shows that Saldate had made up his mind to arrest and implicate Debra prior to arriving to Florence.

**CONFLICTS WITH:** Supplemental Report of Detective Hamrick.

4.     Saldate also made contradictory statements as to when he decided to arrest Debra.  In his pretrial interview with Mr. Ray, he said that Sgt. Ontiveros sent him to Florence to arrest Debra.  During his testimony at the voluntariness hearing, Saldate denied making that statement. During his trial testimony, he could not provide a concrete answer. Piecing together his testimony, Saldate's claimed that he did not plan to arrest Debra when he went in to interview her, but decided to when he saw Debra's alleged feigned emotion upon learning of her son's murder. But his testimony is contradicted by the reports filed by two other detectives. Detective DiModica's report of his interview with Maureen Sadeik and Detective Hamrick's report of his interview with Janet Froebe clearly show that they knew Saldate was going to Florence to arrest Debra. If Saldate was telling the truth regarding his interrogation of Debra and the surrounding events, why was he unable to give a consistent answer about when he decided to arrest her?   The record shows that he did not have probable cause to arrest Debra in Florence.

**CONFLICTS WITH:** Interview of Ilse and Henry Milke (Det. Dimodica's supplemental report)

## SANDRA PICKINPAUGH INTERVIEW, JUNE 30, 1990

1.     Saldate claimed that Debra's "- dress looked very nice." There are no photos or testimony supporting Saldate's allegation about Debra's clothing.  She wore a bra, a T-shirt, a cardigan sweater, panties and blue jeans, socks and tennis shoes. In his supplemental report on Debra's interrogation, he began with his "flashing breasts" allegation.  It was very inappropriate to comment on Debra's clothing.

**CONFLICTS WITH:** Photos shown on TV, testimony of Kirk Fowler

2.     Saldate stated in his report "So me and her were talking and I'm telling her I'm not going to tolerate (her crying) that. She's not going to do it. She - dress looked very nice." Saldate reported that Debra wanted to sexually manipulate him by allegedly flashing her breasts to him.  He withheld the entire allegation contained in no. 25 from his report, hiding his attempt to manipulate Sandra with his outrageous story.

**CONFLICTS WITH:** Comparison with the transcript

3.     Saldate describes to Sandra what he thinks is going on in Debra's mind during the alleged "flashing" incident.  He stated "If he's looking at my breasts then

I may be able to talk myself out of this." Saldate never mentioned this incident in any of his initial documents. Saldate made this statement to Sandra in order to make Debra appear to be manipulative person and bolstering his claim that Debra is guilty. Kirk Fowler's testimony explains that it's physically impossible to do what Saldate alleged. At this point, anything Sandra says to Saldate is clearly compromised.

**CONFLICTS WITH:** Photos shown on TV, testimony of Kirk Fowler, comparison of Saldate's initial report of his interrogation with Debra and his case synopsis.

4.     Saldate summarized in his supplemental report "I then asked Sandra if she could tell me about any of Debra's friends . . ." Saldate did not ask that during the interview; he asked what Debra's position with Jim Styers was. This is one of Saldate's tactics for "improving" the results of his interviews. Jealous of her sister, Sandra suddenly gave a rambling attack saying Debra had no true friends, only people she used. To make Sandra disagreeable attack look like a thoughtful and calm statement, Saldate claimed it was a direct answer to a neutral question. Again he takes statements out of context and puts them into an official report.

**CONFLICTS WITH:** Transcript of interview

5.     Saldate stated in his report that "Sandra replied that she was sure that Debbie would probably lead him (Jim) on, tease him and pursue intimate thoughts with him. Sandra said she was sure that Debbie would never had slept with Jim but then said 'I'm sure she would give him enough food for thought to make him do anything for her.'" Saldate tried to lead Sandra into making a statement that was not in her words, and when he didn't succeed, he just made it up and wrote it in his report. Sandra never said "I'm sure she would give him enough food for thought to make him do anything for her." This example of character assassination is a complete invention of Saldate. In the interview, after telling Sandra about the letters between Jim and Debra, Saldate began his invented story of sexual manipulation, hoping to get Sandy to agree with some of his theory "- it's only her and him. All of a sudden he started, like he said, the gestures, everything else and then you forget about things (inaudible). And I'm sure (inaudible) maybe you can tell me. Like you said the gestures and things that she did (inaudible). But it would not surprise me if she would get up accidentally, you know, quickly run out of her bedroom or something like that (inaudible) or be something." That does not coincide with Sandra's responses. She replied "That's not Debbie. No." That's not Debra, no. In school Debbie even went under the name of "DD" ("Debbie

doesn't") and all her friends knew how modest she was, and Sandra even confirmed that. But Saldate kept harping on that issue.

**CONFLICTS WITH:** Transcript of interview

6.     Saldate stated in this report that Sandra did "admit that Jim at one time had thought that they (Sandra and he) could become romantically involved, however, she immediately told Jim that could not happen and that they would only remain friends. I then asked her if Debra would have been as honest towards Jim if he would have thought about becoming romantically involved with Debra. Sandra then replied that Debra would only use that weakness in Jim and would never tell him that she would never want to be involved with him romantically." Sandra did not mention or confirm any romantic advances from Jim Styers throughout the recorded interview. In fact, she said: "But you're talking about Jim and you've got to realize that Jim has always been like a father to us, actually a surrogate father." This was not the response Saldate was looking for.  But Saldate created this scenario to injure Debra's reputation even more. Sandra said that she regarded Debra to be a manipulative person during the interview, but she did not say anything about how her sister would have treated Jim, or how she would have reacted, if Jim Styers thought about becoming romantically involved with her. Saldate had his knowledge about Styers' romantic thoughts from the confiscated letters only.

**CONFLICTS WITH:** Comparison with the transcript

7.     Saldate also stated in his report "I then asked Sandra if it could be love on Jim's part and she said that's the only thing she could think of that would be driving Jim." It was Saldate who told Sandra: "He - you've got to be real strong. You have to love somebody a lot to do what he did." This way he let Sandra believe that Jim Styers' romantic thoughts about Debra let her have control over him. He continued by stating "I mean, I don't know if it's mind control or if she has that strong of a (inaudible) but she has really controlled Jim." Sandra did not say anything about what could possibly haven driven Jim Styers.

**CONFLICTS WITH:** Comparison with the transcript

8.     Saldate stated in his report ". . . and for the most part, she (Sandy) feels sorry for her (Debra)." Sandra never said anything like this in the interview. This statement of Saldate was created to deceptively cast Sandra's resentful attacks on

5

her sister as reluctant and "loving," an underhanded way of inflating the attack on Debra's character.

**CONFICTS WITH:** His inaccurate allegation is not backed up anywhere in the transcripts.

9.   Saldate stated in his report ". . . and she said her sister Debra was an expert at manipulating people." Sandra never said anything like this in the interview. Saldate initially said that himself.

**CONFLICTS WITH:** Comparison with the transcript

10.   Saldate claimed "That's the type of manipulation she does." This is noting more than character assassination meant to manipulate Sandra. Saldate spoke with Debra for 30 minutes and he claims to have deep knowledge of her character and personality. Saldate discussed Debra's faults by attempting to get Sandra to agree with him.

**CONFLICTS WITH:** This allegation is not based on any facts in the record.

11.   Saldate stated in his report "She said that Debra can make anyone do what she wants them to, even though they may truly know Debra." Sandra did not say anything like this. It was Saldate who said ". . . she has this thing about getting people to do anything for her." Saldate should be asking open-ended questions not questions that suggest their own answer.

**CONFLICTS WITH:** Comparison with the transcript

12.   Saldate stated in his report that in September of 1989, Sandra said she received a call from Debra, asking her if "she and her husband Ron could take Chris because her dad didn't understand and that he was being an asshole and would not take him. She said she told Debra she didn't really know and would have to talk to Ron. Debra went on to tell her that she couldn't handle Chris and that he was just a brat.: Sandra stated in her interview that Ernie had been offer a job in Colorado and that Debra called and said that Ernie had proposed to her and that they were going to get married as soon as Ernie spent a little more adjusted to Christopher. Sandra did not quote Debra as saying her father wouldn't take Chris and that he was being an asshole. The initial statement referred only to financial support at that time: "When she called us she wanted more money. She says Dad's being an asshole and he doesn't understand..." Sandra had just said: "My dad, yeah,

6

I'm the same way, I'm not cleaning up your messes." Initially, Sandra said that Debra had talked to Mark, about her father taking Chris. Mark did not want Christopher to go with her father, but would allow him to stay with Sandra. Sandra never said Debra called her up, asking whether she could take Chris.

Saldate also stated in his report that Debra said that Ernie didn't want to take Chris so she needed someone to take care of him. Sandra said she then asked Debra if she was sure it was Ernie and not her and Sandra said that Debra immediately hung up the phone. Saldate took single statements out of context and put them together in order to create a "Debbie didn't want Christopher" story. Sandra never said that Chris couldn't come or that he (Ernie) didn't want him in Colorado. In fact, when Saldate suggested this scenario to Sandra, she replied, "She (Debbie) didn't say that." But Saldate ignores this, and takes a discussion about Ernie's concern about his proper relationship with Chris into a refusal to see Debra in Colorado because of Chris, all to support his motive. Sandra never said that Ernie didn't want to take Chris, to Colorado.

Saldate stated in his report that "Sandra said that Debra told her that it would only be for 2 months until she and Ernie got settled." Saldate, who had already interviewed Ernie at this time, was looking for more evidence against Debra in the alleged conspiracy. But his report - once again - is inaccurate, because Sandra really said: "If mom is willing to pay for his plane fare out here when she comes then Ron and I would be willing to keep Christopher for no longer than two months until she got her shit together." So it was Sandra's idea to take Christopher (while her son Jason would benefit from his company) for two months in order to be helpful to her sister.

Saldate stated that Debra and Ernie Sweat's relationship "was something serious." Sandra said she knew that Ernie and Debra were dating but that he did not appear to be the type of person, even though he was very nice. Sandra did not say Ernie did not appear to be the kind of person who would marry her sister. She went on to say "Which was understandable to me [that they might get married later] at that time because . . ." Saldate created an overly positive image of Ernie to try and show that Debra was the reason for any problems with their relationship. However Ernie and Debra forcefully denied that allegation in court.

Saldate stated in his report that "He (Jim Styers) then told her that Debbie had given Ernie an ultimatum and that they were having problems because of that." A good example of how Saldate took statements out of context. It was Sandra who

7

initially said "I guess she proposed an ultimatum to him and he didn't like that." She said she "guessed".   Saldate attributed this statement to Jim Styers (who was sharing an apartment with Debra)[1st falsehood] and made the "guess" appear to be a fact [2nd falsehood].

Saldate stated in his report that "Sandra said she immediately realized that Debbie told her these things because that's what Debbie wanted to believe." Sandra finished this story about her sister and Ernie by saying "So she said that they were bickering about it. Which kind of made me wonder but then again, if you've dealt with her for so many years you figure well -" which can't possibly be considered as the version that Saldate made up in his report.

**CONFLICTS WITH:** Court testimony ERNIE SWEAT, Comparison with the transcript

13.     Saldate stated during his interview with Sandra that "Jim did do the shooting." He claimed there was evidence that Jim Styers was the gunman and that led Sandra to believe that he knew, and was telling her, exactly how the crime took place.  In fact, Jim Styers confessed in his letters to Debra that he had been at the murder-scene together with Roger Scott.  He did not confess that he shot Christopher.   There is no definitive proof regarding which co-defendant shot Christopher.

**CONFLICTS WITH:** Letters from Jim Styers to Debra, Interview of Robert  Johnson (Johnson stated that Roger Scott had confessed to the killing)

14.     Saldate stated "In reading these letters you can see it is a setup." The letters Saldate referred to were written by Jim Styers and Debra after their arrest.  The letters do not show a conspiracy theory.  Saldate inaccurately claimed that these letters proved there was a conspiracy and told Sandra this to substantiate his theory.

**CONFLICTS WITH:** Letters from Jim Styers to Debra.

15.     Saldate stated "And in one of the letters . . . we don't have she's telling him a couple of things like when I get out here we could be together." Saldate could not possibly have any knowledge about the content of a letter he didn't have and that does not exist.  Saldate again is attempting to show Sandra that Debra is a bad

person and that she committed this crime.  He is clearly trying to make Sandra tell a story that goes along with his theory

**CONFLICTS WITH:** Common sense

16.     Saldate stated to Sandra that Debra had gone through the psychological testing to see if she was unstable.  Saldate was trying to imply that experts had already found Debra mentally deficient.  This insinuation is inaccurate.  It was also not mentioned that Debra had taken and passed a polygraph test.  However, the result was withdrawn because the testing environment made it inconclusive.

17.     Saldate stated in his report "Sandra said she would usually fall for this and agree with Debra that she should do these things."  Sandra said that Debra would call and tell her that she need help getting away from Mark and she needed help to get on her feet and would ask Sandra to help her with Chris.  Sandra did not say she fell for these things; she said: ". . . we would all coach her, you know, we'd all say, yes, stay out of his [Mark's] life . . ."

**CONFLICTS WITH:** Comparison with the transcript

18.     Saldate further stated in his report "Debra would then turn it around and then use it against her and after several weeks of taking care of Chris, Sandra would realize that the only reason Debra said these things was because she wanted someone to take care of Chris."  Sandra never said anything like this.  Saldate picked up a lot of single statements and put them together, but all of these phrases were completely taken out of context.

**CONFLICTS WITH:** Comparison with the transcript

19.     Saldate stated in his report that "Sandra said this was strange because usually Debbie didn't think of anyone else . . ."  Sandra never said anything like this in that interview. She said that Debra had called to wish Jason a happy birthday and also to tell her about the result of the custody hearing.  Saldate is creating quotes to make his story seem more reliable to Sandra.

**CONFLICTS WITH:** Transcript of interview

20.    Saldate stated in his report "I then asked her about the time when Debra went to Colorado presumably to get her act straight.  Sandra just chuckled and said that was a joke."  Actually, Sandra said "she was very sincere."

**CONFLICTS WITH:** Comparison with the transcript

## VOLUNTARINESS HEARING, SEPTEMBER ___, 1990

1.    Saldate stated, "I'm sure Roger would have told me all that information in the interview room had we continued our interview. However, the interview was continued in the car because it was felt that, because of darkness coming, it was necessary to take Mr. Scott out there to find the body as quickly as possible." During the Voluntariness Hearing Saldate created a new scenario, claiming Roger Scott would have immediately told him the entire truth about Debra's involvement, if they would have had enough time.  According to his report Roger stated "Jim killed him" and continued to elaborate on Jim Styers' role in the murder, where Chris' body was at, several visits to possible murder-scenes, how he (Scott) drove the car and the killing happened. Roger Scott also stated concern about the trouble ahead of him and that he was promised $250 from the insurance proceeds.  Roger Scott, Saldate and Det. Bob Mills got into a car and drove to the murder-scene, when Roger Scott literally imposed. Saldate's report states: "Just after leaving the main station, Roger Scott said if he could tell us some more while he as in the car or would we rather wait until we returned and I suggested that he go ahead and tell us. Roger Scott then said that we probably felt that he and Jim Styers were the only bad ones in this situation but that he was going to tell us something about the baby's mother.  Roger Scott went on to say that the baby's mother knew all about the killing and in fact the only reason that Chris was killed was because the mother wanted it done."  Saldate twisted the entire scenario in the courtroom to ensure the implication of Debra and justify her indictment.

**CONFLICTS WITH:** Saldate's Supplemental Report of Debra's Interrogation.

2.    Saldate contradicted himself when he claimed: " . . . it's hard to interview someone when you are driving down the street." During the cross-examination Ken Ray cornered him by asking "Who was driving?" and Saldate had to confess "Bob Mills," the other detective present in the car. Therefore, Saldate had every chance to continue his interview with Roger Scott in greater detail.

**CONFLICT WITH:** Saldate contradicted himself directly

3.    Upon Ken Ray's question "Had you related to any other officer that it was your intention to go down to Pinal County to arrest Debra Milke?" Saldate replied that he had not talked to anybody. That's another inaccuracy to avoid any questions pertaining to the pre-conclusion to have Debra (and Jim Styers) arrested. In fact, the report of police detectives Hamrick and DiModica prove the opposite. The decision to arrest Debra was made before Saldate ever spoke to Debra.

**CONFLICTS WITH:** Supplemental Report of Detective Hamrick (about the drive to Florence and his interview of Janet Frobe) and Detective DiModica (about his interview of Maureen Sadeik)

4.    Asked about the true circumstances of the fact that Detective Saldate did not tape-record the interrogation of Debra and whether he had an order from his superior, Saldate answered: "I wouldn't even have asked a question." Next Mr. Ray asked why Saldate chose not to record, but Saldate replied to that: "She said she didn't want it recorded." The facts show Saldate never intended to tape-record the conversation and does not like to do it.

**CONFLICTS WITH:** Common sense; Saldate contradicted himself directly

5.    Pertaining to the reason why Saldate had added the final statement to his report "It should be noted that this interview was not tape recorded because Debra refused to have her statement tape recorded." He substantiated this by saying "That's not -- that portion of the interview was not the most important part of the interview. That's one of the mechanical things of the interview that would be at the end of the supplemental." But that appears to be another untrue allegation, since he also didn't tape-record interviews of Ernie Sweat, Mark Milke and Sandra Pickinpaugh (which was recorded by Sandra to possibly avoid subpoena). And the same is true with his initial interrogation of Roger Scott, who was later re-interviewed and tape-recorded by Detective Bob Mills. He didn't indicate the lack of official tape recordings to any of those reports.

**CONFLICTS WITH:**

**SALDATE'S TRIAL TESTIMONY, SEPTEMBER ___, 1990**

1.    Saldate testified at trial about further instructions from his superior and whether Saldate was given any additional instructions, such as just to interview her (Debra) or not to arrest her 'or anything along that line', Saldate replied: "That's not

within the scope of a supervisor in homicide. He doesn't tell you when to arrest someone." But at the Voluntariness Hearing Saldate testified: "But I'm not foolish, I'm just a detective. I have superiors. They make up their decisions and, of course, I have to follow them" - claiming he would have to follow orders from his superior and had only little impact about detail decisions in a case.  In fact, the reports of Detective Hamrick prove that the arrest of Debra was already decided prior to Saldate's arrival in Florence.

**CONFLICTS WITH**: Transcript of the Voluntariness Hearing

2.     At trial, Saldate stated: "As we spoke before, I introduced myself. Debra immediately wanted to know who I was."  This testimony is conflicting with his other statements where he always claimed that he entered the room and introduced himself. In his pretrial interview of Mr. Ray (June 26, 1990) Saldate stated: "I don't know if she appeared that way, but she just sat there and said, Oh, hi.' And I entered and I introduced myself." With that statement Saldate intended to make her appear as a neglecting, non-caring mother.

**CONFLICTS WITH:** Pretrial Interview of Armando Saldate

After a lengthy interview with Mr. Ray (on June 26, 1990), the prosecution and Saldate pressured Sandra Pickinpaugh, for an interview. And she later told Anders Rosenquist: "And, I told him that it was really inconvenient for me and he said, well, either you do it now or you get subpoenaed and you're going to have to deliver your baby early."

In addition, there are at least five incorrect statements in Saldate's report regarding Ernie Sweat.  Mr. Sweat corrected these inaccuracies during his pretrial interview and testimony at trial.

Michael D. Kimerer, #002492
Lori L. Voepel, #015342
Kimerer & Derrick, P.C.
221 East Indianola Avenue
Phoenix, Arizona 85012
Telephone: 602/279-5900
Facsimile: 602/264-5566
Attorneys for Petitioner

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | | |
|---|---|---|
| DEBRA JEAN MILKE, | ) | No. CV-98-0060-PHX-RCB |
| Petitioner, | ) | |
| | ) | **AFFIDAVIT** |
| v. | ) | **(Re: Richard Sadeik)** |
| | ) | |
| TERRY STEWART, et al., | ) | |
| | ) | |
| Respondent. | ) | |

My name is KIRK FOWLER.  I am over the age of eighteen years and have personal knowledge, which forms the basis for this affidavit.  I have never been convicted of a felony and I am competent to make this affidavit.  If I was called to testify, under penalty of perjury, I would testify to the following:

1.    I work full time as a private investigator.  I was licensed to practice in the State of Arizona in 1987. The majority of my work is in the area of criminal law.

1

2.    My training and experience are set out in the herein attached resume, which I incorporate as a part of my affidavit.

3.    Debra Milke's father, Richard "Sam" Sadeik, was diagnosed with terminal cancer in early 1998. Debra's sister, Sandy Pickenpaugh, wrote a letter to Debra telling her that their father had been diagnosed with terminal cancer. Debra then wrote a letter to her father, Mr. Sadeik, attempting to obtain closure with her father before his death and assuring him that she was innocent of her son's murder. Debra sent the letter to me and asked me to forward the letter to Mr. Sadeik, which I did.

4.    On March 20, 1998, I had a telephone conversation with Mr. Sadeik for the purpose of arranging a time that I could meet with Mr. Sadeik to discuss Debra's case. He was very amenable to meeting with me, as he was going to die soon and wanted to know what evidence demonstrated that Debra had not confessed.

5.    Mr. Sadeik stated that when Detective Saldate told him that Debra had confessed to Christopher's murder, he believed Detective Saldate because he was a law enforcement officer, and he did not believe that a law enforcement officer would misstate the facts. He

explained that this was due to his background in the
military and corrections industry, and his faith in
the justice system.

6. Based on these statements and my prior conversations
with Mr. Sadeik, I also wanted to learn more details
from Mr. Sadeik about Detective Saldate's conversation
with him when Saldate called Mr. Sadeik the night of
Debra's arrest.

7. Mr. Sadeik told me that if it comes back that Debra is
not guilty, then (referring to Saldate), "I'm killing
the son of a bitch for what he's put me through and my
family."

8. Mr. Sadeik and I arranged for me to travel to Florence
to meet with him four days later, on March 25, 1998.
Unfortunately, Mr. Sadeik passed away from his illness
before we could meet.

AFFIANT FURTHER SAYETH NAUGHT.

KIRK FOWLER

STATE OF ARIZONA     )
                     ) ss.
County of Maricopa   )

SUBSCRIBED AND SWORN to before this 23rd day of May, 2002,
by KIRK FOWLER.

Tracy S McRae



TRACY S. MCRAE
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
October 20, 2003

3

# William S. "Kirk" Fowler

Owner Kirk Fowler Investigations
Arizona License # 8703004
7845 East Evans Road Suite F
Scottsdale, Arizona 85260
Phone (480) 443-4740  Fax (480) 443-0529

## INVESTIGATIVE WORK HISTORY

1960-65 U.S. Border Patrol. Stationed in Arizona, Texas and Washington. Actively involved in investigating, arresting and prosecuting alien smuggling groups operating out of Mexico.

1965-69 Immigration & Naturalization Service Investigative Division. Stationed in New York City and Los Angeles. Investigated aliens that were involved in criminal, immoral and narcotics violations as well as fraudulent claims of U.S. Citizenship.

1969-86 U.S. Drug Enforcement Administration. Stationed in Los Angeles, New York City, Washington D.C., Mexico City, Dallas and Phoenix. Specialized in conspiracy investigations.

Inaugurated the DEA office at JFK International. Responsible for everything from office space and set-up to coordination with foreign counterpart offices as well as being responsible for developing DEA systems and procedures unique to the airport environment.

Mexico City: Responsible for the DEA intelligence network in Mexico and Central America. Dallas: Responsible for intelligence for a seven state area. Developed and implemented procedural systems in maritime, aerial and land smuggling that are still being used. Phoenix: Responsible for enforcement, intelligence and task force groups as well as the marijuana eradication campaign for the state of Arizona.

1986-Present Private Investigator: Worked background, industrial espionage, financial, medical malpractice, pre-investment, homicide and rape investigations.

## LANGUAGE SKILLS

Speak, read and write Spanish. Attended the Border Patrol Academy as well as the State Department Spanish course. Stationed in Mexico City for 1 & ½ years.

## EDUCATION

BA in history with a minor in Social Psychology.

## OTHER SKILLS

Over 40 years experience in the Martial Arts, currently a 6th Degree Black Belt in Ki Aikido. Taught self-defense, arrest techniques, intelligence, undercover work and raid planning at DEA National & International Academy as well as various state & local training academies. Taught the governor's security detail and various corporate security groups.

1  Michael D. Kimerer, #002492
2  Lori L. Voepel, #015342
   Kimerer & Derrick, P.C.
3  221 East Indianola Avenue
   Phoenix, Arizona 85012
4  Telephone: 602/279-5900
   Facsimile: 602/264-5566
5  Attorneys for Petitioner
6
7                  IN THE UNITED STATES DISTRICT COURT
8                        DISTRICT OF ARIZONA
9
   DEBRA JEAN MILKE,                )     No. CV-98-0060-PHX-RCB
10                                  )
              Petitioner,           )
11                                  )     **AFFIDAVIT**
                                    )     **(Re: Pickenpaugh)**
12 v.                               )
                                    )
13 TERRY STEWART, et al.,           )
                                    )
14            Respondent.           )
15 _____)
16
17      My name is KIRK FOWLER.  I am over the age of eighteen
18 years and have personal knowledge, which forms the basis for
19 this affidavit.  I have never been convicted of a felony and I
20 am competent to make this affidavit.  If I was called to
21 testify, under penalty of perjury, I would testify to the
22 following:
23
24      1.   I work full time as a private investigator.  I was
25           licensed to practice in the State of Arizona in 1987.
26           The majority of my work is in the area of criminal
27           law.
28

                                  1

2.   My training and experience are set out in the herein attached resume, which I incorporate as a part of my affidavit.

3.   In March 1998 I met with Sandy Pickenpaugh at her home.  She was very cordial and open with me and I was surprised by her friendly attitude.  She agreed to meet with me because her father had recently passed away and he had requested that she speak with me.  I though she would probably talk to me only 10 to 15 minutes, but the meeting instead lasted approximately four hours.

4.   During Debra Milke's trial, Sandy and her father provided testimony that was harmful to Debra's case.  Sandy and I discussed Debra's trial and the circumstances leading up to the trial.  I was surprised when Sandy told me that neither she nor her father ever thought Debra had anything to do with Christopher's death.  Sandy told me "Debbie is intelligent but she is too ditzy to balance a checkbook, let alone plot a murder conspiracy."

5.   I asked Sandy if she would be willing to sign an affidavit regarding the foregoing.  She told me she would discuss it with her boyfriend at the time and would let me know.

2

6.   Approximately one week later my daughter told me that Sandy had called but did not leave a message. I attempted to contact Sandy approximately three to five times over the following two weeks and finally left her a message asking her to contact me. She never did. Sandy never returned my phone calls.

7.   I have made no further attempt to contact Sandy. I do not even know her present location.

AFFIANT FURTHER SAYETH NAUGHT.

KIRK FOWLER

STATE OF ARIZONA       )
                       ) ss.
County of Maricopa     )


    SUBSCRIBED AND SWORN to before this 23rd day of May, 2002, by KIRK FOWLER.

Notary Public

My Commission Expires:

TRACY S. MCRAE
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
October 20, 2003

3

# William S. "Kirk" Fowler

Owner Kirk Fowler Investigations
Arizona License # 8703004
7845 East Evans Road Suite F
Scottsdale, Arizona 85260
Phone (480) 443-4740  Fax (480) 443-0529

## INVESTIGATIVE WORK HISTORY

1960-65 U.S. Border Patrol. Stationed in Arizona, Texas and Washington. Actively involved in investigating, arresting and prosecuting alien smuggling groups operating out of Mexico.

1965-69 Immigration & Naturalization Service Investigative Division. Stationed in New York City and Los Angeles. Investigated aliens that were involved in criminal, immoral and narcotics violations as well as fraudulent claims of U.S. Citizenship.

1969-86 U.S. Drug Enforcement Administration. Stationed in Los Angeles, New York City, Washington D.C., Mexico City, Dallas and Phoenix. Specialized in conspiracy investigations.

Inaugurated the DEA office at JFK International. Responsible for everything from office space and set-up to coordination with foreign counterpart offices as well as being responsible for developing DEA systems and procedures unique to the airport environment.

Mexico City: Responsible for the DEA intelligence network in Mexico and Central America. Dallas: Responsible for intelligence for a seven state area. Developed and implemented procedural systems in maritime, aerial and land smuggling that are still being used. Phoenix: Responsible for enforcement, intelligence and task force groups as well as the marijuana eradication campaign for the state of Arizona.

1986-Present Private Investigator: Worked background, industrial espionage, financial, medical malpractice, pre-investment, homicide and rape investigations.

## LANGUAGE SKILLS

Speak, read and write Spanish. Attended the Border Patrol Academy as well as the State Department Spanish course. Stationed in Mexico City for 1 & ½ years.

## EDUCATION

BA in history with a minor in Social Psychology.

## OTHER SKILLS

Over 40 years experience in the Martial Arts, currently a 6th Degree Black Belt in Ki Aikido. Taught self-defense, arrest techniques, intelligence, undercover work and raid planning at DEA National & International Academy as well as various state & local training academies. Taught the governor's security detail and various corporate security groups.

*Interview*

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | CR 89-12631 |
| | ) | |
| DEBRA JEAN MILKE, | ) | |
| | ) | |
| Defendant. | ) | |

Phoenix, Arizona
September 10, 1990
6:40 p.m.

### TRANSCRIPT OF PROCEEDINGS

Interview of Mr. Ernie Sweat

APPEARANCES:

Mr. C. Kenneth Ray II,
Attorney for the Defendant

Mr. Kirk Fowler,
Investigator

Ms. Wanda White
Paralegal
County Attorneys Office

COPPERSTATE REPORTING SERVICE, INC.
1836 East Thomas Road
Phoenix, Arizona 85016
(602) 266-2601

Roxanna Neier — Transcriber

1   in the nature of a confession?

2        A    No.  She was not any more specific than that.  I

3   was there for just a brief time.  I came, I mean Carmen was

4   still working.  She came outside in the lobby to talk to me.

5   We had a brief conversation and I left.

6        Q    Now this was on the Tuesday following the

7   incident?

8        A    Right.

9        Q    When did Detective Saldate speak with you?

10       A    Do you have that information?

11       Q    Just to your knowledge.  I'm not going to hold you

12   to any date.

13       A    Was it two months ago.  June?  Okay.  June.  No,

14   it wasn't April.  It wasn't that long ago I don't believe,

15   was it?  Somewhere spring or summer of this year I spoke

16   with him.

17       Q    Did he record that conversation?

18       A    No, he didn't.

19       Q    Did you request that it be recorded?

20       A    No.

21       Q    Did he ask you if you wanted it recorded?

22       A    No, he didn't.

23       Q    Okay.  Where did he meet you at?

24       A    His office.

25       Q    Did he ask you to come down to his office?

56

1      A      He called me at home and requested that I come to

2   his office.

3      Q      Was anyone else present during that interview?

4      A      No, sir, it was just the two of us.

5      Q      And that was at 620 West Washington police

6   department?

7      A      Yes, sir, it was.

8      Q      How long did that interview last?

9      A      Approximately an hour to an hour and a half.

10      Q      Have you read any narrative report of his

11   concerning that interview?

12      A      Yes, sir, I have.

13      Q      Was it accurately reported?

14      A      Not completely.

15      Q      All right.  Do you have a copy of that report just

16   readily handy?  Would it be all right if you looked at that

17   report so you could point out to me what was inaccurate?

18      A      Sure.

19      Q      I guess my question to you before you get started

20   on that is when did you have an opportunity to first review

21   a copy of this report?

22      A      I read it this morning.

23      Q      This morning?

24      A      Yes.  And it was at that point that I noticed some

25   things were just not correct.

57

1    Q    Is that when you responded to the subpoena to come

2    to court?

3    A    No.  Well, I got the subpoenas quite a while ago.

4    A little while ago.

5    Q    Did you come to report to some location today?

6    A    Well, I called -- I was supposed to call Mr. Levy

7    today because the recording was to call if you were

8    requested for this trial.  And he told me today that you

9    would let me know at some later date when he would need me

10   to come in and testify I suppose.

11   Q    How did you first get an opportunity to look at

12   this report?

13   A    I told him that you had requested that I be here

14   this evening.

15   Q    All right.  Now that arrangement had been made

16   with Kirk, correct?

17   A    Yes, it was.

18   Q    He contacted you when?

19   A    Last night.

20   Q    All right.  And requested that we have this

21   meeting today?

22   A    That is correct.

23   Q    When did you contact Mr. Levy in that regard?

24   A    This morning.

25   Q    And why did you contact Mr. Levy?

58

1      A    I needed to first of all discuss the fact that I

2   needed to respond to the subpoena first of all.  And

3   secondly the gentleman that had come by and spoken with

4   before, his name was Tom something.

5      Q    Buckner?

6      A    Tom Buckner, I believe was his name, had requested

7   that I inform him or inform the court if I had had any

8   contact with Debra Milke.  I didn't remember if he had

9   mentioned Debra Milke's attorney or not but I thought I

10   should go ahead and tell him.  So that I would be following

11   orders of the court.  And that is why.

12      Q    All right.  Please take a chance to review the

13   report.  I'll shut the tape off while you do it and we'll

14   come back.

15      Have you had an occasion to review a narrative

16   report prepared by Detective Saldate in connection with his

17   interview of you whenever it was?

18      A    Yes, I have.

19      Q    All right.  And have you indicated some

20   discrepancies in his report against your recollection of

21   that interview?

22      A    Yes.  Apparently I don't see anything here that's

23   just an out and out untruth.  Apparently I honestly believe

24   that Detective Saldate just got some facts disconfigured as

25   to what I had actually told Debra and what I thought.  And

59

1   most likely he was just going off of his notes.  So these

2   are incorrectly printed.

3       Q    Have you marked on this report those areas that

4   were -- that you dispute?

5       A    Yes, I have.

6       Q    Will you put an initial by each one of those

7   places so that I can then make a copy of it.  And generally

8   could you relate to me those areas of dispute.  I guess as

9   you go through and make the initials.

10      A    Sure.  The first thing it says here that Debra

11  spoke about marriage on several occasions but he told her he

12  was not ready for marriage at this stage.  And would

13  probably not be ready for marriage until later stages in his

14  life.  This is not correct.  I never had this conversation

15  with Debra.  I communicated to Detective Saldate that's how

16  I felt.  He asked me if I had ever considered marriage and I

17  told him no.  This is the reason I'd given.  It's not a

18  conversation I ever had with Debra.

19      Q    So he is describing to Debra a conversation that

20  you had never had with Debra?

21      A    Never had that conversation with Debra.

22      Q    Okay.

23      A    Okay.  Once again it's something it's the way --

24  it's my opinion of how I felt.  It's not something I

25  discussed with Debra.

60

1    Q    So — to state it even further he is ascribing an

2    opinion you had about it to Debra?

3    A    Could you elaborate what you're trying to say?

4    Q    May I look at the section you're talking about?

5    A    Sure.

6    Q    It says here that he said that Debra spoke about

7    marriage?  Did Debra ever speak about marriage with you?

8    A    No.

9    Q    Okay.  And that he relates that Debra had spoken

10   about marriage on several occasions.  So that isn't true

11   either?

12   A    No, that's not true.

13   Q    But that he told her that he was not ready for

14   marriage at this stage and would probably be ready for

15   marriage at a later stage in life.  You were relating to

16   Detective Saidate that you, at this point in your life, were

17   not ready for marriage?

18   A    That's correct.

19   Q    But at some point in the future you might be ready

20   for marriage?

21   A    Possibly.

22   Q    Okay.  Maybe not.  It's not on your agenda at this

23   point.

24   A    Exactly.

25   Q    Okay.  And you related that to Detective Saldate?

61

1      A    That is correct.

2      Q    But you never related it to Debra?

3      A    That is correct.

4      Q    Okay.  Continue please.  And that's on page 1 of

5  the report.

6      A    Okay.  Page 2 of the record.  He said he thought

7  Chris had been neglected by her and he was telling her that

8  she should spend more time with him.  Once again that's not

9  a conversation that I'd ever had with Debra.  Once again I

10 was communicating to Detective Saldate what I felt.  It was

11 an opinion I felt, not something that I had ever discussed

12 with Debra.

13     Q    Okay.

14     A    Page number 3.  This is a technicality but it's

15 not correct.  It says here that she called the office and

16 for some reason they let the call go through, the day that I

17 was telling you the Thursday that we spoke.  Actually she

18 called me at home.

19     Q    Okay.

20     A    Okay?  He said that weekend he spent with another

21 girl at a hotel and did not get home until Sunday evening.

22 It is true that I was with another female but we didn't

23 spend the weekend in a hotel.  We were out at a lot of

24 different places and different cities.  We weren't in

25 Phoenix cooped up in a hotel.

2

1                    A P P E A R A N C E S

2    For the State:

3         Mr. Noel Levy,
          Deputy County Attorney

4

5    For the Defendant:

6         C. Kenneth Ray,
          Court-Appointed

7

8                              - - - -

9

10                                      Phoenix, Arizona
                                        September 14, 1990

11

12        THE COURT:  Good afternoon, ladies and gentlemen.  This

13   is a continuation of CR 89-12631, State of Arizona against

14   Debra Jean Milke.

15        Mr. Levy, your next witness, please.

16   MR. LEVY:  I call Ernie Sweat.

17   THE COURT:  All right.  Is Mr. Sweat present?

18        Sir, would you be so kind as to come up to the Clerk,

19   give her your name and be sworn?

20   (Witness sworn.)

21   THE COURT:  Sir, if you would, have a seat over here.

22

23                    ERNIE SWEAT,

24   called as a witness herein, having been first duly sworn, was

25   examined and testified as follows:

11

1        THE COURT:  Overruled.

2        THE WITNESS:  To the best of my recollection, I don't

3    remember ever discussing marriage with Debra.

4    BY MR. LEVY:

5        Q    That's not the question.

6        A    Okay.

7        Q    Involvement was the question.

8        A    Involvement in what way?  I guess I don't understand

9    what you are asking me.

10       Q    Well, did you ever discuss with her that you didn't

11   want to get involved with a woman with a child?

12       A    No, I did not.

13       Q    You were interviewed by Detective Saldate on April

14   26th of 1990, were you not?

15       A    Yes, I was.

16       Q    You were also interviewed twice by defense counsel,

17   through Kirk Fowler first?

18       A    Yes, sir.

19       Q    And then defense counsel wanted to re-interview

20   you just recently at Mr. Ray's office, isn't that so?

21       A    That is correct.

22       Q    And you went through a number of things about the

23   interview and whether it was your perception rather than an

24   actual dialogue with Debra Milke, isn't that so?

25       A    Yes, sir.

12

1       MR. RAY:  Objection to the leading form.  It's improper

2  impeachment of one's own witness.

3       THE COURT:  Overruled.

4  BY MR. LEVY:

5       Q    And you read over the supplement about the interview?

6       A    Yes, sir, I did.

7       Q    And you recollect in the very last paragraph --

8  and if you wish, I could bring this up with the Court's permission

9  to share it with you, what is stated, and it would be asked

10  if you recall saying this to Detective Saldate.

11       MR. RAY:  I would object on the grounds it would be a

12  response based upon hearsay.

13       THE COURT:  Why don't you show the witness the statement

14  and see if that refreshes his recollection?

15       MR. LEVY;  Thank you, Your Honor.

16  BY MR. LEVY:

17       Q    I'm showing you Page 6, top paragraph.

18       A    Okay.

19       Q    Is your recollection refreshed?

20       A    Yes, it is.

21       Q    The procedure here is if it's refreshed, you can't

22  actually read something, you have just got to tell the jury.

23       A    Okay.  In my conversations with Detective Saldate

24  I had indicated some feelings, my own thoughts toward assuming

25  a role, family role with Chris and Debra.  It's not a conversati

13

1   that I ever had with her.  I did feel that she understood that.

2       Q       Understood what?

3       A       Understood that at no time -- that that was my opinion,

4   that I just had no desire to assume that role.  I felt -- I

5   told Detective Saldate that I felt she understood that, that

6   it was clear.  But it's not actually a conversation we had

7   ever had.

8       Q       Okay.  But -- we are sort of in a vacuum.  What

9   is it you felt she understood?

10      A       That I had no desire to take on a family, essentially.

11      Q       And what you mean by that is her son Chris?

12      A       That is correct.

13      Q       As well as her?

14      A       That is correct.

15  MR. LEVY:  Thank you.

16          Your Honor, that's all the questions I have.

17  THE COURT:  Cross-examination.

18

19                      CROSS-EXAMINATION

20  BY MR. RAY:

21      Q       Good afternoon, Mr. Sweat.

22      A       Good afternoon.

23      Q       On direct examination just a moment ago -- direct

24  examination being when Mr. Levy asked you questions --

25      A       Yes, sir.

15

1  progressive?

2      A    No, sir.  We were friends to begin with.  We were

3  friends first and foremost.  I later dated her.

4      Q    Would you have occasion to see her on a regular

5  basis?

6      A    Yes, sir.

7      Q    Would you have occasion to be in and around her

8  desk?

9      A    Around her desk?  Yes.

10      Q    Did she have any photographs or pictures or anything

11  on her desk?

12      A    Yes, she did.

13      Q    What photographs would that be?

14      A    She had a photograph of her son and a photograph

15  of the two of them together.

16      Q    And was it in your observation of those photographs

17  that you found out that she indeed did have a little boy?

18      A    Yes, sir, it was.

19      Q    And upon seeing those photographs, you inquired,

20  "Is that your little boy"?

21      A    Yes, sir, I did.

22      Q    And she responded happily and favorably, didn't she?

23      A    Yes, sir.

24      Q    And that was not an impediment to you in dating

25  her, was it?

16

1    A    No, not at all.

2    Q    And after you commenced dating her you had occasion

3  to meet Christopher?

4    A    Yes, sir, I did.

5    Q    There was a time during the course of your relations

6  with Debra that she was contemplating going to another job?

7    A    Yes, sir, there was.

8    Q    And could you tell us more about that?  What was

9  the situation leading to her conversing with you about going

10  to another job?

11    A    She had an opportunity with another firm that gave

12  her higher income and more responsibility than what she had.

13  We were friends.  She came to me for advice.

14    Q    What company was that?

15    A    If I remember correctly, it was Meracor Insurance.

16    Q    Is that part of the MeraBank family, to you knowledge?

17    A    To my knowledge, it was.

18    Q    And your educational background is in business and

19  finance, isn't that right?

20    A    Yes, sir.

21    Q    And when she spoke with you about this possible

22  move to Meracor, did that give you any concern?

23    A    No.

24    Q    Did you suggest, at least from your perspective,

25  that that was a wise move for her?

1  Milke's parents?

2       A    I'm not sure it was the month of October.  I did
3  meet them.

4       Q    All right.  That was down in Florence?

5       A    Yes, sir, it was.

6       Q    Did Christopher go with you?

7       A    No.  He was there.

8       Q    He was there?

9       A    Yes.

10      Q    And at that time of that visit you had occasion
11  to meet Richard Sam Sadeik?

12      A    Yes.

13      Q    And you knew that to be Debra's father?

14      A    Yes, sir.

15      Q    You met Maureen Sadeik?

16      A    Yes, sir, I did.

17      Q    And Karen?

18      A    I don't think so.

19      Q    You don't think you met Karen.  All right.  Up to
20  that point in time had you and Debra ever discussed marriage?

21      A    No, sir, we had not.

22      Q    At any time during your relationship with Debra
23  had you ever discussed marriage with her?

24      A    No, sir.

25      Q    Did she ever bring up the idea or the subject that

22

1    she wanted to marry you?

2         A    No, sir.

3         Q    Did you ever bring up the subject with her that

4    you did not want to marry her?

5         A    No, sir.

6         Q    Did you ever say to her, "Debra, I'm not interested

7    in marrying -- marriage because I do not want to be a father

8    to your son"?

9         A    No, sir, I did not.

10        Q    Do you recall reviewing just moments ago a narrative

11   report from Detective Saldate?

12        A    Just moments ago, yes, I did.

13        Q    Did you also review that on other occasions other

14   than today?

15        A    Yes, sir.

16        Q    Do you recall there being a passage in that report

17   suggesting that you had -- or that she had, rather, discussed

18   the subject of marriage with you?

19        A    I do recall reading that passage.

20        Q    And did that passage contain a suggestion that you

21   would probably be ready for marriage at a later stage in your

22   life?

23        A    It did say that, yes, it did.

24        Q    Did you tell that to Detective Saldate?

25        A    Yes, I did.

23

1    Q    Do you recall reading a portion of that passage

2    that said that you said, "Every time she spoke about marriage,

3    he told her", being you told her, "that she could go out and

4    find someone to marry -- should go out and find someone to marry

5    because she did not only need someone for herself, but needed a

6    father for her child"?  Did you tell that to Detective Saldate?

7    A    Yes, I did.

8    MR. RAY:  May I have a moment, Your Honor?

9    BY MR. RAY:

10   Q    Do you recall an interview being taken on September

11   10, 1990?

12   A    Yes.

13   MR. LEVY:  Your Honor, I would object if he is going

14   to refer to an interview because I have never been provided

15   by defense counsel a copy of such interview.  I have not read

16   such copy of that interview despite disclosure and do not have

17   one now by which I can follow any such questioning by Mr. Ray.

18   Therefore, I would object to this procedure.

19   MR. RAY:  Your Honor, may we approach the Bench?

20   THE COURT:  You may.

21   (Discussion at the Bench between Court and counsel.)

22   THE WITNESS:  Your Honor --

23   THE COURT:  Yes, sir?

24   THE WITNESS:  May I say something?

25   THE COURT:  You have to wait for a question.

24

1        THE WITNESS:  Okay.

2  BY MR. RAY:

3        Q    Sir, do you recall an interview taken on September

4  10th commencing at approximately 6:40 p.m.?

5        A    Yes, I did.

t2      6        Q    And at the time of that interview with you --

7        MR. RAY:  May I approach the witness, Your Honor?

8        THE COURT:  You may.

9  BY MR. RAY:

10        Q    -- were you given a copy of a narrative report prepare

11  by Armando Saldate?

12        A    Yes.

13        Q    All right.  If you would, refer to Page 1, first

14  page.

15        A    Okay.

16        Q    Do you see your initials anywhere on that document?

17        A    Yes, sir.

18        Q    Did you affix your initials to that document?

19        A    Yes, sir.

20        Q    And you did so in connection with identifying those

21  areas of that report which were not correct, isn't that right?

22        A    That is correct, sir.

23        Q    And did you not indicate on September 10, 1990,

24  the following, commencing on Page 15, line 9.  The first thing

25  it says here.  "Debra spoke about marriage on several occasions,

25

1  but he told her he was not ready for marriage at this stage

2  and would probably not be ready for marriage until later stages

3  in his life. This is not correct."

4          Is that what you said, sir?

5      A    Yes, it is.

6      Q    And it was in connection with that aspect of that

7  report, is that right?

8      A    Yes, sir.  To elaborate --

9      Q    No, sir.

10     THE COURT:  We have to wait for Mr. Levy to ask the question

11  to allow you to elaborate.

12     THE WITNESS:  Okay.

13  BY MR. RAY:

14     Q    Were you asked to identify any other portions of

15  that report which you found to be in error?

16     MR. RAY:  May I approach again, Your Honor?

17     THE COURT:  You may.

18     THE WITNESS:  Yes, I was.

19  BY MR. RAY:

20     Q    And were you asked to affix your initials to those

21  portions which you found to be incorrect in Detective Saldate's

22  narrative?

23     A    Yes.

24     Q    And how many different places did you do that, sir?

25     A    On five.

1  Q Five different places?  How many pages of the report?

2  A Four pages.

3  Q Sir, on how many actual occasions would you say

4 that you have seen Christopher in the company of Debra?

5  A That's a hard question to answer, sir.

6  Q More than ten?  More than 15?  A hundred?

7  A I would say more than 15, but less than 100.

8  Q Did Christopher hold Debra's hands on those occasions?

9  A Yes, sir.

10  Q Did you ever see an exchange of love between those

11 two?

12  MR. LEVY:  Objection, calls for a conclusion, lack of

13 foundation.

14  MR. RAY:  Withdrawn.

15 BY MR. RAY:

16  Q Did you ever see Debra hug Christopher?

17  A Yes, sir, I did.

18  Q Did you ever see Christopher hug Debra?

19  A Yes, sir.

20  Q On many occasions?

21  A Yes, sir.

22  Q The child was, in your opinion, fairly well dressed,

23 wouldn't you agree?

24  A Yes, sir.

25  Q He appeared healthy to you, didn't he?

1    A    Yes, sir, he did.

2    Q    You never noticed any bruises or unsightly marks

3 on any of his body?

4    A    No, I did not.

5    Q    And your observations of Christopher with Debra

6 was that he appeared happy when he was with his mother, isn't

7 that right?

8    A    Yes, sir.

9    Q    And she appeared happy to be with him?

10    A    Yes, sir.

11    MR. RAY:  No further questions.

12    THE COURT:  Redirect.

13    MR. LEVY:  Yes, Your Honor.

14    Thank you, Your Honor.

15

16                    REDIRECT EXAMINATION

17 BY MR. LEVY:

18    Q    With regard to the cross-examination questions

19 Mr. Ray asked of you, I would like the opportunity on redirect,

20 Mr. Sweat, and so I wish to cover some of those things that

21 were brought up.  When Debra worked for Lincoln National, she

22 had a photo of her son on her desk and photo of both of them

23 together.  Now, how long ago was this?

24    A    April.

25    Q    Of '89?

1   BY MR. LEVY:

2       Q    Now, you were asked several questions by Mr. Ray

3   about your statements to Detective Saldate in the interview,

4   is that correct?

5       A    Yes, sir, that is.

6       Q    Now, it says there are five items, is that correct?

7       A    Yes, sir.

8       Q    Is this one of the items?  "He said that Debra spoke

9   about marriage on several occasions, but that he told her he

10  was not ready for marriage at this stage and would probably

11  be ready for marriage at a later stage in his life.  He said

12  every  time she spoke about marriage he told her that she would

13  go out -- that she should go out and find someone to marry because

14  she did not only need someone for herself, but that she needed

15  a father for her child.  And that he did not fit that role."

16           Is that one of the items?

17      A    Yes, sir, it was.

18      Q    Now, on cross-examination you earlier said that

19  you did tell that to Detective Saldate.

20      A    That is true.

21      Q    And did you tell that in the context that that was

22  your perception?

23      A    No, sir.  What I said to Detective Saldate was exactly

24  that.  I did not -- I did feel she should find someone for her

25  to meet, someone that would make a husband for her and father

1 for her child.   However, in the context it is in that document,

2 it is in the context that we actually had -- that Debra and

3 I had actually had that conversation, which is not correct.

4 I told that to Detective Saldate, that is true.   But in the

5 context it is in that document, Debra and I had never had that

6 conversation.   And I will be very up front.   On cross-examination

7 I had misunderstood the question and I did say what I said

8 originally was incorrect, and I want to clarify that at this

9 point.

10      Q     Okay.   Have you done that or --

11      A     Yes.   That's what I'm attempting to do right now.

12      Q     So you did say and he did report that accurately

13 as far as your telling him that?

14      MR. RAY:   Objection.

15      THE COURT:   Objection overruled.   The witness will be

16 allowed to explain his answer.

17      THE WITNESS:   I did tell him that.   I had that conversation

18 with Detective Saldate.   That was my impression.   However, the

19 way it is in that report is that it was a conversation that

20 I had with Debra, and it was not a conversation we had.   It

21 was what I told him was my perception.

22 BY MR. LEVY:

23      Q     Thank you.

24      Now, by the way, I would assume this is the last

25 place you would want to be, to be a witness here, is that so?



1    A    Yes, sir, that's safe to say.

2    Q    When Detective Saldate contacted you about this

3 interview, were you somewhat nervous about the fact that

4 perhaps you might have to testify?

5    MR. RAY:  Objection, leading, exceeds the scope of

6 cross-examination.

7    THE COURT:  Overruled.

8    THE WITNESS:  Yes, sir, that is true.

9 BY MR. LEVY:

10    Q    So would you say during the course of this interview

11 you were somewhat nervous?

12    A    I was quite nervous.

13    Q    Now, is this another area of the five?  "He said

14 he thought Chris had been neglected by her and he was telling

15 her that she should spend more time with him"?

16    A    That is one of the notes that I made.

17    Q    Did you tell that to Detective Saldate?

18    A    I told Detective Saldate as perception on my part.

19 However, it was listed in that report as a conversation, as

20 conversation that I had had with Debra, and that's not correct.

21    Q    And is this another area?  "Ernie said the last

22 he spoke to her was Thursday after Thanksgiving.  He said she

23 called the office and for some reason they let the call go throu

24 and he answered the phone."

25    And was there some correction there?

37

1    A    Yes, sir, there was.

2    Q    And that was?

3    A    I talked to her at home, not the office.

4    Q    Not at the office?  So it's at home?

5    A    Yes.

6    Q    Other than that?

7    A    That's all.

8    Q    No problem.

9         Is this the fourth one?   "He said that weekend

10   he spent with another girl at a hotel and didn't get home until

11   Sunday evening."

12        Was that another item?

13   A    Yes, sir, it was.

14   Q    And what was that?

15   A    I did not -- I was not camped up in a hotel with

16   another girl that weekend.

17   Q    Did you mean to communicate you just were out with

18   a girl?

19   A    I was just -- I was away from home, but not in a

20   hotel.

21   Q    And then the other item.  Is this the final item,

22   being five?  "He said he knew it was going to be tough to break

23   up with Debra and in fact he had spoken with his roommate, who

24   is a little older than he is, for advice.  He said the roommate

25   was the one who gave him the advice about having his office tell

1  her when she called that he was not in.  He said his roommate's

2  advice was that he could do that to begin to break up the

3  relationship, but that he would later have to tell her that

4  it was over."

5      A    Yes, sir, that is another one.

6      Q    And what is the problem there?

7      A    It's true that my roommate is older than me.  However,

8  as far as having my calls screened at work, that was my idea.

9  It was not the advice of his.  It was not his advice.

10     Q    And as a matter of fact, it was your roommate who

11  screened your calls at home?

12     A    Yes.

13     Q    Now, have I covered the five areas?

14     A    Yes, sir, you have.

15     Q    And I provided a copy of this report to you before

16  Mr. Ray interviewed you, is that correct?

17     A    Yes, sir, that is correct.

18     Q    As a matter of fact, how was it that that interview --

19  did you bring up to me that he wanted an interview?

20     MR. RAY:  Objection, irrelevant, exceeds the scope of

21  cross.

22     THE COURT:  Overruled.  The witness may answer.

23     THE WITNESS:  The fact that -- yes.

24  BY MR. LEVY:

25     Q    You had already been interviewed by a Kirk Fowler,

*Interview*

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | ) |
| Plaintiff, | ) |
| vs. | ) CR 89-12631 |
| DEBRA JEAN MILKE, | ) |
| Defendant. | ) |

Phoenix, Arizona
June 15, 1990
2:05 o'clock p.m.

TRANSCRIPT OF PROCEEDINGS

Interview of Henry Milke

APPEARANCES:

Mr. C. Kenneth Ray II
Attorney for the Defendant

Mr. Noel Levy,
Deputy County Attorney
For the State

Mr. Tom Buckner
Investigator

COPPERSTATE REPORTING SERVICE, INC.
1836 East Thomas Road
Phoenix, Arizona 85016
(602) 266-2601

Roxanna Neier - Transcriber

COPY

67

1    Q    That's reported as being said.  Does that sound

2    like anything Mark had ever said in your presence?

3    A    You know, I tell you what, it kind of seems to me

4    like that kind of behavior -- he would probably only do it

5    in the presence of oh, let's say judge, police, any law

6    enforcement officer because like I said before, it's

7    convicts carry a certain thing against any law enforcement,

8    anything that's law enforcement.  They think they're right

9    in their own rights and they're wrong.  You know, I mean.

10   So it's possible to make these kind of threats to get things

11   his way, that's what I'm trying to say.

12   Q    Do you know a man by the name of Detective Armando

13   Soldante?

14   A    Just by the name, you know, oh, yeah, I spoke over

15   the phone with him, you know.

16   Q    When did you speak with him over the phone?

17   A    Oh, he constantly called me and relayed messages

18   to me about the oh, -- well, when this thing was published

19   in the National Inquirier on January the 8th a lot of this

20   foreign, you know, journalists, one or two had the story.

21   And the Inquirer wanted the syndication rights. I refused

22   anything at all.  That I told them -- that's not bringing

23   the child back, forget it.  But Soldante -- they called the

24   Phoenix Police Department and since Soldante's name was

25   mentioned in the Inquirer they asked for him and he gave me



68

1   all those phone numbers.

2           And there's a few other times, yes, I mean, you

3   know, we talked about --

4       Q    Hold on.

5       Q    You know now I remember since you asked me about

6   the first time I saw or talked to Soldante. You know that

7   was one of the Phoenix radio stations had this on the air.

8   Somebody by the name of Peterson broadcasting K something, I

9   don't know the name.

10      Q    KFYI?

11      A    KF - I - it was something like that.  Anyway, you

12  know, he sounded like a good-natured guy to talk to over the

13  phone but all he was was nosing around but at the time I

14  didn't catch it quick enough.  But he played it out there

15  that I said something about life insurance policy.

16  (Inaudible) heard of it.  And also when I said it on TV.

17      Q    Yes.

18      A    Soldante called me about this.  But he only called

19  me not after it was on TV, he called me after it was on the

20  radio too.  And he started to give me hell about it, how

21  could I make such a statement and where I heard it.  Never

22  mind where I heard it from I said.  I have ways to find that

23  out and I know it so then I asked him well, do you have any

24  children and he says yeah.  If one of your children was

25  killed how would you act, the same.  So did I do something



1   wrong?  No, sir, you didn't.  So we'll call it quits.  He

2   said yep, leave it alone.  People like you or the law don't

3   understand what we people have to go through in a moment

4   like this.  I didn't feel, you know, he should talk to me

5   like that.

6           Maybe I wouldn't have said it.  But at that time

7   you're not even thinking.  The news media is sharp, fishing

8   for things like this.  So I don't know if it's a big deal

9   what I said or not.  I tell you -- (inaudible).

10          (Unrelated colloquy)

11      Q    Okay.  Continue Mr. Milke.

12      A    No, I mean (inaudible) I obviously, you know, not

13  that one was shown to me, you know, but she worked that

14  obviously she had to have one.  But no, like I say this

15  certain police officer he searched and he found out from the

16  department from the investigating department that there's a

17  life insurance policy involved.  Now that made me mad

18  because over a lousy -- I don't care how many dollars.  To

19  me it would have to be a million dollars to  make it

20  worthwhile to take somebody's life.  You don't take

21  somebody's life for $5,000.  I couldn't understand it.  But

22  that even made me more mad.

23      Q    Were these officers, sir, suggesting to you that

24  that was the motive?

25      A    I'm not saying officers.

6-22-98

To: Judith Radulovich

From: James L. Styers (Jim or James is OK)

Dear Judith,

I received your Letter today.
My address is: James L. Styers #82792
Arizona State Prison
ADC - E - SMU II
P.O. Box 3400
Florence, Arizona 85232

Thank you for helping to prove Debra Jean Milke's innocence. And that Detective Armando Saldate did lie. Debbie is innocent and I don't believe she did confess. I would like to communicate with you. And I would like for you to send me the four very pertinent statements contained in the police report that amazed you and Debra's defense team. I wrote my attorney Robert W. Doyle give him my permisson to discuss my case with you if he thought it would help us.

6-22-98

I have not seen my trial transcripts as of yet. So please let me know what you think after you get to read them.

I do not remember what Roger's appearance was as far as what he was wearing. But I do remember him being nervous about something, but he did seem nervous a lot of the time so I did not pay to much about it.

If you have heard back from Randy Suckow yet I would like to know what he said.

And are working with Debbie's mother?

Thank You
May God Bless
James L. Styer #82792

Letter from Jim Styers to a lady in England

4-1-98

Hi Olga,

Got your letter telling me that you heard some news about Debbie and you want me to tell you about her arrest. I will do my best to let you know what I know and as God as my witness this is the truth.

You are right she did not set the whole thing up. She did not set anything up. Neither Debbie or I know or wanted this to happen, I don't know about Roger. When they arrested Debbie she was charged with first-degree murder, kidnapping, conspiracy to commit first-degree murder and child abuse. The same charges as me. And just like me she was found guilty of all of the charges. But on appeal they dropped the charge of child abuse for both of us. Roger was charged with everything except child abuse, he was found guilty of them all also.

Debbie had nothing to do with it and that's the truth.

There is nothing I can do to help her except to trust in God and

to Keep praying for her. Since I have been convicted of the same crimes my words do not mean anything. And if the Lord Leads me to do something then I will do all I can.

The same day I got your letter I got some mail from my Lawyer saying that a reporter for Phoenix Magazine is writing an article about Debbie and that he wants to talk to me about it. But I do not trust any reporters to tell the truth so I refuse to talk to them about our case's. If there is some way that you can help please keep asking me anything and I will answer them the best I can.

You should have gotten the last letter I wrote you by now and nothing has changed much since the last letter. I asked my attorney to send me a copy of the article about Debbie but I don't know if he will. Please tell all I said Hi, and pat Benny for me.

Love Always
In God we trust
Jim

EXH# 41

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

COUNTY OF MARICOPA

STATE OF ARIZONA,        )
                         )
          Respondent,    )
                         )        CR 89-12631
     v.                  )
                         )
DEBRA JEAN MILKE,        )        AFFIDAVIT
                         )
          Petitioner.    )
                         )
_____)

My name is Kenneth Ray.  I am over the age of eighteen.  I have never been convicted of a felony and I am competent to make this affidavit.  I have personal knowledge of the facts stated in this affidavit, and if called to testify, under penalty of perjury, I would testify to the following:

1.  I am an attorney, licensed to practice in the State of Arizona.

2.  I was licensed to practice law in the State of Arizona in 1984.

3.  I was the attorney who represent the Petitioner, Debra Jean Milke in the above cited case.  I represented her throughout the trial phase of the case.

4.  I was appointed by the court to represent her several days after her arrest.  I concluded my representation of her shortly after sentencing.  I did not represent her on appeal.

5.  ·I have handled approximately 600 criminal cases prior to Debra's case.  I have tried approximately 60 criminal cases prior Debra's case.  I have tried one death penalty cases prior to representing Debra Milke in this case.

6.  I was never made aware of a State's witness by the name of Dorothy Markwell until October 4, 1990, the day the prosecutor advised the Court that he had just became aware of a new witness he wanted to call in rebuttal.  He indicated to the Court that he had became aware of this new witness through conversations with another witness, several days earlier.  This was after Debra Milke had testified and I had rested my case.  I subsequently found out that Dorothy Markwell had been contacted by Detective Armando Saldate approximately four months prior to trial, and that Ms. Markwell had been subpoenaed by the State for the trial, but was released from her subpoena just prior to the trial.  I

brought this to the Judge's attention through a motion to bar her
testimony.  The Judge ignored the lie perpetrated on the Court by
the prosecutor and ruled that the prosecution could call her as a
rebuttal witness.  I interviewed her on the 5th of October, 1990
and was given until the 9th of October to obtain any information
I could on her.  However, the 6th and 7th was a weekend, and 8th
was a holiday, therefore, I did not have sufficient time to
investigate her background, motives and credibility.  I could not
obtain any meaningful information from her during the interview
on the 5th, because she was so hostile.

7.  I was not allowed by the Court to impeach Detective
Saldate with the fact that he falsified his election campaign
form by putting down a false address.

8.  I have read Sections I, II, and III of the Post
Conviction Relief Petition file in Debra Milke's case, to refresh
my memory.  I found all the facts contained therein true, and all
the allegations contained therein accurate.

9.  I have read and understand <u>Strickland et al. v.
Washington</u> 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d. 674 (1984).

10.  It is my opinion that my representation of the defendant
in this case was ineffective, based on the holding and reasons
for the holding in <u>Strictland et al. v. Washington</u>. <u>Id</u>.  Further,
it is my position that my ineffective representation of Debra
Milke was caused by the separate and joint conduct of the judge
and prosecutor in this case.

11.  If I were:  a. given sufficient money to investigate
this case properly, b. allowed to fully cross-examine the
state's witnesses in this case, c. allowed to obtain and call
the witnesses I wanted to, d. provided critical discovery, in a
timely manner, e. not blocked by the court in obtaining
information beneficial to the defense, f. treated fairly by the
court in the trial of this case, g. given the flexibility I
needed to prepare and present a defense in this case, by the
court, the outcome would have been different.

12.  It is my opinion that the Judge in this case was
extremely bias toward the prosecution, based on her conduct
throughout the proceedings and the serious improprieties set out
in the Post Conviction Relief Petition filed in this case.

Further affiant saith not.

VERIFICATION


KENNETH RAY, being first duly sworn, under penalty of
perjury, upon his oath deposes and states:

That he has read the attached affidavit and all facts
contained therein (paragraphs 1 - 12 inclusive) are true.

_____
KENNETH RAY


SUBSCRIBED AND SWORN to before me this 30ᵗʰ day of
September, 1995, by Kenneth Ray.


_____
NOTARY PUBLIC



OFFICIAL SEAL
JACQULYN S. BEBEE
Notary Public - State of Arizona
YAVAPAI COUNTY
My Comm. Expires April 18, 1998



Office Distribution
MCSO                X

DISPO  X

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED          PROCESSED

FEB 20 '90        FEB 21 '90

Clerk of the Court    DIST. CENTER

CLERK OF THE COURT

2-13-90

CHERYL K. HENDRIX

K. Abbott
Deputy

NO. CR89-12631

STATE OF ARIZONA

v.

DEBRA JEAN MILKE

County Attorney
By:  Noel Levy

C. Kenneth Ray, II

Jesse Miranda

Roland Steinle, P.D.

Crim. Court. Admin.

The Court having inquired of the Court Administrator's office as to whether an investigator had been appointed to help Mr. Ray in the investigation of this matter, the Court was informed that a request was made to Judge O'Toole on 12-6-89 and that Kirk Fowler was appointed as the investigator in this case.  However, no minute entry was made memorializing this fact.  Therefore, this minute entry is to memorialize the fact that Kirk Fowler was appointed to aid Mr. Ray in this matter.

Upon consideration of the defendant's Ex Parte Application for Travel Authorization,

IT IS ORDERED authorizing the court-appointed investigator to travel to Ft. Hood and/or Killeen, Texas, in connection with the investigation in this matter.

The Court Administrator for the Superior Court of Maricopa County shall arrange and pay for round-trip airline transportation, rental car charges and hotel accommodations as necessary in connection with said travel.

Order signed this date.