5-10-90

Ken -

I sent all of my creditors a letter like the one enclosed. I know you are only working on my case but I wondered if you could have a letter typed up with your letterhead explaining my situation. I mailed these people a letter back in March and this is the response I get. I also gave them your address telling them if they had any questions to please write. I also gave them my address here at Durango but they still send my mail up to Wyoming. My sister had my mail forwarded and every couple of months, she forwards my mail to me.

I know I have bigger problems than this, but I would still like to preserve my credit a little bit if I could. This is the only account that bothers me. The rest all wrote me back giving me an extended 6 months.

I'm starting to feel real strange in here. I have some guys

in here on major charges. One girl got convicted of murder and another girl is in here on child abuse. What I'm saying is that here I am dealing with some heavy shit emotionally and these girls don't care one way or another. My feelings are coming out more often and its very painful. I'm sick of hearing about prison life & like its a college dorm. The girl in here for child abuse burned her 4 yr old daughter with a lighter. I hate being around her because she acts like its no big deal while I'm in here for something I didn't do and I hurt. I loved Christopher with all my heart. Then theres people in here trying to commit suicide. I just want out so bad because I don't belong here.

I'm scared if Mark gets ~~subpeonaed~~ subpeonaed, he will leave Arizona and not show up. I know you have all the evidence to get me acquitted and if Levy would pull his head out of his ass, I could help him nail Roger & Mark. This just seems so endless.

the other day that might be beneficial to us. There's a woman I worked with whom I took smoke breaks with all the time. Prior to all of this, I used to tell her how frightened I was of Mark and that he was acting real strange. I told her I just felt like he was going to do something to me. She knew about me wanting to move to Tempe to get away from him. She knew how scared I was. We talked everyday. Her name is Rosemary Houston. Everyone I worked with in my dept knew about me getting a restraining order because Mark threatened my life. Maybe she can help.

I'm trying to think of everything I can to try and help me get out of here. I just pray that June 1 is my day. I've held on pretty strong so far and I really can't say how I'll be during a trial. I'm scared of the system Ken. But Dr. Garcia told me it is highly unlikely for an innocent person to be convicted. Kirk told me to go ahead

and make plans for my future but its depressing because life in prison always hangs over my head. Sorry I'm rambling on but it helps to talk to someone. You and Kirk are all I've got. Ken— I just want out of here and Az.

Anita told me you're a damn good lawyer and so have a few guards downtown. I have faith in you but not the system.

Please come and see me soon.

Thank you!

Debra Milke

1  Michael D. Kimerer, #002492
2  Lori L. Voepel, #015342
   Kimerer & Derrick, P.C.
3  221 East Indianola Avenue
   Phoenix, Arizona 85012
4  Telephone: 602/279-5900
   Facsimile: 602/264-5566
5  Attorneys for Petitioner

6

7
                 IN THE UNITED STATES DISTRICT COURT
8
                        DISTRICT OF ARIZONA
9

10  DEBRA JEAN MILKE,          )      No. CV-98-0060-PHX-RCB
                               )
11          Petitioner,        )
                               )
12  v.                         )
                               )        **AFFIDAVIT**
13  TERRY STEWART, et al.,     )
                               )
14                             )
            Respondent.        )
15  _____)

16

17      My name is Patricia Prust.  My maiden name was Patricia

18  Bacon.  I am over the age of eighteen years and have personal

19  knowledge, which forms the basis for this affidavit.  I have

20  never been convicted of a felony, and I am competent to make

21

22  this affidavit.  If I was called to testify, under penalty of

23  perjury, I would testify to the following:

24      1.   I attended Cortez High School with Debbie Milke.

25           Debbie and I were close friends through all four

26           years of high school.  We also lived together in 1983

27           after high school while Debbie and I attended

28           community college.  We shared an apartment with

                                  1

another high school friend, Robin Ziluck, which Renate, Debbie's mother, rented to us after her return to Germany.

2.  Debbie and I both worked together while in high school at the Greenway Sheraton Hotel.  One day we were over 90 minutes late to work because someone had hit a dog. Debbie refused to leave the dog to die on the side of the road and insisted we take the dog to a vet.  This illustrates the kind of person I know Debbie to be.

3.  When we lived together, Debbie, Robin and I went out one evening with another girlfriend to a club where Debbie met Mark Milke, who later became her husband.

4.  In 1984 I got married and left Arizona.  I returned to Phoenix in May 1985.

5.  When I returned to Phoenix, Debbie was pregnant with Christopher.  I remember Debbie being very happy about being pregnant.  Debbie drove both Robin and I "up the wall" because she acted as if she was the first woman to ever be pregnant.  Debbie acted like she had done something unique, but that was okay because she was just proud of her accomplishment.  I continued to see Debbie off and on throughout her pregnancy.  When I learned what Mark said after

2

Christopher's death about how unhappy Debbie was about having a baby, I knew that was absolutely false, as Debbie was constantly boasting to us about it.

6.   After Debbie gave birth to Christopher, I still saw her on occasion.   The last 2 years before Christopher's death I saw Debbie approximately a dozen times.   She also called me periodically and told me that it was hard being a single mother, but she said she would never let Mark hurt her son like he hurt her.

7.   Just two months prior to Christopher's death, I saw Debbie at The Boulevard.   I asked Debbie how Christopher was doing, and she went on and on about how smart Christopher was and how he excelled at everything.   Debbie was clearly very proud of Christopher.   She suggested that we get together soon so that our children could play together.

8.   Debbie also told me then that her relationship with Mark was over for good, and that she had moved on with her life.   Debbie seemed to be doing well.   It seemed like the previous few years that had not fared well for her were in the past.

9.   I learned of Debbie's arrest on the radio in 1989 while driving to work.  I initially thought it was strange for someone to have the same name as Debbie's and Christopher's.  When I arrived at work, I went to the reception area, picked up the newspaper and saw Debbie's picture in the newspaper.  I was so shocked that I collapsed.  I immediately left work and called Robin, who had moved to New York.  Robin and I sobbed together during our telephone call.

10.  The second person I called when I learned of Debbie's arrested was my father.  My father stated that he could not believe that the Debbie he knew was capable of killing her son.  Even though Debbie and I had not spent as much time together as we had in high school and when we lived together, I knew Debbie like she was my sister.

11.  I attended Christopher's funeral.  I spoke with Mark and Debbie's sister, Sandy, and told them this had to be a mistake.  They claimed that it was true.  After I left the funeral, I called Robin in New York and told her this was a mistake, and it could not be true.

12.  My father suggested I contact Debbie's defense attorney to see if I could help.  I saw Mr. Ken Ray's

4

name in the newspaper and called him several times to offer my assistance.  He never returned my telephone calls.  I followed Debbie's case in the newspaper and television, but never contacted Debbie directly until July 1998, when I wrote to her about my memories and concerns.

13.  To this day I do not understand how Debbie could have been arrested for or convicted of Christopher's murder.  I have never believed Debbie was guilty of this horrible crime.

14.  I am familiar with the relationship that Debbie had with her sister, Sandy.  I believe that what Sandy stated in her testimony about Debbie was because she thought in her mind that for once in her life, she could be the "good sister."

15.  I believe Dorothy Markwell was never an honest person, and I always felt that Dorothy was jealous of Debbie.  Dorothy was into drugs when I knew her.  She supplied high school kids with a place to party. Debbie always trusted Dorothy, and I remember when Debbie sold her car and moved to Colorado to live with Dorothy the first time to get away from Mark.  I happened to be home for a visit and told Dorothy that I thought she was wrong to trust Dorothy.  I believe

that what Dorothy stated in her testimony about Debbie was unreliable, as I question her motivation.

16. I have been haunted by Debbie's conviction. I have shared my belief with people over the years, and I have been told that I was wrong. However, none of those people knew Debbie. They do not know the Debbie that I ran around with in high school and lived with after graduating high school. They do not know the Debbie I knew and witnessed until just shortly before Christopher's death.

AFFIANT FURTHER SAYETH NAUGHT.

_Patricia Prust_
PATRICIA PRUST

STATE OF ARIZONA     )
                     ) ss.
County of Maricopa   )

SUBSCRIBED AND SWORN to before this 29th day of May, 2002.

_Tracy S McRae_
Notary Public

TRACY S. MCRAE
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
October 20, 2003

6

1 | Michael D. Kimerer, #002492
2 | Lori L. Voepel, #015342
   | Kimerer & Derrick, P.C.
3 | 221 East Indianola Avenue
   | Phoenix, Arizona 85012
4 | Telephone: 602/279-5900
   | Facsimile: 602/264-5566
5 | Attorneys for Petitioner
6 |
7 | IN THE UNITED STATES DISTRICT COURT
8 | DISTRICT OF ARIZONA
9 |

DEBRA JEAN MILKE,                    )    No. CV-98-0060-PHX-RCB
                                     )
          Petitioner,                )
                                     )
v.                                   )
                                     )    **AFFIDAVIT**
TERRY STEWART, et al.,               )    **(Re: Markwell)**
                                     )
          Respondent.                )
_____)

My name is KIRK FOWLER. I am over the age of eighteen years and have personal knowledge, which forms the basis for this affidavit. I have never been convicted of a felony and I am competent to make this affidavit. If I was called to testify, under penalty of perjury, I would testify to the following:

1. I work full time as a private investigator. I was licensed to practice in the State of Arizona in 1987. The majority of my work is in the area of criminal law.

1

2.    My training and experience are set out in the herein attached resume, which I incorporate as a part of my affidavit.

3.    The first time I spoke to Dorothy Markwell was when she was residing in Colorado prior to trial.   Dorothy was not particularly friendly but she was not rude.

4.    Dorothy told me that Debra would throw Christopher against the wall when she got angry with him.   Dorothy could not tell me how many times this happened.

5.    After my conversation with Dorothy I personally spoke to numerous daycare providers for Christopher, including people from Mary Moppets Pre-School and the Day Bridge Learning Center.   I also spoke with every medical physician who treated Christopher, including Dr. Zuerlein, Christopher's attending physician before his thyroid surgery, and Dr. Tefteller, Christopher's doctor, who examined him prior to and after surgery. None of the foregoing providers gave me any indication that Debra mistreated Christopher, or that any signs of abuse existed.   In fact, the daycare providers and medical personnel told me that Debra was a kind and caring mother.   I could find no evidence to corroborate Dorothy Markwell's claim that Christopher was abused.

6. The second time I spoke with Dorothy Markwell was during Debra's trial. Mr. Levy decided to call Dorothy as a last minute witness at trial. Mr. Ray, Debra's attorney at the time, objected to Mr. Levy calling Dorothy as a witness because he did not list her as a potential witness prior to trial. Mr. Ray asked Mr. Levy why Dorothy was not previously listed as a potential trial witness. Mr. Levy stated that he had just located Dorothy.

7. I immediately turned to Dorothy and asked her when was the first time you were contacted by the State. She told me it was approximately six months prior. I asked Dorothy about the second time the State contacted her and she told me it was approximately three months prior. I asked Dorothy about the third time the State contacted her and she told me it was approximately one month prior. I asked Dorothy about the fourth time the State contacted her and she told me it was about two weeks prior. Dorothy told me that the week before she came to Phoenix to testify, the State called and told her that she was not needed. They called again the day before she arrived in Phoenix asking her to come testify.

3

8.   Mr. Levy became angry and stated that the Phoenix Police Department did not make him aware of Dorothy until the day prior to her arrival.  The two Phoenix Police Officers who were present in the courtroom looked down and seemed embarrassed.

AFFIANT FURTHER SAYETH NAUGHT.

KIRK FOWLER

STATE OF ARIZONA      )
                      ) ss.
County of Maricopa    )


SUBSCRIBED AND SWORN to before this 23rd day of May, 2002, by KIRK FOWLER.

Tracy S. McRae
Notary Public

My Commission Expires:

TRACY S. MCRAE
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
October 20, 2003

4

# William S. "Kirk" Fowler

Owner Kirk Fowler Investigations
Arizona License # 8703004
7845 East Evans Road Suite F
Scottsdale, Arizona 85260
Phone (480) 443-4740  Fax (480) 443-0529

## INVESTIGATIVE WORK HISTORY

1960-65 U.S. Border Patrol. Stationed in Arizona, Texas and Washington. Actively involved in investigating, arresting and prosecuting alien smuggling groups operating out of Mexico.

1965-69 Immigration & Naturalization Service Investigative Division. Stationed in New York City and Los Angeles. Investigated aliens that were involved in criminal, immoral and narcotics violations as well as fraudulent claims of U.S. Citizenship.

1969-86 U.S. Drug Enforcement Administration. Stationed in Los Angeles, New York City, Washington D.C., Mexico City, Dallas and Phoenix. Specialized in conspiracy investigations.

Inaugurated the DEA office at JFK International. Responsible for everything from office space and set-up to coordination with foreign counterpart offices as well as being responsible for developing DEA systems and procedures unique to the airport environment.

Mexico City: Responsible for the DEA intelligence network in Mexico and Central America. Dallas: Responsible for intelligence for a seven state area. Developed and implemented procedural systems in maritime, aerial and land smuggling that are still being used. Phoenix: Responsible for enforcement, intelligence and task force groups as well as the marijuana eradication campaign for the state of Arizona.

1986-Present Private Investigator: Worked background, industrial espionage, financial, medical malpractice, pre-investment, homicide and rape investigations.

## LANGUAGE SKILLS

Speak, read and write Spanish. Attended the Border Patrol Academy as well as the State Department Spanish course. Stationed in Mexico City for 1 & ½ years.

## EDUCATION

BA in history with a minor in Social Psychology.

## OTHER SKILLS

Over 40 years experience in the Martial Arts, currently a 6th Degree Black Belt in Ki Aikido. Taught self-defense, arrest techniques, intelligence, undercover work and raid planning at DEA National & International Academy as well as various state & local training academies. Taught the governor's security detail and various corporate security groups.

C. KENNETH RAY II, P.C.
45 W. Jefferson, Suite 810
Phoenix, Arizona 85003
253-3875
STATE BAR #009810

JUDITH ALLEN, CLERK
BY _____ DEP

FILED

90 OCT -5 PM 7: 55

Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

|  |  |  |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff | ) | NO: CR 89-12631 |
| | ) | |
| v. | ) | MOTION FOR SANCTIONS |
| | ) | (Rule 15.7, A.R.Cr.P.) |
| DEBRA JEAN MILKE, | ) | |
| | ) | |
| Defendant | ) | (Oral Argument Requested) |
| | ) | |

The Defendant, by and through her attorney undersigned, respectfully moves this Honorable Court to enter an Order imposing sanctions pursuant to Rule 15.7, Arizona Rules of Criminal Procedure, and, specifically, sanctions in the form of precluding the State from calling rebuttal witnesses and/or precluding the State from calling Dorothy Markwell as a witness in this Cause.

This Motion is made upon the grounds and reasons set forth in the following Memorandum of points and Authorities and upon such argument as may be presented at the hearing hereon.

DATED: October 5, 1990

C. Kenneth Ray II
Attorney for Defendant

//

107

## MEMORANDUM OF POINTS AND AUTHORITIES

On October 4, 1990, leave was granted to the State, over objection by the Defendant, to call one Dorothy Markwell as a rebuttal witness. In requesting leave to call Mrs. Markwell, the State advised that: (1) Mrs. Markwell was a newly discovered witness in Colorado; (2) that the need for her testimony was discovered through the Deputy County Attorney's conversation with one Susan (Suzie) Stinson; (3) that Mrs. Markwell's information related to specific instances of alleged conduct occurring between August and late October, 1988 (fully 14 months before the incident giving rise to the charges the Defendant now faces); (4) that Mrs. Markwell had been located at or near the commencement of the Trial (September 10, 1990) by a representative of the Victim Witness Program. In granting the State leave to call Mrs. Markwell, opportunity was afforded to the Defense to interview Mrs. Markwell. Said interview was conducted on October 5, 1990.

In the interview with Mrs. Markwell, the following information was disclosed: (1) that she had been contacted by the principal investigating Detective (Det. Saldate) in April or May, 1990 by way of a telephone call to her residence in Nevada; (2) that she was contacted by Sharon Callahan of the Victim Witness Office on the day the Trial started;      (3) that she was contacted again by Sharon Callahan a few days later and advised that her testimony would not be needed; and (4) that her first conversation with Deputy County Attorney Noel Levy took place on October 4, 1990.

Also on October 5, 1990, the Defense contacted Susan (Suzie) Stinson who advised that she had, on previous occasions, referred the Government to Dorothy Markwell.

Contact was also made on October 5, 1990 with Sharon Callahan of the Victim Witness Office who advised that she had contacted Mrs. Markwell on September 10, 1990 and then, a few days later after speaking with Mr. Levy (who advised that he would not be calling her as a witness), recontacted Mrs. Markwell by leaving a message upon Mrs. Markwell's answering machine to advise that she would not be

107a

called as a witness.

Until Mr. Levy contacted counsel for the Defendant on October 4, 1990 at 9:00 a.m. to advise that he would be seeking leave of Court, the Defense had no idea or indication that she was a potential witness for the State. Her full name had only been listed in a report prepared by Detective Saldate in connection with his interview of Sandra Pickinpaugh which occurred on June 30, 1990; the extent of the reference to Dorothy Markwell being as follows:

> She [Sandra] said that Sandra [sic: probably meaning Debra]
> convinced an old boyfriend to give her money because she was
> going to get her life straight but instead she used the money
> to go Colorado (sic) to visit a family friend by the name of
> Dorothy Markwell.

No information was contained in the report concerning the location or whereabouts of Dorothy Markwell. Investigation by the Defense in connection with the name of Dorothy Markwell did not disclose anything as to her whereabouts in Colorado. Not until the tape of the interview between Ms. Pickinpaugh and Det. Saldate was Ordered produced during the Trial was it learned that Mrs. Markwell might reside in Henderson, Nevada...such information being contained in the tape but not reported by Det. Saldate in his narrative.

The only other mention of the State's "newly discovered witness" was a reference to a "Dorothy" and "Colorado" in Defense interviews of Mark Milke and Ilsa Milke.

A review of the Court file on October 5, 1990 disclosed that at no time did the State file a list of rebuttal witnesses. Rather, there was the initial filing of the State's List of Witnesses and Exhibits followed by two filings of "Add-On" witnesses; all of which occurred subsequent to the Defendant's filing of her Rule 15.2 Notice of Defenses and Witnesses

Further, the Court's file fails to show any filing by the State of a list of prior acts of the Defendant which it intended to use for such purposes as set forth in Rule 15.1(a)(6), Arizona Rules of Criminal Procedure.

107b

AUTHORITY AND ARGUMENT:

Rule 15.1(a), Arizona Rules of Criminal Procedure, requires the State to identify, within ten (10) days following Arraignment, all things set forth in subsections (1)-(7), inclusive. The State failed to comply within the time required by the Rule and required a Court Order for the State to file its List of Witnesses and Exhibits. At no time did the State comply with the provisions of Rule 15.1(a)(6) which provides that the State provide to the Defense:

> A list of all prior acts of the defendant which the prosecutor will use to prove motive, intent, or knowledge or otherwise use at trial.

In addition, the State never filed disclosure required pursuant to Rule 15.1(f), Arizona Rules of Criminal Procedure, which provides:

> Upon receipt of the notice of defenses required from the defendant under Rule 15.2(b) the state shall disclose the names and addressesof all persons whom the prosecutor will call as rebuttal witnesses together with their relevant written or recorded statements.

Compliance with the foregoing Rules are of absolute necessity in that such are determinative of whether a Defendant will or will not take the stand and give testimony in their own defense. Thus, compliance is of Constitutional proportions in terms of Due Process and the Right to Remain silent and refuse to testify at Trial.

In this case, the State has known all along of the location and information possessed by Dorothy Markwell. Instead of disclosing such information which has been known since at least April or May of 1990, the State, and its Officer(s)/ Agents have engaged in a course of conduct designed to keep such information from the Defendant and then, after the Defendant takes the stand and testifies in her own defense, springs forward with the witness under a claim that the witness and her information is "newly discovered". The integrity of this claim is so thin as to be absurd.

In State v. Smith 140 Ariz. 355, 681 P.2d 1374, appeal after remand 146 Ariz. 325, 705 P.2d 1376 (1984), four criteria for the determination of whether the

107d

sanction of preclusion of an undisclosed witness should be imposed was established. They are: (1) how vital the witness is to the case; (2) whether the opposing party will be surprised; (3) whether the discovery violation was motivated by bad faith; and (4) any other relevant circumstances bearing upon the issue.

In this case, it is the Defendant's position that the information to which the State proposes to have the witness testify is very remote; i.e. relating to a period of time between August and November, 1988 which has no relevant bearing upon the Defendant's motive, intent or mental state at the time of the incident in question. At the same time, it is, under the standards of Rule 403, Arizona Rules of Evidence, legally irrelevant and substantially more prejudicial than probative. Further, it is clear that the Government desires such evidence to be admitted to establish that the Defendant's character in 1988 was inconformity with her alleged character on December 2, 1989; i.e. that she was acting in conformity therewith. Such evidence is barred as inadmissible pursuant to Rule 404(b), Arizona Rules of Evidence, and so remote as to be irrelevant in connection with any purpose allowed in exception to the rule of preclusion.

As to the matter of surprise to the Defendant, such is an understatement. In reliance upon the fact that the defense could not locate Mrs. Markwell once the name became known (on or about June 30, 1990 following the release of Det. Saldate's narrative report), and upon the fact that the Government neither listed her as a witness nor filed any list of rebuttal witnesses nor list of "prior acts" evidence/ testimony, the Defendant elected to testify. Then the State identifies a person and her location which had been known to the State since at least April or May of 1990 in the middle of the State's cross-examination of the Defendant can be nothing short of "surprise" and prejudicial to the highest magnitude.

Under the facts as heretofor recited, bad faith is, in the opinion of the Defense, established prima facia if not conclusively. The failure of the State and/or its agent (Det. Saldate) to disclose that contact had been made with Mrs. Markwell in April-May, 1990; the non-disclosure of Mrs. Markwell's location as given in the

107 e

interview between Det. Saldate and Sandra Pickinpaugh (to include a failure to disclose that the interview had been recorded); the non-disclosure of the fact that Mrs. Markwell had been contacted on September 10, 1990 and subsequently; the failure to list prior acts and rebuttal evidence/testimony, all indicate bad faith inview of the fortuitous "discovery" of Mrs. Markwell on October 4, 1990 after four weeks of Trial and after the Defendant has waived her Constitutional rights of silence taking the stand in her own defense.

Various sanctions are available to the Court under Rule 15.7, Arizona Rules of Criminal Procedure. Given the amount of prejudice to the Defendant, a mistrial would be appropriate. However, given that four weeks of trial have past and the Defendant has waived fundemental Constitutional rights, to declare a mistrial would not amount to an effective sanction against the Government. Indeed, such would be no sanction at all but would, rather, amount to a second chance for the State to correct its errors (if any) made during the Trial. Justice to the Defendant and the Public would not be served. the only appropriate sanction is the sanction of preclusion of witnesses.

DATED: October 5, 1990

C. Kenneth Ray II
Attorney for Defendant

A copy of the foregoing was
delivered on October 9, 1990
to:

Noel J.R. Levy
Deputy County Attorney

107f

**AFFIDAVIT**

STATE OF ARIZONA          )
                          )
County of Maricopa

      Charles Jones, on his oath, deposes and says:

1.      I first met Debra Milke in 1980.. I was nineteen years old and she was sixteen years old. I was an enlisted man in the Air Force and was stationed at Luke Air Force Base which is outside of Phoenix, Arizona. We met through a mutual friend, Dorothy. I don't remember her last name. Dorothy was married a friend of mine who was also in the Air Force. I think Dorothy had a couple of children. Debbie and I dated for about three years.

2.      Debbie was in high school when I met her. Debbie was friendly and outgoing, a normal teenager. She dressed conservatively and always looked nice. She wasn't loud or boisterous. I took her to her junior prom and other activities with her friends. She was a welcome guest at my home. I know my parents like her as well. They had her over to dinner on a few occasions and took us out to restaurants a couple of times.

3.      During the time we dated, I got to know Debbie's mother and sister very well. I was constantly at their apartment. I practically lived there. It was like I was one of the family. Even though I spent many nights their apartment, Debbie and I never slept in the same room. I would get off work and go over to see Debbie. Debbie, her mother and sister and I went everywhere together. I even went on vacations with them. I got along very well with Debbie's mother, Renate, and Debbie's younger sister, Sandy. She and I were like brother and sister. I believe Renate liked having me around. I think she felt safer having a man in the apartment.

4.      Sandy and Debbie always seemed to be tense around one another. It's hard to put into words. I believe their parents divorce was harder on Sandy than it was on Debbie. Because her father was no longer at home, I think Debbie felt that she had to watch out for Sandy. It was clear that Sandy did not want to be mothered by Debbie. It was sad, but I think Sandy really started to resent Debbie even more. Before Renate left, Sandy started to act out. She was staying out late and hanging out with the wrong kind of people. I also think, underneath it all, Sandy felt that Renate liked Debbie more than her.

5.      Debbie is a very loving and caring person. I really don't think she is capable of hating anyone. When Renate moved to Germany, Debbie was really hurt. I think she felt even more responsible for Sandy than before. Sandy, however, didn't want anything to do with her. Their relationship was never good, but after Renate left it got even worse.

Charles Jones
Affidavit
Page -2-

6.      I can't say why Debbie and I broke up. I guess we just grew apart. Debbie was very young when we met. We were both maturing. Since I was older, I was moving away from the high school crowd and into the young adult crowd. We just grew apart. Even though we were not dating, Debbie would still come to visit my parents. They have always liked her. After Renata mother moved back to Germany, Debbie visited them more often.

7.      We were in contact quite a bit after we broke up. I guess we have always been friends. Gradually we saw less and less of one another. Regardless of our relationship, Debbie would still come to see my parents. I never saw any major changes in her. Debbie was always neat, polite, and friendly. I remember that she got married and had a baby. Debbie loved children. She use to babysit some of the kids in the neighborhood she lived in. Sometimes Debbie would bring her baby to see my parents. I last saw Debbie with her son when he was about two years old. There was no reason to believe anything was wrong. Debbie was very maternal, she had always been maternal. Like I said, she loved children.

8.      I couldn't believe it when Debbie was arrested for murder. I will not believe she could ever be involved in anything like that, not Debbie. Since no one asked me to testify for her, I went to her trial. I was there for about two days. Debbie's lawyer seemed poor. I didn't have a very good impression of him. He seemed very timid and just let the prosecution walk all over him. I thought it was really strange.

9.      I was really expecting to be contacted to testify for Debbie. I knew her well. I thought the defense would at least want to talk to me. If someone had asked, I would done this a long time ago.


_Charles Jones_                                    _6-28-95_
Charles Jones                                         Date


SUBSCRIBED AND SWORN to before me this _28_ day of June, 1995.


_Notary Public_

My Commission Expires: _9-16-98_

OFFICIAL SEAL
HOLLY K. WAKE
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires Sept. 16, 1998

**AFFIDAVIT**

STATE OF ARIZONA )
)
County of Maricopa )

     Donald Jones and Josephine Jones, on their oaths, desposes and say:

1.    We are Donald Jones and Josephine Jones. We are the parents of Charles Jones. Charles and Debra (Debbie) Milke were boyfriend and girlfriend. They dated for approximately two years.

2.    We first met Debra Milke in 1980. They had developed a relationship and he wanted us to meet her. Charles was four years older than Debbie. She was about sixteen year old when they first met. Debbie was a junior in high school and Charles was in the Air Force. He was stationed at Luke Air Force Base outside of Phoenix, Arizona. We do not know for sure how they came to meet for the first time. At the time they met, Debbie was living with her mother and sister in Phoenix, Arizona.

3.    Debbie was respectful, polite, and helpful. Debbie was always very friendly. She was such a courteous young lady. We felt close to her just in the time we've known her. We never knew Debbie to smoke, drink alcoholic beverages, or use bad language. She was always dressed very neat, nothing tight. Debbie was very clean looking. She was kind of shy. She had a very nice personality. Whenever she was visiting our home, Debbie was helping. She was very down-to-earth. We thought a lot of her.

4.    Charles and Debbie had a good relationship. Charles took Debbie to the high school prom when she was a junior. As far as we know, they did not date anyone else while they were together. We thought and still think a lot of Debbie. While they were not engaged, we thought Charles and Debbie were serious. We know they were good friends with one another. We are very fond of Debbie. We had hoped she and Charles would get married. Debbie would have been a good daughter-in-law.

5.    Charles brought Debbie over four or five times for dinner. On one occasion we took them out to dinner. Debbie's mother and sister also came along. Another time we had them over for Christmas dinner. Sandy didn't come. She had a different group of friends. Debbie's mother, Renate, did come to the Christmas meal. Debbie was such a nice girl. She was always helping. We each think she looked to us like parents. Even after she and Charles broke up, Debbie would come to visit us.

6.    Once when we were visiting Debbie at her mother's apartment, we noticed that Debbie and Sandy really didn't act right. Debbie had told us that she and Sandy were constantly at each other throats. Always fighting. They acted like neither liked the other. Every chance her sister had, she'd hit Debbie or poke her or say something to her. Each were in high school at the time. Renate, their mother, was there at the time

Donald Jones and Josephine Jones
Affidavit
Page -2-

and made no remarks and made no indication of even caring. We both agree that it
looked like Sandy was the type who would do things to her like that... Well, maybe she
was just jealous of Debbie.

7.      We don' know why Debbie and Charles broke up. Charles isn't one to talk too
much about that sort of thing. We think they broke up in 1981. Charles didn't say
anything about it. It was Debbie's mother who called and said that the two should get
together again. She also said that Debbie loved Charles and that she was sure Charles
loved Debbie. We don't interfere in our son's life. He does what he wants to do.

8.      After Charles and Debbie broke up, Renate, Debbie's mother moved to Germany.
She left Debbie and her younger sister, Sandy, all alone. They stayed by themselves in
the apartment. Their mother paid the rent and just let them fend for themselves.   We
thought it was just a terrible thing that she left her daughters like that.

9.      Debbie would come to visit periodically. I think I (Mrs. Jones) was a mother figure
to her. Once Debbie came over after she had some surgery on her knee. She was still
on crutches. Later, before her mother left, Debbie came over and told us that she was
upset that her mother was leaving. We wanted to tell her she could come live with us,
but we couldn't do that. It wouldn't have been right. Our son had since been Honorably
Discharged from the Air Force and was living with us. We felt for Debbie becuase we
knew that she came from a dysfunctional family. We are very family oriented, she liked
that.

10.     Debbie came to visit us several times. Once, after she had married the other
fellow, Debbie she came to visit us. He was in jail on drug charges. Debbie didn't talk
much about him. Christopher was just a baby. After Renate left, we saw Debbie more
often. Christopher was just a couple of months old when we first saw him. He was about
two years-old the last time we saw him.

11.     After Christopher's birth, Debbie never came to visit without him. She always
seemed to be a good mother. Christopher was very hyper. Christopher was a handful.
Debbie was real diplomatic with him. She was stern, but appropriate. Neither one of us
ever saw her strike him. Debbie would always hold Christopher or have him sit next to
her. When he was a year old, she came to visit. Christopher had a cold. Debbie was
very maternal. She held him and did whatever she could to make him comfortable.
Once he got old enough to walk, Christopher would play on the stairs in our home. On
one occasion he tried to play around the stove. Debbie went over and told him,
"Christopher you mustn't do that because you could get hurt." She then picked him up
and sat him with her, and I gave him a couple of cookies. We always felt that Debbie
was an excellent mother. She seemed to be happy with him and he obviously loved her.

Donald Jones and Josephine Jones
Affidavit
Page -3-

The first time she brought him over she was so proud she had a baby, you know to show him to us. As a parent, Debbie was always, always very tolerant, a very sweet young lady. She never showed any anger towards Christopher, just love.

12.     We met Debbie when she was a teenager, she was dating our son. We continued to see her after they split up and as she was trying to make her own way without her mother. We saw her before she got married, while she was married, and as mother. Throughout it all, Debbie remained the same. She was always respectful, polite, caring, patient, and loving, parent.

13.     We were shocked when we heard of her arrest. We never beleived Debbie was involved in something like this. Never. Knowing her the way we do. We never believed she was involved in this. She is an extremely sweet young lady.

14.     When Debbie was going through the trial, we were expecting to be contacted by somebody. We knew her very well. No one ever came to talk to us about her. We don't know what's important in defending these type of cases. Since we were never approached, it was assumed that our relationship with Debbie was not important to her case. If someone had contacted us, we both would have been more than happy to testify in her behalf.


*Josephine Jones*
Josephine Jones

*Donald Jones*
Donald Jones

6-28-95
Date

6-28-95
Date

SUBSCRIBED AND SWORN to beforfe me this 28 day of June, 1995.

Notary Public

My Commission Expires:

9-16-98

OFFICIAL SEAL
HOLLY K. WAKE
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires Sept. 16, 1998








Michael D. Kimerer, #002492
Lori L. Voepel, #015342
Kimerer & Derrick, P.C.
221 East Indianola Avenue
Phoenix, Arizona 85012
Telephone: 602/279-5900
Facsimile: 602/264-5566
Attorneys for Petitioner

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| DEBRA JEAN MILKE,     ) | No. CV-98-0060-PHX-RCB |
|     ) | |
| Petitioner,     ) | |
|     ) | |
| v.     ) | **AFFIDAVIT** |
|     ) | |
| TERRY STEWART, et al.,     ) | |
|     ) | |
| Respondent.     ) | |
|     ) | |

My name is Alex Janka. I am over the age of eighteen years and have personal knowledge, which forms the basis for this affidavit. I have never been convicted of a felony and I am competent to make this affidavit. If I were called to testify, under the penalty of perjury, I would testify to the following:

1.  I am the stepfather of Debra Jean Milke, the petitioner and Defendant in this case. I live in Emmetten, Switzerland with my wife, Renate Janka.

2.  I witnessed interactions between Debra Milke and her son, Christopher, on numerous occasions. Debra was very affectionate towards Christopher. She was a

loving mother and is not the type of person that would be involved in a conspiracy to have her child killed. She was good overall at handling any problems involving Christopher.

3.  At no time did Ken Ray, Debra's trial attorney, call me to testify at trial about my knowledge of Debra and her relations with her son.   Ken Ray also never inquired to see if I would be a witness at Debra's mitigation hearing.

AFFIANT FURTHER SAYETH NAUGHT.

_____
ALEX JANKA


Country   Germany

SUBSCRIBED AND SWORN to before this  10  day of  May ____, 2002.

_____
Notary Public
Notarvertreter

My Commission Expires:

indefinite

**Nummer  298 /2002 der Urkundenrolle**

Vorstehende, heute vor mir vollzogene Unterschrift

des Herrn Alexander Janka,
geboren am 21.12.1937,
wohnhaft CH-6376 Emmetten, St.-Anna-Weg 13
- ausgewiesen durch gültigen Reisepass, ausgestellt in Zürich vom
Generalkonsulat der Bundesrepublik Deutschland -

beglaubige ich hiermit.

Meine Frage nach einer Vorbefassung bzw. Ausschlussgründen im Sinne des § 3
Abs. 1 Ziff. 7 BeurkG wurde verneint.

Berlin, 10. Mai 2002

(Bruno Finke)
Rechtsanwalt als amtlich bestellter Vertreter
des Notars Berthold Finke
Kurfürstendamm 214, 10719 Berlin

Kostenrechnung gemäß §§ 141, 154 KostO
Geschäftswert: € 3.000,-- (§ 30    KostO)
Unterschriftsbegl. §§ 32,45 I KostO €       10,00
16 % Mehrwertsteuer § 151 a         €        1,60

Summe Notarkosten                   €       11,60

N o t a r   Vertreter

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| **Plaintiff,** | ) | CR 89-12631 |
| | ) | |
| v. | ) | **AFFIDAVIT** |
| | ) | |
| DEBRA JEAN MILKE, | ) | |
| **Defendant.** | ) | |

My name is Debra Jean Milke. I am over the age of eighteen and I am competent to make this affidavit. I have personal knowledge of the facts stated in this affidavit.

1.      I feel that I never got a chance to explain anything during my trial, I was always cut off. I felt like I was cut off by the prosecutor and by the judge.  They only wanted to hear what they wanted to hear.

2.      Regarding my knowledge of Mark's drug use before our marriage,  I always knew that Mark smoked marijuana. When I think of the word drugs, I always think of hard drugs like cocaine, heroin, speed, things like that.  I never really thought of marijuana as drugs, so I always knew Mark smoked pot, and it bothered me.  It didn't bother me as much as hard drugs, that bothers me.  So, yes I knew Mark used... smoked pot but I didn't know that he used cocaine.

3.      I initially told the police that there was nothing in the house.   They came into the house saying that they were looking for drugs. Again, I'm thinking drugs...cocaine, heroin, things of that nature, and I told the police, "There's nothing like that in the house." I knew that there was pot in there, cause Mark and his friend always smoked it.  But I did not know that there was Cocaine in the house.

4.      Regarding my use of birth control and the birth of my son, Christopher: It is true that I was on birth control pills, but  I used birth control pills even before I met Mark, only because I'm a responsible person.  That's why I took the pill.  When I was nineteen years old, and not married at that time, I did not want children.  And also, at that time, I didn't think that I was ready to be a mother.  I quit taking birth control pills when Mark and I were married because I wanted to get pregnant.

5.      Christopher was not a mistake.  I never made an appointment to have an abortion.

1

Because my parents told me about birth defects in children of drug abusers, the thought of Mark's use scared me. The thought of terminating my pregnancy if my child was affected crossed my mind, but I never made an appointment to have an abortion.

6.      Regarding my sister Sandy's claim that she cared for Christopher after his birth:   I had a cesarean section, and when Christopher was born  my sister Sandy was nine months pregnant and she had problems.  She had toxemia and was  bed ridden.   There is no way that it was physically possible for Sandy to have taken care of Christopher the first three weeks of his life.  After Christopher and I were released from the hospital, Mark's mother came to stay with me.  She lived at our house for a couple of weeks, because I had a major surgery and I was on pain killers, and she helped me take care of Christopher.  My sister Sandy was not there.

7.      The reason Sandy moved out of our house ~~after Mark got out of~~ *before Mark went to* prison was because she stole six hundred dollars from Mark and me, and we asked her to leave.  Then  she cried to my mom and said that Mark and I threw her and her baby out in the street.

8.      When Sandy testified that she cared for Christopher during the day and sometimes in the evening, what she failed to say is that I was working two jobs.  I worked during the day, and I worked at night.  And also, during that time period, I was going to drug counseling with Mark at a place called Nova.  That took place in the evenings, and Sandy would watch Christopher for me while I went to drug counseling with Mark.

9.      I never told my sister Sandy that I was not cut out to be a mother or that I could not handle Christopher.

10.     I moved in with Suzy Stinson after I left the apartment where Jim Styers lived.   Jim was Sandy's friend first.  When I was moving out of the apartment, Jim had asked me if he could have my new address and new phone number because he wanted to stay in touch.  Suzy did not see Jim hang around her house a lot, he came over once in awhile.

11.     I never  considered moving to California and leaving Christopher in Mark's custody.   I worked for Farmer's Insurance at that time.  During that time, they opened up a regional office in Carlsbad, California and were encouraging internal transfers.  I considered applying because of the increase in money and opportunity.  I mentioned it to Mark because when I got into the insurance business, I found that it was my niche.  My goal was to become an underwriter.  So I took three days, drove out to Carlsbad and I checked out Farmer's Insurance out there.  I checked out housing costs, etc, and realized that it would not be worth the move because there was no way I could afford to live out there with myself and my son.

12.     I did not leave Christopher overnight with Suzy  or Sandy  to date men.  In addition to my day time job, I had a night time job working at City Bank.   I sometimes didn't come home until two in the morning because I was working, so I wasn't leaving Christopher overnight to go date men.  I left at night to go to work.

2

13.     I did allow Mark, who had been released from prison by this time, to take Christopher on occasion.   I wanted to encourage a relationship between Mark and his son, even though Mark had problems.   There are so many parents who use their children as weapons.   My dad used to do that when I was a teenager.   He used to say terrible things about my mom, and I resented it.   I used to say to myself, "If I ever have children, I would never, never bad mouth that child's parent in front of them."   So even though Mark had his problems, I still encouraged a relationship.

14.     During this time period, I was still legally married to Mark.   I understood that under Arizona law, as long as I was still legally married to Mark, he had a right to take Chris whenever he wanted to   and I had no say so.   So, even when there were times when I didn't want Mark to take Chris, he would get upset, and he would take him anyway.   So, rather than have a fight with Mark, I would let Mark take Chris.   But, I also would plead with Mark not to do any drinking and he always said, "I won't, I won't".   But, Mark had a problem, and I always believed that if he had his own child in his custody whenever he was visiting with him that he would have sense enough and be responsible enough not to drink and do things like that while he was taking care of Christopher.

15.     We had already tried counseling.   I went to counseling with Mark to show support.   He was   either too weak to get off the stuff, or he didn't want to get off the stuff.   I don't know, but I tried.

16.     I knew that the only way I could protect my son's welfare was to divorce Mark and retain custody of him.   That way I could have control.   But, when I approached the subject   I told Mark why I wanted to divorce him, because of his drinking and his doing drugs.   Mark and I sat down and he said, "I'll give you a divorce, but I want joint custody, and I don't want no lawyers involved."   Because of his past, Mark didn't want any lawyers involved, as he knew he didn't have a leg to stand on.   He wanted to do one of the do-it-yourself things, and he said he wanted joint custody.   I explained to Mark how important it was for him to quit drinking and doing drugs and to show responsibility.   I tried to tell him how important it was to make sure Christopher came first, and things like that.   I more or less lectured Mark on being responsible.   He promised me that he would do his part.   I always gave him the benefit of the doubt because I really wanted to believe in him.   I just couldn't imagine that Mark would not care, especially when it came to Chris.   So, we got one of the do-it-yourself things, and filled it all out, split everything down the middle.   At first it was joint custody, I filed it, and there were no lawyers involved.

17.     I filed for divorce in April, and it was already in process when  Mark rented a room in Sandy's house.   One day, Mark asked me if he could have Christopher for a couple of weeks, so he could spend some time with him and get used to having him around more often than when he saw him.   In other words, Mark wanted to get a feeling of what it was like to have Christopher twenty-four hours a day.   He didn't ask if he could have custody, he asked if he could have Christopher for a couple of weeks to visit him, stay with him.   And, in the end, I agreed.   But, before I did agree, I discussed this with my sister, because I was a little leery about letting Chris go, because of Mark's behavior with Chris in the past.   So, I had a discussion with my sister, I

3

told her what Mark wanted to do and I also told her that I was afraid... a little scared to let Mark have Chris for a couple weeks, and I gave her my reasons why. But, she assured me that she would watch out, knowing Mark was living under her roof and Christopher would be there with Mark. She assured me that she would keep an eye on things to make sure Mark was not being irresponsible. After hearing that from my sister and feeling comfortable about that, I told Mark that he could have Chris for a couple weeks.

18.      When he was over at Sandy's house, I went to see Christopher often. I didn't stay away for long periods of time.

19.      On June 25, 1988, I went to a wedding with a friend of mine. When I was at the wedding reception, I got a phone call from my sister. She sounded very calm on the phone, but very serious and she told me to get over to her house as soon as possible. I asked her what was wrong, and she said, "Just get over here as fast as you can. " Of course, she had me worried and concerned. I asked her if it was about Christopher, and she wouldn't answer me. She said, "Just get over here." When I got there, my sister was there with her friend Eddie. But Christopher and Mark were not there. Eddie told me that the night before, he and Mark were at a dope house and that Mark took Christopher with him. Eddie said that this house was on the west side and that these people were biker types, that they had weapons, Dobermans, lots of drugs, lots of paraphernalia and they were shooting up all night with Christopher in the midst of this. Well, I became furious. I mean, I was livid. I told Eddie to take me over there right now. He said, "No way." He was not going to take me over there because he said this place was dangerous, these people seemed dangerous and he would not go over there without a police escort. So, I called the police from my sister's house and told them the situation. They told me that I had to be a mile within the residence before they would give me a police escort to this house. So, Eddie and I drove to the area of this house and I called the police again. The police met me and Eddie at the Circle K and we all went over to this house. The police surrounded the area and then a police officer escorted me up to the front door. I banged on the door. I was anxious to get Chris out of there and I was just furious. Some girl answered the door and she looked stoned out of her mind. I began screaming at her and demanding my son. She told me Mark and Chris had just left. So, I jumped in my car, I didn't even care to wait around to listen to what the police had to say or anything. I drove back to my sister's house. Mark and Chris were there. My sister knew how angry I was and she knew that Mark and I would get into a big fight. So, she voluntarily took Chris and Jason, her son, for a walk because she knew Mark and I would get into it. And that's exactly what happened. We got into it. When I opened the door and barged in, Mark had just gotten out of the shower. The first thing I did was to grab Mark's arms where I saw fresh needle marks. I slapped him across the face and called him all kinds of names. We got into a big, big verbal argument. I was really upset because I felt like he showed me that he did not care or he had no concern about Christopher's welfare. He reneged on his promise about changing his ways and everything. During this fight I told Mark, "You can forget about the joint custody, I'm withdrawing the divorce because I'm going to hire an attorney to do the divorce again and I'm going to seek sole custody. " He made threats to me. In the meantime, my sister came back with the kids, so I took Christopher and drove off. That's when I pulled Christopher out of my sister's

house.

20.     I believe I filed the amended divorce petition in July of 1988.  I did receive sole custody, but the courts said Mark had a right to visitation with Christopher.   Because of everything that had gone on, Mark's visitation with Chris was supposed to be supervised.

21.     The reason I decided to leave Phoenix and go up to Colorado is because Mark was harassing me from prison because he had been served the divorce papers.  Mark made some threats and I was scared.  I even had to get permission from my divorce lawyer, Vincent Libbon to leave Arizona, because technically I wasn't allowed to leave the state while I had a divorce pending.  But, I told Mr. Libbon how afraid of Mark I was.  It didn't matter that Mark was behind bars.

22.     Suzy Stinson was well aware of what was going on, she was also aware of the threats and the harassing phone calls I was getting from Mark's friends.  Suzy knew that I was going to Colorado.

23.     Suzy Stinson's mother was visiting from out of state at the same time that I was packing to move.  So, everyone knew that Chris and I were going to Colorado, and Suzy even helped me pack my car.  So this is all untrue.   I mean, I don't know what else to say.

24.     On the way to Colorado, my car broke down in the middle of the desert in New Mexico.  A trucker ended up driving Christopher and me four hundred miles to reach Dorothy up in Denver.  Christopher and I were at the mercy of this trucker for four hundred miles and I was scared.  I didn't know this guy from Adam, I'd never hitchhiked in my life.

25.     In 1984, Dorothy tried to talk me out of going back to Phoenix to be with Mark, because she was certain that Mark would ruin my life because Mark reminded her of her ex-husband.  When I decided to go back to Phoenix, that ruined my friendship with Dorothy.   From 1984 to 1988, I had absolutely no contact with Dorothy.  In 1988, we got in contact with each other and started writing and talking on the phone.  When I told her what was going on in my life, she wanted me to come up there and bring Christopher.  When all this was going on, I thought it would be a good time to go up to Denver to get away from here for a while.  Dorothy had never met Christopher before, so when I got up there I told her what had been going on in my life.  I told Dorothy that I didn't want Christopher to grow up in a drug-infested environment because I was afraid that he would develop the same problems that Mark had.

26.     I never told Dorothy that I wanted Mark bumped off.  While Mark was in prison, I spoke to his mother a couple times.  My dad was a prison guard down in Florence.  Both Mark and his mother told me about an incident where Mark got thrown into isolation.  Mark said that the conditions were just pathetic, like a dungeon.  Mark swore up and down that my dad was behind it, because my dad was upset at the way Mark was treating me and Christopher.  He told me, " I wouldn't be surprised if your dad tried to get me bumped off in this place".  I mentioned this

conversation to Dorothy, explaining to her about Mark being in prison and how my dad was a prison guard down at the same prison.

27.    I never, ever threw Christopher across the room. Dorothy was a day care provider licensed by the State of Colorado, and by law she has to report any incidents of abuse. The only time I treated Christopher harshly was after work one evening. Coming in from work, I saw Christopher attacking another child. I ran over and grabbed his arm, pulling him off the younger child. Christopher fell back onto the floor and slid into the nearby wall. If I saw someone throw a child across a room, I would intervene. A child the size of Christopher would have bruises or fractured bones or something if he were treated that way. Dorothy never criticized my treatment of Christopher in that instance, nor did she report me to any authorities.

28.    I was stressed out when I was in Colorado. I really was stressed out and Christopher's behavior changed, and I didn't understand why. I had discussions with Dorothy about Chris and she was of the opinion that he was hyperactive. Now I know that it was because of his thyroid gland. But at the time, I had no idea what was causing the change in Chris. I honestly feared that the reason why Christopher's behavior changed was because I uprooted him, took him away from everybody he knew. I did yell at Christopher a lot and there was one time when I spanked him harder than I should have. But I never beat him or spanked him to the point where it left marks on him.

29.    I never screamed at Christopher, saying that he looked like Mark, or that I wished he'd not been born, or that I wished he was dead. Those are horrible, horrible words to say to a child and I never, ever said those things to him.

30.    Dorothy never intervened to stop any abuse because there was no abuse. When I would cry to Dorothy, "I just can't take it anymore," I was talking about Christopher's behavior. I didn't understand what was wrong with him. He'd never acted like that before. He was so unruly, he screamed, he talked back, he spit, he kicked people. He did things I'd never seen him do before. He wouldn't listen, he was restless. He was bouncing off the walls he was so hyper and I didn't understand why. Anyway, with that, trying to find a job up there and then, my divorce was on my mind and my car problems, I was going through a lot of stress. But, I never abused Christopher.

31.    When I went to Phoenix to get my divorce, I was gone for three days: Friday, Saturday, and I came back Sunday. Those are the three days that Dorothy took care of Christopher.

32.    My divorce took place in the late morning and after it was over with it was lunch time. Jim Styers had driven me to the court building, and after my divorce was over with we went out and ate lunch. That's the extent of any celebration over my divorce.

33.    I never said that I was afraid of living by myself with Christopher.

34.    When we were in Colorado, I bought Christopher a Big Wheel for his third birthday and

he had boundaries where he could ride it. When I came home from work one day, Chris' Big Wheel was out on the sidewalk, but he was nowhere around. I assumed he was in the house. When I went inside, I asked Dorothy where Chris was and she said he was outside riding his Big Wheel. I told her he was not. We searched the house calling for him, but he wouldn't answer. We went outside calling for him, but he wouldn't answer. I got really scared, so, we went up and down the streets calling for him and calling for him. I was getting no answer and I was really getting scared. Two houses down from Dorothy this lady came outside and she said, "Are you looking for Christopher?" And I said, "Yes." And she said, "Well, he's in my house." And so I said, "Well, I want him, he's my son." And she said, "No, I called the police." I asked her why and she said, "This is the second time he wandered off and the first time I notified your room mate. This is the second time, and this time I'm calling the police." So, the police came and they asked me why Christopher was not being watched. I explained to them that I was at work and that I'd just gotten home. The lady mentioned that this happened before and when I asked her when, she told me what day it was. It happened to be the day that I was in Phoenix getting my divorce. So, Dorothy was letting Christopher out of her sight. She put all this blame on me, and when I talked to the police there, the police officer explained to me about the laws in Colorado about children being unattended. I told the officer that nothing like this has ever happened and I've never been reported, that I would never neglect my son or leave him unattended.

35.     When I came back from my hearing in Phoenix, I told Dorothy that I was thinking about moving back to Phoenix. She tried to talk me out of it. Dorothy, her husband, and their kids were planning on moving to Henderson, Nevada because she had a big blowout with her family. Her husband was apparently getting a decent job there. They asked me if I would move to Nevada with them and I told them no. Dorothy and I got into an argument because she swore that I was going to move back to Phoenix and get back together with Mark. Her intentions were good, but the way she came across, I didn't appreciate it. She tried to act like my mother.

36.     In order to get the money to fly back to Phoenix, I had to finish up my job. I gave a two week notice at my job. Since Dorothy and I weren't getting along, my friend Steve offered to let Chris and I move into his house for my last two weeks. So, that's what we did. I did not lie to Dorothy or deceive anyone about this.

37.     It's true that Mark did not always return Christopher from his visits on time. Christopher did pick up things from Mark; he was teaching Christopher some terrible words and Chris would come back to me and ask what certain words meant or what certain phrases meant. I know I wasn't teaching him those words. That disturbed me.

                                    *KNOW OR* ᔕᵐᵐ
38.     I did not ~~date~~ a man named Brian and I never told anyone that Christopher had died.

39.     I never told my supervisor that my sister had died in order to get time off of work. During this time, I was an administrative secretary at Lincoln National in the Marketing Department. Rita Console was my boss, and she was the executive assistant to the Marketing Director. We all worked in the same area, but I reported to her. Rita was really a neat person to

work for, but Rita came to work drunk. I could smell hard liquor on her breath and her lunch hours were liquid. I never said anything. I never reported it because I was a single parent and having a full time job with benefits was major security to me. It was all I had.

40.     One of the reasons why I quit my job at Lincoln National was that I was offered a job at Ameribank. The other reason why I left Lincoln National was because I was afraid Ernie and I would get caught dating because you're not allowed, it's just unprofessional, to date people in the workplace.

41.     On my last day of working for Lincoln National, Rita took me out to lunch and we went to the Dirty Drummer. I had a hamburger and a soda and she had some kind of sandwich and a mixed drink.

42.     I don't recall ever bringing Christopher to my job at Lincoln National. So, I know I never pushed him away from my computer there. I took Christopher to my job at John Alden and Mark came to Lincoln National once.

43.     I was never planning to give up custody of Christopher.

44.     Because I would not falsify child support receipts or change the custody on the divorce papers, Mark decided, "Well, I'm going to take your car." He knew that the car was in his mom's name, and he knew that his mother would stick up for him so, that's what he did. He did not take my car because I missed car payments. I made those car payments.

45.     When I moved in with Styers, it was on a temporary basis, not permanent. I began looking for another apartment for Christopher and myself as soon as I got on my feet about ninety days after I moved in with Styers.

46.     I did not tell Sandy that Ernie was in love with me and wanted to marry me, but that Christopher was a burr in his side. Ernie and I never discussed marriage.

47.     Sandy and her husband moved to Wyoming in July. I did not contact Sandy to take custody of Christopher in August of 1989.

48.     In November of 1989, I started looking for an apartment. My dad's birthday was November 2, and I had called him a couple days before his birthday to tell him that I would be down there for his birthday. We started talking and I was telling him what was going on in my life, because I didn't talk to my dad very often. I gave him the run down of what was going on and admitted that Mark and I had problems. Out of exasperation, I just said, "You know dad, I ought to just give custody to Mark." I said it in a joking manner, I didn't mean it literally. And, my dad responded, "Oh don't you dare." and "Have you lost your mind?" - things like that. He knew I wasn't serious, we both laughed..

8

49.     My father and stepmother never said that they would become foster parents if necessary. They never made that suggestion or offer.

50.     Since the day he was born, Christopher has been covered with medical insurance and dental insurance and life insurance through a policy from my employment. I've done that ever since he was born.

51.     Someone other than me (my mother or sister) made the suggestion that Christopher go up to Wyoming with my mom and Alex so he could go see Jason and his aunt. My mom was going to pay for Christopher's airfare, and then I would come and pick Christopher up two weeks or so later. This was being discussed, but it didn't pan out. Christopher didn't go to Wyoming with my mom and Alex because he did not want to.

52.     My only purpose in calling my sister's home in November, was to wish my nephew a happy birthday. I did not ask Sandy to take Christopher.

53.     On the evening that my son was missing, I was not intoxicated. I drank some rum and coke to settle my nerves, because I was an emotional basketcase and I could not stop crying. I was hysterical. I don't recall John giving me a pill. I remember Maureen gave me a pill, I thought it was a Valium, and told me to go lay down and get some rest.

54. .   Because Jim was the last person that was with my son, I thought that if I was going to get any answers from anybody, it was Jim. That's why I kept asking why he was still at the mall, why they wouldn't let him come home. I wanted some answers. I asked questions and no one was giving me answers. And so, that's why I was asking about Jim.

55.     I became annoyed as the evening progressed because they kept asking me the same questions over and over again. I was complying, I was answering all their questions, but when I asked questions, no one gave me any answers. I wanted to know where my son was. I wanted to know how the search was. I wanted to know what was going on, at the same time, I was totally frantic because all I could think about was... Where's my son, who's got him? I... I thought of a child molester, I... so many things crossed my mind. A lot of police were asking me the same things over and over again. And not just one... I would talk to one and then an hour later another person would come in, introduce himself and start asking me the same questions. I didn't understand why these officers didn't confer with each other. That's what was annoying me.

56.     I started having my own suspicions. I didn't want to believe it, but there was a little something in the back of my mind that had me feeling suspicious. It was about Jim, because nothing made sense to me. That's why I was acting concerned about Jim, because I wanted answers from him. I felt like there was this conspiracy going on and there were alot of questions in my mind.   The longer they kept Jim away, I became more suspicious, because it was like, "What does Jim know that he's not telling me.", or "What does Jim know... or... or what do the police know about Jim that they're not telling me." I felt like no one was answering any of my

9

questions. That's why I was concerned.

57.     I never had a conversation with Roger about having Christopher murdered.  I never told Roger that I had any debts of any kind.  One evening, Roger asked me if he could borrow some money from me.  I remember laughing at him and saying to him, What do I look like, a bank?  I asked him how much money he wanted to borrow?  He said he needed two hundred and fifty dollars.  I really started laughing and said I don't think so.  No way.  I have my own bills to pay and I'm not a bank.  I told him that I didn't even know him.

58.     I have never been suicidal in my life.  I never thought about it, so I don't know where Saldate got this.

59.     When Saldate asked me about insurance, he asked me if I had a life insurance policy on Christopher.  I said no because I've never went out and bought a policy.  I never said to Saldate that collecting on this policy was not my motive.  But when Saldate was talking to me about insurance and murder, I said to him that I would never do anything like that.  Jim and Roger did not know about my dad having a policy on Christopher.  I never mentioned that to anybody as I had completely forgotten about it.

60.     I never told Saldate that I once went with them to kill Chris.  I never told Saldate that I had discussed Chris' murder with Scott or Styers.

61.     I was aware that Jim owned a gun.  It's the gun that was in his closet when the police asked for it.  It was there.  I showed it to them.  That was the only gun that I ever thought Jim owned.  I had absolutely no knowledge of two other weapons, or one other weapon.  When Jim bought that gun, he also bought boxes of bullets.  The day I was doing laundry, I was sorting through all the clothes and I was emptying out pockets.  Inside a pair of Jim's jeans, there was a box of bullets.  I put them in my purse to give them back to James Styers later.  I did not want to leave them out.  Then all this happened and when I went to Florence, I took my purse with me, totally forgetting about these bullets being in my purse.

62.     As to the statements attributed to Roger Scott in the State's presentence memorandum, either James Styers lied to Roger Scott, leading him to believe that I was involved, or Roger Scott lied to the police.  I met Roger Scott only two months before Chris' death.  I did not like Roger Scott.  I never discussed killing my son with him , Jim Styers or anyone else.  I did not go with him or Styers to try to kill my son.

63.     I do not want to be merely a name and number to this court and have therefore attached these recent photographs.


        Further affiant saith not.

10





## VERIFICATION

DEBRA JEAN MILKE, being first duly sworn, under penalty of perjury, upon her oath deposes and states:

That she has read the attached affidavit and all facts contained therein (paragraphs 1-63 inclusive) are true.

_Debra Jean Milke_

DEBRA JEAN MILKE

SUBSCRIBED AND SWORN to before me this 4th day of March, 1996, by Debra Jean Milke.

My Commission Expires Aug. 1, 1996

_Charanlee Store_

NOTARY PUBLIC

11

THUNDERBIRD SAMARITAN HOSPITAL AND HEALTH CENTER

| PATIENT NAME | | MAIDEN NAME | ACCOUNT NO. | ADMISSION DATE | ADMISSION TIME | MEDICAL RECORD NO |
|---|---|---|---|---|---|---|
| MILKE, DEBRA | | SADEIK | 060357 | 10/02/85 | 10:05 | 110336 |

PATIENTS CURRENT ADDRESS

| 3118 W VILLA MARIA DRIVE | PHOENIX | AZ | 85023 | TELEPHONE (CURRENT) 602-439400 |
|---|---|---|---|---|

PATIENTS PERMANENT ADDRESS

| 3118 W VILLA MARIA DRIVE | PHOENIX | AZ | 85023 | TELEPHONE 602-439400 |
|---|---|---|---|---|

| SEX | MARITAL STATUS | RACE | RELIGION | AREA OF RESIDENCE | BIRTH PLACE | BIRTH DATE | AGE | SOC. SEC. NO/MEDICARE NO | PREVIOUS NAME |
|---|---|---|---|---|---|---|---|---|---|
| F | M | 1 | OTH | 00 | FC | 03/10/96 | 02 | 526671656 | |

| PREVIOUSLY TREATED HERE | PREV. ADM DATE | PREV. ADM TYPE | NURSING UNIT | ROOM NO | BED | ACCOM CODE | SMOKER | PAY STATUS | CL. OF ADM | IF NEWBORN, MOTHER'S VPN |
|---|---|---|---|---|---|---|---|---|---|---|
| N | | | L/D | 001 | | 1 | | 203 | | |

| PHYSICIAN NAME | PHYSICIAN NO | PHYSICIAN NAME | | PHYSICIAN NO |
|---|---|---|---|---|
| BORCH-CHRISTENSEN, OLE | 00061 | | | |

| PHYSICIAN NAME | PHYSICIAN NO | MED SVC | PAT TYPE | ADM SVC | HOW BROUGHT TO HOSPITAL | ROOM RATE |
|---|---|---|---|---|---|---|
| | | 25 | I | | PRIVATE AUTO | |

ADMITTING DIAGNOSIS/CHIEF COMPLAINT

TERM PREGNANCY

| PATIENT EMPLOYER'S NAME | EMPL CODE | OCCUPATION | UNION AND LOCAL NO |
|---|---|---|---|
| AMERICAN EXPRESS | | DATA ENTRY | |

PATIENT EMPLOYER'S ADDRESS

| 2423 E LINCOLN DR | PHOENIX | AZ | TELEPHONE 602-954107 |
|---|---|---|---|

| SPOUSE OR NAME ST NEAREST RELATIVE NAME | RELATIONSHIP | ADDRESS | TELEPHONE |
|---|---|---|---|
| MARK MILKE | HU | SAME | 602-439400 |

| SECOND NEAREST RELATIVE/FRIEND NAME | RELATIONSHIP | ADDRESS | TELEPHONE |
|---|---|---|---|
| ILSE MILKE | OT | 10955 N 79TH AVE #66 | 602-879087 |

| RESPONSIBLE PARTY NAME | RELATIONSHIP | SOCIAL SECURITY NO | OCCUPATION | |
|---|---|---|---|---|
| DEBRA MILKE | SA | 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 | DATA ENTRY | |

RESPONSIBLE PARTY ADDRESS

| 3118 W VILLA MARIA DRIVE | PHOENIX | AZ | 85023 | TELEPHONE 602-439400 |
|---|---|---|---|---|

| RESPONSIBLE PARTY EMPLOYER'S NAME | EMPL CODE | NO OF YEARS THIS EMPLOYMENT |
|---|---|---|
| AMERICAN EXPRESS | | 8M |

RESPONSIBLE PARTY EMPLOYER'S ADDRESS

| 2423 E LINCOLN DR | PHOENIX | AZ | TELEPHONE 602-954107 |
|---|---|---|---|

| INS CO / INS CARR | COMMERCIAL INSURANCE / BLUE CROSS 1 | ADDRESS |
|---|---|---|
| 00468 METROPOLITAN | | |

| POLICY HOLDER NAME | POLICY NO / ID NO | CLASS OF INSB | GROUP NO / PROGRAM | EFF - VE DATE | INSURANCE CODE | BENEFITS |
|---|---|---|---|---|---|---|
| AMERICAN EXPRESS | 526671656 | 01 | 0015716 | / / | | |

| INS CO / INS CARR | COMMERCIAL INSURANCE / BLUE CROSS 2 | ADDRESS |
|---|---|---|
| | | |

| POLICY HOLDER NAME | POLICY NO / ID NO | CLASS INSB | GROUP NO / APPROVAL | EFF - VE DATE | INSURANCE CODE | BENEFITS |
|---|---|---|---|---|---|---|
| | | | | / / | | |

| CHAMPUS INS TYPE | EFFECTIVE DATE | TERMINATION DATE | IDENTIFICATION NO | SERIAL/CLAIM NO | SERVICE NO |
|---|---|---|---|---|---|
| | / / | / / | — — | | |

| SPONSORS NAME | | | PATIENT OR SPONSORS BRANCH OF SERVICE | MSSA | DUTY STATUS |
|---|---|---|---|---|---|
| | | | | | |

| INST HEALTH INS TYPE | INDUSTRIAL / OTH EMPLOYER NAME | INJURY DATE | CLAIM NO | INSURANCE CODE |
|---|---|---|---|---|
| | | | | |

ADDRESS

| | TELEPHONE |
|---|---|

GUARANTOR AGENT CARRIER NAME AND AGENT ADDRESS

| NAME OF HEALTH FACILITY DISCHARGED FROM IN LAST 30 DAYS | ADDRESS | VETERAN | SSI | COMBINATION OF BENEFITS |
|---|---|---|---|---|
| NONE | — | | | |

| CREDIT REFERENCE NAME #1 | ADDRESS | TELEPHONE |
|---|---|---|
| | | |

| CREDIT REFERENCE NAME #2 | ADDRESS | TELEPHONE |
|---|---|---|
| | | |

| LENGTH OF TIME IN CITY | OWN/RENT HOME | TYPE OF HOME | BANK NAME / BRANCH | SAVINGS/ CHECKING | REGISTRATION OBTAINED FROM |
|---|---|---|---|---|---|
| 12 | R | | LUKE FED CRED UNION | B | PRE-ADMISSION |

INSTRUCTIONS OR SERVICES TO BE RENDERED

REFERRING AGENCY

| | INTERVIEWED BY | REMARKS |
|---|---|---|
| 05 | DJA | |



**THUNDERBIRD SAMARITAN HOSPITAL
AND HEALTH CENTER**
5555 WEST THUNDERBIRD ROAD
GLENDALE, ARIZONA 85306

INTERVAL HISTORY AND
PHYSICAL EXAMINATION

DATE OF ADMISSION:  10-2-85

Patient                          Hospital No.          Physician

MILKE, DEBRA                     060357-*110336        Ole Christensen, M.D.

HISTORY OF THE PRESENT ILLNESS:  The patient is a 21-year-old gravida I, para 0 at term who was admitted earlier today in good labor.  The patient was sized to 6 cm. at around 11 o'clock.  Membranes were ruptured and there was seen to be meconium stained amnionic fluid.  Scalp electrode was applied.  The patient progressed well and was completely dilated at 2:15 this afternoon.  Fetal heart tones were between 140 and 150.  There was good variability without any evidence of late deceleration.  The patient has now been in second stage of labor since 2:15.  The first hour she was pushing.  However it was not felt that this was optimal pushing.  The patient did receive an epidural block in the afternoon because of discomfort.  It was noticed that the head was in an occiput posterior presentation.  At 4:30 the patient was examined, and was found to be completely dilated with the head at -1 to -2 station with molding.  The patient has contractions every three minutes and is pushing well and from 4:30 to 5:00 I have not seen evidence of progress.  There have been a few late decelerations, but they have been corrected with positioning the patient on the left side and giving oxygen.  At the present time, there is no evidence of any late decelerations.  The impression at this point is that the patient has failure to progress, possibly due to occiput posterior presentation.  Estimated fetal weight is around 7.5 to 8 pounds.

PAST MEDICAL HISTORY:  Unremarkable.

MEDICATIONS:  None.

ALLERGIES:  None.

PHYSICAL EXAMINATION:  The patient is in general good health.

LUNGS:  Clear.

HEART:  No murmurs.

ABDOMEN:  Soft in-between contractins with fundal height at xyphoid minus two fingers.

VAGINAL EXAMINATION:  As mentioned.

EXTREMITIES:  DTR's +1 bilateral.  No edema.

DIAGNOSIS:  Term intrauterine pregnancy.
            Failure to progress.
            Meconium stained amnionic fluid.

PLAN:  The patient is scheduled for primary low transverse ceserean section.  Prophylactic antibiotics have been recommended and the patient is in agreement with this.  Possible complications related to this surgery have been explained to the patient.

OC:gmd
d/10-2-85   1715   VII

OLE CHRISTENSEN, M.D.

**THUNDERBIRD SAMARITAN HOSPITAL
AND HEALTH CENTER**
5555 WEST THUNDERBIRD ROAD
GLENDALE, ARIZONA 85308

DISCHARGE SUMMARY

| Patient | Hospital No. | Physician |
|---|---|---|
| MILKE, DEBRA | 060357-*110336 | O. Christensen, M.D. |

DATE OF ADMISSION:  10/2/85
DATE OF DISCHARGE:  10/6/85

ADMITTING DIAGNOSIS:
DISCHARGE DIAGNOSIS:  See below.

OPERATIVE PROCEDURE:  10/2/85 - Low transverse cesarean section.

HOSPITAL COURSE:  The patient is a 21 year old white female, Gravida I Para 0, who is admitted at 39-1/2 weeks, in active labor at 5cm.  She had good progress in labor until the second stage, when after pushing for two hours, there was no descent of the vertex.  It was felt that this was due to cephalopelvic disproportion, and the patient was taken to the operating room, where a cesarean section was done, delivering a viable male without complications.

Postoperatively, the patient was stable.  She remained afebrile.  Her postoperative hemoglobin was 11.3, with hematocrit of 32.3.  By the fourth postoperative day, she was tolerating a regular diet, ambulating well, and had a bowel movement.  Her fundus was nontender at the umbilicus, and the incision was clean and dry.  There was scant lochia.  She was, therefore, discharged home to be seen in the office in two weeks.

She was given personal instructions for her postoperative care at home.

DISCHARGE MEDICATIONS:  Percodan #15.

DIAGNOSIS:  Term pregnancy, delivered, with cephalopelvic disproportion.

KD/ch
D:  10/6/85 (0834-V)
T:  10/8/85 (1214)

KATHRYN DEASON, M.D.

## Cartwright School District No 83
### STUDENT STATISTICAL DATA

**Sadeik, Debra Jean**
Last    First    Middle

6339 W. Palm Ln

**Sadeik, Renate Sigrid**
Last    First    Middle

**Sadeik, Richard Albert**
Last    First    Middle

(Please designate if guardian)

Birthday    3/10/64
Mo    Day    Year

Home Phone

Occupation    H/W

Occupation    USAF

Place Germany

School Last
Attended

For
Whom

For
Whom

ent previously been enrolled in a Cartwright District School

dress ........................................
City                                    State

OF EMERGENCY — NOTIFY

ADDRESS                PHONE        FAMILY PHYSICIAN

LOCAL PHYSICIAN

SPECIAL ABILITIES AND INTERESTS

ther's Place of Employment        Address            Phone Number

er's Place of Employment        Address

| | | | | |
|---|---|---|---|---|
| ...te | | | | |
| Grade | | | | |
| SION with glasses | R L | | | |
| +1.75 lens 3 diopter | | OK | O | OK / OK |
| without glasses | R L | 20/30 / 20/20 | OK | 0 3/4 0 / 10/20 |
| depth per color blind | | | | OK / OK |
| EARING | R | OK | O/4 | |

Birthdate _____ Place _____ Sex
Mo. Day Yr.

Address _____ Phone _____

Mother _____ Occupation Secretary Place of business _____ Phone

Father _____ Occupation _____ Place of business _____ Phone

**IMMUNIZATION DATES**
Smallpox 71    DPT
Skin Tests
Polio
had Measles
Rubella 75    Tetanus
other

Diabetes
Cancer
Tuberculosis
Asthma
Rheumatic Fever
Heart disease



# GLENDALE
# COMMUNITY
# COLLEGE

6000 West Olive Avenue
Glendale, AZ 85302-3090
Phone 602-435-3000
Fax 602-435-3029

■　　■　　■　　■

**Admissions &
Records Office**

February 15, 1995

Ms. Holly K. Wake
Mitigation Specialist
P.O. Box 5069
Glendale, Arizona  85312

Dear Ms. Wake:

This is in response to your request for documentation on Debra Jean Milke.  Enclosed is an official transcript and a computer generated Student Information Form.  No other records pertaining to Debra Jean Milke  were found.

If any further information is required, please contact me at (602) 435-3311.

Sincerely,

Mary Lou Bayless
Associate Dean
Student Services

MLB/rs

■　　■　　■　　■

A MARICOPA COMMUNITY COLLEGE

```
OPERATOR: Madeline Lopez              ID:0005  SYS:001  02/14/95 14:01:33
------------------------------------------------------------------------
*W-R0944 Student not active this term; will initialize from 872
111 STUDENT APPLICATION (NEW FORM)
   INST: 02
 SCREEN: ___     SID: 526671656   CRS: BPC110  1732   TERM: 952
           APPL-RECVD: _    STATUS-NFC: F  AIB: N  ABIL-TO-BENEFIT:    TERM: __
                                     PKA: Sadeik
 NAME: Milke, Debra Jean              SEQ#: 01  TYPE: L  COUNTRY: US
 ADDR: 3118 W Villa Maria Dr
 CITY: Phoenix       ST: AZ ZIP: 85023   PHONES: 439 4004 - 0009541076 ____
           (08)  CITIZENSHIP: 1        COUNTRY: US          (WORK-PHONE -EXT)
           (09)  GI-ACTIVE: N      DEPENDENT: 1   VETERAN:
           (10)  ARIZ-DATE: 000000  MAR-DATE: 000000  RES-CODE: MR  RES-TYPE: 1
           (11)  ADMISSION: 2                         EMISSION: N
           (12)  H.S.-CODE: I7    GRAD-STATUS: 1   GRAD-STATUS-YEAR: 82
           (13)  CURR-INTENT: 1      EFF-TERM:               PROG AWD VERS  S T
 PROG-1:
           (14)  EMPLYMNT-HRS:      (15) HNDCP-ASST: 2     HANDICAPS: __
           (16)   BIRTHDATE: 031064  CENT: 19 AGE: 030    (17)  SEX: F
           (18)   ETHNIC: 5       (19) MARITAL: M         (20)  INFO-RELEASE: Y
           (21) FIRST LANG: ___  LANG SPOKEN: ___      LANG NOW: ___  ASSIST-REQ: _
                         1  2  3  4  5  6  7  8  9 10 11 12 13 14 15 16
           (22)  HELP WITH: ___
           (23) PRIOR COLL: 01 ELIG-RETURN: Y  CLASS-FSU: F
                PC-1: _____     PC2: _____     PC3: _____     PC4: _____
------------------------------------------------------------------------
```

Hilke, Debra Jean
3118 W Villa Maria Dr
Phoenix, AZ 85023
Date of Birth 10/10/64
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

Glendale Community College
6000 West Olive Avenue
Glendale, AZ 85302
602-435-3000
F.I.C.E. # 001076

| COURSE NUMBER | COURSE TITLE | CREDIT UNITS | GRD |
|---|---|---|---|
| **SPRING 1984** | | | |
| EN 101 | FRESHMAN ENGLISH | 3.00 | F |
| MA 124 | FUNDAMENTALS OF ALGEBRA | 5.00 | W |
| MK 271 | PRINCIPLES OF MARKETING | 3.00 | F |
| PE 102 | RACKETBALL | 1.00 | F |

SEM. GPA: 0.142  QPTS: 1.00  QCU: 7.00  ECU: .00

| | | | |
|---|---|---|---|
| **FALL 1986** | | | |
| ENG071 | REVIEW OF ENGLISH FUNDAMENTALS | 3.00 | A |
| GBS151 | INTRODUCTION TO BUSINESS | 3.00 | B |
| PSY101 | INTRODUCTION TO PSYCHOLOGY | 3.00 | B |
| ACC111 | ACCOUNTING PRINCIPLES I | 3.00 | W |

SEM. GPA: 3.333  QPTS: 21.00  QCU: 9.00  ECU: 6.00*

| | | | |
|---|---|---|---|
| **SPRING 1987** | | | |
| ENG101 | FRESHMAN ENGLISH | 3.00 | W |
| REA181 | REAL ESTATE PRINCIPLES | 3.00 | W |

SEM. GPA: 0.000  QPTS: 0.00  QCU: 0.00  ECU: 0.00*

CUM. GPA: .715  QPTS: 22.00  QCU: 16.00  ECU: 7.00**

Under the provisions of the Family Educational Rights and Privacy Act of 1974, you are not to release this information to another party without the written permission of the student.

*** E N D   O F   T R A N S C R I P T ***

Holly K. Mike B.S., B.A.Ed.
P.O. Box 5069
Glendale, Arizona 95312

This transcript must bear signature and seal to be official.

M. R. Bylaa
ASSISTANT DEAN STUDENT SERVICES

02/14/95   PAGE 1 OF 1



February 24, 1995

ANDERS ROSENQUIST, ATTORNEY
ATTN: Holly K. Wake
P.O. Box 5069
Glendale, AZ - 85312

RE: Debra Jean Sadeik (Milke)
    DOB 03/10/64

Dear Ms. Wake:

The enclosed documents are a complete and accurate copy of the entire
file on Debra Jean Sadeik (Milke).

If you require any further information, please feel free to contact me
at (602) 285-7524.

Sincerely,


Dr. James D. Moore
Director Admissions & Records

JDM:jc
enclosures



```
PERATOR: JACQUE CLINE                    ID:0014  SYS:001  02/24/95 15:10:46
------------------------------------------------------------------------------
W-R0944 Student not active this term; will initialize from SYSTEM DEFAULTS
111 STUDENT APPLICATION (NEW FORM)
    INST: 01
SCREEN: ____   SID: 526671656   CRS:              TERM: 952
         APPL-RECVD: _    STATUS-NFC: F  AIB: N  ABIL-TO-BENEFIT:    TERM:
NAME: Sadeik, Debra Jean              PKA:
ADDR: 8124 N 33rd Dr                  SEQ#: 01  TYPE: L  COUNTRY: US
CITY: Phoenix      ST: AZ ZIP: 85021   PHONES: 841 1822 - 000
     (08)   CITIZENSHIP: 1       COUNTRY: US              (WORK-PHONE -EXT)
     (09)   GI-ACTIVE: N    DEPENDENT: 0    VETERAN: _
     (10)   ARIZ-DATE: 000000  MAR-DATE: 000000  RES-CODE: NG  RES-TYPE: 4
     (11)   ADMISSION: 2                          EMISSION:
     (12)   H.S.-CODE: I7   GRAD-STATUS: Y   GRAD-STATUS-YEAR: 82
     (13)   CURR-INTENT: 2     EFF-TERM:               PROG AWD VERS  S
PROG-1:

     (14)  EMPLYMNT-HRS: ___    (15) HNDCP-ASST:      HANDICAPS: 00 00 00
     (16)   BIRTHDATE: 031064  CENT: 19 AGE: 030   (17)   SEX: F
     (18)     ETHNIC: 5    (19) MARITAL: S        (20)   INFO-RELEASE:
     (21) FIRST LANG: ___  LANG SPOKEN: ___       LANG NOW: ___  ASSIST-REQ:
                          1  2  3  4  5  6  7  8  9 10 11 12 13 14 15 16
     (22)   HELP WITH: _   _  _  _  _  _  _  _
     (23) PRIOR COLL: __  ELIG-RETURN: Y  CLASS-FSU: F
          PC-1: _____   PC2: _____   PC3: _____   PC4: _____
------------------------------------------------------------------------------
```

# PHOENIX COLLEGE

1202 West Thomas Road
Phoenix, Arizona 85013

# Student Information Form

(PLEASE PRINT)

**MPUS / SEMESTER OF ENROLLMENT**
☐ Fall   ☐ Spring   ☐ Summer 1   ☐ Summer 2   Year: 19____

TY

rw student at Phoenix College
former student at Phoenix College: Last date attended: Mo. ____ 19____

**3AL NAME**
st, First, Middle)

**ORMER NAME(S)**
(*iden name, etc.)

**JLING DRESS**                                   APT #

**CITY, ATE**                        6. ZIP CODE

**ME HONE**          BUSINESS PHONE              EXT.

**CITIZENSHIP/ORIGIN STATUS** (Check and complete all that apply)
☐ United States Citizen (1)
☐ Immigrant/Permanent Resident (2)
Immigrant No. _____   Date of issue _____
☐ Refugee (3)   ☐ Exchange Visitor (7)   ☐ Non-academic student (7)
☐ Diplomatic (4)   ☐ Alien in transit (7)   ☐ Visitor (8)
☐ Student   (5)   ☐ Alien Crewman (7)   ☐ Other (9)
☐ Student Spouse   (5)   ☐ Worker (7)
**COUNTY OF ORIGIN** _____

> you currently a member of the U.S. ARMED FORCES stationed in Arizona
rauant to military orders?   ☐ Yes   ☐ No
re you a dependent of a member of the U.S. Armed Forces stationed in Arizona
pursuant to military orders?   ☐ Yes (1)   ☐ No
> you a veteran of the U.S. Armed Forces?   ☐ Yes   ☐ No

**:SIDENCY STATUS** (The responsibility of registering under the proper residency classification is placed upon the student. Any student who falsifies his/her residency hall be required to pay full tuition and may be subject to dismissal from the college. *fer to the college catalog for residency guidelines.*)

*Date present stay in Arizona began ____/____/____
(if born in Arizona and resided here continuously since birth, use date of birth.)
*Most recent state of legal residence prior to moving to Arizona _____
*What date did you leave that state? ____/____/____
*In what Arizona county do you reside? _____
*What date did you move to this county? ____/____/____
*Are you a legal Arizona resident?   ☐ Yes   ☐ No

*Failure to answer all questions may result in being classified as out-of-state for tuition/fee purposes.

**EDUCATION STATUS** (Check and complete all that apply.)
☐ Attended other college/university; earned at least 12 credits (1)
☐ High school graduate; (2)
☐ G.E.D. certified; (3)
☐ Under 18 (4)
☐ Over 18 and none of the above apply (5)

**GH SCHOOL:** Name of last high school attended:
Jame of School _____ State _____
Date of High School Grad. or G.E.D. Certified or Expected Grad.
Month _____ Year _____

**:EASON FOR ENROLLING**
☐ Prepare to enter the job market (1)
☐ Transfer to another college/university (2)
☐ Improve skills for present job (3)
☐ Prepare to change careers (4)
☐ Personal interest or self-improvement (5)

**b. MAJOR EMPHASIS OF YOUR EDUCATIONAL PROGRAM**
See attached list for information on degree and interest codes; select and enter one code from list:
☐ AA Degree (Transfer/interest) _____   From List 1
☐ AGS Degree (General Studies) _____   From List 1
☐ AAS Degree (Occupational) _____   From List 2
☐ CCL Certificate (Occupational) _____   From List 2
☐ Transfer for a Bachelor Degree _____   From List 1
☐ Not seeking a degree or certificate _____   From List 1 or 2

---

**14. EMPLOYMENT HOURS** planned per week while enrolled: *
☐ None (1)   ☐ 11-15 (3)   ☐ 21-30 (5)
☐ 1-10 (2)   ☐ 16-20 (4)   ☐ 31 or more (6)

**15. Do you have any DISABILITY or HANDICAP?** *   ☐ Yes (1)   ☐ No (2)
(If yes, please answer below)
Please select the appropriate code(s) from those listed below. All information is voluntary and is used to comply with federal reporting requirements and has no effect upon your status for admission to the college.
01 Blindness   08 Mobility problems
02 Other visual impairment   09 Mobility problems requiring wheel chair
03 Deafness   10 Respiratory problems
04 Other hearing impairment   11 Speech impairment
05 Diabetes   12 I would prefer to discuss privately
06 Epilepsy   13 Learning disability
07 Heart   14 Other _____

Enter your code(s) here: ☐ ☐ ☐ ☐ ☐

If you require assistance or accommodation to participate fully as a student, please contact Disabled Student Resources.

Section 504 of the Rehabilitation Act of 1973 defines: "Handicapped person" as (i) any person who (I) has a physical or mental impairment which substantially limits one or more major life activities, (II) has a record of such impairment, or (III) is regarded as having such an impairment.

**16. BIRTHDATE** * _____
MONTH   DAY   YEAR   AGE

**17. SEX** *   ☐ Male   ☐ Female

**18. RACE/ETHNIC BACKGROUND** *
☐ American Indian or Alaskan Native (1)   ☐ Black (3)   ☐ White (5)
☐ Asian or Pacific Islander (2)   ☐ Hispanic (4)   ☐ Other (6)

**19. MARITAL STATUS** *   ☐ Single   ☐ Married

**20. INFORMATION RELEASE:** Do you give permission for the college to release directory information relative to your enrollment (*as per the Family Education Rights and Privacy Act of 1974*)
The college has the right to release information regarding my enrollment unless I indicate NO. Nothing checked means yes.   ☐ Yes   ☐ No

**21.** What was the first language you spoke as a child? _____
What languages were spoken in your home when you were growing up? _____
What language do you speak most often now? _____
Do you wish assistance with English fluency skills?   ☐ Yes   ☐ No

**22.** Would you like HELP with: *   Y = Yes,   M = Maybe,   N = No
Y M N                                    Y M N
☐ ☐ ☐ 1. Financial aid          ☐ ☐ ☐ 9. Personal concerns
☐ ☐ ☐ 2. Finding work           ☐ ☐ ☐ 10. Learning disability
☐ ☐ ☐ 3. Learning English       ☐ ☐ ☐ 11. Physical disability
☐ ☐ ☐ 4. Reading skills         ☐ ☐ ☐ 12. Health problems
☐ ☐ ☐ 5. Study skills           ☐ ☐ ☐ 13. Commuter information
☐ ☐ ☐ 6. Writing skills         ☐ ☐ ☐ 14. Work experience credit
☐ ☐ ☐ 7. Math skills            ☐ ☐ ☐ 15. Day care information
☐ ☐ ☐ 8. Choosing major/career  ☐ ☐ ☐ 16.

**23. PRIOR COLLEGE ATTENDANCE**
Have you ever attended college?   ☐ Yes   ☐ No
If yes: Are you eligible to return?   ☐ Yes   ☐ No

**23a. PRIOR COLLEGE ATTENDANCE:** List ALL colleges and universities attended (list most recent first, regardless of length of attendance or work completed. Transcripts may be submitted for the evaluation of previous credit but are not required for admission to this college. You must make formal request for evaluation through the Admissions & Records Office.)

1. Institution Name _____ State (Country) _____
   Degree/Credit Earned _____
2. Institution Name _____ State (Country) _____
   Degree/Credit Earned _____
3. Institution Name _____ State (Country) _____
   Degree/Credit Earned _____
4. Institution Name _____ State (Country) _____
   Degree/Credit Earned _____

I certify that the answers on this Admissions Form are true, correct, and complete.

_____   _____
Signature of Applicant   Date

(All of the information on this form is confidential and in compliance with the Family Education Rights and Privacy Act of 1974. The Act's provisions are explained in the college catalog.)

*ffect on admission to the college

*Continue on back*

## List 1 - INTEREST AREA/TRANSFER

7002 Accounting
7006 Advertising
7014 Architecture
7016 Art
7022 Biology
7026 Business, General
7028 Chemistry
7032 Clinical Laboratory Science
7038 Computer and Information Systems (Business)
7040 Computer Science Engineering
7042 Criminal Justice
7046 Dental Hygiene
7048 Economics
7050 Education, Early Childhood
7052 Education, Elementary
7054 Education, Secondary
7056 Education, Special
7058 Engineering
7060 English
7062 English As a Second Language
7064 Finance
7066 Foreign Languages
7068 General Studies
7076 History
7084 Interior Design
7088 Journalism
7090 Management
7092 Marketing
7094 Mathematics
7098 Microbiology
7100 Music
7102 Nursing
7104 Nutrition/Food Science
7106 Philosophy
7108 Physical Education
7110 Physical Therapy
7112 Physics
7114 Political Science
7116 Psychology
7118 Public Administration
7120 Public Relations
7124 Real Estate
7130 Speech Communication
7134 Social Work
7136 Sociology
7140 Theatre/Drama
7142 Undecided
7148 Zoology

## List 2 - AAS DEGREE CODE LIST

3130 Accounting
3400 Administration of Justice - Corrections Technology
3404 Administration of Justice - Evidence Technology
3408 Administration of Justice - Law Enforcement Technology
3760 Adult Corrections
3500 Architectural Drafting
3138 Banking and Finance
3432 Building Safety and Construction Technology
3356 Child Care Administration
3308 Civil Engineering Technology
3291 Clinical Medical Assisting
3684 Computer Graphic Design
3182 Computer Information Systems
3150 Credit Union Management
3264 Dental Assisting
3272 Dental Hygiene
3268 Dental Office Management
3663 Electroneurodiagnostic (EEG) Technology
3276 Emergency Medical Technology - Advanced (Paramedic)
3355 Fashion Design
3266 Fashion Merchandising/Marketing
3416 Fire Science
3368 Food Service Administration
3050 General Business
3324 Health Information Technology
3344 Home Economics
3122 Interior Design
3332 Interpreter Training
3384 Legal Assisting
3202 Legal Secretarial Studies
3070 Management
3094 Marketing
3508 Mechanical Drafting
3214 Medical Transcription
3340 Nursing
3680 Office Automation Occupations
3729 Quality Customer Service
3727 Quality Process Leadership
3278 Travel Industry Technology

## List 3 - CCL CERTIFICATE CODE LIST

5718 Aging Services Management and Administrative Training
5500 Architectural Drafting
5432 Building Safety & Construction Technology
5356 Child Care Administration
5297 Civil Engineering Technology - Basic
5291 Clinical Medical Assisting
5299 Clinical Medical Assisting: Back Office
5303 Clinical Medical Assisting: Diagnostic Testing
5295 Clinical Medical Assisting: Front Office
5732 Commercial Food Preparation
5650 Computer Aided Drafting
5684 Computer Graphic Design
5754 Correctional Officer Training
5751 Correctional Service Officer Training
5760 Corrections Supervision/Management
5367 Corrections Training Academy
5149 Credit Union Management I
5150 Credit Union Management II
5264 Dental Assisting
5664 Electrocardiography (EKG)
5276 Emergency Medical Technology - Advanced (Paramedic)
5267 Emergency Medical Technology - Basic
5271 Emergency Medical Technology - Intermediate
5355 Fashion Design
5266 Fashion Merchandising/Marketing - Basic
5416 Fire Science
5368 Food Service Administration
5682 Hazardous Materials Response
5324 Health Information Technology - Clerical
5332 Interpreter Training
5384 Legal Assisting
5202 Legal Secretarial Studies
5729 Management I
5070 Management II
5094 Marketing
5206 Medical Secretarial Services
5229 Medical Transcription - Basic
5173 Microcomputer Accounting
5217 Microcomputer Applications
5331 Nurse Assisting
5675 Office Automation Occupations - Administrative Support
5674 Office Automation Occupations - Executive Assistance
5676 Office Automation Occupations - Information Processing
5677 Office Automation Occupations - Office Support Services
5757 Parole Officer Training
5375 Peace Officer Certification I - Limited Reserve
5379 Peace Officer Certification II - Full Authority
5279 Phlebotomy
5339 Practical Nursing
5728 Quality Customer Service
5727 Quality Process Leadership
5333 Sign Language Communication Pre-Employment
5369 Specialty Corrections Peace Officer Academy
5278 Travel Industry Technology

* This program does not qualify a student for financial aid. Consult an

Phoenix College, a part of the Maricopa Community College District, does not discriminate on the basis of race, color, religion, national origin, sex, sexual orientation, handicap/disability, age, or Vietnam era/disabled veteran status in employment or in the application, admission, participation, access and treatment of persons

MARICOPA

RECEIVED ALEOAC

SEP 2 0 1990

41

Plaintiff,

CRIMINAL ACTION NO: CR 89-12631

SUBPOENA IN CRIMINAL ACTION
XX Duces Tecum

42

Defendants.

ARIZONA LAW ENFORCEMENT ADVISORY COUNCIL (ALEOAC)
to: 3001 W. Indian School Road
Phoenix, Arizona

COMMANDED to appear and give testimony in this criminal action prosecuted by the State of Ari
specified below:

APPEARANCE TO BE MADE: Hon. Cheryl K. Hendrix
Judge of the Superior Court
September 24, 1990 at 12:30 p.m.

OF APPEARANCE:

Maricopa County Superior Court
Central Court Bldg., 10th Floor
201 W. Jefferson, Phoenix, Arizona 85003

43

evidence on the part of: ---Debra Jean Milke----

ALSO COMMANDED to bring with you and produce these books, papers, documents, or tang

and all records, files and materials relating to and/or reflecting
received by retired Phoenix Police Department Detective Armando
Jr. (P.P.D. Badge No. 1875) for the period from 1909 to the
otherwise, during the period of his employment with the
Police Department and/or any other law enforcement agency.

44

Subpoena is for appearance before the Court please contact the clerk of this Court stated
or hearing time has been changed.

HEREBY NOTIFIED THAT ANY FAILURE TO OBEY THIS SUBPOENA WITHIN
MAY BE DEEMED A CONTEMPT OF THIS COURT, OR MAY RESULT IN CI
IN FAVOR OF THE DEFENDANT IF THE DEFENDANT WHO WAS ISSUED THE S
ED BY YOUR NON-ATTENDANCE. ARS §§ 13-4071 - 13-4116.

COPY

SIGNED AND SEALED this date:                    SEP 1 8 '90

40

P.C.
Suite 810
85003

Clerk

By _____
Deputy Clerk

JUDITH ALLEN, CLERK
J. ALLENDER
DEPUTY CLERK

SUBPOENA IN CRIMINAL ACTION