**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Debra Jean Milke, | CV-98-0060-PHX-RCB |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| v. | **MEMORANDUM OF DECISION AND ORDER** |
| Dora B. Schriro, et al., | |
| Respondents. | |

Debra Jean Milke (Petitioner) filed a petition for writ of habeas corpus alleging that she is imprisoned and sentenced to death in violation of the United States Constitution.  (Dkt. 1).[1] Her amended petition raised eleven claims and numerous subclaims.  (Dkts. 19, 20.)  In an Order dated July 7, 2000, the Court dismissed Claims II, III (in part), IV(A) (in part), IV(C), IV(D), IV(F), IV(G) (in part), V(A), V(B), VI, VIII (in part), IX, and XI (in part) as procedurally barred and Claim V(D) for lack of merit.  (Dkt. 47.)  The Court determined that Claims I, III (in part), IV(A) (in part), IV(B), IV(E), IV(G) (in part), V(C), VII, VIII (in part), X, and XI (in part) were properly exhausted and subject to review on the merits.  (*Id.*)  This Order addresses the merits of those claims.  For the reasons set forth herein, the Court concludes that Petitioner is not entitled to relief.

---

[1]   "Dkt." refers to the documents in this Court's file. "ME" refers to the minute entries of the state court; "ROA-PCR" refers to the seven-volume state court post-conviction record (CR-97-168-PC); and "RT" refers to transcripts of the state court proceedings.

**BACKGROUND**

On December 8, 1989, Petitioner was indicted on charges of first-degree murder, conspiracy to commit first-degree murder, child abuse, and kidnaping. (ROA-PCR 1.) The Arizona Supreme Court summarized the facts surrounding the crime and Petitioner's arrest:

> Debra Milke and her four-year-old son, Christopher, shared an apartment with co-defendant James Styers and his two-year-old daughter. While Milke worked at an insurance agency, Styers, an unemployed and disabled veteran, watched Christopher. Milke and Christopher's father were divorced, and Milke had legal custody of Christopher. Christopher's father often visited with his son and sometimes took him overnight.

> In September, 1989, shortly after beginning a new job, Milke took out a $5000 life insurance policy on Christopher as part of her employee benefit plan. The policy named Milke as the beneficiary. Sometime between the time she bought the policy and the time of Christopher's death, Milke and Styers discussed the policy and the benefits.

> At about 11:00 a.m. on Saturday, December 2, 1989, Styers, with Milke's permission and in her car, took Christopher from the apartment. Styers told Christopher they were going to Metrocenter so Christopher could see Santa Claus. Styers then picked up co-defendant Roger Scott, and the two men and Christopher had lunch and ran some errands. Later, Styers told the police that he first dropped Scott off and then took Christopher to Metrocenter to see Santa Claus. Styers told the police he had to use the restroom, so he took Christopher into the men's room at Sears and had him wait outside the stall but inside the restroom. When he came out, Christopher was allegedly gone. Styers reported this scenario to Metrocenter security; eventually the police were called. In this initial story, Styers claimed that he met Scott outside of Sears while looking for Christopher, that Scott told him that he had come to Metrocenter with a friend named Phil, that Styers and Scott looked for Christopher for a while, and that Styers eventually walked Scott to the bus stop and Scott went home.

> Styers called Milke around 2:45 p.m. and told her that Christopher was missing from Metrocenter. Milke called her father in Florence, Arizona, and told him Christopher was missing. Milke's stepmother, stepsister, and stepsister's boyfriend drove to Phoenix Saturday evening to be with her. Milke was interviewed several times throughout the night by police officers. She went back to Florence with her relatives on Sunday afternoon, December 3.

> In the meantime, the Phoenix police interviewed Scott. Scott's first story coincided with Styers' first story, but ultimately Scott led police to Christopher's body. After that, a Phoenix police detective flew to Florence to interview Milke. She was told that her son had been found shot to death in the desert and that she was under arrest. The detective read her her *Miranda* rights, which she stated she understood.

> Milke told the detective that she was upset with her son because he was going to turn out like his father – in jail, an alcoholic, and a drug user. Milke said

that she verbalized these fears to Styers but did not think that he would ever hurt the child. She stated that she was not crazy, she just did not want Christopher to grow up like his father. She told the detective that she wanted God to take care of Christopher. She said she thought about suicide but decided against it because Christopher would then be in his father's custody. She decided it would be best for Christopher to die. She stated that she had a hard time telling Styers what she wanted, but she finally told him, and he agreed to help. Milke and Styers discussed the plan several times and included Scott on at least one occasion. Ultimately, they decided that Styers and Scott would take Christopher, kill him, and then report him missing at Metrocenter, but Milke was not to know how Christopher was killed.

On Saturday morning, December 2, 1989, Styers told Milke that they were going to murder Christopher that day. They told Christopher that he was going to see Santa Claus at Metrocenter. Milke told police that she did not have a $5000 life insurance policy on Christopher, but her father did. She denied that insurance money was her motivation, but admitted that it may have been Styers' and Scott's because Styers knew of the policy. Milke was arrested and taken back to Phoenix.

*State v. Milke*, 177 Ariz. 118, 120-21, 865 P.2d 779, 781-82 (1993). A jury convicted Petitioner of all four offenses on October 12, 1990. (ROA-PCR 270-73.)

At sentencing, the trial court found three aggravating factors: the murder was committed in the expectation of pecuniary gain, the victim was under the age of fifteen, and the crime was especially heinous and depraved. (ME 1/18/91.) The court found no statutory mitigating circumstances, but determined that the following nonstatutory mitigation had been proved: Petitioner's lack of a prior felony record, her employment history, and her good conduct while incarcerated. (*Id.*) The court then found that the mitigating circumstances were not sufficient to call for leniency, and sentenced Petitioner to death on the first-degree murder count. (*Id.*)

On direct appeal, the Arizona Supreme Court affirmed Petitioner's convictions of first-degree murder, conspiracy, and kidnaping, but vacated the child abuse conviction. *Milke*, 177 Ariz. at 130, 865 P.2d at 791. Petitioner unsuccessfully sought a writ of certiorari in the United States Supreme Court. *Milke v. Arizona*, 512 U.S. 1227 (1994).

On November 1, 1995, Petitioner filed a petition for postconviction relief (PCR) pursuant to Rule 32 of the Arizona Rules of Criminal Procedure. In a lengthy opinion, the PCR court denied relief. (ME 11/18/96.) Petitioner filed a petition for review; the Arizona Supreme Court summarily denied relief on December 16, 1997.

1    Petitioner filed her petition for writ of habeas corpus on January 12, 1998 (Dkt. 1), and

2  her amended petition on August 31, 1998 (Dkt. 19).  She filed her merits brief on June 11, 2002.

3  (Dkt. 98.)   Respondents filed their response on October 9, 2002 (Dkt. 109); Petitioner replied

4  on February 11, 2003 (Dkt. 117).  On September 26, 2003, the Court granted in part Petitioner's

5  motion to expand the record to include exhibits attached to her merits brief and reply.  (Dkt.

6  130.)

7                            **STANDARD FOR HABEAS RELIEF**

8     Petitioner's habeas claims are governed by the applicable provisions of the Antiterrorism

9  and Effective Death Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

10  For properly preserved claims "adjudicated on the merits" by a state court, the AEDPA

11  established a more rigorous standard for habeas relief.  *See Miller-El v. Cockrell*, 537 U.S. 322,

12  337 (2003) (*Miller-El I*).   As the Supreme Court has explained, the AEDPA's "'highly

13  deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be

14  given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)

15  (quoting *Lindh*, 521 U.S. at 333 n.7).

16     The phrase "adjudicated on the merits" refers to a decision resolving a party's claim

17  which is based on the substance of the claim rather than on a procedural or other non-substantive

18  ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The relevant state court

19  decision is the last reasoned state decision regarding a claim.  *Barker v. Fleming*, 423 F.3d 1085,

20  1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-804 (1991)); *Insyxiengmay*

21  *v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

22     Under the AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated

23  on the merits by the state court unless that adjudication:

24     (1) resulted in a decision that was contrary to, or involved an unreasonable
25        application of, clearly established Federal law, as determined by the Supreme
        Court of the United States; or

26     (2) resulted in a decision that was based on an unreasonable determination of the
27        facts in light of the evidence presented in the State court proceeding.

28

28 U.S.C. § 2254(d).

"The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Musladin v. Lamarque*, 427 F.3d 653, 655 (9th Cir. 2005) ("AEDPA limits the source of clearly-established federal law to Supreme Court cases"); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be of "persuasive value" in determining what law is clearly established and whether a state court applied that law unreasonably. *Musladin*, 427 F.3d at 655 (collecting cases); *see Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

- 5 -

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts.  *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340.  In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240, 125 S. Ct. at 2325.  However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness.  *Miller-El I,* 537 U.S. at 341-42. ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

## DISCUSSION

**Claim I:**     **The interrogation tactics of Detective Saldate violated Petitioner's rights against self-incrimination, to due process, a fair trial, and a just sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

Petitioner alleges that the methods used by Phoenix Police Detective Armando Saldate in questioning her about her son's murder rendered the results of the interrogation unreliable and

violated her due process rights.  Specifically, Petitioner asserts that her statement was elicited involuntarily and in violation of her rights under *Miranda*.  Petitioner further contends that Det. Saldate fabricated the incriminating aspects of the interrogation.

In support of these arguments, Petitioner cites the fact that Det. Saldate failed to tape-record or otherwise memorialize the interrogation, that no other officers were present, and that he destroyed his original notes.  Petitioner also alleges that Det. Saldate has a documented history of eliciting involuntary statements from suspects, fabricating confessions, and engaging in other forms of official misconduct.  Finally, Petitioner alleges that when interviewing other witnesses in this case, Det. Saldate biased those witnesses against Petitioner.

**State court proceedings**

Suppression hearing

On September 10, 1990, the trial court held a hearing on Petitioner's motion to suppress her statement to Det. Saldate.  Det. Saldate testified that he interrogated Petitioner at the Pinal County Sheriff's Office at around 8:00 p.m. on the night of December 3, 1989.  (RT 9/10/90 at 44.)  Earlier in the day he had interviewed co-defendant Scott, who revealed the location of the victim's body and indicated that Petitioner had been involved in the murder.  (*Id.* at 29-30.)  The interrogation of Petitioner occurred in the jail's infirmary or medical office, a room approximately fifteen by fifteen feet, containing a desk, chairs, and medical supplies. (*Id.* at 47-48.) The door was closed and only Petitioner and Det. Saldate were present in the room, with Saldate seating himself directly in front of Petitioner in chairs set beside the desk.  (*Id.* at 48.) The interrogation lasted approximately thirty minutes.  (*Id.* at 55.)

When Det. Saldate arrived, Petitioner was in the room with another woman, whom Det. Saldate asked to leave. (*Id.* at 46.)  Det. Saldate introduced himself to Petitioner and indicated that he was investigating the disappearance of Petitioner's son; he then stated that the child had been found shot to death in the desert and that she was under arrest. (*Id.* at 48-50.)  Petitioner uttered the words "What, what" and began crying – in Det. Saldate's opinion "feigning crying,"

- 7 -

without actually shedding tears – until he told her that he would not tolerate it and he was there to discover the truth.  (*Id.* at 50-51.)  According to Det. Saldate's testimony, he then read Petitioner her *Miranda* rights, and Petitioner, first by gesture and then verbally, indicated that she understood those rights.  (RT 9/10/90 at 57-58.)  Petitioner began to cry again, until Det. Saldate repeated that he would not tolerate it and that he wanted her to tell him the truth.  (*Id.* at 59-60.)  At that point, Petitioner asked him what he wanted to know and what he wanted her to tell him.  (*Id.* at 60.)

Det. Saldate testified that he asked Petitioner if he could record the interview, and that she answered that she did not want the interview recorded (*id.* at 51-52); he further stated that if she had indicated that she wanted the interview recorded he would have complied (*id.* at 65).  According to Det. Saldate's testimony, Petitioner spoke freely with him, in a "normal, even" tone of voice, and the conversation was "friendly."  (*Id.* at 67.)  She never exhibited signs of confusion or disorientation (*id.* at 71) and appeared to be "[v]ery, very intelligent" (*id.* at 70).  Det. Saldate testified that he made no threats or promises during the interrogation.  (*Id.* at 61-62.)  According to Det. Saldate, Petitioner did not ask for a lawyer or state that she wished to remain silent or terminate the interrogation. (*Id.* at 70; *see* RT 9/11/90 at 12, 16, 23.)  Det. Saldate testified that Petitioner indicated to him at the end of the interrogation that she felt better after having spoken with him.  (*Id.* at 71.)  Det. Saldate did not handcuff Petitioner when he transported her from Florence to Phoenix.  (*Id.* at 56.)  On the drive to Phoenix, Petitioner asked Det. Saldate to call her father so that he could bail her out and obtain an attorney for her.  (*Id.* at 69-70.)

Det. Saldate testified that he took notes throughout the interrogation.  (*Id.* at 64.)  From those notes he prepared a supplemental report dated December 6, 1989.  (Dkt 101, Ex. 24.)  The report summarized the contents of the interrogation in a narrative fashion but also incorporated direct quotations from Petitioner.  (RT 9/10/90 at 64.)

At the suppression hearing, defense counsel called for testimony from Dr. Martin Kassell,

the psychiatrist who was treating Petitioner in jail. Dr. Kassell had interviewed Petitioner about her encounter with Det. Saldate; at the hearing he offered his opinion about the psychological dynamics of the interrogation. (*Id.* at 80.) He testified that Petitioner told him that Det. Saldate began the interrogation by informing her that her son had been shot to death and that she was under arrest; that she became hysterical; that Det. Saldate demanded that she stop crying and explained that he was there to ascertain the truth; and that Det. Saldate then administered the *Miranda* advisory. (*Id.* at 82.)

Without challenging the factual contents of Det. Saldate's supplemental report, Dr. Kassell opined that Det. Saldate reached illogical conclusions about Petitioner's involvement in the murder based upon unsupported assumptions; according to Dr. Kassell, these assumptions caused Det. Saldate to misinterpret Petitioner's statements and emotional condition. (*Id.* at 86.) Dr. Kassell also testified that in his opinion Petitioner heard Det. Saldate advise her of her *Miranda* rights but was too distraught and intimidated by Det. Saldate to "fully comprehend" them. (*Id.* at 82, 94.)

Dr. John Fritz, a criminologist, also testified for Petitioner at the suppression hearing. Citing what he characterized as implausibilities in Det. Saldate's account of the interrogation, Dr. Fritz testified that Saldate's report was either "altered" or "fabricated." (*Id.* at 34.) Apart from his opinion that Det. Saldate did not actually inquire of Petitioner whether she would consent to the interrogation being recorded, Dr. Fritz could not, however, identify a specific instance in which the report was altered or fabricated. (*Id.* at 149-50.) Dr. Fritz also testified that in his opinion Det. Saldate did not conduct the interrogation as an objective investigator. (*Id.* at 138.)

Kirk Fowler, who served as Petitioner's court-appointed investigator, also testified at the hearing. According to Fowler, Petitioner told him that she had asked for an attorney early in her interview with Det. Saldate. (*Id.* at 157.) Fowler testified that in requesting an attorney, Petitioner used the expression, "'I think I should speak to an attorney,' or words to that effect." (*Id.* at 162-63.)

At the conclusion of the testimony, the trial court denied Petitioner's motion to suppress her statement to Saldate.  The court made the following findings:

> The Court finds that the Defendant was properly Mirandized.  The Court finds that, notwithstanding the Defendant's emotional state at the time, she understood those rights.  The Courts finds that at no time did the Defendant request an attorney, either before or after she was advised of her rights.  The Defendant was given a free choice to discuss, admit or deny or refuse to answer questions.  The Defendant voluntarily, knowingly and intelligently relinquished her right to counsel and her right to remain silent.  She voluntarily, knowingly and intelligently made statements without any promises being made, without there being any threats or coercion, either psychological or physical.[2]

(RT 9/11/90 at 33.)

Trial

At trial, Det. Saldate repeated the testimony he had given during the suppression hearing regarding his conduct during the interrogation.  He also testified about the information provided by Petitioner during the interrogation, which he incorporated into his report.

Det. Saldate quoted Petitioner as explaining, in reference to her son, "Look, I just didn't want him to grow up like his father.  I'm not a crazy person.  I'm not an animal.  I just didn't want him to grow up like that."  (RT 9/12/90 at 71.)  According to Det. Saldate, Petitioner then began to discuss her positive high school experiences, explaining that she was popular and had high self-esteem until she met Mark Milke, whose drug and alcohol use had a negative effect on her life.  (*Id.* at 72.)  Next, she discussed her marriage to Milke and the fact that her pregnancy was unexpected and unwanted.  (*Id.*)  She indicated that she frequently checked on the fetus's condition to see if it was abnormal, and considered getting an abortion but abandoned the idea because she believed the procedure was too painful.  (*Id.* at 72-73.)

According to Det. Saldate's testimony, Petitioner told him that Christopher was a difficult and mischievous child and that she believed that he would grow up to be like his father, a drug and alcohol abuser who would get into trouble with the law.  (*Id.* at 73-74.)  She then stated,

---

[2]  Subsequently, in rejecting Petitioner's motion for a judgment notwithstanding the verdict, the trial court repeated its finding that Petitioner did not "ma[k]e a request for an attorney prior to or during her questioning by Detective Saldate."  (RT 1/18/91 at 8.)

"I'm not a malicious person, I just wanted God to take care of him." (*Id.* at 74.) She indicated that she had contemplated suicide, but believed that killing herself would not solve the problem, because her ex-husband would gain custody of Christopher. (*Id.* at 74-75.) According to Det. Saldate, Petitioner told him that she decided it would be better for Christopher to die, and, after some initial hesitancy, she expressed her feelings about Christopher to her roommate, co-defendant Styers. (*Id.*) Det. Saldate testified that Petitioner stated that she and Styers came to an agreement by which Styers would kill Christopher but keep the details of the murder from Petitioner. (*Id.* at 76.) She stated that she, Styers, and co-defendant Scott had several conversations about killing Christopher; she also indicated that she went out driving with Styers on one occasion with the intent to kill Christopher but the plan fell through. (*Id.* at 79.) Det. Saldate testified that Petitioner then explained that she and the co-defendants developed a plan by which Styers and Scott would kill Christopher and then proceed to the Metrocenter mall and report him missing. (*Id.*)

According to Det. Saldate, Petitioner told him that on the morning of December 2, 1989, Styers indicated that he and Scott were going to carry out the plan to kill Christopher that day. (*Id.* at 80.) When asked if she dressed her son in special clothes or gave him a special hug or kiss, Petitioner told Det. Saldate that she did not have to, because she had previously told the child that he was going to go to heaven soon and that she would meet him there later. (*Id.*) When Styers called her from the mall on the afternoon of December 2 to report that Christopher was missing, Petitioner knew that the plan to kill Christopher had been carried through. (*Id.* at 81.) Petitioner indicated to Det. Saldate that after receiving the call, she prayed to God that she would have no more children. (RT 9/13/90 at 9.)

After revealing this information, Petitioner asked Det. Saldate if he understood her. (*Id.*) She also expressed concern that her family would disown her and that her father would think she was crazy. (*Id.* at 10.) In response to this statement, Det. Saldate asked Petitioner if she believed she was crazy, and, according to Det. Saldate, Petitioner responded, "No, I'm just an emotionally troubled 25-year-old girl who needs help dealing with her problems." (*Id.*) She further

explained that she kept her emotions bottled up and had difficulty discussing her problems "until now." (*Id.* at 11.) When Det. Saldate suggested to Petitioner that there were other options if she no longer wanted custody of her son, including placement with family members, she replied, "I guess I just made a bad judgment call." (*Id.* at 12.)

According to Det. Saldate, during the interview Petitioner denied having life insurance on her son, but explained that her father had a policy on the child. (RT 9/12/90 at 76.) She also denied that the insurance money was her motive but stated that it may have been a motive for Styers and Scott, because Styers was aware of the policy. (*Id.*)

Petitioner also testified at the trial. According to her testimony, Det. Saldate entered the room and introduced himself, asked her friend to step out, closed the door, and then informed Petitioner that her son had been found murdered and that she was under arrest. (RT 10/3/90 at 13.) Petitioner then began crying – shedding real tears – and screaming "What, what?" (*Id.*) Det. Saldate stated that he would not tolerate her crying and told her to be quiet. (*Id.*) He then took out a card and read Petitioner her *Miranda* rights. (*Id.*) Petitioner testified that she was too upset to understand the *Miranda* advisory (*id.*), and that when Saldate asked if she understood her rights she replied that she did not (*id.* at 17). According to Petitioner, Det. Saldate then asked her if she wanted the interview recorded, to which she replied, "No, I need a lawyer." (*Id.* at 17.) Det. Saldate then moved his chair "right in front" of Petitioner. (*Id.* at 18.) He asked Petitioner her age, replied that he had a daughter of the same age and understood what she was going through, placed a hand on her knee, and told her repeatedly that she could trust him. (*Id.*) Petitioner began crying again; Det. Saldate repeated that he would not tolerate her crying and stated that he wanted her to tell him the truth and would not tolerate any lies. (*Id.*) According to Petitioner, Det. Saldate provided her with paper towels to dry her tears. (*Id.*) Det. Saldate asked her what she was thinking about, and Petitioner related to Det. Saldate that she had recently "opened up" to co-defendant Styers about the conflicts between her and Milke over issues of custody and visitation; she explained, however, that Styers would not hurt her son. (*Id.* at 20-22.)

According to Petitioner, Det. Saldate responded by telling her that she was not being truthful. (*Id.* at 22.) Petitioner acknowledged that she then told Det. Saldate, "Look, I'm not crazy and I'm not an animal . . . I just didn't want Christopher to grow up and be like his dad; is there anything wrong with that?" (*Id.*) She then told Saldate about her success and popularity in high school, her high self-esteem, and the negative impact her relationship with her ex-husband had on her life. (*Id.* at 24-25.) She explained that she had been on birth control at the time she became pregnant with Christopher, that she did not want or expect to become a mother at age twenty, and that her pregnancy was accidental. (*Id.* at 25-26.) She explained to Det. Saldate that she had considered getting an abortion but decided against it; that she did not want to become pregnant again; and that she had investigated the possibility of getting her tubes tied but had been turned down for the procedure and wondered if it could be ordered by the court. (*Id.* at 28.) Petitioner then detailed to Det. Saldate her conflicted feelings about her ex-husband's continued presence in Christopher's life. (*Id.* at 28-29.) During this period of the interview, Det. Saldate was looking at Petitioner and listening but not asking questions; he did not again accuse her of lying. (*Id.* at 29.) When Det. Saldate then asked her how she felt, she responded that she felt "numb." (*Id.* at 30.) She then stated, "I'm not a malicious person; God, I just wanted to take care of him." (*Id.*) When asked whether she could have let her ex-husband take care of Christopher, Petitioner replied that she would die before she let Milke have sole custody of the child. (*Id.*)

Det. Saldate next asked Petitioner if she had a life insurance policy on her son. (*Id.* at 31.) Petitioner indicated that she did not but that her father did. (*Id.*) She testified that she considered the life insurance that she had selected for her son to be a part of her health insurance package rather than a separate policy. (*Id.* at 32.) According to Petitioner, Det. Saldate informed her that co-defendants Styers and Scott had anticipated receiving payments from the child's life-insurance policy; Petitioner responded that that might have been their motivation but that she would not do something like that. (*Id.* at 34-35.)

- 13 -

Petitioner then provided Det. Saldate with the details of the previous day's events and the manner in which she learned that her son was missing.  (*Id.* at 37-38.)  She then stopped speaking for a period of five minutes, after which Det. Saldate asked her what she was thinking.  (*Id.* at 39-40.)  At that point, she recited a conversation she had had with Christopher about God, heaven, and hell; during that conversation, according to Petitioner, she told her son that he would not go to heaven to meet God for a long time because he was still a young child.  (*Id.* at 40-41.)

Petitioner next spoke to Det. Saldate about her parents, explaining that she believed they would probably disown her because she had been arrested (*id.* at 43) and that her father would probably think she was crazy (*id.* at 45).   She then asked Det. Saldate if she could be allowed to go home; when he explained that she would have to go to jail due to the seriousness of the charges, Petitioner expressed concern that people would think she was insane.  (*Id.* at 46.)  Det. Saldate then asked her if she was insane.  (*Id.*)  Petitioner replied that she was not, that she just had difficulty expressing her emotions.  (*Id.*)  She denied making the statement, attributed to her by Det. Saldate, that "I'm just an emotionally troubled 25-year-old girl who needs help dealing with her problems."  (*Id.*)  Petitioner acknowledged discussing with Det. Saldate the existence of alternative custodial arrangements for Christopher, but stated that she volunteered the information to refute the suggestion that she would have resorted to eliminating her son because he was a burden.  (*Id.* at 47.)  She also attributed to Det. Saldate the statement about making a "bad judgment call." (*Id.*)  Petitioner denied ever admitting to any knowledge of or involvement in the killing of her son.  (*Id.* at 43-45.)

Petitioner acknowledged that she asked Det. Saldate whether she would have to go to jail.  (*Id.* at 45.)  She also testified that in the car on the way from Florence to Phoenix she asked Det. Saldate whether she could get bailed out.  (*Id.* at 55.)

At the conclusion of the trial, the court provided the jury with the following instruction regarding the voluntariness of Petitioner's statement to Det. Saldate:

> You must not consider any statements made by the Defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the Defendant made statements voluntarily.   The Defendant's statement is not

voluntary if it resulted from the Defendant's will being overcome by a law enforcement officer's use of any sort of violence, coercion or threats or by direct or implied promises, however slight.   You must give such weight to the Defendant's statement as you feel it deserved under all the circumstances.

(RT 10/11/90 at 78.)

Post-conviction rulings

Petitioner's PCR petition challenged the manner in which Det. Saldate conducted the interrogation and his account of the statements made by Petitioner.  The allegations raised in the PCR petition, and rejected by the PCR court, are those now presented to this Court.

In denying Petitioner's claim that her *Miranda* rights were violated, the PCR court reiterated that "the trial court made the factual determination that [Petitioner] did not ask for an attorney at the beginning of the interview" with Det. Saldate.  (ME 11/18/96 at 5).  The Court further determined that she was able to comprehend her rights.  (*Id.* at 4.)

With respect to the issue of voluntariness, the PCR court found that Det. Saldate did not overbear Petitioner's will during the interview such that her statements were involuntary.  (*Id.* at 4.)  The Court also found that Det. Saldate did not fabricate Petitioner's statements.  The PCR court explained its rulings as follows:

The legal standard to be employed to determine the admissibility of the defendant's statements made during the police interrogation is whether the will of the defendant was overcome by coercion or threats or promises.  Interviewing techniques are a necessary part of law enforcement, and a confession resulting from the use of the techniques only becomes improper if there are implied promises or improper influence. There is no indication of any implied promise or improper influence in this case.  There is no indication the defendant was mentally impaired or hysterical to the point of being unable to comprehend what was being said to her.

The extent to which Ms. Milke may have felt intimidated or coerced to make a statement to Det. Saldate was a jury question.  The jury was properly instructed on the law on this issue . . . . The jurors were told they were not to consider any statements made by the defendant to a police officer unless they first determined, beyond a reasonable doubt, that the statements were made voluntarily.

When the defendant related her version of the interview by Det. Saldate to Dr. Kassell, her version of what was said was substantially the same as what was in Det. Saldate's report . When the defendant testified, she told the jury about her interrogation by Det. Saldate.  Her version of the interrogation was not much different from the version given by Det. Saldate.  The only significant difference between Ms. Milke's recollection of the interview and Det. Saldate's recollection

- 15 -

is when and how she requested an attorney.  The defendant said she asked for an attorney at the beginning of the interview.  Her statement was, "I don't want a tape recorder, I want an attorney" . . . .  Det. Saldate disputes that the request for an attorney was made at that time.  He says that at the conclusion of the interview, when the defendant was told she was going to jail, she asked the detective to call her father so that he could get an attorney for her.  The trial court made the factual determination that the defendant did not ask for an attorney at the beginning of the interview.

.   .   .

The criticism that Det. Saldate destroyed his handwritten notes, leaving only the typed "official version" is an argument often made by defense attorney [sic].  It is meritless.  Destruction of handwritten notes after they are incorporated into a written report does not equal reversible error.

The defendant's statements to Det. Saldate were not an unequivocal confession of "Yes, I did it."  If Det. Saldate were to fabricate a confession he could do a better job of making the confession concrete and less abstract.  Perhaps the most inculpatory statement Det. Saldate attributes to the defendant is her comment that she did not want her son to grow up to be like his father.  As aptly pointed out by Dr. Kassell, the comments of the defendant, as reported by Det. Saldate, were generally accurate.  Reasonable minds could differ as to the interpretations to be given to the statements and the conclusions that could be reached.  The jury made the determination of the reliability of the statements and the conclusions to be reached after considering the statements.

Notwithstanding the inflammatory adjectives used to describe Det. Saldate and his conduct . . . , the jury heard his version of the interview and they heard the defendant's version of the interview.  The jury decided the case.

(ME 11/18/96 at 3-7.)

In her PCR petition, Petitioner asserted that Det. Saldate's record revealed a history of overreaching and unprofessional conduct, including interrogating impaired and injured suspects and violating suspects' *Miranda* rights.  The PCR court rejected this argument, explaining that the new information presented by Petitioner to cast doubt on Det. Saldate's veracity did not constitute "admissible evidence."[3]  (ME 11/18/96 at 6.)  The court further noted that "a conviction for perjury or false swearing has not been offered.  The fact that requests for voluntariness hearings were filed in other cases in which Det. Saldate was the interrogating

---

[3]   The PCR petition was supported by more than 100 exhibits.  Included in the exhibits were synopses of previous cases in which Det. Saldate allegedly engaged in misconduct (Ex. 12) and affidavits from three "police experts" each of whom attested that "there is a high probability that the confession never occurred and was fabricated" (Ex. 92).

- 16 -

1  officer does not establish he has lied under oath to obtain convictions." (*Id.*)

2      The PCR court likewise rejected Petitioner's contention that Det. Saldate biased other

3  witnesses, including her sister and father, by the manner in which he interviewed those

4  witnesses.  The court explained:

5           Assuming Petitioner's position is correct, that Det. Saldate caused
         witnesses to be biased against Ms. Milke, to the extent Det. Saldate misinterpreted
6        information given to him by the witnesses, the jurors were told by the witnesses
         themselves what they had told the detective.  Thus, the interview techniques,
7        whatever they were, did not rob the petitioner of her constitutional right to due
         process or a fair trial.
8

9  (ME 11/18/96 at 8.)

10     **New evidence**

11     Petitioner has attached to her merits brief a number of exhibits containing information that

12  was not before the state court.  These include a report from Dr. Richard Leo, Associate Professor

13  of Criminology, Law and Society at the University of California, Irvine. (Dkt. 101, Ex. 28.) Dr.

14  Leo impugns Det. Saldate's professionalism and opines that Saldate "may very well have

15  fabricated or coerced a false or non-existent confession from [Petitioner]." (*Id.* at 11.) Petitioner

16  has also supplied additional information regarding prior cases in which Det. Saldate allegedly

17  engaged in misconduct.  (*See, e.g.*, Dkt. 100, Ex. 15A-Q; Dkt. 120, Exs. M, N, O.)  Petitioner

18  has supplied an affidavit, dated May 23, 2002, from a television reporter who spoke with

19  Petitioner after her interrogation and who attested that he believed Petitioner was genuinely

20  surprised when he informed her that it had been reported that she had made a confession to Det.

21  Saldate. (Dkt. 102, Ex. 38.) Finally, Petitioner has provided articles (*see, e.g.*, Dkt. 120, Exs.

22  L, R), and amicus briefs (Dkts. 126, 132), expressing the opinion that police interrogations ought

23  to be recorded as a matter of policy.   The Court has reviewed these exhibits and found them to

24  be largely cumulative to the information presented to the PCR court.  In addition, as explained

25  below, the new information is of little relevance to the issue presented by Petitioner's claim,

26  which requires this Court to assess the reasonableness of the state court's factual determinations

27  using the deferential standards set forth in the AEDPA.

28

**Analysis**

As a preliminary matter, the Court notes that there is an obvious tension between various aspects of Petitioner's allegations. Petitioner contends, on one hand, that her incriminating statements to Det. Saldate were the involuntary product of his coercion and overreaching. Conversely, she asserts that she did not incriminate herself during the interview and that Det. Saldate "misinterpreted" her comments or "fabricated" her inculpatory statements. It is clear from the Court's review of the record – including Det. Saldate's report and his testimony at the suppression hearing and during trial, and Petitioner's trial testimony – that the gravamen of Petitioner's claim is that Det. Saldate's account of the contents, rather than the circumstances, of the interrogation is false and that she did not, contrary to Det. Saldate's report and testimony, implicate herself in her son's murder. Therefore, the underlying issue presented by this claim is a factual question: did Petitioner make the incriminating statements attributed to her by Det. Saldate? Similarly, with respect to Petitioner's contention that Det. Saldate violated her rights under *Miranda*, the claim requires the resolution of a factual dispute as to whether or not Petitioner invoked her right to an attorney prior to the interrogation. Based upon these considerations, the Court's analysis of Petitioner's claim focuses on the standard set forth in 28 U.S.C. § 2254(d)(2).[4] *See Lambert v. Blodgett*, 393 F.3d at 978 ("challenges to purely factual questions resolved by the state court are reviewed under § 2254(d)(2)"); *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

Pursuant to § 2254(d)(2), Petitioner must establish that the state court's factual determinations are "objectively unreasonable" in light of the evidence presented in state court. *Miller-El I*, 537 U.S. at 340. As the Ninth Circuit explained in *Taylor*, federal habeas courts owe particular deference to state court fact finding; thus, a petitioner's burden under § 2254(d)(2) is to convince the habeas court "that an appellate panel, applying normal standards of appellate

---

[4]   Petitioner does not specify whether she is seeking relief under 28 U.S.C. § 2254(d)(1) or (d)(2).

review, could not reasonably conclude that the finding is supported by the record." 366 F.3d at 999-1000.

In the present case, additional factors support *Taylor*'s prescription for deference to the state court's findings. In addressing the factual questions upon which Petitioner's claim is based, the trial court necessarily assessed the relative credibility of Petitioner's testimony as compared with that of Det. Saldate. Determinations of credibility are entitled to "special deference," even on direct appeal. *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). Thus, habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state court, but not by them." *Marshall v. Loneberger*, 459 U.S. 422, 434 (1983).

As previously discussed, the state court, having listened to the testimony of Petitioner and Det. Saldate and observed each witness's demeanor, determined that Petitioner's *Miranda* rights were not violated because she did not request an attorney prior to or during the interrogation.[5] (ME 11/18/96 at 5.) The court also determined that Petitioner was able to comprehend her rights when they were administered. (*Id.* at 4.) Pursuant to 28 U.S.C. § 2254(e)(1), these factual determinations are entitled to a presumption of correctness. Petitioner has not overcome that presumption by clear and convincing evidence. In fact, the only evidence to support her claim of a *Miranda* violation remains her trial testimony. Further, there is no claim that the fact-finding process before the state court was defective or that the court did not make factual findings. *Taylor*, 366 F.3d at 999. In making its rulings, the court heard and considered the testimony of Petitioner and Det. Saldate, the testimony of Petitioner's expert witnesses at the suppression hearing, and the information presented to support Petitioner's claim that Det. Saldate had engaged in past misconduct of a type similar to that alleged by Petitioner.

For the reasons stated above, the state court's ruling denying the claim is not based on an unreasonable determination of the facts. Therefore, Petitioner is not entitled to relief on her

---

[5]   In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that prior to custodial interrogation a suspect must be informed of his right to remain silent and his right to have an attorney present. If the suspect invokes either of these rights, interrogation must cease.

1    claim that her *Miranda* rights were violated.

2           The same analysis applies to the remainder of Petitioner's challenges to Det. Saldate's

3    conduct and credibility.  The voluntariness of a confession is evaluated by reviewing both the

4    police conduct in extracting the statements and the effect of that conduct on the suspect.  *Miller*

5    *v. Fenton,* 474 U.S. 104, 116 (1985); *Henry v. Kernan,* 197 F.3d 1021, 1026 (9th Cir. 1999).

6    Absent police misconduct causally related to the confession, there is no basis for concluding that

7    a confession was involuntary.  *Colorado v. Connelly,* 479 U.S. 157, 167 (1986) ("coercive police

8    activity is a necessary predicate to the finding that a confession is not 'voluntary' within the

9    meaning of the Due Process Clause of the Fourteenth Amendment").   To determine the

10   voluntariness of a confession, the court must consider the effect that the totality of the

11   circumstances had upon the will of the defendant.  *Schneckloth v. Bustamonte,* 412 U.S. 218,

12   226-27 (1973).  "The question is 'whether the defendant's will was overborne at the time he

13   confessed.'"   *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003) (quoting *Haynes v.*

14   *Washington,* 373 U.S. 503, 513-14 (1963)).   Coercive police conduct includes lengthy

15   questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasion.

16   *Connelly*, 479 U.S. at 167.   While a confession obtained by physical violence is per se

17   involuntary, a confession obtained by psychological coercion is not.  *United States v. Miller,* 984

18   F.2d 1028, 1030 (9th Cir. 1993) (citing *Haynes*, 373 U.S. at 515).

19          The question of whether a suspect's inculpatory statements were voluntary is typically

20   a mixed question of law and fact.  *See Miller*, 474 U.S. at 111-12.  As such, the state court's

21   legal conclusion must be separated from the factual determinations underlying it.  *Lambert v.*

22   *Blodgett*, 393 F.3d at 977-78. This Court has assessed Petitioner's allegation that her statements

23   were involuntary. The PCR court found no evidence of threats or promises (ME 11/18/96 at 4),

24   a factual determination which is entitled to a presumption of correctness under § 2254(e)(1) and

25   which Petitioner has not rebutted with clear and convincing evidence.  *See Lambert*, 393 F.3d

26   at 976 (state court's finding that the interviewing officer made no threats or promises in

27   connection with the confession is "essentially a factual conclusion, which is entitled to

28

deference") (quoting *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1997)).  There is nothing in the record – including Petitioner's trial testimony – that supports a claim that Petitioner's will was overborne by the manner in which Det. Saldate conducted the interrogation.  Petitioner does not allege that Det. Saldate threatened her or made promises, or engaged in any coercive conduct beyond allegedly intimidating her by sitting close to her while they were alone in the interview room and telling her he wouldn't tolerate her crying.  Therefore, the PCR court's determination that Petitioner's statements were voluntary was not based upon an unreasonable determination of the facts, nor was it an unreasonable application of clearly established federal law.

As noted above, Petitioner's primary claim is not that Det. Saldate coerced her into making incriminating statements but that he misconstrued or falsely reported such statements.  Therefore, it is the state court's factual finding – i.e., its determination that Det. Saldate did not fabricate Petitioner's incriminating statements – rather than its legal conclusion, that is at issue.  The PCR court noted the similarity of the versions of Petitioner's statement as testified to by both Det. Saldate and Petitioner.  During her trial testimony, Petitioner did not dispute Det. Saldate's description of the interrogation or the accuracy of many of the specific statements attributed to her.  With respect to other statements, she contested only the phrasing as quoted by Det. Saldate in his report and testimony.  She also offered a general denial of the most inculpatory statements reported by Det. Saldate.  The trial court was positioned to assess the relative credibility of Petitioner and Det. Saldate, as was the jury, which heard both versions of the interrogation and convicted Petitioner.  Petitioner raised the same allegations in her PCR petition, presenting additional arguments and evidence.  The court determined that Det. Saldate did not fabricate Petitioner's incriminating statements.  Petitioner has not presented clear and convincing evidence to overcome the presumption of correctness that attaches to that factual determination.  28 U.S.C. § 2254(e)(1).  Moreover, Petitioner has not suggested that the fact-finding process in state court was defective or that the state court failed to consider the evidence or make factual findings.  *Taylor*, 366 F.3d at 999.  Finally, this Court finds that the PCR court's

factual determination was reasonably supported by the state-court record, specifically by Det. Saldate's testimony at the suppression hearing and at trial. *See* 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 1000. Petitioner has failed to establish that the court's factual determinations were "objectively unreasonable" under § 2254(d)(2). *Miller-El I*, 537 U.S. at 340. Therefore, Petitioner is not entitled to relief on the claim that Det. Saldate fabricated her incriminating statements.

Finally, the Court concludes that the remaining allegations in Claim I do not entitle Petitioner to relief. Petitioner attempts to support her claim that Det. Saldate violated her rights by citing his failure to record the interrogation or to preserve his notes and by alleging that he had engaged in misconduct in past interrogations. These claims, and the arguments and evidence supporting them, were presented to the state court.[6] As described above, the PCR court explicitly addressed and denied the claims; in addition, the court's rulings implicitly rejected Petitioner's attack on Det. Saldate's credibility. The court's factual determinations are entitled to a presumption of correctness, which Petitioner has failed to overcome by clear and convincing evidence.

Petitioner's final challenge to Det. Saldate's conduct is the allegation that his interviews of other witnesses served to prejudice those witnesses against Petitioner. As Respondents note, two of the witnesses, Petitioner's mother and her former father-in-law, did not testify at trial, so whatever bias Det. Saldate is alleged to have imparted was not relevant and did not prejudice Petitioner. With respect to the remaining witnesses, Petitioner's sister, her father, Richard Sadeik, and her former boyfriend, Ernie Sweat, Petitioner has presented no persuasive evidence that Det. Saldate acted improperly during his interviews and no evidence whatsoever suggesting

---

[6]   Petitioner has attached information concerning some seventeen cases in which Det. Saldate is alleged to have engaged in improper conduct during an interrogation. (Dkt. 100, Ex. 15.) It appears that in three of those cases a court ruled that the suspect's statement must be suppressed based upon Det. Saldate's conduct. *State v. Yanes*, Maricopa County No. CR13-0403 (Dkt. 109, Ex. E); *State v. Mahler*, Maricopa County No. CR90-0698 (Dkt. 100, Ex. 15G); and *State v. King*, Maricopa County No. CR90-00050 (Dkt. 100, Ex. 15J).

1   that their trial testimony was untruthful.[7]   Moreover, as the PCR court correctly observed, the

2   witnesses who testified at trial explained their versions of the interviews and the information

3   they provided to Det. Saldate, thereby obviating any potential prejudice.

4         **Conclusion**

5         The PCR court's decision denying this claim was based upon its resolution of factual

6   issues, including the relative credibility of Det. Saldate and Petitioner.   These factual

7   determinations were not objectively unreasonable and were the product of an adequate fact-

8   finding procedure.   Further, Petitioner has failed to present evidence rebutting the factual

9   findings underlying the state court's determination that Petitioner waived her *Miranda* rights and

10   that Det. Saldate did not fabricate her incriminating statements.   This Court concludes, therefore,

11   that the PCR court's decision was not an unreasonable determination of the facts under

12   § 2254(d)(2) nor an unreasonable application of clearly established federal law under

13   § 2254(d)(1).   Therefore, Petitioner is not entitled to relief on this claim.

14   **Claim III:**    **Petitioner's rights to due process and a fair trial were violated by the trial**

15                               **court's erroneous strike of a potential juror.**

16

---

17         [7]   For example, in support of her allegation that Det. Saldate's actions biased Petitioner's

18   sister, Sandra Pickinpaugh, Petitioner has presented the transcript of Det. Saldate's June 30, 1990, interview with Ms. Pickinpaugh (Dkt. 99, Ex. 6) and an affidavit from Petitioner's PCR

19   counsel, Anders Rosenquist (Dkt. 102, Ex. 40).   Contrary to Petitioner's argument, the former document demonstrates that Ms. Pickinpaugh was willing to provide negative information about

20   her sister's character without prompting or manipulation by Det. Saldate.   (*See, e.g.*, Dkt. 99, Ex. 6 at 10, 13.)   In his affidavit, dated May 17, 2002, Mr. Rosenquist states that in October of

21   1995 Ms. Pickinpaugh told him that before the 1990 interview Det. Saldate had provided Ms.

22   Pickinpaugh with information concerning Petitioner's guilt which she, Ms. Pickinpaugh, believed was misleading.   (Dkt. 102, Ex. 40.)   The record further indicates, however, that Ms.

23   Pickinpaugh regarded the contact from Mr. Rosenquist as harassment and was unwilling to sign the affidavit he had prepared.   (*Id.*, Ex. 41.)   Based upon these facts, the Court cannot conclude

24   that Det. Saldate's conduct with respect to Ms. Pickinpaugh prejudiced Ms. Pickinpaugh against

25   Petitioner.   As to Petitioner's father and Mr. Sweat, Petitioner has presented no evidence to support her argument that Det. Saldate improperly influenced their testimony, beyond the

26   suggestion that Mr. Sadeik, based on his military background and employment as a corrections

27   officer, was predisposed to believe Det. Saldate (*id.*, Ex. 42) and Mr. Sweat's identification of errors in Det. Saldate's report of their interview (*id.*, Exs. 44-45).

28

Petitioner alleges that her rights were violated when the trial court struck jury panel member Pete Moquino for cause based on his opposition to the death penalty.

**Relevant facts**

Moquino was juror number 55.  Prior to voir dire, both the State and the defense included juror number 55 on their list of panel members who should be struck because, as the prosecutor stated, "they didn't appear to be able to sit on the jury for one reason or another" (RT 9/11/90 at 37) and, in defense counsel's formulation, "The basis for deciding they were unacceptable was whether they said no to Question 8; that is, suggesting that they would not be able to attend throughout this trial." (*Id.* at 38.)  Question 8 asked if the panel member "would be able to serve as a juror for two weeks . . . being in the courtroom beginning at 1:00 p.m. each day until 4:45 p.m.?"  (Dkt. 102, Ex. 78.)  Moquino answered "no," indicating that he had a doctor's appointment at the V.A. on one of the trial days.  (*Id.*)  The court did not excuse juror 55 at that time, however, stating that, "I have heard horror stories about what it's like at the VA Hospital with appointments, but I will not excuse Juror No. 55, at least not at this point in time."  (RT 9/11/90 at 40.)

Thereafter, during the court's questioning of the remaining panel members, the following colloquy occurred:

> THE COURT:  Is there anyone here who feels they would rather not sit as a juror on this case because of the charge of first degree murder and because there is a possibility that the death penalty could be imposed?  Mr. Moquino?
>
> MOQUINO:  Yes.
>
> THE COURT:  Would it make a difference if I told you that the jurors did not determine punishment; even in a capital case that decision is left to the Judge?
>
> MOQUINO:  I don't think I'd want to have anything to do with it. I don't believe in capital punishment.
>
> THE COURT:  All right.  Thank you, sir.  Anyone else?

(RT 9/11/90 at 98-100.)  The prosecutor subsequently asked the court to strike Moquino for

- 24 -

1  cause.[8]  (*Id.* at 103.)  The court excused Moquino with the following comments: "The Court
2  excuses Mr. Moquino for cause.  The Court does not need to excuse Mr. Moquino for cause."
3  (*Id.* at 104; *see* ME 9/11/90.)  Defense counsel did not object to the excusal, and both the
4  prosecutor and defense counsel passed the panel for cause. (*Id.* at 105.)

5       On direct appeal, Petitioner claimed that the trial court erroneously struck Moquino for
6  cause.  (Opening Br. at 13).  The Arizona Supreme Court initially concluded that Petitioner had
7  waived any objection to the excusal of the potential juror.  *Milke*, 177 Ariz. at 122, 865 P.2d at
8  783.  The court additionally held that the trial court's decision to excuse Moquino for cause was
9  correct because, "It is not improper to excuse a juror whose views about the death penalty
10 'would prevent or substantially impair the performance of his duties as a juror in accordance
11 with his instructions and his oath.'" *Id.* (quoting *Adams v. Texas,* 448 U.S. 38, 45 (1980))
12 (additional quote omitted).

13 **Analysis**

14      The Arizona Supreme Court applied the correct standard for determining whether a
15 prospective juror may be excluded for cause based on his views on capital punishment:
16 "whether the juror's views would 'prevent or substantially impair the performance of his duties
17 as a juror in accordance with his instructions and his oath,'" *Wainwright v. Witt*, 469 U.S. 412,
18 424 (1980) (quoting *Adams,* 448 U.S. at 45); *see Gray v. Mississippi,* 481 U.S. 648, 658 (1987);
19 *Witherspoon v. Illinois*, 391 U.S. 510, 521-23 (1968).  *Compare Milke*, 177 Ariz. at 122, 865
20 P.2d at 783, *with Brown v. Lambert*, 451 F.3d 946, 953 n.10 (9th Cir. 2006) (state supreme court
21 applied the wrong standard with respect to the excused juror, leading to a decision that was
22 "directly contrary" to clearly established federal law under § 2254 (d)(1)).

23

24

_____

25     [8]  In addition to his oral answers to the court's inquiries, on his juror questionnaire
26 Moquino also expressed opposition to capital punishment. While he indicated that he had not
   formed an opinion about the defendant's guilt or innocence, he acknowledged that he did have
27 an opinion about the death penalty and wrote, in explanation, "No death penalty." (Dkt. 102,
   Ex. 78.)
28

On habeas review, a state court's finding of death qualification in the voir dire process is a factual determination entitled to the presumption of correctness established in § 2254(e)(1). *Witt,* 469 at 429 (on federal habeas review, the state court's voir dire findings of bias are "factual issues" entitled to the presumption of correctness formerly found in § 2254(d)); *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992). The trial court struck Moquino for cause based on his opposition to the death penalty, and the Arizona Supreme Court affirmed the factual finding of bias.  While the written record in this case was brief and could have been clearer, the requisite level of juror bias against the death penalty need not be proved with "unmistakable clarity."  *Witt*, 469 U.S. at 424.  Instead, in situations where the printed record lacks clarity, "deference must be paid to the trial judge who sees and hears the jurors" as "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 424-25.

The Court concludes that the decision of the Arizona Supreme Court was not based upon an unreasonable determination of the facts in light of the state court record, pursuant to § 2254(d)(2).  First, Moquino gave no ambiguous responses concerning his opposition to the death penalty and his unwillingness to sit as a juror in a capital case.  *Cf. Brown*, 451 F.3d at 948-49 (juror's ambivalent responses included statements that he could follow the law regarding imposing a death sentence).  Second, defense counsel did not object to Moquino's excusal or seek to rehabilitate him; therefore, the court had no reason to think the record was not sufficient to support its finding of bias.  *See Witt*, 469 U.S. at 430-31 & n.11, 434-35 ("counsel's failure to speak in a situation later claimed to be so rife with ambiguity as to constitute constitutional error is a circumstance we feel justified in considering when assessing respondent's claims.").[9]

---

  [9]  Moreover, the Court finds a greater significance in defense counsel's failure to object to Moquino's excusal than that which the Supreme Court noted in *Witt*.  In the present case, not only did defense counsel fail to object to the excusal; as noted above, counsel had originally selected Moquino as one of the panel members to be excused prior to voir dire.  This

1  This Court must defer to the trial court's finding of bias, absent clear and convincing evidence

2  that the finding was incorrect.  *See* 28 U.S.C. § 2254(e)(1).  Because Petitioner has provided no

3  evidence to overcome the presumption of correctness, the Court defers to the state court's factual

4  determination that Moquino was biased due to his views on the death penalty.  Therefore,

5  applying the standard of review mandated by the AEDPA, the Court concludes that the Arizona

6  Supreme Court did not unreasonably apply *Witt* by determining that the juror was properly

7  excused for cause.

8      For the reasons stated above, Petitioner is not entitled to relief on this claim.

9  **Claim IV:    Petitioner was denied her Sixth Amendment right to effective assistance of
10  counsel at both the guilt and sentencing stage of trial.**

11     Petitioner alleges that trial counsel was ineffective in a number of different respects both

12  at trial and during sentencing.  Petitioner raised these claims in her PCR petition and the court

13  rejected them.  (ME 11/18/96 at 29-41, 44-46.)

14     To support this claim on habeas review, Petitioner has attached to her merits and reply

15  briefs a number of exhibits that were not before the state court.[10]  This new information includes

16  a social history of Petitioner prepared by an attorney named Elizabeth Hurley (Dkt. 99, Ex. 1);

17  a report by a forensic psychologist, Dr. David Biegan, which details the dynamics of Petitioner's

18  family and purports to explain why her father and sister testified against her at trial (*id.*, Ex. 2);

19  a 2002 affidavit from Petitioner's mother (*id.*, Ex. 3); an affidavit from a German television

20  reporter named Bärbel Jacks (*id.*, Ex. 5); and affidavits from acquaintances Paticia Prust (*id.*, Ex.

21  51) and Brenda Kitterman (Dkt. 120, Ex. U).

22

23  circumstance, combined with the trial court's observation that it did "not need to excuse
24  Moquino for cause," indicates that Moquino's views on the death penalty likely did not
25  constitute the sole basis for his excusal.  *See Witt* 469 U.S. at 437-38, n.5 (Stevens, J.,
26  concurring) (positing that defense counsel chose not to object to the juror's excusal based upon
    her demeanor or the fact that jury service would have imposed a hardship).

27     [10]  As noted above, the Court granted Petitioner's motion to expand the record to include
28  these exhibits. (Dkt. 130.)

1    **Clearly established federal law**

2        As previously discussed, when a state court has addressed the merits of a petitioner's

3    claim of federal constitutional error, a federal court may grant habeas relief only if the state

4    court's decision was contrary to or involved an unreasonable application of clearly established

5    federal law.  28 U.S.C. § 2254(d)(1); *see Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (per

6    curiam); *Woodford v. Visciotti*, 537 U.S. at 21.  For a claim alleging ineffective assistance of

7    counsel ("IAC"), the applicable law is set forth in *Strickland v. Washington*, 466 U.S. 668

8    (1984).

9        To prevail under *Strickland*, a petitioner must show that counsel's representation fell

10   below an objective standard of reasonableness and that the deficiency prejudiced the defense.

11   466 U.S. at 687-88.  The inquiry under *Strickland* is highly deferential, and "every effort [must]

12   be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

13   counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

14   time."  *Id.* at 689.  To prove deficient performance, a defendant must also overcome "the

15   presumption that, under the circumstances, the challenged action might be considered sound trial

16   strategy."  *Id.*  To demonstrate prejudice, a petitioner "must show that there is a reasonable

17   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

18   been different.  A reasonable probability is a probability sufficient to undermine confidence in

19   the outcome."  *Id.* at 694.

20       Trial counsel has "a duty to make reasonable investigations or to make a reasonable

21   decision that makes particular investigations unnecessary," and "a particular decision not to

22   investigate must be directly assessed for reasonableness in all the circumstances, applying a

23   heavy measure of deference to counsel's judgments."  *Hayes v. Woodford*, 301 F.3d 1054, 1066

24   (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691).  To determine whether the investigation

25   was reasonable, the court "must conduct an objective review of [counsel's] performance,

26   measured for reasonableness under prevailing professional norms, which includes a context-

27

28

dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted).  As the Supreme Court recently reiterated, "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made and by giving a 'heavy measure of deference to counsel's judgments.'"  *Rompilla v. Beard*, 545 U.S. 374, 381, 125 S. Ct. 2456, 2462 (2005) (quoting *Strickland*, 466 U.S. at 689, 691).

The right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)).  With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695.  In *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." 539 U.S. at 534.  The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

**Analysis**

Applying the *Strickland* standard, the PCR court rejected Petitioner's claims of ineffective assistance of counsel, concluding that, "based upon the prevailing professional norms, counsel's performance both at trial and the presentence hearing met and exceeded effective assistance of counsel standards.  There was no deficient performance.  Any errors were minor or trivial and did not prejudice the defense of the case."  (ME 11/18/96 at 45.)  The Court will address Petitioner's allegations individually to determine if the PCR court's ruling represented an unreasonable application of *Strickland*.

1    <u>Claim IV(A): Counsel failed to conduct an adequate investigation</u>

2          Petitioner alleges that counsel's investigation prior to trial was deficient and prejudicial

3    because he failed to pursue witnesses and information that would have supported Petitioner's

4    contention that she was a loving and capable mother and impeached the witnesses who testified

5    against her.

6          *Background:*

7          At trial, defense counsel called fifteen witnesses over seven days.  Among the first

8    witnesses were individuals who were present with Petitioner on the day she learned that

9    Christopher was missing and who testified that her reaction to the news about her son was

10   appropriate.  For example, Petitioner's neighbors John and Karen Ciulla and Patrick Murphy

11   testified that Petitioner appeared to be genuinely distraught when she learned that her child was

12   missing.  (*See, e.g.*, RT 9/24/90 at 94-95, 115-16, 138-40.)  A co-worker, Carmen Santana, also

13   testified that Petitioner was very worried, upset and crying, after she learned that Christopher had

14   disappeared. (*Id.* at 28-29).

15         Similarly, counsel elicited testimony from witnesses who had observed Petitioner

16   interacting with her son and who described Petitioner as a caring mother.  For example, Vincent

17   Libbon, the attorney who represented Petitioner during her divorce, testified that Petitioner

18   displayed real concern for her son's well-being and sought to protect Christopher from her

19   husband's destructive behavior while preserving the father-son bond.  (RT 9/24/90 at 27.)  The

20   Ciullas testified that they had observed nothing unusual in the relationship between Petitioner

21   and Christopher.  (*Id.* at 99, 134, 141.)  Ms. Santana testified that Petitioner had photos of her

22   son at her work station (RT 9/25/90 at 20-21); she also indicated that she had observed Petitioner

23   and Christopher together on many occasions, that mother and son got along well together, and

24   that Petitioner was able to address the child's needs (*id.* at 21-22).

25         To buttress these lay observations, counsel elicited testimony from Dr. Kassell stating that

26   Petitioner experienced a genuine grief reaction to the loss of her son.  (RT 9/25/90 at 57-59.)

27

28

- 30 -

Dr. Kassell further testified that the grief he diagnosed in Petitioner was distinct from remorse, which is associated with feelings of guilt.[11]   (*Id.* at 58-59.)   This evidence tended to rebut testimony presented by the State which suggested that Petitioner's reaction to the news of Christopher's disappearance was not consistent with that of a concerned parent.

Petitioner herself was the key defense witness.   Testifying over a period of four days, she described her loving relationship with her son, the events surrounding his disappearance and her behavior during the subsequent investigation, and the interrogation by Det. Saldate.

*Discussion:*

Petitioner's first allegation is that counsel was ineffective because he failed to follow up on Petitioner's letter suggesting that Rosemary Houston, a coworker with whom she took daily smoke breaks, could testify about Petitioner's fear of her ex-husband.   (Dkt. 102, Ex. 50.)   The PCR court concluded that this aspect of counsel's performance was neither deficient nor prejudicial.   (ME 11/18/96 at 31-32.)   As the court correctly noted, Petitioner herself testified at trial that she was frightened of Milke, a fact which was of little relevance to Petitioner's defense.

Petitioner next contends that counsel was ineffective for failing to investigate Petitioner's past and, as a result, failed to locate witnesses who would have been willing to testify on Petitioner's behalf.   These witnesses included Charles Jones, Petitioner's boyfriend from 1980-1982, and members of Jones's family; doctors who treated Christopher Milke for a thyroid condition; and various acquaintances and teachers.   According to Petitioner, these witnesses would have testified that she was a caring and affectionate mother who "could not have been involved in the alleged acts."   (Dkt. 98 at 71.)

With respect to the Jones family, whose affidavits, dated June 28, 1995, indicate that they

---

[11]   Defense counsel also sought to present Dr. Kassell's expert testimony, in the form of a "psychiatric autopsy," regarding the veracity of Det. Saldate's account of his interrogation of Petitioner.   (RT 9/25/90 at 6-8.)   The trial court ruled that counsel could not elicit such testimony.

liked Petitioner and believed that she was incapable of murdering her son (Dkt. 102, Exs. 54, 55), the PCR court found that "there is no indication that the defendant told her attorney about the Jones family or, if she mentioned the Jones family to counsel prior to trial, if her statements would have lead [sic] a reasonable defense attorney to conclude that further investigation was necessary or appropriate." (ME 11/18/96 at 32.) The Court agrees. The record does not indicate what information, if any, was available to counsel regarding Jones and his parents as potential witnesses; it is clear from their affidavits that the family did not contact defense counsel. (Dkt. 102, Exs. 54, 55.) Moreover, the significance of any information offered by the Jones family is reduced by the fact that Charles Jones last saw Petitioner approximately two years prior to the murder. (Dkt. 102, Ex. 54.) Based upon these factors, Petitioner has not demonstrated that this aspect of counsel's performance was deficient or prejudicial.

Petitioner also alleges that trial counsel performed ineffectively by failing to interview her mother and stepfather prior to trial and making inadequate efforts to obtain impeachment information relating to Petitioner's father and sister, who testified for the State.

To support these claims, Petitioner attached to her PCR petition an affidavit from her mother, Renate Janka. (PCR pet., Ex. 69.) In her affidavit, dated September 27, 1995, Ms. Janka stated that the trial testimony of her younger daughter, Sandra, was "greatly distorted" and described Sandra as "emotionally unstable" and motivated to lie by her anger and jealousy toward Petitioner. (*Id.*) Similarly, Ms. Janka stated that her ex-husband, Petitioner's father, Richard Sadeik, had testified falsely in an attempt to "get even with [her] through hurting [Petitioner]." (*Id.*) Ms. Janka attested that Petitioner was not an abnormally manipulative person. (*Id.*) Ms. Janka further stated that she had met co-defendant Styers on one occasion, and that he had become so angry and "insultive" [sic] that she became frightened of him. (*Id.*) Finally, Ms. Janka indicated that she had attempted to contact defense counsel several times while she was in the United States for Christopher's funeral on December 6, 1989, but counsel

never returned her calls.[12]  (*Id.*)

In denying Petitioner's challenge to this aspect of defense counsel's performance, the PCR court explained:

> The failure to interview [Petitioner's] half brother, mother or stepfather was not ineffective assistance of counsel because there is no indication as to what information Alex Janke [sic] or Petitioner's stepfather would have said.  The lack of effort to secure the defendant's mother and stepfather at the presentence hearing was not ineffective assistance of counsel for the same reason.  Petitioner alleges the jury should have been given full exposure to the dynamics of petitioner's family through the testimony of Renate Janke.  But the contents of Mrs. Janke's affidavit contains [sic] no information that would have been admissible at trial.  She would not have been allowed to express her opinion that her daughter, Sandra, and her ex-husband, Richard, lied during their testimony and she would not have been able to express her opinions as to why they lied.

(ME 11/18/96 at 33.)

Petitioner has attached to her merits brief a more-recent affidavit from her mother and an affidavit from her stepfather; both affidavits date from 2002.  (Dkt. 99, Ex. 4.)  In her new affidavit, Ms. Janka again indicates that she attempted to contact defense counsel but he never returned her calls or sought her testimony at trial.  (*Id.*)  Ms. Janka also provides new information, stating that Det. Saldate was rude to her and "tried to control [her] psychologically" by making remarks about Petitioner's guilt.  (*Id.*)  Ms. Janka further attests that after her younger daughter, Sandra Pickinpaugh, was interviewed by Det. Saldate, she called Ms. Janka to complain that Det. Saldate had "put her under extreme duress" and had "pressured her into calling [Ms. Janka] to induce [her] into being a witness for the State."  (*Id.*)  In his affidavit, Mr. Janka states that Petitioner was affectionate toward Christopher and that she "was not the type of person that would be involved in a conspiracy to have her child killed."  (Dkt. 102, Ex. 57.)

---

[12] Other information contained in Ms. Janka's first affidavit was less helpful to Petitioner.  Ms. Janka attested that Dorothy Markell, the friend with whom Petitioner stayed in Colorado, called her in Switzerland and informed her that Petitioner was "very stressed out and neglecting and becoming physical with Christopher."  (PCR pet., Ex. 69.)  This information, which supports the State's theory that Petitioner's relationship with her son was troubled and corroborates the testimony to that effect offered by Ms. Markell, does not appear in Ms. Janka's second affidavit.

1    Mr. Janka also states that defense counsel never asked for his testimony at trial or sentencing.
2    (*Id.*)

3           Petitioner asserts that trial counsel was ineffective for failing to pursue such evidence,
4    from Petitioner's mother as well as other family members and acquaintances, to impeach the trial
5    testimony of Petitioner's father and sister.   In determining whether the PCR court's ruling
6    denying these aspects of Petitioner's IAC claim was an unreasonable application of *Strickland*,
7    this Court first notes that the PCR court correctly determined that much of the information
8    Petitioner criticizes counsel for failing to present would not have been admissible at the guilt
9    stage of trial.  For example, Petitioner's mother would not have been allowed to offer testimony
10   regarding her opinion that Petitioner's father and sister testified untruthfully, much less the
11   psychological basis for that opinion.  *See* Ariz. R. Evid. 608(a).  In addition, while Rule 404(b)
12   might have allowed lay witnesses to testify regarding Petitioner's pertinent character traits, the
13   witnesses would not have been allowed to opine that Petitioner was not the kind of person who
14   would have arranged for her child to be murdered.  *See State v. Williams*, 133 Ariz. 220, 227-28,
15   650 P.2d 1202, 1209-10 (1982) (opinions of witnesses regarding truthfulness and guilt are
16   generally inadmissible); Ariz. R. Evid. 701. In addition, while the information provided by Ms.
17   Janka, Ms. Prust, and others purports to explain the motivations which caused Petitioner's father
18   and sister to lie about her during their trial testimony – sibling rivalry in Ms. Pickinpaugh's case,
19   vindictiveness on the part of Petitioner's father – it does not contain avowals regarding either
20   witness's reputation for truthfulness.  *See* Ariz. R. Evid. 404(a) and 608(a).

21          Similarly, Dr. Biegan's report, prepared for Petitioner's habeas petition, attempts to
22   explain, "to a reasonable degree of psychological certainty," the family dynamics underlying
23   "the fact that both [Petitioner's] father and sister testified against her and then altered their
24   position post-trial." (Dkt. 99, Ex. 2.)  However, because there is no evidence that either of these
25   individuals recanted their trial testimony, Dr. Biegan's opinion about their reasons for doing so

26

27

28

is irrelevant.[13]

The Court further finds that counsel's performance with respect to Petitioner's father and sister was not deficient. Much of Mr. Sadeik's testimony dealt with his observations of Petitioner at the time of Christopher's disappearance. On cross-examination by defense counsel, Mr. Sadeik acknowledged that when Petitioner first called him with the news that her son was missing, she was crying and seemed to be genuinely upset (RT 9/13/90 at 104) and that when she arrived at his house the next day she appeared to be in shock (*id.* at 110). On direct examination by the State, Ms. Pickinpaugh testified that Petitioner had told her that she was not cut out to be a mother and felt overwhelmed by the responsibility of caring for Christopher; that Petitioner left Christopher in her care for long periods of time; and that Petitioner told her that Christopher posed an obstacle to her relationship with Mr. Sweat. (RT 9/14/90 at 92-95.) On cross-examination, counsel did not attack Ms. Pickinpaugh's character or motivations; however, during his direct examination of Petitioner, counsel elicited testimony responding to and contradicting Ms. Pickinpaugh's version of the relationship between Petitioner and her son and between Petitioner and Mr. Sweat. (*See, e.g.*, RT 10/1/90 at 57, 109-11.)

In addition, as noted above, counsel presented extensive testimony describing Petitioner' demeanor and behavior after learning that her son had disappeared. As explained by the trial court in denying counsel's motion for a judgment of acquittal notwithstanding the verdict,

---

[13] To support the contention that, in Dr. Biegan's words, her sister and father "altered their position post-trial" (Dkt. 99, Ex. 3), Petitioner has provided information from the German television reporter who interviewed Ms. Pickinpaugh in 1998. (Dkt. 98, Ex. 5.) In her 2002 affidavit, Ms. Jacks attests that Petitioner's sister told her that she did not intend for her testimony to "sink" Petitioner and that she would be willing to testify that she did not believe Petitioner was capable of murdering her son. (*Id.*) Even if the court were to accept these reports as an accurate expression of Ms. Pickinpaugh's state of mind seven years after her sister's trial, there is nothing in her trial testimony that is inconsistent with her subsequent opinions. Similarly, Petitioner has provided no support for his assertion that Mr. Sadeik recanted his testimony, beyond a 2002 affidavit from defense investigator Fowler indicating that Mr. Sadeik told him that he would have been upset with the investigation and prosecution of his daughter if he were to discover that she was in fact innocent. (Dkt. 102, Ex. 42.)

1    Petitioner's behavior on the day of the murders – her unwillingness to participate in a search for

2    Christopher at the mall, her manifest concern for co-defendant Styers, her irritation when

3    informed that officers wished to speak with her – constituted circumstantial evidence of her

4    involvement in the murders.  (RT 1/18/91 at 9-10.)  Therefore, this Court finds that defense

5    counsel engaged in reasonable trial strategy by focusing on testimony indicating that upon

6    learning of her child's disappearance Petitioner appeared genuinely shocked and distraught.

7    Although this and other aspects of counsel's strategy were ultimately unsuccessful, the

8    *Strickland* Court cautioned that judicial scrutiny of counsel's performance must avoid "second-

9    guessing" because "it is all too easy for a court, examining counsel's defense after it has proved

10   unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  466

11   U.S. at 689.

12       Finally, Petitioner alleges that counsel performed ineffectively by failing to obtain

13   Petitioner's and the victim's medical and school records.  The PCR court addressed this claim

14   as follows:

15           Petitioner alleges the preschool records of the victim and the medical and
16   school records of the defendant "contained important leads that could have
     assisted defense counsel in his representation of the Petitioner."  This assertion is
17   supposed to be supported . . . by an affidavit from Dr. Zuerlin who treated
     Christopher while he was in the hospital.  The medical records were not necessary
18   for this lead to exist.  Surely the defendant was aware of a doctor attending to her
     son during his hospitalization.  According to his affidavit, he would have stated
19   that the defendant was concerned for her son while he was hospitalized and it
     appeared to him that they had a good relationship.  Considering the totality of the
20   evidence presented at trial, this testimony would have been cumulative and there
     is no reasonable probability such testimony would have changed the result.

21
     (ME 11/18/96 at 33-34.)
22

23       This Court agrees that trial counsel's failure to present such records did not constitute

24   deficient performance or result in prejudice.  Counsel placed much of this information before the

25   jury through the testimony of the defense witnesses.  Petitioner testified regarding the medical

26   complications she experienced when giving birth to Christopher.  (RT 10/1/90 at 41.) She

27   testified at length that she was a loving and conscientious mother who spent quality time with

28   her child (*see, e.g.*, *id.* at 98) and placed her son's welfare ahead of her own social or romantic

interests (*see id.* at 108-09). She explained that as a single parent she tried to protect Christopher from her ex-husband's lifestyle (*see id.* at 73-75) while working to maintain a relationship between father and son (*see id.* at 68-69). She testified in detail regarding her son's medical condition and the care she provided during his hospitalization. (RT 10/1/90 at 102-07.) In addition, as noted above, counsel attempted to corroborate Petitioner's testimony regarding her relationship with her son by presenting other witnesses who testified that Christopher was not neglected or abused and that Petitioner appeared to be a caring mother who displayed normal emotional bonds with her child.

In addition to the cumulative nature of the evidence Petitioner faults counsel for not presenting at trial, much of the information Petitioner now submits is of dubious relevance. For example, Petitioner fails to demonstrate that any aspect of her defense would have benefitted if counsel had presented high school records showing that she was an excellent student. In fact, in cross-examining Petitioner the State's first questions concerned her academic accomplishments. (RT 10/3/90 at 61.) The State elicited this testimony not to challenge her scholastic record, as argued by Petitioner, but to present her as capable of manipulating her testimony to her own advantage. (*Id.* at 61-63.) Furthermore, the Court notes that evidence of Petitioner's successful high school career would not have supported her argument in mitigation that she suffered from a dysfunctional home life after her parents' divorce.

As the Ninth Circuit has explained, "the duty to investigate and prepare a defense is not limitless: it does not necessarily require that every conceivable witness be interviewed." *Hendricks v. Calderon,* 70 F.3d 1032, 1040 (9th Cir. 1995). Moreover, defense counsel is not obligated under *Strickland* to present cumulative or irrelevant evidence of the type cited in this claim. *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998); *United States v. Schaflander*, 743 F.2d 714, 719 (9th Cir. 1984).

Finally, as the PCR court noted, it is unclear to what extent any of the information Petitioner has presented since her trial was actually available to defense counsel. Presumably, Petitioner herself could have served as a key source of information which would have supported

the defense theory that she was a caring mother and impeached the testimony of her father and sister.  However, with respect to information about which trial counsel might have been put on notice, the record contains only the letter from Petitioner mentioning the possibility that Ms. Houston might be a good witness and the statements of Ms. Janka and Ms. Prust that they unsuccessfully attempted to contact defense counsel.  At the time of her trial, Petitioner had access not only to her counsel but to an investigator, Mr. Fowler, who worked on Petitioner's defense "from its beginning until sentencing" and "spent a great deal of time with [Petitioner]" (Dkt. 99, Ex. 4 at 2), yet there is no suggestion that Petitioner provided trial counsel with the insights concerning her private life and family background which she was uniquely positioned to reveal and which she now faults counsel for not pursuing.  While hindsight has revealed information on these topics that was not presented at trial, an assessment of the reasonableness of counsel's investigative efforts must take into account not only the limited value of that information but the fact that counsel does not appear to have been put on notice of its existence. *See Babbitt*, 151 F.3d at 1174.

Petitioner has not shown that trial counsel was deficient in his investigation or that she suffered prejudice from counsel's performance.  Therefore, the PCR court's denial of this claim was not an unreasonable application of *Strickland*.

Claim IV(B): Counsel was ineffective in his cross-examination of Detective Saldate

Petitioner alleges that her trial counsel was ineffective because he failed to adequately investigate Det. Saldate and prepare for Saldate's cross-examination.  She alleges that counsel failed to subpoena Det. Saldate's personnel records, to timely investigate Saldate's veracity, and to discover evidence of Saldate's past misconduct which was available in the public record and which could have been used to impeach his testimony.  She also contends that counsel's cross-examination of Det. Saldate was deficient because trial counsel failed to confront Det. Saldate regarding discrepancies in his testimony.  Finally, she asserts that counsel failed to properly disclose a treatise which could have assisted in impeaching Det. Saldate.

The PCR court rejected in its entirety the claim that defense counsel was ineffective in his cross-examination of Det. Saldate.  The court concluded that, "Assuming the facts alleged by the petitioner are true, they fail to demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, or that there is a reasonable probability that the result of the trial would have been different if the alleged deficiencies did not exist."  (ME 11/18/96 at 35-36.)  The PCR court's decision was not an unreasonable application of *Strickland*.

With respect to specific issues raised by Petitioner, the PCR court found that the fact that trial counsel obtained Det. Saldate's personnel records a week prior to trial did not constitute deficient performance.  (*Id.* at 35.)  This Court also notes that Saldate's personnel records contain reference to a single incident of misconduct, dating from 1973, sixteen years before the detective's interrogation of Petitioner. (Dkt. 101, Ex. 31.)  Questions as to the admissibility of the incident, and the wisdom of introducing it and opening the door to evidence of overwhelmingly positive performance evaluations contemporaneous with the investigation in this case (Dkt. 109, Ex. D), indicate that Petitioner was not prejudiced by counsel's handling of Det. Saldate's personnel records.[14]

The court next explained that the information Petitioner sought to use against Det. Saldate was limited in its admissibility:

> The potential benefit from obtaining evidence of Det. Saldate's alleged misconduct with other defendants is questionable because it would have been inadmissible to show that the detective engaged in the same misconduct in this case. Rule 404(b) of the Arizona Rules of Evidence. The information would have been inadmissible extrinsic evidence on a collateral matter. Rule 608(b) Arizona Rules of Evidence. If the information was probative of the detective's character for truthfulness, defense counsel might have been allowed to question Det. Saldate about these specific instances of prior conduct, but defense counsel would have been bound by the detective's answers.

(ME 11/18/96 at 37.)

---

[14]  For example, in an evaluation dated 1/1/90, Det. Saldate was given the highest performance rating; he was also commended for "always display[ing] an objective view of the cases."  (Dkt. 109, Ex. D)

1    This Court is not in a position to evaluate the state court's evidentiary ruling. *See Estelle*

2    *v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to

3    reexamine state-court determinations on state-law questions").   However, the PCR court's

4    explanation of the limited admissibility of the information which Petitioner alleges counsel was

5    ineffective in failing to pursue supports finding that the court's ruling on the IAC claim was not

6    an unreasonable application of the prejudice prong of *Strickland*.

7        The PCR court further found that counsel did perform some research into Det. Saldate's

8    past cases, but that it would not have been reasonable for counsel to have devoted the hours

9    necessary for an investigation into every case in which Saldate had been involved.  (*Id.* at 36.)

10   Moreover, Petitioner presented the PCR court with the prior cases in which Det. Saldate

11   purportedly engaged in misconduct (PCR pet., Ex. 12); the court nevertheless rejected

12   Petitioner's IAC claim.

13       As to Petitioner's allegation that counsel's performance was deficient in that he failed to

14   confront Det. Saldate with "obvious discrepancies" in his testimony, this Court agrees with the

15   PCR court that the discrepancies cited by Petitioner are of little significance.[15]  (ME 11/18/96

16   at 38.)  Moreover, trial counsel did attempt to impeach Det. Saldate with respect to his testimony

17   that he was not enthusiastic about traveling from Phoenix to Florence in a helicopter; counsel

18   called for testimony from the helicopter pilot, who did not recall Det. Saldate expressing any

19   reservations about the trip.  (RT 9/24/90 at 71.)

20       Finally, Petitioner alleges that trial counsel performed ineffectively by failing to impeach

21

22   _____

23       [15]  Petitioner focuses on two alleged discrepancies between Det. Saldate's trial testimony
     and statements he made during an earlier deposition.  (Dkt. 98 at 79.)  The first of these
24   concerns his attitude toward the helicopter flight; the second is the duration of his interrogation
     of Petitioner. (*Id.*)  Regarding the latter, Petitioner claims that while Det. Saldate testified at trial
25   that the interrogation lasted half an hour, he stated during his deposition that the interrogation
     took an hour and a half.  (*Id.*)  The Court notes that the pages of the transcribed deposition in
26   which Det. Saldate is alleged to have made the inconsistent statements regarding the helicopter
     flight and the length of the interrogation, pages 6 and 30, respectively, are missing from Dkt.
27   101, Ex. 32.

28

1   Det. Saldate through the use of a treatise.  Counsel attempted to use a treatise to impeach Det.

2   Saldate; the trial court upheld the state's objection.  (RT 9/13/90 at 27-30.)  The PCR court ruled

3   that counsel was not ineffective because Rule 803(18) of the Arizona Rules of Evidence,

4   excluding learned treatises from the rule against hearsay, does not apply to the testimony of a

5   lay witness such as Det. Saldate; therefore, "[c]ounsel cannot be deemed to be ineffective

6   because he was unable to do something which is precluded by the rules of evidence."  (ME

7   11/18/96 at 38.)  Based upon the PCR court's ruling on the evidentiary issue, this Court cannot

8   find that counsel's handling of the treatise was deficient or prejudicial.

9       For the reasons discussed above, Petitioner has not shown that the PCR court applied

10   *Strickland* unreasonably when it denied his claim that trial counsel was ineffective in his cross-

11   examination of Det. Saldate.

12       Claim IV(E): Counsel prepared a deficient motion to suppress and performed deficiently
     at the suppression hearing

13

14       Petitioner alleges that trial counsel was ineffective in preparing the motion to suppress

15   her statements to Det. Saldate.  She contends that counsel neglected to address the coercive and

16   unreliable aspects of the interrogation, erroneously conceded that the statements she made to

17   Det. Saldate were inculpatory, failed to discover and present evidence of Det. Saldate's prior

18   misconduct, and failed to provide the trial court with qualified, objective experts who could

19   refute the propriety of the interrogation methods employed by Det. Saldate.   She also claims

20   counsel was ineffective for failing to call her as a witness at the suppression hearing.

21       The PCR court addressed these allegations as follows:

22           The court was present at the voluntariness hearing and heard the evidence
         and argument.  The court finds that counsel's conduct at the hearing did not fall
23       below the prevailing norm. He did what it is claimed he did not do. He addressed
         the "coercive and unreliable aspects of the interrogation."  He knew of the
24       Running Eagle [sic] interrogation. He provided the court with several experts who
         refuted the propriety of Det. Saldate's methods. Dr. Kassell, Dr. Fritz and Kirk
25       Fowler, Jr. all testified at the voluntariness hearing. The only witness he did not
         call was the defendant. However, she testified at trial. Assuming her testimony
26       would have been the same at the voluntariness hearing as it was at the trial, there
         is no reasonable probability the result of the motion to suppress would have been
27       different.  Counsel's conduct at the hearing exceeded the standards of the

28

1    prevailing professional norm.

2  (ME 11/18/96 at 41.)

3      The PCR court's ruling, which accurately characterizes trial counsel's performance, is

4  not an unreasonable application of the *Strickland* standard.  As the PCR court correctly observed,

5  trial counsel's motion clearly asserted both a *Miranda* violation and a claim that Petitioner's

6  statement was involuntary; the motion alleged that Det. Saldate's conduct during the

7  interrogation served to "overbear [Petitioner] into speaking with Det. Saldate" and that Saldate

8  acted "with the intent and purpose of overbearing upon the will of [Petitioner]." (ROA-PCR 198

9  at 3.)  Moreover, contrary to Petitioner's claim, trial counsel did not concede, in his suppression

10  motion, during his cross-examination of Det. Saldate at the suppression hearing or at trial, or in

11  his direct examination of Petitioner, that Petitioner did in fact make incriminating statements to

12  Det. Saldate.  Further, trial counsel vigorously challenged Det. Saldate's credibility, focusing,

13  as does habeas counsel, on Saldate's failure to follow a superior's directive and tape-record the

14  interrogation. (RT 9/13/90 at 51, 54-55.)  In addition, as the PCR court noted, counsel forcefully

15  challenged Det. Saldate's interrogation techniques, including his conduct in prior interrogations.

16  (*Id.* at 33-45.)

17      Petitioner asserts that trial counsel was ineffective based upon his choice of experts,

18  alleging that Drs. Kassell and Fritz, who testified at the voluntariness hearing, were unprepared

19  and incompetent.  Petitioner's complaint is based upon the experts' performance on the witness

20  stand, where they were subject to effective cross-examination by the State.[16]  Petitioner has

21  presented no information that would allow this Court to impute to trial counsel the alleged

22  incompetence of the experts, nor any suggestion that counsel was put on notice that either Dr.

23  Kassell, Petitioner's treating psychiatrist, or Dr. Fritz, an experienced criminologist, was

24

25 _____

26      [16]  The trial court found Dr. Fritz in contempt for his mishandling of items of physical evidence.  As the PCR court noted, however, this fact was never brought to the jury's attention

27  and did not prejudice Petitioner. (ME 11/18/96 at 40.)  It was also irrelevant to the suppression issue, which is the context in which this aspect of the IAC claim is raised.

28

1   unprepared or unqualified.  As the Ninth Circuit has noted, "there is no duty to ensure the

2   trustworthiness of the expert's conclusions." *Babbitt*, 151 F.3d at 1174.  The Ninth Circuit has

3   also noted that "the choice of what type of expert to use is one of trial strategy and deserves 'a

4   heavy measure of deference.'" *Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002) (quoting

5   *Strickland,* 466 U.S. at 691).  Counsel was entitled to rely on Drs. Fritz and Kassell as his

6   experts; doing so was "within the wide range of professionally competent assistance." *Id.*

7   (quoting *Harris v. Vasquez,* 949 F.2d 1497, 1525 (9th Cir. 1990)).

8   Finally, because the PCR court, having heard Petitioner's trial testimony, determined that

9   it would not have changed its ruling on the suppression issue even if Petitioner had testified at

10   the suppression hearing, Petitioner cannot show that she was prejudiced by trial counsel's failure

11   to call her as a witness.  *See, e.g.*, *Beeman v. Iowa*, 108 F.3d 181, 185 (8th Cir. 1997) (counsel's

12   decision not to call defendant to testify at suppression hearing did not result in prejudice because

13   defendant's trial testimony showed no police coercion).

14   Petitioner has failed to show that the PCR court applied *Strickland* unreasonably when

15   it denied his claim that trial counsel's performance was ineffective with respect to the

16   suppression hearing.

17   Claim IV(G): Counsel failed to investigate and present available mitigation evidence

18   Petitioner claims that trial counsel was ineffective because he failed to discover and

19   present available mitigating evidence.  Specifically, she alleges that counsel made no effort to

20   secure the presence of Petitioner's mother until the day prior to the presentencing hearing; failed

21   to gather Petitioner's school or medical records or secure a complete social, medical, or

22   psychological evaluation of Petitioner; failed to investigate Petitioner's difficult childhood and

23   home life; and failed to provide evidence of Petitioner's close family ties.  The Court concludes

24   that counsel's sentencing-stage performance was neither deficient nor prejudicial

25   Prior to sentencing, trial counsel prepared two memoranda, one challenging the

26   aggravating factors noticed by the State (ROA-PCR 380), the other setting forth arguments in

27

28

support of several statutory and nonstatutory mitigating factors (ROA-PCR 408).  The court held a presentencing hearing on December 7 and 14, 1990, and January 11 and 18, 1991.  At the hearing, counsel presented testimony from Rachel Roth, a counselor  who had treated Petitioner throughout her incarceration at the Durango Jail Psychiatric Unit, where Petitioner was housed in protective custody, and Dr. Leonardo Garcia-Bunuel, a psychiatrist who supervised the treatment of inmates at the unit.  Ms. Roth testified that Petitioner experienced and displayed genuine grief at the loss of her son.  (RT 1/11/91 at 11-13.)  She further testified that she believed that Petitioner was not guilty of the offenses of which she was convicted, and that the prosecution of Petitioner was the product of an institutional bias against single mothers.  (*Id.* at 14-15.)  Dr. Garcia-Bunuel testified that Petitioner suffered from "grief reaction" and post-traumatic stress disorder; he also indicated that in his opinion Petitioner's grief was genuine.  (*Id.* at 54-55.)  Dr. Garcia-Bunuel testified that in assessing Petitioner's emotional condition he considered her family background, but that his information was limited and his main source of information was Petitioner herself; he did not consider, for example, her ex-husband and her father to be productive or reliable sources of information, and other family members did not come forward.  (*Id.* at 61.)  Like Ms. Roth, Dr. Garcia-Bunuel testified that he believed Petitioner was innocent of the charges.  (*Id.* at 73.)

In sentencing Petitioner, the court considered the mitigating factors cited by counsel, including the statutory factors of duress, minor level of participation, lack of foreseeability that the murder would occur, and Petitioner's age.  (ME 1/18/91.)  The court also considered the nonstatutory factors urged by counsel, including Petitioner's grief, legitimate questions concerning her guilt, her lack of a felony record, and her potential for rehabilitation.  (*Id.*)  Finally, on its own initiative, the court considered evidence of Petitioner's deprived childhood, her employment history, and her good behavior while incarcerated.  (*Id.*)

As discussed above, Petitioner attached to her PCR petition an affidavit from her mother and stepfather (PCR pet., Ex. 69), an affidavit from a physician who treated Christopher Milke

and attested that Petitioner appeared to be a concerned mother and that Christopher showed no

signs of abuse (*id.*, Ex. 76), and affidavits from the Jones family (*id.*, Exs. 103, 104).  In its order

denying Petitioner's sentencing-stage IAC claims, the PCR court explained:

> Although the claim has been made that defense counsel failed to secure the presence of defendant's mother and records for the presentence hearing, there is no indication that what would have been presented would have changed the result of the sentencing.  The court had heard about defendant's social and employment history from the defendant herself during the course of the trial.  The court heard about defendant being left to fend for herself after her mother moved to Switzerland.  The affidavit from the defendant's mother does not reflect the defendant suffered any cruelty at the hands of her parents during her formative years.  The court was made well aware of the defendant's tumultuous relationship with her ex-husband.
>
> The court heard about defendant's in-custody behavior from Dr. Garcia.  The court found that her good conduct while incarcerated was a non-statutory mitigating circumstance.  What else was there for counsel to present?
>
> Although it is asserted in the amended [PCR] petition that defense counsel was ineffective in failing to have a psychological examination conducted, there is no showing as to what the evaluation would have shown.

(ME 11/18/96 at 44-45.)

Petitioner has presented no new evidence that would alter the PCR court's analysis.  This

Court agrees that Petitioner's background as the child of divorce does not constitute persuasive

mitigation evidence.  The record, as synthesized in Ms. Hurley's social history, indicates that

Petitioner was a popular and intelligent high school student, that sibling rivalry existed between

Petitioner and her younger sister, that her parents divorced when she was sixteen, that thereafter

there was tension between her parents, that her father was emotionally distant and financially

unsupportive, that her mother moved to Europe when Petitioner was nineteen but returned

frequently and continued to provide financial support, and that Petitioner's relationship with her

husband was troubled, primarily due to his severe substance abuse problem.  (Dkt. 99, Ex. 1.)

The Court finds that this information concerning Petitioner's background is not compelling

mitigation evidence; in any event much of the information was in fact presented to the state

court, largely through Petitioner's own testimony.

Furthermore, as the PCR court observed, the record contains no evidence that Petitioner

suffers from any mental-health issues that could have served as a mitigating circumstance. Therefore, the Court cannot find that trial counsel's failure to present evidence of Petitioner's psychological condition constituted deficient performance or caused prejudice to Petitioner's defense.

Finally, the Court concludes that any additional information Petitioner could have presented regarding the stressful family dynamic she experienced as a child and adolescent is of limited mitigating value because it bears no connection with the crime for which she was convicted.  While the sentencer in a capital case is obligated to hear all relevant mitigation evidence, *see Tennard v. Dretke*, 542 U.S. 274, 287 (2004); *State v. Newell*, 212 Ariz. 389, 132 P.3d 833, 849 (2006), the sentencer is also "free to assess how much weight to assign to such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) ("The sentencer . . . may determine the weight to be given relevant mitigating evidence").  Therefore, in "assessing the quality and strength" of Petitioner's mitigation evidence, the trial court could have taken into account Petitioner's "failure to establish a causal connection" between her family background and the murder of her child.  *Newell*, 212 Ariz. at 389, 132 P.3d at 849.

The other category of mitigating information that Petitioner faults trial counsel for failing to present concerns her relationship with her son.  Petitioner again contends that counsel should have offered additional evidence from friends, family members, and others to support her assertions that she was a caring mother to Christopher.  However, the fact that the jury had convicted Petitioner of murdering Christopher substantially devalued any evidence concerning her positive qualities as a mother.  As the Arizona Supreme Court observed with respect to co-defendant Styers, who argued that his role as Christopher's part-time caretaker served as a mitigating factor, "There was testimony that defendant cared for Christopher at times, but his actions and participation in his murder speak volumes to that."  *State v. Styers*, 177 Ariz. 104, 116-17, 865 P.2d 765, 777-78 (1993).

Based upon these considerations, Petitioner has not shown that there is a "reasonable probability" that the trial court would have imposed a different sentence if defense counsel had presented the additional information cited by Petitioner in this claim. *Strickland*, 466 U.S. at 694. Therefore, PCR court's denial of Petitioner's sentencing-stage IAC claim was not an unreasonable application of *Strickland*.

**Conclusion**

Petitioner's arguments are "predicated upon showing what defense counsel could have presented," rather than the relevant inquiry of "whether counsel's actions were reasonable." *Babbitt*, 151 F.3d at 1173-74. The PCR court recognized that the choices trial counsel made were reasonable. Petitioner has not met her burden of showing that trial counsel "made errors so serious that [he] was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. She has failed to overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.* at 689. Finally, she has failed to "affirmatively prove prejudice" with respect to any of her allegations of ineffective assistance. *Id.* at 693. Because the PCR court's decision denying Petitioner IAC claims was not an unreasonable application of clearly established federal law, Petitioner is not entitled to relief on this claim.

**Claim V(A): Imposition of the death penalty violated Petitioner's Fifth Amendment due process rights and the Eighth Amendment prohibition against cruel and unusual punishment.**

Petitioner alleges that Arizona's death penalty statute fails to genuinely narrow the class of persons eligible to receive the death penalty. The Arizona Supreme Court summarily denied this claim on direct appeal. *Milke*, 177 Ariz. at 124, 865 P.2d 779 at 785. This decision was neither contrary to nor an unreasonable application of clearly established federal law.

In *Furman v. Georgia*, 408 U.S. 238 (1972), the United States Supreme Court held the death penalty statutes of Georgia and Texas to be unconstitutional because they allowed arbitrary and unguided imposition of capital punishment. In response to *Furman*, many states enacted

new capital statutes.  A number of these statutes survived the Court's further scrutiny in *Gregg v. Georgia*, 428 U.S. 153 (1976), where the Court, observing that the death penalty is "unique in its severity and irrevocability," concluded that a death sentence may not be imposed unless the sentencing authority focuses its attention "on the particularized nature of the crime and the particularized characteristics of the individual defendant." *Id.* at 187, 206.  Pursuant to *Gregg*, therefore, in imposing the death sentence the sentencer must find the presence of at least one aggravating factor and then weigh that factor against the evidence of mitigating factors.  *Id.* at 206.  Subsequently, in *Zant v. Stephens*, the Court refined these general requirements, holding that a constitutionally valid capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  462 U.S. 862, 877 (1983).  The Court explained that a death penalty scheme must provide an "objective, evenhanded and substantively rational way" for determining whether a defendant is eligible for the death penalty.  *Zant*, 462 U.S. at 879.

In addition to the requirements for determining eligibility for the death penalty, the Court has imposed a separate requirement for the selection decision, "where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).  "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."  *Zant*, 462 U.S. at 879.  Accordingly, a statute that "provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage" will ordinarily satisfy Eighth Amendment and Due Process concerns, *id.*, so long as a state ensures "that the process is neutral and principled so as to guard against bias or caprice." *Tuilaepa*, 512 U.S. at 973.

The Court has explained that defining specific "aggravating circumstances" is the accepted "means of genuinely narrowing the class of death-eligible persons and thereby

channeling the [sentencing authority's] discretion." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). Each circumstance must meet two requirements. First, "the [aggravating] circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa*, 512 U.S. at 972; *see Arave v. Creech*, 507 U.S. 463, 474 (1993). Second, "the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa*, 512 U.S. at 972; *see Arave*, 507 U.S. at 473; *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

Arizona's death penalty scheme allows only certain, statutorily defined, aggravating circumstances to be considered in determining eligibility for the death penalty. A.R.S. § 13-703(F). As the Supreme Court has noted, "The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencer]." *Blystone v. Pennsylvania*, 494 U.S. 299, 306-07 (1990). Moreover, not only does Arizona's sentencing scheme generally narrow the class of death-eligible persons, but the aggravating factors found as to Petitioner, § 13-703(F)(6) and (9), do so specifically.[17]

The Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors, including (F)(6), do not adequately narrow the sentencer's discretion. *See Lewis v. Jeffers*, 497 U.S. 764, 774-77 (1990); *Walton v. Arizona*, 497 U.S. 639, 649-56 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996). The Ninth Circuit has also explicitly rejected the argument that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith v. Stewart*,

---

[17]  In Petitioner's case, the trial court found that these aggravating circumstances, plus the pecuniary gain factor, (F)(5), had been proven. (ME 1/18/91.) Upon independent review, the Arizona Supreme Court rejected the (F)(5) factor, reweighed the remaining mitigating and aggravating circumstances, and affirmed the death sentence. *Milke*, 177 Ariz. at 124-29, 865 P.2d at 785-90.

140 F.3d 1263, 1272 (9th Cir. 1998).

For the reasons discussed above, Petitioner is not entitled to relief on this claim.

**Claim VII:   Petitioner's right to equal protection of the law was violated when she was denied a jury trial on aggravating factors in a capital case.**

This claim is meritless.  In *Ring v. Arizona*, the Supreme Court held that a sentencing judge, sitting without a jury, may not find an aggravating factor necessary for imposition of the death penalty. 536 U.S. 584.  In *Schriro v. Summerlin*, 542 U.S. 348 (2004), however, the Court held that *Ring* does not apply retroactively to cases, such as Petitioner's, that were already final on direct review at the time *Ring* was decided.  Therefore, Petitioner is not entitled to relief on this claim.

**Claim VIII: Petitioner was denied effective assistance of counsel on direct appeal in violation of the Sixth Amendment.**

Petitioner alleges that her appellate counsel was ineffective for failing to raise the claim that her statement to Det. Saldate was involuntary.  The PCR court rejected this claim, explaining that the Arizona Supreme Court, in its independent review of Petitioner's conviction, did not conclude that her rights were violated by the admission of her statement to Det. Saldate and that appellate counsel's decision to raise other issues instead did not constitute deficient performance.  (ME11/18/96 at 54-55.)  The PCR court's ruling was not an unreasonable application of clearly established federal law.

The Fourteenth Amendment guarantees a criminal defendant the right to effective assistance of counsel on his first appeal as of right.  *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985).  A claim of ineffective assistance of appellate counsel is reviewed according to the standard set out in *Strickland*.  *See Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989). Petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's deficient performance, Petitioner would have prevailed on appeal.  *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *see Miller*, 882 F.2d at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

"A failure to raise untenable issues on appeal does not fall below the *Strickland* standard." *Turner v. Calderon*, 281 F.3d at 872; *see also Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (holding that appellate counsel could not be found to have rendered ineffective assistance for failing to raise issues that "are without merit").  Moreover, appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by petitioner.  *Miller*, 882 F.2d at 1434 n.10 (citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)); *see Smith v. Stewart*, 140 F.3d at 1263, 1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because doing so "is not necessary, and is not even particularly good appellate advocacy").  As the PCR court noted, the "weeding out of weaker issues is . . . one of the hallmarks of effective appellate advocacy."  *Miller*, 882 F.2d at 1434; *see Smith v. Murray*, 477 U.S. 527, 536 (1986).  Therefore, even if appellate counsel declines to raise weak issues, counsel will frequently remain above an objective standard of competence and have caused no prejudice to the client.  *Miller*, 882 F.2d at 1434.

The Court finds that appellate counsel's failure to raise the issue of the voluntariness of Petitioner's statement was not constitutionally ineffective assistance of counsel.  The trial court determined, after a voluntariness hearing, that Petitioner's statement to Det. Saldate was not obtained in violation of her rights.  A jury, having been instructed that the voluntariness of the statement must be proved beyond a reasonable doubt, and having heard the trial testimony of Petitioner and Det. Saldate, convicted Petitioner.  With this background, it was reasonable for appellate counsel to assume that the Arizona Supreme Court would not find erroneous the trial court's factual determination that Petitioner's statement was voluntary.  *See, e.g.*, *Mayo v. Lynaugh*, 882 F.2d 134, 139 (5th Cir. 1989) (failure to raise issue of voluntariness of confessions did not constitute ineffective assistance of appellate counsel where only the defendant's own testimony supported the contention that his confession was given in violation of his rights and it was reasonable for counsel to assume that the appellate court would not reject the trial court's finding, after a full hearing, that there was no coercion).

1   The PCR court's rejection of Petitioner's allegation of appellate IAC was neither contrary

2   to nor an unreasonable application of clearly established federal law.  Therefore, Petitioner is not

3   entitled to relief on this claim.

4   **Claim X:     The Arizona Supreme Court violated Petitioner's rights under the Eighth and Fourteenth Amendments by relying on constitutionally insufficient narrowing constructions of a facially vague statutory aggravating circumstance.**

5

6

7   Upon its independent review of Petitioner's sentence, the Arizona Supreme Court found

8   that two aggravating circumstances existed.  *Milke*, 177 Ariz. at 124-27, 865 P.2d at 785-88.

9   The court held that Petitioner committed the offense in an especially heinous or depraved

10  manner, pursuant to A.R.S. § 13-703(F)(6), because the victim was helpless, the killing was

11  senseless, and Petitioner had a parental relationship with the victim, with the latter fact rendering

12  the crime "shockingly evil."  *Id.* at 124-26, 865 P.2d at 785-87; *see* A.R.S. § 13-703(F)(6).  The

13  court further found that the victim was under the age of fifteen.  *Id.* at 127, 865 P.2d at 788; *see*

14  A.R.S. § 13-703(F)(9).

15  Petitioner claims that the supreme court violated the Eighth Amendment when it

16  determined that the offense was committed in an especially heinous or depraved manner.

17  Specifically, she asserts that the terms "senseless" and "shockingly evil" are unconstitutionally

18  vague.  She also argues that use of the parent-child relationship in support of the heinous and

19  depraved factor represents an unauthorized extension of the narrowing construction placed on

20  the (F)(6) factor by the Arizona Supreme Court.

21  In its ruling, the Arizona Supreme Court acknowledged that the aggravating factor

22  defined in § 13-703(F)(6) is facially vague but correctly noted that the narrowing construction

23  given to the factor by the Arizona courts meets constitutional requirements.  *Milke*, 177 Ariz. at

24  125, 865 P.2d at 786 (citing *Richmond v. Lewis*, 506 U.S. 40, 47 (1992), and *Walton*, 497 U.S.

25  at 654).  This narrowing construction, adopted in *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d

26  1, 11 (1983), identified the following specific factors which may lead to a finding of heinousness

27  or depravity: (1) the apparent relishing of the murder by the killer, (2) the infliction of gratuitous

28

violence on the victim, (3) the needless mutilation of the victim, (4) the senselessness of the crime, and (5) the helplessness of the victim.

In determining that Petitioner's murder conviction satisfied the (F)(6) factor, the supreme court listed two of the *Gretzler* criteria, helplessness and senselessness, only one of which Petitioner challenges.[18] Because the senselessness and helplessness criteria are both found in the construction of the (F)(6) factor that was approved by the United States Supreme Court, Petitioner's criticism of the Arizona Supreme Court's analysis is baseless. *See Lewis v. Jeffers*, 497 U.S. at 777-78. The fact that the court made an additional finding to support its conclusion that the crime was heinous and depraved based on Petitioner's status as the victim's mother does not invalidate its finding that the two specifically-listed and constitutionally appropriate factors had been proved. Moreover, the *Gretzler* factors "are not absolutely exclusive," *State v. Mata*, 185 Ariz. 319, 338, 916 P.2d 1035, 1054 (1996), and the Arizona Supreme Court has "held it permissible to use the parent-child relationship in partial support of the heinousness and depravity finding." *State v. Carlson*, 202 Ariz. 570, 584, 48 P.3d 1180, 1194 (2002) (citing *Milke*, 177 Ariz. at 126, 865 P.2d at 787); *see State v. Stanley*, 167 Ariz. 519, 529, 809 P.2d 944, 954 (1991); *State v. Wallace*, 151 Ariz. 362, 369, 728 P.2d 232, 239 (1986); *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977).

Furthermore, the fact that the supreme court used the descriptive phrase "shockingly evil" in its discussion of the heinous and depraved aggravating circumstance does not indicate that the court offered "shockingly evil" as a factor in place of or in addition to the legitimate *Gretzler* factors. Instead, the court used the phrase as it was used in *Gretzler*, simply as a means of defining or describing what is meant by the word "heinous," not as a "specific factor," such as senselessness or helplessness, upon which a finding of heinousness and depravity can be based. *Gretzler*, 135 Ariz. at 51-52, 659 P.2d at 10-11. Thus, in discussing the applicability of the

---

[18] Petitioner does not dispute the supreme court's finding that the victim, a four-year-old child, was helpless when he was murdered.

1  parent-child relationship as an additional factor supporting a finding that the crime was heinous

2  and depraved, the supreme court considered the underlying definitions of "heinous" and

3  "depraved" and concluded that:

> A mother's conspiracy to murder her own four-year-old child and the resultant premeditated murder of that child is the ultimate perversion of the parent/child relationship. The crime in this case can be described without reservation as "hatefully or shockingly evil" and "marked by debasement, corruption, perversion or deterioration." *Gretzler,* 135 Ariz. at 51, 659 P.2d at 10 (citing *Knapp,* 114 Ariz. at 543, 562 P.2d at 716). The parent/child relationship is a circumstance that separates this crime from the "norm" of first degree murders. The use of that relationship in partial support of a finding of heinousness and depravity under § 13-703(F)(6) is constitutionally permissible.

*Milke*, 177 Ariz. at 126, 865 P.2d at 787.

Petitioner's challenge to the ruling of the Arizona Supreme Court upholding the

applicability of the heinous and depraved aggravating factor is without merit. "[F]ederal habeas

review of a state court's application of a constitutionally narrowed aggravating circumstance is

limited, at most, to determining whether the state court's finding was so arbitrary or capricious

as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers,*

497 U.S. at 780. "A state court's finding of an aggravating circumstance in a particular case . .

. . is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Id.*

at 783. A reasonable sentencer could have determined that Petitioner's offense was heinous and

depraved based upon its senselessness and the helplessness of the victim together with the fact

that Petitioner was the victim's mother. Therefore, Petitioner is not entitled to relief on this

claim.

**Claim XI:    The aggregate of errors in Petitioner's trial, sentencing, and appeal violated her due process rights under the Fourteenth Amendment.**

Petitioner contends that the accumulation of errors and irregularities which allegedly

occurred during her trial, sentencing, and on appeal rise to the level of a denial of fundamental

fairness in violation of the Fourteenth Amendment.   Petitioner raised this claim in her PCR

petition.  (PCR pet. at 64.)  The PCR court denied the claim "because the Arizona Supreme

Court does not recognize the cumulative error doctrine."  (ME 11/18/96 at 53.)

1    The United States Supreme Court has not specifically recognized the doctrine of

2    cumulative error as an independent basis for habeas relief.  Therefore, the PCR court's denial

3    of this claim was not contrary to clearly established federal law under § 2254(d)(1).

4        Relying on Ninth Circuit precedent, Petitioner contends that the accumulation of errors

5    in his trial resulted in a "complete denial of fundamental fairness."  (Dkt. 98 at 120.)  The Court

6    disagrees.

7        The Ninth Circuit has held that in some cases, although no single trial error is sufficiently

8    prejudicial to warrant reversal, the cumulative effect of several errors may nonetheless prejudice

9    a defendant so much that his conviction must be overturned.  *See Mancuso v. Olivarez*, 292 F.3d

10   939, 957 (9th Cir. 2002).  Here, however, the Court has not identified any constitutional errors.

11   Therefore, "[b]ecause there is no single constitutional error in this case, there is nothing to

12   accumulate to the level of a constitutional violation."  *Manusco*, 292 F.3d at 957.

13       Because Supreme Court precedent does not recognize the doctrine of cumulative error,

14   and because this Court has determined that no prejudice resulted from the errors alleged by

15   Petitioner, Petitioner is not entitled to relief on this claim.

16                                **CONCLUSION**

17       The Court finds that Petitioner has failed to establish entitlement to habeas relief on any

18   of her claims.  The Court further finds that an evidentiary hearing in this matter is neither

19   warranted nor required.

20       Accordingly,

21       **IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt.

22   19) is **DENIED**.

23       **IT IS FURTHER ORDERED** that the stay of execution entered by this Court on

24   January 13, 1998, is **VACATED.**

25

26   . . .

27

28

1     **IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to

2   Noel Dessaint, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-

3   3329.

4     DATED this 27th day of November, 2006.

5

6

7   _____

8   Robert C. Broomfield
    Senior United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28