Lori L. Voepel, Bar #015342
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7807
lvoepel@jshfirm.com

Michael D. Kimerer, # 002492
Amy L. Nguyen, # 023383
KIMERER & DERRICK, P.C.
221 East Indianola Avenue
Phoenix, AZ  85012
Telephone:  (602) 279-5900
Fax:  (602) 264-5566
MDK@kimerer.com
ANguyen@kimer.com

*Attorneys for Petitioner Debra Jean Milke*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| DEBRA JEAN MILKE, | NO. CV 98-0060-PHX-RCB |
| Petitioner, | **PETITIONER'S LEGAL MEMORANDA IN SUPPORT OF EVIDENTIARY HEARING RE: WAIVER** |
| v. | |
| DORA SCHRIRO, et al., | **DEATH PENALTY CASE** |
| Respondents. | |

I.   **INTRODUCTION**

The State bears a "heavy burden" in proving a voluntary, knowing, intelligent waiver of a defendant's *Miranda* rights.  *Miranda v. Arizona*, 384 U.S. 436 (1966); *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984).  Moreover, there is a *presumption against* finding a waiver of *Miranda* rights.  *Butler*, 441 U.S. at 373.  Nothing in the appellate record pre-existing the evidentiary hearing supported the state court's waiver finding, a point

1  essentially conceded by the State at oral argument.[1]  Although the State argued that an

2  "implied waiver" occurred here because the interrogation continued after Detective

3  Saldate read Debra her rights and asked if she understood,[2] the 9th Circuit rejected that

4  argument, determining that: "A complete review of the record discloses no evidence

5  supporting a finding that petitioner voluntarily, knowingly and intelligently waived her

6  rights under *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). See 28 U.S.C.Â § 2254(d),

7  (e)."  (9/28/09 9th Circuit Order).   In finding no evidence supported the state court's

8  waiver finding under *Miranda* and § 2254(d), (e), the 9th Circuit necessarily determined

9  that: (1) the state court's waiver finding involved an unreasonable application of clearly

10  established federal law; (2) its determinations of fact in this regard were "objectively

11  unreasonable" on the existing record; and (3) its findings failed to survive an intrinsic

12  challenge of objective reasonableness and were not entitled to a "presumption of

13  correctness" under § 2254(e)(1). *See also Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004).

14         The State's evidence at the evidentiary hearing is in all material respects the

15  same as that presented in the voluntariness hearing and at trial.   This Court should

16  therefore find, as did the 9th Circuit, that the evidence in this case fails to demonstrate

17  Debra voluntarily, knowingly and intelligently waived her *Miranda* rights.

**II.    THE EVIDENCE**

18

19       **A.    State's Evidence.**

20         At the waiver evidentiary hearing on January 11-12, 2010 the only "new"

21  evidence submitted by the State are photocopies of two *Miranda* rights' cards.  (Ex. 51).

22  Evidence of a website was submitted by the State as impeachment against Paul Huebl,

23  only part of which was admitted.  (Ex. 57(a)).  The State's only witness was Armando

24  Saldate, the case agent who interrogated  Debra Milke.  Saldate provided no new evidence

25  on the issue of waiver and acknowledged on cross-examination he had nothing new to add

26  to the record which had not already been presented to the 9th Circuit. (WH 1/11/10 at 35).

27         [1] (8/20/08 OA Transcript at 24-26).

28         [2] (Respondents' 11/7/08 Supplemental Answering Brief Re: Waiver).

2

1   This was consistent with Saldate's prehearing interview.  (Ex. 21 at 5-7).

2   Saldate reaffirmed much of the information contained in his supplemental

3   departmental report (Ex. 50); his testimony at the voluntariness hearing (Exs. 52, 53 ); his

4   pretrial interview (Ex.54); and his 1990 trial testimony (Exs. 55, 56).  The salient points of

5   Saldate's waiver hearing testimony are as follows.  Saldate was an experienced homicide

6   detective, who was called on December 3, 1989 by his supervisor, Sgt. Ontiveros, to assist

7   in the investigation surrounding the disappearance of Christopher Milke. (WH 1/11/10 at

8   9-12, 48-49).  Saldate acknowledged that he knew the law about *Miranda* and had been

9   given instructions about *Miranda* throughout his career. (WH 1/11/10 at 38).  Yet, he also

10   testified that, contrary to both the law[3] and the policy of the Phoenix Police Department,[4]

11   if someone asked for an attorney, he would not cease the interrogation but would continue

12   to "have a conversation" with that person.  (Id. at 38-40).[5]  When Saldate arrived at the

13   Phoenix Police station he was briefed on the status of the investigation.  Styers and Scott

14   were still at the station and had been talking with Detective Mills who was working on the

15   case. (Id. at 49-50).  Saldate first tried to talk with Jim Styers, but could not get any

16   incriminating statements from him. (Id. at 52).  Saldate was critical of the way Detective

17   Mills was interrogating Roger Scott (Id. at 54) and decided he would talk with Scott

18   alone. (Id. at 53).  Saldate had a "gut suspicion" Scott was involved so he immediately

19   read him his rights.  He used his "interrogation style" of getting within 6-12 inches of the

20   subject; told Scott he would not tolerate lies; threatened to go question Scott's sick

21   mother; and eventually obtained incriminating statements. (Id. at 55-62).  Scott gave no

22   

23   [3] *See Edwards v. Arizona*, 451 U.S. 477 (1981) (all questioning must immediately cease after a suspect requests counsel); and *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (emphasizing that *Edwards* set forth a "bright-line rule" that the interrogation must cease).

24   [4] (See Ex.19 at ER 930, 1989 PPD Operations Order C-5, ¶ 14(E), which states: "When a person wishes to remain silent or have an attorney present during questioning, interrogation must cease immediately.  In such cases, if an investigation would apparently be furthered by continuing the interrogation, the department's Legal Advisor may be contacted with a supervisor's permission and asked to assist.").

25   

26   

27   [5] Substantial evidence was presented that Saldate has a history of ignoring police procedures and defendants' Constitutional Rights, including a pattern of failing to scrupulously honor invocations of *Miranda*. (Exs.7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17).

28

1  information incriminating Debra Milke during Saldate's interrogation of him. (Id. at 63).

2  Saldate and Mills drove with Roger Scott to the crime scene.  While en

3  route, Saldate says Roger Scott for the first time mentioned in an offhand remark that

4  Debra Milke was also "involved," but gave no details to support this remark.  (WH

5  1/11/10 at 63-64).  With only this general, vague statement and no physical evidence to

6  connect Debra to the crime (id. at 75), Saldate flew by helicopter to Florence to

7  interrogate her. (Id. at 64-65).  He was told by his supervisor, Sgt. Ontiveros, to tape

8  record the interrogation, but he did not bring a tape recorder with him or ask for one when

9  he arrived in Florence, even though recorders were readily available.  He indicated it was

10  not his practice to record interrogations because he believes it deters a subject from

11  talking freely.  (Id. at 66-71).   Before seeing Debra Milke at Florence, Saldate made the

12  decision to immediately arrest her (id. at 76, 82) and was confident that he would get a

13  confession from her. (Id. at 77).  Even though he quibbled over whether he went there to

14  interview her or interrogate her (id. at 45-47), he conceded that under Phoenix Police

15  Department (PPD) procedures, he went there to interrogate her.  (Id. at 47-48).  He had

16  made up his mind she was guilty based on one comment by Scott, even though the policy

17  of the PPD was that an officer should keep an open mind when he does an interrogation.

18  (Id. at 82-83).  Saldate described his "interrogation style" as always the same. He takes

19  control of the situation; directly confronts his subjects; gets within 6 to 12 inches in front

20  of them; insists they maintain eye contact with him; and tells them he will only listen to

21  the truth and won't  "tolerate lies." (Id. at 55-58).

22  When Saldate arrived in Florence, he immediately went to the Sheriff's

23  office and went to the room where Debra was being held.  (Id. at 76). He introduced

24  himself (id. at 80) and asked a family friend who was present to leave.  He shut the door

25  and wanted a "one-on-one" situation with Debra. (Id. at 79).  He did not ask Phoenix

26  Detective Hamrick, who was present just outside the door, to witness the interrogation.

27  (WH 1/11/10 at 101).  Inside the room, Debra was seated in a chair against the wall. He

28  pulled another chair up directly in front of her, got within 6-12 inches from her, and

4

looked at her eye-to-eye.  (Id. at 80).  Saldate testified he then told her that her son had

been found shot to death and that she was being arrested for involvement in the crime. (Id.

at 80-81; 20).   Debra began to scream and make noises.   (Id. at 81).   On direct

examination,  Saldate said Debra was only "excited" (id. at 26), but he conceded on cross

that he had at other times described her as "hysterical." (Id. at 81).[6]   Saldate immediately

said, "I won't tolerate that!" (Id.).  Saldate admitted that throughout the interrogation, he

told Debra he would not "tolerate lies" and would only "tolerate the truth." (Id. at 84-85).

Saldate then removed a "rights" card from his badge case and read verbatim the *Miranda*

rights as printed on the card.  One of the cards he is shown on direct examination is a copy

of the card he says he used to read Deborah her rights.  (WH 1/11/10 at 20-21).  There is

no printed statement on the card asking if a subject agrees to waive his or her rights.  (Ex.

51).  There is a place for the interrogating officer to initial, but no place for the subject to

acknowledge in writing that the "rights" were read. (Id.).  At no time during this exchange

(or at any other time) did Saldate ask Debra if she would waive her rights. (WH 1/11/10 at

90).  Saldate claims that asking Debra if she understood her rights was sufficient and that

he was not required to ask if she waived her rights. (Id. at 24).   Saldate claims Debra

acknowledged she understood her rights by nodding her head twice and then saying "yes"

when he demanded a verbal response. (Id. at 23-24, 85).[7]  Saldate testified that right after

Debra indicated she understood her rights, he asked her if she wanted the interrogation

recorded.  According to Saldate, Debra indicated she did not want it recorded. (Id. at 17-

18, 85-86).[8]   Saldate then took total control of the interrogation room.  With his chair

directly in front of Debra, he leaned within 6-12 inches of her face.  He forced her to make

eye-contact with him, and told her repeatedly, "I will not tolerate lies."  (WH 1/11/10 at

---

[6]  Saldate claims Debra "feigned" being emotionally distraught because he didn't
see any tears, and said he thought she was just trying to buy time to think. (WH 1/11/10 at
26, 81).  He admitted this is just an opinion and a "gut feeling" on his part. (Id. at 84).

[7]  Debra said she denied telling Saldate she understood her rights, and instead told
him she did not understand her rights as she had never been in trouble or arrested before.

[8]  Debra said she remembers Saldate asking about taping the interrogation, but her
response was not just "No," but rather "No, I need a lawyer." (WH 1/11/10 at 141-143).

79-83).  Whenever she deviated from what he believed to be the truth (ie: she's guilty) or reacted emotionally, he told her he would "not tolerate" that behavior.  (Id. at 84-85, 92-93).  Saldate described his interrogation style as being "honest" and "truthful" with the subject. (Id. at 58).[9]  He said he looked Debra, who was emotional, in the eye and told her "I'm going to deal with you honestly and I want you to deal honestly with me."  (Id. at 80).  In fact, Saldate immediately lied to Debra by telling her that both Styers and Scott had implicated her in the murder.  (Id. at 94-97; Ex. 50 at 1).  At the hearing, he admitted that was not the truth.  (Id. at 95).  Styers has never implicated Debra in the murder of her son.    The interrogation lasted approximately 30 minutes. (Id. at 22, 96).  Saldate claimed that Debra confessed, never denying involvement in the murder of her son and never insisting she was not involved.  (Id. at 29).  Debra has always testified she told Saldate she was not involved in the crime, and after Saldate ignored her request for an attorney, she tried to defend herself.  (Id. at 149, 152-153).  Whenever she tried to defend herself or explain why she couldn't have been involved, however, Saldate would "get in her face" and say he would not "tolerate any lies."  Saldate conceded that whenever Debra got off track or started going "sideways" he would tell her, "I won't tolerate that type of behavior. I just want the truth." (Id. at 96).  He also admitted that in this case, he was even less "tolerant" because he had been up 12 hours working on his day off.    (Id. at 98-99).  Saldate did nothing to memorialize or corroborate what he claims occurred during his 30 minute interrogation of Debra.   He did not record her statement (during or after interrogation); he destroyed his notes; he did not bring Detective Hamrick (or any other officer) in to witness/corroborate her purported confession; he never had Debra sign or

---

[9] Saldate also said he would never "intentionally lie" or put his position on the line by lying.  (WH 1/11/10 at 31-32).  Yet, he was disciplined for lying during an internal PPD investigation into misconduct involving a female motorist, until after he was given a polygraph examination.  (Ex. 18; ER 00913-15).  In issuing its "separation notice," PPD stated that Saldate's "image of honesty, competency, and overall reliability must be questioned." (Id. at 00915).   Although this Court limited questioning at the hearing regarding this incident, the exhibit itself should be considered, as this Court necessarily determined it was relevant when it turned a copy of this disciplinary record over to Petitioner following an *in camera* review in habeas proceedings, and by making it part of the expanded record. (See 9/26/03 Order Granting Motion to Extend the Record).

write anything saying she had waived her rights; and, even though he was in total control of the situation, he made no effort to corroborate or memorialize what he claims happened during the 30 minutes of interrogation.  He could have memorialized what occurred, but chose not to do so. (Id. at 101-105).   He conceded this created a "he said-she said" situation, and essentially acknowledged he believes that "as a police officer and investigator of that case," his version should be viewed as more credible. (Id. at 92-93).

### B.   Petitioner's Evidence.

Debra (who was not required to present any evidence at the hearing) provided additional testimony and exhibits supporting her position of no valid waiver.

### 1.   Debra's Testimony.

Debra's testimony at the hearing was also essentially the same as that presented at trial. (Ex. 1).  By the time Saldate arrived at the Florence Sherriff's Office  to interrogate  Debra at 8:00 pm Sunday night, she was physically and mentally exhausted and emotionally drained.  (WH 1/11/10 at 138).  In addition to not hearing any news about Christopher since learning he was missing Saturday afternoon,  she had just 2-3 hours of sleep since Saturday morning (id. at 137-38), had only eaten ½  sandwich since Friday night (id. at 131), and had ingested alcohol and prescription medication.  (Id. at 127-28).  She had waited in a medical room with a family friend for 2 hours for Saldate to arrive, and was not allowed to leave the room even for a drink of water. (Id. at 137).

Saldate came into the room, asked her friend to leave, shut the door, sat in a chair at the desk, took out a pen and started writing on a notebook. (Id. at 139; Ex. 1: 10/3/90 at 12-13).  Debra was seated in a chair next to the desk up against the wall.  (WH 1/11/10 at 136; Ex.22).  She asked if he had heard anything, which he ignored. (WH 1/11/10 at 140; Ex. 1: 10/3/90 at 13).  After a few moments he said, "We found your son, he was murdered and you are under arrest." (Id.).  She "screamed," "started crying" and yelled, "what, what." (Id.).  He said he was "not going to tolerate" her crying and she moaned, "Why are you doing this?," but he just "told [her] to be quiet." (Id. at 140-41; 13).  He then pulled out a card and read her *Miranda* rights. (Id.).  She said she heard him

7

speaking words, but didn't fully comprehend them. (Id.; see also WH 1/11/10 at 176-178). She did recall him saying she "had the right to remain silent" and mentioning "the word 'attorney'" several times. (WH 1/11/10 at 141; Ex. 1:  10/3/90 at 17).  He asked if she understood her rights, and she said she did not, that she had never been in trouble or under arrest. (Id. at 141; 17).  Additionally, Debra said she was in "shock because of the horror that my son was dead," "disbelief of being accused of his murder," and confused about why he was reading her rights, as she had  nothing to do with it. (Id. at 141-44; 17). Saldate ignored her, did not offer to read the rights again or to have her read them herself, and simply asked,  "Do you want this interview recorded?" (WH 1/11/10 at 142-44; Ex. 1: 10/3/90 at 17; Ex: 1 10/4/90 at 77-80).  Debra said, "No, I need a lawyer." (Id.).[10]

Saldate ignored her request for counsel and moved his chair up directly in front of hers so that their knees were touching. (WH 1/11/10 at 145-46; Ex. 1: 10/3/90 at 17-18).  He asked Debra's age and said "I have a daughter about your age, so I understand how you feel." (Id. at 146-47; 18).  He leaned forward, put his hands on her knees and said she could trust him, that he was her friend and was there to find out what happened. (Id.).  Saldate was in her face, about 6 to 12 inches away.  (Id. at 147).  Debra just sat there crying and not saying anything, and he said "I'm not going to tolerate this activity," "I'm here to question you about the murder of  your son, and this is your opportunity to tell me the truth," and "I won't tolerate any lies." (Id. at 147-48; Ex. 1: 10/3/90 at 18). Debra said, "What do you want from me?" and he said "The truth.  I'm  here to get the truth." (Id. at 148; 19).  Debra told him she didn't know what happened, and didn't know anything about Chris' murder because she wasn't involved in it. (WH 1/11/10 at 149).  She then started to defend herself by explaining why she wasn't the type of person who would do something like this, but he wouldn't believe her.  (Id. at 149-155).  She was "reeling"

---

[10] Debra testified she was not really saying she didn't want it recorded; rather, she wanted an attorney and for the interrogation to stop. (WH 1/11/10 at 141-145, 153).  She also explained she realized she at least needed an attorney even though she didn't fully understand her rights, including her right to stop the interrogation at any point after Saldate ignored her assertion and proceeded with questioning. (Id. at 176-180).

1   and didn't know what he wanted to hear.  (Id. at 149).  Saldate stayed in her face, and kept

2   saying throughout the interrogation, "you're not telling me the truth," "I came here to get

3   the truth," "I'm not going to tolerate any lies." (Id. at 152-154).   Debra said she did not

4   know she could have stopped talking to Saldate because (1) he ignored her  request  for an

5   attorney,  (2) he kept "badgering" her and  accusing her of not being truthful, (3) he was a

6   physically imposing man who was right in her face, and  (4) she was confused and in

7   shock and felt she had do "defend" herself from his vile accusations.  (Id. at 153-154).

8            During the 30 minute interrogation, Debra said Saldate never showed or

9   gave her the *Miranda* card to read, never asked her to initial  the Miranda card or offer to

10  have her sign anything acknowledging that she understood her rights, never asked  her to

11  sign anything saying she wanted to waive  her rights and talk to him, never asked if she

12  wanted to waive her rights or talk to him, never offered to bring  another officer or anyone

13  else into the room to witness the interrogation, did not bring a tape recorder or offer to go

14  get one, and did not offer to have her write out  a statement after the interrogation or offer

15  to re-interview her on  tape.  (Id. at 160-62).   Saldate also never  gave Debra any

16  opportunity to speak with a lawyer or to make a phone call, even though there was a

17  phone on the desk  in the room. (WH 1/11/10 at 162; Ex. 1: 10/3/90 at 39, 56).

18           Debra testified that she did not learn police were saying she had "confessed"

19  until she was in the receiving area at Madison jail just hours after her arrest and return to

20  Phoenix.  (WH 1/11/90 at 157).  A private investigative reporter (who she later learned

21  was Paul Huebl) asked to speak with her, at which time he asked if she had confessed as

22  police claimed. (Id. at 158).   Debra was shocked and confused and adamantly denied

23  doing so. (Id.).  He then said he understood it  had something to do with insurance money,

24  and she said "I heard that too and that's crazy." (Id.).   She then asked when she would be

25  allowed to talk to an attorney. (Id. at 167).  Debra has always maintained that she never

26  gave Saldate a confession or admitted to any involvement in the murder of her son and

27  that she asked for an attorney, but Saldate ignored her.  (WH 1/11/10 at 158-160; Ex. 1;

28  Exs. 2, 3).  In addition to her trial testimony and statements to Paul Huebl within hours of

1    her arrest, Debra also told these things to a jail psychiatrist, Dr. Kassell, within 2-3

2    months of her arrest.  (WH 1/11/10 at 158-60; Exs. 2, 3 52).  Dr. Kassell testified at the

3    voluntariness hearing that Debra told him Saldate walked into the room, said her son had

4    been found murdered and she was under arrest, after which she became hysterical and

5    Saldate said he "wouldn't tolerate" her crying and screaming and was there to get "the

6    truth." (Ex. 52: 9/10/90 at 82).  He testified that Debra said Saldate then Mirandized her

7    but she "did not fully comprehend what was being said because she was too involved with

8    absorbing the information that her son was killed." (Id. at 82).  It was Dr. Kassell's

9    opinion within a reasonable degree of medical and psychiatric certainty that at the time,

10   "she may have heard what was being said and may have understood to a certain degree

11   what was being said but I doubt that she really fully comprehended what the Mirandizing

12   was all about." (Id. at 94).[11]  Dr. Kassell recorded his session with Debra, and the tape

13   was admitted into evidence at the voluntariness hearing. (Id. at 87, 95, 168-72; ER 2045:

14   Tab 99).  This tape (& transcript) was also admitted at the waiver hearing, with part of the

15   tape played during Debra's testimony.  (WH 1/11/10 at  159-60; Exs 2,3).

16              **2.      Paul Huebl's Testimony.**

17              Paul Huebl, an investigative reporter and licensed private investigator

18   testified regarding his interaction with Debra within hours of her arrest. (WH 1/12/10 at 3-

19   46).  Huebl had previously provided an affidavit, which is part of the habeas record and

20   was admitted as a hearing exhibit. (Ex. 20).  His testimony about his conversation with

21   Debra was consistent with her testimony (WH 1/12/10 at 11).  He also recalled Debra

22   saying she had asked for a lawyer but hadn't seen one yet. (Id.). Huebl said he did not talk

23   to Debra's trial attorney about this interaction because he became angry with Huebl for

24   talking to Debra in jail and because he thought the attorney knew about the interview, as it

25   was taped and played to over one million television viewers.  (Id. at 11-13).[12]

26   _____

27              [11] Dr. Kassell's expert opinion that Debra did not fully comprehend her *Miranda*
     rights was uncontroverted by the State at the voluntariness hearing.  (Exs 52, 53).

28              [12] Counsel also played a video of a subsequent television broadcast of Huebl's
     interview with Debra after her conviction, in which he references the fact that he

1        ### 3.    Professor Richard Leo's Testimony.

2              Professor Leo provided expert testimony regarding the interrogations

3    practices and procedures employed by Detective Saldate in Debra's case (and in others),

4    and his two reports (and CV) were admitted by stipulation.  (WH 1/12/10 at 48-135; Exs

5    4, 5, 6).[13]  Interrogations practices, *Miranda* requirements/practices, and false/wrongful

6    convictions have been the main focus of Leo's research during his 20 year career as a

7    social scientist and law professor.  (Id. at 48-53; Ex. 4).  As one of the foremost

8    interrogations experts, Leo has numerous publications (including one of the leading

9    interrogations textbooks) and has testified in 185-86 voluntariness hearings, trials and

10   post-conviction proceedings.  (Id. at 51-52, 85-86).

11             Leo did an extensive evaluation of the materials in this case. He prepared an

12   initial report focused on the practices employed by Saldate and the reliability of his

13   account in light of those practices and Saldate's testimony and report.  (Ex. 5).  He then

14   reviewed additional materials and prepared a supplemental report solely on the *Miranda*

15   waiver issue.  (Ex. 6).  In Leo's opinion, Saldate's interrogation practices relating to: (1)

16   *Miranda* compliance (waiver and handling *Miranda* assertions), and (2) his complete

17   failure to memorialize or corroborate the waiver  or the interrogation in any way, were not

18   consistent with good interrogation practice throughout the country at the time in question,

19   and were in fact "strikingly bad" interrogation practices. (WH 1/12/10 at 70; Ex. 6).  Leo

20   explained how easy it is to obtain and document a waiver (express or implied) and that

21   police are trained in ways of doing so because they know the State has the heavy burden

22   of proving a *Miranda* waiver, and they need more than an officer's subjective account of

23   what occurred.  (WH 1/12/10 at 70-79).  Leo, who has observed/reviewed hundreds of

24   interrogations, opined that what occurred in Debra's case, especially the complete failure

25   ───────────────────────────────

26   interviewed  Debra within hours of her arrest and that she denied at that time having
     confessed to involvement in her son's murder.  (WH 1/12/10 at 17-23; Ex. 23).

27        [13] Leo's reports and opinions should be considered because the State opened the
     door to interrogation practices and procedures through Sadate's testimony and for the
28   other reasons set forth in Petitioner's Response to the State's Motion to Preclude.

to create any type of objective, independent record of the waiver (or the interrogation), was "extraordinary," especially in the context of a capital case. (Id. at 58-65, 70-72, 133-134).   He also testified that in the cases he has examined in which there was an implied waiver, there was at least *some* objective memorialization of the interrogation (through recording) and/or of the waiver (through signing a rights card or some other documentation showing they understood their rights and wanted to move forward with the interrogation), and/or the facts of what happened during the interrogation were undisputed.  (Id.; Ex. 6).  But he has never seen a case in which a valid express or implied waiver finding was based solely on a "swearing contest" between the officer and the accused, where critical facts of what occurred during the interrogation were in dispute, including whether the suspect asserted her right to counsel.  (Id.).[14]

Leo also testified that Saldate's practice of continuing to "have a conversation" with suspects after they asserted their right to counsel was not at all in accordance with general police practices (then or now), as it is understood that the "bright line rule" of *Edwards* required police to "scrupulously honor" assertions of rights by immediately ceasing interrogation.  (Id. at 73-75).  He also noted that Saldate's practice defied the Phoenix Police Department policies and procedures in place at the time.  (Id. at 75; Ex. 19).  Leo also testified that in this "swearing contest" created by **Saldate's** failure to create an objective record, Saldate's subjective account of what occurred is simply not reliable enough to support a finding of implied waiver, relative to the hundreds of other interrogations he has reviewed.  In reaching this opinion, Leo pointed to Sadate's practice of ignoring assertions of *Miranda* rights, combined with Saldate's demonstrated "confirmation bias" (that he believed Debra was guilty at the outset and appears to have misconstrued her statements and body language in inculpatory ways), Saldate's "wildly implausible assertions" regarding what occurred during the interrogation, and his documented tendency to misstate what occurs in interviews when he prepares his

---

[14]   Leo's testimony based on his observation and review of hundreds of interrogations is consistent with the reported cases on implied waiver, discussed below.

supplemental reports  (such as in other witness interviews conducted in this case, such as with Debra's sister, Sandra).  (WH 1/12/10 testimony;  Ex. 5, 6).  Leo stated that his opinion is not merely that Saldate isn't "telling the truth," but rather that Saldate's account of what occurred is not plausible or reliable in light of his expertise, research and experience in the field of police interrogation practices.  (Id. at 90-91, 108-111, 125-26).

## III.   LEGAL ARGUMENT.

### A.   The State Cannot Meet Its "Heavy Burden" of Proving a Valid Express or Implied Waiver Occurred.

The question of waiver "must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Butler*, 441 U.S. at 374-75.  According to *Miranda*, "[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." 384 U.S. at 475.  But "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Id.*  Thus, "an express statement can constitute a waiver, but silence alone after such warnings cannot do so." *Butler*, 441 U.S. at 373.  In addressing whether an express waiver is required, *Butler* emphasized that "an express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of [its] validity," however, an express waiver "is not inevitably either necessary or sufficient ...." *Id.* at 373. "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived" her rights. *Id.*  Thus, although courts must presume the defendant *did not* waive her rights, "in at least *some* cases waiver can be *clearly inferred* from the actions and words of the person interrogated." *Id.* (emphasis added).

Here, it is undisputed that there is no evidence of an express oral or written waiver.  Thus, the State must meet its "heavy burden" of proving waiver (and overcoming the presumption against waiver) through a theory that the waiver in this case was implicit. This it cannot successfully do, because cases finding implied waiver are clearly distinct in

the following ways: (1) the facts of what happened during the interrogations were uncontroverted or undisputed and/or (2) there were objective, independent records created of the interrogation and/or the conduct constituting waiver; plus (3) they involved conduct by the accused that "clearly inferred" a waiver of rights. *See Butler*, 441 U.S. at 373.

In *Butler*, the agent's testimony was *uncontroverted*. 441 U.S. at 370. He testified that Butler was given an "Advice of Rights" form, which he read. Butler acknowledged he understood but *refused to sign a waiver form*. *Id.* at 371. The agents explained he was not required to speak or sign the form, but they wanted him to talk with them. *He replied, "I will talk to you but I am not signing any form,"* then made inculpatory statements. *Id.* (emphasis added). Butler said nothing when advised of his right to counsel and never requested counsel or attempted to terminate questioning. The Supreme Court found there was "no doubt" Butler was "adequately and effectively apprised of his rights," and his refusal to sign the waiver form did not preclude a finding of waiver on the uncontroverted facts of that case. *Id.* at 374-376. Debra's case is not even remotely similar to *Butler*. There was no dispute that Butler agreed to waive his rights, but simply refused to sign the waiver form. In contrast, Debra has never admitted to waiving her rights and maintains she **asserted** her right to counsel. This is not simply a failure or refusal to sign a waiver form. Debra was never asked if she wanted to waive her rights, and she has always disputed Saldate's claim that she failed to request counsel.

Several other courts addressing implied waiver have distinguished *Butler* on its facts. In *United States v. Earle*, 473 F.Supp.2d 131, 134 (D. Mass. 2005), the suspect signed a booking form containing *Miranda* warnings and a question: "do you understand what I have told you?" The statement "yes, I understand" with a signature line followed this question. It also contained a description of Earle's property and a signature line for him to acknowledge the property being held. *Id.* However, the form did not contain a place to indicate whether Earle wished to waive his rights. *Id.* Moreover, although Earle signed the form, there was no evidence he read it first. The agent testified he also orally administered the rights, but the court found the government failed to prove Earle heard or

1   understood the warnings. *Id.* at 133.   The agent's report indicated he initiated the

2   interview by asking if Earle had been advised of his rights and understood them, which

3   Earle said he did.  *Id.* at 134.  The agent testified that Earle never invoked or referred to

4   his rights to remain silent or to counsel, and the agents "did not ask if he wanted to waive"

5   his rights." *Id.*   The court determined that the government failed to carry its "heavy

6   burden" of proving waiver.  *Id.* at 138-39.  As in Debra's case, "the *conflicting* evidence"

7   in *Earle* indicated the officers "either ignored their duty to determine whether the

8   defendant wished to waive his *Miranda* rights or lulled him into believing that it was not

9   important whether he understood them …" *Id.* at 139.

10        Another case distinguishing *Butler* is *Jackson v. U.S.*, 404 A.2d 911 (D.C.

11   Cir. 1979).  Jackson was read his *Miranda* rights and indicated on a police form that he

12   did not wish to answer questions and wanted an attorney present.  *Id.* at 915.  Later, while

13   providing handwriting exemplars, Jackson began a rambling monologue in which he

14   eventually inculpated himself.  The court found the government failed to satisfy its "great

15   burden" of showing waiver because: 1) Jackson was re-questioned before being given the

16   opportunity to consult counsel; 2) he did not possess sufficient capacity to make a

17   knowing, intelligent waiver; and 3) the record "d[id] not reflect any extensive findings of

18   facts as to an intentional and knowing relinquishment." *Id.* at 923; *see also Shreeves v.*

19   *U.S.,* 395 A.2d 774, 781 (D.C.App. 1978).  *Jackson* found *Butler* inapplicable because

20   "appellant, unlike *Butler*, requested the presence of an attorney." Id. at 922, fn 17.  Debra

21   also contends she requested counsel, which like *Jackson*, makes her case distinct from

22   *Butler*, where the failure to assert rights was *uncontested*.

23        In *Paulino v. Castro*, 371 F.3d 1083 (9th Cir. 2004), the facts were also

24   *undisputed*.  Paulino was advised of his rights, stated he understood and wanted to talk,

25   initialed the admonitions on a waiver form, and wrote "yes" next to questions asking

26   whether he understood his rights and wished to give up his right to remain silent.  *Id.* at

27   1085.  Paulino did not complete the item asking whether he wished to give up his right to

28   speak with and have an attorney present during questioning, but wrote, "*I want to talk to*

15

1   *Felix*" and signed the form. *Id.* at 1085-86 (emphasis added).   Detective Felix then

2   activated a hidden tape recorder, reiterated Paulino's rights, and asked if he understood.

3   *Id.*  Paulino asked "Where's the attorney?" and Felix said none were present, but he had a

4   right to one before questioning.  Paulino asked, "You mean it's gonna take him long to

5   come?" and Felix responded, "Well, I'm just asking you a question, man - do you, do you

6   want to talk to me?" *Id.*  Paulino said, "Okay, I want to talk to you but I wanna know

7   what's going on."  The detective said he would explain, and Paulino said, "*I want to talk

8   to you Detective Felix.*" *Id.* (emphasis added).

9          The Ninth Circuit noted that Paulino "said he understood his rights - in

10   particular, his right to counsel - and said he wanted to talk." *Id.* at 1087.  And, "when

11   specifically advised of the right to counsel, far from being silent, he actually repeated, 'I

12   want to talk to you'" … and "wrote 'I want to talk to Felix' at the bottom of the

13   advisement form." *Id.*  Applying *Butler*, the Ninth Circuit found Paulino's "verbal and

14   written responses to Felix's advisement of the right of counsel, when considered in

15   context, constituted a waiver of that right." *Id.*  It rejected the argument that Paulino's

16   failure to confirm his waiver in writing and questions regarding the location of and time it

17   would take an attorney to arrive did not constitute an unambiguous request for counsel. *Id.*

18   These undisputed facts are far different from Debra's case, where a *dispute* exists as to

19   whether she asked for counsel at the outset, and there is no evidence that Saldate asked if

20   she wanted to waive her rights or speak with him without an attorney.  The detective in

21   Paulino also obtained initials on a waiver form and recorded the interrogation, which

22   allowed the Court to review the questions and statements.  Here, there was no waiver

23   form, no recording, no witness, nor any other form of corroboration.

24          The State has previously claimed *Paulino* supports a finding of implied

25   waiver because it involved an ambiguous request for counsel, whereas the state court here

26   found that Debra never requested counsel.  This merely reinforces the importance of

27   having an objective record, as Paulino's ambiguous request for counsel was *documented

28   by a recorded interrogation* the court could evaluate.  No one can verify Debra's claim

16

that she requested counsel **because Saldate, who controlled the conditions of the interrogation, made a conscious decision to not create an objective record or to corroborate what occurred.**  The state court's finding that Debra didn't ask for counsel is thus based on nothing but its objectively unreasonable decision to believe a police officer over Debra notwithstanding Saldate's track record of disregarding *Miranda* rights.

In *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000), Burket was advised of his rights, after which the detective returned to the interrogation room to complete a booking form.  Burket initiated a conversation, and the detective again issued warnings.  Burket said he understood his rights "and *wanted to talk to Detective Hoffman.*" *Id.* (emphasis added).  Although he never said "I waive my *Miranda* rights" or signed a waiver form, the court found Burket's "cooperation and desire to speak with [the detective], coupled with his acknowledgement that he understood his rights, constituted an implied waiver …" *Id.*  A ***videotape*** was also made of Burket's interrogation, so again, *the facts showing waiver and failure to invoke are not in dispute.  Id.* at 195.

Although *United States v. Cazares*, 121 F.3d 1241 (9th Cir. 1997), may initially appear to support the State's position, it deserves closer examination.  First, it is not clear what actually happened during that interrogation because detailed facts are not set forth in the opinion -- merely a summary of the government's showings and a finding that "the sum of the evidence presented to the district court supports the conclusion that [despite Cazares' language difficulties], he understood his rights … and knowingly, and intelligently waived them." *Id.* at 1244.  Second, it is not clear what Cazares was arguing, but it appears the central issue involved whether the Spanish speaking suspect *understood* his rights.  Although the Court also found the showings sufficient to support implied waiver, *it did not address what, if any, dispute existed regarding waiver*.  Third, unlike Debra's case, Cazares *did not claim he asserted his right to counsel*.  Finally, ***two officers were present*** at the interrogation, which corroborated what occurred.  *Id.*

*United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), is also distinct.  Younger was read his rights and acknowledged his understanding, but then made a

17

spontaneous inculpatory statement prior to questioning. *Id.* at 1183-84.  He was then transported to the police station where, during a recorded interview, he was again Mirandized, said he understood, and made additional inculpatory statements. *Id.* Although he asked, "if I'm right, I can have a lawyer present …?" and the officer answered, "if you want one," this was interpreted as merely an indication that Younger understood his rights. *Id.* Younger later said in response to a question about a backpack's contents, "I don't know about the bag.  We'll talk about that in front of a lawyer or something …" *Id. Younger* reiterated that a waiver need not be express, but emphasized the presumption against waiver. *Id.* at 1185.  It also noted that the officer's decision to forego the simple step of requesting an express waiver "resulted in unnecessary time and effort and a waste of judicial resources." *Id.* at 1186, fn 5.  Nevertheless, the Ninth Circuit upheld the implied waiver finding on the grounds that after the officer advised Younger of his rights but before questioning, he made a spontaneous inculpatory statement and responded to further questions without referencing counsel.  It also found Younger's conduct at the station was consistent with implied waiver. *Id.* at 1186.  And the interview was recorded and showed there was no clear request for counsel.

     None of these cases are similar to Debra's.  They involve primarily undisputed or verifiable facts clearly showing the suspect waived his rights and wanted to proceed with questioning or spontaneously volunteered information.  **None involved a "swearing contest" over disputed facts regarding what happened in the interrogation where there was no recording, no witness, no signed statement or waiver, and no other form of corroboration, plus no physical evidence connecting the suspect to the crime.**  Contrary to the State's claim, Debra is not arguing that an implied waiver can never occur during an unrecorded interrogation.  Rather, her position is that the disputed nature of the facts of what occurred during the interrogation (especially regarding her request for counsel), and the lack of *any* objective, independent record or corroboration, make it impossible to "clearly infer" waiver from the record, which is what *Butler* requires to find implied waiver.   This is a fundamental difference between Debra's case

18

and those finding an implied waiver based on undisputed, uncontested, memorialized or otherwise corroborated facts. Additionally, cases finding a valid implied waiver contain something more than just continued questioning following issuance and acknowledgement of *Miranda* rights. Even if such evidence could arguably support an implied waiver, one cannot be "clearly inferred" here, as there is no objective record or corroboration, and a material dispute exists regarding whether Debra requested counsel.

**B.     The State's Position That This is a Mere "Credibility Determination" Ignores Supreme Court and Ninth Circuit Caselaw Finding This Type of "Swearing Contest" Evidence to Be Highly Unreliable.**

The State wants this Court to disregard the lack of any objective, independent record and to treat this as a mere "credibility" determination regarding who this Court thinks is "telling the truth" – Saldate or Debra Milke. What the State's analysis misses, however, is that **Saldate** controlled the conditions of this interrogation, and he is the one who failed to create an objective, independent record of any type, knowing full well that this created a "swearing contest," which "as a police officer and investigator of that case," he knew he would likely win. (WH 1/11/10 at 92-93). This type of "swearing contest" testimony relied on by the State is precisely the type of evidence the Ninth Circuit has previously rejected as highly suspect. *See Taylor v. Maddox*, 366 F.3d 992 (9th Cir.), *cert. denied*, 543 U.S. 1038 (2004). *Taylor* determined on habeas review that the state court improperly admitted an alleged confession after treating the relative credibility of different accounts of what happened in the interrogation room merely as a "swearing-contest" between the officer and the defendant, and simply deciding to believe the officer. 366 F.3d at 1004. *Taylor* recognizes that determinations of credibility in the context of incommunicado interrogations are different from other witness credibility issues, which are normally subject to more deference. Reliability determinations involving police officers regarding what happened in an interrogation are not entitled to special deference, especially where the officers created the conditions they knew would result in a "swearing contest" they would inevitably win. Long before *Taylor*, the Supreme Court criticized the practice of incommunicado interrogation and observed the

19

1   extreme disadvantage of an accused in a swearing contest with police.  *Reck v. Pate*, 367

2   U.S. 433, 446 (1961)("There is the word of the accused against the police.  But his voice

3   has little persuasion.").  And, in *Miranda* itself, our high  court emphasized:

> Since *the State is responsible for establishing the isolated*
> *circumstances under which the interrogation takes place and*
> *has the only means of making available corroborated evidence*
> of warnings given during incommunicado investigation, the
> burden is rightly on its shoulders.

7   384 U.S. at 475 (emphasis added).

8         Even assuming this were a simple "credibility contest" and assuming the

9   truth of Saldate's testimony -- that Debra did not assert her right to counsel (until

10  afterward) and ultimately confessed -- a valid waiver cannot be presumed simply from

11  Debra's silence following Saldate's issuance of warnings or from the fact that a purported

12  confession was eventually obtained. *Miranda*, 384 U.S. at 475; *Butler*, 441 U.S. at 373.

13  Finding implied waiver on the facts and circumstances of Debra's case would be clearly

14  contrary to *Miranda* and *Butler*, and would render meaningless the protections *Miranda*

15  was intended to extend to a suspect in an incommunicado interrogation.   The Ninth

16  Circuit found no evidence of valid waiver on the pre-existing appellate record, and there

17  was absolutely no new evidence presented at the evidentiary hearing that supports a

18  finding of implied waiver under *Butler*.  Thus, there is no basis upon which this Court can

19  properly find that the State has met its "heavy burden" of proving Debra voluntarily,

20  knowingly, intelligently waived her *Miranda* rights.

21  **IV.   <u>CONCLUSION</u>**

22        On this record, a valid waiver cannot be "*clearly inferred* from [Debra's]

23  actions and words." *Butler*, 441 U.S. at 373.  The critical evidence of what happened in

24  Debra's interrogation is disputed and there is no objective memorialization or

25  corroboration to properly determine whether Debra voluntarily, knowingly, intelligently

26  waived her *Miranda* rights.   Even assuming Saldate's uncorroborated testimony is

27  enough, it only shows Debra was administered and understood her rights.  No evidence at

28  the hearing or in the original record shows Debra *knowingly relinquished* her rights.

1

2

3
RESPECTFULLY SUBMITTED this 19th day of January, 2010.

JONES, SKELTON & HOCHULI, P.L.C.

4

5

6
By  /s/  Lori L. Voepel
  Lori L. Voepel, #015342
  2901 North Central Avenue, Suite 800
  Phoenix, Arizona  85012

7
  AND

8

9

10
  Michael D. Kimerer, # 002492
  Amy L. Nguyen, # 023383
  KIMERER & DERRICK, P.C.
  221 East Indianola Avenue
  Phoenix, AZ  85012

11
  *Attorneys for Petitioner Debra Jean Milke*

12

13

14

15
**ORIGINAL E-FILED** and **COPY HAND-DELIVERED** this 19th day of January, 2010, to:

16

17

18
Judge Robert C. Broomfield
United States District Court
Sandra Day O'Connor U.S. Courthouse, # 626
401 West Washington Street, SPC 61
Phoenix, AZ  85003-2158

19
**COPY via ECF:**

20

21

22

23
Jim D. Nielsen, Esq.
Assistant Attorney General
Office of the Attorney General
1275 W. Washington
Phoenix, AZ  85007-2997
Jim.Nielsen@azag.gov
Attorney for Respondents

24

25

26

27
Kent E. Cattani
Julie A. Done
Assistant Attorney General
Criminal Appeals/Capital Litigation Section
1275 W. Washington
Phoenix, AZ 85007-2997
Attorneys for Respondents

28

21

1   COURTESY COPY MAILED
    this same day to:
2
    Larry Hammond, Esq.
3   Osborn Maledon, P.A.
    2929 N. Central, Ste 2100
4   Phoenix, Arizona 85012
    Counsel for *Amicus,* AzCLU
5
    Daniel Pachoda, Esq.
6   ACLU of Arizona
    77 E. Columbus, Suite 205
7   Phoenix, Arizona 85012
    Counsel for *Amicus*, AzCLU
8
    Steven A. Drizin, Esq.
9   Bluhm Legal Clinic
    Northwestern University School of Law
10  357 E. Chicago Avenue
    Chicago, Illinois 60611
11  Counsel for *Amicus,* Center on Wrongful Convictions

12

13   /s/  Ginger Stahly

14

15  2150888.1

16

17

18

19

20

21

22

23

24

25

26

27

28