**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Debra Jean Milke,                           )     No. CV 98-60-PHX-RCB
                                            )
         Plaintiff,                 )     <u>DEATH PENALTY CASE</u>
                                            )
vs.                                         )
                                            )
                                            )     **FINDINGS AND ORDER**
Charles Ryan, et al.,                       )
                                            )
         Defendant.                 )
_____         )

     On November 28, 2006, this Court denied Petitioner's amended habeas petition. (Dkts. 151, 152.) In an order filed September 28, 2009, the Ninth Circuit Court of Appeals, stating that "[a] complete review of the record discloses no evidence supporting a finding that petitioner voluntarily, knowingly and intelligently waived her rights under <u>Miranda v. Arizona</u>, 384 U.S. 436, 444-45 (1966)," remanded the case and instructed this Court "to conduct a limited evidentiary hearing on the sole issue of whether petitioner validly waived her <u>Miranda</u> rights." (Dkt. 163.) The circuit court directed this Court to conduct the hearing and make its findings within 60 days. (*Id.*) The Court set the hearing for November 16, 2009. (Dkt. 167.) Petitioner filed a motion with the circuit seeking a 45-day extension of the deadline. (Dkt. 168.) The circuit granted the motion and this Court set a hearing date of January 4, 2010. (Dkts. 168, 169.) The parties sought another extension, which the circuit granted, and the hearing date was extended to January 11, 2010. (Dkt. 173.) Prior to the hearing, Respondents filed a Motion to Preclude Consideration of Professor Richard Leo's Testimony. (Dkt. 176.) Following the hearing, the parties filed memoranda on the waiver

1    issue.  (Dkts. 190, 191, 192.)

2    **Background**

3          Twenty years ago, on the night of December 3, 1989, Phoenix Police Detective

4    Armando Saldate interrogated Petitioner in connection with the murder of her four-year-old

5    son, Christopher.  According to Saldate, Petitioner provided incriminating information.

6    Petitioner was sentenced to death after a jury convicted her of first-degree murder and

7    conspiracy to commit first-degree murder for arranging Christopher's killing.[1]  Christopher

8    had been driven by co-defendants James Styers and Roger Scott to a desert wash and shot

9    three times in the back of the head.[2]  The Arizona Supreme Court affirmed Milke's

10   convictions and sentences.  *State v. Milke*, 177 Ariz. 118, 865 P.2d 779 (1993).

11         In state court, at a suppression hearing and again at trial, Saldate testified that he read

12   Petitioner her *Miranda* rights, which she indicated she understood, and she then spoke with

13   him without invoking her rights.  (Ex. 52 (RT 9/10/90 at 48-60); Ex. 55 (RT 9/12/90 at 64-

16         [1]      The trial court found three aggravating factors: the victim was under age 15,
17   the murder was especially heinous or depraved, and the murder was committed in the
     expectation of pecuniary gain.  The latter finding was based on information concerning a life
18   insurance policy Petitioner had taken out on the child.  The Arizona Supreme Court struck
     the pecuniary gain factor, independently reweighed the aggravating and mitigating
19   circumstances, and affirmed the death sentence.  *Milke*, 177 Ariz. at 126-29, 865 P.2d at 787-
     90.
20

21         [2]      Styers and Scott were also convicted and sentenced to death.  The Arizona
     Supreme Court affirmed the verdicts and sentences.  *State v. Styers*, 177 Ariz. 104, 865 P.2d
22   765 (1993); *State v. Scott*,  177 Ariz. 131, 865 P.2d 792 (1993).  The district court denied
     habeas relief.  *Styers v. Schriro*, No. 98-CV-2244-EHC, 2007 WL 86944 (D. Ariz. Jan. 10,
23   2007); *Scott v. Schriro*, No. 97-CV-1554-PGR (D. Ariz. July 5, 2005).  In *Styers*, the Ninth
     Circuit Court of Appeals reversed in part and remanded for a new sentencing proceeding.
24   *Styers v. Schriro*, 547 F.3d 1026, 1036 (9th Cir. 2008) (per curiam), *cert. denied Ryan v.*
     *Styers*, 130 S. Ct. 379 (Oct. 5, 2009).  In *Scott*, the court of appeals reversed in part and
25   ordered the district court to review the merits of claims that it had found procedurally barred.
26   *Scott v. Schriro*, 567 F.3d 573, 586 (9th Cir. 2009) (per curiam), *cert. denied Ryan v. Scott*,
     --- S. Ct. ----, 2009 WL 2823584 (U.S. Dec. 14, 2009).  Neither *Scott* nor *Schriro* addressed
27   the issue before this Court.

70).)[3] Petitioner did not testify at the suppression hearing. She presented witnesses, however, including a jail psychologist, Dr. Kassell, who testified that Petitioner was too distraught to understand the *Miranda* warnings; a criminologist who testified that Saldate's report was altered or fabricated; and an investigator who testified that Petitioner told him she had asked for an attorney early in the interview. (Ex. 52 (RT 9/10/90 at 80-94, 134, 157).) The trial judge denied the suppression motion, making the following findings:

> The Court finds that the Defendant was properly Mirandized. The Court finds that, notwithstanding the Defendant's emotional state at the time, she understood those rights. The Court finds that at no time did the Defendant request an attorney, either before or after she was advised of her rights. The Defendant was given a free choice to discuss, admit or deny or refuse to answer questions. The Defendant voluntarily, knowingly and intelligently relinquished her right to counsel and her right to remain silent. She voluntarily, knowingly and intelligently made statements without any promises being made, without there being any threats or coercion, either psychological or physical.

(Ex. 53 (RT 9/11/90 at 32-33).)

Petitioner testified at trial that Saldate administered the *Miranda* advisory, which she was too distraught to understand, and that she then asked for a lawyer. Saldate's trial testimony was consistent with that offered during the suppression hearing.[4] At the

---

[3]     "RT" refers to the court reporter's transcript.

[4]     With respect to the contents of the interrogation, the Arizona Supreme Court provided the following summary of Saldate's testimony:

[Milke] was upset with her son because he was going to turn out like his father – in jail, an alcoholic, and a drug user. Milke said that she verbalized these fears to Styers but did not think that he would ever hurt the child. She stated that she was not crazy, she just did not want Christopher to grow up like his father. She told the detective that she wanted God to take care of Christopher. She said she thought about suicide but decided against it because Christopher would then be in his father's custody. She decided it would be best for Christopher to die. She stated that she had a hard time telling Styers what she wanted, but she finally told him, and he agreed to help. Milke and Styers discussed the plan several times and included Scott on at least one occasion. Ultimately, they decided that Styers and Scott would take Christopher, kill him, and then report him missing at Metrocenter [shopping mall], but Milke

conclusion of the trial, the judge instructed jury:

> You must not consider any statements made by the Defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the Defendant made statements voluntarily. The Defendant's statement is not voluntary if it resulted from the Defendant's will being overcome by a law enforcement officer's use of any sort of violence, coercion or threats or by direct or implied promises, however slight. You must give such weight to the Defendant's statement as you feel it deserved under all the circumstances.

(RT 10/11/90 at 78.)

Following her conviction, Petitioner moved for a judgment notwithstanding the verdict. In denying the motion, the court reiterated its finding that Petitioner had not "made a request for an attorney prior to or during her questioning by Detective Saldate." (RT 1/18/91.)

In seeking post-conviction relief before the trial judge, Petitioner challenged the manner in which Saldate conducted the interrogation and his account of the statements made by Petitioner. In rejecting these allegations, the court again explained that "the trial court made the factual determination that [Petitioner] did not ask for an attorney at the beginning of the interview." (Minute Entry 11/18/96 at 5.) The court further determined that Petitioner was able to comprehend her rights. (*Id.* at 4.)

With respect to the issue of voluntariness, the court found that Saldate did not overbear Petitioner's will during the interview such that her statements were involuntary. The court explained its ruling as follows:

---

> was not to know how Christopher was killed.
> On Saturday morning, December 2, 1989, Styers told Milke that they were going to murder Christopher that day. They told Christopher that he was going to see Santa Claus at Metrocenter. Milke told police that she did not have a $5000 life insurance policy on Christopher, but her father did. She denied that insurance money was her motivation, but admitted that it may have been Styers' and Scott's because Styers knew of the policy.

*Milke*, 177 Ariz. at 121, 865 P.2d at 782. This is consistent with the information contained in Saldate's seven-page supplemental report. (Ex. 53.)

The legal standard to be employed to determine the admissibility of the defendant's statements made during the police interrogation is whether the will of the defendant was overcome by coercion or threats or promises. . . . There is no indication of any implied promise or improper influence in this case. There is no indication the defendant was mentally impaired or hysterical to the point of being unable to comprehend what was being said to her.

The extent to which Ms. Milke may have felt intimidated or coerced to make a statement to Det. Saldate was a jury question. The jury was properly instructed on the law on this issue. . . . The jurors were told they were not to consider any statements made by the defendant to a police officer unless they first determined, beyond a reasonable doubt, that the statements were made voluntarily.

When the defendant related her version of the interview by Det. Saldate to Dr. Kassell, her version of what was said was substantially the same as what was in Det. Saldate's report . When the defendant testified, she told the jury about her interrogation by Det. Saldate. Her version of the interrogation was not much different from the version given by Det. Saldate. The only significant difference between Ms. Milke's recollection of the interview and Det. Saldate's recollection is when and how she requested an attorney. The defendant said she asked for an attorney at the beginning of the interview. Her statement was, "I don't want a tape recorder, I want an attorney.". . . Det. Saldate disputes that the request for an attorney was made at that time. He says that at the conclusion of the interview, when the defendant was told she was going to jail, she asked the detective to call her father so that he could get an attorney for her. The trial court made the factual determination that the defendant did not ask for an attorney at the beginning of the interview.

. . . .

The defendant's statements to Det. Saldate were not an unequivocal confession of "Yes, I did it." If Det. Saldate were to fabricate a confession he could do a better job of making the confession concrete and less abstract. Perhaps the most inculpatory statement Det. Saldate attributes to the defendant is her comment that she did not want her son to grow up to be like his father . . . . Reasonable minds could differ as to the interpretations to be given to the statements and the conclusions that could be reached. The jury made the determination of the reliability of the statements and the conclusions to be reached after considering the statements.

(Minute Entry 11/18/96 at 3-7.)

## Applicable Law

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that prior to custodial interrogation a suspect must be informed of his right to remain silent and his right to have an attorney present. If the suspect invokes either of these rights, interrogation must cease. After being given his *Miranda* warnings, a suspect may waive his rights. The waiver

- 5 -

must be made knowingly and voluntarily. *Id.* at 475; *see Edwards v. Arizona*, 451 U.S. 477, 482 (1981). Although the Court in *Miranda* characterized as "heavy" the burden of proving a knowing and voluntary waiver, subsequently, in *Colorado v. Connelly*, 479 U.S. 157, 168 (1986), the Court clarified that the government must prove such a waiver by a preponderance of the evidence.

In *North Carolina v. Butler*, 441 U.S. 369 (1979), the Supreme Court held that a waiver of *Miranda* rights need not be express, explaining that "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *Id.* at 373 (explaining that an express written or oral waiver "is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver"); *see, e.g.*, *Terranova v. Kincheloe*, 912 F.2d 1176, 1179 (9th Cir. 1990). "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Id.* at 374-75 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Although the Court described the prosecution's burden as "great," it held that a "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver," may be sufficient to establish a waiver. *Id.* at 373.

The Ninth Circuit has explained, in accordance with *Butler*, that "[t]o solicit a waiver of *Miranda* rights, a police officer need neither use a waiver form nor ask explicitly whether the defendant intends to waive his rights." *United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir. 1997). However, "[a] waiver cannot be presumed simply from the fact that *Miranda* warnings were given and a confession was eventually obtained." *United States v. Ramirez*, 710 F.2d 535, 542 (9th Cir. 1983) (citing *Miranda*, 384 U.S. at 475). Nonetheless, where it is clear that the defendant acknowledged his understanding of his rights, his subsequent answers to questions constitutes a valid implicit waiver. *Id.*; *see United States v. Younger*, 398 F.3d 1179, 1186 (9th Cir. 2005) ("the district court did not clearly err in finding that defendant's conduct in making a spontaneous statement and continuing to respond to

questioning . . . constituted an implied waiver"); *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) ("Waivers of *Miranda* rights need not be explicit; a suspect may impliedly waive the rights by answering an officer's questions after receiving *Miranda* warnings.") (citing *Terrovona,* 912 F.2d at 1179-80); *see also United States v. Adams*, 583 F.3d 457, 467-68 (6th Cir. 2009) (valid waiver where defendant was read his rights, indicated he understood them, and continued talking with officer); *United States v. Binion*, 570 F.3d 1034, 1041 (8th Cir. 2009) ("Since Binion had been informed of his rights and had neither invoked his Fifth Amendment privilege nor requested an attorney, his decision to volunteer an incriminating response was an intelligent waiver of that right."); *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008) ("One such case where waiver may be clearly inferred is when a defendant, after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights."); *United States v. Cardwell*, 433 F.3d 378, 389-90 (4th Cir. 2005) ("Because [the defendant] had been fully informed and indicated his understanding of his *Miranda* rights, his willingness to answer [the officer]'s question is as clear an indicia of his implied waiver of his right to remain silent as we can imagine." (citation omitted)); *United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987) ("if after being advised of his rights an individual responds willingly to questions without requesting an attorney, waiver may be implied"). Moreover, in *Davis v. United States*, 512 U.S. 452, 460 (1994), the Supreme Court held that officers who have given *Miranda* warnings may continue to question a defendant even when a request for counsel is equivocal, a holding that also necessarily applies when the defendant makes no request for counsel at all.

Courts consider the dynamics of the interview when determining whether a defendant impliedly waived his *Miranda* rights. In *Bui v. DiPaolo*, 170 F.3d 232, 238-41 (1st Cir. 1999), the First Circuit, reviewing relevant case law, noted that "courts regularly have found waivers" "if a defendant's incriminating statements were made either as part of a 'steady stream' of speech, *Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir. 1990), or as part of a

back-and-forth conversation with the police, *Baskin v. Clark*, 956 F.2d 142, 146 (7th Cir. 1992)." On the other hand, a defendant's silence in the face of repeated questions is indicative of a lack of waiver. *United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir. 1988). In *Thomkins v. Berghuis*, 547 F.3d 572, 587-588 (6th Cir. 2008), *cert. granted*, 130 S. Ct. 48 (U.S. September 30, 2009) (No. 08-1470), no waiver was found where there was no back and forth conversation during the two hour and 45 minute interview, which consisted of the officer engaging in a monologue while the defendant remained mostly silent.

**Evidentiary Hearing**

The evidentiary hearing testimony of Petitioner and Saldate mirrors the testimony they provided in state court. This Court is faced, as the state court was 20 years ago, with two versions of the interrogation, presented under oath by its principals. While the versions conflict at several key points, at many other points they converge. The following facts are not in dispute.

The day after her son was reported missing, Petitioner was asleep at her father's house in Florence, Arizona, when sheriff's deputies arrived. (RT 1/11/10 at 132-33.) Upon being awakened by her stepsister and informed of the deputies' presence, she replied, "What the fuck do they want?" (RT 1/12/10 at 25.) The deputies asked Petitioner to come to the sheriff's office to be interviewed by Phoenix detectives. (RT 1/11/10 at 133.) She drove there with a family friend. (*Id.*)

Detective Saldate was a 22-year law enforcement veteran, with 15 years as a detective.[5] (*Id.* at 8.) He had been involved in approximately 300 homicide cases. (*Id.* at 10.) Saldate was disciplined for misconduct in 1973. (*Id.* at 12, 112; Ex. 18.) He also received several commendations for his work as a police officer and detective. (*Id.* at 12.)

Saldate first interviewed co-defendants Styers and Scott in Phoenix; only Scott provided inculpatory information. (*Id.* at 50-62.) Scott then led Saldate to Christopher's

---

[5] Saldate retired in 1990. He is now the elected constable for the Encanto Justice Precinct. (RT 1/11/10 at 9.)

body and provided information implicating Petitioner. (*Id.* at 63-64.) Thereafter Saldate traveled to Florence to interrogate Petitioner.[6] (*Id.* at 64-74.)

The interrogation took place in Florence at the Pinal County Sheriff's Office in a 15-by-15 room containing a desk and two chairs. (RT 1/11/10 at 65, 134.) Petitioner was waiting in the room with her friend. (*Id.* at 19, 133.) Saldate entered, introduced himself, asked Petitioner's companion to leave, and shut the door. (*Id.* at 19, 139.) He informed Petitioner that her son had been found, that he had been murdered, and that she was under arrest. (*Id.* at 20, 140.) Petitioner shouted "What, what" and began crying. (*Id.* at 20, 140.) Saldate stated that he would not tolerate her crying. (*Id.* at 81, 140.) He then removed a card from his badge case and recited the *Miranda* advisory. (*Id.* at 20, 140-41.) He asked Petitioner if she understood her rights but did not ask her if she waived those rights. (*Id.* at 24, 142.) Saldate, having been requested by a supervisor to tape-record the interrogation, asked Petitioner if she wanted the interrogation to be recorded. (*Id.* at 17-18, 142.) Petitioner did not want it recorded. (*Id.*) Saldate did not bring a tape-recorder with him to the interrogation but could have obtained one at the sheriff's office. (*Id.* at 18-19.)

Saldate placed his chair within six to 12 inches of Petitioner. (*Id.* at 79-80, 145, 147.) He told her he wouldn't tolerate any lies and was there to get the truth. (*Id.* at 92, 148.) Petitioner did most of the talking during the interrogation, with Saldate mainly listening. (*Id.* at 173-74.) Petitioner told Saldate that she was not "crazy" or an "animal." (*Id.* at 152.) She also provided information about her background, portraying herself in a positive light to show she was not the kind of person who would commit such a crime. (*Id.* at 154-55.) She told Saldate that she did not want her son to grow up to be like his father, a person who

---

[6] Saldate characterized his encounter with Petitioner as an "interview." (*See* RT 1/11/10 at 17, 44-48.) This was a reference to what he described as his conversational, non-confrontational style. (*Id.* at 17, 45.) According to the definition set forth in the Phoenix Police Department's General Investigative Procedures, however, Saldate's meeting with Petitioner was an "interrogation" because Petitioner was a suspect rather than a victim or witness. (*Id.*; *see* Ex. 19 at 921.) The Court will use the term "interrogation" to refer to the encounter between Saldate and Petitioner.

abused drugs and got into legal trouble. (*Id.* at 151.) Saldate took handwritten notes during the interrogation. (*Id.* at 101, 173.) Petitioner never invoked her right to remain silent and made no request that the interrogation cease. (*Id.* at 153, 178.) The interrogation lasted about 30 minutes. (*Id.* at 27, 152.) After the interrogation, Saldate drove Petitioner, whom he did not handcuff, from Florence to Phoenix. (*Id.* at 33-34, 156.) While she was being transported, Petitioner asked Saldate to call her father to see if he could get an attorney for her. (*Id.*)

The interrogation was not recorded. (*Id.* at 17.) Saldate did not obtain a signed waiver or acknowledgment of rights, nor did he subsequently corroborate the confession with another officer. (*Id.* at 101, 161-62.) He destroyed his handwritten notes after preparing a supplemental report. (*Id.* at 102.)

The record is also undisputed with respect to the contents of the *Miranda* card Saldate read to Petitioner prior to the interrogation. The card contained the four *Miranda* rights and a single follow-up question: "DO YOU UNDERSTAND THESE RIGHTS?" (Ex. 51.) The card did not contain a second question asking whether the suspect waives his rights. (*Id.*) Pursuant to the Phoenix Police Department's General Investigative Procedures, "Admonition of rights will be read verbatim from the Notification of Rights card distributed by the department." (Ex. 19 at 930.) The card included spaces for the case number and the officer's signature, but not a space for the suspect's signature. (Ex. 51.)

It is further undisputed that in 1989 there was no requirement, under the policies and procedures of the Phoenix Police Department, that interrogations be recorded or that officers obtain a signed waiver. (*See* RT 1/11/10 at 24-26; RT 1/12/10 at 116, 119.)[7]

### Saldate's version of the interrogation

Saldate testified that after reading the *Miranda* warning he asked Petitioner if she

---

[7] The procedures require only that "[w]hen officers tape record an interrogation or interview with a suspect . . . the tapes must be preserved for trial." (Ex. 19 at 933.) They also instruct officers to "[d]ocument everything said by the suspect. He may contradict himself which will help impeach his testimony later." (*Id.* at 921.)

understood her rights. (RT 1/11/10 at 22-23.) She nodded. (*Id.* at 24.) Saldate told her he needed a verbal confirmation that she understood her rights. (*Id.*) She said yes. (*Id.*) He then asked if he could tape record the interrogation. (*Id.* at 18, 115.) She said no. (*Id.*)

Saldate testified that he had no reason to believe that Petitioner did not understand her rights. (*Id.* at 26.) She appeared very intelligent. (*Id.* at 29.) Petitioner was upset and crying early in the interrogation, although Saldate believed she was feigning her emotional reaction in an attempt to manipulate the interrogation. (*Id.* at 26-27.) Thereafter they had a "very composed conversation." (*Id.*) During the interrogation, Petitioner never asked questions about her son or denied involvement in his murder. (*Id.* at 27, 29.) Saldate did not threaten or strike Petitioner or make any promises. (*Id.* at 29.) He testified that Petitioner never asked for an attorney. (*Id.*) If she had, Saldate would have noted it and included the information in his supplemental report. (*Id.*) He had done so in other cases, including cases where he continued to converse with suspects even after they had invoked their right to remain silent or their right to an attorney. (*Id.* at 29-31, 118-19; *see* Exs. 10, 11, 12.) In some of these cases evidence was suppressed as a result of Saldate's conduct during the interrogations. (*Id.* at 105-11; *see* Exs. 8, 11.)

### *Petitioner's version of the interrogation*

Petitioner testified that when Saldate administered the *Miranda* advisory, she responded, "Why are you doing this?" (*id.* at 141), by which she meant, "Why are you reading me my rights?" (*id.* at 164). When Saldate asked if she understood her rights, she replied, "No. I've never been in trouble before. I never had my rights read to me before." (*Id.* at 142.) When asked if she wanted the interview recorded, she replied, "No, I need a lawyer." (*Id.* at 142-43.) It was unclear from Petitioner's testimony at the evidentiary hearing whether this statement was intended to convey both a request for counsel and a refusal to have the interrogation recorded. (*Id.*)

Petitioner testified that although she heard Saldate read the *Miranda* advisory – i.e., she heard Saldate inform her that she had the right to an attorney and the right to remain

silent – she did not fully comprehend those rights because she was too upset at hearing the news of her son's death and being told she was under arrest; she was in "shock" and "reeling." (*Id.* at 141, 149, 170, 176-78.) She testified, however, that she understood her rights sufficiently to ask for an attorney (*id.* at 172) and was aware that she was being informed of her rights because she had been arrested (*id.* at 164).

Petitioner believed she could not invoke her right to remain silent, given that Saldate had ignored her request for an attorney. (*Id.* at 143-44, 153.) She testified repeatedly that Saldate "badgered" her and was "in her face" throughout the interrogation so that she felt "psychologically threatened." (*Id.* at 153, 168, 179.) She conceded that she spoke positively about her background, mentioning that she was popular in high school and nearly a straight-A student, but only in order to defend herself. (*Id.* at 154.) She denied any involvement in her son's murder. (*Id.* at 149.) Soon after the interrogation, when she arrived in Phoenix, Petitioner encountered a journalist named Paul Huebl. (*Id.* at 157-58.) In response to his questions, Petitioner denied that she had confessed to the crime or that she had been motivated by insurance proceeds. (*Id.* at 158.) She also asked Huebl, "When can I talk to a lawyer." (*Id.* at 167.)

Petitioner acknowledged that, although she had never been arrested before, she had had previous interactions with the police, when officers raided her home in connection with her then-husband's drug use. (*Id.* at 165-66.) Prior to her arrest she was aware of what *Miranda* rights were. (*Id.* at 166.) Petitioner testified that she considered herself smart; she achieved a 3.9 grade point average in high school and was a member of the Spanish Honor Society. (*Id.* at 171.) Petitioner had pursued restraining orders against her ex-husband. (*Id.* at 150.) She acknowledged having previously lied under oath, falsely testifying that she had not been abused by her ex-husband. (*Id.* at 175.)

**Paul Huebl**

Paul Huebl, a private investigator and journalist, interviewed Petitioner for a television station in the hours after her arrest and interrogation. Huebl testified that during

the interview Petitioner expressed shock when he informed her of the rumors that she had confessed to the crime and was motivated by insurance money. (RT 1/12/10 at 9-11.) She denied any involvement in her son's murder. (*Id.*) According to Huebl, Petitioner also told him she had asked for a lawyer but hadn't seen one yet; she asked Huebl how she could get a lawyer. (*Id.* at 11.) She did not indicate when she had asked for a lawyer. (*Id.* at 27.) At the time of the interview, Petitioner appeared "sober" and "sane." (*Id.* at 32.)

On cross-examination Huebl acknowledged that he maintains a website on which he has written and posted articles advocating Petitioner's innocence. (*Id.* at 33-37.) He believes she did not commit the murder because at the time she had a new boyfriend and a job at an insurance agency. (*Id.* at 36.)

### *Richard Leo*

As indicated above, Respondents move the Court to preclude consideration of Dr. Richard Leo's testimony. (Dkt. 176.) The motion is denied. The Court will consider the testimony in a manner consistent with Rule 702 of the Federal Rules of Evidence and to the extent that it is relevant to the factual issues before the Court.

Dr. Leo, currently an associate professor of law at the University of San Francisco, formerly a professor of criminology, psychology, and sociology at the University of California–Irvine and the University of Colorado, testified on Petitioner's behalf. (*Id.* at 48-49; Ex. 4.) His field of expertise includes "police interrogation and investigation, the psychology and practices, *Miranda* requirements and how *Miranda* plays out in practice, false confessions and wrongful convictions." (*Id.* at 51.) The bulk of his research on such issues has involved California cases; Arizona cases have constituted perhaps two to 10 percent of his research. (*Id.* at 118.) Professor Leo has testified in court 186 or 187 times, in all but one case on behalf of the defense. (*Id.* at 81-82.)

Professor Leo was initially retained by Petitioner's habeas counsel in these proceedings to render an opinion on "the quality of interrogation practices used by Detective Saldate and whether they likely resulted in a fabricated or false confession from Debra

Milke." (Ex. 5 at 5; *see* RT 1/12/10 at 52-53.)  In his report, dated April 19, 2002, Professor Leo concluded that Saldate's interview techniques were unprofessional, his version of the interview was implausible, and it was possible he had fabricated a confession.  (Ex. 5 at 10-11.)  Professor Leo also wrote that the manner in which Detective Saldate stated he obtained a *Miranda* waiver from Petitioner was "troubling, if not illegal" and that Petitioner alleged that Saldate had "bullied" her into waiving her rights.  (RT 1/12/10 at 57; Ex. 5 at 7.)  However, on appeal from this Court's denial of habeas relief, the issue apparently became whether or not Petitioner validly waived her *Miranda* rights.  Petitioner again retained Professor Leo.  In support of the issue as it is now presented, Professor Leo has prepared a supplemental report in which he corrects his original report to indicate that there was no *Miranda* waiver.  (RT 1/12/10 at 54, 57; Ex. 6 at 7-8. )  Professor Leo has never interviewed Petitioner or Saldate.  (*Id.* at 85-86.)

During his testimony at the evidentiary hearing, Professor Leo acknowledged that he typically does not testify on the issue of *Miranda* waivers as opposed to "interrogation practices, the techniques, the psychology of interrogations and issues having to do with coercion and reliability and false confessions."  (*Id.* at 107.)  Professor Leo offered no opinion as to whether Petitioner could or did understand the *Miranda* warnings. (*Id.* at 83.) He did note that the warnings are "pitched" at eighth or ninth grade reading level. (*Id.* at 83.)

With respect to the legal question before this Court, Professor Leo testified that the state can never meet its "heavy burden" of proving an implied *Miranda* waiver when the interrogation is not recorded or otherwise memorialized and when the suspect and the interrogator provide conflicting versions of what transpired. (*Id.* at 124-25.)  Professor Leo stated that these factors are compounded when the participants offer widely divergent reports of the details of the interrogation.  (*Id.* at 133.)  According to Professor Leo, such a case constitutes a mere "swearing contest" which by its nature is insufficient to support the heavy burden of establishing a waiver.  (*Id.* at 108-09.)  Professor Leo did not mention in his testimony that the appropriate standard for determining a *Miranda* waiver is by

- 14 -

preponderance of the evidence.

After testifying that there was no evidence supporting the existence of an implied waiver in Petitioner's case, Professor Leo conceded that Saldate's testimony "technically" constituted such evidence. (*Id.* at 106.) He opined, however, that Saldate's version of the interrogation was "wildly implausible and contradictory and make[s] no sense in light of how police are trained to and observe to give *Miranda* warnings and conduct their interrogations." (*Id.* at 77; *see id.* at 111.) Nevertheless, Professor Leo conceded that some of the features he found incredible in Saldate's account of the interview – asking if Petitioner wanted the interrogation taped, listening to Petitioner rather than asking questions – were corroborated by Petitioner's own testimony. (*See id.* at 77, 93-94, 111-12.)

**Discussion**

### Standard of review

The Court has been directed to determine whether Petitioner validly waived her *Miranda* rights. In her habeas petition Petitioner alleged that her rights were violated during the interview with Saldate because he used coercive techniques, ignored her invocation of her right to an attorney, and inaccurately reported her responses. (Dkt. 98 at 21-52.) Before this Court, Petitioner did not directly address the issue of waiver or argue that a waiver could not be implied from the circumstances of the interrogation. However, following oral argument on appeal, the circuit court ordered the parties to file supplemental briefs on the following questions: "What evidence is required to prove that a defendant's waiver of rights under *Miranda* . . . was made 'voluntarily, knowingly and intelligently' . . . and is that burden met in this case?"[8] *Milke v. Schriro*, No. 07-99001 (9th Cir. Sept. 5, 2008). Had these issues been raised in the amended habeas petition, this Court would have applied the deferential standards set forth in the AEDPA to the state court's ruling that Petitioner knowingly and

---

[8]    It is not clear whether the Court of Appeals, in remanding this case for an evidentiary hearing, determined that Petitioner had properly raised the waiver issue before this Court in her habeas petition.

voluntarily waived her *Miranda* rights.[9] Moreover, the state court's factual determination that Petitioner understood her rights and did not invoke her right to an attorney would have been entitled to a presumption of correctness, which Petitioner would have been obliged to rebut by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). *See Henderson v. DeTella*, 97 F.3d 942, 946 (7th Cir. 1996) ("The state court's historical findings as to the petitioner's knowledge, understanding, and determination to forgo his *Miranda* rights are, consequently, entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1)."); *Everett v. Barnett*, 162 F.3d 498, 500-01 (7th Cir. 1998).

Given the posture of the case and the directive from the Court of Appeals, it appears that this Court is being instructed to make its findings based on an independent review of the evidence, without regard to the state court's rulings. In doing so, the Court must assess the witnesses' relative credibility and the plausibility of their conflicting accounts.

"Frequently, . . . the state and the petitioner offer conflicting testimony as to whether the petitioner was apprised of and willingly relinquished his rights; assessing the *Miranda* waiver thus demands credibility assessments that typically only the trier of fact can make." *Henderson*, 97 F.3d at 946; *cf. Miller v. Fenton*, 474 U.S. 104, 117 (1985) ("Of course, subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting testimony of police and defendant."). Thus, notwithstanding Petitioner's arguments and Professor Leo's opinion to the contrary,

---

[9]     Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

there are cases in which courts have found a *Miranda* waiver by a preponderance of the evidence based on the conflicting testimony of suspects and officers. *See, e.g.*, *United States v. Gaines*, 295 F.3d 293, 298 (2d Cir. 2002) ("While it would be preferable to have physical evidence supporting [Detective] Williams' testimony, such as Gaines' signature of acknowledgment [that he received and understood his *Miranda* rights]. . . defendant points to no evidence that would establish clear error on the part of the district court in choosing to credit Williams' testimony over Gaines'."); *United States v. Doe*, 149 F.3d 634, 639 (7th Cir. 1998) (affirming credibility findings of district court, which "relied more on the overall plausibility of the competing accounts than on the demeanor of the witnesses," which "was equally good on both sides"); *United States v. Whitworth*, 856 F.2d 1268, 1278 (9th Cir. 1988) (affirming denial of suppression motion where district judge, "presented with conflicting facts, credited the testimony" of FBI agents).

Other rulings also belie the premise that in cases such as Petitioner's a valid waiver cannot be found. In *United States v. Nelson*, 137 F.3d 1094, 1110 (9th Cir. 1998), the defendant moved to suppress her statement on the grounds that the officer made threats and promises during a period when the tape recorder was turned off. The Ninth Circuit affirmed the district court's denial of the motion, explaining that the defendant "present[ed] little evidence – other than her own allegations – to suggest that her statements were involuntary." *Id.* In *United States v. Dagnan*, 293 Fed. Appx. 205, 206-207, 2008 WL 4280024 (4th Cir. 2008), a police officer testified before the district court that he gave *Miranda* warnings to the defendant, while the defendant testified that no warnings were given. *Id.* at 206. The court credited the officer's testimony, despite the fact that the defendant was never asked to sign a *Miranda* waiver and the officer did not have his *Miranda* card with him, which he said he always used in giving warnings to suspects. *Id.* The Fourth Circuit held that the defendant provided no reason to overturn the lower court's credibility assessment, explaining that "[t]he district court had the opportunity to observe the witnesses, listen to their testimony, and was in the best position to make the credibility finding." *Id.* at 207. In *United States v.*

*Montalvo-Ortiz*, 983 F. Supp. 78, 81 (D. Puerto Rico 1997), officers testified that the defendant signed a *Miranda* waiver form, which they subsequently lost, while the defendant testified that he did not sign a form and had requested an attorney. The district court concluded, "After evaluating the testimony of the defendant and the three agents, including their responsiveness and their demeanor on the stand, the Court, using the preponderance of the evidence standard, finds the account of the agents to be more credible." *Id.* In *United States v. Mazuera*, 756 F. Supp. 564, 569 (S. D. Fla. 1991), the court was "confronted with highly conflicting testimony" on the issue of a *Miranda* waiver. Nevertheless, the court found that the government had met its burden based on the more credible version of events testified to by the experienced law enforcement officers. *Id.*

The Court therefore rejects Petitioner's contention that as a matter of law Respondents cannot prove, under the preponderance of the evidence standard, the existence of a valid *Miranda* waiver based on the conflicting testimony of Saldate and Petitioner.

### *Findings*

In Petitioner's case, the record unequivocally shows that there was no express waiver, written or oral. Therefore, the Court must determine, applying the law set forth above to the facts elicited at the evidentiary hearing, whether a valid implied waiver can be found. The Court concludes that Respondents have proved by a preponderance of the evidence that Petitioner waived her *Miranda* rights. This conclusion is based on the following findings.

(1) Saldate advised Petitioner of her *Miranda* rights and asked her if she understood them. In doing so, Saldate followed Phoenix police procedures. He read, verbatim, the *Miranda* advisory, which listed four rights and one follow-up question. He documented Petitioner's statements in his contemporaneous, hand-written notes and then in his supplemental report.

(2) Petitioner acknowledged that she understood her rights, first by nodding affirmatively and then, when asked to supply a verbal answer, by stating yes. There was no evidence that Petitioner was incapable of comprehending her rights, and only her self-serving

testimony suggested that she did not understand them when they were recited by Saldate. Petitioner was 25 years old at the time of the interrogation. She was employed at an insurance agency. In high school she achieved a 3.9 GPA. She had had prior encounters with the police and the court system.

(3) Petitioner did not invoke her right to counsel or her right to remain silent. There is no contention that she invoked her right to remain silent. As described below, the Court's determination that Petitioner did not invoke her right to an attorney is based on the Court's assessment of the relative credibility of Petitioner and Saldate and their versions of the interrogation.

(4) The circumstances of the subsequent interrogation support a finding that Petitioner waived her *Miranda* rights. Petitioner chose not to have the interrogation recorded. She exhibited no unwillingness to answer questions or provide information. She did not remain silent or ask to terminate the interview. Instead, Petitioner spoke freely about a range of topics, seeking to explain and justify her actions. According to her own testimony, which was consistent with Saldate's, Petitioner dominated the conversation with her attempts to explain and defend herself.

(5) Petitioner's testimony at the evidentiary hearing before this Court was inconsistent and self-serving. She stated that Saldate "badgered" her and was "in her face" throughout the 30-minute interrogation. However, she acknowledged that she did most of the talking during the interrogation, providing Saldate with a variety of information and confiding details about her personal life and background. During the period when Saldate was allegedly badgering Petitioner and in her face, he was listening to her story and taking notes.

At the conclusion of the interrogation, while being transported from Florence to Phoenix, Petitioner asked Saldate to call her father to see if he would get her a lawyer. This is not consistent with her testimony that because Saldate failed to honor her initial request for an attorney, she felt psychologically threatened by him and was convinced he would

ignore any further requests for counsel. Petitioner also testified that she was in shock and could not understand her *Miranda* rights, yet she was already familiar with those rights, she asked Saldate why he was reading her the rights, and, according to Petitioner, she immediately invoked her right to counsel. Petitioner's claim to have been in a state of shock during the interrogation is also inconsistent with her ability to vividly recall its details.

The Court further notes that Petitioner's demeanor on the stand did not enhance her credibility but instead emphasized the self-serving nature of her testimony. Rather than detailing her version of the facts of the interrogation, Petitioner's responses appeared rehearsed and formulated to support her legal arguments.

By contrast, the credibility of Saldate's testimony is supported by several factors. As already noted, there are many similarities in the two accounts. The key differences pertain to details of the interrogation which are incriminating or detrimental to Petitioner's claim of a *Miranda* violation. In addition, the details Saldate provided with respect to the content of the interrogation lends credibility to his testimony that Petitioner did not request an attorney. Saldate did not report that Petitioner gave a straight-forward confession of guilt as to her role in her son's murder, as he could have done if he were fabricating his account of the interrogation. Instead, he reported that Petitioner offered a series of justifications for her conduct and attempted to portray herself in a positive light. It is simply not plausible that Saldate concocted this information, particularly since much of it was corroborated by Petitioner's version of the interrogation. The credibility of this aspect of Saldate's account supports a conclusion that he also accurately reported Petitioner's failure to request an attorney.

In addition, it was Saldate's practice to note in his reports if a suspect invoked his right to remain silent or his right to an attorney. The fact that his report in this case does not contain such a notation supports his testimony that Petitioner did not ask for an attorney at the outset of the interrogation.

Finally, although this Court's credibility assessments have been made independently,

based on the record and the evidence introduced at the evidentiary hearing, the Court notes that they are consistent with those rendered by the state court which on three occasions rejected Petitioner's account of the interrogation, finding that Petitioner understood her *Miranda* rights and did not invoke her right to an attorney.

**Conclusion**

Respondents have proved by a preponderance of the evidence that Petitioner knowingly, voluntarily, and intelligently waived her *Miranda* rights during her interrogation by Detective Saldate.

**IT IS HEREBY ORDERED** denying Respondent's Motion to Preclude Consideration of Professor Richard Leo's Testimony (Dkt. 176).

**IT IS FURTHER ORDERED** that the Clerk of Court shall forward a copy of this Order to the Ninth Circuit Court of Appeals forthwith.

Dated this 29th day of January , 2010 .


Robert C. Broomfield
Senior United States District Judge